IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 1:21-CR-380-CKK |
| ) | |
| BRIAN JEFFREY RAYMOND, ) | |
| ) | |
| Defendant ) | |

**OPPOSITION TO DEFENDANT'S MOTION TO COMPEL DISCOVERY**

Comes now the United States of America, by and through the undersigned attorneys, and hereby files its Opposition to Defendant's Motion to Compel Identity of Victims. As set forth below, the Government does not have a duty to disclose the identity of the victims, nor is the defendant entitled to any such information without articulating a compelling need. Furthermore, throughout the pendency of this case, the victims, who have a statutory right to privacy, have expressed significant fear and anxiety about the defendant obtaining their names and contact information. Accordingly, the government respectfully requests that the Court deny the defendant's motion.

**FACTUAL BACKGROUND**

The investigation into the defendant began on May 31, 2020, when a nude woman (Adult Victim 1, or AV-1) was seen on the defendant's balcony, screaming for help and for the police.[1] Witnesses described AV-1 as "hysterical" and noted that she had difficulty walking and needed assistance with getting dressed. AV-1's mother was contacted and met her daughter at the scene, finding that AV-1 was disoriented. AV-1 told her mother that "he abused me" and that she felt

---

[1] The defendant was living in Mexico City at the time, and he resided in embassy-leased housing.

1

she had been raped but could not remember.[2]  AV-1 was taken to a medical facility for a sexual assault examination, where the doctor noted the presence of several injuries, including a vaginal injury consistent with friction, an anal laceration compatible with the introduction of a hard object with blunt edges, generalized redness throughout her perianal area, bruises on her forearm, elbow, and knee, and a laceration on the inside of her cheek.  AV-1 has no memory of sexual intercourse with the defendant, nor does she recall screaming from the balcony.  She only has fragments of memory thereafter, to include seeing the defendant laughing while law enforcement was on the scene.

AV-1 first connected with the defendant on Tinder, a dating application.  They decided to meet in an outdoor shopping center at approximately 2 p.m. on May 31, 2020.  The defendant brought a backpack containing travel mugs and wine, which he poured while crouched behind a trashcan.  AV-1 thinks the defendant served her sparking rosé wine, but she is not certain because the travel mug was dark inside, making it difficult to see what she was drinking.  After approximately two glasses of wine, the defendant and AV-1 walked to his apartment.  Once in the apartment, the defendant served AV-1 another glass of wine as well as some meat, cheese, and chocolates.  Shortly after consuming some of the wine and snacks provided by the defendant, AV-1 suddenly blacked out and has no memory of the hours that followed.

Throughout their date, AV-1 had been sending her friend updates via text message, to include her location information at the defendant's apartment and a photograph of the snacks he served, which she sent at approximately 4:13 p.m.  AV-1's text messages to her friend then went silent for a period of three hours, during which her friend sent several messages asking AV-1 if she was okay.  At approximately 7:11 p.m., AV-1 sent her friend a message containing

---

[2] The defendant admitted to having sexual intercourse with AV-1 but claimed it was consensual.

2

incoherent letters.  AV-1 has no memory of sending that message.  During the medical examination later that night, AV-1 told the doctor that one of her last memories before blacking out was that she needed to send her friend a message to tell her she was not feeling well, and that the defendant was trying to kiss her.  AV-1 has no recollection of sharing these facts with the doctor.

The defendant admitted to having sexual intercourse with AV-1 but stated that shortly after they began, she jumped up, ran to the balcony, and started screaming.  He suggested that perhaps AV-1 experienced a flashback to a prior traumatic incident.  Following this interview, embassy personnel left the defendant alone in his apartment for several hours, until the next morning when he left Mexico and returned to the United States.  Prior to leaving the defendant alone, there had been no search of the premises.

