**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,      :
      :
      :
    v.      :
      :
BRIAN JEFFREY RAYMOND      :      Criminal No. 1:21-cr-00380-CKK
      :
    Defendant.      :
      :
      :
      :
      :

## <u>DEFENDANT'S MOTION TO WITHDRAW GUILTY PLEA</u>

Defendant Brian Jeffrey Raymond submits this Motion to Withdraw Guilty Plea, and

states as follows:

**I.    INTRODUCTION.**

Mr. Raymond moves to withdraw his plea in this case for two independent reasons:  (1)

his plea was constitutionally defective; and (2) he is innocent of the Sexual Abuse charges to

which he pled guilty.

First, Mr. Raymond's plea is infected with ineffective assistance of counsel, and therefore

it is constitutionally defective.  As explained in detail below, federal agents seized Mr.

Raymond's iPhone XR on June 6, 2020 at a sandwich shop.  The photos obtained on that phone

are, and/or led directly to, every piece of important evidence the government has.  But in

presenting their warrant to Mr. Raymond, the agents asked Mr. Raymond for his phone passcode,

and he declined, invoking his right to silence *several* times, including by stating: "I can't do that

until I talk with my lawyer."  Although the warrant authorized the agents to gain access to the

phone using biometrics (face/finger), the agents failed to do so.  The agents gave Mr. Raymond a

1

property receipt, announced the conclusion of the warrant execution, and left, while Mr.

Raymond returned to his hotel.  Under *In re Search of* [Redacted], 317 F. Supp. 3d 523, 533 (D.

D.C. 2018), which specifies that compelling biometrics to gain access to phones must be done

"with dispatch and in the immediate vicinity" of the seizure, as well as other substantial

authority, this was the end of any lawful action the agents could or did take on the warrant.  The

problem for the agents was that, given the passcode settings on Mr. Raymond's phone, it would

have been impossible for them to access Mr. Raymond's phone without violating his

constitutional rights.

When confronted with their failures, the agents called current government counsel, Jamie

Perry ("Perry"), who directed the agents to locate Mr. Raymond at his hotel, and re-execute the

warrant by compelling biometrics.  The agents then teamed up with two more agents and a

uniformed and armed local officer, rused Mr. Raymond to come to his hotel lobby, and not only

sought to re-execute the now dead warrant, but also sought to have Mr. Raymond undertake the

testimonial act of entering his PIN code in violation of his already-invoked right-to-silence.

Although Mr. Raymond did open the phone for the agents, when they asked for his passcode so

they could change the PIN and have permanent access, Mr. Raymond again declined, citing

privacy interests.  Mr. Raymond returned to his hotel room again.

But the agents were not done, because the phones locked again.  Again the agents

contacted Perry, who instructed them to engage Mr. Raymond for *a third time*.  The agents again

had Mr. Raymond called down to the lobby.  The four agents and local officer took up their

stations around the lobby and its exits again, and this time sought not only Mr. Raymond's PIN

codes, but also his Apple passcode, allowing the agents to establish their own PIN code so that

they could access his phone freely.  None of the agents'/officer's actions on the dead warrant were lawful.

The constitutional issues presented by these facts are glaring.  Yet, when he signed and later entered his guilty plea, waiving his opportunity to redress these constitutional violations, Mr. Raymond was not advised of these issues, or the possible consequences they raise. All three interactions with agents were recorded by audio and/or video, and the agents prepared notes of their actions and calls with government counsel.  In total, after Mr. Raymond said he wanted to talk with a lawyer, the agents requested Mr. Raymond's PIN codes/passwords, or suggested Mr. Raymond should give them access to his phones, a total of 27 times.  Prior to Mr. Raymond's plea, his counsel had not reviewed these materials or spotted these issues.  Counsel for Mr. Raymond also had not interviewed Mr. Raymond regarding the manner in which the agents executed the warrant.  Counsel for Mr. Raymond had not brought these issues to the government's attention, nor had the government brought them to counsel's attention despite clearly being aware of the issues.  Counsel for Mr. Raymond had not sought to leverage these issues in plea negotiations, had not researched relevant legal authorities including Judge Harvey's decision on use of biometrics, had not offered Mr. Raymond the option of a motion to suppress, and had not discussed with him the likelihood of success of such motion.  Mr. Raymond was fully unaware of these issues and his options, and when he entered his guilty plea he was unaware that he was waiving his right to bring constitutional claims arising from the agents' and Perry's actions.  Had counsel been aware of these issues prior to Mr. Raymond entering his guilty plea, and made Mr. Raymond aware of these issues, he asserts without equivocation that he would not have chosen to plead guilty, and one of his attorneys from the time of the plea, Mr. Marston, has affirmatively stated that, had he been aware of the suppression

issue, he would have recommended against pleading guilty, and instead would have recommended going to trial.

The second basis for withdrawal is that Mr. Raymond is innocent of Counts 1 and 2 of the Superseding Information, which relate to allegations of violating 18 U.S.C. § 2242(2) with respect to two individuals, Complainant #7 and Complainant #9.  Mr. Raymond asserts that he has never knowingly had non-consensual sex with anyone in his life.  During the plea hearing, he stated that from what he understood about the government's evidence, and based on the government's claims regarding its evidence in plea negotiations, it appeared "probable" that his conduct violated 18 U.S.C. § 2242(2), but that he had no memory of committing such violations.  But Mr. Raymond had not fully reviewed all of the government's evidence at that point.  Mr. Raymond took the plea because of indications by the government about the evidence it had and the indictment it intended to seek, as well as concerns related to the appearance of the illegally seized photographic evidence (even though none of that evidence depicts Sexual Abuse under 18 U.S.C. § 2242(2)).  After more completely reviewing the evidence and discovery, Mr. Raymond now offers significant evidence to negate guilt, as detailed further below.

For these reasons, and such other reasons explained below, in subsequent filings, and at a hearing on this Motion, Mr. Raymond moves the Court to grant withdrawal of his guilty plea.

II.     **PROCEDURAL AND FACTUAL BACKGROUND.**

A.      **The Government's Initial Investigation and Illegal Search and Seizure Directed by Current Government Counsel.**

According to sworn statements by Special Agent Mikel Gajkowski ("Gajkowski") of the U.S. Department of State ("DOS"),[1] the government's investigation in this matter began as follows:  As of May 31, 2020, Mr. Raymond was working for the United States Central Intelligence Agency ("CIA"), and resided at a U.S. government-leased property in Mexico City. On that date, at approximately 6:00 p.m., Mexican police responded to Mr. Raymond's residence, where they found a woman (hereafter referred to as "Complainant #1") who was on a balcony, naked and "hysterical" (a word used by Agent Gajkowski, see Gajkowski Affidavit at 8).  A witness at the scene said that Complainant #1 "initially refused to be touched and later made the statements: 'He raped me,' and 'He tried to rape me.'"  *Id.*

Authorities interviewed Mr. Raymond at the scene, and he indicated he met Complainant #1 online through a dating app, the two got together that day, went to his apartment, drank wine together, and had consensual intercourse.  Gajkowski Affidavit at 8-9.  Then, according to Mr. Raymond's statement, Complainant #1 suddenly ran from the room out onto the balcony, shouting "Help Me!" in Spanish.  *Id.*  On June 2, local U.S. Embassy security personnel interviewed Complainant #1, who stated that she recalled meeting Mr. Raymond on the date in question, but after sharing wine outside and inside Mr. Raymond's apartment, "she could not remember anything until she awoke in an ambulance."  Gajkowski Affidavit at 9-10.

---

[1]     *See* Affidavit In Support of an Application for a Search Warrant ("Gajkowski Affidavit"), executed June 5, 2020, attached as part of Exhibit A (along with the related Search Warrant Application and Search Warrant itself).

What was not included in Gajkowski's Affidavit, because it was not known to law enforcement at that time, was that Complainant #1 had cocaine, methamphetamine, and theophylline (a bronchial dilator asthma medication) in her system on the date in question, according to subsequent Federal Bureau of Investigation ("FBI") lab analysis performed on her urine sample. *See* FBI Laboratory Report, dated November 10, 2020, attached as Exhibit B. Notably, Complainant #1 tested *negative* for any so-called date-rape substances. *Id.* While the defense anticipates toxicology analysis regarding what can happen when a person combines these substances with excessive alcohol, a simple google search reveals that theophylline should not be mixed with "large amounts" of alcohol because it "may increase the risk of side effects" from that drug.[2] Notably, those side effects include convulsions, confusion, tremors, shaking, restlessness, nervousness, irritability, and nausea/vomiting/diarrhea.[3]

Nevertheless, based upon this incident with Complainant #1, on June 5, 2020, Gajkowski applied for a search warrant that would allow federal authorities to seize and search Mr. Raymond's cell phones. The Gajkowski Affidavit includes about two to three pages of factual

---

[2]   *See, e.g.*, https://www.mytherapyapp.com/medications/theophylline#what-are-the-most-common-side-effects-of-theophylline; https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=7a108fa0-c230-475f-be93-6f864b98a410 (indicating a "clinically significant drug interactions" between theophylline and a large intake of alcohol).

[3]   *Id.* Gajkowski and the prosecutors on this case had a call with Complainant #1 on November 11, 2020, in which they asked her about "any past drug use." *See* Memorandum of Interview, dated 11/20/20, attached as Exhibit C. Complainant #1 said that "she was proud to say she had never, in her entire life, used any illegal drug." *Id.* She "further stated that she was adamantly against drugs and that she had never even tried or sampled any illegal substances, to include marijuana." *Id.* Prosecutor Perry asked Complainant #1 if she took any over-the-counter medications or supplements, and Complainant #1 said she only takes an herbal supplement to help her sleep, and only on Mondays, Wednesdays, and Fridays. *Id.*

information, summarized above, and about 18 pages of guesswork and speculation "[b]ased upon [Gajkowski's] training and experience."  Exhibit A.

Gajkowski submitted her Affidavit and Application to United States Magistrate Judge Ivan D. Davis of the United States District Court for the Eastern District of Virginia.  Based upon Gajkowski's Affidavit, on June 5, 2020, Judge Davis authorized the search and seizure of "TWO CELLULAR TELEPHONES IN THE POSSESSION OF BRIAN RAYMOND, CURRENTLY LOCATED ON HIS PERSON OR IN HIS HOTEL ROOM."  *Id.*  The key phone at issue was Mr. Raymond's personal iPhone, model XR, which was labeled "Device 2" in the warrant materials.  *Id.*

Gajkowski's Affidavit included a section near the end called "*Manner of execution.*" Gajkowski Affidavit at 20.  In that section, Gajkowski described seeking to "ruse" Mr. Raymond into meeting "under the pretext of a brief follow-up interview, whereupon the devices would be seized in a public setting."  *Id.*  If that did not work, the agents planned to "approach RAYMOND at his current residence, the Westin Dulles Airport Hotel,"[4] and either take them from his person, or take him into his room and retrieve the devices there.  *Id.*  The Gajkowski Affidavit further asked the court to "authorize agents to press the fingers (including thumbs) of BRIAN RAYMOND to the Touch ID sensor of Device 1 and Device 2 for the purposes of attempting to unlock the devices…[or] to hold Device 1 and Device 2 up to RAYMOND'S face for the purpose of attempting to unlock the devices via Face ID."  *Id.*  Using fingers or a face to open a phone is often referred to as using "biometrics" to open a phone.  Finally, Gajkowski informed the court that DOS agents would transport the phones to headquarters where they

---

[4]     As the agents later learned, Mr. Raymond was actually staying at a different hotel.

would be kept in storage until delivery and search at the agency's Computer Forensics Laboratory in Arlington, VA.  *Id.*  The warrant ultimately approved Gajkwoski's plan, and authorized the compelled use of Mr. Raymond's biometrics to open the devices.  *See* Warrant, at "Attachment B."

