**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 1:21-CR-380-CKK** |
| | : | |
| **BRIAN JEFFERY RAYMOND,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S**
**MOTION TO DISQUALIFY TRIAL ATTORNEY JAMIE PERRY**

The United States, by and through the undersigned attorneys, respectfully files its opposition to defendant Brian Jeffery Raymond's "Motion to Disqualify Trial Attorney Jamie Perry," filed through counsel (ECF No. 135, hereinafter, "motion"). In his motion, the defendant claims that Department of Justice Trial Attorney Jamie Perry "has an irreconcilable conflict of interest and personal stake in the outcome of these proceedings," ECF No. 135 at 1, because she advised law enforcement on the now-challenged execution of a search warrant in this case and allegedly failed to highlight relevant discovery materials. Therefore, defendant argues, government counsel should be disqualified.

The defendant's motion is simply a naked attempt to bolster an unsustainable suppression argument raised in a different context and malign a Justice Department prosecutor in the process. It contains a highly misleading rendition of the facts, and it offers no valid basis for the Court to take the extraordinary step of disqualifying a government attorney. The defendant's motion misapplies civil liability law to threaten a civil suit against the assigned prosecutor and misconstrues the statutes and regulations governing conflicts for Department of Justice attorneys, all in an effort to create the appearance of a conflict where none exists. Finally, the instant motion is based upon a suppression claim that, as will become clear in the government's response to the

1

defendant's motion to withdraw his guilty plea, presents no basis upon which this Court would have suppressed the evidence obtained from the defendant's personal iPhone.   Accordingly, the motion to disqualify Trial Attorney Jamie Perry from this case should be summarily denied.

**LIMITED FACTUAL SUMMARY**

The claims presented in the defendant's motion are outrageous and factually incorrect. Much of his motion restates the Fourth and Fifth Amendment arguments contained within his motion to withdraw his guilty plea, ECF No. 119, the merits of which the government will fully address in its response, due on July 22, 2022.   However, to the extent that the facts presented in the defendant's motion to disqualify government counsel relate specifically to Ms. Perry's conduct, the government seeks here to correct the most reckless and incendiary misstatements and proffers what the testimony of Agent Mikel Gajkowski would provide in the event of a hearing on the matter.   The factual corrections contained herein will be supplemented in the government's response to the merits of the defendant's suppression arguments.

A.  **Defendant Incorrectly Asserts Ms. Perry Knew He Referenced an Attorney Upon Execution of the Warrant**

The defendant's motion incorrectly claims that following the seizure of the defendant's two phones, one personal iPhone (the subject of the defendant's motion to withdraw) and one work-issued iPhone, the agents told Ms. Perry that the defendant "invoked his right to silence." ECF No. 135 at 2-3, 16-17.   That is false—Ms. Perry was unaware that the defendant had even mentioned a lawyer until several weeks after his phones were seized.

During Agent Gajkowski's interview of the defendant on June 6, 2020, the agents asked the defendant how his phones were secured, and he stated they were locked with a PIN, which he declined to provide at that time.   The defendant did not mention that the phones could be opened

with a finger/thumbprint or facial scan.   Operating on the understanding that a PIN was the *only* option for unlocking the two phones, the agents seized his phones without attempting the biometric procedures provided for within the warrant.   After the interview, Agents Gajkowski and Ted Nelson drove to a nearby parking lot for a meeting with two additional agents who were staged in the area.   From the parking lot, Agent Gajkowski made a quick telephone call to Ms. Perry and reported that she had seized the two phones, the phones were locked with a PIN that the defendant declined to provide, and the biometric procedures authorized by the warrant were not attempted.[1] Agent Gajkowski did not inform Ms. Perry that the defendant had mentioned a lawyer when presented with the search warrant, and Ms. Perry did not learn this information until several weeks later upon review of the audio recording from the interview.[2]

Ms. Perry then called her supervisor at the Department of Justice to discuss the matter. After the conversation with her supervisor, Ms. Perry called Agent Gajkowski and told her that because the agents were still in the immediate area and because little time had elapsed, they should compel the defendant to open the phones using biometric procedures authorized by the warrant. Subsequently, the agents called the defendant and asked him to meet them in the lobby of his hotel, where they had him open his phones using the biometric procedures set forth in Attachment B of the warrant.   *See* ECF No. 119-1 (sealed exhibit).   More specific facts regarding the interactions between the defendant and the agents in the hotel lobby—relevant to the defendant's motion to

---

[1] This telephone conversation occurred before the agents were met by a local police officer at the defendant's hotel and is therefore not captured on the body-worn camera footage.

