# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 1:21-CR-380-CKK** |
| | : | |
| **BRIAN JEFFREY RAYMOND,** | : | |
| | : | |
| **Defendant** | : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO WITHDRAW GUILTY PLEA

The United States, by and through the undersigned attorneys, respectfully files its opposition to defendant Brian Jeffrey Raymond's Motion to Withdraw Guilty Plea (ECF No. 119, hereinafter "motion"). The defendant seeks to withdraw his guilty plea, arguing that his plea was constitutionally defective and that he is innocent of the sexual abuse charges to which he pled guilty. ECF No. 119 at 1. Specifically, the defendant claims that he was not advised of the alleged constitutional violations involving the seizure and search of his personal cell phone. *Id*. at 2. According to the defendant, despite the fact that he invoked his right to silence several times, law enforcement repeatedly asked for the passcode to his personal cell phone. *Id*. at 1. Furthermore, agents, in seizing the phone, repeatedly executed a "dead" warrant. *Id*. at 2. Therefore, former counsel's failure to "consider[] prepar[e], or beg[in] preparing, a motion to suppress, or engag[e] the government on this issue" amounted to ineffective assistance of counsel. *Id*. at 21. And, the plea colloquy was similarly insufficient because it failed to inquire of the defendant as to whether he had considered any such motions. *Id*. at 21.

The defendant additionally argues that he "never knowingly had non-consensual sex with anyone in this life" and only admitted during the plea colloquy that it was "probable" that he had committed a criminal offense based on his understanding of the government's evidence. *Id*. at 4.

Now that the defendant has "more completely reviewed the evidence and discovery," and because the defendant now realizes that there was a potential suppression issue, he asserts his innocence. *Id*. at 4.

First, looking at the plea colloquy in this case, the defendant's decision to t accept the plea was a voluntary and intelligent choice. There was no constitutional defect. The fact that the Court did not inquire specifically about potential motions the defense could have filed is immaterial. The plea colloquy contained all the required procedural safeguards. *See infra*, Section I.A.

Second, there were no constitutional violations surrounding the seizure and search of the defendant's personal cell phone. The agents did not violate the defendant's Fifth Amendment Due Process Rights by asking the defendant whether he was willing to enter his PIN to change the lock settings on his phone. The defendant had no right to counsel because he was not the subject of a custodial interrogation. And nothing regarding the circumstances of the defendant's conversation with law enforcement was so coercive that it overborne the defendant's will. *See infra*, Section I.B.3.

Additionally, the search warrant had not yet been executed because though the phone had been unlocked, the forensic examination authorized by the warrant had not yet been completed. The warrant was not "dead." But even if the unlocking of the phone meant that the warrant had been executed, a single search warrant may authorize more than one entry. *See infra*, Section I.B.2. Furthermore, even if the evidence gathered from the defendant's phone had been suppressed, damning evidence would have been – and was – inevitably discovered through valid search authorizations for the defendant's work cell phone, laptop, and iCloud account. *See infra*, Section I.B.4.

Third, considering the substantial evidence of the defendant's guilt, prior counsel made a reasonable, tactical decision to aggressively negotiate a pre-indictment plea on the defendant's behalf – their decision to do so, at the potential expense of filing a motion to suppress that was unlikely to succeed, was reasonable and well within the range of constitutionally adequate performance. *See infra*, Section I.D.

Fourth, the defendant voluntarily admitted, under oath, to sexually assaulting AV-7 and AV-9. In fact, the defendant himself offered to plead to charges related to these specific victims. And, the evidence supporting those offenses is significant. The defendant has therefore failed to meet his burden and establish that he is innocent. Furthermore, where, as here, the government has forgone more serious charges in consideration of a plea, the defendant must also establish innocence as to those offenses. Here again, the defendant fails. *See infra*, Section II.

Finally, allowing the defendant to withdraw his guilty plea substantially prejudices the government. While the government acknowledges that the disputed sentencing enhancements necessitate testimony from various victims, that hearing pales in comparison to a full-fledged trial. Allowing the defendant to withdraw his plea and start anew would cause the victims in this case overwhelming and undue trauma. The substantial prejudice the victims would face is imputed to the government. *See infra*, Section III.

Accordingly, the defendant's motion to withdraw his guilty plea should be denied.

## FACTUAL BACKGROUND

On May 31, 2020, a naked woman, later identified as Adult Victim ("AV") 1, was observed screaming for help from the balcony of the defendant's embassy-provided residence in Mexico City, Mexico. She reported to her neighbors that the defendant had assaulted or raped her, and a

subsequent examination revealed that she had vaginal and anal injuries. While the defendant alleged that he and the victim had consensual sexual intercourse, she has no memory of engaging in a sexual act with the defendant. This incident formed the beginning of an extensive, international investigation, eventually leading to evidence that the defendant had drugged and sexually assaulted numerous women throughout the world over the course of many years. The evidence further revealed that the defendant photographed and videotaped dozens of unconscious, nude, and partially nude women. Most of these women have been identified and interviewed, and many were unaware that the defendant had victimized them in this way.

*Discovery*

As will be discussed in more detail below, the defendant was charged and arrested on October 9, 2020, in San Diego, California, where he was ordered detained by a magistrate judge in the Southern District of California before ultimately being transported to Washington, D.C. He pled guilty on July 23, 2021.

The defendant and his attorneys were provided with extensive discovery prior to the plea. In the earliest days, before the defendant had even arrived in D.C., prior defense counsel met with the government to review some of the relevant materials. In November 2020, the government provided prior counsel with a proposed Protective Order. Prior counsel noted that the government's draft did not give the defendant an opportunity to review discovery materials while in the jail and expressed concern that given COVID and limitations on in-person meetings, this would be untenable. The government then agreed to add language permitting defense counsel to provide a copy of the unclassified, non-explicit, non-sensitive materials to the jail, allowing the defendant to review those materials himself, and the protective order was entered. ECF No. 15.

Over the months that followed, defense counsel was provided with the explicit photos and videos, all victim interview reports, all interview recordings, all chat and email conversations between the defendant and the victims, all defendant statements, chat and email conversations between the defendant and friends, all search warrant affidavits and related reports, all data returned pursuant to search warrants for online accounts, and all device extractions, among other things.[1] Following the entry of the plea, the government continued to provide discovery materials as they were created, particularly reports from follow-up interviews with victims in preparation for the evidentiary hearing. The factual summaries below reflect information that has been provided to the defendant.

*The Attempted Inducement of AV-2*

AV-2 met the defendant on Bumble (a dating application) in approximately November 2017. They went on two separate dates during which AV-2 blacked out: one in California in February 2018 and one in Mexico in November 2018. On the evening of February 2, 2018, the defendant arrived with an opened bottle of tequila and a bottle of wine. That evening, they ended up drinking the entire bottle of wine, some tequila, and several miniature bottles of champagne. AV-2 noted that while the defendant appeared to be drinking the alcohol as well, he never appeared intoxicated. At some point, AV-2 blacked out. AV-2 awoke naked with the defendant lying in her bed. AV-2 stated that there was a wet spot on the bed, which she assumed was the defendant's ejaculate. AV-2 has no memory of being intimate with the defendant. She assumed they had sex, but she was too embarrassed to ask. Afterwards, AV-2 was ill and slept much of the day. AV-2 was extremely upset about her night with the defendant, so she called him several days later and

---

[1] Some of these items were produced in the SCIF pending classification review and reproduced once unclassified.

told him she did not like what had happened and that it could not happen again. The defendant kept what appears to be a list of sexual partners. On that list, AV-2's name appears around the time of this date.

AV-2's contact with the defendant largely ceased, but several months later, the defendant told AV-2 that he had heart surgery, she felt bad for him, and they began talking again. Beginning in September 2018, the defendant mentioned to her that he moved to Mexico City. He then invited her to travel from California to visit him. Over the next several weeks, the defendant continued to encourage AV-2 to visit.

When AV-2 eventually traveled to Mexico for work, the two went to dinner on the evening of November 23, 2018. The defendant picked AV-2 up at her hotel, and while in the lobby, he served her tequila from a flask. Then, they went to a restaurant for dinner. AV-2 estimates that she had approximately four shots of tequila with him that night. She again noted that, to her, the defendant has never appeared intoxicated. After dinner, they returned to her hotel. AV-2 recalls that the defendant walked her up to her room, where they spoke briefly. She recalls him helping her to bed, at which point she blacked out. She awoke the next morning wearing her bra and underwear, feeling dizzy and nauseous, with a headache. The defendant was not there. AV-2 assumed that he helped her to bed and left. AV-2 later asked the defendant what happened that night, and he responded that he helped her undress and get into bed.

In the defendant's iCloud account, obtained pursuant to a search warrant, and in the deleted space on his personal cell phone, law enforcement located photographs and videos of AV-2 on two separate occasions. Metadata indicates that 33 photographs and one video were taken on February 2-3, 2018, at AV-2's address in California, over the course of *six hours*. The photos and video

show AV-2 unconscious and in various stages of undress. They show the defendant's hand moving her bra and pants to expose her breasts and genitals, as well as his hand opening her eyelid. The final photos show AV-2 fully nude. AV-2 stated that she was unaware of any photos that the defendant took while in her home, and she stated that she never gave him consent to photograph her.

The second set, 44 photographs and seven videos, were taken in AV-2's hotel room in Mexico in November 2018. AV-2 is observed unconscious and lying on the hotel bed, and her bra is pushed up to expose her breasts. In some photographs, her underwear is removed to expose her genitals. AV-2 is posed in several different positions on the bed. In some videos, the defendant's hand can be seen lifting her eyelid and manipulating her arms.

Had the defendant not entered a pre-indictment plea, the government likely would have charged the defendant with Attempted Inducement, pursuant to 18 U.S.C. § 2422(a) for his attempt to have AV-2 travel to his apartment in Mexico City in early Fall 2018 with the intent to engage in criminal sexual activity.

*The Inducement of AV-4*

AV-4 met the defendant on Tinder (a dating application) in Spring 2017, when the defendant was living in McLean, Virginia. AV-4 told law enforcement that she was upfront with the defendant during the first date about the fact that she was not looking to hook up. On their second date on May 14, 2017, the defendant invited her to travel from Virginia to a park in Washington, D.C., and he brought with him one alcoholic drink for each of them, which they had in the park before going to a wine bar. At the bar, AV-4 and the defendant each had two drinks. Upon the defendant's suggestion that they continue their date, the two traveled separately from

Washington, D.C. to AV-4's apartment in Virginia. There, AV-4 opened a bottle of red wine and poured them each a glass. The defendant and AV-4 went out onto her balcony with their glasses of wine, leaving the bottle in the kitchen. At some point, the defendant went inside to use the restroom, and he returned with the open bottle of wine and refreshed her glass. Shortly thereafter, AV-4 noticed that the flavor of the wine had changed. At the time, AV-4 was enrolled in an ongoing wine-tasting class, so the change in flavor piqued her interest. She wondered if the bottle had oxidized, and she took several more sips to try to determine why the taste had changed. Approximately 10 minutes later, AV-4 began to feel "woozy" and fell to her knees on the balcony. Her last memory was of the defendant trying to hold her up while she told him she was not feeling well.

AV-4 next remembers awaking in her bed sometime during the night. She was clothed and lying on top of the covers. The defendant was clothed and lying next to her. AV-4 looked over at him, and he appeared surprised that she had woken up. AV-4 was uncomfortable with the defendant in her bed, so she told him that if he was unable to drive home, he was welcome to stay on her couch in the living room. He stated that he was fine, and he would leave. AV-4 noticed that when the defendant got up from bed and put on his shoes (one leg at a time while standing), he did not seem to be intoxicated. AV-4 was surprised because when she attempted to get out of bed to walk him out, she still felt woozy, and her legs felt weak and tired. She compared the feeling to coming out of anesthesia and said her legs felt like she had just run a marathon. Once the defendant left, AV-4 went into the bathroom to inspect her body for signs of sexual assault. AV-4 stated that she had no reason to believe at the time that the defendant had assaulted her.

In the defendant's iCloud account, however, law enforcement located eight photographs

and two videos of AV-4.[2] They depict an unconscious and partially dressed AV-4, with her shirt and strapless bra pulled up to expose her breasts. They also show large bruises on her knees. In one video, the defendant hand can be seen pulling AV-4's shorts and underwear down to expose her upper pubic region, and in some of the photographs, the defendant's thumb can be seen opening her eyelid. Upon viewing the photographs and videos, AV-4 stated that she never gave the defendant consent to undress her or photograph/record her, and she had no prior knowledge that he had done so.

Had the defendant not entered a pre-indictment plea, the government likely would have charged the defendant with Inducement, pursuant to 18 U.S.C. § 2422(a) for persuading, inducing, enticing, or coercing AV-4 travel from Virginia to Washington, D.C. and back to Virginia to then engage in criminal sexual activity.

### The Sexual Contact Against AV-26

AV-26 met the defendant on Tinder, and their first date was at a café in Mexico City. The defendant invited AV-26 to a second date at his embassy-leased residence. When she arrived, the defendant served her strawberries, cheese, and cookies and poured her a glass of wine. AV-26 began to feel ill, and she vomited in the bathroom. When she returned, she noticed that the defendant had refilled her glass. She was feeling very drunk from the first glass of wine, so she held the second glass in her hand while they talked and did not finish it. The defendant then prepared a cocktail for her. Shortly thereafter, AV-26 vomited in the bathroom a second time.

---

[2] Photos and fragments of the videos of AV-4 were found in the deleted space on the defendant's personal phone, which was seized on June 6, 2020.

When she returned to the living room, the two kissed on the couch. At that point, her memory began to lapse.

AV-26 next remembers being in the bedroom with the defendant, not knowing how she got there. She was sitting on the bed and felt that she needed to vomit, at which point the defendant led her by the arm to his bathroom. AV-26's legs gave out, and she fell. The defendant held her hair while she vomited again. She recalls sitting on the floor, unable to get up. AV-26 next has a blip of memory where she's sitting on the defendant's bed. The next thing she can recall is being in the defendant's bed, under the covers. At some point, she awoke to feel the defendant's hand on her breast, resting between her inner and outer blouse. She recalls that the defendant was awake, as he closed his eyes when she looked over at him and quickly pulled his hand away. AV-26 next remembers waking up in the defendant's bed, noticing that her pants were unbuttoned with the zipper pulled all the way down. She left his apartment and vomited again on her drive home.

Had the defendant not entered a pre-indictment plea, the government likely would have charged the defendant with Abusive Sexual Contact, pursuant to 18 U.S.C. § 2244(a)(1) and/or (a)(2), for his conduct against AV-26.

*The Sexual Assault of AV-9*

AV-9 reported that she met the defendant on Bumble and subsequently decided to go on a date with him on March 25, 2020. They first met at a café in Mexico City for a drink and decided to resume their date later that evening, with AV-9 returning to her home in the interim.

On or about March 25, 2020, the defendant texted a friend regarding the date. AV-9 is not mentioned by name, but the details of the text accurately include AV-9's profession and nationality. On March 25, 2020, the defendant sent the following message to his friend: "She just

asked me to send an Uber to pick her up tonight…but that is a personal no for me unless I am definitely getting sex." The defendant then says, "I suppose since it is only 4 bucks and I might have a chance to fuck her I will do it."

AV-9 did, in fact, take an Uber to the defendant's embassy-leased apartment that night. Upon her arrival, the defendant offered AV-9 cold meats, cheeses, and strawberries, and they drank wine. The defendant then suggested that she taste several types of tequila, which she did. AV-9 described the defendant as a perfect gentleman. AV-9 recalled kissing him in his kitchen, and approximately 15-20 minutes later her memory began to lapse while walking with him in a hallway. Her next memory was awaking naked in his bed. AV-9 explained that just a few days after her date with the defendant, she began questioning whether the defendant had drugged her. She had never blacked out from drinking alcohol before, and she described herself as an experienced drinker requiring two full bottles of wine to feel drunk.

On March 26, 2020, the defendant texted a friend, "Success last night…at least I salvaged my Wed". On what appears to be a list of sexual partners maintained by the defendant, AV-9's name appears along with the corresponding month and year.

In the defendant's iCloud account, law enforcement located 20 photographs and 15 videos of AV-9, taken from March 25-26, 2020, in his embassy-leased apartment for over an hour. The photographs and videos show AV-9 unconscious and fully nude, lying in the defendant's bed. Some of the photographs show the defendant's hand opening AV-9's eyelid, and some depict close-ups of her breasts and genitals. He also appears to pose AV-9's body in different ways throughout the photo set. A video shows the defendant's hand on the outside of AV-9's buttocks. Another video shows the defendant's hand touching AV-9's breast and buttocks. And yet another

video shows the defendant's hand forcefully grabbing AV-9's breast. His hand then appears to move down to her pubic region, out of the frame. In one video, the defendant is nude and lying in bed with an unconscious AV-9, cuddling with her body and manipulating her limbs. The defendant's erect penis can be seen in the video.

When law enforcement asked AV-9 whether she and the defendant had sexual intercourse, she replied "claro" (meaning sure, or yes, of course, in Spanish). AV-9 stated that she recalled awaking naked in the defendant's bed, but she did not remember taking off her clothes and did not remember their sexual encounter. Vaginally, AV-9 felt as though she had sex, but she did not recall consenting to any sexual acts. AV-9 stated that she felt extremely ashamed after waking up naked with the defendant. Upon waking the next morning, AV-9 reported feeling hungover and tired, with a headache and a body ache that reminded her of having the flu. AV-9 stated that the defendant ordered her an Uber, and she went home. The defendant reached back out to her, but she never responded because she felt ashamed. During the date, AV-9 said never discussed taking photos with the defendant, and she never gave her consent to be photographed. During her interview, law enforcement informed AV-9 that the defendant was in possession of photographs and videos of her. AV-9 declined to view the photographs and videos, stating that it would not be good for her "psychologically."

*The Sexual Assault of AV-7*

AV-7 met the defendant on Bumble on May 25, 2020, and they exchanged messages for a few days before deciding to meet in person in Mexico City, Mexico.

On May 30, 2020, before the date with AV-7, the defendant texted a friend, "…Today is just the one tonight - but actually coming direct to my place. So, if she shows there is probably a decent chance for success."

The defendant and AV-7 met at his embassy-leased apartment on Saturday, May 30, 2020. Originally, they had planned to meet at an area park for a walk, but the defendant asked her to come to his apartment instead. When she arrived, the defendant served her ham, cheese, and strawberries. The defendant first served AV-7 a drink made from gin and flavored sparkling water. The defendant went to the kitchen to make her a second gin drink, at which point she followed him and offered to help. He told her to go sit back down in the dining room.

