**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

v.

BRIAN JEFFREY RAYMOND,

Defendant.

Criminal Action No. 21-00380 (CKK)

<u>**MEMORANDUM OPINION**</u>
(October 26, 2022)

Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, in this criminal action, Defendant Brian Raymond ("Defendant" or "Mr. Raymond") pled guilty to two counts of Sexual Abuse, in violation of 18 U.S.C. § 2242(2), and one count of Transportation of Obscene Material, in violation of 18 U.S.C. § 1462.  While the parties did not agree on a sentence, it was acknowledged that a violation of Section 2242(2) carries a maximum sentence of life imprisonment, a fine of $250,000.00, and a term of supervised release of at least 5 years but not more than life, as well as mandatory restitution.  A violation of Section 1462 carries a maximum sentence of five years of imprisonment, a fine of $250,000.00, and a term of supervised release of at least one year but not more than three years, as well as restitution.  Prior to sentencing, Defendant has filed his [119] Motion to Withdraw Guilty Plea.  Mr. Raymond argues that he should be permitted to withdraw his guilty plea because: (1) his plea is "infected with ineffective assistance of counsel and therefore it is constitutionally defective;" and (2) he is 'innocent of the Sexual Abuse charges to which he pled guilty." *See* Defendant's Motion to Withdraw Guilty Plea, ECF No. 119, at 1.  The Government opposes the withdrawal of Defendant's guilty plea.  Upon consideration of the pleadings, the relevant legal authorities, and the record as a whole, the Court

GRANTS Defendant's Motion to Withdraw his Guilty Plea.[1]

## I. LEGAL STANDARD

Under Federal Rule of Criminal Procedure 11, a defendant is permitted, before a sentence is imposed, to withdraw a guilty plea if the defendant can show "a fair and just reason for requesting the withdrawal." Fed. R. Crim. P. 11(d)(2)(B); *United States v. Jones*, 472 F.3d 905, 907 (D.C. Cir. 2007). While presentence withdrawal motions should be "'liberally granted,' they are 'not granted as a matter of right.'" *United States v. Thomas*, 541 F. Supp. 2d 18, 23 (D.D.C. 2008) (quoting *United States v. Ahn*, 231 F.3d 26, 30 (D.C. Cir. 2000)). The decision to grant a withdrawal is within the trial court's discretion. *United States v. Tolson*, 372 F. Supp. 2d 1, 8 (D.D.C. 2005), *aff'd*, 264 Fed. Appx. 2 (D.C. Cir. 2008); *see also United States v. Davis*, 617 F.2d 677, 685 (D.C. Cir. 1979) ("[P]ermission to withdraw [a guilty plea pre-sentence] rests in the sound discretion of the trial court."). There are generally two bases for withdrawal of a guilty plea after acceptance of the plea but before sentencing. In particular, a defendant may withdraw his guilty plea if he can (1) establish a "fatal defect in the Rule 11 proceeding at which the guilty plea was entered," *Gooding v. United States*, 529 A.2d 301, 305 (D.C. 1987);" or (2) show "any fair and just reason" for the withdrawal. *United States v. Ford*, 993 F.2d 249, 251 (D.C. Cir. 1993); Fed. R. Crim. P. 11 (d)(2) .

When ruling on a motion to withdraw a guilty plea, courts in this Circuit consider the

---

[1] The Court considered the following documents in connection with the drafting of this opinion: (1) Statement of the Offense, ECF No. 68; (2) Plea Agreement, ECF No. 69; (3) Transcript of the Change of Plea, ECF No. 76; (4) Defendant's Motion To Withdraw Guilty Plea ("Def.'s Mot."), ECF No. 119, and the exhibits attached thereto, some of which are sealed; (5) the Government's Opposition to Defendant's Motion to Withdraw Guilty Plea ("Govt. Opp'n"), ECF No. 147, and the exhibits provided therewith; (6) Defendant's Reply to Government's Opposition to Motion to Withdraw Guilty Plea ("Def.'s Reply"), ECF No. 151, and the exhibits accompanying the Reply, ECF No. 152, which are filed under seal; (7) the Government's Surreply, ECF No. 157; and (8) the entire record in this case.

following factors: "(1) whether the defendant asserted a viable claim of innocence; (2) whether the delay between the guilty plea and the motion to withdraw has substantially prejudiced the government's ability to prosecute the case; and (3) whether the guilty plea was somehow tainted." *United States v. Taylor*, 139 F.3d 924, 929 (D.C. Cir. 1998) (internal quotation marks and citation omitted). The third factor is viewed as the "most important." *Id.*

A court's analysis focuses on all three factors, beginning with the "taint" factor as it is the most influential. *See United States v. Cray*, 47 F.3d 1203, 1208 (D.C. Cir. 1995) (adopting "more structured inquiry-focusing first on the most important, indeed, the determinative factor"). If a plea is tainted because it was "entered unconstitutionally, or contrary to Rule 11 procedures," then the standard for allowing withdrawal of a plea is "very lenient." *United States v. Barker*, 514 F.2d 208, 221 (D.C. Cir. 1975). Under such circumstances, pleas "should almost always be permitted to be withdrawn," whether or not a defendant asserted his legal innocence. *Id.* In contrast, where there is no taint in the Rule 11 hearing itself, trial courts should be "extremely reluctant" to grant a motion to withdraw, even where defendant has raised a legally cognizable defense. *Cray*, 47 F.3d at 1208.

## II. BACKGROUND

### A. Factual Background

An investigation of Mr. Raymond was triggered after police responded, on May 31, 2020, to reports of a naked woman ("AV-1") screaming on the balcony of Defendant's residence – a United States government-leased property in Mexico City, Mexico. When Mr. Raymond was interviewed in Mexico City by authorities, he indicated that he had met AV-1 online, and the two had gone to his apartment, had drinks, and engaged in consensual intercourse. *See* Sealed Affidavit in support of an Application for a Search Warrant by Special Agent Mikel Gajkowski

("Gajkowski Affidavit"), Sealed Ex. A, ECF No. 119-1, at 4-5.[2]  A June 2, 2020 interview with

AV-1 indicated that she had met with Mr. Raymond outdoors, and he brought wine in a backpack.

After going to his apartment, where they drank more wine and ate light snacks, she could not

remember anything – including intercourse or standing and screaming on his balcony – until she

awoke in an ambulance.  Sealed Ex. A, ECF No. 119-1, at 5-6.  When the Federal Bureau of

Investigation ("FBI") ran an analysis on AV-1's urine sample in connection with the incident,

they found cocaine, methamphetamine, and theophylline (a bronchial dilator asthma medication)

in her system but did not find any evidence of so-called date rape substances.  *See* FBI Lab Report

dated November 10, 2020, Ex. B, ECF No. 119-2.  During her follow-up interview, AV-1 denied

ever having used any illegal drugs and suggested that maybe Mr. Raymond had put the drugs in

her drinks.  *See* Sealed Memorandum of Interview of AV-1, Sealed Ex. C, ECF No. 119-3.

### 1. Preparation of the Warrant

Based on the incident with AV-1, on June 2, 2020, Special Agents Mikel Gajkowski and

Ted Nelson conducted a voluntary, non-custodial interview of Mr. Raymond, and during that

interview, Defendant showed the Agents his two cell phones but declined to voluntarily surrender

them.  On June 5, 2020, Agent Gajkowski submitted an Affidavit in support of an Application for

a Search Warrant [Sealed Ex. A] that would allow federal authorities to seize and search Mr.

Raymond's work (Device 1) and personal (Device 2) cell phones.  The manner of execution was

specified therein as follows:

> During the execution of the search of Device 1 and Device 2, as described in Attachment
> A, law enforcement personnel are authorized to press the fingers (including thumbs) of
> BRIAN RAYMOND in the Touch ID sensor of Device 1 and Device 2 for the purpose of
> attempting to unlock the device via Touch ID in order to search the contents as authorized

---

[2] Agent Gajkowski is with the Diplomatic Security Service, Office of Special Investigations.

by this warrant.  Law enforcement personnel are further authorized to hold Device 1 and Device 2 up to RAYMOND's face for the purpose of attempting to unlock the devices via Face ID.

Sealed Ex. A., ECF No. 119-1, at 21.  The Devices would be taken by the Office of Special Investigations ("OSI") to headquarters, to be transported to the Computer Forensics Laboratory ("CIF"), but if OSI could not complete the search of the Devices, they would be sent to "a private company that specializes in data extraction from Apple iPhones and other electronics." *Id.* at 16.

