### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 1:21-cr-00380-CKK** |
| | : | |
| **BRIAN JEFFERY RAYMOND** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S OPPOSITION TO DEFENDANT'S
### MOTION FOR BOND AND RELEASE FROM CUSTODY

The United States, by and through the undersigned attorneys, respectfully submits this memorandum in response to the defendant's Motion for Bond and Release from Custody, ECF No. 179. The defendant, Brian Jeffrey Raymond, moves this Court, through counsel, to review the detention order in this case, pointing to the length of his pretrial detention and arguing that pretrial detention is not the least restrictive measure necessary to reasonably assure community safety and his presence in court. ECF No 179 at 1-2. However, the evidence in this case establishes just the opposite: that the defendant physically and sexually assaulted at least twenty-five unconscious women over the course of approximately fifteen years, stopping only when a magistrate judge ordered him detained. The nature of the offenses with which the defendant is charged, along with the weight of the evidence and the defendant's characteristics, demonstrate that if released, the defendant poses a clear and present danger to the community and that no condition, nor combination of conditions, would reasonably ensure the safety of the community or the defendant's presence in court. For the reasons detailed below, this Court should deny his motion.

### I.    RELEVANT FACTUAL BACKGROUND

On February 23, 2023, a grand jury returned a twenty-five count superseding indictment charging the defendant with the following offenses: one count of Aggravated Sexual Abuse, in violation of 18 U.S.C. § 2241(b); two counts of Sexual Abuse, in violation of 18 U.S.C. § 2242(2);

five counts of Abusive Sexual Contact, in violation of 18 U.S.C. § 2244(a)(1); six counts of Abusive Sexual Contact, in violation of 18 U.S.C. § 2244(a)(2), three counts of Coercion and Enticement to Travel, in violation of 18 U.S.C. § 2422(a); seven counts of Transportation of Obscene Material, in violation of 18 U.S.C. § 1462; and one count of Transportation of Obscene Material, in violation of 18 U.S.C. §§ 1462 and 7(9). *See* ECF No. 184.[1]

The charges arise from allegations that the defendant drugged and sexually assaulted numerous women over the course of several years. The indictment names fourteen separate victims. The evidence supporting the indictment generally falls into three categories: (1) witness statements, (2) electronic evidence, and (3) the defendant's statements. As to witness statements, the government interviewed nearly 30 women whose dates with the defendant ended in partial or total blackout. Broadly speaking, the bulk of the electronic evidence was gathered from six devices (phones and laptops), two memory cards, and various platforms capable of storing information, such as iCloud, Google, and Yahoo. Electronic evidence in this case includes not only images (photographs and videos) of some of these women, but also the defendant's search history revealing a sexual interest in drugged women, research about the interactions between Ambien and alcohol and tequila and visine, and at least one email wherein the defendant sent an inquiry to an online pharmacy about chloral hydrate (an incapacitating agent also known as a "mickey").[2] Finally, the defendant's own statements include admissions that he engaged in sexual acts with women who later reported blackouts. For example, the defendant often spoke at length about his dates with a close friend, Witness-1, disclosing to the friend those women with whom he engaged

---

[1] Though the docket indicated this is the "second superseding indictment," there has only been one previous indictment, filed on January 19, 2023.

[2] Search warrants also revealed evidence that the defendant sought out women via dating platforms such as Hinge, Tinder, and Bumble.

in sexual intercourse. The government has copies of those messages. As another example, after he learned of the government's investigation, the defendant wrote a note to himself where he appeared to outline his defense – namely that the women knowingly engaged in a "fetish" wherein the defendant would photograph them while they were "sleeping." This note was recovered during the execution of a search warrant.

The following factual summary addresses the facts and evidence supporting the superseding indictment and establishing the defendant's dangerousness and risk of flight.

### A. Sexual Assault of AV-1

On May 31, 2020, local police in Mexico City, Mexico, were called to the defendant's embassy-leased apartment based on reports of a naked woman screaming for help from the defendant's balcony. Though she does not recall making these statements, AV-1 told one witness that she was raped and another witness that she had been abused.

During several subsequent interviews, AV-1 told investigators that she met the defendant on the dating application Tinder and arranged to meet up with him at a shopping center with outdoor seating. The defendant brought wine for the two of them, and they drank and talked. Later, AV-1 accompanied the defendant back to his apartment. The two continued drinking and talking until AV-1 abruptly lost consciousness. She told investigators that she only remembered flashes from the night. AV-1 indicated that she could normally drink a bottle of wine without side effects.

Throughout their date, AV-1 had been sending her friend updates via text message, to include her location information at the defendant's apartment and a photograph of the snacks he served. AV-1's text messages to her friend then went silent for a period of three hours, during which her friend sent several messages asking AV-1 if she was okay. AV-1 eventually sent her friend a message containing incoherent letters. AV-1 has no memory of sending that message.

During the medical examination on the night of May 31, AV-1 told the doctor that one of her last memories before blacking out was that she needed to send her friend a message to tell her she was not feeling well, and that the defendant was trying to kiss her. AV-1 has no recollection of sharing these facts with the doctor. A physical examination revealed a vaginal injury consistent with friction, an anal laceration compatible with the introduction of a hard, blunt object, generalized redness throughout her perianal area, bruises on her forearm, elbow, and knees, and a laceration on the inside of her cheek.[3]

When interviewed, the defendant claimed, among other things, that the two were engaged in consensual sex when AV-1 suddenly ran out of the room and onto the balcony, where she started screaming. AV-1 did not consent to, and has no memory of, engaging in sexual acts or sexual contact with the defendant. For the sexual assault of AV-1, the defendant stands charged in Count 1 of the Superseding Indictment with Sexual Abuse, in violation of 18 U.S.C. § 2242(2) and 7(9).

### B.  Sexual Assault of AV-9

AV-9 reported that she met the defendant on the dating application Bumble and subsequently decided to go on a date with him on March 25, 2020. They first met at a restaurant in Mexico City around two in the afternoon and consumed two small glasses of wine each. Then, they went to a café for another drink before deciding to resume their date later that evening, with AV-9 returning to her home in the interim. Messages recovered from the defendant's iCloud

---

[3] AV-1's urine sample was tested twice in Mexico. The results indicated that AV-1's alcohol level was 0.274% at the time of collection. A Mexican chemistry expert indicated that based upon the typical rate of metabolization, AV-1's alcohol concentration was likely 0.320% at the time of the incident. Those tests did not detect the presence of any other substances.

