**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| v. | : | Criminal No. 1:21-cr-00380-CKK |
| | : | |
| BRIAN JEFFERY RAYMOND, | : | |
| | : | |
| | : | |
| Defendant. | : | |

**<u>DEFENDANT'S MOTION TO SUPPRESS EVIDENCE</u>**

Defendant Brian Jeffery Raymond, by and through his undersigned counsel, respectfully submits this Motion to Suppress all evidence, physical and testimonial, obtained as the fruit of the illegal seizures of his person and his cell phones, which occurred on June 6, 2020. In further support of this Motion, Mr. Raymond states as follows:

**I.    INTRODUCTION.**

The government obtained a search warrant for Mr. Raymond's phones that authorized compelled biometric access, but the agents' operations plan for executing the warrant shows they were doomed to fail because they had no viable plan for maintaining access after using biometrics to open the phones. Unfortunately, during the seizure the agents made matters worse by suggesting and allowing Mr. Raymond to turn his phones off, disabling biometric features, which was their only hope of gaining compelled initial access to the phones. They therefore needed PIN codes and, eventually, settings passwords, to get and maintain access to the phones. However, Mr. Raymond asked for an attorney and refused to provide such codes and passwords. Thwarted by Mr. Raymond's rightful refusal to provide codes, the agents, acting on the advice of prosecutors, unlawfully and unreasonably seized Mr. Raymond and his phones two additional times until they achieved full access.

Mr. Raymond files this Motion to suppress the evidence gathered by the agents from his cell phones as well as all evidence that flowed from that illegally seized evidence on two grounds. First, the government conducted two unreasonable, warrantless seizures of Mr. Raymond and his phones after the sole seizure authorized by the warrant. Black letter law (*e.g.*, Rule 41(e)(2)(B)) provides that once agents have seized electronic storage devices or electronically stored information ("ESI") pursuant to a warrant, the warrant is fully executed and terminates. Thus, the second and third seizures were fundamental constitutional violations. Indeed, as the Court has previously concluded, these are "viable challenges related to the manner in which the warrant was executed and [Mr. Raymond's] cell phones were seized." Memorandum Opinion, ECF 158, at 27. Second, the government flagrantly disregarded Mr. Raymond's consistent refusal to provide PIN codes and passwords for his phones, in violation of Mr. Raymond's 5th Amendment rights. This further fundamental violation led directly to the discovery of nearly all of the government's evidence in this case.

Accordingly, in light of the fundamental constitutional violations present, and the inapplicability of any potential exception, the Court should suppress the evidence collected from Mr. Raymond's phones and all evidentiary fruit that flowed from such evidence.

## II.    FACTUAL BACKGROUND.

As of June 2020, Mr. Raymond had two cell phones, a personal iPhone XR, and a work iPhone 6. On June 2, 2020, Special Agent Mikel Gajkowski ("Gajkowski") of the U.S. Department of State conducted a voluntary interview of Mr. Raymond in which she asked Mr. Raymond about his phones. *See* FBI Verbatim Transcription of Interview on June 2, 2020, ECF No. 151, Ex. C, at 10-18. During the interview, Gajkowski asked Mr. Raymond to access both of his cell phones, which he did using biometrics. *Id.* Gajkowski clearly observed this, later stating: "During a

voluntary interview conducted on June 2, 2020, BRIAN RAYMOND identified the devices as his own and accessed both Devices in my presence. Based on these facts and my training and experience, it is likely that BRIAN RAYMOND is the user of both Devices and thus that his biometric features would unlock the Devices via Touch ID or Face ID." Sealed Affidavit in support of an Application for a Search Warrant by Special Agent Mikel Gajkowski ("Gajkowski Affidavit"), ECF No. 151, Ex. A, at 5.

On June 5, 2020, Gajkowski obtained a search warrant from United States Magistrate Judge Ivan D. Davis of the United States District Court for the Eastern District of Virginia to allow agents to seize and search Mr. Raymond's cell phones.[1] *See* Application for Warrant by Telephone or Other Reliable Electronic means, attached hereto as Exhibit A.  Judge Davis authorized the seizure and search of "two cellular telephones in the possession of Brian Raymond, currently located on his person or in his hotel room," including Mr. Raymond's work cell phone (Device 1) and personal cell phone (Device 2). *Id*. The warrant further authorized the use of compelled biometrics to unlock the devices, permitting the agents to press down Mr. Raymond's fingerprints on the Touch ID sensor to unlock the devices or to hold the phones up to his face to unlock the devices. *Id*., Attachment B. In order to obtain the devices from Mr. Raymond, the agents planned to "ruse" Mr. Raymond into meeting with them "under the pretext of a brief follow up interview whereupon the devices would be seized in a public setting." Gajkowski Affidavit at 20.

In her Affidavit in support of the cell phone seizure warrant, Gajkowski affirmed that she knew significant information concerning biometric and PIN code access to Apple cell phones. *Id*. at 3-5. This included the following:

---

[1]      It appears the version of the warrant packet submitted as sealed Exhibit A to Mr. Raymond's Motion to Withdraw Guilty Plea (ECF No. 119) was incomplete and did not include the actual warrant, and therefore we have attached it to this Motion to Suppress as Exhibit A.

> **In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode or password must be used instead.** These circumstances include: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours <u>and</u> the passcode or password has not been entered in the last 6 days. Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time. **Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted**; (2) the device has received a remote lock command; and (3) five unsuccessful attempts to unlock the device via Touch ID are made.

*Id.* at 4. Thus, according to her sworn statement, Gajkowski knew, prior to executing the warrant, that biometric features would not work to open the phones if they were turned off, "and a passcode or password must be used instead." *Id.*

Further on June 5, 2020, government counsel, Ms. Perry, provided Gajkowski with advice concerning compelled biometrics and cell phone PIN codes. *See* Email from Jamie Perry to Mikel Gajkowski dated June 5, 2020, ECF No. 139, Ex. 1. Ms. Perry informed Gajkowski:

> We have to be careful not to compel any sort of testimonial information. Compelling him to place his fingerprint on the touch ID sensor, for example, is not testimonial – the warrant compels him to do so…. Compelling him to give his passcode is testimonial. You can ask him if he's willing to voluntarily provide his passcode. You should not state or otherwise imply that the warrant requires him to provide such information…. I'd be very cautions with this if, for example, you have to briefly take him into custody to retrieve the phones – at that point, any voluntariness is likely overwhelmed by the restraint.

*Id.*

The government has also asserted that on or around that same date, "when planning for the warrant execution, Agent Gajkowski contacted DSS's Computer Investigations and Forensics Division ('CIF') to request that an analyst be present for the seizure, in the event of any technical issues." Government's Opposition to Defendants Motion to Withdraw Guilty Plea, ECF No. 147, at 32. Allegedly, CIF informed Gajkowski that no one was available "due to restricted staffing

and scheduling requirements during the COVID-19 pandemic." *Id.* at 32-33. CIF then sent someone to meet with Gajkowski in advance of the seizure "to work through specific guidance on iPhone seizures." *Id.* at p. 33. As the government informed counsel via discovery letter dated August 15, 2022, "[i]n preparation for executing the Warrant, SA Gajkowski sought CIF support. SA Gajkowski believes she spoke with [SA] Brian Christin…. However, she may have also spoken with [SA] Ryan Stitzer." *See* Letter from Meredith Mayer-Dempsey and Angela Buckner, dated March 2, 2023, attached hereto as Exhibit B.

