**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 1:21-cr-00380-CKK** |
| | : | |
| **BRIAN JEFFREY RAYMOND** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO**
**DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

The United States, by and through the undersigned attorneys, respectfully submits this opposition to the defendant's Motion to Suppress Evidence, ECF No. 190. The defendant, Brian Jeffrey Raymond, moves this Court, through counsel, to "suppress the evidence gathered by the agents from his cell phones, as well as all evidence that flowed from that illegally seized evidence." ECF No 190 at 2. In support of his arguments, the defendant claims the government conducted multiple seizures of both the defendant and his cell phones in violation of his constitutional rights. *Id*. Additionally, the defendant argues that the government violated his Fifth Amendment rights by disregarding his "consistent refusal to provide PIN codes and passwords for his phones." *Id*.

The defendant's motion fails. First, there was no Fourth Amendment violation. The agents' delayed use of the biometric provision did not undermine the validity of the warrant, nor the probable cause supporting it. Furthermore, reengaging the defendant to utilize biometrics was not a second or third seizure of the phone, but a reasonable continuation of the original seizure. Second, there was no Fifth Amendment violation because the act of entering the passcodes into the phones was not a compelled self-incriminating statement to law enforcement. Moreover, the defendant was not in custody and was not coerced to provide his passcode. Third, the government would have inevitably been able to discover the evidence that was on the phones, and separately, the government would have inevitably discovered the hundreds of photographs and videos located on

the defendant's other devices and storage platforms. Accordingly, this Court should deny the defendant's motion.

## I.      RELEVANT FACTUAL BACKGROUND

On February 23, 2023, a grand jury returned a twenty-five count superseding indictment charging the defendant with the following offenses: one count of Aggravated Sexual Abuse, in violation of 18 U.S.C. § 2241(b); two counts of Sexual Abuse, in violation of 18 U.S.C. § 2242(2); five counts of Abusive Sexual Contact, in violation of 18 U.S.C. § 2244(a)(1); six counts of Abusive Sexual Contact, in violation of 18 U.S.C. § 2244(a)(2), three counts of Coercion and Enticement to Travel, in violation of 18 U.S.C. § 2422(a); seven counts of Transportation of Obscene Material, in violation of 18 U.S.C. § 1462; and one count of Transportation of Obscene Material, in violation of 18 U.S.C. §§ 1462 and 7(9). *See* ECF No. 184.[1]

The charges arise from allegations that the defendant drugged and sexually assaulted numerous women over the course of several years. The indictment names fourteen separate victims. A detailed factual recitation of those facts is included in the government's opposition to the defendant's motion for bond and release from custody, ECF No. 187.

## II.     THE SEIZURE OF THE IPHONE XR

On June 1, 2020, the day after local police were called to the defendant's embassy-leased apartment in Mexico City following the assault of AV-1, the defendant returned to the United States. On June 2, 2020, he was interviewed in Northern Virginia by agents from the Department of State's Diplomatic Security Service ("DSS"), including Special Agent Mikel Gajkowski.[2] During

---

[1] Though the docket indicated this is the "second superseding indictment," there has only been one previous indictment, filed on January 19, 2023.

[2] Throughout this opposition the government proffers Agent Gajkowski's anticipated testimony.

this voluntary, noncustodial interview,[3] the defendant acknowledged meeting AV-1 on Tinder and having sexual intercourse with her. *See* Exhibit A, June 2, 2020 Interview at 06:00 – 07:00, 10:50 – 11:00. The defendant told the agents that he took screenshots of his conversations with AV-1, and he agreed to show the agents the conversations within the Tinder application on his personal phone (the iPhone XR). *Id*. at 11:00 – 12:40.[4] The agents asked whether they could take screenshots of the Tinder messages, and the defendant told them to "go ahead" before volunteering that he also had WhatsApp messages. *Id*. at 12:40 – 13:01. At one point, the defendant let Agent Gajkowski hold his iPhone XR and maneuver within the Tinder application herself. *Id*. at 14:50 – 15:50 (Agent Gajkowski asking how to navigate back to messages). When asked about dating in Mexico and his use of dating applications, the defendant claimed that he only dabbled in such applications. *Id*. at 17:30 – 19:00. As the investigation progressed, these statements proved false.

In addition to letting the agents view Tinder messages on his iPhone XR, the defendant showed the agents his conversations with AV-1 within the WhatsApp texting application on his iPhone 6, his work-provided phone which the agents observed had a cracked screen. *Id*. at 15:50 to 17:15 (Agent Gajkowski noting that the defendant's Spanish is "phenomenal" and the defendant pointing out messages talking about "their enjoyment of wine").[5] Towards the end of the

---

[3] The interview took place during the day at a park in Fairfax, Virginia. The defendant was advised that the interview was voluntary and that they would talk about as much or as little as he wanted. The agents also told the defendant that he was free to end the interview at any time or take breaks whenever he wanted. Finally, they told him that his refusal to speak with them would have no bearing on his employment. SA Gajkowski asked the defendant whether he had any questions. The defendant thanked SA Gajkowski for the clarifications and indicated that he wanted to make sure there were no doubts as to the circumstances involving AV-1. *See* Exhibit A, June 2, 2020, Interview (00:00 – 01:12).

[4] When the defendant initially accessed his phones, the agents and the defendant were sitting on opposite sides of a picnic table. The agents could not see what method the defendant used to unlock the phones. Regardless, he accessed the phones and showed the agents his own messages, making it likely (as indicated in Agent Gajkowski's affidavit) that his biometrics would unlock the phones.

[5] In the recording, the defendant says he has "Tinder" messages and "WhatsApp" messages. Agent Gajkowski subsequently asked to see and photograph "Tinder" messages and "Snapchat" messages. The photographs depict Tinder and WhatsApp messages.

recording, Agent Gajkowski referred to the photographs she took of the defendant's messages on his two phones. *Id*. at 1:20:47. In total, there were approximately 31 photographs, at least one of which was referenced in the affidavit supporting the application for the iPhone XR and iPhone 6 search warrants. *See* ECF No. 190-1, Defense Exhibit A (Filed Under Seal).

Following the interview, the agents obtained a warrant to seize and search the defendant's two iPhones. The warrant specifically authorized law enforcement to seize the devices, utilize biometrics to attempt to access the devices, and subsequently search the devices. Attachment B of the search warrant provided, "During the execution of the search of Device 1 and Device 2, as described in Attachment A, law enforcement personnel are authorized to press the fingers (including thumbs) of BRIAN RAYMOND to the Touch ID sensor of Device 1 and Device 2 for the purpose of attempting to unlock the device via Touch ID in order to search the contents as authorized by this warrant. Law enforcement personnel are further authorized to hold Device 1 and Device 2 up to RAYMOND's face for the purpose of attempting to unlock the devices via Face ID." *See* ECF No. 190-1, Defense Exhibit A (Filed Under Seal). Pursuant to this language, Agent Gajkowski understood that biometric techniques could be compelled pursuant to the warrant, but that other information, such as the verbal PIN code(s) to the phone(s), could not.

When planning for the warrant execution, Agent Gajkowski contacted DSS's Computer Investigations and Forensics Division ("CIF") to request that an analyst be present for the seizure, in the event of any technical issues. Agent Gajkowski believes she initially spoke with either a "Brian" or a "Ryan." Agent Gajkowski recalls being told that CIF would be unable to send anyone to support the operation due to restricted staffing and scheduling requirements during the COVID-19 pandemic. When Agent Gajkowski indicated that she would strongly prefer that a technical expert be present, CIF offered to send a member of their team to meet with her ahead of

time to work through specific guidance on iPhone seizures. Agent Gajkowski subsequently met with a CIF evidence technician. *See* ECF No. 190-2 at 14, 17 (Defense Exhibit B).[6] At that meeting, Agent Gajkowski was advised that if the devices were unlocked at the time of seizure, she could navigate to the settings to change the passcode or disable the automatic lock function, put them into airplane mode,[7] and place them into a faraday bag.[8] Agent Gajkowski's recollection is that the CIF representative did not mention that a device passcode is typically required before modifying any of the lock features, nor that an iPhone might be locked by two different features at the same time. This informed Agent Gajkowski's plan heading into the seizure of each device.[9]

Special Agent Brian Christin and Special Agent Ryan Stitzer are supervisors at CIF, and both were contacted regarding the June 6, 2020, warrant execution. Both recall the order of events differently than Agent Gajkowski. Specifically, that Agent Gajkowski did not reach out to them until the day the warrant was executed, June 6, 2020.[10]

On June 6, 2020, the defendant agreed to meet Agent Gajkowski for a follow-up, voluntary interview.[11] The defendant chose the location, a sandwich shop across the street from his hotel. The interview was in a public place and neither the defendant nor his movements were restricted

---

[6] The evidence technician did not have the same technical qualifications as forensic examiner.

[7] "Airplane mode" is a setting on a smartphone or tablet for use on board an aircraft, in which the device does not receive or transmit wireless signals. When activated, the mode suspends the device's radio-frequency signal transmission, effectively disabling all voice and data services.

[8] Faraday bags shield devices from outside signals to prevent data from being altered, deleted, or added to a device.

[9] Initially, the plan was to seize the devices on June 5, 2020. *See* ECF No. 190-2 at 22 (Defense Exhibit B). The agents later decided to execute the warrant on June 6, 2020.

[10] Contrary to the defendant's characterization, ECF No. 190 at 5, the government has not represented (and does not represent) that any of the information previously provided regarding Agent Gajkowski's preparation for the warrant is false. Agent Gajkowski remembers reaching out to CIF, a "Brian" or "Ryan." Two specific CIF employees, Brian Christin and Ryan Stitzer, do not believe they spoke with Agent Gajkowski before June 6, 2020. Regardless of who she initially contacted at CIF, the fact remains that Agent Gajkowski contacted CIF and met with a CIF employee. *See* ECF No. 190-2 at 14, 17 (Defense Exhibit B); *see also* Exhibit C, First Body Worn Camera at 13:47:13.

[11] SA Gajkowski was joined by SA Ted Nelson for the interview. Two other agents were posted nearby but out of sight.

or restrained. The interview began at 10:12 a.m. *See* Exhibit B, June 6, 2020, Interview at 00:13.

At the beginning of the interview, agents asked the defendant to turn his phones on vibrate. *Id*. at

00:20 – 00:22. The defendant responded, "yea." *Id*. The defendant confirmed his understanding that

the interview was voluntary and that he was not under arrest. *Id*. at 00:22 – 00:45. Shortly after, the

defendant indicated that he was trying to turn his phone(s) off. *Id*. at 00:55 – 01:05.

The interview lasted approximately two hours and twenty minutes. The defendant

ultimately recounted his version of what happened with AV-1, much like he did during the June

2, 2020 interview. The conversation remained cordial throughout, and the defendant can be heard

chuckling throughout the interview. *See*, *e.g.*, *Id*. at 18:18, 54:38, 59:18, 1:03:56, 1:16:05, 1:35:35,

1:38:00, 1:45:35, 1:54:28, 2:01:16, 2:03:25.

Towards the end of the conversation, Agent Nelson asked the defendant, "you got two

phones on you, right?" *Id*. at 1:41:20. In response to Agent Nelson's question, the defendant

confirmed that he had two phones on him and that one was a work phone, and the other was a

personal phone. *Id*. at 1:41:20 – 1:41:35. Agent Gajkowski then said, "to prove that just, that these

are the phones, can you just turn them on for me?" *Id*. at 1:41:35 – 1:41:40. The defendant agreed.