The government's subsequent investigation, to include the seizure of numerous devices belonging to the defendant, revealed that the defendant had created hundreds of photographs and videos dating back to 2006, depicting unconscious and nude or partially nude women.  The most recent photos and videos, depicting AV-7, were taken on May 30-31, 2020, just hours before the defendant sexually assaulted AV-1.  Some of the women can be heard snoring, and notably AV-5 appears to be struggling to breathe.  The photos and videos commonly focus on victims' faces, breasts, and genitals.  The defendant posed their bodies and manipulated their limbs.  The defendant also used his thumb to lift some of his victims' eyelids and hold them open.  Upon doing so, the victims' eyeballs do not move, and the victims do not flinch, move, or respond in any way.  These victims are fully unconscious and not merely asleep, and the defendant acts with the confidence of an experienced predator with no apparent concern that his victims might awake.  In several of the videos, the defendant's hand can be seen opening his victims' mouths

and inserting his fingers. Again, the victims do not respond. In some of the photos and videos, the defendant's nude, erect penis can be seen on the edge of the screen or frame. In at least one of the videos, the defendant is seen lying in bed with AV-9's nude body, with her limp legs dragged over his own and his erect penis visible. In another photograph, the defendant can be seen straddling an unconscious AV-7 with his erect penis pointed directly at her nude genitals.

In his guilty plea, the defendant admitted to having sexual intercourse with AV-7 and with AV-9, knowing that each of them was incapable of appraising the nature of the conduct. AV-7 met the defendant on the dating application Bumble and learned that he worked for the U.S. Embassy in Mexico. When he invited her on a date, his employment made her feel that it was safe to accept his offer. On the evening of May 30, 2020, AV-7 met the defendant at his apartment, and he mentioned that the U.S. Embassy paid for his housitng, making her feel even more comfortable being there. He served her ham, cheese, and strawberries and poured her a shot of tequila. She took a sip but did not like it, so defendant made her a drink with gin and sparkling water. AV-7 had two gin drinks before the two decided to share a dance in the defendant's living room. AV-7 recalls that they were both fine, and she was not feeling the effects of the alcohol. They sat back down, and the defendant served her a glass of champagne. Shortly after drinking some of the champagne, AV-7 and the defendant stood to dance a second time, but AV-7 felt nauseous and dizzy and was perplexed to see that her shoes were off. She ran to the bathroom where she vomited into the sink so violently that she could no longer stand. AV-7's last full memory of that night was of the defendant helping her out of the bathroom. AV-7 had one additional flash of memory in which she recalls being face down on a bed with the defendant touching her, possibly on her breast, and he may have been on top of her.

The following morning, AV-7 awoke in the defendant's bed to find they were both naked. She recalled vomiting the night before and immediately went to clean the sink. She was feeling guilty and embarrassed. She also felt sick, and physically her body felt as though she had sexual intercourse. The defendant later discussed having sex with AV-7 with a friend via text message on May 31, 2020. AV-7 is also included on what appears to be a list of sexual partners maintained by the defendant. In the morning, the defendant showed care and concern for her, bringing her water and telling her it was okay that she threw up. Because the defendant was being so kind to her, she assumed he had done nothing wrong. She blamed herself for possibly ruining her chances at a relationship with him. When asked by law enforcement about her sudden vomiting and memory loss, AV-7 reported that it was highly unusual and that she can typically drink much more and feel fine. She has only blacked out one other time, when she and a friend believed they were drugged at a club. While AV-7 was unconscious, the defendant took 77 photographs and four videos of her over the course of two hours and thirty-two minutes.

AV-7 has expressed that the defendant destroyed her life. She feels like "garbage" and does not feel safe. She has trouble sleeping and experiences nightmares. She was so distracted after learning what the defendant had done to her that she was fired from her job.

AV-9 connected with the defendant on Bumble and first met him in person at a café on March 25, 2020. The defendant talked about working at the U.S. Embassy in Mexico, and AV-9 felt safe with him because she believed if someone represented the United States government overseas, that person should have integrity and not present any danger to her. The defendant invited AV-9 to his apartment later that evening, and when she arrived, he served her fruit and cheese. They shared a bottle of red wine, and the defendant then served her a glass of white wine. The defendant then suggested that AV-9 should sample or taste-test different tequilas.

The defendant served AV-9 five shots of tequila, and she sipped from or tasted each one. Shortly thereafter, AV-9 began experiencing memory loss. She recalls that she and the defendant kissed in his kitchen, and she remembers walking down a hallway. Her memory then went blank, and she next recalls waking up naked in the defendant's bed. She had no memory of her clothing being removed or engaging in sexual intercourse, but her body physically felt as though she had sex. The defendant later told a friend that the night was a "success," a word he sometimes used to indicate that a date had resulted in sex. AV-9 is also included on what appears to be a list of sexual partners maintained by the defendant. For over an hour, while AV-9 was unconscious, the defendant took 20 photographs and 15 videos of her.