The next day, Gajkowski teamed up with three other federal agents and put their "ruse" plan into action.  *See* Memorandum of Record, dated June 6, 2020, attached as Exhibit D.  And, it worked – only partially.  The agents determined that two of them, Gajkowski and Ted Nelson, would ask Mr. Raymond to meet them at a Jimmy John's near Mr. Raymond's residence/hotel for a brief follow-up interview.  *Id.*  Two other agents, Victor Karabin and David Palmer, would support the operation by sitting in car nearby where Mr. Raymond would not notice them.  *Id.* Mr. Raymond complied with their request, and talked with agents Gajkowski and Nelson for over two hours.  The agents recorded the conversation, and the prosecution had a transcript created.  *See* Audio Transcription, "Interview of Brian Raymond," dated Saturday, June 6, 2020, attached as Exhibit E.

Following a long conversation with Mr. Raymond, the agents asked Mr. Raymond if he had his two phones on him, and he showed them to the agents.  *Id.* at 177.  They asked him to "prove" that they were his phones by turning them on, which Mr. Raymond apparently did.  *Id.* at 178.  Nelson then asked if he could see the phones, and Mr. Raymond apparently handed them over.  *Id.*  Shortly thereafter, Gajkowski asked Mr. Raymond how the phones were secured, and Mr. Raymond said, "They're locked with a PIN."  *Id.* at 184.  Nelson then said, "So, Brian, listen…. DOJ issued a search warrant for both your cell phones, so we're going to take both your phones."  *Id.*  In response, Mr. Raymond said, "I can't, I can't let you do that without a lawyer present."  *Id.*  Nelson responded saying that was what the warrant was for, and that

Nelson was "not asking," he was telling.  *Id.* at 185.  Undeterred, Mr. Raymond again responded, "I can't authorize that without a lawyer."  *Id.*.  Nelson then said, "This is a criminal justice process….  I'm going to show you my badge, so you know who I am, my credentials…. Nothing good's going to come out of you resisting this."  *Id.*  The agents already had possession of Mr. Raymond's phones at that moment, and they maintained possession, at least for approximately the next two hours.

The agents then discussed giving Mr. Raymond some of the contact information stored in his phones because he expressed concern about losing that information and his immediate ability (or inability) to contact people.  *Id.* at 186-89.  At that point, the following interaction occurred:

> MR. NELSON:  I understand.  Let us get you the contacts you need.  We need your PIN numbers for these phones so we can access them.  Okay?
>
> **MR RAYMOND:  I, I have to consult a lawyer, honestly.  I can't – it's just something I have to do.**
>
> MS. GAJKOWSKI:  Okay.
>
> **MR. RAYMOND: You know, I don't know what my rights are in this situation.**
>
> MS. GAJKOWSKI:  (Inaudible.)
>
> MR. NELSON:  You're right, but we are seizing the phones.  What we need to do, though, is we need to unlock them and at least put them on airplane mode.  Okay?
>
> **MR RAYMOND:  I can't do that until I talk with my lawyer.  I just don't understand what's going on here right now.**
>
> MS. GAJKOWKSI:  So – so, what we are going to do, because I, I just want to be clear, so you're not willing to voluntarily give us your PIN.  Correct?
>
> **MR. RAYMOND:  No, not until I consult with a lawyer.**
>
> MS. GAJKOWSKI:  Okay, understood.
>
> MR. NELSON: Yeah.  Ok.

*Id.* at 189-90 (emphases added).  The agents then again said they could give Mr. Raymond contact numbers from the phones if only he gave them the PINs, but they also acknowledged that they knew that "you [Mr. Raymond] get to decide if you want to give us that passcode…. But that is your decision.  We can't coerce you to give us any PINs.  Okay?"  *Id.* at 191.  Mr. Raymond did not give them his PIN codes, and again stated, "I just don't understand what's going on."  *Id.*

After Mr. Raymond repeatedly invoked his right to silence by declining to give his codes without first talking to a lawyer, the agents began the process of concluding the seizure.  The agents showed and then handed Mr. Raymond a copy of the search warrant.  *Id.* at 192.  The agents laboriously wrote out property receipts for the phones, likely attempting to delay to see if they could get PIN codes from Mr. Raymond.  *Id.* at 192-220.  Along the way they repeatedly indicated that they could get Mr. Raymond information from the phones if only he would unlock them, which Nelson indicated was not a "trick," even though it obviously was.  *Id.*  at 198, 206.  The agents even reiterated that they wanted Mr. Raymond to tell them how to put one of the phones in airplane mode, to which Mr. Raymond responded, "I'd have to, I'd have to unlock it, honestly."  *Id.* at 203.  Gajkowski responded, "To – okay.  That's your choice."  *Id.*  Then the agents put the phones in "faraday bags," which they seemed to think might have some significance to Mr. Raymond, but it clearly did not.  *Id.* at 205.  The agents then handed Mr. Raymond the property receipts, and Gajkowski announced, "The time is 12:26, Saturday, June 6th, and this concludes our interview and search and seizure warrant execution."  *Id*. at 220.

After Mr. Raymond declined to give his passcodes, the agents falsely claimed they had some way of accessing the phones, stating: "The truth is, one way or another, we're getting into

the phones." *Id.* at 191.  But reality, as well as their subsequent actions, demonstrate that was not true.

First of all, reality: it would be impossible to access the critical phone at issue without Mr. Raymond's assistance or biometrics because it was secured with a six-digit PIN code, which means one million possible combinations.  The phone at issue was an iPhone XR, and upon information and belief, it was running a current 2020 operating system at the time of the seizure. In that circumstance, after six failed attempts to enter the PIN code, the phone would disable for one minute (meaning it would not allow even the entry of a PIN code for one minute).  After a seventh failed attempt, the phone would disable for five minutes, after an eight, for fifteen minutes, and after the ninth failed attempt, the phone would disable for one hour.  Finally, after 10 failed attempts, the phone would be permanently disabled, requiring extraordinary measures to open the phone, such as connecting to Mr. Raymond's Apple account through a computer, which would require further login and passcode information that the agents did not have, and in any event, would reset the phone to factory condition.[5]  Thus, when they left the Jimmy Johns with the phones locked/unopened, the agents had a 1 in 100,000 chance of getting into Mr. Raymond's phone using the 10 guesses available before the phone locked.

In addition, even if the agents had used biometrics to open the phone (which they failed to do), they would have needed to keep the phone active until such time as they could image (or copy) the contents.  If the phone's screen was not touched frequently (such as every 30 seconds)

---

[5]     Earlier iPhones and iPhone operating systems allowed more than 10 failed passcode attempts, but only one per hour.  Even if that was the case with Mr. Raymond's phone, with a six-digit PIN, law enforcement may have required as many as 999,990 hours to unlock this phone, which is about 41,666 days, or just over 114 years.  Even guessing the right code in the first quarter of all possibilities would take nearly 30 years.

to keep the phone open, it automatically locked again, and it could not be opened without the PIN code or Mr. Raymond's biometrics.  Furthermore, even if they had the PIN codes *and* had unlocked it with Mr. Raymond's biometrics, they would have needed to image the phones within 48 hours, because the phone would lock after 48 hours of not sensing Mr. Raymond's biometrics, even if they kept entering the PIN code.  But the agents' description of their "*Manner of execution*" clearly did not contemplate such timely action (see above).  Instead, they seized the phone on a Saturday, and planned to put the phone in storage until some later transfer to a tech lab, which would not have been within 48 hours of the seizure.[6]  *In short, given their lack of capability in the field that day, the agents only had one option to get into, and stay in, Mr. Raymond's phone, which was to pressure him into giving them PIN codes and granting them access to settings (requiring a further password) so that they could re-set the code and establish permanent access.  They undoubtedly realized this, which explains their numerous attempts to get the codes even after Mr. Raymond's clear invocation.  It also explains the reason for their subsequent illegal actions at the direction of Perry.*

Now with the phones in hand and Mr. Raymond back at his hotel, and realizing their problems, the agents called DOJ prosecutor Perry[7] to let her know they had the phones, but also that "RAYMOND declined to provide a passcode, which he identified as the means for unlocking both devices."  Exhibit D, at 1.  Perry called the agents' attention to the already-executed warrant's authorization of compelled biometrics to open the phone, and then Perry

---

[6]     Presumably this is why, on cell phone seizure warrants, federal law enforcement agents frequently bring specialized devices/laptops to image phones immediately upon seizure. But these agents failed to plan and prepare in that way.

[7]     While the agents' Memorandum of Record does not identify Perry as the prosecutor whom the agents called, she admitted it was her in a meeting with defense counsel on March 28, 2022.

"requested that the agents reengage RAYMOND to determine whether the devices could be

unlocked through such means." *Id.* Everything the agents did hereafter, as directed by Perry,

was illegal.

Approximately an hour-and-a-half after completing the seizure execution, the four agents

went to Mr. Raymond's hotel along with a uniformed and armed Town of Herndon police

officer.[8]  Nelson instructed the Herndon officer to be prepared to go hands on with Mr. Raymond

in case they needed to physically detain him in order to compel the use of Mr. Raymond's

biometrics.  The four agents and officer stationed themselves around the lobby and near its exits,

and had the front desk call Mr. Raymond down from his room without giving a reason or

identifying the agents.  When Mr. Raymond came downstairs, agent Gajkowski showed a portion

of the search warrant to Mr. Raymond.  Agent Gajkowski handed one phone to Mr. Raymond,

and he held it momentarily and appeared to type on it.  Agent Gajkowski asked, "Did you want

to give me your code?"  Mr. Raymond replied, "No, but it's open, so -- "  The agents discussed

changing the passcodes, and handed Mr. Raymond the second phone, while Gajkowski looked at

the first phone.  Mr. Raymond pulled his mask down and the agents asked him to open the

second phone.  He did so.  Gajkowski was then attempting to change the settings/passcode on

one of the phones, but noticed it required additional ID or codes.  **Gajkowksi still could not**

---

[8]     The information concerning the interactions with Mr. Raymond at the hotel comes from
Exhibit D and also the Herndon officer's body camera footage, which clearly captured
the interactions with Mr. Raymond in the hotel lobby, including most of the conversation.
This footage can be made available upon request of the Court.  In addition, agent Nelson
made a voice memo after the hotel interactions, which was then transcribed.  *See* Exhibit
F.  That memo was an attempt by Nelson to cover his tracks and make it appear as if the
interactions at the hotel were legitimate and that Mr. Raymond provided his PIN codes
and Apple account access voluntarily, but the memo conveniently focuses only on the
second hotel lobby interaction (which was the third interaction overall), not the first,
where Mr. Raymond was again asked for passcodes, and again expressly declined.