[2] Agent Gajkowski understood the defendant's mention of an attorney, when first presented with the warrant, not as an invocation of his right to silence but rather a reluctance or refusal to turn over his physical devices.   Because the agents had a lawful warrant, Agent Gajkowski did not believe his statement to have any legal impact on her ability to physically seize the devices.

withdraw plea (ECF No. 119)—will be fully addressed in the government's response to that filing.[3]

Additionally, on June 5, 2020, the day before the agents planned to seize the defendant's phones, Ms. Perry and Agent Gajkowski discussed the procedures authorized by the warrant and exactly what could be compelled and what could not.   Ms. Perry advised Agent Gajkowski, both verbally and in writing, that the agents could compel the defendant to unlock his phones using biometrics (thumb/fingerprint and/or facial scan) and they could ask him to voluntarily provide his passcode, but they could not compel him to reveal his passcode.   (Exhibit 1).   As will be fully discussed in the response to the defendant's motion to withdraw his plea, and as is readily apparent on the bodycam footage that the government will attach to its response, Agent Gajkowski followed this advice by reminding the defendant several times that it was his choice whether to provide his passcode and stating that they could not compel him to do so.[4]

---

[3] The government notes that on the body-worn camera – the same body-worn camera the government provided to the defense as part of discovery in this case – only Agent Gajkowski's side of any telephone conversations can be heard. At one point, Agent Gajkowski used one telephone to speak with Ms. Perry and during that call used another phone to contact a special agent from her office, who serves as a resource on evidence collection, for technical advice on how to keep the phones from relocking.   When reviewing the body-worn camera footage, the listener cannot hear anything Ms. Perry or the agent on the other phone are saying, and at times it is unclear whether Agent Gajkowski is responding to Ms. Perry or the agent.   Despite this non-evidence, the defendant's motion nevertheless alleges that Ms. Perry herself advised Agent Gajkowski that agents could continue to have the defendant open his phones, up until point when the warrant was returned, without limitation. *See* ECF No. 135 at 5, 16.   Agent Gajkowski will testify, if required, that Ms. Perry never made any such assertion.   Rather, during a call between Agent Gajkowski and Ms. Perry from the hotel lobby, Ms. Perry expressed concern about the idea to return the following week with a computer forensics agent present to have the defendant unlock the phones, as she considered whether it would be temporally too attenuated from the date of the original seizure.   Ms. Perry also asked Agent Gajkowski whether an agent could continuously touch the screens of the phones, once unlocked one last time, to keep them from relocking while another agent drove directly to the computer forensics lab.   The agents believed this was unlikely to succeed, as the defendant's personal phone continually relocked within a matter of seconds.

[4] In the government's opposition to the motion to withdraw, the government will address the defendant's accusation that the agents repeatedly requested that the defendant reveal his PIN code.   While not pertinent to a motion to recuse, here, the government notes that several of the occasions identified by the defendant as 'continued harassment' and attempts to obtain his PIN were, in fact, instances during which Agent Gajkowski confirmed the defendant's right to maintain the secrecy of his PIN code, adhering to the guidance provided by Ms. Perry that the PIN could not be compelled.

4

**B.** **The Government Properly Disclosed Materials Relating to the Phone Seizure to Defense Counsel**

The defendant's motion alleges that the government failed to highlight for defense counsel the materials relating to the June 6, 2020, seizure of the defendant's phone. *See* ECF No. 135 at 6-7. In fact, the government produced the body-worn camera footage *three* times, each time noting its existence to counsel.

Discovery in this case has been voluminous.   When organizing, preparing, and producing voluminous discovery, there is sometimes a substantial delay while discovery materials are uploaded into the government's discovery software, Relativity, and then formally marked and produced by the litigation support department.   In the interest of time and to ensure the defense had all relevant materials as soon as practicable, the government sent materials to defense counsel "unofficially," meaning without the use of Relativity and without Bates-numbers.   Once the materials were ready, the government then reproduced the same materials "officially," meaning through Relativity and with Bates-numbers.

On January 27, 2021, the government "officially" produced 4,414 pages of Bates-stamped documents, comprised of FBI reports and copies of search warrants and accompanying affidavits, to include the search warrant for the defendant's two iPhones.   On the same date, the government also "unofficially" produced additional materials it thought would be important to defense counsel, to include victim interview reports, materials relating to the defendant's June 2 and June 6, 2020, interviews, and the June 6, 2020, bodycam footage.   The government highlighted those materials in its discovery letter.   (Exhibit 2).