After the second drink, AV-7 and the defendant got up to dance, and she noted that she felt fine. They danced and kissed for a short period of time, after which the defendant suggested she have champagne as a belated birthday celebration. The defendant served her a glass of champagne at the dining room table. AV-7 drank some of the champagne, and the two stood to dance again. Upon standing, AV-7 noticed that she was extremely dizzy. AV-7 noted that the defendant seemed completely fine. AV-7 started to feel nauseous, so she ran to the hallway bathroom and vomited into the sink. The defendant came in to check on her, and he had to hold her up while she finished vomiting. AV-7's last memory is of the defendant holding her and turning her body to maneuver her out of the small bathroom. AV-7 described her memory loss as sudden, like a light switch. AV-7 explained that given her history with alcohol, it would not have been normal for her to black out after only a few drinks.

AV-7's next clear memory is waking up in the defendant's bed, naked, with him asleep next to her. She felt sick and sleepy, and physically her body felt as though she had sex. She then

recalled that she had vomited the night before, and she hurried to try to clean the sink in the guest bathroom. The defendant awoke while she was cleaning and brought her a glass of water. While AV-7 located and gathered her belongings, the defendant approached her and gave her a hug from behind. They started kissing, and he leaned her onto the bed while holding her chest, put on a condom, and began to penetrate her. AV-7 had a flash of memory from the night before, in which she was face down on a bed with the defendant behind her and grabbing her. After only a few seconds, AV-7 started feeling sick, and the sexual penetration was causing her physical pain, so she asked the defendant to stop, which he did. She described the pain as feeling like she'd recently had unlubricated sex. AV-7 ran to the bathroom and vomited again. While in the bathroom, she noticed a used condom on the sink, confirming her feeling that sexual intercourse occurred the night before.

On May 31, 2020, the defendant texted a friend, "So last night was a success. She was decent enough looks wise. About what I was expecting and at 26 was still fuckable. But after 30 who knows. But she was cool and we had a nice time so it worked out. TBD if I will see her again." On what appears to be a list of sexual partners maintained by the defendant, AV-7's name appears along with the corresponding month and year.

From the defendant's iCloud account, agents recovered 77 photographs and four videos of AV-7, taken on May 30-31, 2020, over the course of two hours and thirty-two minutes. The photographs and videos show AV-7 fully nude, unconscious, and lying on the defendant's bed. They show the defendant's hand opening her eyelid and playing with her mouth. In one video, AV-7 flinches when the defendant's fingers are in her mouth, and he quickly pulls his hand back. There are many close-up photographs of her breasts and genitals. Notably, there is a photo in which

14

AV-7 is on her back, with her legs tightly closed, and the defendant is straddling her body, with his knees on either side of her legs on the bed, and his erect penis can be seen in the bottom of the frame. AV-7's body is also posed in several different positions.

After viewing the photographs and videos found in the defendant's iCloud, AV-7 confirmed that she never gave him consent to photograph or record her. When asked about their conversations during the date, AV-7 stated that they never discussed sex or taking photographs.

*The Defendant's Activity Immediately After Assaulting AV-7: The Sexual Assault of AV-1*

On May 31, 2020, after AV-7 left the defendant apartment, he texted his friend: "Today I have one set for 2pm (she is 28) but we are meeting in a public place and not my apartment. There is always a chance it could move to my place later but I have booked another one (she is 26) at 5-530pm." A few hours later, AV-1 was seen on the defendant's balcony screaming for help and for the police. Witnesses described AV-1 as "hysterical" and noted that she had difficulty walking and needed assistance with getting dressed. AV-1's mother was contacted and met her daughter at the scene, finding that AV-1 was disoriented. AV-1 told her mother that "he abused me" and that she felt she had been raped but could not remember. AV-1 was taken to a medical facility for a sexual assault examination, where the doctor noted the presence of several injuries, including a vaginal injury consistent with friction, an anal laceration consistent with the introduction of a hard object with blunt edges, generalized redness throughout her perianal area, bruises on her forearm, elbow, and knee, and a laceration on the inside of her cheek. AV-1 has no memory of sexual intercourse with the defendant, nor does she recall screaming from the balcony. She only has fragments of memory thereafter.

AV-1 first connected with the defendant on Tinder. They decided to meet in an outdoor

shopping center at approximately 2 p.m. on May 31, 2020. The defendant brought a backpack containing travel mugs and wine, which he poured while crouched behind a trashcan. AV-1 thinks the defendant served her sparking rosé, but she is not certain because the travel mug was dark inside, making it difficult to see what she was drinking. After approximately two glasses of wine, the defendant and AV-1 walked to his apartment. Once in the apartment, the defendant served AV-1 another glass of wine as well as some meat, cheese, and chocolates. Shortly after consuming some of the wine and snacks provided by the defendant, AV-1 suddenly blacked out and has no memory of the hours that followed. AV-1 noted that given her history with alcohol, she would not have blacked out from only a few glasses of wine.

Throughout their date, AV-1 had been sending her friend updates via text message, to include her location information at the defendant's apartment and a photograph of the snacks he served. AV-1's text messages to her friend then went silent for a period of three hours, during which her friend sent several messages asking AV-1 if she was okay. AV-1 eventually sent her friend a message containing incoherent letters. AV-1 has no memory of sending that message. During the medical examination later that night, AV-1 told the doctor that one of her last memories before blacking out was that she needed to send her friend a message to tell her she was not feeling well, and that the defendant was trying to kiss her. AV-1 has no recollection of sharing these facts with the doctor.

Had the defendant not entered a pre-indictment plea, the government likely would have charged the defendant with Aggravated Sexual Abuse, pursuant to 18 U.S.C. § 2241(b), and Sexual Abuse, pursuant to 18 U.S.C. § 2242(2), for his conduct relating to AV-1.

*The Defendant's Noncustodial Interviews*

When interviewed on May 31, 2020, the defendant admitted to having sexual intercourse with AV-1 but stated that shortly after they began, she jumped up, ran to the balcony, and started screaming. He suggested that perhaps AV-1 experienced a flashback to a prior traumatic incident. Over the course of two subsequent recorded interviews with law enforcement occurring on June 2, 2020 and June 6, 2020[3], the defendant confirmed that he and AV-1 shared a small bottle of wine (amounting to approximately one cup each) in coffee mugs outside of the apartment and that, when they went to the defendant's apartment, he and AV-1 split one bottle of white wine over the course of a few of hours. When asked how he felt after drinking with AV-1, Raymond responded, "I felt fine. I was in full control of what I was doing," he states more broadly that, "I'm a social drinker; I don't drink that often, but even when I do drink, I don't tend to change my personality." Following his initial May 31 interview, embassy personnel left the defendant alone in his apartment for several hours, until the next morning when he left Mexico and returned to the United States. Prior to leaving the defendant alone, there had been no search of the premises.[4] The defendant himself confirms this. In his June 2, 2020, interview, the defendant indicates that, before he left the apartment, he threw away wine bottles and tidied the apartment while packing up to leave. During his June 6, 2020 interview, the defendant confirmed that he threw away wine bottles, dumped food, and cleaned up the apartment.

---

[3] The government provided not only the recorded interviews, but MOIs summarizing the conversations and screenshots of messages the defendant voluntarily provided. Additional details regarding those interviews will be discussed below in Section I.

[4] A residential search warrant was executed on June 14, 2020.

*The Defendant's Internet-Related Activity*

In 2010 and 2011, the defendant conducted internet searches for "Ambien dissolve," "Ambien and alcohol side effects," and "Ambien and alcohol pass out." In 2018, the defendant searched for "visine and tequila."[5] In 2005, approximately one year before the defendant's first known victim, the defendant sent an email to an online pharmacy requesting Chloral Hydrate (a substance used for drug facilitated sexual assaults, commonly referred to as "a micky").

Additionally, the defendant kept what appears to be a list of women with whom he had sexual intercourse. He emailed this list to himself, and it was recovered from his Yahoo email account pursuant to a search warrant. The list contains the names of several women who had no knowledge or only suspected that the defendant had engaged in a sexual act with them, to include AV-2, AV-3, AV-5, AV-7, AV-9, AV-13, and AV-15.

## PROCEDURAL HISTORY

As mentioned above, the defendant was charged in a criminal complaint and arrested on October 9, 2020, in San Diego, California, where he was ordered detained by a magistrate judge in the Southern District of California. The Complaint charged the defendant with Inducement, pursuant to 18 U.S.C. § 2422(a), for persuading, inducing, enticing, or coercing AV-4 travel from Virginia to Washington, D.C. and back to Virginia to then engage in criminal sexual activity. *See* ECF Nos. 1, 1-1.

*Arrest and Plea Negotiations*

The defendant retained Courtney R. Forrest, Emily A. Voshell, and Jonathan S. Jeffress from the firm KaiserDillon PLLC shortly after his arrest in this case in October of 2020. Attorney

---

[5] Visine is a medicated eyedrop also known to be used in drug facilitated sexual assaults.

John P. Marston from the firm Foley Hoag LLP joined the defendant's defense team approximately five months later, in or around February 2021.

The defendant was transported in custody to Washington, D.C., arriving on December 22, 2020. While awaiting the defendant's arrival in D.C., the defendant's attorneys, Courtney Forrest and Jonathan Jeffress, agreed to continue the date for the preliminary hearing, and as such, the government's indictment deadline was extended as well. In mid-November 2020, the government met in-person with defense counsel to review some of the most relevant evidence and discuss the scope of anticipated charges.

Shortly after the defendant's arrival, on January 5, 2021, Mr. Jeffress contacted government counsel indicating that the defendant was interested in engaging in plea negotiations. Two days later, on January 7, 2021, Mr. Jeffress requested a proposed plea. On January 12, 2021, Ms. Forrest inquired of the government when it expected to send its plea offer for the defendant's consideration.

On January 19, 2021, the government extended its first plea offer, contemplating one count of Aggravated Sexual Abuse against AV-1, in violation of 18 U.S.C. § 2241(b), and one count of Inducement to Travel for the Purpose of Criminal Sexual Activity against AV-2, in violation of 18 U.S.C. § 2422(a). The offer included a variety of enhancements related to the administration of a substance or intoxicant, vulnerable victim, large number of vulnerable victims, obstruction of justice, and abuse of a position of trust. With the Adjusted Offense Level accounting for both counts, and with the application of a three-level reduction for acceptance, the Guidelines Calculation resulted in an Estimated Offense Level of 41 and a sentencing range of 324-405 months. The proposed agreement also included $10,000 of restitution to be paid to each victim,

AV-1 through AV-25 (AV-26 had not been identified as a victim at that time). The proposed plea agreement contained a deadline of February 10, 2021, which was extended upon the defendant's request.

On March 9, 2021, Ms. Forrest sent a 13-page letter responding to the government's plea offer and challenging the applicability of certain enhancements. Upon receipt of this letter, the government indicated to counsel that it was inclined to proceed to indictment, given the substantial differences in the government's offer and the defendant's response. On March 11, 2021, counsel responded, indicating a willingness to engage in further plea discussions.

On April 1, the parties met in-person to discuss a potential resolution. During that meeting, counsel indicated that the defendant would likely be willing to plead to offenses relating to his sexual acts with AV-7 and AV-9. Shortly thereafter, on April 6, 2021, Ms. Forrest emailed the government asking for a written offer incorporating counts of Sexual Abuse against AV-7 and AV-9. On April 16, 2021, the government sent its second proposed plea agreement, reflecting two counts of Sexual Abuse for AV-7 and AV-9 respectively, in violation of 18 U.S.C. § 2242(2), and one count of Transporting Obscene Material, in violation of 18 U.S.C. § 1462.

On May 3, 2021, Ms. Forrest sent a written response to the government, indicating that progress was being made towards a resolution but that several issues still needed to be addressed, to include the government's proposed sentencing enhancements. Ms. Forrest also proposed substantial edits to the government's proposed statement of facts. In the weeks that followed, the government and defense counsel, to include Ms. Forrest and Mr. John Marston, engaged in several telephone conversations regarding the terms of the plea agreement and the specific language of the statement of facts. As a result of these negotiations, the government ultimately agreed to hold a

contested evidentiary hearing regarding the administration of a drug or intoxicant and the large number of vulnerable victim enhancements. The defendant agreed to the applicability of the obstruction of justice enhancement and the vulnerable victim enhancement for AV-7. Throughout these discussions, Ms. Forrest indicated that she met, in person, with the defendant to review and discuss the documents, and the defendant himself proposed edits to the statement of facts. On May 27, 2021, the defendant signed the plea agreement and statement of facts, and an Information was subsequently filed with the Court.

*The Plea Hearing*

On July 23, 2021, the defendant pled guilty to two counts of Sexual Abuse, in violation of 18 U.S.C. § 2242(2), and one count of Transportation of Obscene Material, in violation of 18 U.S.C. § 1462. *See* ECF No. 69 at 1. Attorney Forrest represented the defendant at the change of plea hearing. Attorney Marston appeared via telephone.

On that same date, the Court conducted an in-person, change-of-plea hearing lasting approximately three hours. Before accepting the defendant's guilty plea, the Court conducted an extensive Rule 11 colloquy with the defendant. At the beginning of the colloquy, the defendant was placed under oath and advised of the penalties for failing to tell the truth. *See* ECF 119-13, July 23, 2021 Change of Plea Hearing Transcript (hereinafter, "Plea Hr'g Tr.") at 2, 7. The Court previewed for the defendant exactly how the hearing would unfold, to include the types of information she would review with him, the types of questions she would ask of him, and why such information would be important to her findings at the conclusion of the hearing. *Id.* at 5-6 ("I need to make a finding at the end that you're entering this plea knowingly and voluntarily…the other thing is, I want to make sure this is really what you want to do. So you can't come back in a

21

week or so and say, judge, I've changed my mind. So we'll go through this carefully and make

sure this is actually what your decision is."). The Court also clearly established that the defendant

could ask questions to ensure his understanding throughout the hearing. *Id.* at 5.

After briefly discussing the charges contained in the Information, the Court next inquired

about the defendant's preparation with counsel:

> THE COURT: And have you fully discussed those charges and the
> case in general with your counsel?
>
> THE DEFEDANT: Yes, I have.
>
> THE COURT: And are you completely satisfied with the services of
> your attorney in this case?
>
> THE DEFEDANT: Yes
>
> THE COURT: Have you had enough time to talk with your attorney,
> discuss the case, the plea offer and whether or not you should accept
> it?
>
> THE DEFEDANT: Yes, Your Honor.

*Id.* at 11-12.

The Court then reviewed with the defendant the rights he was giving up by pleading guilty,

to include his right to a grand jury indictment and jury trial, his right to a lawyer, and his right to

confront witnesses, decide whether to testify, and present evidence. The Court described the

presumption of innocence and the government's burden of proof. And the Court explained the

contours of the defendant's appellate rights. *Id.* at 12-16. Finally, the Court confirmed the

defendant's understanding of the rights he was giving up by pleading guilty, and the defendant

responded, "I understand." *Id.* at 17. The Court then asked the defendant, "Do you want to plead

guilty in this case, give up your rights to a trial and your right to appeal and other rights that I've

explained that you would have if your case had gone forward to trial?" The defendant replied, "Yes, I do, Your Honor." *Id.* at 17.

At the Court's request, the government then read the entire statement of facts into the record and summarized the facts that supported each element of each offense. *Id.* at 18-36. The Court asked, "Mr. Raymond, do you agree with everything that has been stated in the statement of facts?" The defendant replied, "Yes, Your Honor." The Court asked, "Is there anything that you don't agree with?" The defendant stated, "No." The Court then proceeded to ask the defendant several questions based upon the statement of facts and clarify certain facts, sometimes at the government's request. *Id.* at 38-69. During this course of questioning, the defendant asked to confer with his attorney several times, and the Court granted his request each time. *See, e.g., id.* at 43. The defendant, at times, attempted to minimize his conduct or his knowledge, and each time, the Court asked additional questions to ensure that the defendant's admissions supported the elements of the offenses to which he was pleading guilty. For example, regarding the defendant's knowledge that AV-7 was unable to apprise the nature of the conduct during the sexual act:

> THE COURT: So let's get back to that evening. And as I understand it, you were aware of how much she was drinking. Is that correct?
>
> THE DEFENDANT: Yes. We both had been drinking.
>
> THE COURT: But let's focus on her for a second in terms of AV-7. Knowing how much she had to drink, were you aware that she was not in a position to make some decisions about her conduct?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Her conduct being her sexual conduct or the sexual conduct that you were engaging in?
>
> THE DEFENDANT: That's correct.

*Id.* at 69.

The Court then reviewed with the defendant the remaining terms of the plea agreement, to include the maximum sentences, the special monetary assessment and the agreement regarding restitution, the requirement to register as a sex offender, the 3553(a) factors generally, the Guidelines calculations contained in the plea agreement and the process of ruling on the Guidelines at sentencing, the fact that the government could request a sentence above the Guidelines, and the decision to forgo any future discovery in the case. *Id.* at 70-89. The Court also cautioned the defendant that the government could seek denial of the Guidelines reduction for acceptance of responsibility should the defendant move to withdraw his plea. *Id.* at 84. The defendant then established that there was nothing else he needed to raise regarding the agreement. *Id.* at 95.

The Court then turned to questions regarding voluntariness, confirming with the defendant that no one had forced, threatened, or coerced him to plead guilty or had offered any promises regarding his sentence or other than those detailed in the plea agreement. *Id.* at 99-100. The defendant also acknowledged that he understood the agreement was the result of negotiations between government counsel and his attorney and that the Court does not know at the time of his plea what sentence will ultimately be imposed. *Id.* at 99-100. The Court then asked:

> THE COURT: Are you entering this plea of guilty voluntarily and of your own free will?
>
> THE DEFENDANT: Yes, I am.
>
> THE COURT: Are you entering this plea of guilty because you are guilty?
>
> THE DEFENDANT: Yes. I am.
>
> THE COURT: Is there anything you don't understand about the proceeding or the plea? Anything you want to ask me or counsel?
>
> THE DEFENDANT: No, Your Honor.

24

> THE COURT: How do you, Brian Jeffrey Raymond, plead to Count 1, Sexual Abuse; Count 2, Sexual Abuse; Count 3, Transportation of Obscene Material: Guilty or Not Guilty?
>
> THE DEFENDANT: Guilty.

*Id.* at 100.

The Court accepted the defendant's plea, finding that the defendant was competent, understood the nature and consequences of his decision, and was acting voluntarily and of his own free will and that there was an adequate factual basis for the plea. *Id.* at 100-101.

In December 2021, Attorneys Courtney R. Forrest, Emily A. Voshell, and Jonathan S. Jeffress withdrew from the case. *See* ECF No. 95.

Attorney Marston remained on the case and currently represents the defendant. Attorney Marston is now joined by Attorneys Denise E. Giraudo and A. Joseph Jay, III, of Sheppard Mullin Richter & Hampton LLP. *See* ECF Nos. 83-84.

On April 29, 2022, the defendant filed a motion, through counsel, to withdraw his guilty plea on the "basis that it was tainted by ineffective assistance of counsel related to the failure of counsel to investigate and advise on 4th and 5th Amendments violations and the legal options associated with such violations." ECF No. 119 at 33. The motion attaches declarations from former counsel Courtney R. Forrest and Jonathan S. Jeffress. *See* ECF Nos. 119-10, 119-11. The motion also attaches a declaration from current counsel, John P. Marston, regarding the scope of his representation at the time that the defendant pled guilty. *See* ECF Nos. 119-12.