The Gajkowski Affidavit indicated further that the agents would seek to "ruse RAYMOND into meeting with [them] under the pretext of a brief follow-up interview, whereupon the devices would be seized in a public setting," but if Mr. Raymond was unwilling to appear for a second interview, the agents would approach him at the hotel where he was staying and request that he retrieve the two Devices if he did not have them on his person. Sealed Ex. A, ECF No. 119-1, at 16.   Accordingly, the agents "may escort RAYMOND into his hotel room to ensure there is no destruction of evidence [but] [t]he execution of the warrant would not involve any further physical intrusion onto a premises."  *Id.*

The search and seizure of the two cell phones was authorized by Magistrate Judge Ivan D. Davis of the United States District Court for the Eastern District of Virginia.   The warrant approved Agent Gajkowski's plan and authorized the compelled use of Mr. Raymond's biometrics to open the Devices.[3]

---

[3] Defendant is not challenging the warrant itself, but rather the manner in which it was executed.

**2. First Seizure[4]**

The following day, Agents Gajkowski and Nelson asked Mr. Raymond to meet with them

for a follow-up interview at a Jimmy John's near the hotel where Mr. Raymond was staying.[5] The

agents recorded their conversation, and a transcript of the interview was created.  *See* June 6, 2020

Interview of Brian Raymond ("Interview Tr."), Ex. E, ECF No. 119-5.  During that interview, the

agents asked Defendant if he had his two phones with him and if they could see the phones, and he

complied by handing them over.  Interview Tr., ECF No. 119-5, at 178.  In response to an inquiry

by the agents as to how the two phones were secured, Mr. Raymond said, "They're locked with a

PIN."  *Id.* at 184:2-12.  Agent Nelson indicated then that "DOJ issued a search warrant for both your

cell phones, so we're going to take both your phones."  *Id.* at 184:13-18.  Mr. Raymond responded.

"I can't, I can't let you do that without a lawyer present."  *Id.* at 184:19-20.  Agent Nelson responded

by indicating that was what the search warrant was for, "so we are taking your phones," and

furthermore, he stated that he was "not asking."  *Id.* at 184:21-185:4.  Mr. Raymond again responded,

"I, I'm, I'm serious. I need . . . I can't authorize that without a lawyer."  *Id.* at 185:6-10.  Agent

Nelson replied that it was a "criminal justice process," and he would show Mr. Raymond his badge

and credentials, and "[n]othing good's going to come out of you resisting this."  *Id.* at 185:11-19.

Mr. Raymond indicated that he was not resisting.  *Id.* at 185:20.  Agent Nelson told Mr. Raymond

he could "notify [his] people that we seized the phones" so there would not be safety and national

security concerns, but Mr. Raymond indicated that he didn't "understand how [he was] supposed to

---

[4] The three interactions on June 6, 2020 between Mr. Raymond and Agents Gadjowski and Nelson, whereby his cell phones were taken, returned, taken and returned again are labeled by the Court as the First, Second, and Third "Seizures."

[5] Two other federal agents, Victor Karabin and David Palmer, supported the operation by conducting remote, vehicular surveillance.  *See* Memorandum for Record, Ex. D, ECF No. 119-4, at 2.

have contact with anybody." *Id.* at 185:21-186:9.  After Agent Nelson suggested Mr. Raymond go to a store and get a new cell phone so he could contact people, *id.* at 186:13-20, Mr. Raymond indicated that it was "more than an inconvenience" and he was "dead in the water" as he "d[id]n't have phone numbers." *Id.* at 187:3-12.

At this point in the conversation, Agent Nelson asked Mr. Raymond if there was "something we need to know about . . . [b]esides inconvenience," and Mr. Raymond indicated that there were "naked photos on [the phones] of women." *Id.* at 188:17-22.  Agent Nelson then offered to get Mr. Raymond the contacts he needed but stated that "[w]e need PIN numbers for these phones so we can access them," *id.* at 189:19-21, to which Mr. Raymond responded "I, I have to consult a lawyer honestly.  I can't - - it's just something I have to do." *Id.* at 189:22-190:1.  The dialogue continued as follows:

Ms. Gajkowski: Okay.

Mr. Raymond: You know, I don't know what my rights are in this situation.

Ms. Gajkowski: (Inaudible).

Mr. Nelson: You're right, but we are seizing the phones.  What we need to do though, is we need to unlock them and at least put them on airplane mode.  Okay?

Mr. Raymond: I can't do that until I talk with my lawyer.  I just don't understand what's going on here right now.

Ms. Gajkowski:  So - - so, what we are going to do, because I, I just want to be clear, so you're not willing to voluntarily give us your PIN.  Correct?

Mr. Raymond:  No, not until I consult with a lawyer.

Ms. Gajkowski:  Okay, understood.

Mr. Nelson:  Yeah.  Okay.

*Id.* at 190:2-19.

The agents again told Mr. Raymond they could give him contact numbers from the phones if he decided to give them the passcode but stated they could not "coerce [him] to give [them] any PINs." *Id.* at 190:22-191:9.  They told Mr. Raymond however that "[t]he truth is, one way or another, we're getting into the phones." *Id.* at 191: 10-17.   Mr. Raymond did not provide the PIN codes, and he stated again that he "just [did not] understand what's going on." *Id.* at 191:21-22.  At some point later, Agent Gajkowski asked if Mr. Raymond could tell her how to "turn this [phone] on airplane mode" but Mr. Raymond responded that he would "have to unlock it" and did not know if it went into airplane mode without unlocking it.  *Id.* at 203:3-15.   Thereafter, after some additional conversation and questioning, the agents put Mr. Raymond's phones in evidence bags and handed him property receipts, and Agent Gajkowski announced, "The time is 12:26 Saturday, June 6th, and this concludes our interview and search and seizure warrant execution." *Id.* at 220:8-10.

### 3. Second Seizure

After their interview, Mr. Raymond returned to his hotel and the agents called Government counsel Jamie Perry to let her know that they had the phones but that Mr. Raymond "declined to provide a passcode, which he identified as the means for unlocking both devices."  Memorandum [of follow-up interview] for Record, Ex. D, ECF No. 119-4, at 1.  Counsel "advised that the warrant authorized the agents to compel RAYMOND's fingerprint and/or facial recognition [and] requested that the agents reengage RAYMOND to determine if the devices could be unlocked through such means." *Id.*

Approximately one and one-half hours after Mr. Raymond's phones were seized, the four agents went to Mr. Raymond's hotel along with a uniformed and armed police officer for the Town

of Herndon, Virginia.[6]  Agent Nelson, Agent Gajkowski, and the Herndon police officer stationed themselves around the lobby, with two more agents outside, and one of the agents asked the front desk to summon Mr. Raymond from his room without providing a reason other than that someone wanted to talk to him.  When Mr. Raymond came to the lobby, Agent Nelson indicated that Mr. Raymond was "not under arrest" but that "[t]he search warrant compels [him] to open [his] phone" so they had to come back and "get [him] to open his phone."  Ex. 3, at 9:3-9.  Agent Gajkowski indicated that "law enforcement personnel [are] authorized to access fingers, including thumb onto the device, and further to hold the phone up to [his] face."  Ex. 3, at 9:11-14.  When asked if he could open the phone, Mr. Raymond replied," Yeah.  If I'm compelled to do it, sure."  Ex. 3, at 9:17-20. Agent Gadjowski responded, "Not the codes. Because that's not what you have to provide."  Ex. 3 at 9:21-22.  She asked if Mr. Raymond wanted to give her his code, and he responded, "No, but it's open,  - - ."  Ex. 3, at 10:5-8.

The agents discussed changing the passcodes, and while Agent Gadjowski looked at the first phone, they handed Mr. Raymond the second phone and asked him to open it, which he did.  Agent Gadjowski then attempted to change the settings/passcodes on one of the phones, but she noted that it required an additional ID or code.  She told Mr. Raymond, "So, it's up to you, if you want to enter the password, you don't have to."  Ex. 3, at 11:13-14.  Mr. Raymond responded, "I don't understand. Aren't I compelled to - - ?"  Ex. 3, at 11:15-16.  Agent Gadjowski said, "You are not compelled to give us the code, only the thumbprint, so  I want to be clear on that."  Ex. 3, at 11:18-20.  Mr. Raymond replied, "Well, I'd rather - - I mean, just for privacy reasons. . . I'd rather not."  Ex. 3, at

---

[6] The information concerning the interactions with Mr. Raymond at the hotel is derived from Exhibit D,  the body camera footage recorded by the Town of Herndon police officer (produced by the Government on a DVD), and the audio transcription of the transactions at Mr. Raymond's hotel (marked as Govt. Ex. 3).

11:21-12:2.  Agent Nelson asked Agent Gajkowski if she had changed the passcode on the first phone, but she said she was unable to do so without Mr. Raymond's password [to his Apple account]. The agents told Mr. Raymond that was all they needed and thanked him, and he left to go back to his hotel room.