Mexican law enforcement provided U.S. law enforcement with the remaining sample, which was subsequently tested by the FBI. AV-1's urine was negative for many of the common drugs associated with sexual assault, to include a medically significant amount of GHB, Ambien, and Benzodiazepines. The sample tested positive for small amounts of cocaine, a cocaine metabolite, and methamphetamine. The sample also tested positive for Theophylline, a bronchodilator. AV-1 denies using any of those substances.

indicate that the defendant texted Witness-1 regarding the date. AV-9 was not mentioned by name, but the details of the text accurately include AV-9's profession and nationality. The defendant sent the following message to Witness-1: "She just asked me to send an Uber to pick her up tonight…but that is a personal no for me unless I am definitely getting sex." The defendant then said, "I suppose since it is only 4 bucks and I might have a chance to fuck her I will do it."

AV-9 did, in fact, take an Uber to the defendant's embassy-leased apartment later that night around 8:00 p.m. Upon her arrival, AV-9 told investigators that the defendant offered AV-9 cold meats, cheeses, and strawberries, and they split approximately 1 and ½ bottles of wine.[4] The defendant then suggested that she taste several types of tequila, which she did. AV-9 described the defendant as a perfect gentleman. AV-9 recalled kissing him in his kitchen. Soon after, her memory began to lapse while walking with him in a hallway. Her next memory was awaking nude in his bed.

In the defendant's iCloud account, investigators located 20 photographs and 15 videos depicting AV-9, taken from March 25 to 26, 2020, in his embassy-leased apartment over the course of an hour. *See, e.g.,* Exhibit A (one video and two photographs, filed under seal).[5] The photographs and videos show AV-9 unconscious and fully nude, lying in the defendant's bed. Some of the photographs show the defendant's hand opening AV-9's eyelid, and some depict close-ups of her breasts and genitals. The defendant also appeared to pose AV-9's body in different ways throughout the photo set. A video shows the defendant's hand on the outside of AV-9's buttocks. Another video shows the defendant's hand touching AV-9's breast and buttocks. And

---

[4] In one interview, AV-9 estimated that she drank four to five glasses of wine.

[5] The exhibits referenced in this opposition have been hand delivered to the Court and provided to defense via USAfx. The government will file a motion for leave to file under seal and include an exhibit list. That same exhibit list is attached to this opposition.

yet another video shows the defendant's hand forcefully grabbing AV-9's breast. His hand then appears to move down to her pubic region, out of the frame. In one video, the defendant is nude and lying next to an unconscious AV-9, cuddling with her body and manipulating her limbs. The defendant's erect penis can be seen in the video.

On March 26, 2020, the defendant texted Witness-1, "Success last night…at least I salvaged my Wed". On what appears to be a list of sexual partners maintained by the defendant, AV-9's name appears along with the corresponding month and year.[6]

When law enforcement asked AV-9 whether she and the defendant had sexual intercourse, she replied "claro" (meaning sure, or yes, of course, in Spanish). AV-9 stated that she recalled awaking nude in the defendant's bed, but she did not remember taking off her clothes and did not remember their sexual encounter. Upon waking the next morning, AV-9 reported feeling hungover and tired, with a headache and a body ache that reminded her of having the flu. Vaginally, AV-9 felt as though she had sex, but she did not recall consenting to any sexual acts. AV-9 stated that the defendant ordered her an Uber, and she went home. The defendant reached back out to her, but she never responded because she felt ashamed.

AV-9 explained that just a few days after her date with the defendant, she began questioning whether the defendant had drugged her. She had never blacked out from drinking alcohol before, and she described herself as an experienced drinker requiring two full bottles of

---

[6] The list is contained within an email recovered from the defendant's Yahoo account. The email is titled, "Mortgage Interest and Expenses." Approximately half-way through the document, various women's names are listed next to a number and a location and date. For example, "#91 [Woman Name] [Country] – [Age] – [Month and Year]." The list begins at number 61 and ends with number 143. There are approximately 20 women for which no number is assigned.

Law enforcement interviewed several potential victims in this case. Some of the women interviewed are on this list and some are not. Where the woman interviewed by investigators was on this list, there was some independent corroboration, either from the woman and/or from the defendant, that sexual intercourse (as opposed to sexual contact) occurred. For example, either the woman recalled sexual intercourse when speaking to investigators, and/or the defendant told Witness-1 in messages recovered during the investigation that he slept with the woman or that the night was a "success."

wine to feel drunk. AV-9 told law enforcement that she never discussed taking photographs with the defendant, and she never gave her consent to be photographed. During her interview, law enforcement informed AV-9 that the defendant was in possession of photographs and videos of her. AV-9 declined to view the photographs and videos, stating that it would not be good for her "psychologically." For the sexual abuse of AV-9, the defendant stands charged in Counts Two through Five of the Superseding Indictment with Aggravated Sexual Abuse, in violation of 18 U.S.C. § 2241(b) and 7(9), Sexual Abuse, in violation of 18 U.S.C. § 2242(2) and 7(9), Abusive Sexual Contact, in violation of 18 U.S.C. § 2244(a)(1) and 7(9), and Abusive Sexual Contact, in violation of 18 U.S.C. § 2244(a)(2) and 7(9).

### C.  Sexual Assault of AV-7

AV-7 met the defendant on the dating application Bumble on May 25, 2020, and they exchanged messages for a few days before deciding to meet in person in Mexico City, Mexico. On May 30, 2020, before the date with AV-7, the defendant texted Witness-1, "…Today is just the one tonight – but actually coming direct to my place. So, if she shows there is probably a decent chance for success."

The defendant and AV-7 met at his embassy-leased apartment on May 30, 2020. Originally, they had planned to meet for a walk, but the defendant asked her to come to his apartment instead. When she arrived, the defendant served her ham, cheese, and strawberries.  AV-7 recalled having a sip of a tequila shot but not finishing it. She also remembered two gin drinks with flavored water.[7] AV-7 told investigators that the defendant tasted her first drink because she told him that it tasted "off."[8]

---

[7] In a previous interview, AV-7 recalled having two glasses of tequila, two or three glasses of gin, and then champagne. AV-7 later clarified that by "two glasses of tequila," she meant sips.

[8] In an earlier interview, AV-7 indicated that the defendant kept drinking from her drinks.

After the second drink, AV-7 and the defendant got up to dance, and she noted that she felt fine. They danced and kissed for a short period of time, after which the defendant suggested she have champagne as a belated birthday celebration. The defendant served her a glass of champagne at the dining room table. AV-7 drank some of the champagne, and the two stood to dance again. Upon standing, AV-7 noticed that she was extremely dizzy. AV-7 noted that the defendant seemed completely fine. AV-7 started to feel nauseous, so she ran to the hallway bathroom and vomited into the sink. The defendant came in to check on her, and he had to hold her up while she finished vomiting. AV-7's last memory is of the defendant holding her and turning her body to maneuver her out of the small bathroom. AV-7 described her memory loss as sudden. AV-7 explained that given her history with alcohol, it would not have been normal for her to black out after only a few drinks.