Last Thursday, March 2, 2023, *the day before this Motion was originally due*, the government informed the defense that the above information concerning Gajkowski's warrant preparation, which it had previously provided to the defense and had argued before this Court, is false.[2] *Id.* The current prosecution team now claims that it recently spoke with Christin and Stitzer, and "neither remembers speaking with SA Gajkowski in the day(s) before the June 6, 2020, execution of the warrant. Both believe that SA Gajkowski spoke to an evidence technician, Ms. Stedman, who would not have been qualified to advise SA Gajkowski." *Id.*

According to the government's own tale, Gajkowski was poorly advised by CIF, who told Gajkowski that once the devices were unlocked, she could simply navigate to settings to change the passcode or disable the automatic lock function, put the phones in airplane mode, and then place them in a faraday bag until agents were ready for further inspection. ECF No. 147, at 33. *See also* Enforcement Operation Plan, attached as part of Exhibit B. *But this is not possible to do without entering at least the PIN code if not also an Apple password.* Even after gaining biometric access to an iPhone, a person cannot simply change biometric or passcode settings without entering

---

[2]         The government's willingness to falsify critical facts to the defense and the Court in this case is astonishing. *See, e.g.*, ECF Nos. 119, 147, 151, 153. The defense is considering all appropriate remedies and sanctions in connection with the government's conduct in this case, and will file motions or take such other actions as appropriate at a later time.

a code and/or password. In addition, neither Perry nor CIF instructed Gajkowski regarding what to do if biometrics were disabled and Mr. Raymond refused to provide his PIN codes. Apparently Gajkowski did not ask about this scenario even though the Gajkowski Affidavit contemplated disabled biometrics due to a phone being turned off, and Perry's email contemplated Mr. Raymond's 5th Amendment right to refuse to provide PIN codes. Indeed, the Enforcement Operation Plan disclosed by the government as part of its March 2, 2023 letter to the defense (Ex. B to this Motion) shows that Gajkowski had no viable plan for opening and maintaining access to the phones.[3] Despite this gap, Gajkowski set her "ruse" warrant execution plan, as described below, into motion on Saturday June 6, 2020.

### A. FIRST SEIZURE.[4]

The day after the warrant was issued by Judge Davis, on June 6, 2020 Gajkowski and Special Agent Ted Nelson ("Nelson") met with Mr. Raymond at a Jimmy Johns near his hotel in Virginia. At the beginning of the interview agent Nelson stated he was shutting his phone down and told Mr. Raymond to "turn [your phones] on vibrate if you can." Audio Transcription, Interview of Brian Raymond, June 6, 2020, ECF No. 119, Ex. E, at 2. Mr. Raymond mentioned to the agents that he was turning his phones off. *See id.* at 3. Later on, following a lengthy conversation, the agents asked Mr. Raymond if he had his two phones, and Mr. Raymond

---

[3]     The Enforcement Operation Plan (included as part of Ex. B to this Motion) states that the agents planned to present the warrant and ask Mr. Raymond to open the devices. The Plan further stated that the agents "can compel Raymond to unlock the device if phone is secured by" biometrics, and upon doing so, they "should change the lock/password settings while the phone is unlocked," and then "[d]ocument/log the new code and power off the phone." Again, *this is simply impossible to do without PIN codes and passwords, and the agents' plan was thus doomed to fail.* In the "Alternate scenarios" section, the Plan did not contemplate a scenario where the phones' settings prevented agents from simply changing "the lock/password settings" even after they had gained access to the phones, nor a scenario where the phones had been powered down or otherwise could not be opened with biometrics.

[4]     Mr. Raymond follows the Court in labeling the seizures of Mr. Raymond's phones as first, second, and third seizure. *See* Memorandum Opinion Regarding Defendant's Motion to Withdraw Guilty Plea, ECF No. 158.

confirmed that he did. *Id.* at 177-78. Agent Nelson asked if he could see the phones, and then he stated, "To prove that just, that these are the phones, can you just turn them on for me?" *Id.* Mr. Raymond apparently complied by powering up the phones. *Id.* Gajkowski then asked, "How do you secure these phones?  Like, how – like, are they locked?" *Id.* at 184. Mr. Raymond informed the agents that his phones were "locked with a PIN." *Id.* This was true given the phones had been powered down – biometric features cannot be used to open a phone after it has been powered down or restarted, and instead the PIN code must be used, as stated in the Gajkowski Affidavit. ECF No. 151, Ex. A, at 4.

Nelson told Mr. Raymond that the agents had a search warrant for both phones and that they were going to take the phones from Mr. Raymond. ECF No. 119, Ex. E, at 184. In response, Mr. Raymond said, "I can't, I can't let you do that without a lawyer present." *Id.* This was the first of many instances in which Mr. Raymond indicated he did not want to continue the interaction without counsel. In response, Nelson explained the warrant and stated that he was "not asking." *Id.* at 184-185. At that time, for the second time, Mr. Raymond stated that he "can't authorize [the taking of the phones] without a lawyer." *Id.* at 185. Agent Nelson told Mr. Raymond that nothing good was "going to come out of you resisting this." *Id.*

After Mr. Raymond expressed concern about not having his contacts on hand if he gave away the phone, the agents discussed giving Mr. Raymond some of the contact information stored in his phones, but that first he would need to provide the agents with his PIN code. *Id.* at 189. This is the interaction as it unfolded when Mr. Raymond unequivocally invoked his 5th Amendment right to silence:

> MR. NELSON: Listen.
>
> MR. RAYMOND: I'm just at a loss here.
>
> MS. GAJKOWSKI: Mm-hmm.

> MR. NELSON: I understand.  Let us get you the contacts you need. **We need your PIN numbers for these phones so we can access them.  Okay?**
>
> MR. RAYMOND: **I, I have to consult a lawyer, honestly.** I can't – it's just something I have to do.
>
> MS GAJKOWSKI: Okay.
>
> MR. RAYMOND: You know, I don't know what my rights are in this situation.
>
> MS. GAJKOWSKI: (Inaudible.)
>
> MR. NELSON: You're right, but we are seizing the phones.  **What we need to do, though, is we need to unlock them and at least put them in airplane mode.  Okay?**
>
> MR. RAYMOND: **I can't do that until I talk with my lawyer.** I just don't understand what's going on here right now.
>
> MS. GAJKOWSKI: So -- so, what we are going to do, because I, I just want to be clear, **so you're not willing to voluntarily give us your PIN.  Correct?**
>
> MR. RAYMOND: **No, not until I consult with a lawyer.**
>
> MS. GAJKOWSKI: Ok, understood.

*Id.* at 189-190.

Though the agents acknowledged that they could not "coerce" him into giving them his PIN codes, they told Mr. Raymond that "[t]he truth is, one way or another, we're getting into the phones." *Id.* at 191. Unsatisfied with Mr. Raymond's response and his repeated invocation of his 5th Amendment rights, the agents persisted in ever-changing techniques to try to get Mr. Raymond to open the phones. Nelson again stated, "You need numbers, e-mails, whatever, let us know. We'll do it for you, man.  It's not a trick."  *Id.* at 198.  Later, Nelson put it this way: "Listen, dude, I get it.  I really get it. We'll give you any phone numbers you want out of there, any contact information we get out of there. We're not trying to make your life difficult. All right? But it's a give and take." *Id.* at 199. Later, Gajkowski again raised the concept of putting one of the phones

in airplane mode, stating, "Here's this one – can you tell me how to turn this on airplane mode?" *Id.* at 203. Mr. Raymond replied, "I'd have to, I'd have to unlock it, honestly…. I can't just –" *Id.* Gajkowski feigned ignorance, stating, "Okay. So it doesn't go into airplane mode without unlocking it. Is that correct?" *Id.* Mr. Raymond stated that he did not know the answer to that question. *Id.* After Mr. Raymond repeatedly invoked his right to silence by declining to give his codes without first talking to a lawyer, the agents finally concluded the seizure, placed Mr. Raymond's phones in evidence bags, and provided him with property receipts. After handing Mr. Raymond the property receipts, Gajkowski announced, "The time is 12:26, Saturday, June 6th, and this concludes our interview and search and seizure warrant execution." *Id.* at 220.

At no point during this interaction did the agents attempt to unlock the phones in the manner authorized by the warrant – through use of Mr. Raymond's biometrics. In reality, it was actually impossible for the agents to access Mr. Raymond's phones through biometrics at that time because the phones had previously been turned off, and an iPhone can only be accessed on reboot by entering the PIN code. But of course, as noted above, Gajkowski had already sworn in her affidavit that she knew this fact about iPhones. Thus, given the manner of execution permitted by the warrant, and the agents' failure to contemplate such issues, the agents only had one option to get into Mr. Raymond's phones, which was to illegally, relentlessly pressure him into giving them the PIN codes and conduct additional seizures in violation of the constitution and Rule 41 procedures.