*Id*. Agent Nelson again asked the defendant which phone was his work phone, and which was the

personal phone. *Id*. at 1:42:00 – 1:42:30. During this exchange, the defendant also admitted to

deleting his photographs of himself from the dating application. *Id*. at 1:42:50 – 1:44:00. Agent

Gajkowski asked the defendant how the phones were locked, and he indicated that they were

locked with a PIN. *Id*. 1:44:25 – 1:44:35.

For the first time, Agent Nelson then informed the defendant that the agents had a warrant

to seize his phones. *Id*. at 1:44:43. The defendant responded, "I can't, I can't let you do that without

a lawyer present[12]…I can't authorize that without a lawyer." *Id.* 1:44:44 – 1:45:02. The defendant expressed concern regarding how he would function without his phones, noting that he would be unable to contact anyone. *Id.* at 1:45:35. Agent Nelson's immediate suggestion was that the defendant go to the store and get a new phone, calling the lack of a phone an inconvenience. *Id.* at 1:45:40 – 1:46:00. The defendant responded, "this is more than an inconvenience. I literally am dead in the water." 1:46:00 – 1:46:08. Agent Nelson responded, "just go get another phone and let people know…" to which the defendant responded, "I don't have any phone numbers." *Id.* at 1:46:12. Agent Gajkowski then asked, "Is there a phone number that you'd like us to pull—that we can get from your phone and write down?" *Id.* at 1:46:20.

Observing the defendant's demeanor, Agent Nelson asked the defendant whether there was something the agents needed to know about. *Id.* at 1:46:55. The defendant informed the agents that he had "naked photos on there of women." *Id.* at 1:47:00. The agents responded, "who cares" and "that's fine" and "everyone has naked photos." The defendant chuckled. *Id.* at 1:47:00 – 1:47:05.

Agent Nelson later offered to obtain the defendant's contacts and then asked, for the first time, for the defendant's PIN to do so. *Id.* at 1:47:20 – 1:47:26. The defendant then mentioned that he would need to consult with his lawyer. *Id.* at 1:47:26 - 1:47:30. Agent Nelson told the defendant that the agents needed to unlock the phones to put them in airplane mode, and the defendant refused to provide the PIN codes. *Id.* at 1:47:35 – 1:47:45. Agent Gajkowski clarified her understanding of the defendant's position, stating "I just want to be clear, so you're not willing to voluntarily give us your PIN. Correct?" *Id.* at 1:47:45. The defendant responded, "no, not until I consult with a lawyer." *Id.* at 1:47:45 - 1:47:51. Agent Gajkowski then explained that she was willing to help him obtain contact information from his phone but that she could not hand the phone over to him to do

---

[12] Agent Gajkowski understood the defendant's mention of an attorney not as an invocation of any constitutional right but rather a reluctance or refusal to turn over his physical devices.

so, citing concerns about the destruction of evidence. Therefore, she would need his PIN to obtain that information for him. Explicitly, she informed the defendant, "But that is your decision. We can't coerce you to give us any PINs. Okay?" *Id.* at 1:47:55 – 1:48:24.

Following this exchange, Agent Gajkowski showed the defendant the warrant, noting that he would be provided a property receipt. *Id.* at 1:48:52 – 1:49:05. Agent Nelson informed the defendant: "If you feel like you need an attorney by all means do that . . . just let us know." *Id.* at 1:52:18. The defendant did not audibly respond. While completing multiple copies of the required property receipts, Agent Gajkowski stated, "This is going to take a sec. Do you want to grab some, like, water, bathroom break? You're obviously free to go at any time." The defendant responded, "I'm okay," and Agent Nelson reiterated, "Just because we seized your phone, doesn't mean you're detained. All right?" The defendant affirmed his understanding, stating "I know." *Id.* at 1:54:50 – 1:54:59. As Agent Gajkowski neared the end of her paperwork, she asked the defendant to tell her how to put the device into airplane mode. *Id.* at 1:57:0. The defendant responded, "I'd have to, I'd have to unlock it, honestly." Agent Gajkowski responded, "That's your choice." When the defendant declined, Agent Gajkowski confirmed her understanding that his phone could not be placed into airplane mode without unlocking it and then said, "That's okay." *Id.* at 1:57:10 – 1:57:25. Agent Nelson then told the defendant, "when all else fails, if there's a false statement or untruth, that's what gets people … I've seen a lot of people with 'he said, she saids' get jammed up for lying, and that's the worst. *Id.* at 1:58:00. The defendant responded, "I haven't given any false statement…we definitely drank … definitely had sex." *Id.* at 1:58:00 - 1:58:30. Agent Nelson and the defendant casually discussed work, the ongoing COVID pandemic, health, and other unrelated topics, while Agent Gajkowski completed the paperwork. *Id.* at 1:59:00 – 2:07:00. Agent Nelson then told the defendant to let him know in the next 24 hours if anything they discussed

needed clarification. *Id*. at 2:07:25. The interview ended at 12:26 p.m., and the defendant walked back to his hotel.

Agent Gajkowski and Agent Nelson remained in the area and updated government counsel by phone as to the seizure of the locked phones. Agent Gajkowski explained that because she believed, based upon the defendant's statement, that the phones could only be unlocked with a PIN, she did not attempt to unlock the phones using the biometrics as authorized in the warrant. Government counsel then indicated she was going to consult with a supervisor. While awaiting a response, the agents ate lunch and remained in the area. Government counsel called Agent Gajkowski back and told her that because the agents were still in the immediate area and because little time (less than an hour, at that point) had elapsed, they should compel the defendant to open the phones using biometric procedures authorized by the warrant. Before reengaging with the defendant, the agents requested the presence of a local uniformed police officer.[13]

The agents arrived at the hotel at 1:30 p.m., one hour after their prior contact with the defendant had concluded. Agent Nelson and Agent Gajkowski stood on one side of the lobby. The uniformed officer stood on the other side of the lobby. Two additional agents present for officer safety purposes decided to stand outside so as not to "overwhelm" the defendant. *See* Exhibit C, First Body Worn Camera Video at 13:32:32 – 13:32:38. The two additional agents were in plain clothes and stood far enough from the hotel exit/entrance that the automatic doors were not triggered. The defendant made no indication that he was aware of the presence of the agents.[14]

When the defendant entered the lobby, the agents greeted him and immediately informed him he was not under arrest. *Id*. at 13:35:37. As seen on the body camera footage, the defendant

---

[13] The officer was wearing body worn camera. The time stamp referenced is the time of day as indicated in the upper left-hand corner of the video.

[14] The Court can see the positioning of the second agent at 13:39:05.

walked in calmly and casually with his hands in his pockets and stood near an exterior exit door (a different door than where the plain clothes agents were standing outside). Agents informed the defendant that they were there to compel him to open his phones using his biometrics. Agent Gajkowski read the biometric provision of the warrant to the defendant. *Id*. at 13:35:55. The defendant nodded and said, "ok," *Id*. at 13:36:10, stating soon after that "if I'm compelled to do it, sure." Agent Nelson joked that he thought they were done, and the defendant replied, "no worries." *Id*. at 13:36:18. Agent Gajkowski reminded the defendant, "Not the codes. Because that's not what you have to provide." When the defendant opened the first device, he appeared to type something into his phone. As seen on the body camera footage, upon noticing this, Agent Gajkowski physically turned her head away. *Id*. at 13:36:28. After the defendant unlocked the phone, Agent Gajkowski asked him whether he wanted to grab any phone number, and the defendant said, "no." *Id*. at 13:36:42. Agent Nelson handed the defendant the second phone. *Id*. at 13:36:51. The defendant pulled down his face mask in an apparent attempt to unlock the phone using biometrics. The video then depicts the defendant typing something into the second phone before handing the phone back to Agent Nelson and saying, "here you go." *Id*. at 13:36:51 – 13:37:03.

After the defendant opened the second phone, Agent Gajkowski reapproached the defendant about the first phone, indicating that she was trying to change the password but that the phone was asking for touch ID. *Id*. at 13:37:05. The defendant quickly placed a finger on the phone and then handed it back to Agent Gajkowski. Agent Gajkowski was handling the phone when she again paused to ask the defendant whether changing the password requires thumb print or password. The defendant responded that it required both fingerprint and password. Agent Gajkowski then asked the defendant if he was willing to enter the passcode, presumably to enable her to change the lock settings. The defendant indicated that he did not understand and

asked whether he was compelled to provide the passcode. The agents told him he could not be compelled to provide the passcode, and so the defendant responded that he'd rather not, for privacy reasons. *Id*. at 13:37:15 - 13:37:50. While this was going on, the second phone locked, and Agent Nelson asked the defendant to unlock it using biometrics. The defendant took the phone and appeared to slide his finger across the screen before handing it back to Agent Nelson. *Id*. at 13:37:55 – 13:38:08.

During this entire time, the defendant stood calmly by an exterior exit door (a different door than the exit/entrance where plain clothes officers stood outside), often with his hands in his pockets. Agent Gajkowski told Agent Nelson regarding the first phone, "I can't change the password without the code. So I'm going to change a couple settings here and we'll go from there." *Id*. at 13:38:00. Agent Nelson handed Agent Gajkowski the second phone and thinking they had successfully changed the phones settings and would no longer need the defendant to provide biometric access, the agents thanked the defendant for his time and the defendant walked back to his room. The entire exchange with the defendant lasted approximately five minutes.

As the agents were preparing to leave the hotel, Agent Gajkowski realized that, despite her attempts to change the settings, the phones had relocked, and she could not get back in. *Id*. at 13:40:00, 13:41:40. Agent Gajkowski told Agent Nelson that she was trying to call "Brian" (a supervisor at CIF) but was unable to reach him. Agent Gajkowski then called the same government attorney. She asked about returning at a later date, and then told the other agents something to the effect of "once we return the warrant [inaudible] they can't." 13:45:00 – 13:45:20. After further discussion wherein Agent Gajkowski explained the methods she had tried to use to keep the phones unlocked, [15] Agent Gajkowski said to the government attorney, "Do you want us to try to get the

---

[15] The other agents and the officer were discussing ways to keep the phone active in an unlocked state, such as GPS. *Id*. at 13:45:50 – 13:46:22.

face one more time and keep it on if we can?" *Id*. at 13:46:22.[16] Ultimately, Agent Gajkowski

indicated that she would try again. *See generally*, *Id*. at 13:46:20 – 13:46:35.

Agent Gajkowski indicated that she was trying to reach the CIF evidence technician with

whom she spoke the day before. *Id*. at 13:47:13. Agent Gajkowski called another agent in her office

who served as a resource in evidence collection to determine whether he had any additional ideas

as to how to proceed to ensure that the phones were properly seized and accessible. *Id*. at 13:48:56.

On the body camera footage, Agent Gajkowski can be heard explaining the situation to the agent,

namely that she could not figure out how to keep the phones unlocked. *Id*. at 13:48:56 – 13:50:50.

At one point, Agent Gajkowski was speaking to both government counsel and the agent on two

separate phones, switching back and forth between each. *Id*. at 13:50:50. Several times throughout

the video, Agent Gajkowski indicated that the passcodes could not be compelled.