AV-9 has expressed that she suffers from nightmares in which she sees the defendant. Since learning of the photos and videos the defendant took of her, AV-9 has been experiencing depression and she lost her job approximately two months later. She has also been unable to trust in relationships and has isolated herself from others.

The government has interviewed over 30 victims and potential victims and has recovered photos and/or videos of 25 of them.[3] Based upon their individual accounts, the defendant's actions and patterns were well-honed over the course of fourteen years, resulting in strikingly similar experiences for his victims. Without detailing each victim or potential victim's recollection here, which the government will do at the evidentiary and sentencing hearings, there are notable similarities in their experiences with the defendant. These facts are included herein because they speak to the calculated, manipulative, and predatory nature of the defendant's crimes and the reasons why the victims are so fearful of him.

---

[3] Potential victims are referred to by their initials.

The defendant met most of his victims on dating websites or dating applications. In his initial or early interactions with his victims overseas, the defendant regularly shared that he worked for the U.S. Embassy in their countries and that his housing was provided by the U.S. Government. This includes AV-1, AV-3, AV-5, AV-7, AV-8, AV-9, AV-10, AV-12, AV-19, AV-24, and M.J.L. This made many of them feel safe with him, as they reasoned that he was representing the United States in an important position of trust.

The defendant often served the victims the same or similar types of food and drinks. For example, several of the victims recall being served sparkling wine shortly before their memory lapses began. The defendant encouraged other victims to participate in a taste-test of several different types of tequila or other types of liquor. The defendant often brought his own alcohol to dates outside of his residence, sometimes in marked wine or liquor bottles and sometimes in unlabeled plastic water bottles. Plastic water bottles containing liquor were also recovered from the defendant's belongings following his arrest. Some of the women noted that the defendant would take the empty or almost empty bottles with him when he left their homes, once even taking bottles out of the trash and placing them in his backpack.

Some of the victims recall vomiting after consuming drinks served by the defendant, which was unusual for them. This includes AV-5, AV-7, AV-8, AV-10, AV-14, AV-16, AV-18, AV-24, AV-26, M.R., and M.A. Some of his victims experienced sudden memory loss on at least one occasion during their time with the defendant. This includes AV-1, AV-3, AV-4, AV-7, AV-8, AV-9, AV-13, AV-17, AV-24, AV-28, M.R., and M.J.L. For example, AV-4 reported that she and the defendant were each having a glass of wine on her apartment balcony. The defendant went inside to retrieve the open wine bottle and returned to refill her glass. AV-4 noticed that the flavor profile of the wine had changed. She took several sips, trying to identify

the different taste.  Approximately ten minutes later, AV-4 started to feel woozy and abruptly collapsed onto her knees, unable to stand.  Her memory ended suddenly with the defendant helping her into her bed.  Other victims experienced partial memory loss with the defendant, describing memory fragments, flashes, or snapshots, and some experienced full memory loss but have not specified whether it came on suddenly or more gradually.  These include AV-2, AV-5, AV-6, AV-10, AV-14, AV-15, AV-16, AV-18, AV-19, AV-22 AV-25, AV-26, M.A., S.J., F.C., D.O., and A.B.P.  Taking these two groups together, at least 29 women have reported experiencing memory loss after consuming beverages provided by the defendant.[4]  Most of the women interviewed identified themselves as experienced drinkers and expressed that the amount of alcohol they consumed with the defendant should not have rendered them unconscious or caused them to experience memory loss.  For many of them, their first and only black-out occurred with the defendant, while a few had experienced just one prior memory lapse while drinking.  This includes AV-1, AV-2, AV-3, AV-4, AV-7, AV-9, AV-14, AV-15, AV-16, AV-17, AV-18, AV-28, M.R., B.G., and S.J.[5]  Several women noted that the defendant did not drink very much with them or did not appear intoxicated.

The defendant engaged in sexual intercourse with some of these women when they were incapable of consent.  Some have no memory of the defendant having sex with them but awoke naked with signs that intercourse had occurred, such as physical sensations, used condoms, or in one instance a wet spot on the bed presumed to be ejaculate.  A few have memory fragments of the defendant on top of them.  The defendant kept what appears to be list of women with whom

---

[4] Three of the victims depicted in the photos and videos have not yet been interviewed.