**change the settings/passcode, and she said, "So, it's up to you, if you want to enter the password, you don't have to."  Mr. Raymond said, "I don't understand, am I compelled to?"  Agent Gajkowski said, "You are not compelled to give us the code, only the thumbprint.  I want to be clear on that."  Mr. Raymond replied, "I'd rather, just for privacy – I'd rather not."  Agent Gajkowski said, "Ok, understood."**  Nelson asked Gajkwoski if she had changed the passcode now so they could access the first phone freely, and she said she is not able to change the code without Mr. Raymond's password (to his Apple account).  The agents thanked Mr. Raymond, and he left to return to his hotel room.

**Although Mr. Raymond opened both phones for the agents, the agents did not keep the phones open, and they locked again.  The agents called Perry, who again suggested that they re-engage with Mr. Raymond to try to get into the phones.  *After nearly an hour had passed, and after repeatedly declining their requests, the agents again had Mr. Raymond called down to the lobby for a third attempt to execute their warrant.***

The agents and officer resumed their posts around the lobby and guarded its doors.  Mr. Raymond appeared, and they made it abundantly clear that they were not going to go away without getting into his phones and resetting the PIN codes.  According to Nelson, he informed Mr. Raymond that if he did not give them his codes they "would continue to struggle with this over the weekend," indicating both that they desperately needed access, and that they were prepared to relentlessly pursue it.  Exhibit F, p. 2.  The Herndon officer's body camera appears to pick up after Nelson is already engaged in conversation with Mr. Raymond, but based upon information and belief, the agents did not tell Mr. Raymond in this third encounter that he was not under arrest nor that he was free to leave.  Nelson said they were trying to respect Mr.

Raymond's privacy,[9] and that they did not want to keep bothering him.  Gajkowski chimed in and said they can only get into the phones with Mr. Raymond's face or fingerprint, but they want to "get it so that" they can access the phones freely.  The agents, having spent much of the day with and around Mr. Raymond at this point, put unrelenting pressure on Mr. Raymond to give them his PIN codes, and his Apple account password, so that they could set their own code to gain free access to the phones.  They ignored Mr. Raymond's clear and repeated statements that he would not give them his codes and passwords.  Counting from the point when Mr. Raymond first said he wanted time to speak with a lawyer, through this third and final interaction when they finally overcame Mr. Raymond's will hours later, the agents directly asked or suggested that Mr. Raymond give them his passcodes and passwords **at least 27 times.[10]  This bears repeating:  *After Mr. Raymond first said he wanted to talk to a lawyer, the agents pressured him for his passcodes and passwords 27 times over the course of several hours and three separate interactions.*  With their insistence, and more than doubling their presence since Jimmy Johns, Mr. Raymond finally relented and entered his PIN code and Apple password so that the agents could reset the codes and establish permanent access to the phones.  Notably, although the agents blurted out that this was voluntary, they did not use a standard PIN code consent form to advise Mr. Raymond of his rights or memorialize his consent.

---

[9]  At this point, after hearing hours of recorded statements from Nelson, it seems fairly sensible to make a public service recommendation that anyone who interacts with Nelson in the future should assume that the opposite of everything he says is true.

[10]  *See* Exhibit G, Chart of Agent Attempts to Obtain PIN Codes and/or Passwords After Mr. Raymond First Requested to Speak With Lawyer.

**B.      The Government's Subsequent Investigation and Mr. Raymond's Arrest.**

Once the agents gained access to Mr. Raymond's phone, they and DOJ accessed his

photographs.  They observed what appeared to be photos and videos of unconscious or sleeping

women, some of which were explicit in nature.  This changed the course of the government's

investigation, and in the following months, the government sought and executed numerous

search warrants on Mr. Raymond's accounts, home, parents' home, and additional devices, each

time mentioning the incident with Complainant #1 and the subsequent search/seizure of Mr.

Raymond's phone.  Through these searches, among other things, the government obtained copies

of the photos and videos found on Mr. Raymond's phone, as well as additional photos the

government alleges Mr. Raymond attempted to delete from his phone between the incident with

Complainant #1 on May 31, 2020, and the seizure of Mr. Raymond's phone on June 6, 2020.[11]

While many (though not all) of the photographs and videos depicting unconscious women are

explicit, *none* of them depicts a "sexual act" for purposes of federal sex abuse offenses.[12]  Many

of them do not depict "sexual contact" of any kind.[13]

---

[11]      As stated in the Statement of Offense (ECF No. 68, at ¶ 4), the government found a total
of 487 photos and videos of unconscious or sleeping women in various states of undress
on Mr. Raymond's devices and iCloud account.  The vast majority of these were
originally observed on Mr. Raymond's phone taken by the agents on June 6, 2020.

[12]      As discussed further below, the two primary plea charges in this case were two counts of
Sexual Abuse under 18 U.S.C. § 2242(2), one element of which is a "sexual act."  That
term is defined in 18 U.S.C. § 2246(2)(A)—(D).  The definition relied upon by the
government in its charges and at the plea hearing was "contact between the penis and the
vulva."  18 U.S.C. § 2246(2)(A).  None of the photos depict such contact in this case.
Indeed, none of the photos depict any "sexual act" under any of the definitions of that
term found in § 2246.

[13]      The law essentially deems abusive "sexual acts" as higher in degree and deserving of
greater punishment than abusive "sexual contact."  Whereas a "sexual act" is, basically,
actual sex or oral sex, "sexual contact" is "intentional touching" of private areas "with an
intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any

As would be expected, the government sought to identify and interview the women in the photographs, as well as other women who had contact with, or dated, Mr. Raymond.  As of the plea hearing, the government asserted that the photographs and videos depicted 24 different women.  Statement of Offense, ECF No. 68, at ¶ 14.  The government further asserted that there were at least 26 "adult victim," or "AV" females related to this case.  Plea Agreement, ECF No. 69, at p. 11.  But a close review of the interview memoranda and related materials shows that, with regard to many, if not most of these individuals, no cognizable crime (or certainly no chargeable federal crime) occurred.  As noted above, substantial reasons exist to question Complainant #1's version of her interaction with Mr. Raymond, and Mr. Raymond took no photos of her.  The government has not identified or interviewed two others (20 and 21).  Among the rest, the most that the photographic evidence shows is a possible "sexual contact" offense with respect to some of the complainants, but they provide no evidence of "sexual abuse" under 18 U.S.C. § 2242(2), even taking into account the various speculations engaged in by witnesses and the government.

Based upon the materials and information the government had gathered in the four months after seizing Mr. Raymond's phone, on October 8, 2020 the government charged him by complaint with one count of Enticement under 18 U.S.C. § 2422.  *See* Complaint and Affidavit in Support of Complaint, Case No. 20-MJ-200 (GMH), attached as Exhibit H.  That statute prohibits a person from inducing or enticing an individual to travel between states for the purpose of "any sexual activity for which any person can be charged with a criminal offense" under any applicable law.  The Affidavit in Support of this Complaint describes interactions

---

person."  18 U.S.C. § 2246(3).  Some of the photos recovered from Mr. Raymond's phone depict "sexual contact," but as stated, none depicts a "sexual act."

between Mr. Raymond and Complainant #4.  According to the Affidavit, Complainant #4 went

from her home in Virginia to D.C. to meet Mr. Raymond for a date.  Mr. Raymond and

Complainant #4 drank alcohol, some of which was supplied by Complainant #4, some of which

they got at a wine bar.  After their date in D.C., the two then went to her apartment, where they

shared more wine, and then Complainant #4 blacked out.  At some time thereafter, the Affidavit

asserts, Mr. Raymond took a photograph of her breasts with her bra pulled down.  Notably,

according to Complainant #4 herself, she and Mr. Raymond did not have sexual intercourse.  Mr.

Raymond was arrested on this Complaint on October 9, 2020, in California.  He made his initial

appearance in the Southern District of California, where he was ordered detained and sent to

Washington, D.C.

Thereafter, the government further charged Mr. Raymond by Complaint on December 31,

2020 with additional counts.  *See* Complaint and Affidavit in Support of Complaint, Case No.

20-MJ-261 (ZMF), attached hereto as Exhibit I.  This Complaint charged Mr. Raymond with

multiple counts of Sexual Abuse under 18 U.S.C. § 2242(2), Abusive Sexual Contact under 18

U.S.C. § 2244(a)(2), and Enticement under 18 U.S.C. § 2422(a).  The Affidavit discussed

various facts and allegations with respect to Complainants 1, 2, 5, 6, 7, and 9.  As with all other

allegations and charges in this case, the photographic evidence the government obtained through

and following seizure of Mr. Raymond's phone constitutes the primary evidence of wrongdoing

asserted by the government.  Once again, however, upon inspection it appears the government's

evidence amounts to possible proof of "sexual contact" offenses, but not more.

### C.  Mr. Raymond Was Not Informed of Legal Issues Related to Seizure and Search of His Phones, or Related Issues, in Advance of Plea.

Upon arriving in Washington, D.C. following his arrest, Mr. Raymond engaged Jonathan

Jeffress of KaiserDillon PLLC to represent him.  *See* Declaration of Jonathan Jeffress, attached

18

hereto as Exhibit J.  Mr. Jeffress, in turn, brought in his colleague, Courtney Forrest, to handle most aspects of the matter.[14]  *See id.*; Declaration of Courtney Forrest, attached hereto as Exhibit I.  Mr. Jeffress reviewed the seizure and search warrant related to Mr. Raymond's phone, and Mr. Jeffress considered with Mr. Raymond whether the warrant presented a *Franks* issue, that is, whether the Gajkowski Affidavit used false information to establish probable cause.  Mr. Jeffress concluded that a *Franks* challenge was unlikely to be successful.

But Mr. Jeffress did not review or discuss with Mr. Raymond any of the materials surrounding the execution of the search warrant, to include the recording or transcript of the agents' interactions with Mr. Raymond at Jimmy Johns where he invoked his right to silence, the agents' notes and voice memos regarding the calls to prosecutor Perry showing her direct role, the agents' notes and memos regarding their interactions with Mr. Raymond at his hotel, and the Herndon officer's body camera footage.  *See* Exhibit J.  Mr. Jeffress further did not interview Mr. Raymond about the execution of the search warrant, or in any way gain an understanding of how it occurred, to include Mr. Raymond invoking his right to silence, and the fact that the agents attempted to execute the warrant three times.  *Id.*  Given Mr. Jeffress was not aware of the issues surrounding the execution of the search warrant, Mr. Jeffress did not discuss the legal issues related to such execution with Mr. Raymond, or the possibility of moving to suppress the evidence resulting from the seizure of Mr. Raymond's phone.  *Id.*  Indeed, Mr. Jeffress did not discuss any of the several options Mr. Raymond may have had in light of the facts and evidence, and did not engage the government on these matters.  *Id.*  Finally, Mr. Jeffress was not aware of, and did not discuss with Mr. Raymond, the decision in *In re: Search of [Redacted] Washington,*

---

[14]     At certain points, Emily Voshell, then an associate in Mr. Jeffress' firm, also worked on this case.