On June 16, 2021, the government "officially" produced documents numbered 7,856-10,542.   In its accompanying discovery letter, the government indicated that the production

included a voice memo created by Agent Ted Nelson on June 6, 2020.   The letter then went on to state, "Note: we have included the two body-worn camera videos from June 6 to ensure that the materials relevant to Agent Nelson's voice note are easily accessible."   (Exhibit 3).   The government therefore took the extra step of reproducing the bodycam footage and noting it in the letter, making it abundantly clear that Agent Nelson's voice memo regarding the phone seizure was linked to the bodycam footage and making it easy for defense counsel to readily link those materials and review them together.   Finally, the government produced the bodycam footage a third time, this time "officially" with Bates-numbers on June 30, 2021, noting in the accompanying letter, "You have already received some of these items informally, to include…phone seizure body-cam footage..."   (Exhibit 4).   Contrary to the defendant's allegations, the government took reasonable measures to ensure that defense counsel was aware of the most relevant evidence, to include its efforts to search and seize the defendant's personal phone.   Allegations that the government intentionally avoided highlighting certain discovery is, at its best, unsupported, and at its worst, a possible attempt to deflect responsibility to review and sully opposing counsel.[5]

## ARGUMENT

### A.  There is No Conflict Requiring Disqualification of Government Counsel

The defendant alleges that Ms. Perry has an "irreconcilable conflict of interest" and therefore must be recused from this case based primarily upon a hypothetical, threatened personal

---

[5] The defendant's motion to disqualify contains an additional allegation, namely, that Ms. Perry was unwilling to discuss the defendant's concerns regarding the phone seizure and the effect thereof on the plea agreement. *See* ECF No. 135 at 20-21.   While not dispositive for either of the defendant's pending motions, the government notes, for the record, that the defendant's characterization of this conversation lacks important nuance.   During a meeting to discuss classified discovery, held on March 28, 2022, defense counsel, without advanced notice, made allegations regarding the seizure of the defendant's phone and suggested that the government reopen the plea negotiations and discuss the possibility of a more lenient sentence.   Given the lack of notice, the government attorneys were unprepared to discuss the issue at that time and therefore declined to do so, suggesting instead that if the defendant felt as though he had a basis upon which to withdraw his plea, he should consider immediately alerting the Court, as the parties had been instructed to file a proposed sentencing calendar shortly thereafter.

liability suit as well as the need for Ms. Perry to testify in this matter. *See* ECF No. 135 at 1-2, 13, 18. As explained herein, no such conflict exists. Ms. Perry did not violate the defendant's clearly established rights and did not encourage or direct the agents to do so. As such, any anticipated civil action would be summarily dismissed, and nevertheless, the mere filing of a lawsuit does not, on its own, create a conflict. Additionally, Ms. Perry is not a necessary witness as to the instant motion or the defendant's motion to withdraw his plea. If a hearing is required to inform the Court's ruling on the alleged suppression issues, Agent Gajkowski would testify to the execution of the warrant, the seizure and subsequent unlocking of the defendant's phones, and the advice she received from Ms. Perry. As discussed further in Section B, prosecutors routinely give advice to agents during investigations, and agents routinely testify as to their adherence to such advice. Finally, Department of Justice regulations do not provide any basis upon which Ms. Perry should be recused, and forced disqualification of a government prosecutor would raise significant concerns relating to the separation of powers. For these reasons, the defendant's motion should be denied.

      **1. Ms. Perry did not violate the defendant's rights.**

      The defendant's motion to disqualify government counsel is premised entirely upon an unsupported argument that the seizure of his personal iPhone was unconstitutional and that government counsel intentionally directed the purportedly illegal search. The government will fully respond to the constitutional claims regarding the manner in which the defendant's phone was seized in its response to his motion to withdraw his plea, and it will establish there were no constitutional violations. At issue in the instant motion, however, is Ms. Perry's involvement in advising Agent Gajkowski before and during the seizure, which is addressed herein.