## LEGAL AUTHORITY

Pursuant to Federal Rule of Criminal Procedure 11(d)(2), a defendant may withdraw his guilty plea after it is accepted by the court but prior to sentencing if he can show a fair and just

reason for the withdrawal. The Supreme Court's general test for the validity of a plea agreement is whether the plea represents a "voluntary and intelligent choice among the alternative courses of action open to the defendant." *Hill v. Lockhart*, 474 U.S. 52, 56 (1985). It is the defendant's burden to prove there are valid grounds for the withdrawal. *See* Fed. R. Crim. Pro. 11(d)(2)(B). In considering whether there is a "fair and just" reason to allow a defendant to withdraw his plea, the Court must consider three factors: (1) whether the guilty plea was tainted, (2) whether the defendant has asserted a viable claim of innocence, and (3) whether the delay between the guilty plea and the motion to withdraw has prejudiced the government's ability to prosecute the case. *United States v. West*, 392 F.3d 450, 455 (D.C. Cir. 2004); *United States v. Hanson*, 339 F.3d 983, 988 (D.C. Cir. 2003).

Of these three factors, the first factor is the most important and requires a showing that the court's taking of the guilty plea either failed to conform to the requirements of Rule 11 or was in some other sense constitutionally deficient. *See West*, 392 F.3d at 455-58; *United States v. Horne*, 987 F.2d 833, 837 (D.C. Cir. 1993); *United States v. Taylor*, 139 F.3d 924, 929 (D.C. Cir. 1998); *United States v. Ford*, 993 F.2d 249, 251 (D.C. Cir. 1993). While courts often balance these three factors, none of the D.C. Circuit's cases would have been decided differently "if the only inquiry undertaken were whether the defendant's guilty plea was taken in compliance with Rule 11." *United States v. Cray*, 47 F.3d 1203, 1207 (D.C. Cir. 1995) (internal citations omitted). Indeed, in this Circuit, the defendant's claim of actual innocence is only evaluated after the court has determined whether the alleged Rule 11 defect is sufficient to justify granting his motion to withdraw. *See Cray*, 47 F.3d at 1206-08 (indicating that by focusing on Rule 11 error first, courts will conserve resources by not having to exhaustively examine all three factors in every case);

*United States v. Tolson*, 372 F. Supp. 2d 1, 9 (D.D.C. 2005). As such, a defendant who "fails to show some error under Rule 11 has to shoulder an extremely heavy burden if he is to ultimately prevail," *Cray*, 47 F.3d at 1208, and insignificant or immaterial defects in the Rule 11 plea proceedings are insufficient to meet the necessary burden. *See, e.g.,* Fed. R. Crim. Pro. 11(h) ("variance from the requirements of this rule is harmless error if it does not affect substantial rights"); *see also United States v. Vonn*, 535 U.S. 55, 66 (2002) (noting that Congress added this provision to Rule 11 to end the practice of reversing automatically for any Rule 11 error). This heavy burden exists because the judicial system regards the withdrawal of guilty pleas as "inherently in derogation of the public interest in finality," *Horne*, 987 F.2d at 837, which "undermines confidence in the integrity of our procedures; and, by increasing the volume of judicial work, inevitably delays and impairs the orderly administration of justice." *Hill*, 474 U.S. at 58. As the Supreme Court has noted, it is no trifling matter to allow a defendant to withdraw a guilty plea after he has "sworn in open court that he actually committed the crimes, after he has stated that he is pleading guilty because he is guilty, after the court has found a factual basis for the plea, and after the court has explicitly announced that it accepts the plea." *United States v. Hyde*, 520 U.S. 670, 676 (1997).

## ARGUMENT

### I.   The Defendant's Plea Adhered to the Requirements of Rule 11 and Was Not Tainted by Ineffective Assistance of Counsel

The defendant's first argument is that his plea was constitutionally defective because it was "infected with ineffective assistance of counsel," ECF No. 119 at 1, because "Counsel for [the defendant] had not sought to leverage [the alleged suppression issue] in plea negotiations," *Id*. at 2. The defendant attaches declarations from former counsel Courtney R. Forrest, Jonathan S.

27

Jeffress, and John P. Marston before stating (notably with no cite to specific lines from the attorneys' declarations), "defense counsel did not review the materials, investigate the facts and issues, or even discuss with [the defendant] the issues or his options." *Id*. at 43. The defendant further points out that, "at no time did the Court ask [the defendant] about potential motions he may have been able to file, or whether he had discussed possible pre-trial motions with his counsel." *Id*. at 21.

The defendant's arguments fail. First, the plea colloquy conformed to the requirements of Rule 11 and was not constitutionally deficient. Second, there were no constitutional violations where, during a noncustodial conversation, law enforcement asked the defendant whether he was willing to unlock his phone and where law enforcement took reasonable steps to execute a lawful search warrant. Third, even if there were constitutional violations, the evidence obtained from the defendant's phone would have inevitably been discovered through other means. Finally, the defendant has failed to demonstrate that prior counsel, Ms. Courtney Forrest and Mr. Jonathan Jeffress, were ineffective. The overwhelming evidence suggests that the defendant's decision to plead guilty was the product of reasonable, rational advice of counsel. Therefore, the defendant's motion should be denied.

### A. The plea colloquy conformed to the requirements of Rule 11 and was not constitutionally deficient

In the instant case, the transcript demonstrates that the plea was attended by "all the required procedural safeguards" of Rule 11. *Cray*, 47 F.3d at 1208. A guilty plea is constitutionally valid if it "represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *United States v. McCoy*, 215 F.3d 102, 107 (D.C. Cir. 2000) (quoting *Hill*, 474 U.S. at 56). To assess whether the plea was voluntary and intelligent, courts look to the record

of the plea colloquy to determine whether it would "lead a reasonable person to believe that the defendant understood the nature of the charge." *United States v. Ahn*, 231 F.3d 26, 33 (D.C. Cir. 2000).

As detailed above, during the change-of-plea hearing, the Court conducted a lengthy and comprehensive review of the defendant's constitutional rights, his decision to plead guilty, and his understanding of the proceeding and his plea agreement. The Court reviewed the relevant facts in great detail and gave the defendant an opportunity to respond to or refute the facts before finding that there was an adequate factual basis for the plea. The Court gave the defendant ample opportunity to ask questions and to confer with his attorney, and the defendant took advantage of such opportunities on several occasions. Though the defendant points out that the Court did not ask him about potential motions he may have been able to file, ECF No. 119 at 21, or ask former counsel whether there were suppression issues, ECF No. at 21, the Court's omission of those questions is harmless and did not affect the defendant's substantial rights. *See, e.g.,* Fed. R. Crim.

Pro. 11(h).[6]  Most notably, the defendant affirmed, under oath, that he was satisfied with the quality

of his representation and had adequate time to consult with counsel prior to the entry of his plea.[7]

The D.C. Circuit has emphasized that, in the context of a motion to withdraw a plea, "[i]t is neither

unfair nor unjust…to hold the defendant to his solemn representation to the court." *Horne*, 987

F.2d at 837; *see also United States v. McKnight*, 570 F.3d 641, 649 (5th Cir. 2009) ("[S]olemn

declarations in open court carry a strong presumption of veracity."). Accordingly, there is no basis

upon which to find that the Rule 11 proceeding was constitutionally inadequate or lacking in any

---

[6] *See., e.g., United States v. Saxena*, 229 F.3d 1 (1st Cir. 2000) (failure to tell defendant he could not withdraw guilty plea if sentence recommendation not followed harmless error, where that information was contained in the written plea agreement signed by defendant); *United States v. Smith*, 184 F.3d 415 (5th Cir. 1999) (court's failure to personally insure that defendant understood the charges harmless error, where defendant does not maintain she did not understand the charges and does not challenge her attorney's assertion that he reviewed the indictment with her and she understood the charges); *United States v. Van Doren*, 182 F.3d 1077 (9th Cir. 1999) (failure to ask whether plea was the result of coercion by threats or promises harmless error in light of repeated inquiries into voluntariness generally); *United States v. Delacruz*, 144 F.3d 492 (7th Cir. 1998) (failure to advise defendant plea could not be withdrawn if judge did not accept prosecutor's recommendation harmless error, where defendant otherwise aware that court not bound by recommendation and thus would have entered guilty plea in any event); *United States v. Bachynsky*, 924 F.2d 561 (5th Cir. 1991) (inadequate statement of the nature of the charges harmless error, where record shows defendant indicated he understood charges and had discussed them with his attorney); *United States v. Stead*, 746 F.2d 355 (6th Cir. 1984) (failure to advise that defendant was waiving right to confront witnesses and to be free of self-incrimination harmless error); *United States v. Coronado*, 554 F.2d 166 (5th Cir. 1977) (failure of court to make required explanation of the charges harmless error, where Rule 11 proceedings disclose that defendant otherwise understood them); *and see United States v. Powell*, 354 F.3d 362 (5th Cir. 2003) (court's failure to advise the defendant she would be subject to mandatory restitution harmless error, where restitution ordered fell short of maximum possible fines (not imposed) of which defendant was advised); *United States v. King*, 234 F.3d 126 (2d Cir. 2000) (failure to advise on right to withdraw plea if court did not accept sentencing recommendation harmless error where defendant received sentence below government's recommendation).

[7] The defendant's representations at the plea hearing regarding adequacy of counsel and the knowing and voluntary nature of his plea…may constitute a formidable barrier to…later refutations." *United States v. Taylor*, 139 F.3d 924, 933 (D.C. Cir. 1998) (quoting *Blackledge v. Allison*, 431 U.S. 63, 74 (1977). Such declarations concerning the performance of [defendant's] counsel were made in open court under oath and thus carry a strong presumption of veracity. *United States v. Sibbles*, 562 F. Supp. 2d 1, 5 (D.D.C. 2008) (quoting *United States v. Hawkins*, No. 03-cr-390 (JDB), 2005 WL 1660840, at *4 (D.D.C. July 11, 2005); *see also United States v. Ross*, 147 Fed. Appx. 936, 940 (11th Cir. 2005) ("There is a strong presumption that [a defendant's] acknowledgment of his understanding and his statements as to his communications with the attorney[ ] are true."); *United States v. Grewal*, 825 F.2d 220, 223 (9th Cir. 1987) (finding that any claim of ineffective assistance of counsel was contradicted by defendant's own declarations made under oath and on the record; the declarations concerning the performance of the defendant's attorneys were made in open court under oath and thus carry a strong presumption of veracity).

way.

**B. The defendant's ineffective assistance of counsel claim must fail because it is based upon arguments that the evidence from his phone would have been suppressed, none of which would have been successful.**

To succeed on an ineffective assistance claim based upon an alleged failure to competently litigate a suppression issue, a defendant must prove that his constitutional suppression arguments would have been meritorious, in addition to making the requisite showings on deficient performance and prejudice. *Kimmelman v. Morrison*, 477 U.S. 365 (1986).[8] Here, there were no Fourth or Fifth Amendment violations committed during the seizure of the defendant's phone, and even if there were, the lack of deliberate law enforcement misconduct would have weighed heavily against suppression. The defendant therefore cannot establish that his suppression arguments would have prevailed if raised prior to the plea and thus cannot make the requisite showings as required by *Kimmelman* or *Strickland.*

**1. Additional Factual Background Regarding the Seizure of the iPhone**

On June 1, 2020, the defendant returned to the United States, and on June 2, 2020, he was interviewed in Northern Virginia by agents from the Department of State's Diplomatic Security Service ("DSS"), to include Special Agent Mikel Gajkowski. During this voluntary, noncustodial interview,[9] the defendant acknowledged meeting the initial victim (AV-1) on Tinder and having

---

[8] "Although a meritorious Fourth Amendment issue is necessary to the success of a Sixth Amendment claim like respondent's, a good Fourth Amendment claim alone will not earn a prisoner federal habeas relief. Only those habeas petitioners who can prove under *Strickland* that they have been denied a fair trial by the *gross incompetence* of their attorneys will be granted the writ and will be entitled to retrial without the challenged evidence." *Kimmelman*, 477 U.S. at 382 (emphasis added).

[9] In addition to SA Gajkowski, one other agent was present. The interview took place during the day at a park in Fairfax, Virginia. The defendant was advised that the interview was voluntary and that they would talk about as much or as little as he wanted. The agents also told the defendant that he was free to end the interview at any time or take breaks whenever he wanted. Finally, they told him that his refusal to speak with them would in no way have any bearing on his employment. SA Gajkowski then asked the defendant whether he had any questions. The defendant

sexual intercourse with her, but he claimed the sex was consensual. When the defendant was asked about his dating activity in Mexico and his use of dating applications, he claimed that he only dabbled in such applications. During this interview, the defendant showed the agents conversations with AV-1 stored on his two Apple iPhones. On his iPhone XR, his personal phone, he showed the agents his conversations with the victim contained within the Tinder application, and on his iPhone 6, his work-provided phone, he showed the agents his conversations with the victim contained within the WhatsApp texting application.

Following the interview, the agents obtained a warrant to seize and search the defendant's two iPhones. The warrant authorized the agent to unlock the defendant's phones using his biometrics. See ECF No. 119-1 at 21. Most smartphones, including iPhones, feature biometric device locks as a means by which the user can unlock his device using certain physical characteristics, such as a fingerprint or facial scan. The warrant specifically authorized law enforcement to seize the devices, utilize biometrics to attempt to access the devices, and subsequently search the devices. Prior to the execution of the warrant, Agent Gajkowski understood that biometric techniques could be compelled pursuant to the warrant, but that other information, such as the verbal PIN code to the phone(s), could not. Additionally, when planning for the warrant execution, Agent Gajkowski contacted DSS's Computer Investigations and Forensics Division ("CIF") to request that an analyst to be present for the seizure, in the event of any technical issues.[10] Agent Gajkowski was told that CIF would be unable to send anyone to

thanked SA Gajkowski for the clarifications and indicated that he wanted to make sure there were no doubts as to the circumstances involving AV-1.

[10] Throughout this response, the government proffers what testimony Agent Gajkowski would provide, should a hearing become necessary in this matter.

support the operation due restricted staffing and scheduling requirements during the COVID-19 pandemic. When Agent Gajkowski indicated that she would strongly prefer that a technical expert be present, CIF offered to send a member of their team to meet with her ahead of time to work through specific guidance on iPhone seizures. At that meeting, Agent Gajkowski was advised that if the devices were unlocked at the time of seizure (by consent or biometrics), she could simply navigate to the settings to change the passcode or disable the automatic lock function, put them into airplane mode,[11] and place them into a faraday bag.[12]  The CIF representative did not mention that a device passcode is typically required before modifying any of the lock features, nor that an iPhone might be locked by two different features at the same time. This informed Agent Gajkowski's plan heading into the seizure of each device.

On June 6, 2020, the defendant agreed to meet Agent Gajkowski for a follow-up, voluntary interview.[13]  The defendant chose the location, a sandwich shop across the street from his hotel. The defendant understood that the interview was voluntary and that he was not under arrest. There were no restraints of any kind placed on the defendant, and the interview was in public, without any restrictions of his movement. The interview began at 10:12 a.m. Exhibit 4. At the conclusion of the interview, Agent Gajkowski asked the defendant, "How do you secure these phones? Like, how—like are they locked?" The defendant replied, "Yeah. They are locked with a PIN." Agent

---

[11]  Airplane mode" is a setting on a smartphone or tablet for use on board an aircraft, in which the device does not receive or transmit wireless signals. When activated, the mode suspends the device's radio-frequency signal transmission, effectively disabling all voice and data services.

[12]  Faraday bags shield devices from outside signals to prevent data from being altered, deleted, or added to a device.

[13]  Agent Gajkowski was joined by Agent Ted Nelson for the interview. Two other agents were posted nearby but out of sight, to assist if necessary.

Gajkowski then confirmed her understanding, stating "And both of them, you use a PIN." Id.[14]
The defendant responded, "Yep."

Agent Nelson then informed the defendant that they had a warrant to seize his phones. The
defendant responded, "I can't, I can't let you do that without a lawyer present[15]…I can't authorize
that without a lawyer." *Id*. The defendant's concern then turned to how he would function without
his phones, noting that he would be unable to contact anyone. *Id*. Agent Gajkowski noticed that
the defendant started to seem panicked by the thought of not having his phone, noting that he
would not be able to contact anyone. Agent Gajkowski then asked, "Is there a phone number that
you'd like us to pull—that we can get from your phone and write down?" *Id*. Agent Nelson later
offered to obtain the defendant's contacts and then asked, for the first time, for the defendant's
PIN to do so. *Id*. The defendant then mentioned that he would need to consult with his lawyer as
to his rights. Agent Gajkowski clarified her understanding of the defendant's position, stating "I
just want to be clear, so you're not willing to voluntarily give us your PIN. Correct?" The defendant
responded, "no, not until I consult with a lawyer." *Id*. Agent Gajkowski then explained that she
was willing to help him obtain contact information from his phone but that she not could hand the
phone over to him to do so, citing concerns about the destruction of evidence. Therefore, she would
need his PIN to obtain that information for him. Explicitly, she replied "But that is your decision.

---

[14] The government cites here to the transcript of the defendant's audio-recorded interview. For the Court's
convenience, the corresponding audio-recording has been provided to the Court on a DVD, labeled, "United States v.
Brian Raymond, 1:21-cr-00380-CKK, Govt. Memo in Opp. To Defendant's Motion to Withdraw Plea Exhibits 1-
14A".

[15] Agent Gajkowski understood the defendant's mention of an attorney not as an invocation of any constitutional right
but rather a reluctance or refusal to turn over his physical devices. Because the agents had a lawful warrant, Agent
Gajkowski did not believe his statement to have any legal impact on her ability to physically seize the devices.

We can't coerce you to give us any PINs. Okay?" *Id.* Following this exchange, Agent Gajkowski showed the defendant the warrant, noting that he would be provided a property receipt. *Id.* While completing multiple copies of the required property receipts, Agent Gajkowski stated, "This is going to take a sec. Do you want to grab some, like, water, bathroom break? You're obviously free to go at any time." The defendant responded, "I'm okay" and Agent Nelson reiterated, "Just because we seized your phone, doesn't mean you're detained. All right?" The defendant affirmed his understanding, stating "I know." *Id.* As Agent Gajkowski neared the end of her paperwork, she asked the defendant to tell her how to put the device into airplane mode. *Id.* The defendant responded, "I'd have to, I'd have to unlock it, honestly." The agent responds, "That's your choice." When the defendant declined, the agent confirmed her understanding that his phone could not be placed into airplane mode without unlocking it and then said, "That's okay." *Id.* Agent Nelson and the defendant then casually discussed work, the ongoing COVID pandemic, health, and other unrelated topics, while Agent Gajkowski completed the paperwork. *Id.* The interview ended at 12:26 p.m., and the defendant walked back to his hotel.