### 4. Third Seizure

Although Mr. Raymond opened both phones for the agents, the agents did not keep the phones open, and they locked again.  Agent Gadjowski was unable to reach a supervisor at CIF, so she called counsel Perry as well as another agent in her office.  Following these calls, the agents had Mr. Raymond called down to the lobby once again.  Agent Nelson indicated that they were having trouble keeping the phones open, and they were "trying to respect [Mr. Raymond's] privacy" and "rights" and did not want to keep bothering him because "it was an inconvenience."  Ex. 3, at 30:1-21.  Agent Gadjowski indicated that they could only get into the phones with Mr. Raymond's face or fingerprint but they wanted to "get it so that" they could access the phones freely.  *Id.* at 30:13-17.  Mr. Raymond eventually entered his PIN code and Apple password so that the agents could reset the codes and establish permanent access to the phones.[7]

### 5. Post-Warrant Activity

Mr. Raymond's phones were forensically analyzed and found to contain photographs and videos of unconscious or sleeping women, some of which were explicit.  Thereafter followed numerous search warrants on Mr. Raymond's accounts, home, parents' home, and additional devices.  On October 8, 2020, the Government charged Mr. Raymond with one count of Enticement pursuant to 18 U.S.C. § 2422.  *See* Complaint and Affidavit in support thereof, Ex. H, ECF No. 119-

---

[7] Defendant notes that the agents "did not use a standard PIN code consent form to advise Mr. Raymond of his rights or memorialize his consent."  Def.'s Mot., ECF No. 119, at 15.

8.[8]  That Complaint focuses on Mr. Raymond's interactions with AV-4 during their second date, when she invited Mr. Raymond to her apartment in Virginia and proceeded to pass out after drinking some wine there, subsequent to drinking some liquor he brought as well as wine purchased later at a restaurant.  While there is no allegation of sexual intercourse, AV-4 did identify several photos and videos in Mr. Raymond's possession that depicted her exposed breasts, which were taken when she was unconscious.

Subsequently, on December 31, 2020, Mr. Raymond was charged with Sexual Abuse, in violation of 18 U.S.C. § 2242(2) (involving AV-1, AV-7, AV-9), Abusive Sexual Contact, in violation of 18 U.S.C. § 2244(a)(2) (involving AV-7, AV-5, AV-6, AV-9), and Coercion and Enticement, in violation of 18 U.S.C. § 2422(a) (involving AV-2).  *See* Criminal Complaint, Ex. I, ECF No. 119-9.

### B. Procedural Posture of this Case

On May 28, 2021, the operative three-count Criminal Information was filed against Brian Raymond.  This Information states that Defendant violated 18 U.S.C. § 2242 by "knowingly engag[ing] in a sexual act with another person, . . ., who was, as the defendant well knew, at the time incapable of declining participation in, and communicating unwillingness to engage in, the sexual act."  *See* Information, ECF No. 59, at 2-3 (Sexual Abuse, Counts One and Two, involving AV-7 and AV-9, respectively).[9]  Mr. Raymond is charged also with violation of 18

---

[8] The statute prohibits a person from inducing or enticing an individual to travel between states for the purpose of "any sexual activity for which any person can be charged with a criminal offense" under any applicable law.

[9] One element of Sexual Abuse under 18 U.S.C. § 2242(2) is a "sexual act."  18 U.S.C. § 2242(2)(A)-(D).  Defendant explains that the "definition relied upon by the government in its charges and at the plea hearing was 'contact between the penis and the vulva.'"  Def.'s Mot., ECF No. 119, at 16, n.12 (quoting 18 U.S.C. §2242(A)).

U.S.C. § 1462, for bringing "into the United States and into any place subject to the jurisdiction thereof and knowingly us[ing] a common carrier and interactive computer service, for carriage in interstate and foreign commerce, obscene matters, that is, the depictions [photos and videos]" as described in an accompanying chart. *See* Information, ECF No. 59, at 3-4 (Transportation of Obscene Material, Count Three). When Defendant was arraigned, he entered a plea of not guilty to all three counts, but the case was set eventually for a plea agreement hearing on July 23, 2021.

### 1. Change of Plea Hearing[10]

The Court began the Change of Plea Hearing by confirming that Mr. Raymond  had "fully discussed [the] charges [in the Information] and the case in general with [his] counsel" and was "completely satisfied with the services of [his] attorney in this case."  July 23, 2021 Change of Plea Transcript (" Change of Plea Tr."), ECF No. 76, at 11:16-25.  The Court discussed Defendant's constitutional rights and explained that acceptance of a guilty plea would effectively waive those rights before asking Mr. Raymond whether he wanted to plead guilty. *Id.* at 17:13-24.  The Government read the statement of offense into the record.  *See generally id.* at 18-36; *see also* Statement of Offense, ECF No. 68, at 2-3 (alleging an "incident at Raymond's embassy-leased residence in Mexico City" involving a woman ("AV-1") and asserting that Defendant had "recorded and/or photographed at least 24 unconscious nude or partially nude women (AV-2 through AV-25)" and further, that Defendant had "approximately

---

[10] Defendant's only "challenge" to the manner in which the plea proceeding was conducted is a cursory statement that "at no time did the Court ask Mr. Raymond about potential motions he may have been able to file, or whether he had discussed possible pre-trial motions with his counsel." Def.'s Mot., ECF No. 119, at 21.  As noted by the Government, this is "immaterial" as the "plea colloquy contained all the required procedural safeguards."  Govt. Opp'n, ECF No. 147, at 2.

487 videos and images of unconscious women in various stages of undress on multiple devices"

belonging to him). Counsel for the Defendant confirmed that the Government made photos and

videos available to defense counsel and she had reviewed the content and explained the dates

and locations to Defendant. Change of Plea Tr., ECF No. 76, at 37:9-22. During the Change

of Plea Hearing, Mr. Raymond agreed that he had recorded and/or photographed at least 24

unconscious, nude or partially nude women (AV-2 through AV-25) and that he had possessed

approximately 487 videos and photos of unconscious women in various stages of undress.

Change of Plea Tr., ECF No. 76 at 41-42.

 With regard to AV-7, Mr. Raymond admitted that he had sexual intercourse with her in

the morning but said that he did not recall intercourse the prior night. *Id.* at 47:14-48:5; 50:13-

22. Mr. Raymond, through counsel, noted that "[he] was also drinking alcohol on that night, so

he d[id] not have a perfect memory of the incident." *Id.* at 45:12-22. He did not recall that AV-

7 disputed consenting to undressing and having sex but, for purposes of the plea hearing, he

accepted that AV-7 disputed her consent. *Id.* at 47:4-14. Because the photos of AV-7 were

taken at night, he was "in agreement with [AV-7's statement]" that intercourse "probably

occurred" the prior night. *See* Change of Plea Tr., ECF No. 76, at 51:1-10; *see also id.* at 46:2-

21 (indicating he was not disputing what the Government was saying but only recollected

having intercourse with AV-7 in the morning). Mr. Raymond agreed that AV-7 was "incapable

of appraising the nature of the conduct" at the time intercourse occurred, based on "our

consumption of alcohol." *See id*. at 63:19-64:5; 69:2-9 (responding affirmatively to the Court's

question: "Were you aware that she was not in a position to make some decisions about her

[sexual] conduct [that you were engaging in]?").

 With regard to AV-9, Mr. Raymond affirmed that he "recall[ed] having sexual

intercourse with [AV-9] on [his] bed." *Id.* at 52:7-9.   Through counsel, Mr. Raymond indicated

that he agreed that AV-9 "was in a state where she was incapable of appraising the nature of the

conduct" but he explained that he was not commenting on "consent or nonconsent." *Id.* at 52:10-

53:1; 53:19-54:2.   When asked by the Court what this meant to him, Mr. Raymond indicated

that "it should not have happened" because they "were both intoxicated and [his] judgment was

impaired, and [he didn't] believe [they] should have had the sexual intercourse."   *Id.* at 53:2-9.

Defense counsel noted for the record that the "sexual acts with AV 7 and AV 9, which

are defined in the statute, and we've agreed are sexual intercourse, that sexual act was not

depicted in any of the photos or videos," but Defendant agreed "that he engaged in a sexual act

with both AV 7 and AV 9[.]"   Change of Plea Tr., ECF No. 76, at 64:11-21.   Mr. Raymond

agreed also that he had "imported these photos and videos into the United States [and]

transport[ed] them on [his] own electronic devices."   *Id.* at 61:8-15, and 66:15-19.

The Court concluded that there was "evidence beyond a reasonable doubt based on the

proffer and on [Defendant's] admissions to meet the elements of the offenses on all three counts."

*Id.* at 65:9-11.   The Court proceeded then to discuss the plea letter, *see id.* at 69-96, before

ascertaining that Mr. Raymond was "entering this plea of guilty [to two counts of sexual abuse

and one count of transportation of obscene material] voluntarily and of [his] own free will" and

because he was "guilty."   *Id.* at 100:7-12.