AV-7's next clear memory was waking up in the defendant's bed, nude, with him asleep next to her. She felt sick and sleepy, and physically her body felt as though she had sex. She then recalled that she had vomited the night before, and she hurried to try to clean the sink in the bathroom. The defendant awoke while she was cleaning and brought her a glass of water. While AV-7 located and gathered her belongings, the defendant approached her and gave her a hug from behind. They started kissing, and he leaned her onto the bed while holding her chest, put on a condom, and began to penetrate her. AV-7 had a flash of memory from the night before, in which she was face down on a bed with the defendant behind her and grabbing her. After only a few seconds, AV-7 started feeling sick, and the sexual penetration was causing her physical pain, so she asked the defendant to stop, which he did. She described the pain as feeling like she'd recently had unlubricated sex. AV-7 ran to the bathroom and vomited again. While in the bathroom, she

noticed either a used condom or a condom wrapper on the sink, confirming her feeling that sexual intercourse occurred the night before.

The next day, on May 31, 2020, the defendant texted Witness-1, "So last night was a success. She was decent enough looks wise. About what I was expecting and at 26 was still fuckable. But after 30 who knows. But she was cool and we had a nice time so it worked out. TBD if I will see her again." On what appears to be a list of sexual partners maintained by the defendant, AV-7's name appears along with the corresponding month and year.

In addition to the defendant's messages with Witness-1, the defendant's iCloud account contained 77 photographs and four videos depicting AV-7, all taken on May 30 to 31, 2020, over the course of approximately two hours and thirty minutes. *See, e.g.*, Exhibit B (one video and one photograph, filed under seal). The photographs and videos show AV-7 fully nude, unconscious, and lying on the defendant's bed. They show the defendant's hand opening her eyelid and playing with her mouth. In one video, AV-7 flinches when the defendant's fingers are in her mouth, and he quickly pulls his hand back. There are many close-up photographs of her breasts and genitals. Notably, there is a photo in which AV-7 is on her back, with her legs tightly closed, and the defendant is straddling her body, with his knees on either side of her legs on the bed such that his inner thighs touch her. The defendant's erect penis can be seen in the bottom of the frame. AV-7's body is also posed in several different positions.

After viewing the photographs and videos found in the defendant's iCloud, AV-7 confirmed that she never gave him consent to photograph or record her. When asked about their conversations during the date, AV-7 stated that they never discussed sex or taking photographs. For the sexual assault of AV-7, the defendant stands charged in Counts Six and Seven of the

Superseding Indictment with Abusive Sexual Contact, in violation of 18 U.S.C. § 2244(a)(1) and 7(9), and Abusive Sexual Contact, in violation of 18 U.S.C. § 2244(a)(2) and 7(9).

### D.  Sexual Assault of AV-6

AV-6 met the defendant on the dating application Tinder in or around 2018. The two chatted for approximately one year before meeting in person. They went on several dates, including one at a movie theatre and additional dates at the defendant's embassy-leased residence. During their first date at his apartment, the defendant offered AV-6 various alcoholic drinks to sample. AV-6 ended up staying at the defendant's apartment that night because she drank too much. She reported having sexual intercourse with the defendant that night and described it as consensual despite only being able to remember "flashes" of it. Their other dates at the defendant's apartment were similar. The two would drink and engage in sexual intercourse, and AV-6 could not recall the entire encounter. She stated each time was consensual and the defendant never pressured her into sex.

In the defendant's iCloud account, and on his iPhone XR, law enforcement recovered photographs and videos depicting AV-6, including 29 photographs and six videos from June 23, 2019, and 35 photographs from December 21, 2019. Photographs were also found on the defendant's MacBook Air. *See, e.g.,* Exhibit C (one video and two photographs, filed under seal). In both sets of photographs and videos, AV-6 is fully nude, unconscious, and lying on the defendant's bed. In both sets, the defendant's hand can be seen opening AV-6's eyelids, and in both sets, there are close-up photographs of her breasts and genitals. In the videos from June 23, 2019, the defendant's hand can be seen lifting AV-6's arm and dropping it onto the bed several times.  In one video, AV-6's face flinches, and the defendant jumps back, dropping the recording device in the process and causing the video to very briefly record his face, torso, and erect penis.

In another video, the defendant's erect penis is briefly seen. Notably, one of the videos starts with AV-6's hand placed on her own breast. In the video, the defendant's hand can be seen moving AV-6's hand from her breast to her genitals. He then moves her hand from her genitals and drops it onto the bed next to her. On what appears to be a list of sexual partners maintained by the defendant, AV-6's name appears along with the corresponding month and year.

When AV-6 was informed that the defendant was in possession of photographs and videos of her, she was shocked. She stated that she never imagined the defendant would do anything like that to her. AV-6 further stated that she never consented to him photographing or recording her and was concerned that he could have drugged her. For the sexual assault of AV-6, the defendant stands charged in Counts Eight and Nine of the Superseding Indictment with Abusive Sexual Contact, in violation of 18 U.S.C. § 2244(a)(1) and 7(9), and Abusive Sexual Contact, in violation of 18 U.S.C. § 2244(a)(2) and 7(9).

**E.  Sexual Assault of AV-5**

AV-5 met the defendant on the dating application Tinder in early 2019. They met for their first date at a bar in Mexico City. They each had a beer, but the date was short, and they talked very little. The defendant told AV-5 that he worked at the U.S. Embassy (as he did for several other victims). They continued chatting via WhatsApp after their first date, but due to the defendant's travel schedule, they were unable to meet again for several months.

In May 2019, the defendant invited AV-5 on a date to his embassy-leased residence. He served cheese, ham, strawberries, and chocolates and he offered her a drink. AV-5 later stated that she had trouble remembering the details of that night. She stated that they had two mezcal drinks and then switched to red wine and champagne.  The defendant offered her tequila, but she declined. AV-5 could not recall how many drinks she had but recalled that they listened to music on

YouTube. She also recalled kissing the defendant in the living room. AV-5 reported that her last memory was sitting in a chair and her next memory was lying in a bed and sitting up to vomit. She recalled trying to clean it up and the defendant seeming upset. AV-5 reported that she felt ashamed, so she left shortly thereafter. She drove home in her own car, and she thought it was late night or early morning, as it was dark outside. AV-5 went to sleep when she arrived home and woke up with a headache, which she expected given how much she drank. AV-5 stated that she assumed she had vomited because they were mixing different types of alcohol. She stated that following the date, she reached out to the defendant, but he did not seem interested.