### B.  SECOND SEIZURE.

Shortly after interviewing Mr. Raymond and completing the execution of the phone warrant, the agents called Department of Justice attorney Jamie Perry ("Perry") to notify her that Mr. Raymond had declined to provide his PIN code to unlock the devices. *See* Memorandum For Record, dated June 6, 2020, ECF No. 119, Ex. D, at 1. According to the government, Perry then took a moment to call her supervisor, Pragna Soni ("Soni"), while the agents ate lunch. ECF No.

147, at 35. The government claims that after discussion between Perry and Soni, Perry advised

that "because the agents were still in the immediate area and because little time (less than an hour,

at that point) had elapsed, they should compel the defendant to open the phones using biometric

procedures." *Id.* at 36. The agents then paused to "discuss their plan and to review the warrant

procedures. They also requested the presence of a local uniformed police officer." *Id.*

      Thus, roughly two hours after first seizing Mr. Raymond's phones, the agents went to his

hotel to reengage him.[5] Nelson, Gajkowski, and a uniformed Herndon police officer stationed

themselves around the lobby, along with two more agents outside. While in position, one of the

agents asked the front desk to summon Mr. Raymond from his room. When Mr. Raymond came

downstairs, Gajkowski showed a portion of the previously executed search warrant to Mr.

Raymond and explained to him that "law enforcement personnel [are] authorized to access fingers,

including thumb onto the device, and further to hold the phone up to [his] face." Gajkowski handed

Mr. Raymond one of the phones, and he clearly held it and typed on its face in order to open it

using a PIN code. Agent Gajkowski asked, "Did you want to give me your code?" Mr. Raymond

replied, "No, but it's open, so -- ." The agents discussed changing the passcodes, and handed Mr.

Raymond the second phone to unlock, which he did, again by typing a code into the phone.

Gajkowski attempted to change the settings/passcode on one of the phones, but noticed it required

an additional code or password to Mr. Raymond's Apple account. As a result, Gajkowski said to

Mr. Raymond: "So, it's up to you, if you want to enter the password, you don't have to." In

response, Mr. Raymond questioned: "I don't understand, am I compelled to?" To which Gajkowski

stated: "You are not compelled to give us the code, only the thumbprint. I want to be clear on that."

---

[5]      The information concerning the interactions with Mr. Raymond at the hotel comes from ECF. No. 119,
Exhibits D and F, and the Herndon officer's body camera footage, provided by the government as exhibits to ECF No.
147.

Mr. Raymond replied, "I'd rather, just for privacy – I'd rather not." The agents told Mr. Raymond that was all they needed and thanked him, and he left to go back to his hotel room.

### C.  THIRD SEIZURE.

Although Mr. Raymond had already opened both phones for the agents, he had refused to provide the code to change the settings to grant permanent access. Even so, the agents set the phones aside and failed to keep them open, and they locked once more. At that moment, the agents had no independent mechanism to open the phones given they did not have Mr. Raymond's PIN codes, which he had repeatedly stated he would not provide. As a result, the agents called Perry <u>again</u>, who suggested that they again seize Mr. Raymond, now *for a third time*, to try to get into the phones.[6] The agents asked Perry if they could come back another day to attempt to have Mr. Raymond open the phones. Gajkowski repeated Perry's advice for the others to hear: "No, once you have returned a warrant – you can't."  This statement, as well as her initial advice that the agents could re-execute the terminated warrant in the first place, shows that Perry believed that a warrant can, and should, be executed as many times as she would like until it has been "returned." Thus, on Perry's advice, nearly an hour later, and roughly three hours after the first seizure, the agents again had Mr. Raymond called down to the lobby for a third attempt to re-execute their already dead warrant. If this is permissible (and as argued below, it is not), the potential for police abuse of warrants would be extraordinary.

In preparation for Mr. Raymond, the agents and uniformed officer resumed their posts around the lobby and guarded its doors. Once Mr. Raymond appeared, the agents made it

---

[6]      It appears agents also urgently reached out to CIF members at various times throughout their second and third seizures.  *See* Exhibit B attached hereto. For example, Nelson wrote to CIF agent Christin, "On a SW and need assistance with a phone.  Can you call me."  Gajkowski emailed Karen Stedman (whom other CIF members later indicated was not qualified to assist), and said "Hi, Karen – its Mikel from OSI [Office of Special Investigations]. Can you please call me ASAP?" Gajkowski also later emailed agent Stitzer, stating, "Good afternoon, Sir – please call me ASAP regarding an urgent OSI matter."

abundantly clear that they were not going to go away without getting into Mr. Raymond's phones and resetting the PIN codes. Agent Nelson informed Mr. Raymond that if he did not give them his codes they "would continue to struggle with this over the weekend," indicating both that they desperately needed access, and that they were prepared to relentlessly pursue it. Audio Transcription, Ted Nelson Note, dated June 6, 2020, ECF No. 119, Ex. F, at 2.  Additionally, Gajkowski indicated that they could only get into the phones with Mr. Raymond's face or fingerprint, but they wanted to "get it so that" they could access the phones freely.

After having spent much of the day with and around Mr. Raymond, the agents *continued* to put unrelenting pressure on Mr. Raymond to give them his PIN codes and his Apple account password, so that they could set their own code to gain free, permanent access to the phones. They ignored Mr. Raymond's clear and repeated statements that he wanted to consult an attorney and would not give them his codes and passwords, thereby ignoring the fact that he invoked his right to silence and continuing to pressure him. More so, based upon information and belief, the agents never told Mr. Raymond during this third encounter that he was not under arrest nor that he was free to leave.

In fact, counting from the point when Mr. Raymond first said he wanted time to speak with a lawyer, through this third and final interaction when they finally overcame Mr. Raymond's will hours later, the agents directly asked or suggested that Mr. Raymond give them his passcodes and passwords *at least 27 times*. *See* Chart of Agent Attempts to Obtain PIN Codes, ECF No. 119, Ex. G. With their insistence, Mr. Raymond finally relented and entered his PIN code and Apple password so that the agents could reset the codes and establish permanent access to the phones. Notably, although the agents blurted out that this was voluntary, they did not use a standard PIN code consent form to advise Mr. Raymond of his rights or memorialize his consent.

### D.  THE GOVERNMENT'S SUBSEQUENT INVESTIGATION FOLLOWING THE UNLAWFUL SEIZURES.

After gaining access to Mr. Raymond's phones, the agents accessed his photographs and observed what appeared to be photos and videos of unconscious or sleeping women, some of which were explicit in nature. That same Saturday, after already being aware of what was on the phone due to the unconstitutional access, Gajkowski sent a preservation request to Apple for Mr. Raymond's iCloud account. *See* Email from Gajkowski to lawenforcement@apple.com, June 6, 2020, at 7:04 p.m., attached hereto as Exhibit C.[7] But it was already too late to make up for the manner in which Perry, Soni, and the agents had effected multiple seizures and violated Mr. Raymond's 4th and 5th Amendment rights. The discovery of the materials on Mr. Raymond's phones changed the course of the government's investigation, and in the following months, the government sought and executed numerous search warrants on Mr. Raymond's accounts, home, parents' home, and additional devices, all as a result of the illegal search and seizure of his person and phones. Through these additional searches, among other things, the government obtained copies of the photos and videos found on Mr. Raymond's phone.[8]

### E.  CRIMINAL COMPLAINTS AND INDICTMENTS.

Based upon the materials and information the government had gathered in the four months after seizing Mr. Raymond's phone, on October 8, 2020 the government charged him by complaint with one count of Enticement under 18 U.S.C. § 2422. *See* ECF No. 119, Ex. H. Subsequently, on December 31, 2020, Mr. Raymond was charged with Sexual Abuse, in violation of 18 U.S.C. §

---

[7]     Agent Gajkowski also sent multiple other preservation requests to other companies in the two days *after* seizing Mr. Raymond's phones.