Following these calls, the agents asked the defendant (via the desk attendant) to return to

the hotel lobby. *See* Exhibit D, Second Body Worn Camera Video at 14:21:09. As before, the two

agents in plain clothes waited outside of the hotel, far enough from the exit door that the automatic

sensors were not triggered. Both agents stood together, and it is unclear from the video that the

defendant noticed their presence. Agent Gajkowski and Agent Nelson explained to the defendant

that they were having trouble keeping the phones on, and Agent Nelson told the defendant that

while not required, his cooperation would be appreciated because they did not want to continue to

inconvenience him. *Id*. at 14:21:40 ("We can't compel you or force you. Any cooperation would

be greatly -- we don't want to keep bothering you because it's an inconvenience.  But we want

respect your rights.  So I don't know if you can meet us halfway or what.  You don't have to, but

---

[16] There is no indication in the footage that the government attorney "believed that a warrant can, and should, be executed as many times as she would like until it has been 'returned.'" *See* ECF No. 190 at 11. The exchange at minute 13:46:22 soundly refutes any such speculation.

God it would be helpful.").

The defendant expressed some reluctance, before stating, "I want to help," *Id*. at 14:21:49, to which Agent Gajkowski replied that she understood. She then asked him to open the phone using the facial recognition and they would proceed from there. Noticing that the defendant began typing into the phone, Agent Gajkowski asked "is it a passcode?" The defendant explained that sometimes he must use the passcode if something has been changed. Agent Gajkowski responded, "Okay, okay. So passcode is voluntary. We can compel face. But that's what—I just want to reiterate that." *Id*. at 14:22:18. The defendant showed no reaction to Agent Gajkowski's statement and handed the now unlocked phone to her, stating "there it is." Agent Gajkowski then asked the defendant if he would "feel comfortable" setting the password to something easy, like 1, 2, 3, 4, and the defendant replied, "sure." *Id*. at 14:22:30 - 14:22:45. The defendant then added, in substance, that the password may need to be 6 digits. As the defendant navigated through the settings while Agent Gajkowski looked on, they noticed an option to set up an alternate appearance (presumably to change the face associated with the Facial ID). Agent Gajkowski joked that he would not want her face to be on his phone, and the agents and the defendant laughed. *Id*. at 14:23:05 – 14:23:20. When they eventually found the setting to turn off the passcode feature, rather than change the code itself, the defendant asked if he should instead turn the passcode off. In doing so, as he did earlier, he turned the face of his phone towards Agent Gajkowski, who quickly realized that he was going to type in his PIN to change the setting. *Id*. at 14:23:40. Agent Gajkowski stepped away as he entered his passcode.[17] *Id*. at 14:23:45. The defendant then changed the settings on the second device. *Id*. at 14:23:45 – 14:25:25.

---

[17] Here the government notes that, before Agent Gajkowski stepped away, she noticed the following: to change the passcode on each phone, the iPhone 6 required only a passcode. The iPhone XR, however, required both a passcode and the defendant's iCloud password.

Throughout this second encounter in the hotel lobby, the defendant's demeanor was similarly calm and cooperative. Upon confirming that both phones were permanently unlocked, the defendant said, "thanks guys" and turned to walk away. *Id*. at 14:25:41. At one point as he was walking away, he appeared to ask from the hallway whether "that was it" (presumably confirming they were finished), and the agents assured him they were done. *Id*. at 14:25:56. The entire exchange lasted approximately five minutes.

Agent Gajkowski returned the phones to the faraday bags. Neither she, nor any other agent, accessed the phones. They were turned over to CIF on June 8, 2020.

## III.   EVIDENCE SEIZED PURSUANT TO SEARCH WARRANTS

Broadly speaking, the bulk of the electronic evidence was gathered from six devices (phones and laptops), two memory cards, and various platforms capable of storing information, such as iCloud, Google, and Yahoo. Electronic evidence in this case includes not only images (photographs and videos) of women, but also the defendant's search history revealing a sexual interest in drugged women, research about the interactions between alcohol and certain substances, and at least one email wherein the defendant sent an inquiry to an online pharmacy about chloral hydrate (an incapacitating agent also known as a "mickey"). Search warrants also revealed that the defendant met many of the victims via dating platforms such as Hinge, Tinder, and Bumble.

The government obtained search authorization for each of the devices and platforms referenced above. The affidavits supporting those warrants referenced the iPhone XR to varying degrees. A summary is included below[18]:

---

[18] *See also*, Exhibit E, a chart indicating how many images (photographs and videos) were located on each device. Please note that many of the photographs and videos referenced in that chart are duplicates. In other words, sometimes the same image was found on multiple devices and/or platforms.

| Residence (or Item Located at Residence) and Date Search Warrant was Signed | Explicit Photos Located | Mentioned in the Affidavit | | | |
|---|---|---|---|---|---|
| | | Fact that iPhone XR was Seized on June 6, 2020 | Internet Searches on iPhone XR *(Reviewed on June 12)* | Images Found on iPhone XR *(Reviewed on June 12)* | iCloud[19] |
| **Embassy Housing in Mexico[20]** **June 11, 2020** | No | | | | |
| Purple Asus Laptop *August 19, 2020* | Yes | Yes | Yes | Yes | |
| Blue Asus Laptop *August 19, 2020* | Yes | Yes | Yes | Yes | |
| | | | | | |
| **iCloud** **August 14, 2020** | Yes | Yes | Yes | Yes | |
| | | | | | |
| **Parents' House in California** **October 9, 2020** | No | Yes | Yes | Yes[21] | Yes |
| MacBook Air *November 27, 2020* | Yes | Yes | No | No | Yes |
| Kingston SD Card *November 27, 2020* | Yes | Yes | No | No | Yes |
| SanDisk USB *November 27, 2020* | Yes | Yes | No | No | Yes |
| LG Phoenix *November 27, 2020* | No | Yes | Yes | Yes | Yes |
| | | | | | |
| **Yahoo** | Yes | Yes | No | No | Yes |

[19] The iPhone XR photos and internet search history are mentioned in the iCloud warrant, signed on August 14, 2020.

[20] The iPhone XR and iPhone 6 had not been analyzed yet. The iPhone XR was extracted on June 9, and the iPhone 6 was extracted on June 10. The analysis of both devices began on June 12.

[21] The warrant indicates "through the forensic analysis of Raymond's electronic devices, his iCloud account and his mobile messaging application, law enforcement recovered two video fragments and eight photographs of AV-4." Two videos were located on the iPhone XR. Two videos and eight photographs were located in the iCloud. Out of an abundance of caution, this chart assumes the affidavit is referencing photos on the iPhone XR.

| | | | | | |
|---|---|---|---|---|---|
| **Google** | No | Yes | No | No | Yes |

Below, the government summarizes the warrant affidavits, as well as some of the relevant evidence located on each device and/or platform.

### A. June 5, 2020: iPhone XR and iPhone 6

During an interview on June 2, 2020, investigators observed the defendant in possession of two different iPhones. The defendant accessed each phone and showed the agents his messages with AV-1. On June 5, 2020, investigators obtained authorization to seize and search the two phones.[22] The defendant's personal iPhone XR, and the defendant's work phone, an iPhone 6, were seized on June 6, 2020. Based on her report and her behavior immediately following the report, agents suspected that AV-1 had been drugged in order to facilitate the reported sexual assault. Law enforcement therefore requested authorization to seize evidence from the phones, including records related to research about and possession of controlled substances, records and communications relating to dating applications, communications between the defendant and AV-1, and photographs and videos of AV-1 and other potential victims. Of course, the affidavit supporting the search warrant did not reference any evidence found on the iPhone XR. Instead, it only referenced AV-1's sexual assault report, along with the fact that she met the defendant on Tinder and spoke with him via WhatsApp messages.

The iPhone XR was extracted on June 9, and the iPhone 6 was extracted on June 10. The analysis of both devices began on June 12, 2020.

On the iPhone 6 there were WhatsApp messages with multiple charged victims, including AV-1, AV-7, AV-8, and AV-9. There was also a Google search in Safari for "snoring Asian girl."

---

[22] At the time of the application, investigators were unsure of the model numbers.

Additionally, an analysis of the iPhone 6 revealed that the iPhone appeared to be backing up to the defendant's iCloud account.[23]

On the iPhone XR, there were internet artifacts from the defendant's Safari search history that included "deep sleep," "passed out," and "how to save photos from.icloud to aniother device."[24] Additionally, 29 explicit images were recovered from the iPhone XR depicting AV-2, AV-3, AV-4, AV-5, AV-6, and AV-7. These images were carved. In this context, "carved" means a file embedded in another file (i.e., not the original file). Sometimes, but not always, a carved or fragment image is the only copy of a file because the original file has been deleted. Here, the original photos had already been deleted, but copies were found in the defendant's iCloud. The carved files were recovered via forensic review of the iPhone XR. They would not have been visible via a physical inspection of the phone (Agent Gajkowski unlocking the phone and navigating to the photo album, for example).

### B.  June 11, 2020: Purple Asus Laptop and Blue Asus Laptop

The assault of AV-1 occurred in the defendant's embassy-leased housing in Mexico City, Mexico. On June 11, 2020, investigators obtained authorization to search the defendant's embassy-leased housing in Mexico. Based on her report and her behavior immediately following the report, agents suspected that AV-1 had been drugged in order to facilitate the reported sexual assault. Law enforcement therefore requested authorization to seize, among other things, bedding, food, drinking glasses, pharmaceuticals, illicit substances, and any photographic or digital equipment that may have been used to record or retain images of the sexual assault. The affidavit supporting the residential search warrant did not reference the defendant's iPhone XR, nor any evidence found

---

[23] Subsequent analysis of the iCloud account did not reveal any iPhone 6 backups.

[24] Verbatim recitation of his search terms.

on that device. Instead, it only referenced AV-1's sexual assault report, along with the fact that she met the defendant on Tinder and spoke with him via WhatsApp messages. The residence was searched on June 14, 2020. Law enforcement seized several items, including a purple Asus Laptop and a blue Asus Laptop.

On August 19, 2020, investigators obtained authorization to search the defendant's purple Asus laptop and blue Asus laptop. Law enforcement requested authorization to seize, among other evidence, internet search history, communications, and photographs and images. The affidavit referenced AV-1's sexual assault report, along with the fact that she met the defendant on Tinder and spoke with him via WhatsApp messages. The affidavit also referenced images located on the iPhone XR and internet search history located on both the iPhone XR and the iPhone 6.

On the purple Asus Laptop, Google analytics referral cookies[25] from Internet Explorer included, "Asian girl and passed out and street." Additionally, 34 explicit images depicting AV-20 and AV-22 were recovered.

On the blue Asus Laptop, internet artifacts from Internet Explorer included searches on Yahoo or YouTube for "passed out" and "ambien," "ambien and alcohol and pass out," and "deep sleep." The titles of web pages visited included, "girl passed out eyes open," "girl passed out on hotel patio," and "messing with sleeping girlfriend!" Google analytics referral cookies from Internet Explorer included, "ambien and alcohol side effects," "zolpidem" and "passed out photos." Nine explicit images depicting AV-20 and AV-21 were recovered.

### C.  August 14, 2020: iCloud Account

One June 2, 2020, and June 6, 2020, investigators observed the defendant in possession of two different iPhones. On June 6, 2020, investigators seized two iPhones from the defendant, and

---

[25] Google Analytics Referral Cookies are cookies used by website owners to track and measure how users interact with their website content, including any search terms used to find that website.

on that same date, they submitted a preservation request to Apple for the defendant's iCloud account.[26] Contrary to the defendant's factually inaccurate claims, ECF No. 190 at 13, when agents submitted the preservation request, the iPhones had not yet been analyzed. This fact is borne out by the emails attached to the defendant's motion. *See* ECF No. 190-2 at 14-15. Further indication that the agents had not yet analyzed the phones and therefore did not know the defendant's Apple ID is evidenced by the preservation letter itself, which provides several identifiers for the defendant (in an attempt to help Apple identify the account), but does not provide the actual Apple ID. *See* ECF No. 190-3 at 3.