[5] Some women were not asked this question or some of the other questions referenced herein, so these lists may not be exhaustive.

he had sex in an email he sent to himself labeled "Mortgage and Interest Expenses."  The email seems to contain only a partial list, beginning with #61 in 2016 and ending with #143 in 2020, with the last entry occurring shortly before his arrest.  The list contains the names and nationalities of the women, whether they had fake breasts, and a month/year.  There are additional, unenumerated names listed by the years 2014 and 2015.  Several of the victims are included on this list, some of whom have no memory of engaging in sexual intercourse with the defendant.  Additionally, from time to time, the defendant would tell friends about engaging in sexual intercourse with certain women, some of whom did not know that sex had occurred, to include AV-7 and AV-9.  The women who on at least one occasion did not recall that the defendant had sex with them but either appear on the list or experienced physical signs of intercourse include AV-1, AV-2, AV-3, AV-5, AV-7, AV-9, AV-13, AV-14, AV-15, and M.R.  Other women reported that on at least one occasion, they had only partial memories of sex with the defendant, to include brief flashes, fragments, or snapshots.  Some of the women noticed unexplained injuries after their time with him, ranging from small scratches and bruises to an anal laceration.

   Most of the victims were unaware that the defendant had removed their clothing, photographed their nude bodies, touched them, and/or had sexual intercourse with them.  Some of them suspected something had occurred, based upon a physical feeling that they had been vaginally penetrated or unexplained bruises and scratches.  However, they trusted the defendant so deeply, they believed him when he assured them that nothing happened or that they had initiated, or consented to, the sexual intercourse.  Many of them also blamed themselves for possibly drinking too much, even though their blackouts could not be explained by the amount of alcohol they consumed.  For the victims, the process of learning they had been victimized in this

way has been traumatic. The defendant exerted complete control over their nude bodies while they were unconscious, sometimes for hours at a time. Viewing their own photos and videos has been an emotional and upsetting experience for many of them. Some were sexually abused and penetrated by the defendant without their knowledge or consent. For many of the victims, their complete lack of memory continues to cause them great distress—they will never know exactly what the defendant did to them. They are struggling to cope. Some of them have lost their jobs. Many of them experience nightmares, sometimes featuring either the defendant or their own lifeless bodies. Many continue to struggle with anxiety. Some have lost relationships, as they have been rendered unable to trust or experience intimacy with another person. The defendant's actions have significantly impacted their lives.

In addition to the substantial, wide-ranging, and long-standing criminal conduct described above, the defendant has also engaged in obstructive acts in relation to this case and shown a willingness to interfere in the legal process. As part of his guilty plea, the defendant admitted to deleting and attempting to relocate some of the obscene materials he created of his victims. He also admitted that he lied to law enforcement regarding his use of dating applications such as Tinder and that he deleted the dating application Bumble from his phone after speaking with them.

In July 2021, the defendant pleaded guilty to sexual abuse of AV-7, in violation of 18 U.S.C. § 2242(2), sexual abuse of AV-9, in violation of 18 U.S.C. § 2242(2), and transportation of obscene material, in violation of 18 U.S.C. § 1462.[6] In his plea agreement, the defendant agreed that AV-1 through AV-26 are all victims of the offense and entitled to the same rights as victims so designated under the Crime Victims' Rights Act ("CVRA"). 18 U.S.C. § 3771. The

---

[6] In a notice filed on April 12, 2022, the defendant indicated that he plans to file a motion to withdraw his plea.

defendant was scheduled to be sentenced in February 2022, but a defense attorney conflict issue caused that date to be vacated. The defendant is now scheduled to be sentenced in November 2022, following an evidentiary hearing focused on whether the defendant had a large number of vulnerable victims and whether he rendered his victims unconscious.

## ARGUMENT

On March 30, 2022, counsel for the defendant filed a motion to compel the identity of the victims and their contact information. The government is not required to disclose this information, and such information is not material to the defendant's preparation for the evidentiary and sentencing hearings. Furthermore, the defendant's motion fails to recognize that the government has already provided the reports of investigation ("ROIs") in this case, and continues to do so, providing a roadmap as to what the victims will testify to at the evidentiary hearing. Finally, the victims have expressed on multiple occasions that they are scared by the thought of the defendant knowing their names and locations and do not want their information shared. Based upon the foregoing, the government requests that the defendant's motion be denied.