*D.C.*, 317 F.Supp.3d 523 (D.D.C. 2018), indicating that the agents' attempts to compel use of biometrics to open Mr. Raymond's phones were impermissible given they did not do so "with dispatch and in the immediate vicinity" of the seizure.[15]  For her part, Ms. Forrest had reviewed some of the materials from the June 6, 2020 seizure, but only with a focus on the substantive interview that occurred.  *See* Exhibit K.  She did not spot, or discuss with Mr. Raymond or the government, any of the potential constitutional issues surrounding the execution of the seizure and search warrant on his phone.  *Id.*

In mid-February 2021, Mr. Raymond engaged one of his current defense team members, John Marston, to serve as secondary counsel, with Mr. Jeffress and Ms. Forrest to continue as primary counsel.  *See* Declaration of John Marston, attached hereto as Exhibit L.  As the government was aware shortly thereafter, the division of labor among the defense team involved Ms. Forrest and her colleagues continuing to have responsibility for most aspects of the case, including review of discovery – Mr. Marston was not tasked to review discovery.  *Id.  See generally* discussion in ECF No. 112.  Mr. Marston gained an understanding from Mr. Jeffress and Ms. Forrest that the cell phone seizure and search had occurred, and that it produced what appeared to be the most critical evidence in the case, but that they had not identified any legal issues with the search and seizure.  Exhibit L.  Prior to Mr. Raymond's guilty plea, Mr. Marston

---

[15]     As noted above, it is important to remember that use of Mr. Raymond's biometrics alone would not have solved their need to gain permanent access to the phones.  The agents were not equipped or prepared to image the phone immediately upon opening it, which was a determinative and ultimately grave mistake on their part.  As soon as the phone locked again, which it did, the agents were locked out and needed Mr. Raymond's biometrics again.  This would have kept happening to them unless they not only opened the phones, but also got into the settings to change the PIN code and biometric requirements.  This required Mr. Raymond's passcodes which he had refused to provide, invoking his right to silence.

was otherwise unaware of the manner of execution of the seizure and search of Mr. Raymond's phone, and did not discuss it with Mr. Raymond at any time prior to Mr. Raymond signing or entering his guilty plea. *Id.* Mr. Marston asserts, however, that had he been aware of the manner in which the agents executed the seizure and search warrant on Mr. Raymond's phone, he would have recommended against taking a plea, and instead would have recommended going to trial. *Id.*

Thus, prior to entering his guilty plea in this case, none of Mr. Raymond's counsel, nor Mr. Raymond, were aware of the potential issues surrounding the seizure of Mr. Raymond's cell phone, nor Mr. Raymond's substantial suppression arguments and legal options in connection therewith. None of Mr. Raymond's counsel had raised these issues with the government, or used them in negotiating a resolution of this matter. None of Mr. Raymond's counsel had considered preparing, or begun preparing, a motion to suppress, or engaging the government on this issue. At the same time, Perry, who was aware of these issues from the moment they arose given that she had guided and directed every illegal step the agents took, did nothing to call them to the defense's attention. Nor did any member of the prosecution team.[16]

Finally, at Mr. Raymond's change of plea hearing on July 23, 2021, among the many things covered by the Court, at no time did the Court ask Mr. Raymond about potential motions he may have been able to file, or whether he had discussed possible pre-trial motions with his counsel. *See* Transcript of Change of Plea, July 23, 2021, attached as Exhibit M. The Court did

---

[16]   As noted below, defense counsel raised the search warrant issues with Perry and her colleagues at an in-person meeting on March 28, 2022. It was abundantly clear that Perry was aware of these issues and had thought about them previously. When asked if she had discussed these issues with Mr. Raymond's prior counsel, Mr. Jeffress and Ms. Forrest, Perry said, "I don't recall."

not ask Mr. Raymond's counsel or, even more importantly, government counsel whether there were any potential suppression issues, or whether the parties had discussed any such issues.[17]  *Id.* Mr. Raymond was thus entirely blind as to the issues presented by the government's seizure of his phone in this case, and he had no awareness regarding the importance and impact of waiving his rights on those issues.  Had he known, he would not have entered such a plea, and instead he would have gone to trial.

> **D.**     **Mr. Raymond's *De Facto* Alford Plea Before the Court With Regard to Complainants #7 and #9, and Mr. Raymond's Innocence.**

On May 27, 2021, unaware of the issues surrounding the government's seizure and search of his cell phones, Mr. Raymond signed a Plea Agreement (ECF No. 69) in which he agreed to plead guilty to two counts of Sexual Abuse under 18 U.S.C. § 2242(2), one related to Complainant #7, and one related to Complainant #9, and one count of Transportation of Obscene Material under 18 U.S.C. § 1462 related to the photos on his phone.  Mr. Raymond also signed a Statement of Offense (ECF No. 68) to accompany the Plea Agreement.  Then, on July 23, 2021, Mr. Raymond appeared before the Court for a change of plea hearing.  Exhibit M.

The most significant charges in the Plea Agreement are the two Sexual Abuse counts related to Complainants #7 and #9.  In the context of this case, these charges involve a "sexual act with another person" who is "incapable of appraising the nature of the conduct."  18 U.S.C. § 2242.  While the Statement of Offense includes a great deal of information extraneous to these charges, there are just two very brief factual assertions that underlie the Sexual Abuse offenses:

---

[17]     While Rule 11 does not list pretrial motions or motions to suppress among the things a court must cover with a defendant in a change of plea hearing in order to ensure the defendant is knowingly and voluntarily waiving his rights to file such motions, counsel understands that some judges do cover that topic, and doing so here may have encouraged the government to bring this issue to light in a timely fashion.

(1) "[K]nowing that AV-7 was at the point where she was incapable of appraising the nature of the conduct, Raymond had sexual intercourse with AV-7"; and (2) "Raymond had sexual intercourse with AV-9 in his bed.  During the sexual act, Raymond knew that AV-9 was incapable of appraising the nature of the conduct."  ECF No. 68 at ¶¶ 7 and 9.  The remainder of this section discusses the July 23 plea colloquy on these and related points, and the actual facts underlying these assertions, which demonstrates that Mr. Raymond did not admit guilt with regard to these offenses, and furthermore he has a valid claim of innocence with respect to the Sexual Abuse charges related to Complainants #7 and #9.

At the plea hearing on July 23, the Court followed a fairly standard, but also very detailed, Rule 11 colloquy.  As noted by the Court, the hearing covered five topics: 1) the basics of the plea and rights Mr. Raymond was waiving; 2) the government's proffer of facts, which involved a recitation of the Statement of Offense in this case; 3) whether Mr. Raymond agreed with the Statement of Offense; 4) the important terms of the Plea Agreement; and 5) questions posed to Mr. Raymond to determine whether his plea was made voluntarily.  Exhibit M, pp. 6-7.  The third topic – whether Mr. Raymond agreed with the Statement of Offense – is important in considering Mr. Raymond's assertion of innocence.

At the start of the discussion with the Court on this topic, Mr. Raymond stated that he agreed with everything Perry had recited from the Statement of Offense.  But the Court inquired further, and when it came to the critical facts with regard to Complainants #7 and #9 (a sexual act when they were incapable of appraising the nature of the conduct), Mr. Raymond did not agree.

### i.      Complainant #7.

At the change of plea hearing, in discussing the events involving Complainant #7, the following exchange occurred:

The Court: Well, were you aware that AV 7 at this point was not in position to give consent?

Ms. Forrest: If we could have one second, your honor.

The Court: Sure.  It's the sentence where she was incapable of appraising the nature of the conduct.  So in other words, she was not in a position to consent or not consent.

The Defendant: (Confers with counsel privately.)

Ms. Forrest: Yes, your honor.  **As I said, Mr. Raymond doesn't have a good memory of this incident.  So based on the discovery that the government has provided**, including the images of AV 7 that were taken after the sexual intercourse occurred, as evidence of her intoxicated state, as well as her statement, **Mr. Raymond has stipulated that these facts are correct.**

The Court: So in essence, you're not disputing what the government is saying in this paragraph.  Would that be a fair way of expressing it?

The Defendant: That's correct.

The Court: And did you have sexual intercourse with AV 7?

The Defendant: **I recall having intercourse with her the following morning.**

The Court: And did you discuss having sex with her with a friend in a text message the following day?

The Defendant: I believe so, yes.

Exhibit M, pp. 46-47 (emphases added).  Further with regard to subsequent questions about the interaction with Complainant #7, Mr. Raymond stated, "No.  I don't recall those details myself, but I don't dispute them."  *Id.*  In addition, his counsel, Ms. Forrest, similarly stated, "He does not recall that.  He doesn't recall having sex with AV 7 that night.  He only recalls having sex with her the following morning."  *Id.*

Shortly after these interchanges, the government raised a concern, and the Court further questioned Mr. Raymond about Complainant #7:

Ms. Perry: Your honor, may I address two things in paragraph 7?

…

Ms. Perry: The government is not alleging that Victim 7 was incapable of appraising the nature of the conduct the following morning. We are alleging that that night the photos and videos were taken, Raymond had sexual intercourse with adult victim 7.

The Court: Okay. So if we could clarify, as I understand it, Mr. Raymond, you're indicating you don't remember having sex with her that night, but you do remember it in the morning. Is that what you're saying?

The Defendant: That's correct, your honor.

…

The Court: So you're accepting – although your recollection is that you had sex in the morning, are you accepting based on the other evidence that's presented in terms of when the photographs were taken and her statement that sex did occur that night?

The Defendant: **I am in agreement with her statement that it was probably – it probably occurred.**

The Court: That night?

The Defendant: That's correct.

*Id.* at 50-51.

The facts outside the Statement of Offense show that Mr. Raymond did not commit the offense of Sexual Abuse against Complainant #7. According to Complainant #7's statements, she drank a significant amount of alcohol, tequila, gin, wine, and champagne. *See* Memorandum of Interview, Dated October 28, 2020, attached as Exhibit N-1, p. 1; Memorandum of Interview, Dated October 29, 2020, attached as Exhibit N-2, p. 1. After drinking, eating, and dancing, Complainant #7 threw up in the bathroom. Exhibit N-2, p. 2 She then asked to stay over because she was not feeling well. *Id.* Even though she recalled asking to stay over, she said that she did not recall going to the bedroom. *Id.* She said that the next morning, she and Mr.