      To respond to the defendant's allegation that Ms. Perry violated the defendant's

constitutional rights, and to orient the Court, the government briefly restates the most relevant facts as follows: (1) law enforcement lawfully seized the defendant's personal phone but failed to utilize the biometric provisions as authorized by the warrant; (2) upon alerting Ms. Perry to the fact that such techniques were not used, Ms. Perry consulted with a supervisor; (3) considering the fact that the agents were still in the immediate area and that little time had elapsed, Ms. Perry then directed the agents to employ the biometric unlocking procedure; and (4) the agents reengaged the defendant to unlock the phones as explicitly authorized by the warrant.   Both before and during the phone seizure, Ms. Perry instructed Agent Gajkowski that the use of the defendant's thumb/fingerprint and/or face could be compelled but that the defendant could not be forced to provide his PIN.   Contrary to the defendant's bold allegations, Ms. Perry never encouraged the agents to harass the defendant for his PIN, nor did they do so.   Ms. Perry was also not aware that the defendant had mentioned an attorney until several weeks after the phone was seized.[6]

Despite the defendant's egregious misstatement of the evidence relating to the seizure of his phone, there are no facts, whatsoever, to indicate that Ms. Perry violated the defendant's constitutional rights or directed the agents to do so.   Accordingly, there is no basis upon which to argue that Ms. Perry has a conflict based upon the legal advice given in relation to the seizure.

**2. Ms. Perry is not subject to personal liability.**

The defendant's motion is replete with implied threats that a civil suit against Ms. Perry is all but assured.[7]   However, even if such action were to materialize, Ms. Perry is protected by

---

[6] By proffering what Ms. Perry knew and when, the government does <u>not</u> concede that the defendant's statement regarding his request for an attorney implicates his constitutional rights surrounding the seizure and download of his phone.   This will be fully briefed in the government's response to the motion to withdraw the plea. Nevertheless, we intend to clarify relevant facts for the purposes of this Motion and the future Opposition to the motion to withdraw.

[7] The defendant's motion is anchored by a misguided belief that *because* Ms. Perry engaged in a constitutional violation, and *because* she is now subject to civil liability, her role as a prosecutor is somehow tainted.   But this claim makes several unsupported leaps, to include Ms. Perry's purported concerns over civil liability.

qualified immunity.   Ms. Perry did not personally engage in conduct that violated the defendant's rights, and his generalized constitutional claims do not sufficiently establish a viable claim.

Qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).   Qualified immunity not only protects against liability; it shields individuals from trial and even discovery. *See Saucier v. Katz,* 533 U.S. 194, 200–01 (2001), *rev'd in part on other grounds*, *Pearson v. Callahan*, 129 S. Ct. 808 (2009) (recognizing that qualified immunity "is an immunity from suit rather than a mere defense to liability").   The qualified immunity doctrine recognizes the unique costs and burdens associated with personal-capacity litigation against government officials.   These include the diversion of official energy and resources to litigation rather than pressing public problems, the threat of personal liability discouraging capable people from assuming public positions, and the fear of suit deterring officials from exercising judgment with the decisiveness critical to their offices.   *See Harlow*, 457 U.S. at 814; *see also Filarsky v. Delia*, 566 U.S. 377, 389–90 (2012) (explaining that qualified immunity "help[s] to avoid 'unwarranted timidity' in performance of public duties, ensuring that talented candidates are not deterred from public service, and preventing the harmful distractions from carrying out the work of government that can often accompany damages suits") (internal citation omitted).   And since these costs and burdens begin to accrue as soon as a case is filed, the Supreme Court "repeatedly ha[s] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant,* 502 U.S. 224, 227 (1991) (per curiam).

Qualified immunity insulates a prosecutor's conduct *even if* the criminal defendant's rights were violated.   *See Wilson v. Layne*, 526 U.S. 603, 614, 618 (1999) (holding that media presence

during warrant execution violated Fourth Amendment but granting qualified immunity because right to exclude media was not clearly established).   In essence, qualified immunity gives public officials the benefit of the doubt so long as the law at the time of their conduct did not clearly prohibit their actions.   *See Saucier*, 533 U.S. at 202 ("If the law did not put the officer on notice that his conduct would be clearly unlawful, . . . qualified immunity is appropriate."); *Hunter*, 502 U.S. at 229 (describing qualified immunity as "accommodation for reasonable error").   Qualified immunity provides "ample room for mistaken judgments" and protects all government officials except "the plainly incompetent or those who knowingly violate the law."   *Malley v. Briggs*, 475 U.S. 335, 343 (1986).   Neither exception is applicable here.

If the defendant were to bring a civil suit against Ms. Perry, any court would, at the earliest stage, evaluate (1) whether the defendant has alleged government counsel personally engaged in conduct that violated a constitutional right, and (2) whether that right was clearly established at the time of the alleged violation.   *Saucier*, 533 U.S. at 201–02.   Both prongs must be satisfied, but courts have discretion to address these prongs in any order and may grant qualified immunity because the right alleged to have been violated was not "clearly established."   *Pearson*, 555 U.S. at 227.