Agent Gajkowski and Agent Nelson then briefly met the other two agents at a predetermined "rally" point, the parking lot of an Outback Steakhouse approximately one block away. The other two agents then left the area. Agent Gajkowski and Agent Nelson remained and updated government counsel by phone as to the seizure of the locked phones. Agent Gajkowski explained that because she believed, based upon the defendant's statement, that the phones could only be unlocked with PIN, she did not attempt to unlock the phones using the biometrics as authorized in the warrant. Government counsel then indicated she was going to consult with a supervisor. While awaiting a response, the agents ate lunch and remained in the area. Government

counsel called Agent Gajkowski back and told her that because the agents were still in the immediate area and because little time (less than an hour, at that point) had elapsed, they should compel the defendant to open the phones using biometric procedures authorized by the warrant. Before returning to the hotel, the agents reconvened to briefly discuss their plan and to review the warrant procedures. They also requested the presence of a local uniformed police officer.[16] The agents arrived at the hotel at 1:30 p.m., an hour after their prior contact with the defendant concluded, and they confirmed with the officer that his body camera was turned on.[17] . Two of the agents decided to stand outside, to not overwhelm the defendant,[18] while Agents Gajkowski and Nelson remained in the lobby with the uniformed officer.

When the defendant entered the lobby on his own volition, the agents greeted him and immediately informed him he was not under arrest. Exhibit 7, 7a (clip 1, video and transcript). As seen on the body camera footage, the defendant walked in calmly and casually, with his hands in his pockets, and stood, on his own, near an exterior exit door. Agents informed the defendant that they were there to compel him to open his phones using his biometrics, and the defendant acknowledged. Agent Gajkowski reminded the defendant, "Not the codes. Because that's not what

---

[16] The agents were aware that the defendant's demeanor may have changed after the initial seizure of his phones and thought there was a slim possibility they would need to use minimal force to place his finger on the phone or hold the phone up to his face. In such situations, DSS typically chooses to have a local officer present to assist if necessary.

[17] The government has attached, as Exhibits 1 and 2, the full body camera footage from the June 6, 2020, encounter with the defendant in the hotel lobby. The government also refers throughout this filing to the attendant transcript. The government respectfully requests that the Court view the body camera footage, rather than relying solely upon the transcript, as the tone and demeanor of the agents and the defendant are critical to the Court's analysis of the issues addressed herein.

[18] Towards the end of the body camera footage, the two agents can be seen wandering around near the front door—their demeanor could hardly be viewed as "guarding" the door as alleged by the defendant. It is unclear whether the defendant realized they were there.

you have to provide." When the defendant opened the first device, he appeared to type something into his phone. As seen on the body camera footage, upon noticing this, Agent Gajkowski physically turned her head away. Exhibit 8, 8a.[19] After the defendant opened the second phone, Agent Gajkowski then navigated to the phone's settings, but she realized that the phone required her to input a password to do so. She then asked the defendant if he was willing to enter the passcode, presumably to enable her to change the lock settings, but she again reminded him that he could not be compelled to do so. Exhibit 9, 9a. During this entire time, the defendant stood calmly by an exterior exit door, often with his hands in his pockets. Agent Gajkowski then stepped away to attempt to change the lock setting, and thinking she had successfully changed the lock setting, the agents thanked the defendant for his time and the defendant walked back to his room.

As the agents were preparing to leave the hotel, Agent Gajkowski realized that the phones had relocked, despite her attempts to change the settings, and that she could not get back in. Agent Gajkowski told Agent Nelson that she was trying to call "Brian" (a supervisor at CIF) but was unable to reach him. Agent Gajkowski then called the same government attorney. She asked about returning at a later date, to which government counsel expressed concern as to the delay, and government counsel asked whether an agent could unlock the phones one last time, continuously touch the screens of the phones to ensure they did not relock. The agent indicated that they would try. Exhibit 10, 10a. Agents quickly decided this was unlikely to succeed because the defendant's personal phone continually relocked within a matter of seconds. Agent Gajkowski also called

---

[19] In the chart created by defense counsel and attached to his motion, ECF No. 119-7, the defendant grossly mischaracterizes moments such as this to argue that this was one of many attempts to harass the defendant and demand that he reveal his PIN. To the contrary, and as evidenced by the footage, Agent Gajkowski was trying to adhere to the guidance provided to her regarding the defendant's right to refuse his PIN.

another agent in her office who serves as a resource in evidence collection to determine whether he had any additional ideas as to how to proceed to ensure that the phone was properly seized and accessible. On the body camera footage, she can be heard explaining the situation to the agent. At one point, Agent Gajkowski was speaking to both government counsel and the agent on two separate phones, switching back and forth between each.

Following these calls, the agents asked the defendant to return to the hotel lobby. They explained to him that they were having trouble keeping the phones on, and Agent Nelson told the defendant that while not required, his cooperation would be appreciated because they did not want to continue to inconvenience him. Exhibit 12, 12a. The defendant expressed some reluctance, to which Agent Gajkowski replied that she understood. She then asked him to open the phone using the facial recognition and they would proceed from there. Noticing that the defendant began typing into the phone, Agent Gajkowski asked "is it a passcode?" The defendant explained that sometimes he must use the passcode if something has been changed. Agent Gajkowski responded, "Okay, okay. So passcode is voluntary. We can compel face. But that's what—I just want to reiterate that.". The defendant showed no reaction to Agent Gajkowski's statement and handed the now unlocked phone to her, stating "there it is." Agent Gajkowski then asked the defendant if he would "feel comfortable" setting the password to something easy, like 1, 2, 3, 4, and the defendant replied, "sure." As the defendant navigated through the settings while Agent Gajkowski looked on, they noticed an option to set up an alternate appearance (presumably to change the face associated with the Facial ID). Agent Gajkowski joked that he would not want her face to be on his phone, and the agents and the defendant laughed in unison.   When they eventually found the setting to turn off the passcode feature, rather than change the code itself, the defendant asked if he should instead

turn the passcode off. In doing so, as he did earlier, he turned the face of his phone towards Agent Gajkowski, who quickly realized that he was going to type in his PIN to change the setting. Agent Gajkowski stepped away as he entered his passcode.[20] The defendant then changed the settings on the second device. Throughout this second encounter in the hotel lobby, the defendant's demeanor was similarly calm and cooperative. Upon confirming that both phones were permanently unlocked, the defendant said, "thanks guys" and turned to walk away. Exhibit 13, 13a. At one point as he was walking away, he appeared to ask from the hallway whether "that was it" (presumably confirming they were finished), and the agents assured him they were done. Exhibit 14, 14a.

The iPhone XR, the defendant's personal phone, was forensically analyzed on June 9, 2020, and the iPhone 6, the defendant's work phone, was forensically analyzed on June 16, 2020. The searches revealed that the iPhone 6 was backing up (preserving a copy) to the defendant's iCloud account, the same iCloud to which the iPhone XR was also backing up.

From the iPhone XR, the government recovered over 180 photos and over 25 videos for AV-2, AV-3, AV-4, AV-5, AV-6, and AV-19.

A search of the iPhone 6 revealed that the defendant lied to federal agents about his dating history, his use of dating applications, and the number of women he had dated in recent months. The iPhone 6 revealed that the defendant was in fact talking with over 59 women in Mexico in the mere eight months prior to the May 31 incident at his residence. The iPhone 6 data further showed that he met many of these women on dating applications such as Tinder and Bumble, despite claiming that he barely used Tinder and did not use Bumble. The agents also retrieved the

---

[20] Here the government notes that, before Agent Gajkowski stepped away, she noticed the following: to change the passcode on each phone, the iPhone 6 required only a passcode. The iPhone XR, however, required both a passcode and the defendant's iCloud password.

defendant's WhatsApp chats with AV-7 and saw that his conversation with her was remarkably similar to his conversation with AV-1, discussing the same topics, suggesting essentially the same outing, and sending a photograph of the same bottle of wine. The agents discovered that this was a common pattern for the defendant with the women he was pursuing, discussing alcohol and sending them the photos of the wine he would serve on their eventual dates, often sending the same few photos to multiple women.

On June 6, 2020, before either device had been extracted, the government submitted preservation letters to preserve several of the defendant's online accounts, to include his iCloud account and his Yahoo email account. An eventual search of those accounts, pursuant to separate search warrants, revealed photos and videos of nude and partially nude, unconscious women. Much of what was located in the iCloud was also on the defendant's iPhone XR. However, the iCloud account contained many more pictures and indicia of abuse. From the defendant's iCloud, the government recovered over 300 photos and 30 videos for AV-2, AV-3, AV-4, AV-5, AV-6, AV-7, AV-8, AV-9, AV-10, AV-11, AV-12, AV-13, AV-14, AV-15, AV-16, AV-17, AV-18, and AV-19.

On June 14, 2020, before either device had been examined, agents seized from the defendant's residence in Mexico City a blue laptop and a purple laptop, as well as an SD card, all of which contained photographic evidence of nude, unconscious women. From those devices and storage cards, the government recovered over 200 photos and 20 videos for AV-2, AV-3, AV-4, AV-5, AV-6, AV-12, AV-13, AV-17, AV-18, AV-19, AV-20, AV-21, AV-22, AV-23, AV-24, AV-25.

**2. There was no Fourth Amendment violation relating to the seizure of the defendant's personal phone, and even if there were, the exclusionary rule would not apply.**

The decision to reengage the defendant to conduct the biometric unlocking procedure was a reasonable continuation of the original seizure rather than a new and separate search requiring a new warrant. Plainly put, the government or its agents did not engage in any unconstitutional action. Nevertheless, even *if* this Court were to conclude that this decision resulted in a technical violation of the warrant, suppression would be unwarranted.

**a. The decision to reengage the defendant to have him unlock his devices was reasonable and resulted in a continuation of the initial seizure.**

When the agents seized the defendant's personal iPhone on June 6, 2020, they did not attempt the biometric unlocking procedures authorized by the warrant because they did not know that an iPhone could be locked by two different mechanisms (by passcode *and* biometrics, for example). Therefore, when the defendant indicated that the phones were locked by a PIN, the agents mistakenly thought that a PIN code was the only method by which the phones could be unlocked. Recognizing that they could not compel him to reveal his PIN code, the agents ended the encounter at 12:26 p.m. Agent Gajkowski then called government counsel. Upon learning that the biometrics were not attempted, government counsel subsequently advised the agents to immediately reengage the defendant to unlock his phones using either Touch/Face ID. Given the physical and temporality proximity to the initial seizure, coupled with the fact that the warrant did not simply authorize a seizure, but rather authorized compelled biometrics, as well as subsequent search of the device(s), the agents, after additional consultation, decided to attempt to employ the biometric provisions as authorized by the warrant. Agents then engaged a local uniformed police officer for assistance in the unlikely situation they would need to briefly detain the defendant to

41

unlock the phones and requested that the defendant meet them in the lobby of his hotel. Based upon the timestamp on the police officer's body camera, agents arrived at the defendant's hotel at 1:30 p.m., one hour after they seized the defendant's phone. The decision to reengage with the defendant to unlock the phones using his biometrics, and the actions that followed, were reasonable and constituted a continuation of the original warrant.

"The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." *Schmerber v. California*, 384 U.S. 757, 767 (1966). As the Supreme Court has repeatedly recognized, "obtaining ... physical evidence from a person involves a potential Fourth Amendment violation at two different levels—the 'seizure' of the 'person' necessary to bring him into contact with government agents, and the subsequent search for and seizure of the evidence. *United States v. Dionisio*, 410 U.S. 1, 8 (1973) (internal citation omitted) (citing *Davis v. Mississippi*, 394 U.S. 721 (1969)). "The touchstone of our analysis under the Fourth Amendment is always the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security. Reasonableness, of course, depends on a balance between the public interest against the individual's right to personal security free from arbitrary interference by law officers." *Pennsylvania v. Mimms*, 434 U.S. 106, 108-09 (1977) (internal citations omitted). Fourth Amendment decisions "reflect the recognition that the Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract." *United States v. Ventresca*, 380 U.S. 102, 108 (1965).

Here, the agents' reengagement of the defendant for the purpose of unlocking his phones was not an affront to his personal dignity, did not represent an unwarranted or arbitrary intrusion on his privacy, and was ultimately reasonable given the totality of the circumstances.

42

As an initial matter, Attachment B of the search warrant provided, "During the execution of the search of Device 1 and Device 2, as described in Attachment A, law enforcement personnel are authorized to press the fingers (including thumbs) of BRIAN RAYMOND to the Touch ID sensor of Device 1 and Device 2 for the purpose of attempting to unlock the device via Touch ID in order to search the contents as authorized by this warrant. Law enforcement personnel are further authorized to hold Device 1 and Device 2 up to RAYMOND's face for the purpose of attempting to unlock the devices via Face ID." *See* ECF No. 119-1 at 21.

The term "execution" as applied to search and seizure warrants generally may be construed as ambiguous, and a search of the relevant case law did not clarify with any certainty whether a search and seizure warrant for an electronic device is fully "executed" once the device is physically in law enforcement's possession or once it has been successfully imaged or extracted by law enforcement as authorized by the warrant. By claiming that the warrant was executed, and therefore dead, as soon as the defendant's devices were in Agent Gajkowski's possession, the defendant ignores the fact that the warrant also allowed for the extraction of data from the devices. While this question of semantics may not be dispositive here, it illustrates that the defendant's position as to when the "execution" of the warrant was actually complete may not be as cut and dry as he would prefer.

Fortunately, the Court need not answer this question, as there are circumstances in which the execution of a warrant involving subsequent entries is considered a reasonable continuation of the initial interaction or seizure, which is what occurred here. Most of the Circuits to have considered this question have held that a single search warrant may authorize more than one entry into the premises if the second entry is a reasonable continuation of the original search. The

43

government notes that the cases considering the reasonable continuation question involve premises warrants, rather than device warrants. With the search of a defendant's home, for example, the reasonable continuation rule stops the government from committing repeated disturbances of the "peaceful enjoyment" of the home on a single warrant. *United States v. Castro*, 881 F.3d 961, 968 (6th Cir. 2018) (acknowledging that the intrusion into a device is different than the intrusion into a home). There is nothing construed as more sacred than one's home, in the constitutional context. If such reasonable continuation doctrines permit reengagements in the context of one's abode, it is difficult to see how using a court-authorized procedure related to access a cellular device over the course of several hours somehow so outrageous as to warrant suppression. Thus, the principles applied in this line of cases justify the reengagement with the defendant here, even if a lower standard for a device seizure/search may ultimately be appropriate.

Circuit courts consider whether (1) the subsequent entry is a continuation rather than a new, separate search, and (2) whether the decision to conduct a second entry is reasonable under the totality of the circumstances. *See, e.g., United States v. Keszthelyi*, 308 F.3d 557, 568-69 (6th Cir. 2002); *United States v. Bowling*, 351 F.2d 236, 240-41 (6th Cir. 1965) (holding that the agents' decision to return the morning after the initial search pursuant to the same warrant was reasonable, as the warrant provided for the seizure of stolen machinery from the defendant's home, and agents chose upon the first entry to document the serial numbers on the machines located there, return to their office to check the serial numbers against a list of stolen equipment, and reenter he premises the following day to seize the relevant items); *United States v. Squillacote*, 221 F.3d 542, 555 (4th Cir. 2000) (finding a six-day search of the defendant's home, which at times occurred after 10 p.m., to be a reasonable continuation of the initial search considering the totality of the

circumstances).

In *Carter*, officers searched a hotel room pursuant to a warrant, ended their search, and provided the defendant with an inventory list. *United States v. Carter*, 854 F.2d 1102, 1105 (8th Cir. 1988). Shortly thereafter, officers realized that they had not located money that was specifically identified to be seized in the warrant. The officers called the hotel and asked that the room not be cleaned until they could return. Officers then seized money from under the mattress upon returning to the hotel. *Id.* The Eighth Circuit upheld the subsequent entry into the hotel room as reasonable, finding that the second entry was a continuation of the first, rather than a separate search requiring a new warrant. *Id.* at 1107 (noting that the authority of the warrant had not expired at the time of the second entry into the hotel room and that the warrant specifically listed the money that was subsequently seized). Similarly, in *Kaplan*, officers conducted a search of the defendant's office, subject to a warrant, seized files, and left. *United States v. Kaplan*, 895 F.2d 618, 623 (9th Cir. 1990). After examining the files, the officers realized that they had not seized everything authorized by the warrant, so two hours and ten minutes later, they returned to the office and obtained the remaining files. *Id.* The Ninth Circuit found this to be a constitutional continuation of the initial search, noting that the officers' decision to return was reasonable. *Id.* (remarking that the files obtained during the subsequent entry were specifically requested in the warrant). Notably, in both *Carter* and *Kaplan*, the officers did not have an expectation or reason to return at the time the initial search ended—rather, they realized shortly thereafter they had inadvertently or mistakenly missed critical evidence and therefore returned to continue their search, which was ultimately deemed reasonable in each instance based upon the totality of the circumstances.

In addition to considering the reasonableness of a subsequent entry on a single warrant,

courts have also considered whether probable cause continued to exist during the course of the continuation or delay, and whether law enforcement acted in deliberate bad faith. For example, in *Gerber*, agents searched the defendant's automobile pursuant to a warrant on a Friday, but they were unable to open the hood of the car to complete their search. *United States v. Gerber*, 994 F.2d 1556, 1557-59 (11th Cir. 1993). The following Monday, not realizing the warrant had expired, the agents returned with the tools necessary to open the hood and seized additional incriminating items. *Id.* at 1557. The court found that the continuation of the initial search beyond the expiration of the warrant was reasonable because the probable cause supporting the warrant still existed, and the agents did not deliberately cause the delay. *Id.* In a case involving a more substantial delay, the Eleventh Circuit declined to suppress evidence where law enforcement delayed *six months* after a laptop's seizure to search the device, in violation of the warrant's addendum requiring the search to be completed within 60 days. *United States v. Nicholson*, 24 F.4th 1341, 1347 (11th Cir. 2022). The Court held that although the government failed to comply with the temporal limitations in the warrant, there was no Fourth Amendment violation because "the key constitutional question is whether the probable cause that justified the warrant went stale or dissipated." *Id.* at 1359 (finding law enforcement's conduct to be more akin to a Rule 41 violation and denying the defendant's request to suppress the evidence obtained from the laptop because there was no evidence of intentional or deliberate disregard for the temporal limitations contained within the warrant).