### 2. Post-Plea Activity

This Court established a [75] Scheduling Order on September 7, 2021.   Thereafter the

Government identified an alleged defense counsel conflict, which necessitated the appointment

of conflicts counsel and briefing of issues by the parties.   The Court held a status hearing, which

ended with the withdrawal of defense counsel from KaiserDillon and the subsequent appearance

of counsel from Sheppard Mullin. *See* Order, ECF No. 85. Only John Marston, one of the defense counsel, remained as counsel of record throughout that entire time. The Government alleged subsequently a conflict of interest involving an attorney named Matthew Sonne (who was not affiliated with defense counsel), which led to briefing by the parties and the re-appointment of conflicts counsel. After a sealed conflicts hearing, the Court accepted Mr. Raymond's waiver of the alleged conflict and permitted counsel from Sheppard Mullin to continue to represent Defendant. *See* Sealed Memorandum Opinion and Order, ECF No. 96. A [revised] Scheduling Order was entered by the Court on April 7, 2022, and sentencing was set for November 17, 2022. *See* Scheduling Order, ECF No. 113.

On April 12, 2022, Defendant filed his [116] Notice of Intent to Withdraw Plea and Request for a Briefing Schedule. In connection with Defendant's [119] Motion to Withdraw Guilty Plea, Defendant identified an alleged conflict of interest with regard to Government counsel, and he later filed his [135] Motion to Disqualify [Government] Counsel (based on counsel Perry's involvement in connection with execution of the warrant). After the parties briefed that issue, Defendant's Motion to Disqualify Counsel was granted in part and denied in part by this Court, with the effect that Government counsel Jamie Perry was directed to recuse herself from proceedings relating to Defendant's motion to withdraw his guilty plea. *See* July 19, 2022 Memorandum Opinion and Order, ECF No. 142. Subsequently, the parties completed their briefing on the instant motion to withdraw guilty plea, which is ripe now for resolution by this Court.

## III. ARGUMENT

Defendant argues that his motion to withdraw plea should be granted on grounds that: (1) the plea is tainted by ineffective assistance of counsel; (2) Defendant has a viable claim of

innocence/legally cognizable defense; and (3) the Government will not be significantly prejudiced by any delay.  In response, the Government argues that: (1) Defendant's decision to accept the plea was voluntary and intelligent, and the plea contained the "required procedural safeguards;" (2) there were no constitutional violations surrounding the search and seizure of the cell phones and Mr. Raymond had no right to counsel nor did the agents coerce him; (3) the warrant was not fully executed until the forensic examination, and furthermore, a search warrant authorizes more than one entry; (4) Mr. Raymond admitted under oath to sexually assaulting AV-7 and AV-9; and (5) the Government will experience substantial prejudice if Mr. Raymond is permitted to withdraw his plea.  As explained herein, the Court concludes that, despite the Government's contentions, Defendant's arguments provide fair and just grounds for granting withdrawal of Mr. Raymond's guilty plea.

### A. Defendant Argues that the Plea is Tainted

One way in which a plea may be "tainted" is if a defendant received ineffective assistance of counsel when deciding to plead guilty.  *See, e.g., Taylor*, 139 F.3d at 929-934; *Pettiford v. U.S.*, 700 A.2d 207, 216 (D.C. 1997); *see also United States v. Barker*, 514 F.2d 208, 218-221 (D.C. Cir. 1975) (while an ineffective assistance claim may provide grounds for withdrawal of a guilty plea, such withdrawal is not an "automatic right").  Prior to addressing the merits of Defendant's allegations that the plea is tainted due to ineffective assistance of counsel, the Court reviews briefly the standard applied when reviewing ineffective assistance challenges to guilty pleas during presentencing.  Here, the Court of Appeals for the District of Columbia Circuit (the "D.C. Circuit") has adopted the approach set forth in *Strickland v. Washington*, 466 U.S. 668, 688 (1984), whereby the claimant must demonstrate that (1) defense counsel's performance failed to conform to an objective standard of reasonableness and (2) the unreasonable performance

prejudiced defendant's position. *Tolson*, 372 F. Supp. 2d at 11-12.  In the context of a motion to withdraw a guilty plea, in order to satisfy the second *Strickland* prong, the claimant must demonstrate that "but for counsel's alleged errors, the defendant would have pleaded not guilty and insisted upon going to trial." *Id.* at 18 (quoting *United States v. Horne*, 987 F.2d 833, 835 (D.C. Cir. 1993)) (internal alterations omitted).

### 1. Objective Standard of Reasonableness

Mr. Raymond contends that his former counsel from KaiserDillon PLLC:

> [Jonathan Jefress] did not review or discuss with Mr. Raymond any of the materials surrounding the execution of the search warrant, to include the recording or transcript of the agents' interactions with Mr. Raymond at Jimmy John's where he invoked his right to silence, the agents' notes and voice memos regarding calls to prosecutor Perry showing her direct role, the agents' notes and memos regarding their interactions with Mr. Raymond at his hotel, and the Herndon officer's body camera footage.

Def.'s Mot., ECF No. 119, at 19; *see* Declaration of Jonathan S. Jefress, Ex. J, ECF No. 119-10, at ¶¶6-7 (noting that he does not recall reviewing materials related to the manner in which Mr. Raymond's cell phones were seized or discussing this issue with Mr. Raymond).

Furthermore, while Mr. Jefress' co-counsel, Courtney Forrest, reviewed some of the materials from the June 6, 2020 seizure, she focused on Mr. Raymond's interview and "believe[s] that [she] discussed" the interview with Mr. Raymond, but she did not address the agents' subsequent contact with him. *See* Declaration of Courtney Forrest, Ex. K, ECF No. 119-11, at ¶¶ 6-8, 10 (indicating also that she did not discuss with Mr. Raymond the option of filing a motion to suppress). While Mr. Marston was also counsel of record from mid-February 2021, he was "not tasked [with] review[ing] discovery." Def.'s Mot., ECF No. 119, at 20. *See* Declaration of John Marston, Ex. L, ECF No. 119-12, at ¶¶ 4-6 (noting that he "understood that the warrant and search and seizure had been reviewed for legal issues, and that the conclusion had been reached that there

were no viable issues to pursue with respect to the warrant and search and seizure of Mr. Raymond's phone"). Mr. Marston indicates that had he "been aware of these issues prior to Mr. Raymond entering his guilty plea, [he] would have recommended to Mr. Raymond . . . that he not plead guilty but instead proceed to trial in this case." *Id.* at ¶ 8. Accordingly, Defendant asserts that prior to entering his guilty plea, neither he nor his counsel "were aware of the potential issues surrounding the seizure of [his] cell phone[s], [or any] substantial suppression arguments and legal options in connection therewith." Def.'s Mot., ECF No. 119, at 21.

Failure by counsel to reasonably investigate a client's case and inform the defendant of facts relevant to a plea may constitute ineffective assistance of counsel that renders a plea constitutionally defective. A plea is "constitutionally valid" only if it "represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *United States v. McCoy*, 215 F.3d 102, 107 (D.C. Cir. 2000) (quoting *Hill v. Lockhart*, 474 U.S. 52, 56 (1985)) (internal quotation marks omitted). Where a defendant is represented by counsel during the plea process and enters his plea upon the advice of counsel, the voluntariness and intelligence of the plea depends on whether counsel's advice was within the range of "reasonable competence" demanded of attorneys in criminal cases. *Taylor*, 139 F.3d at 929; *see United States v. Loughery*, 908 F.2d 1014, 1018 (D.C. Cir. 1990) (demanding a "level of reasonable competence" that is measured as "reasonableness under prevailing professional norms"). "[A]n essential prerequisite to counsel's presentation of an intelligent and knowledgeable defense is the requirement that he consult, investigate and prepare for trial." *Pettiford v. United States*, 700 A.2d 207, 216 (D.C. 1997) (quotation omitted). Similarly, counsel must "make preparations in order to engage in plea bargaining[.]" *Id.*

In the instant case, Mr. Raymond alleges ineffective assistance of counsel, and as such, he

must establish that his counsel's performance did not meet an objective standard of reasonableness, and that the unreasonably deficient performance prejudiced him. *Tolson*, 372 F. Supp. 2d at 12. A plea based on advice of counsel that "falls below the level of reasonable competence such that the defendant does not receive effective assistance," is not voluntary or intelligent. *Taylor*, 139 F.3d at 929. Here, prior defense counsel *acknowledge* that they failed to review (or failed to adequately review) materials relevant to the execution of the warrant and seizure of Defendant's phones, and/or failed to spot or investigate these issues, and they failed to discuss with Mr. Raymond these issues and his options. Nor did prior counsel familiarize themselves with Magistrate Judge Michael Harvey's decision in *In re: Search of [Redacted] Washington, District of Columbia*, 317 F. Supp. 3d 523 (D.D.C. 2018), which analyzes potential constitutional concerns pertaining to warrants that authorize the use of biometrics.