In the defendant's iCloud account, and on his iPhone XR, law enforcement recovered photographs and videos depicting AV-5, including 25 photographs and 10 videos, all taken on May 17, 2019. Photographs were also found on the defendant's MacBook Air. *See, e.g.,* Exhibit D (one video and two photographs, filed under seal). In the photographs and videos, AV-5 is completely nude, unconscious, and lying in the defendant's bed.  In some of the videos, the defendant's hand can be seen opening her eyelids and playing with her mouth and tongue.  In one photograph, the defendant's hand is touching AV-5's inner thigh. In a video, the defendant's hand is grabbing her breast. Concerningly, AV-5 appears to be struggling to breath in the videos.  On what appears to be a list of sexual partners maintained by the defendant, AV-5's name appears along with the corresponding month and year.

AV-5 had no memory of being in the defendant's bed (as depicted in the photographs) or of removing her clothing and she did not give the defendant permission to take photographs or videos of her. For the sexual assault of AV-5, the defendant stands charged in Counts Ten and Eleven of the Superseding Indictment with Abusive Sexual Contact, in violation of 18 U.S.C. § 2244(a)(1) and 7(9), and Abusive Sexual Contact, in violation of 18 U.S.C. § 2244(a)(2) and 7(9).

### F.  Sexual Assault of AV-26

AV-26 met the defendant on Tinder, and their first date was at a café in Mexico City. The defendant invited AV-26 to a second date at his embassy-leased residence. When she arrived, the defendant served her strawberries, cheese, and cookies and poured her a glass of wine. AV-26 began to feel ill, and she vomited in the bathroom. When she returned, she noticed that the defendant had refilled her glass. She was feeling very drunk from the first glass of wine, so she held the second glass in her hand while they talked and did not finish it. The defendant then prepared a cocktail for her. Shortly thereafter, AV-26 vomited in the bathroom a second time. When she returned to the living room, the two kissed on the couch. At that point, her memory began to lapse.

AV-26 next remembered being in the bedroom with the defendant, not knowing how she got there. She was sitting on the bed and felt that she needed to vomit, at which point the defendant led her by the arm to his bathroom. AV-26's legs gave out, and she fell. The defendant held her hair while she vomited again. She recalled sitting on the floor, unable to get up. AV-26 next remembered sitting on the defendant's bed and trying to unbuckle her shoes. She had another memory lapse, next recalling being in the defendant's bed, under the covers. At some point, she awoke to feel the defendant's hand on her breast, resting between her inner and outer blouse. She recalls that the defendant was awake, and that he closed his eyes when she looked over at him and quickly pulled his hand away. AV-26 next remembered waking up in the defendant's bed, noticing that her pants were unbuttoned with the zipper pulled all the way down. She left his apartment and vomited again on her drive home. AV-26 told investigators that while she does not drink often, it usually took a full bottle of wine for her to feel drunk and one or two glasses would not affect her.

No photographs or videos depicting AV-26 have been recovered. For the sexual assault of AV-26, the defendant stands charged in Count Twelve of the Superseding Indictment with Abusive Sexual Contact, in violation of 18 U.S.C. § 2244(a)(2) and 7(9).

**G. Sexual Assault of AV-23**

AV-23 went on approximately four to six dates with the defendant at his embassy-leased housing in Country 6 in late 2013. AV-23 reported that, on their first date, they may have gone swimming in his building's pool or hot tub and then had drinks in his apartment. The defendant served AV-23 drinks, to include a French 75 cocktail. AV-23 reported that they began to kiss and become physical, but the defendant abruptly stopped the encounter, appearing to pass out. AV-23 reported staying the night at the defendant's apartment and waking up with no reason to believe anything bad had happened to her. AV-23 reported that her subsequent dates with the defendant were similar, and their last date was in early 2014.

Law enforcement subsequently recovered 40 photographs of AV-23 from the defendant's Kingston SD Card, all dated in December of 2013. *See, e.g.,* Exhibit E (four photographs, filed under seal). In the photographs, AV-23 is fully nude. The defendant can be seen, in one, holding AV-23's arm and, in another, holding AV-23's eyelid open. Through the series of photographs, AV-23 appears to have been positioned by the defendant, including being turned over, having her legs spread open, and having her body manipulated such that her hand is placed on her own breast.

When AV-23 viewed a selection of the photographs, she indicated that she did not consent to have the defendant photograph her while she was nude or unconscious. For the sexual assault of AV-23, the defendant stands charged in Counts Thirteen and Fourteen of the Superseding Indictment with Abusive Sexual Contact, in violation of 18 U.S.C. § 2244(a)(1) and 7(9), and Abusive Sexual Contact, in violation of 18 U.S.C. § 2244(a)(2) and 7(9).

### H. Coercion and Enticement of AV-15

AV-15 met the defendant on the dating application Bumble in the Spring of 2017. She communicated with the defendant for approximately one month prior to meeting him. Their first date was at a restaurant in Bethesda, Maryland. The defendant later reached out to AV-15 to schedule their second date, suggesting three outdoor options. After some communication, the defendant decided the two would go hiking at Scott's Run Nature Preserve in McClean, Virginia on April 9, 2017. The defendant picked AV-15 up from Maryland for the date. When the defendant arrived at her apartment, AV-15 invited him in. The defendant brought a green bottle containing an alcoholic beverage. The two drank some and then left for Scott's Run.

AV-15 reported that the defendant drove them through Washington, D.C., past Sibley Hospital, to get to Scott's Run. When they arrived, the defendant produced a backpack containing bottles of wine and two thermoses. AV-15 recalled the defendant filling both of their thermoses and that they drank the bottles of wine. AV-15 further recalled feeling tipsy by the end of the date. The defendant then drove them back to her apartment, where AV-15 recalled kissing the defendant and having a drink with him (that she made). AV-15 reported that she had no further memories from the night. When she woke up, the defendant was gone. AV-15 noticed that she had multiple bruises on her body, including a prominent, painful bruise on her buttocks. The two went on one additional date before they stopped communicating.

In the defendant's iCloud account, agents found four photographs of AV-15, taken on April 9, 2017. *See, e.g.,* Exhibit F (two photographs, filed under seal). The photographs show AV-15 fully nude, laying on her stomach in bed, appearing unconscious. In one of the photographs, AV-15's dog can be seen sitting next to the bed. On what appears to be a list of sexual partners maintained by the defendant, AV-15's name appears along with the corresponding month and year.

15

AV-15 had no memory of these photographs being taken and did not give the defendant permission to photograph her while she was nude or unconscious. For the defendant's conduct, he is charged in Count Fifteen of the Superseding Indictment with Coercion and Enticement to Travel, in violation of 18 U.S.C. § 2422(a).