[8]     As stated in the Statement of Offense (ECF No. 68, at ¶ 4), the government found a total of 487 photos and videos of unconscious or sleeping women in various stages of undress on Mr. Raymond's devices and iCloud account. All of the device and account search and seizure warrants that produced these 487 photos and videos relied upon the contents of Mr. Raymond's phones to establish probable cause.

2242(2) (involving AV-1, AV-7, AV-9), Abusive Sexual Contact, in violation of 18 U.S.C. § 2244(a)(2) (involving AV-7, AV-5, AV-6, AV-9), and Coercion and Enticement, in violation of 18 U.S.C. § 2422(a) (involving AV-2). *See* Criminal Complaint, ECF No. 119, Ex. I.

In January 2023, a grand jury indicted Mr. Raymond on the following counts: Sexual Abuse, in violation of 18 U.S.C. §§ 2242(2) and 7(9) (involving AV-1 and AV-9), Aggravated Sexual Abuse, in violation of 18 U.S.C. §§ 2241(b)  and 7(9) (involving AV-9), Abusive Sexual Contact, in violation of 18 U.S.C. §§ 2244(a)(1) and 7(9) (involving AV-5, AV-7, and AV-9), Abusive Sexual Contact, in violation of 18 U.S.C. §§ 2244(a)(2) and 7(9) (involving AV-5, AV-6, AV-7, and AV-9), and Coercion and Enticement to Travel — 18 U.S.C. § 2422(a) (involving AV-4). *See* Indictment, ECF No. 168.  In February 2023, the grand jury returned a superseding indictment charging Mr. Raymond with the following counts: Aggravated Sexual Abuse, in violation of 18 U.S.C. §§ 2241(b) and 7(9) (involving AV-9), Sexual Abuse, in violation of 18 U.S.C. §§ 2242(2) and 7(9) (involving AV-1 and AV-9), Abusive Sexual Contact, in violation of 18 U.S.C. §§ 2244(a)(1) and 7(9) (involving AV-5, AV-6, AV-7, AV-9, and AV-23), Abusive Sexual Contact, in violation of 18 U.S.C. §§ 2244(a)(2) and 7(9) (involving AV-5, AV-6, AV-7, AV-9, and AV-23), Coercion and Enticement, in violation of 18 U.S.C. § 2422 (involving AV-4, AV-15, and AV-17), and Transportation of Obscenity, in violation of 18 U.S.C. § 1462(a) (involving AV-2, AV-5, AV-6, AV-7, AV-8, AV-9, AV-12, AV-22).

As with all other allegations and charges in this case, the photographic and video evidence the government obtained through and following the illegal search and seizure of Mr. Raymond and his phones, in violation of Mr. Raymond's 4th and 5th Amendment rights, constitutes the government's primary and most significant evidence.[9]

---

[9]     Note, however, that none of the photos or videos show a "sexual act," and therefore do not show sexual abuse of any kind. The vast majority do not even show contact, in any form, of the alleged victims by Mr. Raymond.

### III.   LAW.

#### A. THE FOURTH AMENDMENT PROHIBITS MULTIPLE/REPEATED SEIZURES ON A SINGLE WARRANT.

##### 1.   A Warrant Authorizes Only **One** Seizure.

The 4th Amendment prohibits law enforcement officers from conducting "unreasonable searches and seizures." *United States v. Winecoff*, No. CR 20-266 (RBW), 2021 WL 6196999, at *3 (D.D.C. Dec. 30, 2021) (quoting *United States v. Gross*, 784 F.3d 784, 786 (D.C. Cir. 2015)). It is well settled that a warrant authorizes only a single search and seizure. *United States v. Keszthelyi*, 308 F.3d 557, 569 (6th Cir. 2002) (citing *United States v. Gagnon*, 635 F.2d 766, 769 (10th Cir. 1980)); *United States v. Jeffries*, No. 5:16 CR 180, 2017 WL 11445474, at *2 (N.D. Ohio Sept. 5, 2017) ("Once the execution of a warrant is complete, the warrant terminates.").

##### 2.   With Respect to a Device or ESI Warrant, the Single Authorized Seizure is Fully Executed When the Government Takes Possession of the Device or ESI.

With regard to electronic storage media and ESI, such as cell phones and the information stored on them, the single seizure authorized by a warrant concludes when law enforcement has taken possession of the media/information. Fed. R. Crim. P. 41(e)(2)(B). Thus, future review of a device or ESI at a later time is not a "continuation" of the warrant's execution. Under Federal Rule of Criminal Procedure 41(e)(2)(B):

> A warrant…may authorize the seizure of electronic storage media or the seizure of or copying of electronically stored information. Unless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant. The time for executing the warrant [within 14 days, during the daytime] refers to the seizure or on-site copying of the media or information, and not to any later off-site copying or review.

*See also United States v. Castro*, 881 F.3d 961 (6th Cir. 2018); *United States v. Carrington*, 700 F. App'x 224, 232 (4th Cir. 2017) (device and ESI warrants "are deemed executed when the

electronically stored information is seized and brought within the government's control"); *United States v. Huart*, 735 F.3d 972, 974 n.2 (7th Cir. 2013) ("[U]nder [Rule] 41(e)(2)(B), a warrant for electronically stored information is executed when the information is seized or copied – here, when the [government] seized the phone."); *United States v. Nicholson*, 24 F.4th 1341 (11th Cir 2002); *United States v. Gerber*, 994 F.2d 1556, 1557-59 (11th Cir. 1993); *United States v. Estime*, 2020 U.S. Dist. LEXIS 191242, 39-40 (S.D.N.Y., Oct. 14, 2020) ("[U]nder Rule 41(e)(2)(B), a search warrant for ESI is executed through 'the seizure…of the media' which is accomplished when the physical storage device is in the custody of the government.").[10]

Under the cases cited immediately above (and many others), as it states in Rule 41, multiple, even long-delayed reviews or searches of electronic media or ESI are permitted, *after the single seizure authorized by the warrant*. Thus, while ongoing, multi-part, or even delayed *reviews* of cell phone material/ESI may be permissible in various circumstances, the hard and fast rule remains as to *seizures*: one warrant, one seizure. Indeed, as the court stated in *Castro*, "Officers may conduct a more detailed search of an electronic device *after it was properly seized* so long as the later search does not exceed the probable cause articulated in the original warrant *and the device remains secured*."  881 F.3d at 966 (emphases added) (citing *United States v. Evers*, 669 F.3d 645, 650-52 (6th Cir. 2012)).

### 3. The Narrow "Reasonable Continuation" Rule is Inapplicable to Completed Cell Phone or ESI Seizures.

While one warrant authorizes one seizure/search, in limited circumstances, law enforcement may temporarily continue execution of a search in order to resume at another time so long as the subsequent search is a "reasonable continuation of the original search." *Keszthelyi,* 308

---

[10]      As seen in cases such as *Carrington*, *Huart*, and *Estime*, the government has generally been the party arguing in favor of the view that a warrant to seize phones or other electronic storage media has concluded with the physical seizure of the media or ESI.  Ironically, the government here seeks the opposite outcome.

F.3d at 569. For the subsequent search to be permissible, it must be 1) a continuation of the initial search (*i.e.,* not a new, separate search); and, 2) the decision must be reasonable under the totality of the circumstances. *Jeffries,* 2017 WL 11445474, at *2. The first criterion examines whether the search was simply suspended until later because of some unforeseen obstacle not of the agents' own making. *Keszthelyi*, 308 F.3d at 571. For example, in *Keszthelyi,* the Court cited to *United States v.Gerber,* 994 F.2d 1556, 1559 (11th Cir. 1993), in which officers suspended a Friday evening search of a vehicle until Monday, because they needed a mechanic's assistance to open the car's hood. *Keszthelyi,* 308 F.3d at 570. For the second criterion, reasonableness under the 4th Amendment is assessed by balancing "the nature and quality of the intrusion on the individual's 4th Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *See Tennessee v. Garner,* 471 U.S. 1, 8 (1985) (quoting *United States v. Place*, 462 U.S. 696, 703 (1983). The Sixth Circuit reasoned in *Keszthelyi,* that a subsequent search was unreasonable where "nothing impaired the ability of the agents to execute fully the warrant at the time of their initial entry." *Keszthelyi,* 308 F.3d at 572.