On August 14, 2020, investigators obtained authorization to search the defendant's iCloud account. The signed warrant was served on Apple that same day. Law enforcement requested authorization to seize Apple accounts associated with the defendant's Yahoo and Google email addresses and to search for incriminating evidence in the contents of the defendant's iCloud (including backups and photo library) and the contents of messages. The affidavit supporting the search warrant referenced images located on the iPhone XR and referenced internet search history located on both the iPhone XR and the iPhone 6. The affidavit also referenced AV-1's sexual assault report, along with the fact that she met the defendant on Tinder and spoke with him via WhatsApp messages. Finally, the affidavit referenced the defendant's statements to investigators.

When investigators received the return, they located device registration dates and times for an Apple account associated with the defendant's Yahoo email address. The devices associated

---

[26] On June 4, 2020, Agent Gajkowski contacted a DS employee and provided the DS employee with the defendant's pertinent identifiers (such as name, phone number, and email addresses) with the goal of receiving assistance drafting various preservation letters. On June 6, 2020, the government inquired as to the status of preservation letters for the defendant's various accounts. Agent Gajkowski's supervisor contacted the same DS employee requesting confirmation that preservation letters had been sent to Tinder, Bumble, Facebook, email accounts, and Apple. No preservations letters had been sent, and so, on the evening of June 6, 2020, Agent Gajkowski sent one to Apple herself.

with the account were an iPhone XR (2019), an iPhone 6 (2018), an iPhone 8 (2018), an iPhone 4S (2016), and a MacBook Air (2012).

A forensic examination of the iCloud account revealed WhatsApp messages between the defendant and a close friend, Witness-1, with whom the defendant often spoke at length about his dates, disclosing to the friend those women with whom he engaged in sexual intercourse. There were also WhatsApp messages and/or iMessages with several of the charged victims in this case, including AV-1, AV-5, AV-6, AV-7, AV-8, AV-8, AV-12, AV-15, AV-17, and AV-26.

Finally, 400 explicit images were recovered from the iCloud account depicting AV-2, AV-3, AV-4, AV-5, AV-6, AV-7, AV-8, AV-9, AV-10, AV-11, AV-12, AV-13, AV-14, AV-15, AV-16, AV-17, AV-18, and AV-19. Some of these photographs are described in the government's opposition to the defendant's motion for bond and release from custody, ECF No. 187.

**D. October 9, 2020: MacBook Air, Kingston SD Card, SanDisk USB, and LG Phoenix**

After his June 2020 interviews with law enforcement, the defendant stayed with his parents in California. On October 9, 2020, investigators obtained authorization to search that residence. The search warrant was executed on that same date. Law enforcement requested authorization to seize, among other things, sexually explicit materials depicting victims (whether stored electronically or printed), pharmaceuticals, and electronic devices. The affidavit supporting the search warrant referenced AV-1's sexual assault report, along with the fact that she met the defendant on Tinder and spoke with him via WhatsApp messages. The affidavit also referenced images located in the defendant's iCloud account and internet search history located on the Asus laptops, the iPhone XR, and the iPhone 6. Additionally, it referenced images of, and messages with, AV-4 (found on the iCloud, electronic devices, and mobile messaging applications). Finally,

the affidavit referenced the defendant's statements to investigators and a picture found on the iPhone XR where the defendant is holding his MacBook Air.

Pursuant to that warrant, law enforcement seized several items, including a MacBook Air laptop, a Kingston SD Card, an LG Phoenix phone, and a SanDisk Cruzer USB flash drive. On November 27, 2020, investigators obtained separate authorization to search the devices seized in California.[27] The affidavit supporting the search warrant referenced AV-1's sexual assault report, along with the fact that she met the defendant on Tinder and spoke with him via WhatsApp messages. The affidavit also referenced images located in the defendant's iCloud and internet search history located on the blue and purple Asus laptops. Additionally, it referenced images of, and messages with, AV-4 (from the iCloud only). The affidavit did not reference any photograph or video evidence found on the iPhone XR.

On the MacBook Air, internet artifacts retrieved from Safari history and cache included, "a private unconscious rape," "abusing a sleeping girl," "Asian chloro drugged fuck," "drugged girlfriend being abused," "he took advantage of unconscious sisters limp body," and "I fucked my drunk, passed out sister and she won't remember." Other searches included, "tequila and visine latina raped on first date," "vodka & valium," and "Xanax and alcohol." Additionally, 513 explicit images were recovered from the MacBook Air laptop depicting AV-2, AV-3, AV-4, AV-5, AV-6, AV-12, AV-13, AV-14, AV-15, AV-16, AV-17, AV-18, AV-19, AV-25, and AV-28. A visual

---

[27] Investigators initially obtained authorization in California to search the defendant's devices. The affidavit supporting the search warrant referenced AV-1's sexual assault report, along with the fact that she met the defendant on Tinder and spoke with him via WhatsApp messages. The affidavit also referenced images located on the defendant's iCloud and internet search history located on the Asus laptops, the iPhone XR, and the iPhone 6. Additionally, it referenced images of, and messages with, AV-4 (found on the iCloud, electronic devices, and mobile messaging applications). Finally, the affidavit referenced the defendant's statements to investigators and a picture found on the iPhone XR where the defendant is holding his MacBook Air. Except for the LG Phoenix 4, none of the devices were analyzed. The devices were moved to Washington, D.C., and the government sought a new warrant.

inspection revealed that images found on the MacBook Air depicting AV-3, AV-4, AV-5, AV-6, appear to be duplicates of images found on the iPhone XR.

On the LG Phoenix phone, internet artifacts from Google Chrome included searches for "deep sleep won't wake up." Sixty-eight explicit images were recovered from the Kingston SD card depicting AV-19, AV-23, and AV-24. Three explicit images were recovered from SanDisk Cruzer USB depicting AV-21.

### E.  November 27, 2020: Yahoo Account

Both AV-17 and AV-18 indicated that they communicated with the defendant via his Yahoo email account. Additionally, a warrant served on Tinder indicated that both Yahoo and Google email addresses were associated with the defendant's Tinder account. On November 27, 2020, investigators obtained authorization to search the defendant's Yahoo account. Law enforcement requested authorization to seize, among other things, communications, photographs, and videos. The signed warrant was served on Yahoo that same day. Yahoo responded on December 16, 2020.

The affidavit supporting the search warrant referenced AV-1's sexual assault report, along with the fact that she met the defendant on Tinder and spoke with him via WhatsApp messages. The affidavit also referenced images located on the defendant's iCloud and internet search history located on the Asus laptops. Additionally, it referenced images of AV-4 and AV-17 (found on the iCloud only). Finally, the affidavit referenced the defendant's statements to investigators. The affidavit did not reference any evidence found on the iPhone XR.

An analysis of the Yahoo return revealed that the defendant sent an email to an online pharmacy. In the email, he stated, "Hello, do you have chloral hydrate for insomnia." Forensic

analysis also revealed an email containing several passwords (including numeric codes). Additionally, seven explicit images were recovered from the Yahoo account depicting AV-20.

### F.  November 27, 2020: Google Account

The defendant's Tinder account was associated with a Google email address.[28] Additionally, after the June 2 interview, the defendant emailed investigators screenshots using his Gmail account. On November 27, 2020, investigators obtained authorization to search the defendant's Google account. Law enforcement requested authorization to seize, among other things, communications, internet search history, photographs, and videos.

The affidavit supporting the search warrant referenced AV-1's sexual assault report, along with the fact that she met the defendant on Tinder and spoke with him via WhatsApp messages. The affidavit also referenced images located on the defendant's iCloud and internet search history located on the Asus laptops. Additionally, it referenced images of AV-4 and AV-17 (found on the iCloud only) and AV-20 and AV-22 (from the Asus laptops only). Finally, the affidavit referenced the defendant's statements to investigators. The affidavit did not reference any evidence found on the iPhone XR.

YouTube history associated with the defendant's email address indicated that the defendant viewed videos with titles such as, "drunk passed out girl," "passed out lawyer chick, eyecheck, feet, tongue," "video of Kelly passed out on GHB." YouTube searches included, "asian girl drugged" and "deep sleep Latina."

---

[28] Several of the women interviewed recalled meeting the defendant on dating applications, to include Tinder, Bumble, and Hinge. The defendant's iCloud account revealed that the defendant communicated with dozens of different women via Tinder and WhatsApp. On August 19, 2020, a search warrant was issued for the defendant's Tinder account. That warrant affidavit referenced evidence from the iPhone XR. On August 25, 2020, Tinder returned information responsive to the warrant. The Tinder return revealed that the defendant initially opened a Tinder account on September 1, 2017, using his Google email address. Information obtained from Tinder revealed conversations between the defendant and approximately 490 unique Tinder users occurring between August 2018 and June 2020.

## IV.    RELEVANT BACKGROUND REGARDING ELECTRONIC EVIDENCE

For purposes of the government's inevitable discovery argument, the government provides the following additional information:

### A.  Apple Products[29]

At the time the government seized the defendant's phones and subsequently sought search warrants for the iCloud and MacBook, Apple produced the iPhone and desktop and laptop computers. Apple provided a variety of services that could be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications. The services included email, instant messaging, and file storage. Relevant here, the services also included iCloud. iCloud is a cloud storage and cloud computing service from Apple that allowed its users to create, store, access, share, and synchronize data (such as photos, videos, and bookmarks) on Apple devices or via icloud.com on any Internet-connected device. Also relevant, iCloud Backup allowed users to create a backup of their device data. iCloud backups sometimes include information that has since been deleted from the device itself.

Apple provided users with electronic space on iCloud. That storage space, located on servers controlled by Apple, would contain data associated with the use of iCloud-connected services, including email, images and videos, and other files.  iCloud could also be used to store iOS device backups, which could contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, and other data.

---

[29] The information in this section is based on information published by Apple on its website, including, but not limited to, the following document and webpages: "U.S. Law Enforcement Legal Process Guidelines," available at https://www.apple.com/legal/privacy/law-enforcement-guidelines-us.pdf; "Manage and use your Apple ID," available at https://support.apple.com/en-us/HT203993; "iCloud," available at http://www.apple.com/icloud/; "Introduction to iCloud," available at https://support.apple.com/kb/PH26502; "What does iCloud back up?," available at https://support.apple.com/kb/PH12519; and "Apple Platform Security," available at https://help.apple.com/pdf/security/en_US/apple-platform-security-guide.pdf.

Importantly, records and data associated with third-party apps, including the instant messaging service WhatsApp, which was used by the defendant to communicate with women, could also be stored on iCloud.

Apple services could be accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. The account identifier for an Apple ID is an email address provided by the user. Users submit an Apple-provided email address, or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). A single Apple ID often links to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

Apple captured information associated with the creation and use of an Apple ID. Apple also maintained information about the devices associated with an Apple ID. Similarly, the telephone number of a user's iPhone is linked to an Apple ID.

### B.  Accessing iPhones without a Passcode

Most smartphones, including iPhones, feature biometric device locks as a means by which the user can unlock his device using certain physical characteristics, such as a fingerprint or facial scan. Alternatively, a user can enter a passcode to unlock the device. Depending on the device, a user may have to use biometrics and also enter a password to fully unlock a device such that certain settings can be changed.