**A. The government is under no obligation to disclose the names of the victims, nor is the defendant entitled to such information.**

The defendant contends that certain information—specifically, the names and contact information of his victims—is material to the preparation of his defense, and therefore the government is required to produce that information. But this argument overlooks the crucial fact that, irrespective of whether the defendant makes a conclusory statement that such information is important to the preparation of his defense, the government is not required to provide it.

Except as permitted by certain of its subparts that are irrelevant to the instant motion, Rule 16 of the Federal Rules of Criminal Procedure

11

> does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by . . . [a] government agent in connection with investigating or prosecuting the case. Nor does this rule authorize the discovery or inspection of statements made by prospective government witnesses except as provided in 18 U.S.C. §3500.

Fed. R. Crim. P. 16(a)(2). Under Rule 16, the government is under no obligation to provide the victim's identity or unredacted ROIs, unless prompt disclosure is mandated by *Brady v. Maryland*, 373 U.S. 83 (1963) or *Giglio v. United States*, 405 U.S. 150 (1972). S*ee United States v. Bagley*, 473 U.S. 667, 675, n.7 (1985) (holding that the discovery rules established by *Brady* do not create a broad constitutional requirement of discovery).

Furthermore, the Rule 16 requirement that the prosecution provide all exculpatory evidence to the accused does not create an entitlement for the defendant to receive, before the evidentiary and sentencing hearings (or more traditionally before trial), the names of witnesses who will testify against the defendant. "It does not follow from the prohibition against concealing evidence favorable to the accused that the prosecution must reveal before trial the names of all witnesses who will testify unfavorably." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) (rejecting the argument that the Constitution requires the prosecution to reveal the names of witnesses and finding that withholding the identity of a government informer up until the time at which he testified did not implicate *Brady* or violate Due Process). In fact, in 1975 Congress specifically rejected a proposed revision of Rule 16 that would require the pretrial disclosure of prosecution and defense witnesses. *See* H.R. Conf. Rep. No. 94-414, at 12 (1975), reprinted in 1975 U.S.C.C.A.N. 713, 716 (citing the discouragement of witnesses and improper attempts to influence their testimony as "paramount concerns"); *see also United States v. Ruiz,* 536 U.S. 622, 631-32 (2002) (noting that witness disclosure requirements have been carefully tailored in recognition of concerns for witness intimidation, citing 18 U.S.C. § 3500 (government witness

statements ordinarily subject to discovery only after testimony is given), Rule 16 (embodying limitations set forth in 18 U.S.C. § 3500), 18 U.S.C. § 3432 (requiring witness lists to be provided three days before a capital trial, with exceptions), and the aforementioned opposition to the proposed revision to Rule 16).  Put simply, nothing in the Federal Rules of Criminal Procedure, Title 18 of the United States Code, or Supreme Court jurisprudence requires the government to provide witness names or creates an entitlement for the defendant to receive them.

The law in this Circuit similarly rejects the defendant's argument that he is entitled to the victims' names and contact information.  *United States v. Bolden*, 514 F.2d 1301, 1312 (D.C. Cir. 1975) (holding that the D.C. Circuit "has long recognized that the government need not disclose its witness list before trial except in capital cases"); *United States v. Martinez*, 764 F. Supp. 2d 166, 169 (D.D.C. 2011) (affirming that defense has no right to disclosure of witnesses in advance of trial).  The government must disclose Brady and Giglio information, but that obligation does not extend to the names of inculpatory witnesses.  *United States v. Ford,* No. 15-0025 (PLF), 2016 WL 482871, at *4 (D.D.C. Feb. 4, 2016) (citing *Weatherford*, 429 U.S. at 559); *United States v. Pray*, 764 F. Supp. 2d 184, 189–90 (D.D.C. 2011) (finding that while exculpatory material must be given to defense with enough time to make use of it at trial, the actual names of victims were not exculpatory).  In some instances, the court may require the government to share its witness list prior to trial, but there is no prescribed deadline in this Circuit.  *See United States v. Edelin*, 128 F. Supp. 2d 23, 31 (D.D.C. 2001) ("[w]ithholding the names of potential witnesses until several days before those witnesses testify is not a violation of a criminal defendant's constitutional rights.").

The *only* instance where the prosecution is required to disclose its witness list in advance of trial is in a capital case or a treason prosecution, in which the government must provide the

names of its witnesses three days before trial. *See* 18 U.S.C. § 3432 (including an exception if the court finds by a preponderance of the evidence that providing the list would jeopardize the safety of any person). The existence of this statute draws a clear distinction between capital/treason cases and all other criminal prosecutions such as this.