Raymond began to have consensual sex after she woke up.  *Id.*, pp. 2-3.  She said that prior to that, Mr. Raymond put on a condom.  *Id.*, p. 2.  But she felt nauseous again, so she went to the bathroom, and upon returning, they did not resume having sex.  *Id.*  She further stated that when she went to the bathroom, she saw a used condom on the vanity by the sink, so she believed Mr. Raymond had used a condom the night before.  *Id.*

Two important facts show that Mr. Raymond did not, and could not have, had sex with Complainant #7 at night during or after their drinking alcohol.  First, Complainant #7's testimony describes two condoms, one used condom on the vanity, and one that Mr. Raymond wore during the consensual sex in the morning.  But when agents searched Mr. Raymond's home shortly after this incident they found only a single condom, which was in the trash in the master bathroom.[18]  *See* Scene Report, Dated June 14-15, 2020, attached as Exhibit O, p. 5.  Second, Mr. Raymond has erectile dysfunction ("ED"), and took Cialis, as the government knows based upon its seizure of such pills and Mr. Raymond's drug order histories.  Evidence gathered from a premises search warrant shows that Mr. Raymond was on dutasteride, a medication for enlarged prostate, a common side effect of which is ED.[19]  Further evidence will show he was taking this medication for years.  As a person with ED, Mr. Raymond experiences a prolonged refractory period (the time between ejaculation and when he can again achieve an erection), generally at least 12 hours.  Therefore, he asserts that he could not have had sex with Complainant #7 to the point of ejaculation during the night (as allegedly evidenced by a used condom in the bathroom),

---

[18]     Mr. Raymond's encounter with Complainant #7 occurred on May 30, 2020, the day before the incident with Complainant #1, very shortly after which Mr. Raymond traveled to the United States where spent two weeks quarantined in a hotel near Dulles in Virginia.  Thus, his apartment was essentially as he left it by the time the agents went to search it in mid-June, 2020.

[19]     *See* https://www.rxlist.com/consumer_dutasteride_avodart/drugs-condition.htm

and then also had consensual sex with Complainant #7 in the morning, which he clearly did, because both he and she remember that occurring.[20]

ii.         **Complainant #9.**

With regard to Complainant #9, the following exchanges occurred at the change of plea hearing on July 23, 2021:

> The Court: And you later that day invited her [Complainant #9] to your Embassy-leased apartment, where you drank a lot of wine and tequila. Is that correct?
>
> The Defendant: That's correct.
>
> The Court: And do you recall having sexual intercourse with her on your bed.
>
> The Defendant: Yes, your honor.
>
> The Court: Were you aware while you were having sex with her that she would be capable [sic] of giving consent or not giving consent to the sex?
>
> The Defendant: May I have one moment, please?
>
> …
>
> Ms. Forrest: Yes, your honor, he's agreed that she was in a state where she was incapable of appraising the nature of the conduct, the statement of facts does not reflect consent or non-consent.
>
> The Court: That's my reading of it, but I'm perfectly happy to go along with "incapable of appraising the nature of the conduct," … How would you define what that means to you, Mr. Raymond?

---

[20]    The government asserted at the plea hearing that Mr. Raymond "reported to the government that he'd had sex with a woman on the night that adult victim 7 was at his apartment." Exhibit M, p. 32. Mr. Raymond asserts that during the government interview in question, he was referring to sex with Complainant #7 in the morning, not any alleged sex in the night while Complainant #7 was unconscious. Indeed, in this interview Mr. Raymond referred to a conversation he had with Complainant #7 just prior to the intercourse, which was plainly a conversation in the morning when both he and Complainant #7 were awake.

The Defendant: It should not have happened.

The Court: Well, does it mean that she knew what was going on?

The Defendant: Well, we were both intoxicated and my judgment was impaired, and I don't believe we should have had the sexual intercourse.

…

Ms. Forrest: Your honor, Mr. Raymond is agreeing that, based on the amount of alcohol that AV 9 consumed, based on the images of her taken after their sexual intercourse, that – and her statement, given the evidence, that she must have been incapable of appraising the nature of the conduct at the time the intercourse occurred.

The Court: Would you agree with that statement, Mr. Raymond?

The Defendant: Yes, I would.

Exhibit M, pp. 52-54.

Thereafter, the Court further inquired regarding consent, and asked Mr. Raymond if Complainant #9 consented "to your taking off her clothing or having any kind of sexual intercourse." *Id.* at 55. Mr. Raymond asked for a moment to speak with counsel, and then said, "Yes. That's correct. I do recall her waking up in bed naked the following morning. And I don't recall the specific details of the intercourse. And so the rest of the information is based on her statement, which I stipulate is accurate." *Id.*

Complainant #9's short statement to agents sheds little further light on her encounter with Mr. Raymond, and does not establish that Sexual Abuse occurred. *See* Memorandum of Interview, Dated October 28, 2020, attached as Exhibit P. In the statement, she said she and Mr. Raymond drank a lot of wine and tequila, and she indicated that she believed, and later felt, that they had had sex. *Id.*, pp. 1-2. But she also said that she thought it was a "normal date" and that Mr. Raymond "was a gentleman." *Id.*, p. 2. While Mr. Raymond does not recall having sexual intercourse with Complainant #9, he asserts that he has never knowingly had sex with someone

who was passed out, blacked out, or otherwise incapable of appraising the nature of what was happening.  Mr. Raymond believes that if in fact he had intercourse with Complainant #9, it was at a time when she at least appeared awake, aware, and consenting.

        **iii.**        **Discovery Issues.**

The facts and circumstances discussed above with regard to Complainants #7 and #9 raise another issue relevant to the plea, which is that at the time of the plea hearing, due to the COVID-19 pandemic, Mr. Raymond's prolonged stay in protective custody, and a variety of related factors, Mr. Raymond did not have an opportunity to review in detail the various statements of the Complainants, or other important discovery.  Thus, in the various instances when Mr. Raymond or his counsel stated at the change of plea hearing that his plea was based on what he understood the government's evidence was, or what the discovery showed, he had not seen that evidence or discovery which is why agreed to "stipulate" as to the facts.  Later, when he gained greater access to the materials, it became plainly apparent to Mr. Raymond that the government's evidence did not show anything more than what he already believed was the case, which is that he did not knowingly engage, and has never knowingly engaged, in a sexual act with another person while that person was incapable of appraising the nature of the conduct.  No witness has ever said that he has, no photo shows that he has, no video shows that he has, and indeed, as with Complainants #7 discussed above, substantial evidence exists to the contrary.

        **E.**        **The Government's Planned Sentencing Hearing Involves Nearly a Full-Blown Trial on Contested Issues.**

The Plea Agreement provided for two alternative Guidelines ranges, called "Government's Estimated Offense Level Under the Guidelines," and one called "Defendant's Proposed Guidelines Range."  There exists a six-level difference between these ranges based primarily on the government's unsubstantiated view that Mr. Raymond administered intoxicants

to women without their knowledge (a 4-point enhancement if it applies), and also on the

government's theory that this case involves a "large number of vulnerable victims" (a 2-point

enhancement if it applies).  Setting aside the merits of these issues, for purposes of this motion

the salient point is that the government effectively intends to conduct a trial in this case even if it

simply proceeds to sentencing.

The government previously told the defense that it planned to call as many as 12

witnesses, and perhaps more given that various experts are likely to testify.  At a hearing on

August 25, 2021, defense counsel stated, "The evidentiary hearing that we need is on a very

narrow issue.  It's the two contested sentencing enhancements."  Transcript of Status

Conference, dated August 25, 2021, attached as Exhibit Q, p. 8.  The government responded:

> First of all, your Honor, … this is the crux of this case.  This is
> what the CIPA issue is about, is whether Mr. Raymond drugged
> these women and whether these women were vulnerable and
> whether he – the large number of vulnerable victims enhancement
> applies.  **So this is not a narrow issue.  This is not going to be a
> narrow hearing.  This is the case.**

*Id.*, p. 13.

The government had been making similar statements about the size and scope of the

evidence against Mr. Raymond on the enhancement issues even during plea negotiations, and

repeatedly characterized classified information that it had seen, but the defense had not, as

somehow compelling evidence on the intoxicant issue.  For example, at the plea hearing itself,

the government said:

> The Court: Can I ask a question.  What would the employer
> documentation have to do with this case?  If you can tell me
> without getting into what you can't obviously put on the record.
> But I must admit, I'm puzzled by what information you would
> need [through CIPA proceedings].
>
> Ms. Perry: On the government's side, I think there is some
> substantive information contained in some of those reports that go

> – would lend – they're relevant to some of the contested issues at sentencing.
>
> The Court: Give me an example of a contested issue it would be relevant towards.
>
> Ms. Perry: Whether the defendant drugged any of this victims.

Exhibit M, pp. 104-5.  Further, at the August 25, 2021 status and scheduling conference following the plea, the government said:

> But, your Honor, it isn't just  -- when defense counsel says, "I don't know what the Government could possibly need for the evidentiary hearing in these [CIPA] filings," the concern of the Government  -- remember, we have seen everything.  Defense counsel has not been able to.

Exhibit Q, p. 22.  Based upon subsequent review by the defense and recent discussions with the government, the prosecution overstated its case and the relevance of the materials in Mr. Raymond's employment files.  The materials the government claims are so important for sentencing do not in any way establish the government's enhancements.  The government's veiled threats about secret contents of files, among other things, caused Mr. Raymond to feel compelled to take a plea.  But they also illustrate the substantial and lengthy sentencing process and evidentiary hearing that the government anticipates in this case.

### F.      Subsequent Conflicts and Discovery Review by Counsel.

After Mr. Raymond's change of plea hearing, starting in late October 2021, a conflict began to develop between Mr. Raymond and Mr. Jeffress and Ms. Forrest, which was unrelated to their work on Mr. Raymond's case.  Leading up to this same time, the government first began to make certain classified material from Mr. Raymond's employment files available to the defense to review.  The Court appointed conflict counsel, ultimately Mr. Raymond chose not to waive the conflict, and Mr. Jeffress and Ms. Forrest withdrew as counsel for Mr. Raymond.  Mr. Raymond chose to continue with Mr. Marston as his counsel, but sought to add A. Joseph Jay

and Denise Giraudo to his defense team.  The defense asked the government to agree on new protective orders to permit the defense to review discovery, but instead the government raised a potential conflict issue involving Mr. Jay and Ms. Giraudo's firm.  Similar to its tactics elsewhere in this case, the government did this by submitting *ex parte* filings, which they refused to provide to the defense.  Significant delay ensued.  Finally, as of February 17, 2022, the conflict issue was cleared, and the full current defense team gained access and ability to review some of the discovery in this case in earnest.[21]

Based on that review and consultations with Mr. Raymond, by around mid-March 2022, counsel began to have concerns that the plea lacked factual support in significant areas.  Even well before that time, Mr. Raymond had asserted to counsel his innocence with regard to the Sexual Abuse offenses in the plea.  In addition, counsel began to have concerns that Mr. Raymond has substantial claims with regard to constitutional violations by the government in executing the critical search and seizure warrant in this case, and Mr. Raymond had not been apprised of those claims or violations at the time he entered his guilty plea.