When properly defined, qualified immunity focuses on whether the constitutional or statutory right at issue was clearly established on the particular facts of the case.   *See Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) ("The 'clearly established' standard [] requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him.").   In conducting such an analysis, courts routinely reject attempts from plaintiffs to define the right with only general constitutional precepts, such as "due process," "free speech," or "reasonableness."   *See San Francisco v. Sheehan*, 575 U.S. 600, 613 (2015) ("Qualified immunity

10

is no immunity at all if 'clearly established' law can simply be defined as the right to be free from unreasonable searches and seizures.").   Notably, the generalized claims in the defendant's motion are too vague and do not meet this need for "specificity [which is] is especially important in the Fourth Amendment context" because "it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts."  *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam).

In the instant matter, no clearly established right was violated by the advice Ms. Perry provided to the agents.   The inclusion of biometric unlocking procedures in search warrants is a recent development, and while courts throughout the country have largely concluded that such procedures do not violate the Fourth and Fifth Amendments, there is little authority as to precisely how to carry out such procedures.   Magistrate Judge Harvey's opinion regarding biometrics, issued two years before the seizure at issue in this case, notes that this is an "emerging area of the law."  *Matter of Search of [Redacted] Washington, D.C.,* 317 F. Supp. 3d 523, 526 (D.D.C. 2018). The opinion concludes that biometric provisions contained in search warrants do not violate either the Fourth or Fifth Amendments, but it says little about *how* agents should implement such provisions.   *See id.* at 533 (drawing upon cases involving fingerprinting procedures, Judge Harvey simply indicates that the procedure should be done "with dispatch" and in the immediate vicinity of the premises to be searched but does not define the outer limits of what it means to act with dispatch).   For a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *see also Wesby,* 137 S. Ct. at 590 ("It is not enough that the rule is suggested by then-existing precedent.   The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the [criminal defendant] seeks to apply.   Otherwise, the rule is not

one that every reasonable official would know.")   Here, there was no clearly established right that was violated, as the law regarding the use and logistics of biometric unlocking procedures is still emerging.   Importantly, none of the defendant's rights were personally violated by Ms. Perry, as her advice was reasonable and took into account that the agents were still in the immediate area and little time had elapsed, and the advice was given after consultation with a supervisor. Additionally, the fact that the defendant mentioned a lawyer, which Ms. Perry did not know until later, has no bearing on the analysis here, as a determination of qualified immunity is limited to the facts known to the government official at the time of the conduct in question.   *See Hernandez v. Mesa,* 137 S. Ct. 2003, 2007 (2017) ("Facts an officer learns after the incident ends—whether those facts would support granting immunity or denying it—are not relevant.").

Ms. Perry's conduct was not plainly incompetent or a knowing violation of the law; rather, it was reasonable and well within the bounds of her ethical and constitutional duties.   *See Anderson v. Creighton,* 483 U.S. 635, 639 (1987) (finding that where a government official's conduct is objectively reasonable, the official will be protected from liability).   Accordingly, any civil suit threatened or brought against Ms. Perry based upon the advice provided to agents both before and during the seizure of the defendant's phone would certainly be dismissed at the earliest possible stage based upon qualified immunity.   Ms. Perry therefore has no conflict due to an interest in the outcome of a hypothetical or threatened civil suit, and there is no basis upon which to disqualify Ms. Perry from this case.[8]

---

[8] The defendant's motion all but concedes this point, noting that a disqualifying conflict would require a "bona fide civil action" alleging bad faith as well as proof of misconduct by clear and convincing evidence, none of which is present here, and recognizing that in the absence of such evidence, a defendant cannot disqualify a prosecutor by the mere filing of a civil suit. *See* ECF No. 135 at 13.

### 3. Ms. Perry is not an essential witness.

The defendant next argues that Ms. Perry is an essential witness to the seizure of the defendant's phone. This assertion ignores the obvious fact that any testimony this Court deems necessary to resolve the defendant's motion to withdraw his plea can be obtained by other means. To be called as a witness, a prosecutor's testimony must be vital and unable to be presented from another source. *United States v. Wooten*, 377 F.3d 1134, 1143 (10th Cir. 2004). "Where witnesses other than the prosecutor can testify to the same matters or conversations, no compelling need exists." *United States v. Wallach*, 788 F. Supp. 739, 744 (S.D.N.Y. 1992); *see also United States v. Torres*, 503 F.2d 1120, 1126 (2d Cir. 1974) (a prosecutor should not take the stand unless unavoidably necessary and all other sources of possible testimony have been exhausted). As with all matters of courtroom practice, the district court has wide discretion over whether to allow a prosecutor to be called as a witness. *United States v. Hinkle*, 492 F.2d 660, 662 (D.C. Cir. 1974).