In the instant case, the agents' reengagement of the defendant in his hotel lobby, for the purpose of unlocking his devices using the biometric procedures authorized by the warrant, was a continuation of the initial seizure, and the decision to do so was reasonable in light of the circumstances. When the defendant indicated that he used a PIN code to unlock his phones, the

agents did not consider whether there were other unlocking methods enabled and therefore prematurely ended their contact with the defendant without attempting to unlock his devices. Like in *Carter* and *Kaplan*, upon realizing this oversight (and in this case, after consulting with government counsel), the agents took subsequent steps to obtain the information explicitly listed in warrant. While there was no temporal limitation specifically applicable to the biometric procedures in the warrant at issue here, other than the 10-day expiration date, legal authority in this district requires that the unlocking procedure be done with dispatch. *See Matter of Search of [Redacted] Washington, District of Columbia*, 317 F. Supp. 3d 523 (D.D.C. 2018). The fact that the agents reengaged the defendant a mere hour after the initial seizure and concluded their interaction an hour after that reasonably complies with this requirement. Additionally, the probable cause supporting the issuance of the warrant did not dissipate or go stale in the time it took for the agents to complete the process. Finally, the agents did not deliberately delay the unlocking procedure or act in bad faith. Considering the totality of the circumstances, the subsequent engagement was very clearly a continuation of the initial seizure rather than a new, separate search, and the agents' actions were reasonable. Accordingly, there was no Fourth Amendment violation, and a pre-plea motion to suppress the evidence obtained from the defendant's personal phone would not have succeeded.

> **b. Even if the biometric unlocking procedure were found to be a separate search, any violation was not the product of bad faith or intentional police misconduct, and therefore suppression would not have been appropriate.**

The exclusionary rule's "sole purpose" is to deter future Fourth Amendment violations. *Davis v. United States*, 564 U.S. 229, 236-37 (2011); *see also United States v. Calandra*, 414 U.S. 338, 347 (1974) (noting that the "prime purpose" is to deter future unlawful police conduct);

*United States v. Leon*, 468 U.S. 897, 906 (1984) ("The [exclusionary] rule thus operates as a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved."). The deterrent value of exclusion directly corresponds to the "culpability of the law enforcement conduct" in committing the violation. *Herring v. United States*, 555 U.S. 135, 143 (2009). "When the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong." *Davis*, 564 U.S. at 238. However, where the law enforcement action was pursued in good faith, as it was here, the deterrence rationale loses much of its force. *Leon*, 468 U.S. at 919.

To trigger the exclusionary rule, law enforcement conduct "must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 144 (noting that the Court has never suggested that evidence should be excluded in circumstances where it might provide marginal deterrence). The Supreme Court has held that balancing the benefits of deterrence with the systemic cost of excluding otherwise credible evidence and the possibility of letting guilty and dangerous defendants go free, merely negligent law enforcement conduct does not justify exclusion. *Id.* at 141-47 (holding that when a constitutional violation was caused by an officer's negligent error or good faith mistake, rather than systemic error or reckless disregard of constitutional requirements, the costs of suppressing evidence necessarily outweigh the benefits); *see also Pennsylvania Bd. Of Probation and Parole v. Scott*, 524 U.S. 357, 364-65 (1998) ("[The exclusionary rule's] costly toll upon truth-seeking and law enforcement objectives presents a high obstacle for those urging [its] application."). Error that results from negligence or mistake, is not

enough, by itself, to require the "extreme sanction of exclusion." *Herring*, 555 U.S. at 140 (quoting *Leon*, 468 U.S. at 916). In such a case, "the criminal should not go free because the constable has blundered." *Herring*, 555 U.S. at 148 (drawing a distinction between mistakes versus systematic error or reckless disregard for constitutional requirements).

"In deciding whether exclusion is appropriate, an assessment of the flagrancy of the police misconduct constitutes an important step in the calculus." *Leon*, 468 U.S. at 911. Evidence should only be suppressed where "the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." *Illinois v. Krull*, 480 U.S. 340, 348-49 (1987) (quoting *United States v. Peltier*, 422 U.S. 531, 542 (1975)). As such, the exclusionary rule should not be applied for the purpose of deterring "reasonable law enforcement activity. *Leon*, 468 U.S. at 919 (further explaining that courts have considerable discretion in deciding what is reasonable based upon the circumstances of particular cases). Exclusion has "always been our last resort, not our first impulse." *Hudson v. Michigan*, 547 U.S. 586, 5591 (2006). "'[E]vidence seized in reasonable, good-faith reliance on a search warrant' need not be excluded, even if the warrant turns out to have been unsupported by probable cause" or otherwise invalid. 867 F.3d 1265, 1278 (D.C. Cir. 2017) (quoting *Leon*, 468 U.S. at 905). "This application of the good-faith exception to the exclusionary rule reflects the policies behind the suppression remedy, which was adopted to deter unlawful searches by police, not to punish the errors of magistrates and judges." *United States v. Thorne*, 548 F. Supp. 3d 70, 130 (D.D.C. 2021) (quoting *Massachusetts v. Sheppard*, 468 U.S. 981, 990 (1984)) (internal punctuation omitted).

In the above-cited cases involving the continuation of an initial search, courts declined to suppress the evidence seized in those instances because of a lack of law enforcement misconduct,

even where there were technical violations of the warrant. The conduct was reasonable, so there was nothing to deter by suppressing the fruits of their searches. *See, e.g., Squillacote*, 221 F.3d at 557 ("Under these circumstances, even if the FBI's actions amounted to technical violations of the terms of the warrant, the violations were relatively minor and were motivated by considerations of practicality rather than by a desire to engage in indiscriminate fishing."); *Gerber*, 994 F.2d at 1561 (holding that evidence should not be suppressed due to an inadvertent, rather than intentional, failure to conform with Rule 41 when agents made a second entry on the warrant two days after it had expired); *United States v. Twenty–Two Thousand, Two Hundred Eighty Seven Dollars ($22,287.00) United States Currency,* 709 F.2d 442, 449 (6th Cir. 1983) (denying suppression of evidence seized the day after the warrant expired, deeming the infraction "de minimis" because a reasonable basis existed and there was no "intentional or deliberate" disregard of the Rule 41 requirements); *In re Motion to Quash Grand Jury Subpoenas,* 593 F. Supp. 184, 192 (S.D.W.Va. 1984) (finding suppression inappropriate where agents, who initially could not gain access to the premises and failed to realize that the warrant expired the same day it was issued, executed the warrant four days after its expiration, because nothing occurred in the interim to obviate the magistrate's finding of probable cause and because the agents acted in good faith).

In the instant case, the agents did nothing to exhibit deliberate, reckless, or grossly negligent disregard for the defendant's Fourth Amendment rights. At worst, they failed to initially attempt the biometric procedure because they did not know that the phones could be unlocked using more than one method. Even if their reengagement of the defendant, an hour later, was determined to constitute a new, separate search, it was clearly pursued in good faith. And even if the advice provided by prosecutors was plainly wrong, which it is not, the evidence of malintent

is entirely nonexistent. Because there was no sufficiently deliberate conduct for exclusion to meaningfully deter, there would have been no justification for suppressing the evidence from the defendant's personal device. As such, a pre-plea motion to suppress would have failed.

### 3. The defendant's decision to enter his PIN to change the lock settings on his devices was voluntary and therefore not a violation of the Fifth Amendment.

The defendant claims that the agents' decision to have a *conversation*, however prolonged, with the defendant, was so problematic that it overborne his will. This claim is meritless. The agents did not violate the defendant's Fifth Amendment Due Process Rights by asking the defendant whether he was willing to enter his PIN to change the lock settings on his phone. Moreover, the conversation with the defendant was not coercive. and the defendant's decision to change his PIN was voluntary. Nevertheless, even if this Court were to find that the entry of his PIN was involuntary, the exclusionary rule would also not apply given the lack of flagrant misconduct by the agents.

#### a. The defendant's decision to enter his PIN to change the lock setting was voluntary, and his will was not overborn by coercive police tactics.

The defendant claims that had prior counsel filed a motion to suppress the search of his phone on Fifth Amendment grounds, he would have prevailed and therefore would not have pled guilty. Specifically, he alleges that when he entered his PIN code to change the automatic lock setting on his personal phone, he did so only because his will was overborn due to the nature of the agents' coercive conduct and therefore his PIN was obtained in violation of the Fifth Amendment. *See* ECF No. 46-47. In reality, the agents engaged the defendant in a calm and voluntary encounter during which the defendant agreed to input his PIN code to keep his personal phone from relocking, after it had already been opened using his biometrics as authorized by the

warrant.

"The Due Process Clause of the Fourteenth Amendment provides that no State shall deprive any person of life, liberty, or property, without due process of the law…we [previously] held that by virtue of the Due Process Clause, certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned." *Colorado v. Connelly*, 479 U.S. 157, 163 (1986) (internal citations omitted). Put simply, statements made to law enforcement that the government seeks to use against a defendant in a criminal case must be voluntary. The presence of coercive police activity is a "necessary predicate" to the finding that a confession is not voluntary. *Id.* at 167. "In determining whether a defendant's statements were voluntary, a court must assess whether, under the totality of the circumstances, law enforcement officials obtained the evidence by overbearing the will of the accused…The Supreme Court has emphasized that some form of government overreaching is required for a statement to be involuntary." *Hsin-Yung*, 97 F. Supp. 2d 24, 34 (D.D.C. 2000); *see also Connelly*, 479 U.S. at 163-64 (noting that while each Fifth Amendment voluntariness challenge requires a fact-specific analysis, all have contained a "substantial element of coercive police conduct," and without proof of such conduct, there is "simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law"). The D.C. Circuit has held that "egregious facts are necessary to establish that the statements…made during questioning are involuntary." *Robinson*, 256 F. Supp. 3d at 29 (quoting *United States v. Hallford*, 816 F.3d 850, 863 (D.C. Cir. 2016). When circumstances are less than egregious, they are usually deemed voluntary. *Id.* at 856 (finding statement was voluntary when the interview lasted less than an hour, the agents' questions were straightforward and asked in a

conversational tone, and they made no threats or promises).[21]

A criminal defendant's statement is inadmissible "if under the totality of the circumstances it was involuntarily obtained." *United States v. Reed*, 522 F.3d 354, 358-59 (D.C. Cir. 2008). Voluntariness relies upon whether the defendant's "will was overborne" when he gave the statement. *United States v. Murdock*, 667 F.3d 1302, 1305 (D.C. Cir. 2012); *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). The test for this is whether "the statement was a product of an essentially free and unconstrained choice by its maker." *Murdock*, 667 F.3d at 1305. The issue of voluntariness is a legal question that requires "careful evaluation of all the circumstances of the interrogation, including but not limited to the defendant's age and education, the length of detention, whether the defendant was advised of his rights, and the nature of the questioning. *Id*. at 1305-1306; *see also Schneckloth*, 412 U.S. at 226. Knowledge of the right to refuse to make a statement is just one factor to be taken into account. *Schneckloth*, 412 U.S. at 227. Voluntariness must be proven only by a preponderance of the evidence. *Connelly*, 479 U.S. at 167; *Reed*, 522 F.3d at 359.

The determination as to whether a defendant's statement was voluntary is highly fact specific. For example, in *United States v. Robinson*, 256 F. Supp. 3d 15 (D.D.C. 2017), this Court

---

[21] *Compare Mincey v. Arizona,* 437 U.S. 385, 398-400 (1978) (finding confession involuntary where detective gave *Miranda* warnings but persisted in questioning defendant who had been wounded a few hours earlier, was in a hospital bed in an intensive care unit encumbered by tubes and needles, was complaining of intense pain, gave confused and incoherent responses, and repeatedly asked that the interrogation stop until he could get a lawyer), *with Berghuis v. Thompkins,* 560 U.S. 370, 386-87 (2010) (finding no coercion in a three-hour interrogation absent evidence "that police threatened or injured [the defendant] during the interrogation or that he was in any way fearful"), *United States v. Mohammed,* 693 F.3d 192, 198 (D.C. Cir. 2012) (finding statements voluntary even though the defendant may have been handcuffed during two-hour interrogation and DEA agents lied to him that his hands tested positive for heroin; the DEA agents "did not threaten or intimidate [the defendant]"), *and United States v. Reed,* 522 F.3d 354, 359 (D.C. Cir. 2008) (finding confession voluntary because district court credited FBI agent's testimony that defendant was not hit in the face and was given a blanket when placed in a cold room, and defendant's remaining allegation—that he was forced to wear a jumpsuit without underwear—did not rise to the level of coercion).

considered whether statements made by the defendant, a medical professional, to law enforcement were voluntary. In that case, DEA agents and Metropolitan Police Department officers encountered the defendant while conducting a search warrant of his office. There was a considerable law enforcement presence, approximately 20 individuals including uniformed officers with weapons and detectives and agents in street clothes with law enforcement insignia on their jackets. There were marked and unmarked police cars on site, without lights or sirens, and the perimeter around the building had been secured. *Id.* at 18-19. The search operation was orderly and calm. *Id.* at 19.

With officers standing nearby but several feet away, the defendant was told about the search warrant, and they informed the defendant they were not there to arrest him. *Id.* at 18. They then asked if he would mind sitting for an interview, and he replied, "no problem." *Id.* at 19. He had an opportunity to decline the interview and was free to leave. Officers conducted a pat down of his person for safety purposes, but he was never handcuffed or restrained. *Id.* The defendant and several law enforcement officials moved to a nearby office, and the defendant chose a seat near the door. *Id.* at 20. The defendant was not restrained and had a "clear opportunity" to leave, but he opted to stay. *Id.* A new detective arrived wearing "raid gear" and joined the interview. *Id.* The defendant was never read his *Miranda* rights. *Id.* at 21.

Towards the end of the interview, the defendant was asked if he would voluntarily surrender his DEA registration (which allowed him to write prescriptions for controlled substances), and the investigator explained that if he did not, an administrative process would be initiated to revoke it. *Id.* at 23. The investigator further noted that if he surrendered his registration

voluntarily, he would retain some prescription rights.[22] The defendant agreed. *Id.* Ultimately, the interview lasted approximately 45 minutes to an hour, and the defendant never asked to take a break. *Id.*

Based upon the totality of the circumstances, this Court found that the defendant's statements were voluntary and denied the motion to suppress, carefully considering each individual fact as it related to the tactics of law enforcement and whether the defendant's will was overborne, rendering his statements involuntary. This Court noted that the defendant agreed to be interviewed, he had multiple opportunities to decline, he was free to leave, and he seemed willing to help. *Id.* at 29-30. He was told he was not under arrest. *Id.* at 25. The setting was not coercive or police-dominated—rather, it was inside an office within the defendant's own place of work. *Id.* at 26. The defendant's demeanor was calm and patient throughout the interview. *Id.* Similarly, the officers were calm and conversational, and the interview was not particularly long. *Id.* In making its findings, this Court noted that while there were some facts supporting the defendant's argument that his statements were involuntary, such as a mention of his license being revoked, any such facts fell "far short of the type of coercive police activity that could plausibly render a statement involuntary." *Id.* at 30.[23]

The facts of the instant case are similar in many ways. The defendant is well-educated and had a long, professional career. His initial encounter with law enforcement on June 6, 2020, was in a location he chose, and the subsequent encounter was in his hotel lobby, rather than a police-

---

[22] This Court did not interpret the investigator's statements to be intended as threats or promises—rather, this Court found that the investigator was merely informing the defendant of his options. *Id.* at 23.

[23] This Court also declined to find a *Miranda* violation, finding that a reasonable person in Robinson's position would have understood he was not in custody and free to leave. *Id.* at 25-27. Such a violation has not been alleged by the defendant in his pending motion to withdraw his plea.

dominated or otherwise coercive setting. During the encounter at the hotel, the defendant's demeanor was calm, as evidenced by the body camera footage showing the defendant standing casually with his hands in his pockets throughout much of the encounter. The agents were similarly calm and kept a light, conversational tone with the defendant, apologizing for the inconvenience and wishing him well on several occasions. During the encounter, the defendant stood directly next to an exterior exit, while agents at times stood several feet away or paced around the lobby. The uniformed officer largely stayed out of the way. The defendant was informed, almost immediately upon coming into the lobby, that he was not under arrest. The defendant was never restrained, patted down, or handcuffed, and he was free to leave at any time. The agents, other than the uniformed officer, were wearing street clothing without visible weapons. Only two were in the lobby; the other two were standing outside near the entrance but were not guarding or blocking the door.

Importantly, as reflected in the body camera footage, the defendant was informed several times that he could not be compelled to provide his PIN code. And when agents mentioned to the defendant that they were struggling to keep the phones from timing out (relocking), and stated,

> "We can't compel or force you. Any cooperation would be greatly—
> we don't want to keep bothering you because it's an inconvenience.
> But we want to respect your rights. So I don't know if you can meet
> us halfway or what. You don't have to, but God it would be helpful."

it was said in almost a sheepish tone, acknowledging the technical mishaps and inconvenience. The statement was a far cry from an improper or coercive threat or promise. Shortly thereafter, Agent Gajkowski asked, "*Do you feel comfortable* setting the password to your choosing so that I can open it? I won't have your personal password." The defendant responded, "sure." Agent Gajkowski then confirmed, "You're okay to do that?" The defendant did not answer, but he

56

proceeded to navigate to the settings on his phone to turn off the automatic lock feature. The phone required the defendant to input his PIN code to change this setting, and when he went to do so, he angled his phone screen towards Agent Gajkowski. She then turned her head away, saying, "oh, sorry, sorry. You don't want to –." In doing so, she was trying to ensure that she did not inadvertently view the defendant's PIN code against his wishes. The defendant turned off the lock setting on his device.[24] After testing the phone to ensure the lock setting had successfully been changed, the agents apologized for the inconvenience, and the defendant told them it was fine and said, "thanks, guys" before leaving. Based upon the body camera footage, the encounter ended at 2:26 p.m., exactly two hours after the conclusion of the prior interview.

As in *Robinson*, the totality of these facts establish that all statements made by the defendant during his encounter with law enforcement in the hotel lobby were made freely and voluntarily without undue pressure or coercion, to include the defendant's eventual decision to input his PIN to remove the automatic lock setting from his phone. There is no indication, whatsoever, that the agents engaged in egregious, coercive tactics intended to overbear the defendant's will. Accordingly, a pre-plea motion to suppress the defendant's "statement" (i.e., the entry of his PIN code to change the lock settings) would have failed. The defendant highlights in his motion, *numerous times* that he told the agents he would need to consult with an attorney before handing over his phones or provide his PIN. The implication of the defendant's continued recitation of this fact is to encourage the Court to believe that the defendant had formally invoked

---

[24] The defendant's motion alleges that the agents also compelled the defendant to provide his "Apple account password" and "Apple account access." This is not true—the agents never so much as referenced an Apple account password or a desire to access the defendant's Apple account. Instead, the defendant's phone required him to input both his PIN code and his Apple ID password to change his lock settings.

his right to counsel. But the defendant had no right to counsel because he was not subject to a custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966) ("Prior to any questioning [stemming from a custodial interrogation], the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.").

> **b. Even if the entry of the defendant's PIN was found to be involuntary, suppression would not have been appropriate.**

As with Fourth Amendment violations, the exclusionary rule is only applicable when there have been deliberate, intentional, or reckless violations of the defendant's Fifth Amendment rights. When there has been no such conduct, there is no need for the type of deterrence achieved by suppression. *See Colorado v. Connelly*, 479 U.S. 157, 166 (1986) ("The purpose of excluding evidence seized in violation of the constitution is to substantially deter future violations of the constitution."). As with the Fourth Amendment exclusionary rule cases, the concern is the same here: improperly suppressing relevant statements, absent evidence of deliberate law enforcement misconduct, will impose "substantial costs" on the societal interest by prohibiting the use of otherwise relevant evidence. *Id.* (citing *United States v. Janis*, 428 U.S. 433 (1976).