In that opinion, Magistrate Judge Harvey explained:

> [W]hen attempting to unlock a telephone, computer or other electronic device during the execution of a search warrant that authorizes a search of the device, the government may compel the use of an individual's biometric features, if (1) the procedure is carried out with dispatch and in the immediate vicinity of the premises to be searched, and if, at the time of the compulsion, the government has (2) reasonable suspicion that the suspect has committed a criminal act that is the subject matter of the warrant, and (3) reasonable suspicion that the individual's biometric features will unlock the device[.]

*Id.* at 532-33 (discussing Fourth Amendment concerns); *see also United States v. Jeffries*, Case No. 5:16 CR 180, 2017 WL 11445474, at *2 (N.D. Ohio 2017) (focusing on the "reasonable continuation rule" in connection with a second search of a cell phone and finding a Fourth Amendment violation based on the second, separate search). With regard to Fifth Amendment concerns, Magistrate Judge Harvey found ultimately that while a warrant seeking to use biometrics "was obviously compulsive and was likely to be incriminating," *In Re: Search of [Redacted] Washington, District of Columbia*, 317 F. Supp. at 534, the compelled use of biometric features was

non-testimonial for Fifth Amendment purposes.  *Id.* at 534-537.

Defendant contends that the agents' attempt to execute the warrant on two additional occasions after "complet[ing] and finaliz[ing] their seizure at Jimmy John's, issuing a property receipt, and announcing the conclusion of the execution of the warrant," *see* Ex. E, ECF No. 119-5, at 220, violates the standard set forth by Magistrate Judge Harvey, that a warrant be executed "with dispatch in the immediate vicinity." Def.'s Mot., ECF No. 119, at 45.  Defendant argues that "[t]he agents' re-seizure of the phones and compelled biometrics on their second and third attempts to execute the warrant, hours after concluding their initial execution at a separate location, violated that standard," and the agents were "unreasonable in their relentless pursuit of biometrics and PINs/passcodes."  *Id.*  Defendant relies on *Jeffries* for the proposition that "agents may only suspend execution of a search warrant, and return to it at a later time, so long as it is a reasonable continuation of the search (not a new, separate search), and the decision to suspend and re-engage was reasonable under the totality of the circumstances."  Def.'s Mot., ECF No. 119, at 45.

Defendant contends that the interactions at Mr. Raymond's hotel, were not "reasonable continuations" of the initial search nor were they "reasonable," as the agents had "no obstacle beyond the agents' control that stopped them from executing the biometrics portion of the warrant in their first encounter with Mr. Raymond." *Id.*; *see United States v. Keszthelyi*, 308 F.3d 557, 571-572 (6th Cir. 2002) (finding that a search of defendant's residence on two consecutive days was not a "continuation" as the search was thoroughly completed on the first day, nor was the search on the second day "reasonable" under the Fourth Amendment, in part because there was nothing "impair[ing] the ability of the agents to execute fully the warrant at the time of their initial entry");[11]

---

[11] The Court notes that the legal authority on this issue of what qualifies as a "reasonable continuation" of a search is sparse, particularly as it pertains to seizure of a cell phone.

*see also In re: Search of [Redacted]*, 317 F. Supp. 3d at 533, n. 7 ("Law enforcement is not absolved of its responsibility to act reasonably in executing a warrant merely because the government has received court authorization to compel the use of an individual's biometric features.")  In this case, in addition to an alleged Fourth Amendment violation based on the unreasonableness of the seizure, Defendant argues that there is a Fifth Amendment violation insofar as the agents allegedly coerced Mr. Raymond to enter his passcode on the cell phones.

After describing in detail the process by which the warrant was executed, the Government asserts that there "were no Fourth or Fifth Amendment violations committed during the seizure of the defendant's phone, and even if there were, the lack of deliberate law enforcement misconduct would have weighed heavily against suppression."  Govt. Opp'n, ECF No. 147, at 31.  The Government contends that the "decision to reengage the defendant to conduct the biometric unlocking procedure was a reasonable continuation of the original seizure rather than a new and separate search requiring a new warrant" and even a technical violation of the warrant would not warrant suppression.  Govt. Opp'n, ECF No. 147, at 41.  The Government argues, without citing supporting legal authority, that the "execution" of the warrant was not actually complete when they took the phones into custody, as they still had to extract data from the phones.  *Id.* at 43. Furthermore, the Government contends that "[m]ost the Circuits to have considered this question have held that a single search warrant may authorize more than one entry into the premises if the second entry is a reasonable continuation of the original search."  *Id.*

The Court notes that the cases relied upon by the Government address searches of premises, but the Government suggests that the "principles applied in this line of cases justify the reengagement with the defendant here, even if a lower standard for a device seizure/search may ultimately be appropriate."  *Id.* at 44-45 (discussing cases permitting multiple entries into a

defendant's home, hotel room, or office on a single warrant).  Furthermore, the Government cites *United States v. Gerber*, 994 F.2d 1556, 1557-59 (11th Cir. 1993) and *United States v. Nicholson*, 24 F.4th 1341, 1347 (11th Cir. 2022), which address the existence of probable cause during the course of a continued or delayed search.  *Gerber* involves the search of an automobile, which was started on a Friday but completed on a Monday, because tools were needed to open the hood, and *Nicholson* involves a search of a laptop that had been seized six months earlier where the search was supposed to be completed within 60 days.  The Court notes that these two Eleventh Circuit cases are neither factually on point nor particularly instructive.

The Court finds further that the Government's focus – at this stage – on whether or not Defendant would have *succeeded* on a suppression argument is premature.  The Government acknowledges that, for purposes of a claim of ineffective assistance of counsel – in this case, underlying a motion to withdraw the plea – "the merits, or lack thereof, of the defendant's suppression arguments are one factor relevant to a determination as to prior counsel's performance, while the heart of the issue is whether prior counsel's conduct 'f[ell] within the wide range of reasonable professional assistance.'"  Govt. Opp'n, ECF No. 147, at 66; quoting *Strickland*, 466 U.S. at 689.  Here, Defendant does not argue that prior counsel made the wrong decision in failing to pursue a suppression motion but rather that counsel *failed to even identify* issues regarding the execution of the warrant that could have been raised with the Government, or used as possible leverage during plea negotiations, or resulted in a suppression argument.[12]

"[A] court deciding an actual ineffectiveness claim must judge the reasonableness of

---

[12] The Government asserts that the failure to raise a meritless argument does not constitute deficient performance, Govt. Opp'n, ECF No. 147, at 70-72, but in this case, there was no conscious decision by counsel not to raise an argument; instead, issues regarding the seizure of the phones were not properly investigated by counsel and thus, were not identified.

counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690.  While "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," *id.* at 690, that is not the situation at hand where there was a failure to reasonably investigate the circumstances surrounding the seizure of the cell phones, and accordingly, no strategic choices were made in that regard.  As in *Kimmelman v. Morrison,* "[i]n this case, [ ], we deal with a total failure to conduct pre-trial discovery [here, regarding the seizure of the cell phones], and one as to which counsel offered only implausible explanations."  477 U.S. 365, 386 (1986).[13]  Accordingly, the Court finds that the first *Strickland* prong is satisfied insofar as there are viable concerns regarding the manner in which the warrant was executed that should have been apparent to or investigated by prior counsel, and furthermore, the strategic use of this information should have been explored by counsel with Mr. Raymond.

### 2. Prejudice to the Defendant

The Court next looks at whether counsel's aforementioned failure prejudiced Mr. Raymond in his ability to make a voluntary and intelligent plea decision.  In *Kimmelman*, the evidence that was introduced and later contested was a bedsheet (and tests resulting therefrom), and in that case, the district court noted that while this evidence was "important, [it was] not the most important," which was "direct testimony from the victim herself as well as from the testimony of witnesses[.]"

---

[13] *Kimmelman* involved defendant's challenge to his rape conviction, based on ineffective assistance of counsel, and in that case, trial counsel failed to conduct any discovery.  Although his performance at trial was deemed by the Supreme Court to be "generally creditable enough," even when taking both into account, "counsel's performance fell below the level of reasonable professional assistance . . ."  477 U.S. at 386.

*Id.*, 477 U.S. at 388 (internal citation omitted).[14]  The appellate court affirmed that trial counsel had been "grossly ineffective," but remanded for consideration whether there was prejudice due to the attorney's incompetence.  *Id.* at 365-366.  The Supreme Court affirmed the appellate court's finding of attorney incompetence and remand for determination of prejudice.[15]

While the defendant in *Kimmelman* moved for a review of evidence post-conviction, the instant case is in a different posture altogether as a plea has been entered but Defendant has not yet been sentenced (or subjected to an evidentiary hearing in connection with that sentencing). Accordingly, consideration of prejudice at this point should not hinge entirely on whether a suppression motion would ultimately be successful but rather, whether the information – that was not investigated by prior counsel – and its potential implications – involve credible claims that would have resulted in Defendant electing to proceed to trial rather than entering into a plea agreement (or, in the alternative, bargaining for a more favorable plea agreement).  *See Hill v. Lockhart*, 474 U.S. 52, 58 (1985) (where the Supreme Court applied to the guilty plea context the two-prong test for determining ineffective assistance of counsel that it had previously announced in *Strickland*); *id.* at 59 (prejudice is demonstrated if "there is a reasonable probability that, but for counsel's errors, [defendant] would not have pleaded guilty, and would have insisted on going to trial").