## I. Coercion and Enticement of AV-4

AV-4 met the defendant on the dating application Tinder and, after exchanging chat messages, they went on their first date at a restaurant in Virginia near both of their homes. Following their first date, the defendant suggested they meet at a park called Dumbarton Oaks in the Georgetown area of Washington, D.C. Based upon his invitation, AV-4 drove from Virginia to Washington, D.C. on May 14, 2017, where the defendant was waiting for her. AV-4 brought two "juice boxes" of Soju, a Korean liquor, for them to drink while they walked around the park. Later, they walked to a wine bar, where they ordered a glass or two of wine and continued to converse. While at the bar, the defendant expressed that he wanted to continue the date but indicated that his apartment was unavailable. AV-4 then offered her apartment in Virginia as an alternative.

The defendant and AV-4 left the wine bar and traveled separately back to AV-4's apartment in Virginia. The defendant followed AV-4 in his own vehicle and arrived immediately after her. They entered her apartment and took their shoes off by the door. AV-4 opened a bottle of red wine and poured them both a glass. After showing the defendant around, they walked out onto her balcony with their glasses, leaving the bottle of wine inside. At some point, the defendant went to the restroom and returned to the balcony with the open bottle of wine, where he refilled both of their glasses. Shortly thereafter, AV-4 noticed that the flavor of the wine had changed. At the time, AV-4 was enrolled in a wine-tasting class, so the change in flavor piqued her interest. She

wondered if the bottle had oxidized, and she took several more sips to try to determine why the taste had changed. AV-4 became "woozy," her legs gave out from underneath her, and she dropped to her knees while on the balcony. AV-4 last remembered telling the defendant that she was not feeling well and needed to lie down.

AV-4 next remembered awaking in her bed, fully clothed, with the defendant lying next to her. AV-4 stated that the defendant seemed surprised that she woke up. She told him that if he had too much to drink, he could stay on her living room couch. The defendant declined and said he was fine. He then walked to the door, put on his shoes, and left the apartment. AV-4 noticed that he easily put on his shoes and that he did not appear to be intoxicated, while she continued to have trouble standing on her weak legs. AV-4 explained that she felt cloudy, like coming out of anesthesia after a surgery.

In the defendant's iCloud account, and on his iPhone XR, law enforcement recovered photographs and videos depicting AV-4, including two videos and eight photographs, all dated May 14, 2017. Photographs were also found on the defendant's MacBook Air. *See, e.g.,* Exhibit G (two photographs, filed under seal). The data shows that the videos and photographs were taken on May 14, 2017, the day of their date. In the videos and photographs, AV-4 is lying down on her back on a bed. Her eyes are closed, and she appears unconscious. She is depicted in several photographs with her shirt pulled up and her bra pulled down so that both breasts are visible. In one photograph, her bra is on, but her shirt is pulled up, and in one photograph, a male's thumb can be seen holding her eyelid open. In one video, a male hand can be seen briefly pulling down her shorts to reveal her upper pubic region. Large red marks can be seen on both of her knees in several photographs.

AV-4 stated that she had never "blacked-out" from drinking alcohol before that night, and she has not done so since. AV-4 said that, to her knowledge, she and the defendant were not physically intimate. AV-4 stated that she was unaware that the defendant removed her clothing to expose her breasts and she was unaware that the defendant took photographs and videos of her. AV-4 further stated that she did not consent to the defendant manipulating her clothing, video recording her, or taking photographs of her. For the defendant's conduct, he is charged in Count Sixteen of the Superseding Indictment with Coercion and Enticement to Travel, in violation of 18 U.S.C. § 2422(a).

**J.  Coercion and Enticement of AV-17**

AV-17 has known the defendant for a long time. Over the course of their relationship, she visited him in Cancun, Mexico, and he visited her on more than one occasion in Chicago, Illinois. During both visits to Chicago, AV-17 recalled blacking out. During the second visit, she recalled a memory flash where the defendant was in bed with her, hugging her from behind, and she could feel his erect penis. AV-17 asked the defendant if they had sex and he said no.

In November of 2015, the defendant invited AV-17 to travel from Chicago to the D.C. area to visit him. AV-17 arrived in the morning while the defendant was at work. The defendant gave AV-17 detailed instructions on where to go in Washington, D.C., including places to tour and where to eat lunch, as well as how to leave D.C. on the Metro rail to get to his residence in Tysons Corner, Virginia. AV-17 followed the defendant's instructions and left D.C. in the evening to meet him at the metro stop near his apartment.

That evening, the two had a drink at the defendant's apartment, went to dinner, and went to a happy hour. AV-17 recalled having one glass of wine at his apartment and two at the restaurant. When the two returned to the defendant's apartment, AV-17 believes she had another drink before

suddenly blacking out. Her last memory was being in the defendant's kitchen with him holding her up and her head being on his chest. Her next memory was waking up in the defendant's bed, wearing only underwear. When she awoke, she had deep scratches on her back and did not know how she got them. She had no memory of going into the defendant's bedroom or of taking off her clothes. AV-17 reported that she did not believe the defendant would do anything to hurt her. She also stated that the only times she has ever blacked out from drinking alcohol have been when she was with the defendant. In general, alcohol does not make her tired. Finally, AV-17 indicated that in the decades she has known the defendant, she has not seen him intoxicated and that he would just "taste" drinks.

Law enforcement recovered six photographs of AV-17 in the defendant's iCloud account dated November 6, 2017. Photographs were also found on the defendant's MacBook Air. *See, e.g.,* Exhibit H (three photographs, filed under seal). The photographs depict AV-17 nude, with her breasts exposed, and wearing underwear. She is depicted both on the floor and on the bed in the images. In a photograph, the defendant can be seen holding AV-17's eyelid open. In another, the front of AV-17's underwear is pulled down, exposing her pubic area. AV-17 did not consent to the defendant manipulating her clothing or body or taking photographs of her. For the defendant's conduct, he is charged in Count Seventeen of the Superseding Indictment with Coercion and Enticement to Travel, in violation of 18 U.S.C. § 2422(a).

### K.  Transportation of Obscene Materials

In addition to the aforementioned conduct, Counts Eighteen through Twenty-Four charge the defendant with Transportation of Obscene Materials, in violation of Title 18 U.S.C. § 1462(a) and Count Twenty-Five charges Transportation of Obscene Materials, in violation of Title 18 U.S.C. § 1462(a) and 7(9). These counts involve transporting obscene matter depicting of AV-2,

AV-5, AV-6, AV-7, AV-8, AV-9, AV-12 (located in the defendant's iCloud account) and AV-22 (located on two laptops recovered from his Mexico residence). The obscene matter was created between the years of 2006 and 2020. The images comprising the obscene matter are very similar in nature to the incidents described above. Each woman viewed the material or a portion of the material where she was depicted and indicated that she did not consent to her clothes being removed or photographs or videos being taken.