In general, however, given that Rule 41(e)(2)(B) and related cases clearly dictate that a warrant authorizing the seizure and search of an electronic device or ESI is fully executed upon the first seizure of the device/ESI, the reasonable continuation rule is inapplicable in that setting. Subsequent review of the device/ESI is not a "continuation" of the seizure/search.[11]

---

[11]    One would imagine this rule simply codified what had long been the case in other more traditional settings. For example, imagine a corporate fraud case with a warrant authorizing the seizure and search of the target's business records.  If agents went to the company and seized 1,000 boxes of documents, they would be authorized to remove them from the premises and copy/review them as often and for as long as necessary in the future.  Each such review of records already seized on a valid warrant is not a continuation of the initial seizure/search because the warrant was fully executed on the initial seizure.

### 4. Any Biometrics Portion of a Device/ESI Warrant Must be Conducted During the Single Initial Seizure Authorized by the Warrant.

In addition, the 4th Amendment dictates that where a warrant authorizes agents to compel a person to open an electronic device using biometrics, the agents must execute that portion of the warrant *at the time and in the immediate vicinity of the initial seizure*.[12] *See In re Search of [Redacted]*, 317 F. Supp. 3d 523, 533 (D.D.C. 2018). In that case, Magistrate Judge Harvey explained the requirements for compelled biometrics:

> [W]hen attempting to unlock a telephone, computer or other electronic device during the execution of a search warrant that authorizes a search of the device, the government may compel the use of an individual's biometric features, if (1) the procedure is carried out with dispatch and in the immediate vicinity of the premises to be searched, and if, at time of the compulsion, the government has (2) reasonable suspicion that the suspect has committed a criminal act that is the subject matter of the warrant, and (3) reasonable suspicion that the individual's biometric features will unlock the device.

*Id.*[13] Magistrate Judge Harvey also explained that "[l]aw enforcement is not absolved of its responsibility to act reasonably in executing a warrant merely because the government has received court authorization to compel the use of an individual's biometric features." *Id.* at n.7.

---

[12]     As noted further below, the biometrics arguments in this case are ultimately a side show. Mr. Raymond's phones were turned off, thus disabling biometrics. As noted above, the agents had suggested Mr. Raymond silence his phones, and he turned them off as is clear from the recording/transcript (Mr. Raymond announced he was shutting his phones off, and agent Nelson, at the moment of the initial seizure, asked Mr. Raymond to turn the phones back on). ECF No. 119, Ex. E, at 3 and 177-78. If the agents had attempted biometrics in the first seizure, they would have failed to get into the phones via that method.

[13]     Mr. Raymond does not concede that a warrant may lawfully compel biometrics to gain access to a phone, which he asserts should be viewed as a testimonial act akin to providing a PIN code. Thus, the warrant's grant of authority to compel biometrics in this case should be deemed unconstitutional, and the agents' actions in pursuit of biometrics a violation of Mr. Raymond's 5th Amendment rights.

**B.  THE 5TH AMENDMENT RIGHT TO SILENCE INCLUDES A RIGHT TO REFUSE TO PROVIDE ELECTRONIC DEVICE PIN CODES AND PASSWORDS.**

The 5th Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. Amend. V. As such, the accused are protected "from having to reveal, directly or indirectly, his knowledge of facts relating him to the offense or from having to share his thoughts and beliefs with the Government." *Doe v. United States*, 487 U.S. 201, 213 (1988). A statement is subject to 5th amendment privilege if it is (1) testimonial, (2) incriminating, and (3) compelled." *In re Search of* [Redacted], 317 F. Supp. 3d at 534 (citing and quoting *United States v. Hubbell*, 530 U.S. 27, 189 (2000)).

Under these principles, law enforcement cannot compel a person to provide a PIN code or password for an electronic device during seizure of that device. Providing a password is testimonial. *See, e.g.*, *In re Grand Jury Subpoena Duces Tecum Dated March 25, 2011,* 670 F.3d 1335, 1341 (11th Cir. 2012); *In re Search of* [Redacted], 317 F. Supp. 3d at 534-36; *United States v. Djibo,* 151 F. Supp. 3d 297, 307 (E.D.N.Y. 2015). Providing a password is an incriminating statement where it provides a "link in the chain of evidence" leading to incriminating evidence, even if the statement itself is not incriminating. *See, e.g.*, *United States v. Hubbell*, 530 U.S. 27, 38 (2000) (quotations and citations omitted). Finally, a statement is not voluntary if it is "extracted by…the exertion of any improper influence" (*United States v. Powe*, 591 F.2d 833, 840 (D.C. Cir. 1978) (quotations and citations omitted)) or where, "under the totality of the circumstances, law enforcement officials obtained the evidence by overbearing the will of the accused" (*United States v. Yeh*, 97 F. Supp. 2d 24, 34 (D.D.C. 2000) (citations omitted)).  *See also Arizona v. Fulminante*, 499 U.S. 279, 285-88 (1991); *United States v. Hallford*, 816 F.3d 850, 856 (D.C. Cir. 2016).

## C. EVIDENCE OBTAINED THROUGH AN UNCONSTITUTIONAL SEIZURE IS SUBJECT TO SUPPRESSION.

Turning now to the consequences of unconstitutional seizures, the appropriate remedy is ordinarily suppression of the illegally-obtained evidence. *See United States v. Jones*, 908 F. Supp. 2d 203, 214 (D.D.C. 2012), (citing *Mapp v. Ohio,* 367 U.S. 643 (1961)). The reason for this rule of suppression, often called the "exclusionary rule," is to deter future unlawful police conduct. *Id.* (citing *Illinois v. Krull,* 480 U.S. 340, 346 (1987)). The analysis of whether the exclusionary rule will apply begins with determining whether the violation by law enforcement is "fundamental" in nature, or merely a "technical" or "procedural" violation of Rule 41. *See, e.g.*, *United States v. Henderson*, 906 F.3d 1109, 1115 (9th Cir. 2018).  Fundamental violations are those that violate the constitution, and they lead to suppression unless the "good faith" exception applies. *Id.* Technical or procedural violations, such as the failure to submit a warrant return to the court after execution, only result in suppression if 1) the defendant was prejudiced by the error, or 2) there is evidence of deliberate disregard for Rule 41's requirements. *Id. See also United States v. Magruder*, 2021 U.S. Dist. LEXIS 27073 (D.D.C. 2021) (noting that prejudice means "that the search might not have occurred or would not have been so abrasive if the rule had been followed.") (citation omitted). In contrast, in the case of fundamental violations, there is no requirement that a defendant establish the officers or agents were acting out of deliberate bad faith in order to obtain suppression based on an illegal seizure. *Herring v. United States*, 555 U.S. 135, 144 (2009). In *Herring*, the Court expressly held that the exclusionary applies to "deter deliberate, *reckless, or grossly negligent conduct . . . .*"  *Id.* (emphasis added).

Further, the "good faith" exception to the exclusionary rule in cases of fundamental violations applies when an "officer acting with objective good faith has obtained a search warrant from a magistrate and acted within its scope.  *United States v. Leon*, 468 U.S. 897, 920 (1984).