Law enforcement has access to software, such as GreyKey,[30] which can guess a phone's PIN or passcode. Where a phone passcode is a combination of four numbers, the software may take a few weeks to access the phone. Where a phone passcode is a combination of six numbers,

---

[30] GrayKey is a device used to unlock and pull data from iPhones. It connects to the iPhone and functions by rapidly entering passcodes until the phone is unlocked. This method works regardless of whether the phone has been turned off and regardless of the length of the passcode.

the software may take up to one year to access the phone. Where the passcode is an alphanumeric combination, accessing the phone could take several years. In addition to trying every combination of a series of numbers, the software allows law enforcement to guess the passcode and try those combinations first.

The amount of data that can be extracted from a locked phone depends on whether the phone had been unlocked since the last restart. If the phone had not yet been unlocked since it was restarted, any extraction would contain limited data. Where the phone had been unlocked at least one time after restart, the Graykey extraction is nearly identical to a full extraction. In June 2020, if an iPhone was unlocked via biometrics (Face ID, fingerprint, etc.) and connected to a Graykey device, Graykey could then perform a full file system extraction, regardless of whether the phone relocked or whether the passcode was available.

## V.      ARGUMENT

As an initial matter, the defendant had no reasonable expectation of privacy for his iPhone 6, a government issued phone. *See City of Ontario v. Quon*, 560 U.S. 746, 763 (2010) (declining to rule broadly on a government-employees privacy expectations in a government-issued electronic device, but noting that when a government employee is told a device is "subject to auditing," he should be on notice that a search may take place); *United States v. Hill*, 319 F. Supp. 3d 44, 49-50 (D.D.C. 2018) (finding respondent had no reasonable expectation of privacy in her personal information stored on three BOP-owned electronic devices). Therefore, the government's analysis focuses on the defendant's personal phone, the iPhone XR. As to the suppression of evidence on that phone, the defendant's motion fails for three reasons.

First, there was no Fourth Amendment violation because the delayed use of the biometric provision was a reasonable continuation of the phone seizure. Even if the Court found the delay

unreasonable, the evidence should not be suppressed because the agents acted in good faith. Law enforcement did not intentionally delay the seizure to obtain information outside of the scope of the warrant. Furthermore, the warrant remained valid and probable cause continued to exist.

Second, there was no Fifth Amendment violation because the defendant was not subjected to coercive police tactics. The interviews took place outside of a sandwich shop and in a hotel lobby, and the defendant was free to leave at any time. Additionally, the defendant's act of typing his passcode into his phone was not a compelled, self-incriminating statement. Moreover, because the defendant was not the subject of custodial interrogation, nor had he been formally charged, he had no right to an attorney at the time that his phones were seized by law enforcement.

Finally, the government would have inevitably discovered (and in fact did discover) the most incriminating evidence in this case: the photographs and videos found on the MacBook Air and in the iCloud account. The defendant was in possession of two iPhones which, irrespective of whether agents could access their content, would have led (and in fact did lead) investigators to submit a preservation letter and seek a search warrant for the iCloud account. Additionally, the iCloud search warrant was supported by ample probable cause and did not rely solely on the iPhone XR evidence. Furthermore, multiple search warrants did not reference evidence found on the iPhone XR, including the search warrant for the MacBook Air. Therefore, the government would have inevitably discovered the evidence in this case, and the defendant's motion should be denied.

### A. There was no Fourth Amendment violation relating to the seizure of the defendant's personal phone, and even if there were, the exclusionary rule does not apply.

A search warrant under Rule 41 for a cellular device is executed when law enforcement takes physical custody of the device. The actual search of the device may be conducted later, "so long as the later search does not exceed the probable cause articulated in the original warrant and

the device remained secured." *See United States v. Castro*, 881 F.3d 961, 966 (6th Cir. 2018),

citing *United States v. Evers*, 669 F.3d 645, 650-52 (6th Cir. 2012); *see also* Fed. R. Crim. Pro.

41(e)(2)(B) ("The time for executing the warrant. . .refers to the seizure or on-site copying of the

media or information, and not to any later off sight copying.)"

Here, law enforcement executed the warrant to seize the defendant's phone at the time

the device was seized. But, when "presented with circumstances which complicated their ability

to execute fully the warrant at the time of the initial entry [or here, seizure]," law enforcement

"made a reasonable decision to execute the warrant in a manner that required [multiple] entries .

. . ." *United States v. Keszthelyi*, 308 F.3d 557, 569-70 (6th Cir. 2002). In short, the decision to

reengage the defendant to conduct the biometric unlocking procedure was a reasonable

continuation of the seizure rather than a new and separate search requiring a new warrant.[31]

1.  **The decision to reengage the defendant to have him unlock his devices was
    reasonable and resulted in a continuation of the original seizure.**

"The overriding function of the Fourth Amendment is to protect personal privacy and

dignity against unwarranted intrusion by the State." *Schmerber v. California*, 384 U.S. 757, 767

(1966). As the Supreme Court has repeatedly recognized, "obtaining ... physical evidence from a

---

[31] The defendant argues that compelled biometrics should be viewed as testimonial and thus the warrant deemed unconstitutional. *See* ECF No. 190 at 18 n.13. However, courts generally agree that law enforcement may compel an individual to provide biometrics incident to the execution of a search warrant for electronic devices without running afoul of the Fifth Amendment's right against self-incrimination. *See, e.g.*: *Matter of White Google Pixel 3 XL Cellphone in a Black Incipio Case*, 398 F. Supp. 3d 785, 793-94 (D. Idaho 2019) (finding that a forced application of a fingerprint to unlock a device was not testimonial for Fifth Amendment purposes); *Matter of Search of [Redacted] Washington, D.C.*, 317 F. Supp. 3d 523, 539 (D.D.C. 2018) (same); *Matter of Search Warrant Application for Cellular Telephone in United States v. Anthony Barrera*, 415 F.Supp.3d 832, 842 (N.D. Ill. 2019) (concluding "that any implicit inference that can be drawn from a biometric unlock procedure is not of testimonial significance")**;** *In the Matter of Search Warrant Application for [Redacted Text]*, 279 F. Supp. 3d 800, 801 (N.D. Ill. 2017) ("[T]he Court holds that requiring the application of the fingerprints to the sensor does not run afoul of the self-incrimination privilege because that act does not qualify as a testimonial communication."); *In re Search Warrant No. 5165*, 470 F. Supp 3d 715 (E.D. Ky 2020) (adopting the reasoning set forth by the D.C. District Court in 317 F. Supp. 3d 523); *but see*: *In re Search of a Residence in Oakland, California*, 2019 WL 6716356 (N.D. Cal. Dec. 10, 2019) (finding that compelled production of biometric data was testimonial for Fifth Amendment purposes in the context of a warrant application seeking permission to compel fingerprint or facial recognition device unlocking); *United States v. Wright*, 431 F. Supp 3d 1175, 1187 (D. Nev. 2020) (ruling that compelled production of biometric data, i.e. holding up the iPhone to someone's face without their permission, is testimonial).

person involves a potential Fourth Amendment violation at two different levels—the 'seizure' of the 'person' necessary to bring him into contact with government agents, and the subsequent search for and seizure of the evidence. *United States v. Dionisio*, 410 U.S. 1, 8 (1973) (internal citation omitted) (citing *Davis v. Mississippi*, 394 U.S. 721 (1969)). "The touchstone of our analysis under the Fourth Amendment is always the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security. Reasonableness, of course, depends on a balance between the public interest against the individual's right to personal security free from arbitrary interference by law officers." *Pennsylvania v. Mimms*, 434 U.S. 106, 108-09 (1977) (internal citations omitted). Fourth Amendment decisions "reflect the recognition that the Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract." *United States v. Ventresca*, 380 U.S. 102, 108 (1965).

A single search warrant may authorize more than one entry into the premises if the subsequent entry is a reasonable continuation of the original search. When evaluating reasonable continuation, circuit courts consider whether (1) the subsequent entry is a continuation rather than a new, separate search, and (2) the decision to conduct a second entry is reasonable under the totality of the circumstances. *See, e.g., Keszthelyi*, 308 F.3d at 568-69; *United States v. Bowling*, 351 F.2d 236, 240-41 (6th Cir. 1965) (holding that the agents' decision to return to the premises the morning after the initial search pursuant to the same warrant was reasonable where agents chose upon the first entry to document the serial numbers on the machines located there, return to their office to check the serial numbers against a list of stolen equipment, and reenter the premises the following day to seize the relevant items); *United States v. Squillacote*, 221 F.3d 542, 555 (4th Cir. 2000) (finding a six-day search of the defendant's home, which at times occurred after 10 p.m., to be a reasonable continuation of the initial search considering the totality

of  the circumstances).

Searches have been found reasonable where, after an initial search has ended, agents realize that they had inadvertently or mistakenly missed critical evidence and therefore returned to continue the search. *See United States v. Carter*, 854 F.2d 1102, 1105 (8th Cir. 1988) (upholding the second seizure and search of a hotel room as a continuation of the first, where agents ended their search and provided an inventory list, realized they had not located evidence specifically identified in the warrant, told the hotel not to clean the room until they returned, and then subsequently searched the room again); *United States v. Kaplan*, 895 F.2d 618, 623 (9th Cir. 1990) (upholding a search occurring over two hours after the initial search where officers realized that they had not seized everything authorized by the warrant). Searches have also been found reasonable where, upon realizing they lacked the ability to fully execute a search, law enforcement suspended the search temporarily. *See United States v. Gerber*, 994 F.2d 1556, 1557-59 (11th Cir. 1993) (finding the continuation of a vehicle search reasonable where agents' continued the search two days after the initial entry, after the warrant had expired, because the agents initially lacked the tools necessary to open the hood and seize additional evidence, the probable cause supporting the warrant still existed, and the agents did not deliberately cause the delay).

The government notes that the cases cited above considering the reasonable continuation question involve premises warrants, rather than device warrants. With the search of a defendant's home, for example, the reasonable continuation rule stops the government from committing repeated disturbances of the "peaceful enjoyment" of the home on a single warrant. *Castro*, 881 F.3d at 968. On the other hand, searches of electronic devices, removed from a location and secured by law enforcement "differ in degree and kind." *Id*. After a device is lawfully seized, its owner loses the right to possess it until the search is complete. Thus, the repeat search of a device can

hardly be said to infringe on a suspect's ownership interest in it in the way the repeat search of a home might. Recognizing this key difference, the Sixth Circuit noted that "[a] comparison of the two settings. . .gives analogy a bad name." *Id*. at 968. The same can be said of the seizure in this case, where law enforcement's follow up interactions with the defendant did not further interrupt his ownership interest in his phones.

Finally, in addition to considering the reasonableness of a subsequent entry on a single warrant, courts also consider whether probable cause continued to exist throughout the continuation or delay and whether law enforcement deliberately caused delay. *See United States v. Nicholson*, 24 F.4th 1341, 1351 (11th Cir. 2022) (where law enforcement waited six months after seizing a device to search it, the court held that, although the government failed to comply with the temporal limitations in the warrant, there was no Fourth Amendment violation because the probable cause that justified the warrant still existed).

When the agents seized the defendant's iPhone XR on June 6, 2020, they did not attempt the biometric unlocking procedures authorized by the warrant because they did not know that an iPhone could be locked by two different mechanisms simultaneously (by passcode *and* biometrics, for example). Therefore, when the defendant indicated that the phones were locked by a PIN, the agents mistakenly thought that a PIN code was the only method by which the phones could be unlocked. Recognizing that they could not compel him to reveal his PIN code, the agents ended the encounter. Upon realizing that they should have utilized biometrics to open the iPhone XR, the agents reengaged the defendant to unlock his phones using either Touch or Face ID. Given the physical and temporal proximity to the seizure, coupled with the fact that the warrant did not simply authorize a seizure, but rather also the compelled use of biometrics, and a subsequent search of the device, this was reasonable. Agents then requested that the defendant meet them in the lobby of

his hotel. After biometrics were compelled,[32] the agents realized the phones locked again. Agents began troubleshooting the issue with government counsel and members of CIF. The agents also reengaged with the defendant, explaining the situation and repeatedly indicating that providing his PIN was voluntary. Each subsequent interaction with the defendant lasted approximately five minutes, and each time, the defendant appeared calm and willing to assist.