### B. The defendant has failed to establish that he has a compelling need for the identities of the victims.

The defendant's motion to compel argues that identities of the victims are necessary to the preparation of his defense at sentencing, but he does not specify how or why beyond a generalized desire to investigate the victims' credibility and reliability. To succeed on a motion to compel witness information, the defendant must show that he has a "compelling need" for such information. *United States v. Hsin-Yung*, 97 F. Supp. 2d 24, 35 (D.D.C. 2000). Making a conclusory statement that witness information is necessary to prepare a defense is not sufficient. *See United States v. Madeoy,* 652 F. Supp. 371, 375 (D.D.C. 1987) (citing *United States v. Anderson,* 481 F.2d 685, 693 (4th Cir. 1973); *see also, e.g., United State v. Cannone,* 528 F.2d 296, 301-302 (holding that the district court abused its discretion by ordering the government to disclose the identities of its witnesses where the defendant made only an "abstract, conclusory claim that such disclosure was necessary to its proper preparation for trial"). Cases involving the identities of informants are instructive as well, where courts have consistently held that defendants have a "heavy burden" to establish that the person's identity is necessary to prepare a defense. *See, e.g., United States v. Mangum,* 100 F.3d 164, 172 (D.C. Cir. 1996) ("Mere speculation that informer might possibly be of some assistance is not sufficient to meet [defendant's] burden."); *United States v. Warren,* 42 F.3d 647 (D.C. Cir. 1994) (finding that speculation alone is insufficient); *United States v. Edelin*, 128 F. Supp. 2d 23, 34 (D.D.C. 2001) (holding that mere speculation that the witness may have helpful information is not enough to

14

meet the defendant's burden); *United States v. Morrow*, No. CRIM.A. 04-355CKK, 2005 WL 3163806, at *5 (D.D.C. Apr. 13, 2005) ("Defendants have failed to meet their "heavy burden," as they have not offered anything other than mere speculation that the informer(s) might possible be of some assistance; this failure is fatal to their arguments for disclosure.").

Here, the defendant has failed to provide specific information as to why he has a "compelling need" for the identities of the victims. Rather, he has merely stated that he wants to conduct an investigation into the reliability and credibility of the victims. The defendant is entitled to no such thing, as the Supreme Court has found that the Constitution does not require the disclosure of the names of witnesses to enable the defendant to engage in a pretrial impeachment investigation, such as running a background check on the victim for purposes of cross-examination. *See Weatherford*, 429 U.S. at 559-60; *see also United States v, White,* 116 F.3d 903, 918 (D.C. Cir. 1997) ("The constitutional right to cross examination has never been held to encompass a right to pretrial disclosure of prosecution witnesses.").[7] The defendant has been provided extensive victim statements that provide a roadmap as to what they will testify to at the evidentiary hearing, allowing counsel the opportunity to prepare, well in advance of the evidentiary hearing, to test the veracity of their statements during cross examination.

The only other reason the defendant provided in support of his request is that such information is needed "to potentially bring forward the many complainants or other witnesses who directly contravene the government's theory." DE 103 at 3. The government is unclear how the victims' identities relate to this endeavor. If the defendant knows of individuals who,

---

[7] The government has disclosed, and will continue to disclose, any exculpatory and/or impeachment information in its possession, pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972).

based upon his personal experience with them, directly contravene the government's theory, he can provide that information to counsel.

## C. The victims are opposed to the disclosure of their identities, and doing so at this stage would cause them significant distress, violate their right to privacy and reasonable protection, and discourage them from testifying.

The victims in this case have the right to be reasonably protected from the accused as well as the right "to be treated with fairness and with respect for the victim's dignity and privacy." 18 U.S.C. § 3771. Disclosure of the victims' identities to facilitate the defendant's speculative investigation flies in the face of their enumerated rights as the victims of the defendant's criminal conduct. Additionally, most of the victims in this case have experienced, and continue to experience, significant trauma, depression, anxiety, and other negative impacts to their daily lives because of the defendant's actions. Receiving unsolicited contact from the defendant's representatives or knowing that the defendant now has access to their identities and contact information would almost certainly be detrimental to their mental health and ability to function and could discourage them from testifying or making an impact statement at sentencing. Potential harm to the victims is an imperative consideration, especially when weighed against the defendant's failure to cite a compelling need for their information. *See United States v. Pray*, 764 F. Supp. 2d 184, 190 (D.D.C. 2011) ("Protecting witnesses from harm is the norm, not the exception.").