In defense counsel's next meeting with the government, on March 28, 2022, defense counsel discussed with the government at length the significant 4th and 5th Amendment violations present in the seizure and search of Mr. Raymond's cell phones.  Defense counsel also mentioned that it appeared there is a lack of factual support for the plea.  Defense counsel asked the government to agree to delay the submission of a proposed sentencing schedule to the Court in hopes of discussing and perhaps resolving these issues.  The government refused.  On April 5, 2022, the defense filed a status report which noted the significant search and seizure issues and

---

[21]    Current defense counsel is still awaiting full security clearances, and as such, counsel has not been able to review *all* discovery in this case.

other open discovery matters, and asked the Court for additional time to review and potentially address these issues.  On that same date, the government filed a proposed schedule for sentencing.  After additional filings addressing the search and seizure and discovery issues, the Court issued a Scheduling Order on April 7, 2022, largely adopting the government's proposed schedule.  In that order, the Court stated that "unless and until the Defendant takes any of the actions threatened in its Reply, ECF No. 112, at 5, [such as filing a motion to withdraw his plea,] the parties are expected to comply with these deadlines."  ECF No. 113, at 3.  On April 8, 2022, after meeting with Mr. Raymond and discussing the Court's Scheduling Order, defense counsel emailed government counsel to ascertain whether the government would oppose a motion by Mr. Raymond to withdraw his guilty plea.  Government counsel wrote back to say the government would oppose such a motion.  Then, on April 12, 2022, through counsel Mr. Raymond filed a Notice of Intent to Withdraw Plea.  ECF No. 116.  The Court then set the current briefing schedule on this Motion.

## III.    APPLICABLE LEGAL STANDRDS.

This section first outlines the legal standards applicable to motions to withdraw a guilty plea prior to sentencing.  Then, given that Mr. Raymond is seeking to withdraw his plea on the basis that it was tainted by ineffective assistance of counsel related to the failure of counsel to investigate and advise on 4th and 5th Amendments violations and the legal options associated with such violations, this section briefly summarizes the legal standards applicable to such constitutional issues.

### A.  Presentencing Withdrawal of a Guilty Plea.

Presentence withdrawal motions should be "liberally granted," and the trial court has discretion regarding whether to grant such a withdrawal.  *See United States v. Magruder,* No. 19-

203, 2021 WL 5769462 at *6 (D.D.C. Dec. 6, 2021) (citing *United States v. Thomas*, 541 F.

Supp. 2d 18, 23 (D.D.C. 2008)); *United States v. Tolson*, 372 F. Supp. 2d 1, 9 (D.D.C.

2005), *aff'd,* No. 05-3102, 264 Fed.Appx. 2, 2008 WL 441764, at *1 (D.C. Cir. Jan. 24, 2008)).

There are generally two bases for withdrawing a guilty plea after the court has accepted the plea,

but before sentencing.  In particular, the defendant can withdraw his guilty plea if the he can (1)

establish a "fatal defect in the Rule 11 proceeding at which the guilty plea was entered;" or (2)

"show a fair and just reason for the withdrawal." *See Gooding v. United States,* 529 A.2d 301,

306–07 (D.C.1987); Fed. R. Crim. P. 11(d)(2).

When ruling on a motion to withdraw a guilty plea, the court must consider the following

factors: (1) whether the guilty plea was somehow tainted; (2) whether the defendant asserted a

viable claim of innocence;[22] and (3) whether the delay between the guilty plea and the motion

to withdraw has substantially prejudiced the government's ability to prosecute the case.  *See*

*Thomas*, 541 F.Supp.2d at 23; *see also United States v. Taylor*, 139 F.3d 924, 929 (D.C. Cir.

1998).

i.   Tainted Plea.

Whether the plea was tainted is the "most important" factor.  *Taylor*, 139 F.3d at 929. To

show a guilty plea was somehow tainted, the defendant must show that the district court's taking

of the guilty plea either failed to conform to the requirements of Rule 11, "or was in some other

sense constitutionally deficient." *Tolson*, 372 F. Supp. 2d at 9.  Further, "the standard for

allowing withdrawal of a plea is fairly lenient when the defendant can show that the plea was

---

[22]     The D.C. Circuit also has expressed this factor as a "legally cognizable defense." *See*
*Thomas* 541 F.Supp.2d at n.1 (citing *United States v. Curry*, 494 F.3d 1124, 1129
(D.C.Cir. 2007)).

entered unconstitutionally" or contrary to Rule 11 procedures. *Taylor*, 139 F.3d at 929; *United States v. Barker,* 514 F.2d 208, 221 (D.C.Cir.1975).

One way a plea can be "tainted" is if the defendant received ineffective assistance of counsel when deciding to plead guilty. *See*, *e.g.*, *Taylor*, 139 F.3d at 929-934; *Pettiford v. US*, 700 A.2d 207, 216 (D.C.1997). An ineffective assistance of counsel claim often will provide sufficient grounds for withdrawal of a guilty plea, although withdrawal is not an "automatic right" prior to sentencing. *See United States v. Barker*, 514 F.2d 208, 218 (D.C.Cir.1975).

The D.C. Circuit has adopted the *Strickland* approach when reviewing presentencing ineffective assistance challenges to guilty pleas. *See Tolson*, 372 F. Supp. 2d at 11-12; *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Accordingly, to prevail, the proponent of an ineffective assistance claim must demonstrate (1) defense counsel's performance failed to conform to an objective standard of reasonableness and; (2) the unreasonable performance prejudiced the defendant's position. *Tolson*, 372 F. Supp. 2d at 12. Where an ineffective assistance claim is made in a motion to withdraw a guilty plea, to satisfy the second prong of *Strickland*, the claimant must convince the court that "but for counsel's alleged errors, the defendant would have pleaded not guilty and insisted upon going to trial." *Id*. at 18 (quoting *United States v. Horne,* 987 F.2d 833, 837 (D.C. Cir. 1993)) (internal alterations omitted).

The broad test for determining the validity of a guilty plea is "'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" *Tolson*, 372 F.Supp.2d at 10-11 (citing *Hill,* 474 U.S. at 56, 106 S.Ct. 366 (quoting *North Carolina v. Alford,* 400 U.S. 25, 31, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970))). A plea based upon advice of counsel that "falls below the level of reasonable competence such

that the defendant does not receive effective assistance," is neither voluntary nor

intelligent. *See Taylor,* 139 F.3d at 929. "Where ... a defendant is represented by counsel during

the plea process and enters his plea upon the advice of counsel, the voluntariness of the plea

depends on whether counsel's advice 'was within the range of competence demanded of

attorneys in criminal cases.'" *Id.* (quoting *McMann v. Richardson,* 397 U.S. 759, 771, 90 S.Ct.

1441, 25 L.Ed.2d 763 (1970)).

  Failure by counsel to reasonably investigate a client's case and inform the defendant of

the facts bearing on a plea may constitute ineffective assistance of counsel, rendering a resultant

plea constitutionally defective.  Indeed, "an essential prerequisite to counsel's presentation of an

intelligent and knowledgeable defense is the requirement that he consult, investigate and prepare

for trial." *Pettiford v. US*, 700 A.2d 207, 216 (D.C.1997) (quoting *Harris v. United States*, 441

A.2d 268, 272 (D.C.1982)).  The court also has "recognized that defense counsel must make

preparations in order to engage in plea bargaining," in fact, "the Supreme Court has stated that

trial counsel's failure to become informed of the facts bearing on a plea situation might satisfy

the standard necessary to vacate a plea on collateral attack."  *Pettiford v. US*, 700 A.2d 207, 216

(D.C.1997) (quoting *Ramsey v. United States,* 569 A.2d 142, 147 (D.C.1990)). Under the

standards promulgated by the American Bar Association, "defense counsel has a duty to

investigate in all cases," and that duty continues regardless of "the apparent force of the

prosecution's evidence, a client's alleged admissions to others of facts suggesting guilt, a client's

expressed desire to plead guilty or that there should be no investigation, or statements to defense

counsel supporting guilt."  ABA Standards for Criminal Justice, The Defense Function 4–4.1(a)-

(b) (4th Ed. 2017).

### ii.   Viable Claim of Innocence/Legally Cognizable Defense.

A defendant seeking to withdraw a guilty plea "generally must make out a legally cognizable defense to the charge against him." *United States v. McCoy*, 215 F.3d 102, 106 (D.C. Cir. 2000) (quoting *United States v. Cray,* 47 F.3d 1203, 1207 (D.C.Cir.1995)).  However, a general denial is not enough; the defendant must "affirmatively advance an objectively reasonable argument that he is innocent." *Id.*  "Even in cases 'calling only for a legally cognizable defense,' the defendant must have 'effectively denied his culpability.'" *Magruder* at *6 (quoting *United States v. Leyva*, 916 F.3d 14, 24 (D.C. Cir. 2019)).  As such, the defendant's pleading must contain some assertion that he is "actually innocent" or  otherwise "disclaim his admission of guilt at the plea proceeding." *Magruder* at *6 (quoting *United States v. Curry*, 494 F.3d 1124, 1129 (D.C. Cir. 2007)).  Relevantly, "a potentially successful motion to suppress evidence is not equivalent to an assertion of legal innocence." *Magruder* at *6 (quoting *United States v. Yansane*, 370 F. Supp. 3d 580, 591 (D. Md. 2019)).

### iii.   Prejudice from Delay.

Prejudice to the Government has never been a determinative factor for granting a motion to withdraw a guilty plea, and should be relevant only in close cases.  *See Tolson*, 372 F.Supp.2d at 9*; United States v. Hanson*, 339 F.3d 983, 988 (D.C. Cir. 2003).  Indeed, "considerations of prosecutorial resources generally ought not deny a defendant the 'opportunity to go to trial because he had earlier entered a defective (e.g., involuntary) guilty plea.'" *Tolson*, 372 F.Supp.2d at 9 (quoting *United States v. Cray,* 47 F.3d 1203, 1207 (D.C.Cir.1995)).  "[I]t is without question that constitutional rights, particularly in the context of criminal prosecutions, should not often be set aside solely to avoid inconveniencing the government." *Tolson*, 372 F.Supp.2d at 9.

Withdrawal motions that are made promptly after entering a plea are regarded with "particular favor." *United States v. Roberts,* 187 U.S.App.D.C. 90, 99, 570 F.2d 999, 1008 (1977).  But even where there has been a delay between the guilty plea and the desire to withdraw it, the Court will consider whether or not the delay substantially has prejudiced the Government's ability to prosecute the case.  *Gooding v. United States*, 529 A.2d 301, 307 (D.C.1987). Where such prejudice is absent or minimal, withdrawal routinely is permitted.  *Id.*; *United States v. Roberts,* 570 F.2d at 1008.

Regarding timeliness of the withdrawal, one significant factor is whether final sentencing has occurred because "the government will generally have suffered little harm prior to sentencing and thus withdrawal of a plea of guilty should be liberally granted before final sentencing."  *See Roberts* 570 F.2d at n.48.  Another significant factor is when the defendant first learned of the basis for withdrawal.  Because the court has a duty to ensure a defendant did not enter into a guilty plea based on "manifestly incorrect information," the proper time from which to measure a delay is from the time the defendant learned of the new information – particularly where such information resulted from prior counsel's failure to investigate.  *See Goodall v. United States*, 584 A.2d 560, 561 (D.C.1990); *see also Thomas* 541 F.Supp. at 29 (acknowledging a change in counsel may result in "some unavoidable delay.").