It is not a foregone conclusion that this Court will conduct a suppression hearing when ruling on the defendant's motion to withdraw his plea. Given that the motion is based upon an allegation that ineffective assistance of counsel tainted the defendant's guilty plea, the Court could find, for example, that prior counsel reviewed the evidence relating to the phone seizure, determined that a suppression argument was not worth raising, and made a tactical decision to turn her attention to negotiating a favorable plea agreement, and therefore conclude that prior counsel's performance did not fall below an objective standard of reasonableness. *See generally Strickland v. Washington,* 466 U.S. 668 (1984). In this scenario, the Court may elect not to address the second *Strickland* prong regarding prejudice. This would end the inquiry as to whether the Rule 11 change of plea proceeding was tainted, and the Court would then move on to assess whether the defendant made a viable claim of innocence and whether the government had suffered any

prejudice.   And even if this Court were to address prejudice—whether there is a reasonable probability the outcome would have been different had counsel filed a motion to suppress the evidence from the defendant's personal phone—the Court could do so based upon the parties' filings and relevant law and choose not to hold a suppression hearing to hear testimony regarding the phone seizure.

Even assuming the Court decided to hold a suppression hearing before ruling on the defendant's motion to withdraw his plea, Ms. Perry's testimony would not be vital, and other witnesses would testify to the relevant information.   Agent Gajkowski could testify as to the oral advice provided by Ms. Perry, both before and during the seizure, and Ms. Perry's written guidance to Agent Gajkowski could be entered into the record as an exhibit.

Even where there is a "solid allegation" that prosecutors may serve as witnesses in the litigation, it is in the district court's discretion to disqualify a prosecutor on these grounds.   *See United States v. Sattar*, 314 F. Supp. 2d 279, 316 (S.D.N.Y. 2004) (citing *Purgess v. Shamrock*, 33 F.3d 134, 144 (2d Cir. 1994) ("The disqualification of an attorney…is a matter committed to the sound discretion of the district court.")).   In the unlikely event the Court determined that there were facts known only to Ms. Perry and not available from any other source, such testimony would relate only to the suppression issues contained within the defendant's two pending motions and would not be relevant during trial, should the defendant succeed in withdrawing his plea.   A narrowly tailored remedy, such as asking Ms. Perry to recuse only from the proceedings relating to the motion to withdraw the plea, would account for any such concerns.   Disqualification from the ongoing case would be unwarranted, if not unprecedented.

### 4.  The defendant's other arguments regarding a purported conflict of interest, to be remedied by Ms. Perry's disqualification, also fail.

As established above, Ms. Perry does not have a personal interest in this case.  But it is worth noting that the rules cited by the defendant generally relate to financial, personal, or political conflicts of interest, as opposed to prosecutorial advocacy or (assuming *arguendo* for the defendant's motion) bad advice.  Based upon the Code of Federal Regulations and relevant Department of Justice policies, the possible conflicts of concern are those of a financial nature and those that involve a personal or political relationship with an interested party.  An executive branch employee cannot substantially participate in "any particular matter in which, to his knowledge, he or any other person specified in the statute, has a financial interest, if the particular matter will have a direct and predictable effect on that interest."  5 C.F.R. § 2640.  For example, a DOJ prosecutor should not, without an agency waiver, become substantially involved in the investigation of a company for which he serves as an investor.  Additionally, a DOJ prosecutor cannot, without agency permission, participate in the criminal investigation or prosecution if she has a personal or political relationship with the subject of the investigation or with a person she knows has a specific and substantial interest that would be directly affected by the outcome of the investigation or prosecution.  28 C.F.R. § 45.2.  This typically includes relatives, employers (past, present, and prospective), and business associates.  And executive branch employees must take steps to avoid an appearance of the loss of impartiality in matters involving personal and business relationships.  5 C.F.R. § 2635.

Notably, decisions relating to these conflicts are left to the executive branch agencies, and the regulations are not intended to create rights enforceable by private individuals.  *See, e.g.*, 28

C.F.R. § 45.2(d) and 5 C.F.R. § 2635.502(d). Title 3-1.140[9] of the *Justice Manual* "does not mandate recusal or disqualification, but rather outlines a procedure that should be followed if the U.S. Attorney [or Section Chief] becomes aware of a matter that might require recusal." *Rodriguez v. Shulman*, 843 F. Supp. 2d 96, 100 (D.D.C. 2012) (discussing the Justice Manual's precursor). The Department of Justice's Ethics Office provides specific guidance on financial conflicts of interest warning against situations that may unfairly benefit an employee, an employee's relative, or an organization where the employee has previously worked or is seeking future employment. *See* United States Dep't of Just., *Conflicts*, https://www.justice.gov/jmd/conflicts.