In addition to the deterrent purpose, suppression in the Fifth Amendment context is also concerned with excluding coerced statements because of their probable unreliability and the likelihood that a confession could be untrue. *See al-Qurashi v. Obama*, 733 F. Supp. 2d 69, 78 (D.D.C. 2010); *Mohmmed v. Obama*, 704 F. Supp. 2d 1, 24-25 (D.D.C. 2009) ("[A]s a practical matter, resort to coercive tactics by an interrogator renders the information less likely to be true."). In the instant case, no such concern exists. The "statement" at issue was the defendant's entry of his PIN code for the purpose of removing the automatic lock setting. It worked; therefore, the

statement was reliable.

As discussed above, the agents acted in good faith to uphold the defendant's Fifth Amendment rights. Agent Gajkowski informed the defendant multiple times that he could not be compelled to provide his PIN. When unexpected technical difficulties arose, Agent Gajkowski contacted government counsel for legal advice. At moments when the defendant turned the face of his phone towards Agent Gajkowski, she purposefully looked or stepped away so as to not inadvertently view the defendant's PIN against his will. The agents treated the defendant with courtesy and respect, informed him he was not under arrest, and did not take any efforts to restrict his movement or his freedom to leave. None of their conduct reflects the type of deliberate or reckless behavior requiring suppression.

Accordingly, even if the defendant's entry of his PIN were to be deemed involuntary, the "statement" would not have been suppressed and the evidence obtained from the phone would have been admissible.

### 4. Assuming the government never unlocked the defendant's personal iPhone XR or such evidence had been suppressed, the government would have inevitably located the same evidence through other means

The defendant's motion to withdraw his plea relies upon the assumption that the government's case would be fatally affected by the suppression of the evidence from his personal phone, the iPhone XR. In other words, if the defendant were permitted to withdraw his plea, he would file a motion to suppress, win on the motion to suppress, and thereby prove the ineffectiveness of his prior counsel. But this entire theory is upended by the fact that the government would have inevitably discovered the most important evidence of the defendant's crimes through other means, and from other sources. Indeed, it is this very fact that undermines

any claim of ineffectiveness on the part of the prior counsel. Rather, prior counsel was effective, and inevitable discovery, as raised in this context, is precisely why.

First, on June 6, 2020, the government also seized the defendant's work phone, an iPhone 6. The defendant's motion does <u>not</u> challenge the seizure or search of the iPhone 6, presumably in recognition of the fact that he has no reasonable expectation of privacy in a device provided to him by an employer. A search of the iPhone 6 revealed that the defendant lied to federal agents about his dating history, his use of dating applications, and the number of women he had dated in recent months. While this does not include significant overlap with the defendant's iPhone XR that is at issue in the defendnat's motion, the iPhone 6 (work phone) coincidentally was backing up – i.e., preserving a copy – of its contents to the defendant's iCloud account. Based upon the evidence of the defendant's prolific interactions with women on his iPhone 6, coupled with the lies to agents regarding the same, the government would have inevitably obtained a search warrant for the defendant's iCloud account (as it eventually did in this case) and therefore obtained the most damning evidence, hundreds of photos and videos of nude, unconscious women and chat conversations the government used to identify and locate the women depicted. To be clear, even if the Court suppressed the evidence from the defendant's iPhone XR, the government would still have duplicate evidence available from the defendant's iPhone 6 (his work phone), and his Apple iCloud account, which combined, revealed over 300 pictures, over 30 videos, and .

The probable cause articulated for the defendant's two iPhones was arguably the same probable cause needed to obtain a search warrant for the defendant's iCloud account, even without the supporting evidence from the iPhone 6. In fact, the government served a preservation request on Apple for the defendant's iCloud account on June 6, 2020, before either of the iPhones had

been examined, evidencing its intent to pursue the content contained therein. This was, in part, because iPhones regularly back up to the user's iCloud account, making search warrants for iCloud accounts rather routine. And again, the iCloud account in this case revealed the most damning (and same) evidence, hundreds of photos and videos of nude, unconscious women and chat conversations the government used to identify and locate the women depicted.

Finally, assuming *arguendo* that the defendant's personal phone, the iPhone XR, had been seized in a locked state, and the agents never returned to unlock it or the defendant never entered his PIN code to disable the automatic lock feature, the government nevertheless would have been able to access the vast majority of data on the phone without ever unlocking it, using a technology available to law enforcement. Accordingly, the government would have located the photos and videos contained on the iPhone XR. Therefore, based upon any one of these three scenarios, the government would have inevitably discovered the evidence necessary to prosecute the defendant.

When evidence has been seized unlawfully,[25] the inevitable discovery exception to the exclusionary rule allows such evidence to nonetheless be introduced "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams,* 467 U.S. 431, 444 (1984); *United States v. Redrick*, 48 F. Supp. 3d 91, 107 (D.D.C. 2014). This exception exists because exclusion of physical evidence that would have been discovered regardless adds nothing to the integrity or fairness of a criminal prosecution. *Nix*, 467 U.S. at 446.

---

[25] The government does not concede that the evidence recovered from the defendant's personal iPhone XR was seized unlawfully. It simply presents the inevitable discovery exception as yet one more reason why the evidence from the defendant's phone or the evidence located during the government's subsequent investigation never would have been suppressed or even if it was suppressed, the same evidence would have been located.

In determining whether an additional search warrant, for example, would have been sought, absent any reliance on the unlawfully seized evidence, courts have looked to whether agents had probable cause for the additional warrant and whether there was a viable chain of events that would have led to an additional warrant independent from the problematic search. *United States v. Brown*, 64 F.3d 1083, 1085 (7th Cir. 1995). Put differently, the key issue is one of probability: how likely a subsequent warrant would have been issued and how likely the evidence would have been found. *United States v. Souza*, 223 F.3d 1197, 1204 (10th Cir. 2000). In the instant case, the government did in fact seek search warrants for the iPhone 6 and for the iCloud. Though the affidavits supporting those warrants referenced materials found on the iPhone XR, they need not have to satisfy the probable cause standard.[26]

### a. The government would have obtained a search warrant for the defendant's iCloud account even without the support of the information found on the iPhone XR.

Even without the evidence found on the iPhone XR or the iPhone 6, the government had probable cause to search the defendant's iCloud. But even assuming the government lacked the requisite probable cause to search the defendant's iCloud account, the iPhone 6 would have provided sufficient evidence to do so.

On June 6, 2020, the defendant's work-provided iPhone 6 was seized along with his personal iPhone XR. The defendant's motion does not challenge the search or seizure of the iPhone 6. Accordingly, the question becomes whether agents would have recovered anything from the

---

[26] The test for probable cause is not reducible to "precise definition or quantification." *Florida v. Harris*, 568 U.S. 237, 243 (2013) (citing *Maryland v. Pringle*, 540 U.S. 366, 371(2003)). It is a fluid concept turning on the assessment of probabilities in particular factual contexts. Id. (quoting *Illinois v. Gates,* 462 U.S. 213, 239 (1983)).

iPhone 6 to justify an eventual warrant for the defendant's iCloud account, where the majority of the evidence was ultimately found. The answer is that a review of the information found on the iPhone 6 would have certainly prompted agents to obtain a warrant for the defendant's iCloud account.

During his June 2, 2020, interview with DSS, the defendant lied to the agents about the nature and scope of his dating activities in Mexico City as well as his use of dating applications, stating that he did not use Bumble, had only dabbled in using Tinder, and had only been physically intimate with one other woman he met on Tinder while in Mexico. The defendant admitted as much in the statement of facts at the time of his guilty plea. In his June 6, 2020, interview, the defendant expanded on this slightly but continued to largely minimize his contact with women in Mexico.

Upon review of the defendant's WhatsApp activity on his iPhone 6, *his work phone*, the government also separately learned that the defendant had lied. The iPhone 6 revealed that the defendant was in fact talking with over 59 women in Mexico in the mere eight months prior to the May 31 incident at his residence. The iPhone 6 data further showed that he met many of these women on dating applications such as Tinder and Bumble, despite claiming that he barely used Tinder and did not use Bumble. The agents retrieved the defendant's WhatsApp chats with AV-7 and saw that his conversation with her was remarkably similar to his conversation with AV-1, discussing the same topics, suggesting essentially the same outing, and sending a photograph of the same bottle of wine. The agents discovered that this was a common pattern for the defendant with the women he was pursuing, discussing alcohol and sending them the photos of the wine he would serve on their eventual dates, often sending the same few photos to multiple women.

Given the defendant's encounter with AV-1, who was found naked and screaming for help, with no memory of sexual intercourse but with the presence of anal and vaginal injuries, combined with his known lies to law enforcement, his dozens and dozens of contacts with women in Mexico on his iPhone 6, and his similar approach towards these women, agents undoubtedly would have sought to further investigate why the defendant lied and whether any of his encounters with these other women mirrored what happened with AV-1. The logical next step would have been to seek a warrant for the defendant's iCloud account, where his iPhone 6 was backing up—the same iCloud account to which his personal iPhone XR was also connected. And again, to be clear, this is not speculative in nature: the government indeed obtained a warrant for his iCloud account, and thus obtained the significant evidence of the defendant's crimes. Nevertheless, framing it in hypothetical terms, the evidence recovered from the defendant's iCloud account would inevitably have been located, even if the iPhone XR had never been seized, unlocked, extracted, or searched.[27]

**b. Under the specific circumstances present in this case, a timely extraction was possible regardless of whether the phone was provided in a locked or unlocked status.**

The defendant's motion alleges that had the government failed to unlock the defendant's personal iPhone XR, or failed to keep it from relocking, it would have taken decades for the government to access the content on the phone. This is incorrect. The government has access (and had access at the time of the seizure) to forensic tools capable of circumventing security features

---

[27] Even without the information found on the iPhone 6, agents were already contemplating a warrant for the defendant's iCloud account, and the probable cause would have largely been the same as the initial warrant for the two iPhones. In fact, agents had already sent a preservation request to Apple on June 6, 2020, before either phone had been reviewed.

and extracting data from cellular phones, including the iPhone XR. While the specifics of that process are law enforcement sensitive, the defendant's iPhone XR was seized in a status that would have made it possible to conduct such an extraction regardless of whether it was provided in an unlocked or locked status, and the extraction would have contained the most relevant evidence in this case (photos, videos, text messages, and chats). Accordingly, despite the defendant's best efforts to argue that the government never could have accessed the contents of his iPhone XR but for his biometrics and assistance, the government can establish with certainty that it would have retrieved the most pertinent information from his iPhone XR had the agents never reengaged after his interview.

### C. Prior counsel's performance was reasonable and therefore did not taint the defendant's guilty plea.

Prior counsel reviewed the discovery relating to the seizure of the defendant's personal iPhone and likely made a tactical decision[28] to focus their efforts on obtaining an advantageous plea agreement, which they did, rather than filing a suppression motion that was unlikely to succeed.[29] *Waters v. Lockett*, 896 F.3d 559, 568 (D.C. Cir. 2018) ("counsel does not perform deficiently by declining to pursue a losing argument."). Given the overwhelming, admissible evidence of the defendant's guilt and the number of possible charges, negotiating a pre-indictment

---

[28] The government cannot speak directly to prior counsels' precise strategy, as their declarations are silent on some of the most critical questions, such as whether they determined a motion to suppress was unlikely to succeed, why they decided to immediately engage the government in plea negotiations, and whether the overwhelming evidence of the defendant's guilt impacted their strategy. Regardless, considering the information that is contained in the record, it is clear that his deficiency claim must fail because prior counsel had received all relevant discovery and reviewed it before engaging in plea discussions.

[29] The government requested a voluntary interview with Ms. Forrest in an attempt to expand upon these essential yet missing factual considerations, but she respectfully declined. She provided limited discovery, showing that she reviewed the materials relevant to the seizure of the defendant's phone, and she indicated that she will testify at a hearing on the defendant's motion if required.

plea was more than reasonable. Furthermore, the defendant cannot show he was prejudiced by this strategy, as his suppression arguments would have failed. *United States v. Geraldo*, 271 F.3d 1112, 1116 (D.C. Cir. 2001) ("Prejudice cannot result from an attorney's failure to pursue a frivolous claim. [Defendant's] suppression motion amounted to nothing more.").

In *Hill*, the Supreme Court applied to the guilty plea context the two-prong test for determining ineffective assistance of counsel that it had previously announced in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Hill*, 474 U.S. at 58. To prove that counsel was ineffective for purposes of the plea, the defendant must show both that counsel's performance was deficient and that as a result, he was prejudiced, i.e., "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59. The defendant shoulders the burden of proof as to both elements. *See, e.g., Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (finding that failure to make the required showing on either prong defeats the ineffectiveness claim, and courts have the discretion to dispose of the claim without addressing both prongs if the defendant's showing is insufficient on one). The burden to show deficiency is substantial, in that the defendant must prove that his lawyer made errors "so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Strickland,* 466 U.S. at 687; *see also United States v. Brisbane*, 729 F. Supp. 2d 99, 109 (D.D.C. 2010) (noting that the defendant's burden is a heavy one).

While the merits, or lack thereof, of the defendant's suppression arguments are one factor relevant to a determination as to prior counsel's performance, the heart of the issue here is whether prior counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689. The Court must evaluate the asserted errors of counsel in the context

of the attorney's *overall performance* to determine whether the defendant's claims overcome the presumption of competence. *See Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986) (emphasis added).

*Strickland's* deficiency prong requires the Court to consider the unique circumstances of the case and determine whether counsel acted reasonably "under prevailing professional norms." *Strickland,* 466 U.S. at 688. This standard is not overly rigorous, and attorney performance need only to meet a minimal standard of competence. *See United States v. Catlett*, 97 F.3d 565, 570 (D.C. Cir. 1996); *Hinton v. Alabama*, 571 U.S. 26, 272 (2014). There is a wide range of what might be considered reasonable professional assistance, and there are numerous ways upon which to provide constitutionally effective assistance in any given case. *Strickland*, 466 U.S. at 689 (noting that "even the best criminal defense attorneys" would not defend a particular client in the same fashion).

> When engaging in an analysis of reasonable performance, the Supreme Court cautioned that "[j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence…A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."

*Strickland,* 466 U.S. at 689.

Because of this, there is a presumption that, "under the circumstances, the challenged action might be considered sound trial strategy." *Id*; *see also Padilla v. Kentucky*, 559 U.S. 356,

371 (2010) (noting that surmounting this presumption of is "never an easy task"). In fact, strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland,* 466 U.S. at 690.

This presumption is especially important when evaluating an attorney's performance in the context of a guilty plea, without the benefit of a trial record. Relevant here, "[p]lea bargains are the result of complex negotiations suffused with uncertainty, and defense attorneys must make careful strategic choices in balancing opportunities and risks…These considerations make strict adherence to the Strickland standard all the more essential when reviewing the choices an attorney made at the plea bargain stage." *Premo v. Moore*, 562 U.S. 115, 125 (2011). In the case of an early plea, neither the prosecution nor the defense may know with much certainty what course the case may take. It follows that each side, of necessity, risks consequences that may arise from contingencies or circumstances yet unperceived. *Id.* at 126. An attorney's performance cannot be deemed deficient where she balanced her assessment of loss at trial against the benefits for her client of a potential plea agreement, *United States v. Curry*, 494 F.3d 1124, 1130 (D.C. Cir. 2007), or where she provided reasonable advice on how to best proceed without considering every possible motion or defense. *See, e.g., McMann v. Richardson*, 397 U.S. 759, 770 (1970) ("In our view a defendant's plea of guilty based on reasonably competent advice is an intelligent plea not open to attack on the ground that counsel may have misjudged the admissibility of the defendant's confession."); *Tollett v. Henderson*, 411 U.S. 258, 267 (1973) ("A guilty plea, voluntarily and intelligently entered, may not be vacated because the defendant was not advised of every conceivable constitutional plea in abatement he might have to the charge.").

In light of the substantial evidence of the defendant's guilt, prior counsel made a

reasonable, tactical decision to aggressively negotiate a pre-indictment plea on the defendant's behalf – their decision to do so, at the potential expense of filing a motion to suppress that was unlikely to succeed, was reasonable and well within the range of constitutionally adequate performance.

### 1. Counsel's decision to focus on plea negotiations was reasonable and ultimately beneficial to the defendant.

In November 2020, prior counsel met, in-person, with the government while the defendant was still pending transport to the D.C. area, to review the most relevant evidence at the earliest possible stage and discuss the government's anticipated charges for a future indictment. During the discussion regarding possible charges, prior counsel requested additional information from the government regarding legal issues such as venue and jurisdiction, indicating that they were beginning to identify potential issues worth exploring, to evaluate the strength and viability of the government's case. The defendant arrived in Washington, D.C. on December 22, 2020, at which point counsel finally had an opportunity to meaningfully consult with him, as counsel expressed on several occasions that communication had been difficult while he was in transit.

Two weeks later, prior counsel contacted the government to report that the defendant wanted to continue the preliminary hearing date and waive speedy trial for the purpose of plea negotiations. As presented in detail in the Procedural History section above, from that point forward, prior counsel engaged the government in appropriately aggressive, comprehensive, well-researched, and, based upon statements made in emails and meetings, defendant-driven plea negotiations. During these negotiations, prior counsel contacted the government with questions regarding the state of discovery and made several detailed requests for materials. Due to the gaps of information in prior counsels' declarations, the government has no insight into exactly how

much focus prior counsel placed on evaluating the phone seizure specifically. Regardless, it is clear from the record that prior counsel (1) reviewed the discovery materials, (2) conducted legal research, (3) possessed a command of the facts and issues, and (4) challenged the government on several critical points during the plea negotiations, resulting in an advantageous plea agreement for her client. And it appears that the desire to engage in such negotiations was driven, at least in part, by the defendant. In this regard, prior counsel's performance was more than just sufficient; it was highly effective. And given the strength of the government's evidence and the number of charges the government anticipated including in its indictment, a tactical decision to focus on the plea was entirely reasonable.[30] The fact that current counsel may have approached the case differently is of no consequence here. *Strickland*, 466 U.S. at 689.[31]

### 2. Counsel's failure to raise a meritless argument does not constitute deficient performance.

The D.C. Circuit has long held that "counsel does not perform deficiently by declining to pursue a losing argument." *Waters v. Lockett*, 896 F.3d 559, 568 (D.C. Cir. 2018); *United States*

---

[30] Here the government notes that, though the declarations are silent on this issue, prior counsel likely weighed not only the government's evidence against the defendant, but also the discovery surrounding the alleged constitutional violations.