---

[14] The Supreme Court noted that the aforementioned statement about the bedsheet made by the trial court did not constitute a finding of fact that was subject to deference.  *Id.* at 389.

[15] The Supreme Court observed that there had been no evidentiary hearing on the "merits of respondent's Fourth Amendment claim" and the "State ha[d] not conceded the illegality of the search and seizure" and was entitled to an opportunity to demonstrate an exception to the prohibition against warrantless searches.  *Id.* at 390-391.  Even if the State could not do so, the Supreme Court noted that "respondent may be unable to show that absent the evidence concerning the bedsheet there is a reasonable probability that the trial judge would have had a reasonable doubt as to his guilt."  *Id.* at 391.  And if respondent could not make that showing, there would "be no need to hold an evidentiary hearing on his Fourth Amendment claim."  *Id.*

The Government argues that "[p]rejudice cannot result from an attorney's failure to pursue a frivolous claim." Govt. Opp'n, ECF No. 137, at 73 (quoting *United States v. Geraldo*, 271 F.3d 1112, 1116 (D.C. Cir. 2001)). The Court notes however that Mr. Raymond's allegations stemming from the seizure of his phones involve non-frivolous [Fourth Amendment] claims. Here, the seizures of the cell phones occurred within the same day, with relatively short gaps of time between the first and second seizures and the second and third seizures. The first seizure was at a Jimmy John's near Mr. Raymond's hotel, and the next two were at Mr. Raymond's hotel. While this may or may not meet the "dispatch" and "immediate vicinity" prongs set forth by Magistrate Judge Harvey, the Court finds troubling the agents' failure to use biometrics during the first seizure, in compliance with the clear terms of the warrant, as well as their announcement that the execution of the warrant was completed, which was followed by calling Defendant back, not once, but twice, to reopen the phones. Furthermore, there is no allegation that the second and third seizures resulted from any obstacles created by or actions taken by the Defendant. Instead, Defendant was summoned back because of the agents' failure to familiarize themselves with the terms of the warrant, their admitted technological ineptitude, and/or their failure to plan in advance on how the phones would be kept open. The Government argues that the seizure was a reasonable continuation, Govt. Opp'n, ECF No. 147, at 41-47, and even if it was a separate search, there was no bad faith or intentional misconduct, and thus suppression would be unwarranted. Govt. Opp'n, ECF No. 147, at 47-51. Without deciding at this time whether any evidence should be suppressed because of alleged constitutional violations, this Court finds that Defendant's allegations pertaining to whether law enforcement acted "reasonably" under the circumstances are not frivolous, as this is an open question.

Defendant claims additionally that there are Fifth Amendment violations relating to Mr.

Raymond's provision of his passcode because the provision of a passcode is a testimonial act, Def.'s Mot., ECF No. 119, at 41-42 (string citing cases), which can be incriminating if it provides a "link in a chain of evidence needed to prosecute the claimant for a federal crime." *United States v. Hubbell*, 530 U.S. 24, 38 (2000).  Furthermore, Mr. Raymond alleges coercion, and he asserts that a coerced statement is not voluntary, *United States v. Hallford*, 816 F.3d 850, 856 (D.C. Cir. 2016), and courts must consider the "characteristics of the accused and the details of the interrogation" in determining if coercion applies.  *Id.* (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). In turn, the Government asserts that a determination as to whether a statement is voluntary or not is "highly fact specific."  Govt. Opp'n, ECF No. 147, at 53 (discussing the execution of the search warrant in *United States v. Robinson*, 256 F. Supp. 3d 15 (D.D.C. 2017) (J, Kollar-Kotelly)).  The Government argues that even if entry of the passcode was found to be involuntary, suppression would not be appropriate because the alleged violation was not deliberate, intentional or reckless.  Govt. Opp'n, ECF No. 147, at 58-59.

In this case, Defendant indicated repeatedly that he needed to consult with counsel (and was unable to do so as his phones had been seized).[16]  Moreover, certain statements made by the agents may have made it unclear as to the authority they possessed to compel Mr. Raymond to open his phones, in contrast to other statements indicating they could not compel provision of a passcode.  *See* discussion in Section II.A. 2-4 (highlighting what the agents said during execution of the warrant).[17]

---

[16] The Government asserts that "the defendant had no right to counsel [during the seizure of the telephones] because he was not subject to a custodial interrogation."  Govt. Opp'n, ECF No. 147, at 58.

[17] Defendant alleges that the pictures and videos on the phones were "the catalyst for every investigative step taken thereafter [including the warrants for Defendant's computers, which also contained pictures and videos]."  Def.'s Mot., ECF No. 119, at 44. This allegation ignores that,

All of these aforementioned concerns lead the Court to conclude that Defendant has identified viable challenges related to the manner in which the warrant was executed and his cell phones were seized, which should have been discussed with him by counsel.  In the context of Defendant's Motion to Withdraw Plea, this Court found previously herein that Defendant's prior counsel did not meet an objective standard of reasonableness when they failed to investigate, consider, research, or explain to Mr. Raymond these issues surrounding the seizures of his phones. Nor did "Mr. Raymond's counsel . . .  raise these issues with the government, or seek to use them in plea negotiations, much less seek suppression" of the evidence.  Def.'s Reply, ECF No. 151 at 5.  This Court agrees with Mr. Raymond that this "plainly deficient performance [was] outside the 'range of competence demanded of attorneys in criminal cases.'"  Def.'s Reply, ECF No. 151, at 5-6 (quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970)).  The question remaining before this Court is whether that deficient performance prejudiced Mr. Raymond to the extent that he would have elected to proceed to trial rather than accepting a plea.

The Government asserts that there was no prejudice as counsel's decision to focus on plea negotiations was reasonable and beneficial to Mr. Raymond,  Govt. Opp'n, ECF No. 147, at 69-70, and furthermore, Defendant cannot show that but for counsel's performance, he would have gone to trial. Govt. Opp'n, ECF No. 147, at 74-76.  This assertion stands in contrast to defense counsel Marston's statement that he would have advised Mr. Raymond to go to trial.  *See* Marston Declaration, ECF No. 119-12 (indicating that he would have "recommended to Mr. Raymond (as [he is] now recommending) that he not plead guilty but instead proceed to trial in this case").  And,

---

upon handing over the phones, Defendant volunteered that they contained pictures of naked women.

more importantly, Mr. Raymond indicates, that "[h]ad he known [about the issues presented by the government's seizure of his phone], he would not have entered such a plea, and instead he would have gone to trial."  Def.'s Mot., ECF No. 199, at 22; *see* Def.'s Reply, ECF No. 151, at 22 ("[I]f given the choice between pursuing motions and trial, or taking the government's plea offer, Mr. Raymond unequivocally asserts that he would have chosen motions and trial, and rejected the government's plea deal, which required him to waive a number of constitutional rights.") Accordingly, the Court finds convincing Mr. Raymond's argument that he was prejudiced insofar as his ability to make a voluntary and intelligent decision regarding all his options before pleading guilty was hindered.  The Court concludes therefore that the second prong of *Strickland* has been met, and Mr. Raymond's plea is tainted by ineffective assistance of counsel.

### B. Defendant Argues that he has a Viable Claim of Innocence

The Court now turns to whether Defendant has a viable claim of innocence or a legally cognizable defense regarding the sexual abuse charges.  A defendant seeking to withdraw a guilty plea "must make out a legally cognizable defense to the charge against him." *McCoy*, 215 F.3d at 106 (quoting *Cray*, 47 F.3d at 1207).  A general denial is insufficient; instead, the defendant must "affirmatively advance an objectively reasonable argument that he is innocent, for he has waived his right simply to try his luck before a jury."  *Id.*; *United States v. Asaifi*, Criminal Action No. 04-401-02 (RMC), 2007 WL 1322098, at *5 (D.D.C. May 3, 2007) (same); *see also United States v. Robinson*, 498 F. Supp. 2d 328, 332-33 (D.D.C. 2007) (a claim of innocence must be more substantial where a Rule 11 hearing was conducted properly with no constitutional violations); *compare United States v. Basu*, 531 F. Supp. 2d 48, 55 (D.D.C. 2008) (considering whether a withdrawal motion relies on claims contrary to representations made during the plea hearing).