### L.  Additional Evidence

In the defendant's iCloud account, investigators recovered over approximately 300 photographs and videos of 20 women (AV-2 through AV-19 and AV-26 through AV-27), all appearing to be unconscious and nude or partially nude. Additionally, analysis of two laptop computers seized from the defendant's Mexico City residence revealed the presence of images depicting AV-20 through AV-22, all appearing to be unconscious and nude or partially nude. Further, images of AV-23 and AV-24 were recovered from SD cards recovered during a residential search warrant in California (as well as images depicting other victims listed above). And images recovered from a MacBook Air laptop seized from the defendant's belongings in California revealed nude, apparently unconscious photographs of an additional victim, AV-25 (as well as images depicting other victims listed above).

In addition to the photographs and videos, analysis of the defendant's devices revealed the following internet searches in 2010 and 2011: "passed out," "Ambien," "Ambien and alcohol side effects," "Zolpidem Tartrate tablets and 10mg," "Ambien," "dissolve," "Zolpidem and pharmacies," "Ambien and alcohol and pass out," "passed out and carried," and "deep sleep."  The defendant's internet history also included searches for videos of passed out, sleeping, and drunk women.

Finally, some of the photographs and videos recovered from the defendant's iCloud account were located in a space titled, "expunged." Upon information and belief, files appear in an "expunged" space temporarily when a user deletes them from the iCloud account but before they are permanently deleted.

## II.    PROCEDURAL HISTORY

The defendant was charged in a criminal complaint on October 8, 2020, and arrested on October 9, 2020, in San Diego, California, where he was ordered detained by a magistrate judge in the Southern District of California. The defendant was transported in custody to Washington, D.C., arriving on December 22, 2020. A second criminal complaint was filed on December 31, 2020. Several consent motions to exclude time followed, all of which were granted. *See* ECF Nos. 10, 17, 27, 33, 34, 44, 47, 57, 58.

On July 23, 2021, the defendant pled guilty to two counts of Sexual Abuse, in violation of 18 U.S.C. § 2242(2), and one count of Transportation of Obscene Material, in violation of 18 U.S.C. § 1462. *See* ECF No. 69 and July 23, 2021, Minute Entry.

On April 29, 2022, the defendant filed a motion to withdraw his plea, alleging ineffective assistance of the legal team representing him at the time of the plea. *See* ECF No. 119. On October 26, 2022, the Court granted the defendant's motion to withdraw his plea. ECF No. 158.

The parties subsequently filed two status reports in November 2022 and December 2022 agreeing to the exclusion of time as the parties engaged in renewed plea negotiations. *See* ECF Nos. 163, 164. After the breakdown of plea negotiations, the defendant indicated that he would not agree to the exclusion of time under the Speedy Trial Act. *See* January 17, 2023, Minute Order; *see also* ECF No. 165, 166, 167.

On January 19, 2023, a grand jury returned an eleven-count indictment. *See* ECF No. 168.

On February 23, 2023, a grand jury returned a twenty-five-count superseding indictment. *See* ECF No. 184.

On January 20, 2023, the Court issued a minute order calculating the Defendant's 70-day and 90-day deadlines and directing the parties to address whether the Court should, *sua sponte*, designate this case as complex and toll Speedy Trial on its own authority. The government filed a motion for exclusion of time under the Speedy Trial Act, ECF No. 173, and the defendant filed a response, ECF No. 174.  On February 9, 2023, the parties jointly proposed a pretrial schedule that would be consistent with a trial date of September 18, 2023. ECF No. 176. The Court then issued a Memorandum Opinion and Order dated February 16, 2023, finding "that this case is so complex and unusual that the ends of justice can only be served by the tolling of Speedy Trial time until the tentative November 8, 2023, trial date." ECF No. 178.

## III.    APPLICABLE LEGAL SANDARD

As an initial matter, this Court reviews the magistrate's detention decision *de novo*.  *See, e.g., United States v. Washington*, 907 F. Supp. 476, 480 (D.D.C. 1995) (citing, *inter alia*, *United States v. Delker*, 757 F.2d 1390 (3d Cir. 1985)). Here, the defendant is a danger to the community and a flight risk, and therefore, the government respectfully requests that this Court find that he should be held pending trial in this matter.

The federal bail statute authorizes a defendant's pretrial detention when no "condition or combination of conditions will reasonably assure the appearance of the person…and the safety of any other person and the community."  18 U.S.C. § 3142(e).  The United States requests detention pursuant to 18 U.S.C. § 3142(f)(1)(A) because Aggravated Sexual Abuse, Sexual Abuse, Abusive Sexual Contact, and Coercion and Enticement are crimes of violence pursuant to 18 U.S.C. § 3156(a)(c); pursuant to § 3142(f)(1)(B) because Aggravated Sexual Abuse and Sexual Abuse carry

a maximum sentence of life imprisonment; and pursuant to § 3142(f)(2) because the defendant is a serious flight risk and because there is serious risk that he will obstruct or attempt to obstruct justice.

The government must establish dangerousness by clear and convincing evidence. *United States v. Peralta*, 849 F.2d 625, 626 (D.C. Cir. 1988). The Government is permitted to proceed by proffer to establish facts relevant to the detention determination.  *See United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996) (joining other circuits and finding both the government and the defendant may proceed in a detention hearing by proffer or hearsay). Moreover, the Government is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use."  *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986); *United States v. Williams*, 798 F. Supp. 34, 36 (D.D.C. 1992).

There are four factors under Section 3142(g) that the Court should consider and weigh in determining whether to detain the defendant pending trial: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. § 3142(g).

## IV.   ARGUMENT

The defendant repeatedly assaulted unconscious women over the course of several years. Going a step further, he recorded those assaults. The nature and circumstances of the offenses and the weight of the evidence in this case weigh heavily in favor of detention. Moreover, the defendant's characteristics and history do not mitigate the harm he poses to the community. He used his government position to lure his victims, and for years, he concealed his criminal conduct from his employer, friends, and family. Additionally, the Court has no assurances that the

defendant will appear in court. He is well-traveled and has few ties to the District of Columbia. And finally, the defendant has demonstrated a willingness to obstruct justice, going as far as attempting to delete evidence. There is little indication that the defendant will follow court orders. A review of the relevant detention factors confirms that there is no condition, nor combination of conditions, that would reasonably ensure the safety of the community or the defendant's presence in court. The defendant should therefore remain detained.