This is so because suppression is intended to have a "deterrent effect" against unreasonable conduct by law enforcement. *Id*. at 906. No such deterrence may be necessary where law enforcement officers are acting in good faith within the scope of a warrant, even one that later turns out not to be based on sufficient probable cause. *Id*. at 918. As noted in *Leon*, however, the Court's "discussion of the deterrent effect of excluding evidence obtained in reasonable reliance on a subsequently invalidated warrant assumes, of course, that the officers properly executed the warrant and searched only those place and for those objects that it was reasonable to believe were covered by the warrant." *Id.* at 918, n. 19. Indeed, "[t]he *Leon* good faith exception applies to defects that arise under the search warrant process, not unconstitutional seizures." *United States v. Wilkins*, 538 F. Supp. 3d 49, 95 (D.D.C. 2021). This "good faith" exception, therefore, does nothing to save an unreasonable or improper execution of a warrant, even a valid one. *Leon* also notes "the objective standard we adopt, moreover, requires officers to have a reasonable knowledge of what the law prohibits." 468 U.S. at 919, n.20.

The good faith exception is intended to prevent the exclusion of evidence when the judge, a neutral third party, has committed an error – it does not excuse law enforcement's own constitutional violations.  "The Supreme Court has never applied the good faith exception to excuse an officer who was negligent himself, and whose negligence directly led to the violation of the defendant's constitutional rights.  *United States v. Camou*, 773 F.3d 932, 945 (9th Cir. 2014). As the court in *Camou* noted:

> In *Herring*…the Supreme Court found the good faith exception was met because the officer *reasonably relied* on an external source, which turned out to be erroneous. *Id*.; *see also Arizona v. Evans*, 514 U.S. 1, 14, 115 S. Ct. 1185, 131 L. Ed. 2d 34 (1995) (holding that good faith exception was met where police reasonably relied on erroneous information concerning an arrest warrant in a database maintained by judicial employees); *Illinois v. Krull*, 480 U.S. 340, 358-60, 107 S. Ct. 1160, 94 L. Ed. 2d 364 (1987) (extending good

faith exception to searches conducted in reasonable reliance on subsequently invalidated statutes); *Leon*, 468 U.S. at 922 (holding that the officer's reasonable reliance on a warrant later held to be invalid met the good faith exception).

*Id.* (emphasis in original).

Additionally, when an unconstitutional search or seizure has occurred and suppression is required, the Court must also exclude any evidence obtained as the "fruit" of that search or seizure. *Wong Sun v. United States*, 371 U.S. 471, 484 (1963) ("[E]vidence seized during an unlawful search could not constitute proof against the victim of the search."); *see also U.S. v. Sparks,* 594 F. Supp. 3d 9, 16 (D.D.C. 2022) (noting that both primary evidence obtained from an illegal search and seizure and evidence "later discovered and found to be derivative of an illegality, the so-called fruit of the poisonous tree" are subject to exclusion). Evidence derived from an illegal seizure must be excluded as fruit of the poisonous tree unless the government demonstrates "(1) that the evidence would have been discovered inevitably, (2) that the evidence was discovered from a separate, independent source, or (3) that the discovery of the evidence was so attenuated from the illegal seizure that the taint of the unlawful police conduct was dissipated." *U.S. v. Johnson*, 365 F.Supp.3d 89, 99 (D.D.C. 2019).

Finally, evidence obtained based on a statement compelled in violation of the 5th Amendment must be suppressed under the fruit of the poisonous tree doctrine. *United States v. Goldberger*, 837 F. Supp. 447, 454 (D.D.C. 1993) (citing *Harrison v. United States,* 392 U.S. 219, 223–24 (1968) and (*Bram v. United States,* 168 U.S. 532, 548 (1897)).

Here, the Court has already considered these issues in the context of Mr. Raymond's Motion to Withdraw Guilty Plea, and "identified viable challenges related to the manner in which the warrant was executed and his cell phones were seized," (Memorandum Opinion, ECF 158, at 27), and there is no doubt that the government's three seizures of Mr. Raymond's phones, two of

which were illegal, coupled with its complete disregard for his repeated refusals to provide PIN codes, resulted in the discovery of nearly all of the government's evidence in this case. Accordingly, this evidence should be suppressed as a clear violation of Mr. Raymond's 4th and 5th Amendment rights.

## IV.   ARGUMENT.

### A. THE GOVERNMENT VIOLATED MR. RAYMOND'S 4th AMENDMENT RIGHTS BY CONDUCTING MULTIPLE UNREASONABLE SEIZURES OF HIS PERSON AND CELL PHONES.

1. <u>The Agents and Prosecutors Violated the One Warrant, One Seizure Rule.</u>

Here, the government actors had no valid basis on which to seize Mr. Raymond and his cell phones three separate times, over the course of several hours (they began their first interaction with Mr. Raymond around 10:00 a.m., and concluded after finally obtaining permanent access to the phones after 2:30 p.m.), at two separate locations.  The warrant Gajkowski obtained, just like all seizure and search warrants, *authorized a single seizure*. Further, an electronic device or ESI warrant is fully executed when the government seizes the device or ESI. Fed. R. Crim. P. 41(e)(2)(B). Here, the agents seized Mr. Raymond's phones pursuant to a Rule 41 device/ESI warrant, and at that moment, it is indisputable that the warrant was fully executed. *See, e.g.*, *United States v. Carrington*, 700 F. App'x. 224, 232 (4th Cir. 2017); *United States v. Estime*, 2020 U.S. Dist. LEXIS 191242, 39-40 (S.D.N.Y., Oct. 14, 2020). This first seizure was fully compliant with the proper execution of a warrant seeking an electronic storage device under Rule 41. The agents took possession of the storage mediums (the phones), provided Mr. Raymond with property receipts, announced the execution of the warrant was complete for the record, and departed the scene. The two further re-seizures of Mr. Raymond and the devices, however, were blatant violations of fundamental constitutional rights. Because the government seized Mr. Raymond and

his phones three times on a single warrant, on this basis alone, the Court should find that the government violated the 4th Amendment.

Despite the clear rule of law, the government has attempted to justify the second and third seizures in this case as "reasonable continuations" of the first seizure. ECF No. 147, at 41-46. The government is incorrect. To sustain this argument, the government must show (1) the second and third seizures were continuations of the first, not separate seizures, and (2) the decision to continue later was reasonable under the totality of the circumstances, i.e., that it was not the result of the agents' mistakes or ineptitude, but instead some unforeseen obstacle. *Jeffries*, 2017 WL 1144575, at 2. On each front, the government fails.

    a.   <u>The Second and Third Seizures Were *Not* Continuations of the First.</u>

In this case, the second and third seizures were not continuations of the first, given the agents had announced immediately after the first seizure that they had concluded the execution of the warrant, provided property receipts, let Mr. Raymond go, and, most importantly for Rule 41 purposes, took possession of his phones. Fed. R. Crim. P. 41(e)(2)(B). In addition, the third seizure, which ultimately provided the agents access to the phones, was not a continuation of the first or second. The only stated justification for seizing Mr. Raymond and his phones a second time was the failure to attempt biometrics on the phones. This alleged justification (which is not viable in any event) is entirely inapplicable to the third seizure. Thus, the second seizure, and even more so the third seizure, must be viewed as separate seizures from the first. For this reason, the government's actions fail the "reasonable continuation" standard.[14]

---

[14]    The government has also attempted to uphold its baseless "reasonable continuation" argument by asserting that the execution of the warrant was not complete when the agents took the phones into custody because they still had to extract data from them. ECF No. 147, at 43-45. But this confuses and conflates the seizure of the phones with the subsequent review of the phones' contents, as highlighted in Rule 41 and the caselaw cited above. As made clear in Rule 41(e)(2)(B), the seizure must comply with the timing requirements of the rule, while the copying (or extraction) and review of the materials may occur at a later time. Indeed, as noted by the Court, the government fails

       b.  Under the Totality of the Circumstances, the Decision to Seize Mr.
Raymond and His Phones *Three Times* was Unreasonable.