Importantly, the defendant lost his possessory right to the device – at least temporarily – at the time of the seizure. His subsequent contact with law enforcement was not a second or third search or seizure, but simply a continuation of the original seizure, which, as in *Carter*, *Kaplan*, and *Gerber*, was necessary for agents to fully execute the warrant. Further, provided a warrant is properly issued, "it is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of the search authorized by the warrant – subject of course to the general Fourth Amendment protection 'against unreasonable searches and seizures." *Dalia v. United States*, 441 U.S. 238, 257 (1979).

Additionally, the fact that the agents reengaged the defendant roughly an hour after the initial seizure and concluded their interaction an hour after that reasonably complies with these requirements. The probable cause supporting the issuance of the warrant did not dissipate or go stale in the time it took for the agents to complete the process. *See, e.g., United States v. Brewer*, 588 F.3d 1165, 1173 (8th Cir. 2009) (passage of several months did not dissipate probable cause for searching electronically stored files in the custody of law enforcement). Finally, the agents did not deliberately delay the unlocking procedure.

---

[32] The defendant stresses the fact that the phones had been turned off and later turned back on, making the use of the biometric provision impossible. *See* ECF No. 190 at 9. Even so, biometrics was not initially attempted, and the agents acted reasonably when they sought to execute that part of the warrant. Furthermore, the agents did not instruct the defendant to do anything beyond using biometrics.

The government acknowledges the Court's conclusions in its Memorandum Opinion, dated October 26, 2022, ECF No. 158 at 6-10, 25-27. In light of the weight of authorities above, however, the government respectfully requests that the Court reconsider its previous assessment that there were three seizures. Based on the facts in this case, the decision to reengage with the defendant to unlock the phones using his biometrics, and the actions that followed, were reasonable and constituted a continuation of the original seizure rather than a separate one.

> **2.   Even if the biometric unlocking procedure is found to be a separate seizure, suppression is not warranted because any violation was not the product of intentional police misconduct.**

The exclusionary rule's "sole purpose" is to deter future Fourth Amendment violations. *(Willie Gene) Davis v. United States*, 564 U.S. 229, 236-37 (2011); *see also United States v. Calandra*, 414 U.S. 338, 347 (1974) (noting that the "prime purpose" is to deter future unlawful police conduct); *United States v. Leon*, 468 U.S. 897, 906 (1984) ("The [exclusionary] rule thus operates as a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved."). The deterrent value of exclusion directly corresponds to the "culpability of the law enforcement conduct" in committing the violation. *Herring v. United States*, 555 U.S. 135, 143 (2009). "When the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong." *(Willie Gene) Davis*, 564 U.S. at 238. However, where the law enforcement action was pursued in good faith, as it was here, the deterrence rationale loses much of its force. *Leon*, 468 U.S. at 919.

To trigger the exclusionary rule, law enforcement conduct "must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 144 (noting that the Court has never

suggested that evidence should be excluded in circumstances where it might provide marginal deterrence). The Supreme Court has held that merely negligent law enforcement conduct does not justify exclusion when balancing the benefits of deterrence with the systemic cost of excluding otherwise credible evidence and the possibility of letting guilty and dangerous defendants go free. *See Id.* at 141 – 47 (holding that when a constitutional violation was caused by an officer's negligent error or good faith mistake, rather than systemic error or reckless disregard of constitutional requirements, the costs of suppressing evidence necessarily outweigh the benefits); *see also Pennsylvania Bd. of Probation and Parole v. Scott*, 524 U.S. 357, 364-65 (1998) ("[The exclusionary rule's] costly toll upon truth-seeking and law enforcement objectives presents a high obstacle for those urging [its] application."). Error that results from negligence or mistake, is not enough, by itself, to require the "extreme sanction of exclusion." *Herring*, 555 U.S. at 140 (quoting *Leon*, 468 U.S. at 916). In such a case, "the criminal should not go free because the constable has blundered." *Herring*, 555 U.S. at 148 (drawing a distinction between mistakes versus systematic error or reckless disregard for constitutional requirements).

"In deciding whether exclusion is appropriate, an assessment of the flagrancy of the police misconduct constitutes an important step in the calculus." *Leon*, 468 U.S. at 911. Evidence should only be suppressed where "the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." *Illinois v. Krull*, 480 U.S. 340, 348-49 (1987) (quoting *United States v. Peltier*, 422 U.S. 531, 542 (1975)). As such, the exclusionary rule should not be applied for the purpose of deterring "reasonable law enforcement activity." *Leon*, 468 U.S. at 919 (further explaining that courts have considerable discretion in deciding what is reasonable based upon the circumstances of particular cases). Exclusion has "always been our last resort, not our first impulse." *Hudson v. Michigan*, 547

U.S. 586, 591 (2006). "'[E]vidence seized in reasonable, good-faith reliance on a search warrant' need not be excluded, even if the warrant turns out to have been unsupported by probable cause" or otherwise invalid. *United States v. Griffith*, 867 F.3d 1265, 1278 (D.C. Cir. 2017) (quoting *Leon*, 468 U.S. at 905).

Even where there are technical violations of a warrant, where law enforcement conduct is reasonable, evidence will not be suppressed. *See, e.g., Squillacote*, 221 F.3d at 557 ("Under these circumstances, even if the FBI's actions amounted to technical violations of the terms of the warrant, the violations were relatively minor and were motivated by considerations of practicality rather than by a desire to engage in indiscriminate fishing."); *Gerber*, 994 F.2d at 1561 (holding that evidence should not be suppressed due to an inadvertent, rather than intentional, failure to conform with Rule 41 when agents made a second entry on the warrant two days after it had expired); *United States v. Twenty–Two Thousand, Two Hundred Eighty Seven Dollars ($22,287.00) United States Currency,* 709 F.2d 442, 449 (6th Cir. 1983) (denying suppression of evidence seized the day after the warrant expired, deeming the infraction "de minimis" because a reasonable basis existed and there was no "intentional or deliberate" disregard of the Rule 41 requirements); *In re Motion to Quash Grand Jury Subpoenas,* 593 F. Supp. 184, 192 (S.D.W.Va. 1984) (finding suppression inappropriate where agents, who initially could not gain access to the premises and failed to realize that the warrant expired the same day it was issued, executed the warrant four days after its expiration, because nothing occurred in the interim to obviate the magistrate's finding of probable cause and because the agents acted in good faith).

In the instant case, the agents did nothing to exhibit deliberate, reckless, or grossly negligent disregard for the defendant's Fourth Amendment rights. At worst, they failed to initially attempt the biometric procedure because they did not know that the phones could be unlocked

using more than one method. Even if their reengagement of the defendant, an hour later, was determined to constitute a new, separate seizure, it was clearly pursued in good faith and was no longer than necessary (each hotel encounter only lasted approximately five minutes). In short, there is no justification for exclusion of the evidence from the defendant's personal device because there is no deliberate, reckless, or grossly negligent law enforcement conduct to deter.

> **B. The defendant's decision to enter his PIN to change the lock settings on his iPhone XR was voluntary and therefore not a violation of his Fourth, Fifth, or Sixth Amendment Rights.**

The agents did not violate the defendant's Fourth Amendment rights when they asked him to voluntarily provide his PIN, nor when they suggested that he change the PIN, because neither request exceeded the scope of the search authorized by the warrant. Similarly, the agents did not violate the defendant's Fifth Amendment rights because the act of typing the PIN into the phone was not a compelled self-incriminating statement. It was a "foregone conclusion" that the defendant owned and had access to the phone. Moreover, the agents' conversations with the defendant were not coercive, and the defendant's decision to change his PIN was voluntary. Finally, there was no *Miranda* or Sixth Amendment violation because the defendant was not the subject of custodial interrogation, nor had criminal proceedings formally been initiated.

> **1. The agents did not exceed the scope of the warrant by asking for the defendant's PIN.**

As described in detail above, the defendant was not compelled by the warrant or law enforcement to provide his PIN. The search warrant for the iPhone XR authorized the agents to compel the defendant to unlock the device using biometrics. Had the defendant been compelled to provide his PIN, the government agrees that it would have been in violation of the scope of the warrant. However, that did not happen.

As is clear from the video of agents' encounters with the defendant, law enforcement was well aware that ascertaining the actual passwords was beyond the warrant's authorization. In fact, the agents made efforts to look away when the defendant entered the code into the phones. Instead, they compelled biometrics, as was authorized by the warrant. They also asked the defendant whether he was <u>willing</u> to provide his PIN, a request which did not run afoul of the warrant or Fourth Amendment. The defendant responded by voluntarily typing his own PIN into each phone to unlock it. Similarly, the defendant's decision to (at the agents' request) change his PIN to something easy to remember was voluntary. The defendant was not subjected to coercive tactics and was not in custody. Far from overwhelmed or frustrated, the defendant offered to help the agents, indicating that the password may need to go up to six digits, rather than the four-digit code the agents suggested. The agents therefore did not exceed the scope of the warrant and did not violate the defendant's Fourth Amendment rights.

> **2. The defendant's decision to enter his PIN to change the lock setting was voluntary, and his will was not overborn by coercive police tactics.**

The Fifth Amendment provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. "This privilege extends not only 'to answers that would in themselves support a conviction . . . but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant.'" *United States v. Maffei*, 2019 U.S. Dist. LEXIS 70314, *16 (N.D. Cal. April 25, 2019), citing *Hoffman v. United States*, 341 U.S. 479, 486 (1951).

As an initial matter, "the seizure of any incriminating information found *on* the phones … would not violate the Fifth Amendment because the 'creation' of that information was voluntary and 'not 'compelled' within the meaning of the privilege [against self-incrimination]." *In re Search of [REDACTED] Washington, D.C.*, 317 F. Supp. 3d 523, 534 (D.D.C. 2018) (quoting *United*

*States v. Hubbell*, 530 U.S. 27, 34 (2000)). The question instead is whether the defendant typing his PIN code into his phone violated the Fifth Amendment under the circumstances present in this case. "To succeed under a Fifth Amendment challenge on a motion seeking to suppress . . . the entry of [the defendant's] PIN (and all fruits stemming from these revelations), [a defendant] would have had to show three things: (1) that the government compelled him to make a (2) testimonial communication or act and (3) that the testimonial communication or act incriminated him." *McKathan v. United States*, 969 F.3d 1213, 1223-24 (11th Cir. 2020).