Furthermore, a defendant's willingness to interfere with the judicial process also weighs against disclosure, especially this far in advance of the evidentiary and sentencing hearings. *See United States v. Edelin*, 128 F. Supp. 2d 23, 28 (D.D.C. 2001) (noting that a willingness to interfere with the judicial process is a "crucial" element for determining what information should be disclosed and when). The defendant has already admitted to committing multiple acts of

obstruction during the investigation. The potential for interference in the judicial process weighs against disclosure of the victims' identities and contact information.

Finally, as a group, the victims are vehemently opposed to the disclosure of their names and contact information.[8] Throughout the pendency of this investigation and prosecution, which has been going on for almost two years, the victims have consistently expressed that they are concerned about their privacy and what the defendant might do if given access to their information. They recognize how adept he was at targeting them, gaining their trust, manipulating them, and convincing them that nothing was wrong. Many of them have expressed that they are afraid of him based upon his employment, either because they knew he worked for the Central Intelligence Agency for many years or because they knew him to be a high-ranking and powerful government official representing the United States abroad, with foreign contacts in their respective countries. They are fearful of his ability to retaliate against them for their cooperation in this case, and the foreign victims acknowledge that the government has little control or ability to protect them overseas. Despite this fear, they have agreed to cooperate in this case. However, because of their significant concerns, many of them have asked to testify and/or give their victim impact statements using their victim number or initials on the public record, a request that the government will consider filing closer in time to the evidentiary and sentencing hearings.[9]

The victims' statutory rights to privacy and to reasonable protection from the accused and their opposition to the disclosure of their identities and contact information, as well as

---

[8] To the extent that in our discussions with the victims any of them indicate otherwise, the government will inform the Court.

[9] At this stage, the government has not yet made any final decisions as to which victims will testify at the evidentiary hearing. Those that do not testify will likely choose to make a victim impact statement at sentencing.

17

defendant's demonstrated willingness to interfere with the judicial process, all weigh heavily against granting the defendant's motion.

## CONCLUSION

The government has no obligation to disclose the names and contact information of its witnesses, and the defendant has no constitutional right to the same. The defendant has failed to show a compelling need for such information and has readily admitted that the purpose of his request is to conduct a fishing expedition for impeachment material to use in cross examination, to which he also not entitled. The victims fear the defendant, and they are struggling emotionally, mentally, socially, and professionally with what he did to them. As such, they are opposed to their information being disclosed, and their right to privacy and reasonable protection is a crucial consideration. Accordingly, the government requests that this Court deny the defendant's motion to compel the victims' identities and contact information.

Respectfully submitted this 14th day of April, 2022.

| | |
|---|---|
| KENNETH A. POLITE, JR.<br>Assistant Attorney General | MATTHEW M. GRAVES<br>United States Attorney |
| By:       /s/      <br>Jamie B. Perry<br>MD Bar No: 1012160031<br>Danielle L. Hickman<br>CA Bar No: 193766<br>Trial Attorneys<br>U.S. Dept. of Justice, Criminal Division<br>Human Rights and Special Prosecutions<br>1301 New York Avenue, Northwest<br>Washington, D.C. 20530<br>(202) 307-3262<br>Jamie.Perry@usdoj.gov<br>Danielle.Hickman@usdoj.gov | By:       /s/      <br>Angela N. Buckner<br>DC Bar #1022880<br>Assistant United States Attorney<br>United States Attorney's Office<br>555 4th Street, N.W.<br>Washington, D.C. 20530<br>(202) 252-2656<br>Angela.Buckner@usdoj.gov |

## CERTIFICATE OF SERVICE

    I hereby certify that I have caused an electronic copy of the Opposition to Defendant's Motion to Compel Discovery to be served via ECF upon counsel for Defendant Brian Jeffrey Raymond.


By:           /s/          
Jamie B. Perry, Trial Attorney
U.S. Department of Justice
Human Rights and Special Prosecutions
1301 New York Avenue, Northwest
Washington, D.C. 20530
(202) 307-3262
Jamie.Perry@usdoj.gov