**B. Suppression of Evidence Obtained in Violation of the 4th & 5th Amendment.**

i. Violation of the 4th Amendment.

The Fourth Amendment prohibits law enforcement officers from conducting "unreasonable searches and seizures."  *United States v. Winecoff*, No. CR 20-266 (RBW), 2021 WL 6196999, at *3 (D.D.C. Dec. 30, 2021) (quoting *United States v. Gross*, 784 F.3d 784, 786 (D.C. Cir. 2015)).  When an unconstitutional search or seizure is conducted by the government,

the Court must exclude any evidence obtained as the "fruit" of that search or seizure. *Wong Sun v. United States*, 371 U.S. 471, 484 (1963) ("[E]vidence seized during an unlawful search could not constitute proof against the victim of the search.").

### 1. *Legality of Obtaining Biometric Data.*

Due to the relative novelty of biometric technology, few courts have examined the constitutional implications of compelling an individual to provide biometric data to unlock a device. The courts that have examined the issue are split on the constitutional implications of such an act. *See United States v. Wright*, 431 F. Supp. 3d 1175, 1186 (D. Nev. 2020) (collecting cases that "map to a split in the recent district court decisions addressing this issue.").

In this district, Magistrate Judge Harvey has proposed a standard for when the government may compel the use of biometric features during the execution of a search warrant. *See In re Search of* [Redacted], 317 F. Supp. 3d 523, 533 (D. D.C. 2018). Magistrate Judge Harvey explained:

> when attempting to unlock a telephone, computer or other electronic device during the execution of a search warrant that authorizes a search of the device, the government may compel the use of an individual's biometric features, if (1) the procedure is carried out with dispatch and in the immediate vicinity of the premises to be searched, and if, at time of the compulsion, the government has (2) reasonable suspicion that the suspect has committed a criminal act that is the subject matter of the warrant, and (3) reasonable suspicion that the individual's biometric features will unlock the device.

*Id.* at 532-33. Magistrate Judge Harvey further warned: "Law enforcement is not absolved of its responsibility to act reasonably in executing a warrant merely because the government has received court authorization to compel the use of an individual's biometric features." *Id.* n. 7.

2.  *Legality of Conducting Multiple Searches Pursuant to a Single Warrant.*

It is axiomatic that a warrant generally authorizes a single search.  *See United States v. Keszthelyi*, 308 F.3d 557, 569 (6th Cir. 2002) (citing *United States v. Gagnon*, 635 F.2d 766, 769 (10th Cir.1980)); Wayne R. LaFave, 2 Search & Seizure: A Treatise on the Fourth Amendment § 4.10(d) (6th Ed. 2021) ("[a warrant] may be executed only once, and thus where police unsuccessfully searched premises for a gun and departed but then returned an hour later and searched further because in the interim an informant told the police of the precise location of the gun, the second search could not be justified as an additional search under authority of the warrant.").  "Once the execution of a warrant is complete, the warrant terminates." *United States v. Jeffries*, No. 5:16 CR 180, 2017 WL 11445474, at *2 (N.D. Ohio Sept. 5, 2017).[23]

However, in limited circumstances, law enforcement officers may suspend the initial execution of the search temporarily to continue the search at another time so long as the subsequent search is a "reasonable continuation of the original search."  *Keszthelyi*, 308 F.3d  at 569.  For the subsequent search to be permissible, it must be 1) a continuation of the initial search (*i.e.*, not a new, separate search); and, 2) the decision must be reasonable under the totality of the circumstances.  *Jeffries*, 2017 WL 11445474, at *2.

The first criteria examines whether the search was simply suspended until later because of some obstacle. *Id*. at 571.  For example, in *Keszthelyi*, the Court cited to *United States v. Gerber*, 994 F.2d 1556, 1559 (11th Cir. 1993), in which officers suspended a Friday evening

---

[23]    The government's own training materials state that the execution of a warrant must be "ongoing and continuous." *See* Federal Law Enforcement Training Centers, Execution of a Search Warrant (I) (MP3), https://www.fletc.gov/audio/execution-search-warrant-i-mp3 (accessed April 22, 2022).

search of a vehicle until Monday, because they needed a mechanic's assistance to open the car's hood. *Keszthelyi*, 308 F.3d at 570.

For the second criterion, reasonableness under the Fourth Amendment is assessed by "balancing the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *See Tennessee v. Garner*, 471 U.S. 1, 8 (1985). The Sixth Circuit reasoned in *Keszthelyi*, that a subsequent search was unreasonable because "nothing impaired the ability of the agents to execute fully the warrant at the time of their initial entry." *Keszthelyi*, 308 F.3d at 572.

ii.   Violation of the 5th Amendment.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself."  U.S. CONST. Amend. V.  As such, the accused are protected from "from having to reveal, directly or indirectly, knowledge of facts relating him to the offense or from having to share his thoughts and beliefs with the Government."  *Doe v. United States*, 487 U.S. 201, 213, 108 S. Ct. 2341, 101 L. Ed. 2d 184 (1988).  A statement is subject to 5th amendment privilege if it is (1) testimonial, (2) incriminating, and (3) compelled." *In re Search of* [Redacted], 317 F. Supp. 3d at 534.

*1.   Entry of Passwords Is Testimonial.*

In the vast majority of cases addressing the issue, courts have held that providing a password to unlock a phone or other electronic device is a testimonial act for Fifth Amendment purposes.  *See e.g., United States v. Apple MacPro Comput.*, 851 F.3d 238, 247 (3d Cir. 2017); *In re Grand Jury Subpoena Duces Tecum Dated March 25, 2011*, 670 F.3d 1335, 1341 (11th Cir. 2012); *In re Search of* [Redacted], 317 F. Supp. 3d at 534; *United States v. Djibo*, 151 F. Supp. 3d 297, 307 (E.D.N.Y. 2015).  As such, providing a passcode cannot be compelled under the

Fifth Amendment, because the act of communicating the passcode is testimonial, as "[t]he expression of the contents of an individual's mind falls squarely within the protection of the Fifth Amendment." *See Doe v. United States*, 487 U.S. 201, 219 (1988) (Stevens, J., dissenting) (citing *Boyd v. United States*, 116 U.S. 616, 633-635 (1886); *Fisher v. United States*, 425 U.S. 391, 420 (1976) ); *see also United States v. Kirschner*, 823 F.Supp.2d 665, 669 (E.D. Mich. 2010) (citing *Doe*, 487 U.S. at 208 n. 6, 108 S.Ct. 2341); *Com. v. Baust*, 89 Va. Cir. 267, 2014 WL 10355635, at *4 (2014).

### 2.   *Providing A Password is an Incriminating Statement.*

A statement is incriminating if the answer either supports a conviction in a criminal case, or provides a "link in the chain of evidence" leading to incriminating evidence, even if the statement itself is not incriminating. *United States v. Hubbell*, 530 U.S. 27, 38 (2000) (quotations and citation omitted).  Thus, the Fifth Amendment privilege protects one from furnishing a passcode that would constitute a link in the chain connecting the person to incriminating evidence on the phone.

### 3.   *When Making A Statement is Compelled.*

A statement is compelled if it is not given voluntarily.  *See United States v. Sheffield*, 821 F. Supp. 2d 351, 356 (D. D.C. 2011) (the Fifth Amendment does not bar "any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence."). For a statement to be given voluntarily it "must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *United States v. Powe*, 591 F.2d 833, 840 (D.C. Cir. 1978).  "In determining whether a defendant's statements were voluntary, a court must assess whether, under the totality of the circumstances, law enforcement officials obtained the evidence by overbearing

the will of the accused." *United States v. Yeh*, 97 F. Supp. 2d 24, 34 (D. D.C. 2000) (citations

omitted); *see also Arizona v. Fulminante*, 499 U.S. 279, 285-88, 111 S. Ct. 1246, 113 L. Ed. 2d

302 (1991) (noting that voluntariness is determined by the totality of the circumstances).  The

burden is on the government to establish, by a preponderance of the evidence, that a challenged

statement was voluntary. See *United States v. Karake*, 443 F. Supp. 2d 8, 13 (D. D.C. 2006).

A coerced statement is not voluntary. *See United States v. Hallford*, 816 F.3d 850, 856

(D.C. Cir. 2016). In determining whether law enforcement agents coerced an individual into

making an incriminating statements, a court must consider "the characteristics of the accused and

the details of the interrogation."  *Id.* (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226

(1973)).  The essential inquiry is whether the defendants "'will' was 'overborne and his capacity

for self-determination critically impaired' as a result of the agents' conduct." *Id*.

## IV.    ARGUMENT.

### A.    Mr. Raymond Should be Allowed to Withdraw His Plea Because it is Infected with Ineffective Assistance of Counsel.

In this case, Mr. Raymond's plea is unquestionably tainted by ineffective assistance of

counsel, and he should be allowed to withdraw it.  To withdraw his plea on this basis, Mr.

Raymond must establish that defense counsel's performance did not meet an objective standard

of reasonableness, and that the unreasonably deficient performance prejudiced his position.

*Tolson*, 372 F. Supp. 2d at 12.  Here, Mr. Raymond meets these standards with respect to the

substantial constitutional issues related to the seizure of Mr. Raymond's phone because defense

counsel did not review the materials, investigate the facts and issues, or even discuss with Mr.

Raymond the issues or his options.

First, the photographic and video evidence in this case is the most critical evidence the

government gathered in its investigation, and finding it on Mr. Raymond's phone was the

catalyst for every investigative step taken thereafter.  Without those photos, or the investigative fruits that flowed from them, the government's case against Mr. Raymond would, at a minimum, be substantially weaker, and indeed it may have no case at all.  Thus, the magnitude of the issue is enormous.

Second, set against the backdrop was a complete failure to spot, research, raise, discuss, leverage, or prepare a motion with respect to the multiple illegal actions taken by the government during the seizure of Mr. Raymond's phone, which was the original source of the photographic and video evidence.  Initial defense counsel undertook no investigation whatsoever with regard to the manner of execution of the seizure of Mr. Raymond's phone, and did not review (or at least adequately review) the substantial discovery related thereto.  Nor was Mr. Raymond afforded an opportunity to weigh his legal options, and if he had, he would have decided not to plead guilty which waived his rights to contest constitutional violations, but instead he would have chosen to go to trial as counsel would have recommended.  Further, counsel did not interview Mr. Raymond concerning the manner of the government's seizure of his phone.  In short, defense counsel was entirely blind to these issues, and therefore so was Mr. Raymond. Further, it was not a mere strategic or tactical decision to forego a motion on these issues and plead guilty because defense counsel was entirely unaware of the facts and issues.  Indeed, Mr. Marston has indicated that his strategic and tactical recommendation would have been *not* to plead guilty in light of these facts and issues, and Mr. Raymond asserts he would have followed that advice.  The lack of awareness and advice on this issue prior to Mr. Raymond pleading guilty is easily beneath the standard of an objectively reasonable defense counsel.