The federal regulations governing conflicts for executive branch employees and the rules promulgated by DOJ do not recognize the type of conflict alleged by the defendant. Ms. Perry has no financial interest in this matter and no personal or political relationships with the defendant or any victim or any other relevant person. That Ms. Perry provided advice during the course of the investigation—whether legally correct or the product of error—such advocacy does not in any way, shape, or form mandate recusal. The law does not require a level of disinterest such that future, ongoing proceedings in the litigation be sanitized of a prior prosecutors' participation. *See, e.g.*, *FTC v. Facebook, Inc.*, No. 20-3590 (JEB), 2022 WL 103308, *20 (D.D.C. Jan. 11, 2022) ("True disinterest on the issue of such a defendant's guilt is the domain of the judge and the jury — not the prosecutor." (quoting *Wright v. United States*, 732 F.2d 1048, 1056 (2d Cir. 1984) (internal quotation marks omitted))).

---

[9] The Justice Manual states "When United States Attorneys, or their offices, become aware of an issue that could require a recusal in a criminal or civil matter or case as a result of an actual or apparent conflict of interest, they must contact EOUSA's General Counsel's Office (GCO)." U.S. Dep't of Just., *Just. Manual* § 3-1.140 (2018).

Furthermore, the relief requested by the defendant implicates meaningful separation-of-powers issues. More broadly, the Constitution provides for three coordinate branches of government:

> The Constitution confers limited authority on each branch of the Federal Government. It vests Congress with enumerated "legislative Powers," Art. I, § 1; it confers upon the President "[t]he executive Power," Art. II, § 1, cl. 1; and it endows the federal courts with "[t]he judicial Power of the United States," Art. III, § 1. *In order to remain faithful to this tripartite structure, the power of the Federal Judiciary may not be permitted to intrude upon the powers given to the other branches.*

*Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016), as revised (May 24, 2016) (emphasis added). Specifically, the authority to assign attorneys to prosecute violations of federal offenses lies with the Attorney General.   *See generally* Title 28, United States Code, Chapters 31 and 35.[10]   Any action by the Court to intrude upon that authority without an extraordinary reason to do so would raise serious separation of powers concerns.   *See, e.g., In re U.S.*, 441 F.3d 44, 58 (1st Cir. 2006) ("This court has been mindful of these separation of powers constraints. It has rejected an attempt to have federal courts use their inherent supervisory authority to disqualify a federal prosecutor who had otherwise been properly appointed by the Executive branch."); *United States v. Silva-Rosa*, 275 F.3d 18, 22 (1st Cir. 2001) ("In essence, then, appellants are asking this Court to dictate to the executive branch whom it can appoint to serve as its prosecutors. Such a position would expand the power of judicial officials to such a degree as to trigger weighty separation of powers concerns."); *In re Matter of Grand Jury Subpoena of Rochon*, 873 F.2d 170, 176 (7th Cir. 1989) ("In sum, disqualification is a drastic measure which courts should hesitate to impose except when

---

[10] A fundamental principle of criminal law is that "[o]ur legal system has traditionally accorded wide discretion to criminal prosecutors in the enforcement process."   *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 248 (1980).   Integral to that discretion, the government has an "interest in retaining its chosen counsel" and the "right to prosecute the matter through counsel of its choice."   *United States v. Vega*, 317 F. Supp. 2d 599, 602−03 (D.V.I. 2004).

absolutely necessary.").

The government is unaware of any occasion where a court in this circuit has disqualified the duly assigned prosecutor in a federal criminal matter of this nature. More to the point, this is not simply the duly assigned prosecutor in a criminal case, but the executive branch's representative before a separate branch of government. As even recognized by the defendant, in a different context, such employees represent a "sovereignty" distinct from an ordinary party. *See* ECF No. 135, at 23 (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935). This sovereignty is permitted the attorney of her choosing.