[31] It appears that current counsel, Mr. Joseph Jay, provided consultation to prior counsel regarding the phone search warrant during the time in which the parties were actively engaged in plea negotiations. Recent discovery produced by Kaiser Dillon included an email dated February 16, 2021, sent by Joseph Jay to Jonathan Jeffress and Courtney Forrest, copying Matthew Sonne. The email indicates that Mr. Jay requested, and was provided, a copy of the search warrant authorizing the seizure of the defendant's phones and that he subsequently questioned the appropriateness of the warrant. The government notes that Joseph Jay and his firm withdrew from the defendant's case in October 2020 and did not reengage until November 2021 after Ms. Forrest was forced to withdraw due to a conflict. Such involvement with the defense team in the interim appears contrary to representations made by current counsel during the February 2022 conflict hearing. The government has requested but has not yet received a transcript from that hearing. Because it appears that Mr. Jay reviewed discovery materials prior to the plea and took the opportunity to opine on those materials, it may be necessary to seek discovery or testimony from Mr. Jay and/or Sheppard Mullin to determine whether he provided any advice to the defendant regarding the seizure of his phone or his decision to plead guilty. This is particularly pertinent since current counsel is accusing prior counsel of ineffectiveness on an issue that current counsel may have been intimately involved in.

*v. Watson*, 717 F.3d 196, 198 (D.C. Cir. 2013); *United States v. Kelly*, 552 F.3d 824, 831 (D.C. Cir. 2009). As the D.C. Circuit previously held, an attorney's decision not to challenge a search or seizure may be considered a sound tactical decision when the defendant "would have gained nothing because his attack on the search would have been frivolous." *United States v. Geraldo*, 271 F.3d 1112, 1116 (D.C. Cir. 2001). The same reasoning applies to a decision not to seek suppression of a statement when the motion would have been fruitless or to forgo consideration of a specific defense that would not have been viable. *See Premo*, 562 U.S. at 118-20 (finding counsel's explanation—that he decided to discuss a plea without first challenging the defendant's confession because suppression would serve little purpose in light of the defendant's confession to others—to be reasonable); *United States v. Berkeley*, 515 F. Supp. 2d 159, 164 (D.D.C. 2007) (finding that counsel's performance did not fall outside the range of competence demanded of attorneys in criminal cases where counsel explained that he never discussed a particular defense with the defendant because he did not consider it to be viable and rather focused on negotiating a plea, which he viewed as the best alternative facing the defendant in a no-win situation).

As explained in greater detail above, a motion to suppress the evidence from the defendant's personal iPhone XR would not have succeeded. Accordingly, prior counsel's failure to file such a motion does not constitute deficient performance. Again, the government is not currently privy to exactly how prior counsel weighed the possible options as to how to best represent the defendant in the months prior to entering his guilty plea. However, prior counsel's actions are illustrative of what she deemed most important and most likely to achieve an advantageous outcome for the defendant. Prior counsel reviewed the materials relating to the defendant's law enforcement interviews and the seizure of his phone. While Ms. Forrest's

71

declaration contains some glaring gaps of information, she stated "I reviewed discovery related to the actual manner in which the government seized Mr. Raymond's cell phones on June 6, 2020, including *at least* the transcript of Mr. Raymond's interview by law enforcement on June 6, 2020." ECF No. 119-11 (emphasis added). This appears to indicate that she also reviewed the body camera footage provided by the government has part of discovery. In discovery provided to the parties by Kaiser Dillon on July 11, 2022, Ms. Forrest produced a page of notes (containing redactions) that she drafted upon reviewing the defendant's interviews. In those notes, she documented her observation that the defendant refused to provide his PIN until consulting with a lawyer, indicating that she considered this fact to be of at least some importance. Prior counsel spotted other potential issues in the case and subsequently researched and analyzed those issues, ultimately challenging the government on the applicability of certain guidelines calculations and the viability of certain charges. Finally, when providing Mr. Marston summaries of the evidence and discovery, she apparently indicated to him that there were no issues "*worth raising*." [32] This statement is enlightening, as it indicates that prior counsel did not abandon all investigation or review of the evidence or make a blanket statement that there were no issues whatsoever. Rather, it strongly infers that prior counsel evaluated all potential issues and determined they were not meritorious. The record therefore indicates that prior counsel did not perform deficiently by declining to pursue a losing argument.

---

[32] Mr. Marston used these words during a hearing on June 21, 2022, when explaining to the Court his role in the plea negotiations and his basis of knowledge for evaluating the government's plea offers and subsequently advising the defendant.

### D.  Even if prior counsel's performance is deemed deficient, it did not result in any prejudice to the defendant.

Under *Strickland's* second prong, it is the defendant's burden to show that there is a reasonable probability that, but for counsel's errors, the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694; *United States v. Newman*, 805 F.3d 1143, 1147 (D.C. Cir. 2015) ("The burden of establishing prejudice falls squarely on the defendant's shoulders."). Because the defendant's suppression arguments were destined to fail, nothing would have been different as to the admissibility of the government's evidence at trial. And considering the overwhelming evidence of the defendant's guilt, it is improbable the defendant would have then chosen to go to trial and highly unlikely he would have been acquitted. The defendant therefore cannot show that the result of this case would have been different had counsel filed a motion to suppress.

### 1.  The defendant was not prejudiced because a motion to suppress would not have succeeded.

"Prejudice cannot result from an attorney's failure to pursue a frivolous claim." *Geraldo*, 271 F.3d at 1116. Put simply, there is no prejudice created by a failure to challenge a legal search and seizure. *United States v. Wood*, 879 F.2d 927, 933-34 (D.C. Cir. 1989). Therefore, if counsel "reasonably opts" not to raise a legal issue with little to no likelihood of success, then there is no reasonable probability that raising the issue would have changed the result. *Waters v. Lockett*, 896 F.3d 559, 570 (D.C. Cir. 2018); *see also United States v. Miller*, 953 F.3d 804, 808-09 (D.C. Cir. 2020) (concluding that even when assuming deficient performance, a defendant fails to establish Strickland prejudice when a suppression motion would have failed on the merits); *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986) ("Where defense failure to litigate a Fourth Amendment claim

competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice.").

Had the merits of the defendant's suppression arguments been litigated prior to negotiating a plea, the government would have shown that the seizure of the defendant's personal phone was lawful and therefore the evidence recovered from his phone never would have been suppressed. In the unlikely event the Court had found a constitutional violation, it would not have risen to the level necessary to justify suppression due to the complete lack of deliberate police misconduct requiring deterrence. And even if, in the worst-case scenario for the government, this Court found a constitutional violation requiring suppression of the defendant's personal iPhone XR, nevertheless, the same evidence would have inevitably been found elsewhere. The defendant therefore has failed to establish that his suppression motion would have succeeded and cannot meet his burden on prejudice.

### 2. Defendant cannot show that but for counsel's performance, he would have gone to trial.

To prevail on prejudice in the plea context, the defendant must demonstrate a reasonable probability that "but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Premo*, 562 U.S. at 129 (quoting *Hill*, 474 U.S. at 59). In considering this claim, this Court can look to the strength of the government's evidence to determine that such a decision would have been highly unlikely. *See United States v. Perez*, 603 F.3d 44, 49 (D.C. Cir. 2000) (finding that counsel's alleged deficiencies could not have prejudiced the defendant because the government's case "was simply too strong"); *United States v. Gwyn*, 481 F.3d 849, 854 (D.C. Cir.

74

2007) (noting that there was no probability of a different result given "the overwhelming evidence" against the defendant.). For example, in *Premo*, the Supreme Court found that it was reasonable to determine that the defendant would not have gone to trial and rather would have accepted a plea where "[the government's case] was already formidable and included two witnesses to an admissible confession. Had the prosecution continued to investigate, its case might well have become stronger. At the same time, [the defendant] faced grave punishments. His decision to plead no contest allowed him to avoid a possible sentence of life…the bargain counsel struck was thus a favorable one…and the decision to forgo a challenge to the confession may have been essential to securing that agreement." *Premo*, 562 U.S. at 129.

Additionally, this Circuit has also routinely found a lack of prejudice where, as here, the defendant would likely have been convicted at trial and would have faced a higher sentence as a result. *See, e.g.*, *United States v. Wilkins*, 734 F. App'x 1, 3-4 (D.C. Cir. 2018) (unpublished) ("Put together, the low probability of acquittal at trial and the sentencing risks of going to trial belie Wilkins's assertion that he would have rejected the plea agreement had he been more fully informed."); *United States v. Zaitar*, 641 F. App'x 1, 2 (D.C. Cir. 2015) (unpublished) (finding no prejudice "given the charges that Zaitar would have faced had he gone to trial, and his counsel's judgment (undisputed here) that his defense was 'awful'"); *United States v. Hunt*, 560 F. App'x 2, 3-4 (D.C. Cir. 2014) (unpublished) ("[T]he overwhelming evidence against Hunt, together with the somewhat favorable terms of the plea deal, suggest that, even if Hunt's counsel performed deficiently, there is no 'reasonable probability' that but for counsels' errors the outcome of the proceeding would have been different."); *In re Sealed Case*, 488 F.3d 1011, 1017-19 (D.C. Cir. 2007).

In the instant case, the evidence against the defendant is overwhelming. The number of victims is overwhelming. The years over which the defendant committed these crimes is overwhelming. The government's case relies on far more than just the defendant's personal iPhone, and as established above, it inevitably, and separately, would have recovered the most damning evidence from other sources. Therefore, it strains credulity that the defendant would have elected to go to trial, and it is even more unlikely that he would have prevailed.

* * *

Because the defendant has failed to satisfy the requirements of an ineffective assistance claim, he has therefore not met his burden to show that his plea was constitutionally deficient. That leaves the remaining two factors relevant to evaluating the defendant's motion: (1) whether the defendant has asserted a viable claim of innocence, and (2) whether the delay between the guilty plea and the motion to withdraw has prejudiced the government's ability to prosecute the case. Notably, in this Circuit, courts have the discretion to evaluate the defendant's claim of actual innocence only if the alleged Rule 11 defect is sufficient to justify granting the motion to withdraw. *See Cray*, 47 F.3d at 1206-08. The government contends that the Court could therefore end its analysis here. Nevertheless, the remaining factors are addressed below.

## II.   The Defendant Has No Viable Claim of Innocence, and the Evidence of his Guilt is Overwhelming

In his motion, the defendant asserts that he never knowingly had "non-consensual sex with anyone in his life" and that "he had no memory of committing" the violations to which he pled guilty. *See* ECF No. 119 at 4. Instead, the defendant argues, "he took the plea because of indication by the government about the evidence it had." ECF No. 119 at 4. The defendant claims that, because of the COVID-19 pandemic and a variety of other factors, he did not have an opportunity

to personally review "in detail" the various statements of the victims. ECF No. 119 at 29. Therefore, the defendant characterizes his admissions of guilt as a "*De Facto* Alford Plea Before the Court." ECF No. 119 at 22. Once the defendant reviewed the discovery, he allegedly only then realized the "government's evidence did not show anything more than what he already believed was the case" (that he has never engaged in a sex act with another person without that person's consent), ECF No. 119 at 29, and as a result, suddenly realized that he was innocent.

As a preliminary matter, it is important to note that the alleged legal issues surrounding the seizure and search of his personal cell phone have no bearing on the defendant's actual innocence claim. Furthermore, arguments focused on the weight of the evidence in this case do little to support a claim of actual innocence because mere legal insufficiency is not enough. And though the defendant may not have personally viewed all discovery in this case, on various occasions during the plea colloquy, then-counsel for the defendant confirmed that she had personally reviewed discovery and discussed it with him. *See e.g.*, Plea Hr'g Tr. at 37:15-25, 38: 1-2, 56:6-9. Thus, here, the relevant inquiry is whether the defendant satisfies the weighty burden of showing not only that he is actually innocent of all of the charges of conviction (i.e., the charges he under oath admitted to having committed), but also that he is actually innocent as to the charges which the government also declined to bring in consideration of the plea. And here, the defendant fails.

To start with the obvious, the defendant admitted guilt. Although he feigned memory loss during the plea colloquy, the defendant ultimately and voluntarily admitted, under oath, to sexually assaulting AV-7 and AV-9. And even if the plea colloquy, the statement of offense, and the victims' statements supporting that statement of offense were factually insufficient (which they are not), when responding to the defendant's claims of actual innocence, the government is not

limited to that evidence. Looking beyond the plea colloquy to the victims' statements, the defendant's statements to law enforcement, his private messages, and the hundreds of photos and videos found in his iCloud, cell phone, and numerous other devices, the evidence of the defendant's factual guilt is both insurmountable and also somehow completely unaddressed by the defendant's motion. Therefore, his motion should be denied.

### A. Legal Standard

The actual innocence "exception is designed to excuse procedural barriers to relief in only a 'narrow class' of 'extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime.'" *United States v. Baxter*, 761 F.3d 17, 28 (D.C. Cir. 2014) (quoting *McCleskey v. Zant*, 499 U.S. 467, 494 (1991)). In this context, "'actual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998) (citation omitted).[33] Indeed, there is "no requirement in the Constitution that a defendant must be permitted to disown his solemn admissions in open court that he committed the act with which he is charged simply because it later develops that the State would have had a weaker case than the defendant had thought…" *Brady v. United States*, 397 U.S. 742, 757 (1970).

To establish actual innocence, the moving party must demonstrate that, "in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Bousley*

---

[33] The government notes that the *Baxter* and *Bousley* decisions were in the context of 28 U.S.C. § 2255. Thus, their discussion of "actual innocence" is in a different procedural posture—in *Baxter*, it was after a jury verdict, and in *Bousley*, it was after pleading guilty, being sentenced, and failing to raise the claim on direct appeal. Still, it is worth noting that in *Bousley*, the Supreme Court made clear that, when a defendant pleads guilty, and "the government has forgone more serious charges in the course of plea bargaining, [the defendant's] showing of actual innocence must also extend to those charges." *Bousley*, 523 U.S. at 624. And the D.C. Circuit in *Baxter* recognized this standard applies in such cases. *See Baxter*, 761 F.3d at 28 (quoting same); *see also United States v. Moore*, No. 1:08-cr-310-01-RCL, 2022 WL 2702375, at *2 (D.D.C. July 12, 2022) (same).

*v. United States*, 523 U.S. 614, 623 (1998) (internal citation omitted). It is a demanding standard, *McQuiggin v. Perkins*, 569 U.S. 383, 401 (2013), and a general denial is insufficient. *United States v. Curry*, 494 F.3d 1124, 1129 (D.C. Cir. 2007) (citing *United States v. Cray*, 47 F.3d 1203, 1209 (D.C. Cir. 1995) ("A defendant appealing the denial of his motion to withdraw a guilty plea, unlike a defendant who has not first pled guilty, must do more than make a general denial in order to put the government to its proof; he must affirmatively advance an objectively reasonable argument that he is innocent, for he has waived his right simply to try his luck before a jury.")).[34]

### B.  Additional Relevant Factual and Procedural History[35]

The defendant claims that he is now actually innocent of sexually assaulting AV-7 and AV-9. Notably, he says nothing about the additional counts the government could have charged. During the course of the plea negotiations, in addition to AV-7 and AV-9, the defendant's conduct against AV-1, AV-2, AV-4, and AV-26 was discussed for possible inclusion in the plea. The facts

---

[34] *See also United States v. Thompson-Riviere*, 561 F.3d 345, 353 (4th Cir. 2009) (asserting legal innocence requires evidence that "(1) has the "quality or power of inspiring belief," and (2) tends to "defeat the elements in the government's *prima facie* case" or to "make out a successful affirmative defense.") (internal citations omitted); *see United States v. Hamilton*, 510 F.3d 1209, 1214 (10th Cir.2007) ("[T]he defendant must present a credible claim of legal innocence. In other words, the defendant must make a factual argument that supports a legally cognizable defense.").

[35] As discussed above in Section A, "[i]n cases where the government has forgone more serious charges in the course of plea bargaining, [a defendant's] showing of actual innocence must also extend to those charges." *Bousley v. United States*, 523 U.S. 614, 624 (1998) (citation omitted); see also *United States v. Caso*, 723 F.3d 215, 219-22 (D.C. Cir. 2013) (discussing what constitutes a foregone charge).  *When responding, the government* "is not limited to the existing record" but instead may "present any admissible evidence of petitioner's guilt even if that evidence was not presented during petitioner's plea colloquy." *Id*.

Here, the defendant does not claim actual innocence as to the transport of obscene material count to which he pled guilty. He does, however, claim actual innocence specifically as to AV-7 and AV-9 and more broadly as to ever having sexually assaulted women. *See* ECF No. 119 at 4. The government's fact section therefore addressed not only AV-7 and AV-9, but also AV-1, AV-2, AV-4, and AV-26 three other victims specifically referenced by the government during arrest and/or plea negotiations and which, as a result of plea negotiations, were not charged. Though the government focuses on these specific additional victims, the defendant was on notice of additional charges related to every adult victim referenced in the obscene photo section of the Statement of Offense. *See* ECF No. 68. He fails to provide any evidence of actual innocent as to those victims.

involving those victims has been included above in the Factual Background section.

*Additional Victims*

In addition to the victims referenced above, who were discussed with defense counsel for possible inclusion in the plea, the defendant has also not addressed any claims of actual innocence for the additional chargeable victims, including AV-5, AV-6, AV-15, AV-17, and AV-24. Images for each of these victims were recovered, and the victims confirmed that they did not give the defendant permission to photograph or video them. Additional evidence revealed potential charges of aggravated sexual abuse (18 U.S.C. §2241), sexual abuse (18 U.S.C. § 2242), abusive sexual contact (18 U.S.C. § 2244), inducement (18 U.S.C. § 2422(a)), and transportation (18 U.S.C. § 2421).

*Additional Statements from the Plea Colloquy*

At the Change of Plea Hearing on July 23, 2021, the defendant admitted that between the time that the first victim came forward and when law enforcement executed a search warrant for his personal phone, he deleted numerous images and videos of unconscious women from his phone, Plea Hr'g Tr. at 36:7-13, including photos of AV-7 and AV-9, Plea Hr'g Tr at 41:14-21. He further admitted that he recorded and/or photographed at least 24 unconscious, nude or partially nude women – women who did not consent to the recording or photography. Plea Hr'g Tr. At 42:19-24, 43:12-23.

As to AV-7, the defendant admitted that he possessed photos of AV-7 nude and unconscious (including photos of AV-7's breasts and genitals and at least one photograph where the defendant's erect penis is visible) and a video wherein the defendant is manipulating and moving parts of an unconscious AV-7's body. *See generally* Plea Hr'g Tr. at 48-49.

80

Regarding the sexual assault of AV-7, the defendant admitted it occurred, Plea Hr'g Tr. at 36: 20-22, and that he straddled and photographed her body (capturing his own erect penis in the process), Plea Hr'g Tr. at 49: 13-16. At times, the defendant attempted to minimize his behavior, indicating that "it probably occurred," Plea Hr'g Tr. at 51:8. Nonetheless, the defendant eventually admitted that AV-7 was not in a position to make decisions about consent. Plea Hr'g Tr. at 69:2-6.[36]

Regarding AV-9, the defendant agreed that, AV-9 must have been incapable of appraising the nature of the conduct at the time the intercourse occurred. *See* Plea Hr'g Tr. at 53: 23-24-54:2. the defendant agreed that he was not so impaired that he did not realize that AV-9 was not in a position to consent. Plea Hr'g Tr. at 54:22-25- 55:1.