As a preliminary matter, the Government asserts that the Court must determine whether

"the defendant satisfies the weighty burden of showing not only that he is actually innocent of all of the charges of conviction (i.e., the charges he under oath admitted to having committed), but also that he is actually innocent as to the charges which the government also declined to bring" because of the plea arrangement. Govt. Opp'n, ECF No. 147, at 77. In support of this statement regarding the need to demonstrate actual innocence of the additional charges, the Government relies upon *Bousley v. United States*, 523 U.S. 614 (1998) and *United States v. Baxter*, 761 F.3d 17 (D.C. Cir. 2014), *cert den.*, 752 U.S. 1185 (2015). As Defendant notes, both of these habeas corpus cases "deal with claims of actual innocence in § 2255 proceedings to overcome the procedural bar to raising issues that were not raised on direct appeal." Def.'s Reply, ECF No. 151, at 22. Mr. Raymond argues that the rule contemplated by these cases — that a claim of innocence must encompass "'any more serious charges' arising out of/related to the same course of conduct/same victim" — does not apply in the context of "pre-sentencing motions to withdraw pleas. *Id.* at 22 (emphasis omitted). "[N]or does it appear to require proof of innocence (in any context) of all conceivable "more serious" charges arising out of/related to separate courses of conduct/separate victims." *Id.* at 22-23 (emphasis omitted). Defendant concludes that "defense is aware of no plea withdrawal case arising under Rule 11(d)(2)(B), and the government cites none, that requires a defendant seeking to withdraw his plea to establish his innocence of all conceivable and foregone "more serious" charges arising out of/related to separate courses of conduct/separate victims." *Id.* at 23. Accordingly, Mr. Raymond does not in his briefing discuss the Government's allegations about victims other than AV-7 and AV-9, the two victims named in the Government's [68] Statement of Offense with regard to the Sexual Abuse charges brought against Mr. Raymond.

In considering whether Defendant has alleged a cognizable defense, the Court looks for

guidance to statements made by the parties during the plea hearing and at any other extrinsic evidence of sexual abuse.  Mr. Raymond begins by asserting that he has "an objectively reasonable argument that he is innocent," *McCoy*, 215 F.3d at 106, as there is "no objective evidence that Mr. Raymond engaged in a "sex act" at times when [AV-7 and AV-9] were 'not capable of appraising the nature of the conduct.'"  Def.'s Mot., ECF No. 119, at 48.[18]  Defendant asserts again, as he did during the plea hearing, that none of the photos show sexual intercourse, and he argues that, upon thorough review of the evidence and discovery, "none of the evidence depicts Sexual Abuse under 18 U.S.C. § 2242(2)."  Def.'s Mot., ECF No. 119, at 4.[19]  The Government notes however that "defendant admitted that between the time that the first victim came forward and when law enforcement executed a search warrant for his personal phone, he deleted numerous images and videos of unconscious women from his phone, . . . , including photos of AV-7 and AV-9."  Govt. Opp'n, ECF No. 147, at 80; Change of Plea Tr., ECF No. 76, at 41:14-21.

As for what Defendant stated during the plea, the Court reiterates first that Mr. Raymond affirmed that he entered the plea voluntarily and of his own free will.  During the plea hearing, Mr. Raymond indicated repeatedly however that he did not recollect having non-consensual sex with these women, or that it may be "probable" that it occurred "based on the government's

_____

[18] The Government notes that Mr. Raymond is not claiming actual innocence as to his transport of obscene materials charge.  Govt. Opp'n, ECF No. 147, at 79, n.35.

[19] Defendant notes further that, during plea negotiation, the Government made statements about the "size and scope of the evidence against Mr. Raymond on the enhancement issues" and "repeatedly characterized classified information that it had seen, but the defense had not, as somehow compelling evidence on the intoxicant issue[.]" Def.'s Mot., ECF No. 119, at 30.  But, after review of the documents, the Defendant concludes that "the prosecution overstated its case and the relevance of the materials in Mr. Raymond's employment files," which do "not in any way establish the government's enhancements."  *Id.* at 31.

evidence, which he had not yet fully reviewed." Def.'s Mot., ECF No. 119, at 48. The Government explains that "though the defendant may not have personally viewed all discovery in this case, on various occasions during the plea colloquy, then-counsel for the defendant confirmed that she had personally reviewed discovery and discussed it with him." Govt Opp'n, ECF No. 147, at 77 (citing Change of Plea Tr., ECF No. 76, at 37:15-25, 38:1-2, 56:6-9).

With regard to AV-7, Mr. Raymond admitted that he possessed photos of AV-7, nude and unconscious ,and a video where he is seen manipulating and moving parts of her body while she is unconscious (which is relevant to the transporting of obscene material charge). Change of Plea Tr., ECF No. 76, at 48-49. Defendant agreed to what the pictures showed, based on the fact that his counsel had reviewed and discussed the photos with him rather than having observed them himself. *Id.* Mr. Raymond argues that "[w]hile many (though not all) of the photographs and videos depicting unconscious women are explicit, *none* of them depicts a "sexual act" for purposes of federal sex abuse offenses." Def.'s Mot., ECF No. 119, at 16 (emphasis in original). According to Mr. Raymond, "[t]he most that the photographic evidence shows is a possible "sexual contact" offense with respect to some of the complainants, but they provide no evidence of "sexual abuse" under 18 U.S.C. § 2242(2)[.]" Def.'s Mot., ECF No. 119, at 17.

Looking at statements made by AV-7, Mr. Raymond indicates that AV-7 reported that she and Mr. Raymond had consensual sex in the morning after their date, and Mr. Raymond used a condom, but when she felt ill, they stopped. Def.'s Mot., ECF No. 119, at 48; *see also* Sealed Memorandum of Interview with AV-7, Sealed Ex. N-1, ECF No. 119-14. When she went to the bathroom, she claimed she saw a used condom on the vanity, which she assumed was from the night before, which means there would be two condoms in the trash. *Id.* at 48-49. But a search of the apartment yielded only a single used condom. *Id. a*t 49; *see* Sealed June 14-15, 2020 Scene

Report, Sealed Ex. O, ECF No. 119-16.  Mr. Raymond asserts now that having sex twice in that period of time would be medically and physically impossible for him, as he has erectile dysfunction and was on medication for an enlarged prostate.  Def.'s Mot., ECF No. 119, at 26, 49.

The Government focuses however on Defendant having "admitted [that the sexual assault] of AV-7 [ ] occurred." Govt. Opp'n, ECF No. 147, at 81 (citing Change of Plea Tr., ECF No. 76, at 36:20-22) (where the Defendant responded affirmatively to the Court's question whether he "agree[d] with everything that has been stated in the Statement of Facts.")  The Government asserts additionally that "defendant eventually admitted that AV-7 was not in a position to make decisions about consent."  Govt. Opp'n, ECF No. 147, at 81 (citing Change of Plea Tr., ECF No. 76, at 69:2-6) (where Defendant responded affirmatively to the Court's question "were you aware that [AV-7] was not in a position to make some decisions about her [sexual] conduct").

With regard to statements made by AV-9, Defendant indicates that she noted that she believed it was a "normal date" and that Mr. Raymond was a "gentleman."  Def.'s Mot., ECF No. 119, at 28 (quoting  Memorandum of Interview with AV-9, Ex. P, ECF No. 119-17).  The Government argues however that Defendant agreed that AV-9 "must have been incapable of appraising the nature of the conduct at the time the intercourse occurred" and that he was "not so impaired that he did not realize that AV-9 was not in a position to consent."  Govt. Opp'n, ECF No. 147, at 81; *see* Change of Plea Tr., ECF No. 76, at 53:19-54:2 (where he agreed with defense counsel's statement that "based on the amount of alcohol that AV-9 consumed, based on the images of her taken after their sexual intercourse, . . . and her statement, given the evidence, that she must have been incapable of appraising the nature of the conduct at the time the intercourse

occurred"); *id.* at 54:22-55:1 (affirming that he was not so impaired that he did not realize she was not in a position to agree or not to agree to sex); *but see id.* at 55:11-15 (noting that he recalled her waking up in bed the next morning, did not recall the specific details of intercourse, and "so the rest of the information is based on her statement, which I stipulate as accurate").    Mr. Raymond concludes his argument by stating that he does not admit to knowingly having sex with someone who "passed out, blacked out, or [was] otherwise incapable of appraising the nature of the conduct," Def.'s Mot., ECF No. 119, at 49, and accordingly, for the sexual abuse charges to which he pleaded guilty, he alleges that he has a viable claim of innocence.    This statement is consistent with his testimony during the plea insofar as his admissions then were alleged to be based not on his personal recollection but instead, on his acceptance of the truth of the assertions by AV-7 and AV-9 (which was characterized by Defendant as a *de facto* Alford plea).