### A. Nature and Circumstances of the Charged Offense

The first factor, the nature and circumstances of the offense charged, clearly weighs in favor of detention. The defendant lured women to his apartment, rendered them unconscious, and then took advantage of them when they were in a vulnerable state. He photographed their nude bodies, often focusing on their genitals. He grabbed their breasts. He pressed his erect penis against them. He posed the unconscious women such that they touched their own breast and genitalia. He spread their legs. He opened their eyelids and stuck his fingers in their mouths. And, incredibly, he documented these atrocities. He recorded himself abusing women, sometimes for *multiple hours* at a time – and he has been recording his abusive conduct for over a decade.

The defendant's motion asserts there is "absolutely no evidence that" the defendant "administered intoxicants," ECF No. 179 at 9, and "none of these photographs depict [the defendant] engaging in a sexual act," ECF No 179 at 7, as if somehow these statements minimize or excuse the fact that the defendant recorded and photographed himself sexually assaulting unconscious women,  as if the fact that he did not record the sex act itself somehow absolves him. To the contrary, these photographs and videos are conclusive evidence of the defendant's absolute disregard for others and the continuing danger he poses to the public. The defendant did this over and over again, to victim after victim. Not only is the defendant's longstanding behavior

manipulative and predatory, but the sheer number of victims is indicative of the brazen and serious nature of the offenses committed. The defendant acted dangerously and deliberately, and given these facts and circumstances, the defendant should remain detained.

### B.  The Weight of the Evidence Against the Defendant

The weight of the evidence is overwhelming and favors detention. A grand jury has returned a twenty-five-count indictment. The evidence consists not only of witness statements, but hundreds of images recovered from several of the defendant's digital devices and the online storage platforms he used.[9] The images capture the defendant digitally penetrating AV-5's and AV-7's mouths as they lay unconscious. They capture the defendant victimizing AV-5, AV-6, AV-9, and AV-23, touching or causing them to touch their own breasts. They capture sexual assault. The absolute unresponsiveness of the victims as their eyelids are opened, their bodies are arranged in various positions, or their limbs are dropped to the bed makes the fact that the defendant drugged these women abundantly clear. This is not surprising. A forensic review of the defendant's devices and various media platforms revealed search artifacts indicating a longstanding sexual interest in drugged and passed out women and revealed that the defendant was researching the effect of certain sedative drugs. The weight of the evidence is overwhelming, and thus, this factor clearly weighs in favor of detention as well.

### C.  The History and Characteristics of the Defendant

From August 2018 until June 1, 2020, the defendant worked for a U.S. Government agency and lived in U.S. embassy-leased housing in Mexico City, Mexico. There, he used his government housing to engage in criminal sexual conduct, including sexual abuse, abusive sexual contact, and the creation and transportation of obscene materials. He used his government position to gain

---

[9] In order to truly evaluate the nature and circumstances of this offense, the government respectfully directs the Court to Exhibits A though H, failed under seal.

victims' trust. He used wine and tequila tastings to disguise his malicious intent. And then, when they could no longer voice their lack of consent, he undressed, photographed, recorded, and sexual assaulted these unsuspecting women. The defendant has engaged in this criminal conduct for *years*. The images of AV-22, the victim named in Count Twenty-Five of the superseding indictment, were taken in 2006. The most recent images recovered are from 2020. And rather than being ashamed of his ongoing criminal conduct or showing any remorse or empathy for the dozens of women he victimized, the defendant kept and treasured these images, transporting images of vulnerable and abused women from country to country, device to device, all while playing the role of a law-abiding citizen.

The defendant's character is further apparent through witness statements indicating that he did not appear himself to be intoxicated. He knew what he was doing. This was no accident or misunderstanding. The defendant cannot blame his alcohol consumption. The defendant was calculated and measured. By drugging these women, he intentionally took away their ability to report the sexual assaults. He planned the victimization of these women. He scheduled these encounters and then bragged about "successful" dates to Witness-1. Even with no criminal convictions, the facts of this case leave no doubt that the Court should be concerned about the defendant's violent behavior.

As to familial and community ties, the defendant suggests that he can stay with his parents in California. But in an October 2020 FBI interview, the defendant's father indicated that he does not really know or have a relationship with his son. The defendant's mother agreed, indicating that the defendant does not maintain regular contact with his family. Notably, several years ago, the defendant took leave without pay, purportedly to care for his ailing mother. In reality, he visited approximately 15 different countries on leisure travel during that time. As to whether he is

forthcoming with his family, it appears that, at the time of the October 2020 interview, the defendant had not told his parents that he resigned from his U.S. government position. Instead, he told them he was awaiting his next assignment. When asked about his prior relationships, his parents had no idea the defendant had been married and divorced. And, of course, his family appears to have had no idea that the defendant was violating women. His "apparent ability to engage in subterfuge by concealing his illegal activity from family members" should concern this Court. *United States v. Glover*, No. 21-MJ-609, ECF No. 23 at 6, Order (D.D.C. Nov. 24, 2021) (denying release to a third-party custodian for a defendant with no criminal history charged by information with possession of child exploitative materials). The defendant's history and characteristics simply do not weigh in favor of release. [10]

### D.  The Nature and Seriousness of the Danger to Any Person or the Community

The nature and seriousness of the danger to any person or the community posed by the defendant's release weighs in favor of detention. Violence, alone, is not necessarily dispositive of whether a defendant should be detained. As the D.C. Circuit has stated, "defendants have been detained even where the charged offense did not involve violence, based on … being a repeat offender, *see* § 3142(f)(1)(D), a serious risk of obstruction of justice, *see* § 3142(f)(2)(B), or a serious risk of threats to prospective witnesses or jurors, *id*." *United States v. Hale-Cusanelli*, 3 F.4th 449, 456 (D.C. Cir. 2021).

Nor is the possibility of a future threat, alone, determinative. As the D.C. Circuit further explained in *Hale-Cusanelli*, "[w]e did not hold in *Munchel* that only those persons who

---

[10] The defendant references his "spotless" record in D.C. Jail, including alleged "assistance" he provided. ECF No. 179 at 11. As to the first example, at best, the defendant tried to provide assistance, and the government declined. At worst, the defendant manipulated another prisoner into engaging in bad conduct for the sole purpose of later informing on that prisoner. Therefore, ultimately, this incident neither offers the Court assurances about the defendant's personal characteristics, nor is it relevant to dangerousness or flight risk. The Court can quickly dispose of the second example of cooperation proffered by defense for many of the same reasons. Ultimately, the defendant did not voluntarily cease this conduct. He got caught. And it is his detention that ensures the safety of the community.

participated in violence on January 6 could properly be considered as posing a future danger to the community justifying pretrial detention …[t]o the contrary, we explained in *Munchel* that a person could be deemed a danger to the community sufficient to justify detention even without posing a threat of committing violence in the future." *Hale-Cusanelli*, 3 F.4th at 456 (citing *United States v. Munchel*, 991 F.3d 1273, 1283 (D.C. Cir. 2021), *judgment entered,* 844 F. App'x 373 (D.C. Cir. 2021)).