Further, the government's reasonable continuation argument fails because the decision to

continue seizing Mr. Raymond and his phones a total of three times was not reasonable under the

totality of the circumstances. The government's stated justification for attempting a second seizure

was that they failed to use Mr. Raymond's biometrics to open the phone. Other than their own

ignorance and failure to appreciate the contents of their warrant, as well as the basic parameters of

well-established law pertaining to ESI warrant seizures, there was no obstacle beyond the agents'

control that stopped them from attempting to execute the biometrics portion of the warrant in their

first encounter with Mr. Raymond. But even more critically, it appears that pursuit of biometrics

was nothing more than an impermissible guise to take a run at Mr. Raymond and his PIN codes

during the second seizure. Mr. Raymond's phones were powered down just prior to the first

seizure. This meant that they could not be opened with biometrics, a known fact concerning

iPhones of which Gajkowski had sworn she was aware. *See* ECF No. 151, Ex. A, at 4. And that is

to say nothing of the *third* seizure, which is entirely unjustifiable given the agents had, by that

time, already had two chances to effect the biometrics portion of the warrant and had failed to gain

access to the phones using such biometrics. Indeed, as is plain from the agents' operations plan,

the agents did not have a viable plan that day for gaining and maintaining access to Mr. Raymond's

phones. The agents' negligence, and not anything done by Mr. Raymond, was the sole cause of

the need to effect multiple illegal seizures.

The second and third seizures at Mr. Raymond's hotel were not at all reasonable under the

totality of the circumstances, but instead represented an increase in show of force, and relentless

---

to cite supporting legal authority for its proposition that future data extraction means the warrant somehow remained
open, and the cases it does cite are "neither factually on point nor particularly instructive." ECF No. 158, at 22.

and repeated pursuit of access to Mr. Raymond's PIN codes and passwords. *See Keszthelyi*, 308 F.3d at 572 (holding a subsequent search unreasonable because "nothing impaired the ability of the agents to execute fully the warrant at the time of their initial entry"). *See also In re: Search of* [Redacted], 317 F. Supp. 3d at n. 7 ("Law enforcement is not absolved of its responsibility to act reasonably in executing a warrant merely because the government has received court authorization to compel the use of an individual's biometric features."). Simply put, there were no obstacles or exigent, artificial, or extenuating circumstances that could conceivably justify reasonably continuation of the seizure.  The reasonable continuation rule is entirely inapplicable on these facts.[15]

As the Court has already found in its Memorandum Opinion, "the agents' failure to use biometrics during the first seizure, in compliance with the clear terms of the warrant, as well as their announcement that the execution of the warrant was completed, which was followed by calling Defendant back, not once, but twice, to reopen the phones" is "troubling." Memorandum Opinion, ECF 158, at 25. As the Court further found in its Memorandum Opinion, "there is no allegation that the second and third seizures resulted from any obstacles created by or actions taken by the Defendant. Instead, Defendant was summoned back because of the agents' failure to familiarize themselves with the terms of the warrant, their admitted technological ineptitude, and/or their failure to plan in advance on how the phones would be kept open." *Id*. Thus, the subsequent seizures of Mr. Raymond's phones at his hotel were the result of the agents' own failure

---

[15]     Strangely, the government has attempted to argue that the rule of *In re Search of* [Redacted], 317 F. Supp. 3d 523, somehow justifies the illegal second seizure. ECF No. 147, at 47. The opposite is true, and also, this argument again fails to justify the critical *third seizure*. The fact that biometrics were disabled means the test of *In re Search* is effectively irrelevant. But even under that test, the government's justification fails. The third seizure is the one that matters, because it provided access to the phones. That seizure was carried out over two hours after the first seizure, and as many as 4.5 hours after the start of the agents' interactions with Mr. Raymond that day. That seizure, as well as the second, were also carried out at an entirely separate location. Thus, the third seizure was not carried out "with dispatch" or in the "immediate vicinity" of the initial seizure.

to abide by the parameters of the warrant and clearly established guidelines in Rule 41, not to mention the 4th and 5th Amendments. These actions, under the totality of the circumstances, were completely unreasonable. Therefore, the attempts by the agents to re-execute an already fully-executed warrant *two additional times* at Mr. Raymond's hotel were illegal under the 4th Amendment.

Accordingly, the Court should find that the government violated Mr. Raymond's 4th Amendment rights in unreasonably effecting three seizures of Mr. Raymond and his phones.

2.   <u>Suppression is Required, and No Exceptions Apply.</u>

Suppression of evidence is a remedy provided by courts to deter unreasonable conduct by law enforcement. *Herring v. United States*, 555 U.S. 135 (2009). Evidence obtained through fundamental constitutional violations is subject to exclusion, including all evidence obtained as the fruit of such violations. *See United States v. Henderson*, 906 F.3d 1109, 115 (9th Cir. 2018); *United States v. Jones*, 908 F. Supp. 2d 203, 215 (D.D.C. 2012). It is difficult to imagine a case where agents and prosecutors acted with greater disregard for constitutional principles. The agents and prosecutors violated the one warrant, one seizure rule, by effecting two seizures after the warrant as fully executed as provided in Rule 41(e)(2)(B). The government has, unbelievably, claimed the agents were ignorant as to facts about iPhones that Gajkowski swore to in her affidavit. Gajkowski swore she knew that iPhones that had been turned off required PIN codes to open them, yet she claims she effected the second seizure to attempt to compel biometrics on phones that had been powered down. In addition, the government did not just reseize Mr. Raymond once, but they did so twice, *after* he had said he would not provide them with further information until he spoke with counsel. In approving the third seizure, Perry provided blatantly unconstitutional advice, appearing to reveal her patently wrongful belief that the agents could seize and reseize Mr. Raymond as many times as they would like up to the point that they returned the warrant. Finally

the agents acted in disregard of the "with dispatch" and "immediate vicinity" requirements applicable to compelled biometrics by allegedly pursuing biometrics repeatedly over the course of several hours at two separate locations. Taken together, these actions demonstrate deliberate disregard for the Constitution, but at the very least they constitute recklessness or gross negligence, and therefore suppression is required. "[T]he deliberate and reckless actions of law enforcement in this case warrant the suppression of evidence so as to prevent the same behavior from occurring again." *United States v. Perkins*, 884 F. Supp. 3d 868, 884 (E.D. Tenn. 2017).[16]

Further, none of the potential exceptions to suppression apply in this case. In the face of unmistakable 4th Amendment violations, the government has attempted to save its evidence via the inevitable discovery exception to suppression. But the evidence does not support the government's assertion that it would have inevitably or independently discovered the photographic evidence. The reality is that there was not some pre-set or separate path, whether hypothetical or real, which would have led the government to the materials on Mr. Raymond's phones if they had not illegally obtained them. *Compare Nix v. Williams,* 467 U.S. 431 (1984). Instead, the government sought several warrants *after* it had seized and searched Mr. Raymond's phones, and each and every one of those warrants relied on the contents of Mr. Raymond's phone in establishing probable cause. Tellingly, the iCloud preservation request sent by the government to Apple in this case only went out on the night of the phone seizures, June 6, 2020, at 7:04 p.m.  It is no surprise, therefore, that in its Opposition to the Motion to Withdraw the government did not

---

[16]     As noted above, fundamental constitutional violations normally require suppression, while technical or procedural violations (such as failure to "return" the warrant on time) result in suppression only when 1) prejudice exists, and 2) there is evidence of deliberate disregard for Rule 41's procedures.  Here, even on that standard, suppression should be required, because the warrant would not have succeeded in producing access to the phones without the violations (thus, there is prejudice), and the actions appear so flagrant and egregious as to constitute deliberate disregard.

document or establish some separate or pre-existing search pathway that did not rely on Mr. Raymond's phones, because none exists.

The government also argues that the "good faith" exception applies, but it clearly does not. As noted above, that exception is for reasonable, good faith actions by law enforcement when executing a warrant that subsequently is found invalid. *See, e.g.*, *United States v. Wilkins*, 538 F. Supp. 3d 49, 95 (D.D.C. 2021). Here, the government undertook unreasonable and illegal actions on an otherwise valid warrant. That, frankly, ends the "good faith" inquiry – that exception simply does not apply in this case.[17]

The simple truth of what happened here is this: the agents' plan was doomed to fail from the start. They had no viable plan for maintaining access to the phones – the plan to change the phones' settings to maintain access would have required PIN codes and passwords. Therefore, even if they successfully used Mr. Raymond's biometrics to open the phones, they would have failed to sustain access. But the phones were powered down as the agents sat conversing with Mr. Raymond, and they had no opportunity to open the phones with biometrics. As was inevitable, the agents realized they needed Mr. Raymond's PIN codes and passwords that day. They asked Mr. Raymond for codes, and he refused, time and time again. The agents got desperate, conducted multiple calls with the Department of Justice and technology experts, and based on the instructions from Perry, decided to just keep running at Mr. Raymond over and over. Finally, during the third seizure they told Mr. Raymond they were not leaving until he gave them access, and he relented. That is what happened, and it is precisely the kind of improper government conduct that merits suppression of the ill-gotten evidence.