There is no binding authority stating that the entry of a password or PIN constitutes a testimonial communication, and the government does not so concede.[33] In fact, here, the defendant made no statement, but merely typed his passcode into his phone, outside of the view of law enforcement, and then permanently unlocked the phone. However, even if this Court finds that typing in the PIN was testimonial and incriminating in that it connected the defendant to the device, there is no Fifth Amendment violation because law enforcement already knew the phone belonged to him, already knew he had access to the phone, and already knew that there was evidence on the phone. Thus, any incriminating testimony, such as the existence, custody, and authenticity of the evidence, was a "foregone conclusion." *See, e.g. United States v. Spencer*, 2018 U.S. Dist. LEXIS 70649, *2 (N.D. Cal. April 26, 2018) (defendant's ability to decrypt hard drives was a foregone conclusion and thus not in violation of the Fifth Amendment where device was in defendant's

---

[33] While neither the Supreme Court nor the D.C. Circuit have ruled on this issue, some courts have found that providing a passcode or PIN is a testimonial act. *See e.g. In re Search of [REDACTED] Washington, D.C.*, 317 F. Supp. 3d at 539 (finding compelled use of biometrics not testimonial, but citing cases where compelling decryption through a defendant providing a password was); *United States v. Hearst*, 2022 U.S. Dist. LEXIS 188771, at *21 (N.D. Ga. Mar. 10, 2022), *report and recommendation adopted*, 2022 U.S. Dist. LEXIS 187824 (N.D. Ga. Oct. 14, 2022) (citing a list of cases, including, *United States v. Doe (In re Grand Jury Subpoena Duces Tecum)*, 670 F.3d 1335, 1346 (11th Cir. 2012) (holding that Doe's "decryption and production of the contents of the hard drives would sufficiently implicate the Fifth Amendment privilege" because the "decryption and production would be tantamount to testimony by Doe of his knowledge of the existence and location of potentially incriminating files; of his possession, control, and access to the encrypted portions of the drives; and of his capability to decrypt the files.")); *but see Florida v. Stahl*, 206 So. 3d 124, 134 (Fla. Dist. Ct. App. 2016) (holding compelled production of passcode non-testimonial).

exclusive residence, defendant conceded ownership of two other devices therein and had already provided the login passwords for both, and conceded that he purchased and encrypted an external hard drive matching description of the one found by the government). Additionally, the defendant was not compelled to type in his password; he voluntarily unlocked his phone. Because the defendant was not compelled to provide a self-incriminating testimonial statement, there was no Fifth Amendment violation.

### a. Self-Incrimination and Testimonial Communication

The Fifth Amendment "protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." *Kastigar v. United States*, 406 U.S. 441, 445 (1972); *see also Doe v. United States*, 487 U.S. 201, 213 (1988) (noting that the Fifth Amendment is intended to "spare the accused from having to reveal, directly or indirectly, his knowledge of the facts relating him to the offense"). Thus, "[t]he Supreme Court has recognized that in some instances, the production of evidence can implicate the Fifth Amendment." *United States v. Apple Macpro Computer*, 851 F.3d 238, 247 (3d Cir. 2017) (citing *Fisher v. United States*, 425 U.S. 391, 410 (1976)). This is because by "producing documents, one acknowledges that the documents exist, admits that the documents are in one's custody, and concedes that the documents are those that the [Government] requests." *Apple Macpro Computer*, 851 F.3d at 247 (citing *United States v. Chabot*, 793 F.3d 338, 342 (3d Cir. 2015)). In other words, admitting to the possession of information that could lead to other evidence that might be used in a criminal prosecution similarly qualifies as "self-incriminating." *See Fisher*, 425 U.S. at 410. For that reason, the court in *Maffei* found that providing investigators with a passcode to a cellphone was a testimonial communication because providing a passcode "implies factual statements, including which of the three seized cellphones belonged to her and

that she had control over or a relatively significant connection to the cellphone." 2019 U.S. Dist. LEXIS 70314, *19. However, an act of production (here, the defendant entering his PIN into his phone) is neither testimonial nor incriminating when the "potentially testimonial component of the act of production—such as the existence, custody, and authenticity of evidence—is a 'foregone conclusion'" *Apple Macpro Computer*, 851 F.3d at 247 (citing *Fisher*, 425 U.S. at 411).

In *Apple Mac Pro Computer*, 851 F.3d 238, the Third Circuit declined to review a Fifth Amendment challenge based on a defendant's claim that an order requiring him to produce lawfully seized devices in a fully unencrypted state violated his privilege against self-incrimination. Citing Supreme Court precedent, the Third Circuit noted that the Fifth Amendment "does not independently proscribe the compelled production of every sort of incriminating evidence but applies only when the accused is compelled to make a Testimonial Communication that is incriminating." *Id*. at 247, citing *Fisher v. United States*, 425 U.S. 391, 408 (1976). In other words, where the act of production does not confirm for the government the defendant's access to or ownership of that phone (thus linking the defendant to the potentially incriminating evidence on the phone), the production is not testimonial. *See United States v. Fischer*, 2020 U.S. Dist. LEXIS 32965, at *14 n.2 (D. Neb. Feb. 16, 2020) (quoting *Apple Macpro Computer*, 851 F.3d at 247). In such instances, the production is a foregone conclusion, and the act (i.e., entering the PIN) "adds little or nothing to the sum total of the Government's information." *Fisher*, 425 U.S. at 411. Therefore, the question is not whether the <u>content</u> ultimately recovered from the defendant's devices was incriminating or added to the sum total of the government's information, but whether the defendant's act of entering his PIN into the phones was incriminating. *See, e.g. United States v. Ponds*, 454 F.3d 313, 323 (D.C. Cir. 2006) (recognizing that courts should look only to the communicative aspects of the act of production, rather than the content of the documents produced,

which are unprotected); *United States v. Doe (In re Grand Jury Subpoena Duces Tecum)*, 670 F.3d at 1342 (where the defendant was required to use decryption, the court indicated that, "What is at issue is whether the act of production may have some testimonial quality sufficient to trigger Fifth Amendment protection," rather than the content of the devices sought).

In this case, the defendant was compelled by the judicially authorized warrant to turn over incriminating evidence, his iPhone XR and iPhone 6. The government already knew that the phones belonged to the defendant because agents observed him in possession of the phones on June 2, 2020. Agents already knew that the defendant had access to the phones because, during the June 2, 2020 interview, agents observed the defendant accessing them. Indeed, he showed the agents messages on each of the phones. This case is therefore distinct from *United States v. Doe (In re Grand Jury Subpoena Duces Tecum)*, where the record did not establish the government knew the defendant was capable of accessing the encrypted portions of the devices prior to him opening them. 670 F.3d at 1342. Finally, while the act of entering the PIN resulted in the defendant producing a decrypted device, the government already had authorization to seize that device and would have extracted the information from that device, whether decrypted or not.

> **b. Even if typing the PIN into the phone and/or providing agents with the generic PIN was a "statement," the statement was not compelled or coerced.**

A criminal defendant's statement is inadmissible "if under the totality of the circumstances it was involuntarily obtained." *United States v. Reed*, 522 F.3d 354, 358-59 (D.C. Cir. 2008). The issue of voluntariness is a legal question that requires "careful evaluation of all the circumstances of the interrogation, including but not limited to the defendant's age and education, the length of detention, whether the defendant was advised of his rights, and the nature of the questioning. *United States v. Murdock*, 667 F.3d 1302, 1305-1306 (D.C. Cir. 2012) (internal citation omitted);

*Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Knowledge of the right to refuse to make a statement should also be considered. *Schneckloth*, 412 U.S. at 227. Ultimately, voluntariness relies upon whether the defendant's "will was overborne" when he gave the statement. *Murdock*, 667 F.3d at 1305; *Bustamonte*, 412 U.S. at 226. The test for this is whether "the statement was a product of an essentially free and unconstrained choice by its maker." *Murdock*, 667 F.3d at 1305. The "need for showing overbearing compulsion [is] a prerequisite to a Fifth Amendment violation." *United States v. Washington*, 431 U.S. 181, 190 (1977). Thus, the presence of coercive police activity is a "necessary predicate" to the finding that a confession is not voluntary. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986) (noting that while each Fifth Amendment voluntariness challenge requires a fact-specific analysis, all have contained a "substantial element of coercive police conduct," and without proof of such conduct, there is "simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law"). Voluntariness must be proven only by a preponderance of the evidence. *Connelly*, 479 U.S. at 167; *Reed*, 522 F.3d at 359.

The D.C. Circuit has held that to render statements involuntary, "egregious facts are necessary." *United States v. Robinson*, 256 F. Supp. 3d 15, 29 (D.D.C. 2017) (quoting *United States v. Hallford*, 816 F.3d 850, 863 (D.C. Cir. 2016)). In *Robinson*, approximately 20 law enforcement officers, some uniformed, encountered the defendant at his office. There were marked and unmarked police cars on site, without lights or sirens, and the perimeter around the building had been secured. *Id.* at 18-19. The defendant had an opportunity to decline the interview and was free to leave. Towards the end of the interview, the defendant was asked if he would voluntarily surrender his DEA registration (which allowed him to write prescriptions for controlled substances), and the investigator explained that if he did not, an administrative process would be initiated to revoke it. *Id.* at 23. The investigator further noted that if he surrendered his registration

voluntarily, he would retain some prescription rights.[34] Based upon the totality of the circumstances, this Court found that the defendant's statements were voluntary and denied the motion to suppress, noting that the defendant agreed to be interviewed, he had multiple opportunities to decline, he was free to leave, and he seemed willing to help. *Id.* at 29-30; *see also Hallford*, 816 F.3d at 856 (finding statement was voluntary when the interview lasted less than an hour, the agents' questions were straightforward and asked in a conversational tone, and they made no threats or promises).[35]

In this case, the defendant's initial encounter with law enforcement on June 2, 2020, was cordial, and at the conclusion of the interview, he was free to leave. This context is important because it goes to the defendant's state of mind during the second interview. When agents said he was free to leave during the second interview, he could trust that this was in fact true.

The second interview on June 6, 2020, was in a location the defendant chose, a sandwich shop. The subsequent encounters were in his hotel lobby. The front desk called the defendant down to the lobby. During the encounters at the hotel, the defendant's demeanor was calm, as evidenced by the body camera footage showing the defendant standing casually with his hands in his pockets throughout much of the encounter. The agents were similarly calm and kept a light, conversational tone with the defendant, apologizing for the inconvenience and wishing him well on several occasions. During the encounter, the defendant stood directly next to an exterior exit,

---

[34] The Court did not interpret the investigator's statements to be intended as threats or promises—rather, the Court found that the investigator was merely informing the defendant of his options. *Id.* at 23.

[35] *Compare Mincey v. Arizona,* 437 U.S. 385, 398-400 (1978) (finding confession involuntary where detective gave *Miranda* warnings but persisted in questioning defendant who had been wounded a few hours earlier, was in a hospital bed in an intensive care unit, was complaining of intense pain, gave confused and incoherent responses, and repeatedly asked that the interrogation stop until he could get a lawyer), *with Berghuis v. Thompkins,* 560 U.S. 370, 386-87 (2010) (finding no coercion in a three-hour interrogation absent evidence "that police threatened or injured [the defendant] during the interrogation or that he was in any way fearful").

while agents at times stood several feet away or paced around the lobby. The uniformed officer largely stayed out of the way. The defendant was initially informed, almost immediately upon coming into the lobby, that he was not under arrest. The defendant was never restrained, patted down, or handcuffed, and he was free to leave at any time. The agents, other than the uniformed officer, were wearing street clothing without visible weapons. Only two were in the lobby; the other two were standing outside near the entrance but were not guarding or blocking the door.

Importantly, as reflected in the body camera footage, the defendant was informed several times that he could not be compelled to provide his PIN code. And when agents mentioned to the defendant that they were struggling to keep the phones from timing out (relocking), they stated,

> "We can't compel or force you. Any cooperation would be greatly— we don't want to keep bothering you because it's an inconvenience. But we want to respect your rights. So I don't know if you can meet us halfway or what. You don't have to, but God it would be helpful."

Second Body Worn Camera Video at 14:21:40.