Third, Mr. Raymond was prejudiced by this ineffectiveness because the constitutional issues presented by the facts are substantial, and include glaring 4th and 5th Amendment issues

that give Mr. Raymond a meaningful chance at diminishing or obtaining dismissal of this case by

seeking suppression.  An on-point ruling by Magistrate Judge Harvey in this district indicates

that when a warrant permits agents to compel a person's biometrics to open a device, agents

must do so "with dispatch in the immediate vicinity" of the seizure of the phone.  *In re: Search*

*of* [Redacted], 317 F. Supp. 3d at 532-33.  The agents' re-seizure of the phones and compelled

biometrics on their second and third attempts to execute the warrant, hours after concluding their

initial execution at a separate location, violated that standard.  Further, as Magistrate Judge

Harvey warned against in his ruling, law enforcement's actions in this case were unreasonable in

their relentless pursuit of biometrics and PINs/passcodes.

But even apart from Judge Harvey's ruling on biometrics, the agents had completed and

finalized their seizure at Jimmy Johns, issuing a property receipt, and announcing the conclusion

of the execution of the warrant.  Exhibit E, p. 220.  Under other persuasive legal authorities, the

attempts by the agents to re-execute the warrant two additional times at Mr. Raymond's hotel

were illegal under the 4th Amendment.  *See, e.g.*, *Jeffries*, 2017 WL 11445474, at *2.  Under the

case law, agents may only suspend execution of a search and seizure, and return to it at a later

time, so long as it is a reasonable continuation of the search (not a new, separate search), and the

decision to suspend and re-engage was reasonable under the totality of the circumstances.  *Id.*  In

this case, the interactions at the hotel, as directed by DOJ attorney Perry, were not "reasonable

continuations" of the search, and were not reasonable under the totality of the circumstances.

Other than their own ignorance and failure to appreciate the contents of their warrant, there was

no obstacle beyond the agents' control that stopped them from executing the biometrics portion

of the warrant in their first encounter with Mr. Raymond.  *See Keszthelyi*, 308 F.3d at 571.  The

subsequent intrusions at Mr. Raymond's hotel were not at all reasonable under the totality of the

circumstances, but instead represented an increase in show of force, and relentless and repeated

pursuit of executing the biometrics portion of the warrant.  *See id.* at 572 (holding a subsequent

search unreasonable because "nothing impaired the ability of the agents to execute fully the

warrant at the time of their initial entry").  *See also In re: Search of* [Redacted], 317 F. Supp. 3d

at n. 7 ("Law enforcement is not absolved of its responsibility to act reasonably in executing a

warrant merely because the government has received court authorization to compel the use of an

individual's biometric features.").

      The blatant 5th Amendment violations in this case are perhaps even more obvious and

striking.  As soon as the agents told Mr. Raymond they were taking his phones, he said he

wanted a lawyer.  The agents informed him that they were taking his phones anyway, and they

then asked him for his PIN codes.  Mr. Raymond declined, and said he would not give them

codes without first talking to a lawyer.  They asked again, and he declined again, and then, the

agents were clearly flustered and surprised, and this exchange happened:

> **MS. GAJKWOSKI:  So – so, what we are going to do, because,
> I, I just want to be clear, so you're not willing to voluntarily
> give us your PIN.  Correct?**
>
> **MR. RAYMOND:  No, not until I consult with a lawyer.**
>
> **MS. GAJKOWSKI:  Okay, understood.**
>
> **MR. NELSON: Yeah.  Ok.**

Exhibit E, p. 189-90.  Normally, one would expect law enforcement to cease all inquiry into PIN

codes and passcodes at that point.  But in total, the agents asked for or otherwise suggested Mr.

Raymond should give them his codes 27 times.  The agents left, likely realized they were never

going to get into the phone without Mr. Raymond's assistance, and called Perry, who instructed

them to "re-engage."  They went to Mr. Raymond's hotel, this time with four of them and an

armed and uniformed officer, stationed themselves around Mr. Raymond's hotel lobby and

called him down.  In re-executing the dead warrant, this exchange occurred:

> **MS. GAJKOWSKI:  So, it's up to you, if you want to enter the password [to allow us to change the code/settings], you don't have to.**
>
> **MR. RAYMOND: I don't understand, am I compelled to?**
>
> **MS. GAJKOWKSI: You are not compelled to give us the code, only the thumbprint.  I want to be clear on that.**
>
> **MR. RAYMOND: I'd rather, just for privacy – I'd rather not.**
>
> **MS. GAJKOWSKI: Ok, understood.**

(From Herndon body camera footage, available if the Court requests.)  But the phone locked

almost immediately, and the agents were once again unable to access the phones.  The agents

called Perry again, and decided to take yet another run at Mr. Raymond.  They called him down

again, and for the 27th time, they asked him for his codes because they did "not want to keep

bothering" him, and they did not want "to continue to struggle with this over the weekend."

Finally, after hours with the agents, at multiple locations, and with a clear show of force and

unrelenting requests, Mr. Raymond was overborn and not only typed in his PIN code, but also

his Apple password, allowing the agents to change the phone's settings to grant them free access.

They agents well knew they could not compel Mr. Raymond to give them his passcodes, and

they ignored his invocation of his right not to give them his codes, because they were desperate

for them.  This violation of Mr. Raymond's 5th Amendment rights led to direct and free access

to his phone, and raises a substantial suppression issue.  But when he entered his guilty plea in

this case, Mr. Raymond had absolutely no idea this was an issue, because his counsel had no idea

it was an issue given they had not conducted any investigation into the underlying facts.

For these reasons, Mr. Raymond's counsel leading up to and at the time of his plea was ineffective, and it prejudiced Mr. Raymond's position on whether to plead guilty or go to trial. Mr. Raymond should be allowed to withdraw his guilty plea as a result.

**B.      Mr. Raymond Should be Allowed to Withdraw His Plea Because He Has a Viable Claim of Innocence With Regard to the Sexual Abuse Charges to Which He Pled.**

Separate from this ineffective assistance issue, Mr. Raymond also has "an objectively reasonable argument that he is innocent" (*McCoy*, 215 F.3d at 106), and for that reason he should be allowed to withdraw his guilty plea. With regard to the two most significant charges in his plea, Sexual Abuse of Complainants #7 and #9, there is absolutely no objective evidence that Mr. Raymond engaged in a "sex act" at times when those individuals were "not capable of appraising the nature of the conduct."[24] The photos do not show any such acts, and that is because they did not occur. This is why, at his plea hearing, Mr. Raymond struggled each time the Court asked if he had intercourse with one of these individuals without their consent, or at a time when they could not appraise the nature of the conduct. Mr. Raymond said repeatedly that he did not know that happened, could not remember the intercourse, or that it may be "probable" that it occurred based on the government's evidence, which he had not yet fully reviewed.

With regard to the reported incident with Complainant #7, additional facts outside the Statement of Offense actually show Mr. Raymond is innocent. As discussed above, Complainant #7 stated that she and Mr. Raymond had consensual sex in the morning after their date, but she became nauseous, and they stopped. She went to the bathroom, and claimed that she saw a used condom on the vanity, which she assumed was from the night before. But she also claimed that

---

[24]      Indeed, there is no objective evidence that Mr. Raymond engaged in a sex act with anyone, ever, who was not capable of appraising the nature of the conduct.

Mr. Raymond used a condom during the consensual intercourse in the morning.  That means there should be two condoms in the trash of Mr. Raymond's apartment from that night.[25]  But when agents thoroughly searched Mr. Raymond's apartment later, they found only a single used condom in the trash.  In addition, Mr. Raymond asserts that medically and physically, he would not have been capable of having sex with Complainant #7 both in the middle of the night and in the morning.  Mr. Raymond is prepared to introduce this evidence in order to demonstrate that he did not engage in a sex act with Complainant #7 at a time when she was incapable of appraising the nature of the conduct.  Finally, with regard to Complainant #9, Mr. Raymond notes that she informed the government that she believed it was a "normal date" and that Mr. Raymond was a "gentleman."  While Mr. Raymond does not recall having intercourse with Complainant #9, as he stated at the plea hearing, he asserts that he never knowingly had sex with someone who was passed out, blacked out, or otherwise incapable of appraising the nature of the conduct.  Thus, Mr. Raymond asserts that he is innocent of the two most significant charges in the plea, and for that reason he should be allowed to withdraw it.

### C.    Mr. Raymond Should be Allowed to Withdraw His Plea Because the Government is Not Prejudiced from Delay.

Finally, Mr. Raymond asserts that the government is not prejudiced by his withdrawal at this time, and it will not unduly delay this matter.  While Mr. Raymond's change of plea hearing was last July, a significant portion of the time that passed since then is attributable to multiple conflicts issues and other factors beyond Mr. Raymond's control.  Notably, the pre-sentence report in this case has not yet even issued, and the sentencing date was still seven months away

---

[25]    As noted above, the events with Complainant #7 occurred the night before the events with Complainant #1, after which Mr. Raymond left the apartment and returned to the United States where he quarantined in a hotel near Dulles Airport.

at the time Mr. Raymond provided notice of his intention to withdraw his guilty plea, and the sentencing date was not even set when Mr. Raymond called the issues discussed herein to the government's attention.  In addition, Mr. Raymond's counsel called these issues to the government's attention as soon as possible after finally obtaining and beginning to review discovery materials.  Mr. Raymond has acted expeditiously with regard to these issues and alerted both the government and the Court as soon as counsel became aware of the scope of the issues.

Finally, judicial economy is not substantially jeopardized by Mr. Raymond withdrawing his guilty plea and proceeding to trial given that the government already planned to conduct a multiphase contested sentencing hearing with a dozen or more witnesses.  Likewise the government and its witnesses are not significantly prejudiced in the event Mr. Raymond goes to trial rather than sentencing, because the government already plans to conduct the near equivalent of a trial in this case in November.

## V.      CONCLUSION.

For the foregoing reasons, Mr. Raymond requests that the Court grant this Motion and

allow Mr. Raymond to withdraw his guilty plea.


Dated: April 29, 2022                 Respectfully submitted,


                                      s/John Marston
                                      John Peter Marston
                                      **FOLEY HOAG LLP**
                                      1717 K Street, NW
                                      Washington, DC 20006
                                      (202) 261-7321
                                      Fax: (202) 785-6687
                                      jmarston@foleyhoag.com


                                      s/A. Joseph Jay III
                                      A. Joseph Jay III (D.C. No. 501646)
                                      Denise Giraudo (D.C. No. 499348)
                                      **SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP**
                                      2099 Pennsylvania Avenue, NW
                                      Washington, D.C. 20006
                                      (202) 747-1900
                                      JJay@sheppardmullin.com;
                                      DGiraudo@sheppardmullin.com


                                      *Counsel for Brian Jeffrey Raymond*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this **29th** day of **April**, 2022, I filed the foregoing using the

Court's CM/ECF system which gave notice to all counsel of record.


/s/ John P. Marston

**John P. Marston**