## B. <u>The Requested Remedy is Impractical and Untenable</u>

Federal prosecutors routinely engage with law enforcement beginning at the earliest stages of an investigation.  Ideally, prosecutors and agents work together as a team when strategizing about investigatory tactics, drafting search warrant affidavits, and planning for interviews.   Such collaboration should be encouraged, as it gives the prosecutor an opportunity to advise agents in advance of such operations as to the subject's legal rights and the investigative team's ethical and constitutional obligations.   Once a defendant is charged and the case enters the judicial phase, it is common for agents to testify at preliminary, detention, suppression, and other pretrial hearings as to their investigatory actions.   Often, such testimony includes whether they received, and followed, advice provided by the prosecutor.   To disqualify a prosecutor each time her advice is challenged would result in a myriad of unintended negative consequences to the fair and efficient administration of justice.   Accordingly, the D.C. Circuit has been hesitant to find prosecutorial misconduct stemming from prosecutors' legal advice to investigators.  *See, e.g., United States v. Heldt*, 668 F.2d 1238 (D.C. Cir. 1981) ("Most prosecutors participate in searches to some extent by drafting applications for search warrants and giving legal advice to agents conducting searches,

and such practice is certainly encouraged.   A loose disqualification rule based on legal advice rendered in an official capacity could disrupt the orderly process of criminal prosecutions without rendering any corresponding benefit to the public.").

Requiring the disqualification of a prosecutor each time her advice is challenged is untenable and unwarranted.   Such an extreme remedy would remove the executive branch's discretion in how to best assign and staff its matters.   It would encourage frivolous suppression motions for the sole purpose of unfairly hindering the government's case by routinely disqualifying prosecutors from their cases.   The results would be disastrous to judicial economy.   Moreover, forcibly recusing prosecutors would discourage them from providing legal advice during their investigations, creating a chilling effect that could potentially lead to panoply of mistakes, whether constitutional violations, logistical errors, or investigative mishaps. Notably, such disqualifications could be used maliciously as a backdoor method for defendants to personally implicate prosecutors in adverse evidentiary rulings and create potential personal liability, or at the very least reportable ethical concerns.   Defendants would effectively be encouraged to target prosecutors they would rather not have assigned to their cases.[11]   The court should reject such tactics and deny the defendant's motion.

Notwithstanding the defendant's pending motion to withdraw his guilty plea, the extraordinary request to remove a prosecutor underpinning an unresolved and ongoing issue is both surprising as it is meritless.   Here, the prosecutors are well aware of their constitutional and

---

[11] The defense tactics, to include collaterally attacking a prosecutor by seeking disqualification and threatening civil suits in a criminal pleading, are self-evident in the motion.   However, additional corollary methods to chill a prosecutor's involvement in a case are also evident.   Given the incendiary constitutional violations alleged by the defense, resolution of the suppression arguments on other grounds (as often occur when courts are faced with various avenues to resolve such arguments) may open the door to professional responsibility referrals, a route we take quite seriously.

ethical obligations.   Moreover, the allegations raised by the defendant, even if accepted as true, provide neither the legal, ethical, nor practical remedy he now seeks.

## CONCLUSION

Ultimately, Ms. Perry's conduct in relation to the seizure of the defendant's phone and her subsequent disclosure of the relevant materials were reasonable and well within the bounds of her ethical and constitutional obligations. [12]   She did not personally violate the defendant's rights, nor did she advise or encourage the agents to do so, and she therefore has no disqualifying personal interest based upon a potential civil suit.   Further, Ms. Perry is not an essential witness, and no other conflicts or reasons exist to justify her disqualification from this case.   The Department of Justice fully supports her continued involvement in this matter and respectfully requests that this Court deny the defendant's motion to disqualify Ms. Perry.

//

//

//

//

//

//

//

//

//

//

---

[12] The defendant's citation to 18 U.S.C. § 241, implying that a department prosecutor *committed a crime,* is astounding.

20

KENNETH A. POLITE, JR.                    MATTHEW M. GRAVES
Assistant Attorney General                United States Attorney

By:    ____/s/_____                           _____/s/_____
       Hope Olds, Acting Chief                   John Crabb Jr., Chief
       U.S. Dept. of Justice, Criminal Division  U.S. Attorney's Office
       Human Rights and Special Prosecutions     Criminal Division


       _____/s/_____                       _____/s/_____
       Jamie B. Perry                            Angela N. Buckner
       MD Bar No: 1012160031                     DC Bar No. 1022880
       Danielle L. Hickman                       Assistant United States Attorney
       CA Bar No: 193766                         United States Attorney's Office
       Trial Attorneys                           601 D Street, N.W.
       U.S. Dept. of Justice, Criminal Division  Washington, D.C. 20530
       Human Rights and Special Prosecutions     (202) 252-2656
       1301 New York Avenue, Northwest           Angela.Buckner@usdoj.gov
       Washington, D.C. 20530
       (202) 307-3262
       Jamie.Perry@usdoj.gov
       Danielle.Hickman@usdoj.gov

21