The defendant further acknowledged that the descriptions of the photos and videos in the statement of offense were accurate, Plea Hr'g Tr. at 58: 2-5, 10-11, that he posed bodies, Plea Hr'g Tr. 58:22-25, that he touched breasts and genitals, Plea Hr'g Tr. at 59:1-4, for his own gratification Plea Hr'g Tr. 60:2-6, and that the victims did not consent, Plea Hr'g Tr. at 62:20-25.

### C. The defendant has failed to establish actual innocence both as to the counts of conviction, as well as the counts forgone as a result of the plea

Defense calls his conviction the result of a "De Facto Alford Plea," yet nothing could be further from the truth. After the defendant *himself* offered to plead guilty to the sexual assaults of AV-7 and AV-9 (as opposed to the government's proposal regarding AV-1 and AV-2), he personally signed the extensively negotiated Statement of Offense (ECF No. 68) indicating that he "fully underst[ood]" the Statement of Offense and that the Statement of Offense was "true and

---

[36] Both agreed that sex the next morning was consensual, so the defendant can only be referencing the sexual assault the night before.

accurate. ECF No. 68 at 9.

Even setting aside that the defendant swore, under oath, that the Statement of Offense was true, his reliance on a handful of interview summaries and a purported erectile dysfunction is a far cry from establishing an objectively reasonable argument that he is actually innocent. He has failed to establish his actual innocence of the counts of conviction, and he has failed to establish actual innocence as to the offenses for which the government would have sought indictment had the defendant not pled guilty.[37] Therefore, the defendant's motion to withdraw on those grounds should be denied.

### 1. The defendant has failed to establish actual innocence as to AV-7

The defendant asserts that the "facts outside the Statement of Offense show" that he "did not commit the offense of Sexual Abuse" against AV-7. *See* ECF No. 119 at 25. To support his argument, he attaches two DSS MOIs dated October 28, 2020 and October 29, 2020 in an apparent attempt to convince this Court that when the defendant said under oath, "I am in agreement with her statement that it was probably – it probably occurred," *see* ECF No. 119 at 25 (citing Plea Hr'g Tr. at 50-51), he was alluding to these two statements.

As an initial matter, and as discussed in detail above in the government's fact section, the defendant and his legal defense team had access to far more discovery regarding AV-7 than these two statements. Regardless, the defendant's attempts to establish actual innocence by highlighting

---

[37] Because the defendant makes no attempt to assert his innocence regarding the transport of obscene material count, the government does not address that count in this section. As to the counts the government would have brought had defendant not agreed to plead guilty, defendant asserts only that "he has never knowingly had sex with someone who was passed out, blacked out, or otherwise incapable of appraising the nature of what was happening." ECF No. 199 at 28-29. Because general denial is not sufficient, *United States v. Curry*, 494 F.3d 1124, 1129 (D.C. Cir. 2007), the government focuses its argument on those allegations for which the defendant makes some specific attempt to assert his innocence.

supposed weaknesses in the government's evidence fail. For example, the defendant claims that that because law enforcement only found one condom in the trash during the execution of a search warrant in mid-June 2020, the version of events that he initially put forward during the plea colloquy is supported by the evidence. *See* ECF No. 119 at 26. In other words, if the defendant had sexually assaulted AV-7 on the night of May 30, there would have been two condoms: the one AV-7 saw on the vanity by the sink the morning after and the one in the trashcan – the one they used that morning. Thus, finding one condom on June 14, 2020 means that the defendant and AV-7 only had sex once, consensual sex the morning of May 31, 2020. Considering the amount of people who had access to the defendant's apartment in the days following AV-7's assault, this assertion is ridiculous.

First, after AV-7 left the defendant's apartment on the morning of May 31, 2020, the defendant invited a completely different woman to his apartment. Second, the defendant's apartment was not immediately secured after AV-1 reported that she had been assaulted. Furthermore, the defendant himself admits that he cleaned up his apartment before he left for the United States. And notably, the defendant has already admitted to actual obstructive behavior, Plea Hr'g Tr. at 36:7-13, including deleting photos of AV-7 and AV-9, Plea Hr'g Tr at 41:14-21. It is not unreasonable to infer that the defendant removed from the apartment (or flushed) any physical evidence that would incriminate him.[38] Thus, even if the defendant's assertion on this specific point is considered as true, it comes nowhere close to proving that it is somehow now more likely than not, based on a missing condom, that no reasonable juror would have convicted him of the

---

[38] Leaving one condom in the trashcan actually makes sense. Afterall, the defendant claimed almost immediately to law enforcement on scene that he and AV-1 had consensual sex the morning of May 31, 2020.

crime.

The defendant also claims that because he experiences a prolonged refractory period, he could not have had sex with AV-7 to the point of ejaculation during the night and then achieved an erection the next morning. *See* ECF No. 119 at 26-27. The defendant took pictures of himself and an unconscious AV-7. And in at least one of those pictures, his erect penis is depicted. the defendant need not have ejaculated to sexually assault AV-7. And in fact, AV-7 confirms that she woke up feeling as though she had been penetrated the night before. It seems to go without necessary explanation that a man with an erect penis can forcibly, and without consent, penetrate a victim without actually ejaculating.[39]

In reality, the evidence shows AV-7 went on a date with the defendant that resulted in her vomiting and suddenly losing consciousness, something that is not characteristic for her after a few drinks. AV-7 noted that shortly before her black-out, the defendant seemed fine. The defendant knew she was vomiting and could not stand, as he had to hold her up and drag her body out of the bathroom and into his bedroom. AV-7's memory lapsed, but she has at least one memory fragment of being face-down in the bed and the defendant grabbing her breast. The evidence reveals that when AV-7 lost consciousness, the defendant decided to undress her, staddle her naked body, and take photos and videos without her permission. When AV-7 woke the next morning, she felt in her body as though she had sex the night before, and she saw a used condom by the sink. Shortly thereafter, the defendant initiated sex, lasting only seconds before AV-7 vomited again subsequently left the defendant's apartment. the defendant texted a friend calling the night "a

---

[39] Here, the government notes that AV-7 said she saw a "used" condom. Even assuming the defendant ejaculated the night he sexually assaulted AV-7, however, his assertions regarding his erectile dysfunction are irrelevant.

success." And he added AV-7 to his list.

As part of plea negotiations, the defendant offered to plead to the sexual assault of AV-7, at a time when the government was focused on having him plead to AV-1. When placed under oath, he swore that the statement of facts was true. When further questioned about his conduct by the Court, the defendant indicated that while he did not remember this particular sexual assault very well, Plea Hr'g Tr. at 50:18-22, it probably occurred, Plea Hr'g Tr. at 51:7-8. When asked to clarify his remarks, the defendant admitted that AV-7 was not in a position to make decisions about the sexual conduct in which the defendant engaged. Plea Hr'g Tr. at 69:2-9. And of course, the defendant admitted and that he straddled and photographed AV-7's naked body while she was unconscious (capturing his own erect penis in the process), Plea Hr'g Tr. at 49: 13-16. The defendant has failed to meet his burden.

### 2.   The defendant has failed to establish actual innocence as to AV-9

The defendant asserts that while he "does not recall having sexual intercourse with [AV-9], he has never knowingly had sex with someone who was passed out, blacked out, or otherwise incapable of appraising the nature of what was happening." ECF No. 119 at 28-29. To support his claim, the defendant directs the Court's attention to one DSS MOI dated October 28, 2020, *see* ECF No. 119 at 28, which he says, "sheds little further light on [AV-9's] encounter with" the defendant other than the fact that it was a "normal date", and the defendant was a "gentleman." *See* ECF No. 119 at 28.[40] Thus, in combination with the defendant's now obvious attempts to minimize his behavior during the plea colloquy, *see* Plea Hr'g Tr. at 52-53, the defendant claims

---

[40] The government investigation revealed that the defendant had a pattern and practice of using his demeanor, his education, his worldliness, and his U.S. government position as tools to prey on women and put them at ease.

the MOI supports his claim of *actual* innocence. Indeed, according to the defendant, unlike when he addressed the Court under oath during the plea colloquy, he now recalls that when he engaged in a sex act with AV-9, she appeared "awake, aware, and consenting." ECF No. 119 at 29.

The evidence demonstrates just the opposite. In her recorded interview, AV-9 indicated that after consuming a normal amount of alcohol for her, one of her last memories was kissing the defendant. The next morning, she woke up naked in his bed. AV-9 indicated that she felt in her body as though she had vaginal sex the night before. AV-9 did not recall providing consent. She further stated that she would not and did not give the defendant permission to take photographs of her. The defendant bragged to a friend that he had sex with AV-9. And he added her name to his list.

For his part, when AV-9 lost consciousness, the defendant filmed a video where he literally rolls AV-9's body over. In several videos, he picks up AV-9's limp arm and lets it drop to the bed. In one video, he sticks his finger in her mouth before repeatedly opening one of her eyes. In yet another video, he lays naked in bed next to AV-9 with his erect penis visible while raising her leg in the air. Given the defendant's assertions regarding his inability to have an erection soon after engaging in sexual intercourse, it logically follows that his sexual abuse of AV-9 must have occurred *after* this video was taken, and *after* AV-9 was rendered unconscious.

The defendant offered to plea to assaulting AV-9. And at the plea hearing, the defendant admitted that that AV-9 must have been incapable of appraising the nature of the conduct at the time the intercourse occurred. *See* Plea Hr'g Tr. at 53: 23-24-54:2. The defendant agreed that he was not so impaired that he did not realize that AV-9 was not in a position to consent. Plea Hr'g Tr. at 54:22-25- 55:1.

More broadly, the defendant further acknowledged that the descriptions of the photos and videos in the statement of offense were accurate, Plea Hr'g Tr. at 58: 2-5, 10-11, that he posed unconscious, naked bodies, Plea Hr'g Tr. 58:22-25, that he touched breasts and genitals, Plea Hr'g Tr. At 59:1-4, for his own gratification Plea Hr'g Tr. 60:2-6, and that the victims did not consent, Plea Hr'g Tr. At 62:20-25. The defendant fails to put forward an objectively reasonable argument that he is innocent of sexually assaulting any of these women, and his motion should be denied.

## III. The Government, and the Victims, Would be Substantially Prejudiced by a Withdraw of the Defendant's Guilty Plea

The defendant boldly argues that the government would not be prejudiced by his decision to withdraw his plea and that it will not unduly delay this matter. *See* ECF No. 119 at 49. This is false. The defendant filed his Motion to Withdraw his Guilty Plea on April 29, 2022, a full nine months after the plea hearing.  This kind of delay militates heavily against withdrawal.  *See, e.g.*, *United States v. Benton*, 639 F.3d 723, 727 (6th Cir. 2011) (collecting cases and noting that court had "declined to allow plea withdrawal when intervening time periods were as brief as one month"). Indeed, the D.C. Circuit has held that the "movant's reasons must meet *exceptionally high standards* where the delay between the plea and the withdrawal motion has substantially prejudiced the government's ability to prosecute the case." *United States v. Cray*, 47 F.3d 1203, 1206–07 (D.C. Cir. 1995) (emphasis added) (citation and internal quotation marks omitted); *see also Horne*, 987 F.2d at 837 (noting that "withdrawal of a guilty plea is inherently in derogation of the public interest in finality and the orderly administration of justice").

The purpose of allowing a defendant to withdraw a plea "is not to allow a defendant to make a tactical decision to enter a plea, wait several weeks, and then obtain a withdrawal if he believes that he made a bad choice in pleading guilty." *United States v. Carr*, 740 F.2d 339, 345

(5th Cir. 1984); *see also Brady,* 397 U.S. at 757 ("The rule that a plea must be intelligently made to be valid does not require that a plea be vulnerable to later attack if the defendant did not correctly assess every relevant factor entering into his decision."). This is precisely what appears to have occurred here. The defendant made the decision to plead guilty.   As explained above, he reviewed a written plea agreement with his counsel and signed it.   This Court took great pains to ensure the defendant was making this choice freely and voluntarily, and that he was doing so without being under the influence of any outside pressure or undue influences, such as drugs or alcohol.   Furthermore, this Court engaged in a lengthy colloquy in which the government explained what they were prepared to prove at trial, and the defendant admitted that he was guilty of the offenses detailed by the government. The fact that the defendant may now feel he made a "bad choice" or that had he been advised to do so, he would have filed a suppression motion, does not render his plea unknowing or involuntary and is not a basis to withdraw his plea. *See Carr*, 740 F.2d at 345.Moreover, despite his claims of ineffective assistance of counsel from Ms. Forest, the defendant makes no such claim about Mr. Marston who represented him throughout the plea negotiations and who actively engaged in negotiations with the government on the defendant's behalf. As such, "if the defendant has long delayed his presentence withdraw motion and has had the full benefit of competent counsel at all times, the reasons given to support withdraw must have considerably more force given the prejudice a withdrawal could inflict on the government." *U.S. v. Thomas*, 541 F. Supp 2d 18, 29 (D.D.C. 2008) (*See United States v. Barker*, 514 F.2d 208, 222 (D.C. Cir. 1975).

When the defendant made the choice to enter a plea of guilty before this Court on July 23, 2021. He did so with victims listening in, pursuant to the Crime Victims' Rights Act (18 U.S.C.

3771(a)(4)), as he admitted to recording and sexually assaulting two of them, each time while the victim was incapable of appraising the nature of the conduct or consenting to it, in his Embassy leased residence in Mexico City, Mexico. The offenses he admitted to occurred on two different occasions in 2020. Additionally, he admitted that over the course of fourteen (14) years he recorded and/or photographed at least twenty-four (24) unconscious and nude or partially nude women, and touched the breasts, buttocks, groin area, and/or genitalia of numerous women while they were incapable of consent. Moreover, he admitted to transporting these obscene materials, specifically four hundred and seventy-nine (479) photographs and videos of twenty (20) unconscious and nude or partially nude women, into the United States.

Victims anxiously awaited news from the government that the case had been resolved, and that they would not need to come to Court and testify in front of the defendant, the same man who victimized them unknowingly, in a room full of strangers. Most of these victims are women who met the defendant through online dating applications. Many were largely unaware they were even victims until government law enforcement agents identified and located them. Some simply believed they had become intoxicated while drinking with the defendant, never knowing there had been more to their encounter. It was only after the government contacted them that they learned of the images and videos and realized the full extent of their victimization, causing many of them extreme mental distress. Some victims are women who were close contacts, women who had relationships with the defendant and believed they knew him well. The defendant took advantage of them all by using his training and skills to prey upon their vulnerabilities. He researched and manipulated them, carefully selected his prey, and victimized them, caring only about his own perverse pleasure. He has inflicted significant emotional damage upon his victims. The

humiliation, shame, fear, anxiety and sheer terror these women have expressed experiencing is heartbreaking. The depth of the traumatization cannot be overstated. Yet, they chose to listen to the plea, believing that hearing the defendant admit his conduct would give them back some control over their life and allow them to begin the process of healing.

Months later, the defendant's efforts to withdraw his plea have resulted in the publication of personal details for certain victims, yet again traumatizing the victims. As the Court is well aware, the defendant's most recent filing contained attachments including reports containing unredacted details about the events with one of the victims that were then published in media accounts. The reckless intrusion into the victims' lives was nothing less than an attempt to intimidate the victims, retraumatizing them and forcing them to revisit their event. This act led the government to seek—and this Court to grant—an emergency Order sealing the exhibits. *See* ECF No. 123. Allowing the defendant to withdraw without a sound basis would continue to victimize these individuals across the world.

Most importantly, the victims in this case would be harmed exponentially if the defendant were allowed to withdraw his plea. As noted in prior filings, the government has arranged for witnesses located in the several different countries to attend the sentencing, including several of the defendant's victims. The victims have spent months mentally preparing themselves to confront their abuser, whom they fear.  Fortunately for them, the defendant pled guilty and, by doing so, he admitted what he did to two of them in open court. Allowing the defendant to withdraw his plea would create undue stress and anxiety for these two women especially, who would be forced to relive a traumatic part of their lives that they believed was finally beginning to be behind them.  While the government acknowledges that the disputed sentencing enhancements

necessitates testimony from various victims, allowing the defendant to withdraw his plea and start anew would nevertheless cause these victims overwhelming and undue trauma.

The substantial prejudice the victims would face is imputed to the government. *See, e.g.*, *United States v. Lineback*, 330 F.3d 441, 444 (6th Cir. 2003) (affirming district court's factual determination that "prejudice suffered by the victims here would result in prejudice to the government"); *United States v. Morrison*, 967 F.2d 264, 269 (8th Cir. 1992) ("Withdrawal of the plea would obviously require the prosecution and its witnesses to endure this emotional process again. Whether we classify this as prejudice to the government, or prejudice to the complaining victim, it is real prejudice, caused by the timing of Morrison's guilty plea and subsequent attempts to withdraw."). There is no guarantee that the government would be able to reestablish contact with, and the trust of, the victims after they had been assured that the defendant had pled guilty and already personal and graphic details of their assault had been made public. The news of having to endure a full-fledged trial will likely have meaningful consequences for the government and result in the loss of victim cooperation. As such, this is exactly the sort of situation in which prejudice has been established. *See, e.g.*, *United States v. Farrelly*, No. 3:19-CR-44-J-34PDB, 2021 WL 463767, at *19 (M.D. Fla. Feb. 9, 2021) ("Whether considered prejudice to the government or as another circumstance within the totality, the Court finds that requiring the victim to testify and relive such traumatic experiences at this point in time after believing the matter to have been resolved weighs against granting [the defendant's] Motion.").

In light of the substantial prejudice to the government and the victims, and because the defendant's reasons for seeking to withdraw his plea do not meet the "exceptionally high standards" set out by the D.C. Circuit, this final factor weighs in favor of denying the defendant's

motion to withdraw.  *See Cray*, 47 F.3d at 1206–07.

## CONCLUSION

Accordingly, the government respectfully requests that this Court deny the defendant's

motion to withdraw his guilty plea.


Respectfully submitted,

KENNETH A. POLITE, JR.                     MATTHEW M. GRAVES
Assistant Attorney General                 United States Attorney


_____/s/_____                      _____/s/_____
Danielle L. Hickman                        Angela N. Buckner
CA Bar No: 193766                          DC Bar No. 1022880
Trial Attorney                             Assistant United States Attorney
U.S. Dept. of Justice, Criminal Division   United States Attorney's Office
Human Rights and Special Prosecutions      601 D Street, N.W.
1301 New York Avenue, Northwest            Washington, D.C. 20530
Washington, D.C. 20530                     (202) 252-2656
(202) 616-2333                             Angela.Buckner@usdoj.gov
Danielle.Hickman@usdoj.gov