Furthermore, with regard to objective evidence of the sexual intercourse, the Court notes that the victims' recollections are admittedly unclear, whether due to consumption of alcohol or for some other reason.    Furthermore, while the Court has not seen the photos and videos at issue, the Government did not dispute defense counsel's statement during the plea hearing that none of the pictures depict sexual intercourse, which is the "sex act" alleged for purposes of the sexual abuse charge.    Finally, as noted above, there were repeated instances during the plea hearing where Mr. Raymond indicated that his acceptance of the facts in the statement of offense were based not on his personal recollection but instead, on what the victims must have recollected. Accordingly, the Court finds that this "actual innocence/cognizable defense" factor stands in equipoise between the parties, for purposes of analyzing this motion to withdraw the plea.

### C. Prejudice

As a final factor, this Court considers whether or not the delay between the guilty plea

and the motion to withdraw has substantially prejudiced the Government's ability to prosecute the case.  In this case, the plea was entered in July 2021.  The Government notes that there was a lengthy delay of nine months between the time the plea was entered and the Defendant's motion to withdraw the plea, and such delay "militates heavily against withdrawal."  Govt. Opp'n, ECF No. 147, at 87; *see United States v. Benton*, 639 F.3d 723, 727 (6th Cir. 2011) (looking at cases and noting that the court had "declined to allow plea withdrawal when intervening time periods were as brief as one month"); *see also United States v. Carr*, 740 F.2d 339, 345 (5th Cir. 1984) (noting that the purpose of allowing a withdrawal is "not to allow a defendant to make a tactical decision to enter a plea, wait several weeks, and then obtain a withdrawal if he believes that he made a bad choice in pleading guilty").  The Government argues that "[t]he fact that the defendant may now feel he made a "bad choice" or that had he been advised to do so, he would have filed a suppression motion, does not render his plea unknowing or involuntary . . ."  Govt. Opp'n, ECF No. 147, at 88.  But this argument is contrary to what this Court has already determined herein – that Defendant's plea was not made voluntarily and intelligently because Mr. Raymond received inadequate assistance of counsel based on counsel's failure to investigate the circumstances surrounding the execution of the warrant and to explore any possible options resulting from the manner in which the warrant was executed. [20]

---

[20] The Government notes that Mr. Marston was Defendant's counsel during the relevant period of time, but Mr. Marston's responsibilities have already been addressed in the context of the prior conflict disputes.  As such, the Court accepts that Mr. Marston's responsibilities did not include identifying issues related to execution of the warrant and the manner in which Defendant's phones were seized.  *See* Marston Decl., Ex. L, ECF No. 119-12, ¶ 4-6.  Mr. Marston indicates that these warrant issues were identified by him in March 2022 and raised with the prosecution on March 28, 2022.  *Id.* ¶ 7.

Defendant argues, and this Court agrees, that "a significant portion of the time that passed since [entry of the plea] is attributable to multiple conflict issues and other factors beyond Mr. Raymond's control." Def.'s Mot., ECF No. 119, at 49. Defendant notes further that the pre-sentence report has "not yet been issued," and the sentencing date was not even set when Mr. Raymond called the issues discussed herein to the government's attention," and accordingly, "Mr. Raymond has acted expeditiously with regard to these issues[.]" Def.'s Mot., ECF No. 119, at 49-50. This Court finds that Mr. Raymond's delay in bringing his motion to withdraw the plea was neither caused by him nor intentional.

The Government asserts next that there is substantial prejudice to the victims who listened to the plea and heard Defendant admit to "recording and sexually assaulting two of them, each time while the victim was incapable of appraising the nature of the conduct or consenting to it" and further to recording and/or photographing "unconscious and nude or partially nude women" and transporting these photos and videos into the United States. Govt. Opp'n, ECF No. 147, at 89. The Government focuses on the victims' need to have this matter resolved expeditiously as possible after having suffered "extreme mental distress" upon realizing the "full extent of their victimization." Govt. Opp'n, ECF No. 147, at 89-90. The Government argues that "the victims in this case would be harmed exponentially if the defendant were allowed to withdraw his plea" as witnesses located in several different countries were scheduled to attend the sentencing, "including several of the defendant's victims," and they have "spent months mentally preparing themselves to confront their abuser, whom they fear." Govt. Opp'n, ECF No. 147, at 90. Defendant contends however that "judicial economy is not substantially jeopardized" insofar as the "government already planned to conduct a multiphase contested sentencing hearing with a dozen or more witnesses." Def.'s

35

Mot., ECF No. 119, at 50.  And, in fact, the Government acknowledges that the "disputed sentencing enhancements necessitate testimony from various victims," but the Government reiterates that there is "undue stress and anxiety for [all victims and] these two women especially, who would be forced to relive a traumatic part of their lives. . ."  Govt. Opp'n, ECF No. 147, at 90-91.

The Government asserts further that the "substantial prejudice the victims would face is imputed to the Government."  Govt. Opp'n, ECF No. 147, at 91 (quoting *United States v. Lineback*, 330 F.3d 441, 444 (6th Cir. 2003)).  If Defendant is permitted to withdraw his plea, "[t]he news of having to endure a full-fledged trial will likely have meaningful consequences for the government and result in the loss of victim cooperation," which is prejudicial to the Government.  Govt. Opp'n, ECF No. 147, at 91; *see United States v. Farrelly*, No. 3:19-CR-44-J-34PDB, 2021 WL 463767, at *19 (M.D. Fla. Feb. 9, 2021) ("Whether considered prejudice to the government or as another circumstance within the totality, the Court finds that requiring the victim to testify and relive such traumatic experiences at this point in time after believing the matter to have been resolved weighs against granting [the defendant's] Motion.")  The Court notes that *Farrelly* is distinguishable because the victim, who was a minor at the time of the sexual offense, "would very likely [have] be[en] required to testify were the Court to grant Mr. Farrelly's Motion [to withdraw plea]," *id.* at *19, but was not otherwise slated to testify, unlike the victims in the instant case.

This Court is certainly sympathetic to the victims' stress, humiliation, and anxiety due to the nature and circumstances of the alleged crimes, and the Court appreciates how difficult it must be for these victims to openly discuss these matters and how any delay in the proceedings affects their ability to move forward with their lives.  Accordingly, the Court

acknowledges that the Government has identified prejudice to the victims and to itself, and this factor weighs in favor of the Government.  At the same time, the Court finds that this prejudice is minimized in some degree by the fact that the victims in this case were already scheduled to testify at Defendant's sentencing hearing with regard to the same sensitive issues they would discuss at a trial.  Upon consideration of the three factors — taint, actual innocence/cognizable defense to the sexual abuse charges, and prejudice, with taint being accorded the most weight — this Court finds that the balance of these factors weighs in favor of granting Defendant's request for withdrawal of his plea.

### D. Hearing

As a final matter, this Court must decide whether an evidentiary hearing is warranted in this case.  Generally, when a defendant seeks to withdraw a guilty plea, "the district court should hold an evidentiary hearing to determine the merits of the defendant's claims." *Taylor*, 139 F.3d at 932.  While claims "frequently concern matters outside the trial record," some motions to withdraw a guilty plea "can be resolved on the basis of trial transcripts and pleadings alone." *Id.; see United States v. Thomas*, 541 F. Supp. 2d at 22-26 (concluding that an evidentiary hearing was unnecessary because defendant's claim was insufficient to render a plea invalid even when defendant argued that prior counsel failed to investigate fully); *United States v. Robinson*, 587 F.3d 1122, 1127-33 (D.C. Cir. 2009) (finding district court did not err in denying evidentiary hearing as the defendant's pleas were not tainted despite alleged coercion by the government).

Here, the Court finds that an evidentiary hearing is unnecessary, as most of the allegations relied upon by Defendant revolve around statements he made at the plea hearing and the manner in which the warrant was executed, and the Court has reviewed the transcripts,

videos, and other evidence and was able to observe the Defendant's demeanor during the plea. Additionally, the Court notes that "[a] district court should ordinarily conduct an evidentiary hearing *upon request*." *See Thomas*, 541 F. Supp. 2d at 23 (emphasis added); *United States v. Sibblies*, 562 F. Supp. 2d 1, 3 (D.D.C. 2008) (reciting the same standard). In this case, the Defendant requested a hearing,  Def.'s Reply, ECF No. 151, at 1, but in contrast, the Government "submit[ted] that the Court can determine the merits of the motion to withdraw guilty plea on the briefs and an evidentiary hearing is neither warranted nor necessary." Govt. Surreply, ECF No. 157, at 5. For these reasons, the Court concludes that an evidentiary hearing is unwarranted in connection with this Court's determination on Defendant's motion to withdraw the plea.

### IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant Brian Raymond's [119] Motion to Withdraw Guilty Plea. Defendant has demonstrated that his plea was tainted by ineffective assistance of counsel and he has raised a cognizable defense to the sexual abuse charges to which he pled guilty, and these two factors outweigh the Government's claim of prejudice.  An appropriate Order accompanies this Memorandum Opinion.


_____/s/_____
COLLEEN KOLLAR-KOTELLY
UNITED STATES DISTRICT JUDGE