Yet here, the government has proffered violence, repeated offending, and obstruction. The defendant's actions were surely violent. And that violence is probative of future dangerousness. *See Munchel*, 991 F.3d at 1283-84 (requiring individualized assessment but looking to violent conduct on January 6 as probative of future dangerousness). The defendant stripped and photographed unconscious women. He forcefully grabbed their breasts and carelessly lifted and dropped their arms. He sexually assaulted them. Moreover, the government's evidence establishes that he did this to nearly thirty women, fourteen of which have been named in the government's superseding indictment. He stands before this Court as a repeat offender.

When the Government proves by clear and convincing evidence that an arrestee presents an identified and articulable threat to an individual or the community … a court may disable the arrestee from executing that threat. *Munchel*, 991 F.3d at 1282 (citing *United States v. Salerno*, 481 U.S. 739, 751, 107 S. Ct. 2095, 2103, 95 L. Ed. 2d 697 (1987)). The threat "must be clearly identified," *Munchel*, 991 F.3d at 1282–83, and here, that threat is clear. The defendant was victimizing women when they were most vulnerable. And when faced with the consequences of his actions, the defendant proceeded to delete evidence. The defendant's actions therefore also provide a basis for this Court to make a forward-looking determination about the risk of obstruction

as a basis for detention. *Hale-Cusanelli*, 3 F.4th at 456. The defendant was then, and is now, a danger of the community, and he should continue to be held.[11]

### E.  Risk of Flight

The defendant also poses a significant risk of flight. The defendant is extremely comfortable living, working, and traveling overseas. Indeed, he has lived and worked in multiple foreign countries across the globe. He speaks Spanish and Mandarin Chinese. He is currently unemployed and lacks any ties to the District of Columbia. The defendant is now aware that the government's investigation revealed the full scope and duration of his conduct, far beyond its initial investigation into the sexual assault of a single victim. He now knows that he faces life in prison. Each of these factors make it highly likely that the defendant will attempt to flee if released, and therefore this defendant should remain detained pending trial.

### F.  Proposed Release Conditions

The defendant indicates that the threat he poses to the community will be "entirely mitigated by strict conditions of home incarceration" ECF No. 179 at 11.[12] He argues that while

---

[11] The defendant claims the length of his pretrial detention is "entirely attributable to government tactics and ineffective assistance of counsel." ECF No. 179 at 12. As to the delay in this case, there have been several consent motions to exclude time. *See* ECF Nos. 10, 17, 27, 33, 34, 44, 47, 57, 58. Additionally, much of the time between the defendant's initial detention and the July 2021 plea hearing was spent engaged in discovery review and plea negotiations. *See* ECF 147 at 18-21, ECF 139 at 5-6. After the plea, the government proposed a sentencing schedule to which the defendant, through counsel, generally agreed. *See* ECF No. 73 at 1. Regarding the government's purported "silence as to the seizure issues, ECF 179 at 13, the government disclosed and specifically highlighted these materials on at least three separate occasions. *See* ECF 139-2 through ECF 139-4.

[12] The defendant models his release conditions off *U.S. v. Hanson*, 613 F.Supp.2d 85 (D.D.C. 2009). That case is easily distinguishable from the facts and circumstances of this case. In *Hanson*, the defendant had been indicted on the following two counts arising out of her unlawful export of unmanned aerial vehicle components to the People's Republic of China: (1) one count alleging violations of the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701–1706, and the Export Administration Regulations, 15 C.F.R. §§ 730–774; and (2) one count alleging a conspiracy to commit an IEEPA offense, in violation of 18 U.S.C. § 371. *Id*. at 87. The defendant, a naturalized citizen with familial ties to China, faced a guideline sentencing range of between 63 and 78 months in prison. *Id*. at 87. The Court's decision focused on whether there were conditions that would assure the defendant would appear in court when required to do so. *Id*. at 90. Neither violent conduct, nor danger to the community, appeared to factor into the court's decision. The defendant in *Hanson* was not drugging and sexually assaulting women.

on home incarceration, he will not be able to leave the house, arrange dates, or meet up with women. ECF No.179 at 11. These arguments fail.

First, the defendant proposes that this Court allow him to live in close proximity to the border of the United States and Mexico. This suggestion is problematic for several reasons, including the fact that the defendant speaks Spanish and could cross the border with relative ease into a country where he lived for approximately two years. Indeed, the defendant is a savvy traveler with extensive experience living abroad. Furthermore, despite the list of conditions proposed by the defendant, there are serious doubts as to whether these conditions will be enforced by defendant's parents. *See Glover*, No. 21-MJ-609, ECF No. 23 at 11. More to the point, there is no indication that the defendant's parents are familiar with the mobile applications and technologies that the defendant has used to victimize women. *Id*. In comparison, the defendant is a resourceful offender. He used his command of mobile applications and devices to commit the charged offenses, conduct internet research, and delete images. The proposed conditions do not offer any assurances that he will not find a way to, or a corner of his home allowing him the privacy to, further victimize women. *Glover*, No. 21-MJ-609, ECF No. 23 at 11.

## **CONCLUSION**

The evidence in this case establishes by clear and convincing evidence that the defendant is a danger to the community[13] and a flight risk. There is no condition or combination of conditions that would ensure the safety of the community if the defendant were released.

Respectfully Submitted,

| | |
|---|---|
| MATTHEW M. GRAVES | KENNETH A. POLITE, JR. |
| UNITED STATES ATTORNEY | ASSISTANT ATTORNEY GENERAL |
| District of Columbia | U.S. Department of Justice |
| | Criminal Division |
| | |
| _____/s/_____ | _____/s/_____ |
| Meredith E. Mayer-Dempsey | Angela N. Buckner |
| NY Bar No. 5213202 | DC Bar No. 1022880 |
| Assistant United States Attorney | Trial Attorney |
| United States Attorney's Office | U.S. Dept. of Justice, Criminal Division |
| for the District of Columbia | Human Rights and Special Prosecutions |
| 601 D Street, Northwest | 1301 New York Avenue, Northwest |
| Washington, D.C. 20530 | Washington, D.C. 20530 |
| (202) 252-7259 | (202) 616-0238 |
| Meredith.Mayer-Dempsey@usdoj.gov | Angela.Buckner.2@usdoj.gov |

---

[13] The government has consulted several of the victims in this case; all indicated that they fear for their safety and oppose release. Should the Court set a hearing on this matter, some of those victims may wish to be heard.