---

[17]     The test for whether the good faith exception applies is "whether a reasonably well trained officer would have known that the search was illegal." *Leon*, 468 U.S. at 922 n. 23. On these facts, it is clear that the actions of Perry, Soni, Gajkowski, and Nelson would have appeared illegal to a reasonably well trained law enforcement agent.

### B. THE AGENTS VIOLATED MR. RAYMOND'S 5th AMENDMENT RIGHTS BY COERCING HIM TO ENTER HIS PIN CODES ON HIS CELL PHONES AFTER HE REPEATEDLY INVOKED HIS RIGHT TO REFUSE.

Mr. Raymond's entry of PIN codes and passwords was testimonial, incriminating, and compelled, and thus was subject to the 5th Amendment privilege. At the agents' first request for Mr. Raymond's phones, he explicitly stated he needed a lawyer. Instead of ceasing all inquiry regarding Mr. Raymond's phones and PIN codes, the agents persisted. Even after the agents continued to ask Mr. Raymond for his PIN codes, Mr. Raymond declined to provide the codes without first speaking with a lawyer.  Mr. Raymond repeated <u>multiple</u> times that he wanted a lawyer:

> MR. NELSON: I understand. Let us get you the contacts you need. We need your PIN numbers for these phones so we can access them. Okay?
>
> **MR RAYMOND: I, I have to consult a lawyer, honestly. I can't – it's just something I have to do.**
>
> MS. GAJKOWSKI: Okay.
>
> **MR. RAYMOND: You know, I don't know what my rights are in this situation.**
>
> MS. GAJKOWSKI: (Inaudible.)
>
> MR. NELSON: You're right, but we are seizing the phones. What we need to do, though, is we need to unlock them and at least put them on airplane mode. Okay?
>
> **MR RAYMOND: I can't do that until I talk with my lawyer. I just don't understand what's going on here right now.**
>
> MS. GAJKOWKSI: So – so, what we are going to do, because I, I just want to be clear, so you're not willing to voluntarily give us your PIN. Correct?
>
> **MR. RAYMOND: No, not until I consult with a lawyer.**
>
> MS. GAJKOWSKI: Okay, understood.

MR. NELSON: Yeah. Ok.

ECF No. 119, Ex. E, at 189-192.

Even after the agents re-seized Mr. Raymond's phones at Perry's request, they continued to ask for his PIN:

> MS. GAJKOWSKI: So, it's up to you, if you want to enter the password [to allow us to change the code/settings], you don't have to.
>
> **MR. RAYMOND: I don't understand, am I compelled to?**
>
> MS. GAJKOWKSI: You are not compelled to give us the code, only the thumbprint. I want to be clear on that.
>
> **MR. RAYMOND: I'd rather, just for privacy – I'd rather not.**
>
> MS. GAJKOWSKI: Ok, understood.[18]

Here, it is clear that the agents did not obtain the evidence from Mr. Raymond's phones through his own free will. *United States v. Hallford*, 816 F.3d 850, 856 (D.C. Cir. 2016) (stating that the essential inquiry is whether the defendant's "'will' was 'overborne and his capacity for self-determination critically impaired' as a result of the agents' conduct"). The agents repeatedly asked Mr. Raymond for his PIN codes, but he consistently refused. The agents recognized that they could not compel Mr. Raymond to give them his passcodes, and they repeatedly ignored his invocation of his right not to give them his codes, because they were desperate and knew that they would not be able to keep Mr. Raymond's phones unlocked without them. It was only after enduring *hours* of unrelenting requests to provide his PIN codes, at *multiple locations*, and with blatant disregard of his invocation of his right to refuse, that Mr. Raymond finally gave in and

---

[18]     This interaction with Mr. Raymond occurred at his hotel and comes from the Herndon officer's body camera footage.

typed his PIN code and password, allowing the agents to change the phones' settings to grant them free access. Undeniably, Mr. Raymond's statement was coerced by the agent's relentless pursuit of his PIN Codes and was not given freely or voluntarily. *See United States v. Sheffield*, 821 F. Supp. 2d at 356; *United States v. Hallford*, 816 F.3d at 856. This violation of Mr. Raymond's 5th Amendment rights led to direct and free access to his phones and further supports suppression of all evidence that flowed from these illegal seizures. *United States v. Hubbell*, 530 U.S. 27 at 38.

### C. SUPPRESSION APPLIES TO THE EVIDENCE OBTAINED FROM THE PHONES, AND ALL SUBSEQUENT FRUIT OF THAT EVIDENCE.

Finally, the Court should suppress not just the evidence illegally obtained from Mr. Raymond's cell phones, but also all "fruit" that flowed from such evidence. In this case, the government derived considerable evidence and testimony based on the material seized from Mr. Raymond's phones. All of the subsequent search warrants in this case, including for devices, locations, and accounts, were derived from the material found on Mr. Raymond's phones. All but one of the alleged victims in this case were found and interviewed based on the material on Mr. Raymond's phones. If the government did not obtain access to that material illegally, they likely would not have identified the alleged victims or had probable cause for any of the additional warrants. There is therefore a clear "causal nexus" between the government's constitutional violations and the evidence obtained therefrom. *U.S. v. Holmes*, 505 F.3d 1288, 1292 (D.C. Cir. 2007).

For these reasons, all evidence and testimony obtained in reliance on the material from the illegally seized phones must also be suppressed. *See, e.g.*, *Wong*, 371 U.S. 471; *Sparks*, 594 F. Supp. 3d at 28-29.

## V.     CONCLUSION.

The government committed fundamental violations of the 4th and 5th Amendments by seizing Mr. Raymond and his phones not once, but three times, and by pressuring him over the course of several hours to finally give up his PIN codes and passwords to permit them access to his phones, after he had repeatedly and flatly refused to provide such information. If a seizure can occur more than once on a single warrant, nothing would stop law enforcement from seizing people and property repeatedly over the course of the 14 day life of every warrant. If a person invokes his right to silence, and is then subjected to an increasing show of force and repeated requests to provide testimonial and incriminating information, then the 5th Amendment has no meaning. Such tyrannical conduct is not allowed in this country, and for good reason. Shockingly, in this case, such conduct was not only condoned by Department of Justice lawyers, those lawyers instigated the conduct. In light of the serious, fundamental constitutional violations in this case, the material obtained from Mr. Raymond's phones, and all evidence that constitutes the fruit of such material, must be suppressed. Indeed, virtually all evidence and statements obtained by the Government are fruits of the poisonous tree. Thus, for the foregoing reasons, Mr. Raymond requests that the Court grant this Motion and hold that any evidence and statements obtained as a result of the illegal seizures of Mr. Raymond's phones be suppressed.

Dated: March 10, 2023          Respectfully submitted,

s/John Marston
John Peter Marston (D.C. No. 493012)
**FOLEY HOAG LLP**
1717 K Street, NW
Washington, DC 20006
(202) 261-7321
Fax: (202) 785-6687
jmarston@foleyhoag.com

s/A. Joseph Jay III
A. Joseph Jay III (D.C. No. 501646)
Denise Giraudo (D.C. No. 499348)
**SHEPPARD, MULLIN, RICHTER &HAMPTON, LLP**
2099 Pennsylvania Avenue, NW
Washington, D.C. 20006
(202) 747-1900
JJay@sheppardmullin.com;
DGiraudo@sheppardmullin.com

*Counsel for Brian Jeffrey Raymond*