It was said in almost a sheepish tone, acknowledging the technical mishaps and inconvenience. The statement was a far cry from an improper or coercive threat or promise. Shortly thereafter, Agent Gajkowski asked, "Do you feel comfortable setting the password to your choosing so that I can open it? I won't have your personal password." The defendant responded, "Sure." Agent Gajkowski then confirmed, "You're okay to do that?" The defendant did not answer, but he proceeded to navigate to the settings on his phone to turn off the automatic lock feature. The phone required the defendant to input his PIN code to change this setting, and when he went to do so, he angled his phone screen towards Agent Gajkowski. She then turned her head away, saying, "oh, sorry, sorry. You don't want to –." In doing so, she was trying to ensure that she did not inadvertently view the defendant's PIN code against his wishes. The defendant turned off the lock

setting on his device.[36] After testing the phone to ensure the lock setting had successfully been changed, the agents apologized for the inconvenience, and the defendant told them it was fine and said, "thanks, guys" before leaving. Based upon the body camera footage, the encounter ended at 2:26 p.m., exactly two hours after the conclusion of the prior interview. Each hotel encounter only lasted approximately five minutes.

As in *Robinson*, the totality of these facts establish that the statements made by the defendant during his encounter with law enforcement in the hotel lobby were made freely and voluntarily without undue pressure or coercion, to include the defendant's eventual decision to input his PIN to remove the automatic lock setting from his phone. There is no indication, whatsoever, that the agents engaged in egregious, coercive tactics intended to overbear the defendant's will, and therefore, even if the Court finds that the input of a PIN was a statement, the statement was voluntary.

### 3. Neither *Miranda*, nor the defendant's Sixth Amendment Rights, are implicated.

The defendant highlights in his motion the numerous times that he told the agents he would need to consult with an attorney before handing over his phones or provide his PIN. Notably, while the defendant mentioned consulting with an attorney when the phones were initially seized at the sandwich shop, he did not when agents reengaged him later at the hotel. In any event, the defendant had no right to counsel because he was not subject to a custodial interrogation in either instance. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966) ("Prior to any questioning [stemming from a custodial interrogation], the person must be warned that he has a right to remain silent, that any

---

[36] The defendant's motion alleges that the agents also compelled the defendant to provide his "Apple account password" and "Apple account access." ECF No. 190 at 12. This is not true—the agents never so much as referenced an Apple account password or a desire to access the defendant's Apple account. Instead, the defendant's phone required him to input both his PIN code and his Apple ID password to change his lock settings.

statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."); *see also Rhode Island v. Innis*, 446 U.S. 291, 297 (1980).  Likewise, the Sixth Amendment right to counsel attaches only at the initiation of adversary criminal proceedings, and before proceedings are initiated, a suspect in a criminal investigation has no constitutional right to the assistance of counsel. *(Robert) Davis v. United States*, 512 U.S. 452, 456-57 (1994).

> **4.  Even if the entry of the defendant's PIN was found to be an involuntary and incriminating statement, suppression is not warranted.**

As with Fourth Amendment violations, the exclusionary rule is only applicable when there have been deliberate, intentional, or reckless violations of the defendant's Fifth Amendment rights. When there has been no such conduct, there is no need for the type of deterrence achieved by suppression. *See Connelly*, 479 U.S. at 166 ("The purpose of excluding evidence seized in violation of the constitution is to substantially deter future violations of the constitution."). Like the Fourth Amendment exclusionary rule cases, the concern is the same here: suppressing relevant statements, absent evidence of deliberate law enforcement misconduct, is improper because it will impose "substantial costs" on the societal interest by prohibiting the use of otherwise relevant evidence. *Id.* (citing *United States v. Janis*, 428 U.S. 433 (1976)).

In the instant case, Agent Gajkowski informed the defendant multiple times that he could not be compelled to provide his PIN. At moments when the defendant turned the face of his phone towards Agent Gajkowski, she purposefully looked or stepped away so as to not inadvertently view the defendant's PIN against his will. The agents treated the defendant with courtesy and respect, informed him he was not under arrest, and did not take any efforts to restrict his movement or his ability to leave. Each hotel interaction lasted approximately five minutes. None of the agents' conduct reflects the type of deliberate or reckless behavior requiring suppression.

Accordingly, even if the defendant's entry of his PIN were to be deemed involuntary, the "statement" should not be suppressed.

### C. Assuming the government never unlocked the defendant's iPhone XR, or such evidence had been suppressed, the government would have inevitably located the same evidence through other means.

When evidence has been seized unlawfully, the inevitable discovery exception to the exclusionary rule allows such evidence to nonetheless be introduced "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams,* 467 U.S. 431, 444 (1984); *United States v. Redrick*, 48 F. Supp. 3d 91, 107 (D.D.C. 2014). This exception exists because exclusion of physical evidence that would have been discovered regardless adds nothing to the integrity or fairness of a criminal prosecution. *Nix*, 467 U.S. at 446. "If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . the evidence should be received." *Id*. at 444.

In determining whether an additional search warrant, for example, would have been sought, absent any reliance on the unlawfully seized evidence, courts have looked to whether agents had probable cause for the additional warrant and whether there was a viable chain of events that would have led to an additional warrant independent from the problematic search. *United States v. Brown*, 64 F.3d 1083, 1085 (7th Cir. 1995). Put differently, the key issue is one of probability: how likely a subsequent warrant would have been issued and how likely the evidence would have been found. *United States v. Souza*, 223 F.3d 1197, 1204 (10th Cir. 2000).

Here, the government would have inevitably sought and obtained a search warrant for the defendant's iCloud account. The defendant was observed on June 2, 2020, in the possession of two different iPhones, a personal phone and a work phone. As discussed *supra* in Section IV.A.,

Apple phones are linked to, and often back up to, an iCloud account. Those facts alone would have resulted (and did result) in the government submitting a preservation letter in anticipation of seeking a search warrant.[37] As to probable cause for the iCloud warrant, it is important to note that investigators obtained search authorization for the defendant's iPhones based solely on AV-1's report of sexual assault, AV-1's demeanor on the day she reported, and the defendant's statements after the report. Those same facts provided sufficient probable cause to search the defendant's iCloud account. The search warrant affidavit need not have referenced on the iPhone XR at all.[38] Furthermore, AV-1 indicated that she spoke with the defendant via WhatsApp, a mobile messaging application that can (and did) backup to iCloud. And the internet search history discovered on the defendant's iPhone 6 ("snoring Asian girl") and Google account ("drunk passed out girl," "passed out lawyer chick, eyecheck, feet, tongue," "video of Kelly passed out on GHB," "asian girl drugged" and "deep sleep Latina")[39] would have ensured that the iCloud search warrant application included any incriminating images.

The fact that the government did not submit a preservation request to Apple until after it seized the iPhones is not relevant to the probable cause inquiry. The preservation letter is only

---

[37] When investigators know that an iCloud account exists, they often send a preservation letter requesting that Apple freeze the account so that no data can be deleted while the government prepares subpoenas and/or warrants. A preservation letter should identify the account by user ID. However, if the user ID is unknown, Apple can sometimes identify an account by a user's name, phone number, and/or email address. Therefore, preservation letters often include any known identifiers of the user and request that the company preserve any accounts associated with those identifiers. Here, the defendant's identifiers were sent to Apple on June 6. Days later, the forensic analysis of the iPhone 6 (the work phone) revealed (1) the defendant's Apple ID, and (2) that the work phone was backing-up to the defendant's iCloud. The government therefore had confirmation that the defendant had an iCloud account before it submitted the iCloud search warrant application. But even if the government had not obtained confirmation from the analysis of the work phone that the defendant had an iCloud account, the government could have issued a subpoena requesting the subscriber information associated with the defendant's identifiers. Either way, the government would have had probable cause to believe an iCloud account existed.

[38] Indeed, the iCloud search warrant affidavit did not rely solely on the evidence found on the iPhone XR. The affidavit discussed AV-1's report of sexual assault, AV-1's demeanor on the day she reported, and the defendant's statements after the report. It also indicated that the defendant voluntarily showed agents his Tinder and WhatsApp messages.

[39] Verbatim recitation of his search terms.

relevant in that it is further proof of the government's intent to seek an iCloud search warrant regardless of what evidence was located on the iPhone XR. Notably, the Apple preservation request was submitted before the government knew what was on the iPhone XR.

Moreover, multiple warrants did not rely on the evidence which the defendant seeks to suppress (though they did reference images found in the defendant's iCloud account). The search warrant for the MacBook Air, Kingston SD Card, and SanDisk USB did not rely on images or search history located on the iPhone XR.[40] From those devices and storage cards, the government recovered over 580 incriminating photographs of AV-2, AV-3, AV-4, AV-5, AV-6, AV-12, AV-13, AV-15, AV-17, AV-18, AV-19, AV-21, AV-23, AV-24, AV-25, and AV-28. A visual inspection revealed that images found on the MacBook Air depicting AV-3, AV-4, AV-5, AV-6, appear to be duplicates of images found on the iPhone XR. Similarly, the Google and the Yahoo account search warrants did not rely on images or search history found on the iPhone XR. The government recovered seven photographs of AV-20 from the Yahoo account. Accordingly, even without the evidence obtained from the iPhone XR, probable cause existed for the warrants subsequently obtained in this case, and the government's investigation would have resulted in investigators seeking search authorization for all the same accounts and devices.

Finally, as discussed *supra* in Section IV.B., the government has access (and had access at the time of the seizure) to forensic tools capable of circumventing security features and extracting data from the iPhone XR, even if the agents never reengaged the defendant after the original seizure. For example, depending on the length of the code, software could have accessed the phone within months. Additionally, the defendant had an email containing several passwords and passcodes. Law enforcement would have also tried those number combinations. Moreover, after

---

[40] The government notes that the warrant authorizing the search of the defendant's parents' house (where the devices were found) did rely on evidence found on the iPhone XR. The warrant to search those devices, however, did not.

the agents compelled biometrics, the phone was in a state such that a nearly full extraction would have been possible, regardless of whether agents had the passcode.

In sum, there is no evidence the government would introduce at trial that was not also accessible through other means, whether through a lengthy forensic extraction process or because they were available independently on the defendant's iCloud account, or other devices. Thus, the evidence should not be suppressed. *See Fischer*, 2020 U.S. Dist. LEXIS 32965, *17 (admitting the contents of defendant's phone – even assuming officers improperly questioned defendant about the PIN prior to providing Miranda warnings – because the government proved a reasonable probability that the information on the phone would have been inevitably discovered through forensic unlocking tools). For this reason, the defendant's arguments again fail, and his motion should be denied.

## CONCLUSION

Accordingly, the government respectfully requests that this Court deny the defendant's motion to suppress evidence.

Respectfully Submitted,

MATTHEW M. GRAVES                          KENNETH A. POLITE, JR.
UNITED STATES ATTORNEY                     ASSISTANT ATTORNEY GENERAL
District of Columbia                       U.S. Department of Justice
                                           Criminal Division


_____/s/_____                  _____/s/_____
Meredith E. Mayer-Dempsey                  Angela N. Buckner
NY Bar No. 5213202                         DC Bar No. 1022880
Assistant United States Attorney           Trial Attorney
United States Attorney's Office            U.S. Dept. of Justice, Criminal Division
for the District of Columbia               Human Rights and Special Prosecutions
601 D Street, Northwest                     1301 New York Avenue, Northwest
Washington, D.C. 20530                      Washington, D.C. 20530
(202) 252-7259                             (202) 616-0238
Meredith.Mayer-Dempsey@usdoj.gov           Angela.Buckner.2@usdoj.gov