**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| v. | : | Criminal No. 1:21-cr-00380-CKK |
| | : | |
| BRIAN JEFFERY RAYMOND, | : | |
| | : | |
| | : | |
| Defendant. | : | |

## REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

Defendant Brian Jeffery Raymond, by and through his undersigned counsel, respectfully submits this Reply to the Government's Opposition (the "Opposition") to Defendant's Motion to Suppress Evidence (the "Motion"), and states as follows:

### I.   INTRODUCTION.

The government illegally seized Mr. Raymond's iPhones. Based on the searches of those phones, the government obtained numerous other search warrants, the fruits of which represent virtually all of the evidence in the case. Based on the flagrancy of the violations, the appropriate remedy is to reset the clock to the morning of June 6, 2020 before the illegal seizures occurred. Despite this clear reality, the Opposition relies on a series of misstatements, misrepresentations, and/or misapplications of Fourth and Fifth Amendment jurisprudence in a futile attempt to save the government's case, and in so doing, all but concedes the seizures were illegal and that suppression is required. Indeed, as the government's Opposition makes clear, every step the government took after the illegal seizures was the *direct result of the illegal seizures*. The government's own chart of search warrants demonstrates how poisoned virtually all of the evidence is in this case:

| Residence (or Item Located at Residence) and Date Search Warrant was Signed | Explicit Photos Located | Mentioned in the Affidavit | | | |
| --- | --- | --- | --- | --- | --- |
| | | Fact that iPhone XR was Seized on June 6, 2020 | Internet Searches on iPhone XR (Reviewed on June 12) | Images Found on iPhone XR (Reviewed on June 12) | iCloud[19] |
| Embassy Housing in Mexico[20] June 11, 2020 | No | | | | |
| Purple Asus Laptop August 19, 2020 | Yes | Yes | Yes | Yes | |
| Blue Asus Laptop August 19, 2020 | Yes | Yes | Yes | Yes | |
| iCloud August 14, 2020 | Yes | Yes | Yes | Yes | |
| Parents' House in California October 9, 2020 | No | Yes | Yes | Yes[21] | Yes |
| MacBook Air November 27, 2020 | Yes | Yes | No | No | Yes |
| Kingston SD Card November 27, 2020 | Yes | Yes | No | No | Yes |
| SanDisk USB November 27, 2020 | Yes | Yes | No | No | Yes |
| LG Phoenix November 27, 2020 | No | Yes | Yes | Yes | Yes |
| Yahoo | Yes | Yes | No | No | Yes |
| Google | No | Yes | No | No | Yes |

As argued more fully below, the government has no legitimate defense for the illegal seizures, nor the suppression of virtually all of the evidence in this case that is required as a result.

## II.   ARGUMENT.

### A.   The "reasonable continuation" doctrine does not apply because the second and third seizures were not continuations of the first, nor were they reasonable.

1. <u>The second and third seizures were separate from, and not continuations of, the first seizure.</u>

The government attempts to justify the repeated illegal seizures in this case by disingenuously asserting that the agents made a "decision" to simply "delay" full execution of the warrant, and that the subsequent seizures in (nominal) pursuit of biometrics were thus "continuations" of the first. Opposition at 1 and 28. This flies in the face of clear law under Rule 41(e)(2)(B), which provides a two-step process for the seizure and search of electronic storage media given the realities of encryption and the potentially vast amounts of data on devices: 1) seize the device(s), at which time the warrant is considered fully executed and the warrant terminates, and 2) review the contents as often and as long as desired. Thus, as a legal matter, the warrant was fully executed upon the seizure of the phones, and the further seizures were separate, warrantless, and illegal. The second and third seizures in this case were thus fundamental constitutional violations requiring suppression.

The government's claim of an intentionally delayed biometrics seizure is also entirely contrary to the facts. After the initial seizure, agent Gajkowski stated, "The time is 12:26, Saturday, June 6th, and this concludes our interview and search and seizure warrant execution." She was right – they were done. But not only that, the agents' own pre-execution operations plan, which listed all kinds of information such as routes, travel times, and hospital locations, did not contemplate delaying execution in order to compel Mr. Raymond's biometrics. The plan simply stated:

At the conclusion of the interview, SAs Gajkowski and Nelson present warrant and ask BRIAN RAYMOND to surrender his cell phones and unlock both devices. *(If needed, SSA Karabin and SA Jones can join at this time.)*

- **Thumbprint or facial recognition:** The agents can compel Raymond to unlock the device if phone is secured by this method. Agents should change the lock/password settings while the phone is unlocked. Document/log the new code and power off the phone.

- **Draw-pattern or alpha-numeric:** The agents can *ask* Raymond if he is willing to voluntarily provide the code or demonstrate the unlock pattern, whereupon agents will confirm the pattern/code and power-off the phone.

  *If* Raymond declines to provide code/pattern, the agents should keep the device in airplane mode.

ECF No. 190-2, at 23. This plan, which was doomed to fail,[1] did not contemplate delayed biometrics for any reason. The agents' plan was to seize the phones, open them with biometrics, change the settings, and walk away. When the agents seized the phones, biometrics were already disabled, leaving PIN codes as the only option to open the phones. At that moment, the warrant execution was over, they knew it, and they said it. This initial seizure was in accordance with Rule

---

[1]    This plan was doomed to fail for a variety of reasons. First, the phones were powered down, disabling biometrics. This meant the only way to open the phones was with PIN codes, which Mr. Raymond refused to provide as was his right. The agents had no plan for this scenario. Second, the plan to simply "change the lock/password settings" would not work, because doing so requires additional codes/passwords. If you go to "Settings" on an iPhone, and tap "Face ID & Passcode," the phone immediately requires a PIN code to proceed, regardless of whether the phone was opened with Face ID or a PIN code. If you get beyond that screen, and tap "Change Passcode," the phone again requires you to type in the old PIN code. Thus, the agents plan, such as it was, <u>required Mr. Raymond's PIN codes or it would fail.</u> Third, the plan says (in bewildering fashion) that if Mr. Raymond will not provide his codes, "the agents should keep the device in airplane mode," but it is impossible to put a device in airplane mode unless it is already unlocked, and even if it was unlocked, and then put in airplane mode, when it locked again the agents would need a PIN code to open the phone. Airplane mode does not somehow magically equate to unfettered access to a phone. Putting this all together, if the agents had encountered the phones in a powered on status, and if they had opened them with biometrics, they would not have been able to change the PIN code or Face ID and the phones would lock shortly thereafter, even if they were in airplane mode. At that point, the agents would need PIN codes to open the phones, or to re-seize Mr. Raymond to again compel his biometrics. The only way this warrant would have worked was for the agents to get the phones in a powered on status, open them with biometrics, and immediately image them with a computer imaging device. But they had no such device, and no such plan.

41, and nothing prevented the seizure of the devices or the warrant's execution. The two (not one – *two*) subsequent seizures of Mr. Raymond and his phones after that moment were thus not even continuations of the first.

2. <u>The second and third seizures were unreasonable.</u>

Much less were those seizures reasonable. As demonstrated below, the government's arguments with regard to reasonableness fail for at least four reasons: 1) biometrics were disabled, and they had no basis to pursue biometrics in the second seizure, much less the third seizure; 2) Nelson's words and Gajkowski's actions make clear that the agents sought to compel Mr. Raymond to open the phones, not simply to submit to compelled biometrics; 3) the caselaw cited by the government in fact supports Mr. Raymond's position in this case; and 4) the agents violated the rule of compelling biometrics "with dispatch and in the immediate vicinity of the" seizure, confirming the unreasonableness of their actions. The following discussion expands on each of these points.

First, in its argument, the government brushes aside the fact that biometrics were disabled when the agents initially seized the phones in "before first unlock" (or "BFU") status after being powered down. In so doing, the government argues that the agents simply "failed to initially attempt biometrics because they did not know that the phones could be unlocked using more than one method." Opposition at 35-36. This assertion is unbelievable. At that moment, only one method – PIN codes – would unlock the phones. This assertion also undoes the government's earlier false attempt to claim that the agents intentionally delayed execution of the biometrics portion of the warrant. Did they consciously delay biometrics, or did they fail to attempt biometrics because they did not know how phones work? Which is it? And why does the Operations Plan, which includes details down to the nearest hospital, not contemplate a second — or third — search? Because this claim is simply false.

The truth, in fact, is that they neither purposely delayed nor "failed" due to confusion about how phones worked. Instead, the phones were powered down, and the agents *needed codes* to open the phones. In fact, Mr. Raymond's entry of PIN codes is the only way the agents got into the phones later that day.[2] The truth is that the government agents sat still and did and said nothing while Mr. Raymond, at their suggestion, powered the phones down, thus disabling biometrics. *PIN codes were their only option, and they knew it.* Agent Gajkowski swore to this in her affidavit in support of the warrant, where she said phones that are powered down require PIN codes to open because biometrics are disabled. Thus, either the government is lying to the Court now, or Gajkowski lied to the judge in Virginia when swearing out the warrant. Frankly, it does not matter, because the truth is that the phones, as seized, would not open with biometrics, and the warrant was already fully executed in compliance with Rule 41. So any further attempts by the government to open them with biometrics were unreasonable.

Second, a close review of the *actual* words used by the agents in their alleged attempt to open the phones with biometrics in the second, separate, warrantless seizure – after consultation with a Department of Justice attorney – shows that they had only deception in mind, and were prepared to do anything to get into the phones with PIN codes even after Mr. Raymond *repeatedly refused* to provide them:

---

[2]     The government makes unsupported assertions that they might have gotten into the phones using GrayKey. But in BFU status, with six alphanumeric characters required to unlock, GrayKey would not have worked. Even if it could have opened the phones after decades of trying, the data would be compromised because of the BFU status, as the government concedes. Opposition at 26 ("If the phone had not yet been unlocked since it was restarted, any extraction would contain limited data."). The government ignores the fact that Mr. Raymond's phones were in BFU status when first seized, and claims they were in "after first unlock" (or "AFU") status, but that was true only after the illegal second seizure. The government then falsely assumes that Mr. Raymond's passcodes were not alphanumeric. The fact is, even if the phones had been in AFU status, it could have taken decades to access the phones given six character alphanumeric passcodes.

NELSON: Hey Brian, listen. Let you know, you're not under arrest. Here's the problem. For the search warrant – the search warrant **compels you to open your phones**. So we gotta come back and get you to open your phones.

MR. RAYMOND: Ok.

GAJKOWSKI: [Hands sheet of paper to Mr. Raymond and points at it.] Uh, so, during the execution of the devices, law enforcement personnel are authorized to touch the fingers including thumbs that – onto the device, and further to hold the phone up to your face.

MR. RAYMOND: Ok.

GAJKOWSKI: Ok?

NELSON: That cool, **can you open the phones for us**?

MR. RAYMOND: Yeah. **If I'm compelled to do it, sure**.

NELSON: **You are**.

GAJKOWSKI: [Talking over Nelson.] Not the codes, if that's not what you want to provide –

NELSON: [Still talking to Mr. Raymond over Gajkowski.] We were almost done, and I was like, dang it!

MR. RAYMOND: [Still talking to Nelson.] Ok, no worries.

NELSON: Thanks man, I appreciate it.

MR. RAYMOND: [After receiving phone from Gajkowski and looking at it, then typing PIN code into phone.] Its just a simple – uh, I don't think it will [inaudible] –

GAJKOWSKI: Ok, but I can't – did you want to give me your code?

MR. RAYMOND: **No**, but its open, its open, right –

NELSON: Yeah, **as long as you open it**, what we'll do is we'll put it in airplane mode, or we'll change the password on it.[3]

---

[3]      Note that the agents could not simply change the PIN code without further entering passwords. In fact, Gajkowski tried to do that and could not. In addition, putting the phones in airplane mode would have done nothing for them, given the phones would lock again. This statement by Nelson demonstrates the doomed nature of the agents' plan even at this late stage.

First Body Worn Camera Video, Opposition, Exhibit C.

Nelson's words belie any claim that the agents did not compel Mr. Raymond to open his phones. He clearly did. He made no mention of using biometrics to open the phones, he simply stated, "the search warrant compels you to open your phones." In the midst of this flummoxing environment, Gajkowski flashed a sheet of paper from the warrant and read about touching fingers and holding the phone up to Mr. Raymond's face. By the time Gajkowski said, "Not the codes, if that's not what you want to provide," she had withdrawn with the sheet of paper and moved away from Mr. Raymond, and was talking over Nelson, who was still talking to Mr. Raymond, saying, "We were almost done, and I was like, dang it!" When Mr. Raymond then stated, "If I'm compelled to do it," Nelson then issued a second order by simply saying, "You are." Then, as Mr. Raymond was entering the code to open the first phone, Gajkowski asked if he wanted to provide the codes, and he said, "No." The clear impression from the agents – indeed, from Nelson's own words – was, you have to open these phones for us, the warrant says so. Then, the agents did not apply Mr. Raymond's fingerprints or face to the phones, but instead *handed him the phones* after instructing him to open them. Mr. Raymond opened the phones using codes because biometrics were disabled, and the agents were pleased. Of course, the phones locked again, and they decided to go through this patently illegal routine – after again consulting a Department of Justice attorney – yet one more time an hour later, with even more pressure applied and absolutely no justification whatsoever.

The government wants the Court to find that this unconscionable chain of events comprising multiple, unlawful, warrantless seizures, full of deception and tricks, was a "reasonable continuation" of the initial seizure. The government condemns itself by its own argument. It

condemns itself by the actions and words of its agents.  It condemns itself by the facts of what happened. The record of the recordings is impossible to dispute.

Third, the government, unfortunately, goes further, and cites caselaw which unequivocally shows that the government's claims are baseless. Opposition at 28-30. In fact, none of the "reasonable continuation" premises search cases cited by the government involve circumstances such as those at issue here, including the applicability of rule of 41(e)(2)(B) related to cell phones.

- In *Keszthelyi*, the court found that a second search of a premises was an unreasonable separate search because the agents *consciously chose* to conclude the search, and nothing prevented the agents from conducting a more thorough search if they had wanted to do so. *United States v. Kesthelyi*, 308 F.3d 557, 568-69 (6th Cir. 2002). That case actually demonstrates precisely why what the agents did here violated the 4th Amendment.

- In *Bowling*, the agents made a *conscious decision* to suspend a premises search around midnight in order to look up serial numbers and make sure they took the right machines in the morning. *United States v. Bowling*, 351 F.2d 236, 241 (6th Cir. 1965).

- In *Squillacote*, agents reasonably and intentionally searched a home for evidence of espionage on six consecutive days, maintaining agent presence (but not searching) throughout each night, because the search was complicated and the house was incredibly cluttered and in disarray. *United States v. Squillacote*, 221 F.3d 542, 557 (4th Cir. 2000).

- In *Carter*, after searching a hotel room known to contains drugs, the arrestee/occupant told the officers they had missed $4,000 that was hidden in the

room, and the officers then returned to retrieve the money, which was specified in the warrant. *United States v. Carter*, 854 F.2d 1102, 1105 (8th Cir. 1988).

- In *Kaplan*, agents searched a doctor's office but missed certain files specified in the warrant, but then "learned that not all records called for under the warrant had been given to them." *United States v. Kaplan*, 895 F.2d 618, 623 (9th Cir. 1990). The court found it permissible, therefore, to return to ask for the specific records listed in the warrant. *Id.*

- Finally, in *Gerber*, agents paused a vehicle search because they needed additional tools. *United States v. Garber*, 994 F.2d 1556, 1557-59 (11th Cir. 1993).

These cases are nothing like Mr. Raymond's case. Here, unlike in *Bowling*, *Squillacote*, and *Gerber*, the agents made <u>no conscious decision</u> to delay the seizure, nor did they announce they were delaying it for any valid reason (in fact, they announced it was over). Furthermore, unlike in *Carter* and *Kaplan*, no reasonable explanation exists for the *two* additional seizures in this case. Most notably, the government's excuse for returning a second time (to compel biometrics, which would never have worked) does nothing to justify the agents' actions in seizing Mr. Raymond and his phones *a third time*.

The government acknowledges that this case, which includes multiple attempts to open cell phones, is different from the cited cases, which deal with premises. The government seems to believe this somehow helps its argument, suggesting that the fact there is no case law supporting three separate searches on a single warrant is *helpful* to the government. But instead, that fact dismantles the government's argument. Rule 41(e)(2)(B) says that in this non-premises device seizure, the warrant was fully executed upon the physical seizure of the devices. The agents own words declare the same. Any subsequent re-seizure is separate, and therefore warrantless under the

Rule, and unsupported by any case law. *See, e.g.*, *United States v. Huart*, 735 F.3d 972, 974 n.2 (7th Cir. 2013); *United States v. Estime*, 2020 U.S. Dist. LEXIS 191242, 39-40 (S.D.N.Y., Oct. 14, 2020).[4] Indeed, the government's blatant disregard for Rule 41(e)(2)(B) was a fundamental constitutional violation justifying suppression. *See United States v. Henderson*, 906 F.3d 1109, 115 (9th Cir. 2018).[5]

Finally, the rule with regard to compelled biometrics provides that they must be obtained "with dispatch" in the "immediate vicinity" of the seizure. *See In re Search of* [Redacted], 317 F. Supp. 3d 523, 533 (D.D.C. 2018). Even though biometrics were disabled here, even on the government's ruse of seeking biometrics, the government's actions in seizing Mr. Raymond and his phones three times, at two locations, over the course of several hours, was patently unreasonable under the law.  As such, the repeated seizures were unconstitutional.

### B. The "good faith" exception does not apply to the unconstitutional execution of an otherwise valid warrant.

The government also attempts to hide under the guise of "good faith," arguing that "any violation" in this case "was not the product of intentional police misconduct" and therefore should not lead to suppression. Opposition at 33. The government is wrong because the good faith exception does not apply to the unlawful execution of an otherwise valid warrant, and the standard applicable under the exclusionary rule is not one of "intentional misconduct" (although the violations here do appear intentional), but includes "deliberate, reckless, or grossly negligent

---

[4]     Further, the government focuses on the denial of a person's "possessory interest" in a premises or a device as if that is the sole critical feature of a warrant. It is not. The seizure of the person and the device is perhaps the most significant constitutional feature of a warrant. At that moment, the person and the device are subjected to forcible law enforcement action. Here, that occurred an impermissible three separate times.

[5]     On the facts involved here, suppression is required even under the non-fundamental, "technical" violation standard, because 1) Mr. Raymond was prejudiced given the search would not have otherwise happened, and 2) there is evidence of intentional and deliberate disregard of Rule 41. *See United States v. Magruder*, Criminal Action No. 19-203 (CKK) (D.D.C. Feb. 2021), at p. 11.

disregard for Fourth Amendment rights." Opposition at 33, citing *Davis v. United States*, 564 U.S. 229, 238 (2011). Further, "the Supreme Court has never applied the good faith exception to excuse an officer who was negligent himself, and whose negligence directly led to the violation of the defendant's constitutional rights." *See United States v. Camou*, 773 F.3d 932, 945 (9th Cir. 2014).

The government's reliance on the "good faith" exception to the exclusionary rule in an attempt to save the unconstitutional seizures in this case is misplaced because its own actions caused the violations. Here, the government acknowledges that the "good faith" exception applies when law enforcement have acted reasonably in reliance on a warrant that "turns out to have been unsupported by probable cause." Opposition at 35, citing *United States v. Griffith*, 867 F.3d 1265, 1278 (D.C. Cir. 2017). However, that is simply not the situation in this case. In this case, the agents, who undoubtedly knew better, directed by a prosecutor who undoubtedly knew better, acted unreasonably and unconstitutionally in executing an otherwise valid warrant. This is the inverse of the situation where the "good faith" exception applies.

In straining to fit within the good faith exception, the government claims the agents were "merely negligent," and their conduct should not give rise to suppression. Opposition at 34, citing *Herring v. United States*, 555 U.S. 135, 143 (2009). But it is important not to conflate the "technological ineptitude"[6] of the agents with the very deliberate, or at least grossly negligent, constitutional violations at issue. To say that the agents' poor preparation for the warrant, doomed plan for changing settings, apparent failure to even read the sworn affidavit, and extraordinary (to an unbelievable degree) "technological ineptitude" constitutes negligence is an understatement. But in looking at deterrence and the "culpability of the law enforcement conduct," the Court must evaluate the *constitutional misconduct*, not merely the technological blundering that gave rise to

---

[6]     *See* Court's Memorandum Opinion regarding the Motion to Withdraw Guilty Plea, ECF No. 158, at 25.

-12-

the need to commit such misconduct. It is like the government is saying, because we were unprepared and totally inept when it comes to cell phones (and clearly caught off guard by shutdown phones and a suspect who invoked his 5th Amendment rights), we were justified in executing the warrant in an entirely unconstitutional manner. This is not at all the law. Here, the blatant disregard for Rule 41 is inexcusable and certainly cannot be attributed to or blamed on ineptitude.

The fallacy of the government's thinking can be exposed by imagining a keyed safe as the target of the seizure, and converting their argument as follows: We are not adept at using keys, so we took the safe without a warrant. One point does not follow from, or justify, the other, just like the technological ineptitude here does not excuse the blatant constitutional violations that any police department trainee should recognize. In this case, the unconstitutional manner of executing multiple seizures in violation of the Fourth and Fifth Amendments was well below the standard of a reasonably trained officer (*United States v. Leon*, 468 U.S. 897, 922 n.23 (1984)), to say nothing of the actually-trained prosecutor who instigated all of the illegal conduct in the first place. The government's arguments concerning "good faith" and "unintentional police misconduct" are entirely unavailing.[7]

---

[7]   Not to mention that any potential "good faith" argument is entirely undone by Nelson's words compelling Mr. Raymond to open his phones. And that was not even the end of the agents' misconduct, because they seized Mr. Raymond yet a third time thereafter, without even their feigned biometrics justification. No good faith exception can possibly save the government's conduct in this case.

**C. The government violated Mr. Raymond's Fifth Amendment rights by making repeated requests for PIN codes after Mr. Raymond clearly invoked his right to refuse to provide such codes.**

The government argues at length in defense of the blatant 5th Amendment violations in this case.[8] The only way the government can overcome these violations is, yet again, by brushing aside inconvenient facts, and misconstruing the law. The three elements at issue are (1) whether the entry of the codes was compelled by the government; (2) whether entry of the codes was a testimonial communication or act; and (3) whether entry of the codes was incriminating either directly or as a link to further incriminating evidence. Opposition at 38, citing *McKathan v. United States*, 969 F.3d 1213, 1223-24 (11th Cir. 2020).

1. Compulsion.

The government can muster only a bare conclusory argument that Mr. Raymond was not compelled to enter his PIN code and password, and that his decision to do so was voluntary. The government does not confront the reality that Mr. Raymond clearly and unequivocally invoked his Fifth Amendment right to silence *multiple times*, or that the agents asked him for his codes in various ways as many as 27 times across three separate interactions over the course of several hours. Even as Mr. Raymond was typing in his codes in the second seizure, he was saying he did not want to provide the codes.

The government also ignores Nelson's seemingly deliberate misstatement of the warrant's power. In the second seizure, as quoted above, Nelson expressly misled Mr. Raymond to believe

---

[8] The government spends considerable time analyzing whether Mr. Raymond's ultimate provision of PIN codes and passwords violated the 4th and 6th Amendments. Mr. Raymond has made no claim that his 6th Amendment rights were violated. In arguing the 4th Amendment issue, the government concedes that, "[h]ad the defendant been compelled to provide his PIN, the government agrees that it would have been in violation of the scope of the warrant" and thus the 4th Amendment. Compulsion is also an element of the 5th Amendment analysis. Because the government coerced Mr. Raymond using repeated requests for codes and phone access after he had invoked his right to refuse, the defense agrees with the government that this conduct exceeded the scope of the warrant and violated the 4th Amendment. Nelson's words are *prima facie* evidence of this compulsion.

that the warrant compelled him to open the phones. Nelson did not refer to biometrics. When Mr. Raymond said he would open the phones if he was compelled to do so, Nelson simply responded, "You are." At the conclusion of the second seizure, when asked to provide passwords that would allow the agents to change the phones' settings, Mr. Raymond stated that he did not want to provide passwords for privacy reasons, *again* invoking his 5th Amendment right. Yet the agents, on advice of the prosecutor, seized Mr. Raymond and his phones still a *third time* after they failed to keep the phones open, and this time they pressured him into giving up his passwords and granting full and permanent access to the phones.

If this course of conduct, levied against a person who has properly and fairly invoked his right to silence, is not unlawful compulsion or coercion then the Fifth Amendment is worthless. The government's only answer is to simply ignore these inconvenient facts.

### 2.  Testimonial and incriminating.

The government also argues that entry of PIN codes and passwords was not testimonial, and in any event was not incriminating because all that action demonstrated was access to and ownership of the phones, which were already known to the agents and thus "foregone conclusions." Opposition at 38-41, citing *United States v. Apple MacPro Computer*, 851 F.3d 238 (3d Cir. 2017). In *Apple MacPro Computer*, the government had seized various electronic devices, and the suspect had voluntarily granted access to some of the devices, either in whole or in part. But the government was not able to access all of the devices because some of them, and some portions of others, remained encrypted. The government sought an order from a magistrate judge under the All Writs Act compelling the suspect to produce the devices in unencrypted format. The suspect objected on 5th Amendment grounds. A magistrate judge issued an order compelling production in unencrypted status "because the Government possessed Doe's devices *and knew that their contents included child pornography*, [thus] the act of decrypting the devices would not be

testimonial for purposes of the Fifth Amendment privilege against self-incrimination." *Id.* at 243. The U.S. Court of Appeals for the Third Circuit upheld this conclusion on that basis, and found that decrypting the devices was not a testimonial, incriminating act of production, because any testimonial qualities of that act were merely foregone conclusions given what the government already knew about the devices. *Id.* at 248.

This case is different from *Apple MacPro Computer* in at least one determinative respect. The agents here had *no idea* what was on the phones. In *Apple MacPro Computer*, agents had already seen some illicit contents on some of the devices, and had spoken to a witness who "reported that she had witnessed Doe unlock his Mac Pro while connected to the [encrypted] hard drives to show her hundreds of pictures and videos of child pornography." *Id*. Here, the agents were planning to search Mr. Raymond's phones in hopes of locating information concerning a single event with AV-1 just days earlier. They had no idea at that time what files were on the phones, or what those files would lead them to on the iCloud and other devices. Thus, Mr. Raymond's testimonial act of decrypting the phones for the agents was uniquely and independently incriminating, providing "a link in the chain of evidence needed to prosecute" Mr. Raymond. *Hoffman v. United States*, 341 U.S. 479, 486 (1951). The government is wrong to suggest otherwise.

To put it simply, entering the PIN codes and passwords that day was both testimonial and incriminating because, unlike in *Apple MacPro Computer*, without those codes and passwords the agents would have no idea what was on those phones. Without the codes, all the government would have obtained with its warrant are two pieces of the earth's crust, designed by Apple in California, assembled in China.

-16-

### D. Mr. Raymond did have an expectation of privacy with respect to his iPhone 6, and therefore all evidence illegally seized from that phone must be suppressed.

The government erroneously asserts that Mr. Raymond had no reasonable expectation of privacy with respect to his iPhone 6 and falsely assumes it was linked to government-affiliated servers or systems. Opposition at 26. The caselaw cited by the government indicates a two-step analysis: 1) do the "operational realities" indicate a reasonable expectation of privacy in the premises/device, and 2) if so, is the intrusion unrelated to work matters or alleged work-related misconduct, in which case a warrantless intrusion is impermissible. *City of Ontario v. Quon*, 560 U.S. 746, 756-57 (2010). However, in this case, the operational reality was that the phone was entirely Mr. Raymond's, and the government did not have access to its contents, nor command any reviews or audits of the phone. The phone also did not have a warning page/home screen, which typically states that the user should not have any expectation of privacy. The phone was not even connected to government email – it was impossible to send government email over the phone or to access the government's internal intranet site. Instead, the phone, which had a regular local Mexico City number, was simply given to Mr. Raymond to use as he would a personal phone, including establishing a PIN code and other settings to which the government had no access. The phone was provided simply because it was more likely to work than a U.S.-issued phone with a foreign number in the event of emergencies. It was in all respects, Mr. Raymond's phone.

Further, the reason for the intrusion in this case was entirely unrelated to Mr. Raymond's work – the alleged misconduct as discussed in the warrant had nothing to do with the workplace. *Cf. United States v. Hill*, 319 F. Supp. 3d 44 (D.D.C. 2018) (dealing with subpoenas for a government-issued phone and tablet, that came with a warning that the employee had no expectation of privacy in the devices, in an investigation of work-related misconduct). For these reasons, Mr. Raymond had an expectation of privacy with respect to his iPhone 6, and the

unconstitutional seizure of his iPhone 6 should result in the suppression of the material (mostly messages and contacts) obtained from that phone.

### E. The government has not demonstrated, and cannot demonstrate, that it inevitably would have discovered the same evidence through other means.

1. Inevitable discovery only applies when non-speculative, historical facts capable of ready verification show the evidence would have been discovered.

The government also claims that it would have inevitably discovered the same evidence through other means, but in so doing, it fails to meet its burden because it ignores the record facts and instead impermissibly speculates about what it might have done. "To prevail on an inevitable discovery theory, the government must prove by a preponderance of the evidence that, even without the unlawful seizure, the evidence it seeks to admit would have been discovered anyway." *United States v. Holmes*, 505 F.3d 1288, 1293 (D.C. Cir. 2007) (citing *Nix v. Williams*, 467 U.S. 431, 444 (1984)). "Further, inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification." *Id.* In *Holmes*, the police unlawfully seized the defendant's keys and then searched his car where they found a pistol. In rejecting the government's several arguments that it was *possible* they might have subsequently searched the car even if they had not seized the keys, the court stated, "The government points to no evidence in the record with which it can attempt to meet its burden to prove that Holmes's car, and ultimately the pistol therein, would inevitably have been discovered… [A]ll of this is nothing more than a possibility. As evidence of inevitable discovery…this fails under *Nix*. It is, at best, speculative rather than based on demonstrated historical facts capable of ready verification." *Id.* at 1293-94. *See also United States v. Wills*, 316 F. Supp. 3d 437 (D.D.C. 2018) (citing *Holmes* and *Nix*, and stating, "It is certainly possible to review various courses of conduct available to the officers and

speculate about what they *could* have done to eventually lawfully discover the marijuana as the result of a reasonable search…. But all of this is nothing more than a possibility.").

In addition, demonstrating that probable cause existed to further search and locate the tainted evidence from a subsequent source is not enough. *See United Stats v. Marrocco*, 478 F.3d 627 (7th Cir. 2009) (stating that "probable cause to search does not alone render discovery of the evidence in question inevitable"); *United States v. Heath*, 455 F.3d 52 (2d Cir. 2006) ("[T]he government cannot prevail under the inevitable discovery doctrine merely by establishing that it is more probable than not that the disputed evidence would have been obtained without the constitutional violation"); *United States v. Allen*, 159 F.3d 832 (4th Cir. 1998) ("The inevitable discovery doctrine cannot rescue evidence obtained via an unlawful search simply because probable cause existed to obtain a warrant when the government presents no evidence that the police would have obtained a warrant. Any other rule would emasculate the Fourth Amendment."); *United States v. Cabassa*, 62 F.3d 470, 447 (2d Cir. 1995) ("[T]he doctrine of inevitable discovery requires something more [than probable cause] where the discovery is based upon the expected issuance of a warrant. Otherwise, it would result in illegally seized evidence being received when there was a 49% chance that a warrant would not have issued.").

When a subsequent warrant was in fact obtained and led to the same material, a court must determine "whether the search pursuant to a warrant was in fact a genuinely independent source of the information and tangible evidence…. This would not have been the case if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if the information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant." *Murray v. United States*, 487 U.S. 533 (1988). In *Murray*, the Court held that evidence discovered during the illegal search could be admitted if it was reacquired during a

second, lawful search with a warrant, so long as the warrant was obtained <u>solely</u> on the basis of information for an independent source. *Id. See also United States v. Thomas*, 955 F.2d 207 (4th Cir. 1992) ("The premise of the inevitable discovery doctrine is that the illegal search played no real part in discovery of incriminating evidence. Only then, if it can be shown that the taking did not extend to the second search, would the product of the second search be admissible.").

> 2. <u>The verifiable facts show that the government would not have inevitably discovered the same evidence elsewhere.</u>

The government asserts that it "would have inevitably sought and obtained a search warrant for the defendant's iCloud account" irrespective of whether agents could have accessed the content of the phones, which would have led the government to essentially the same evidence.[9] Opposition at 47. But the government's assertion here is belied by the search warrant, the contents of which confirm that the only reason the government submitted the warrant was actually *because of* evidence found on Mr. Raymond's iPhones. Undeniably, the iCloud search warrant application relied extensively on the materials and information obtained from Mr. Raymond's phones, to include not just photos and videos, but online history dating back many years.[10] Thus, the government's iCloud search warrant corroborates the fact that the illegal search and seizure of Mr. Raymond's iPhones is what ultimately led them to his iCloud in the first place.

The government's contention is further belied by the fact that the iCloud search warrant was not obtained until more than *two months after the illegal seizures, after the phones had been fully*

---

[9]   Inevitable discovery is an issue distinct from the fruit of the poisonous tree doctrine, which is argued below. Here, the government argues that it would inevitably have discovered the same evidence that was on the phones, primarily photos and videos, by later obtaining the materials from Mr. Raymond's iCloud account. It is not at all clear that all of the material obtained from the iCloud was duplicative of all information obtained from Mr. Raymond's phones. In any event, the iCloud warrant is both insufficient to establish inevitable discovery, and also clear fruit of the illegal phone seizures as discussed below.

[10]   The key warrants and applications in support thereof are attached as follows: Mexico devices (Asus laptops) warrant and affidavit in support thereof, Exhibit A; iCloud warrant and affidavit in support thereof, Exhibit B; California devices (Macbook, SD card, thumb drive) warrant and affidavit in support thereof, Exhibit C; Yahoo! warrant and affidavit in support thereof, Exhibit D.

*analyzed*, and even more fruit from the phones investigated. If the government were going to submit the search warrant based solely on its knowledge of the iPhones' existence, as they so contend, they would not have waited more than two months after the iPhones had already been seized and searched, and the photographs discovered, to exploit the photos by obtaining the iCloud search warrant. The government attempts to rely on the mere thought of a preservation request to Apple as evidence that it inevitably would have searched Mr. Raymond's iCloud. But no such preservation request was sent until after the phones were seized. *See* Email from Gajkowski to lawenforcement@apple.com, June 6, 2020, at 7:04 p.m., ECF No. 190, Exhibit C. On these facts, the government has not, and cannot, demonstrate that it inevitably would have obtained the same materials from iCloud.

The government also claims that multiple warrants in this case, apart from the iCloud warrant, "did not rely on the evidence which [Mr. Raymond] seeks to suppress." Opposition at 49. But as the government is forced to acknowledge, the iCloud warrant relied heavily on the phone seizures, and *all of the other warrants relied on the iCloud seizure*. *Id.* at 15. The government simply has no inevitable discovery argument in this case.

Nor does the iCloud seizure provide the government with an independent source argument. In evaluating the iCloud or other warrants as independent sources, the Court must determine whether "the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant." *Murray*, 487 U.S. at 542. The answer to each of these questions is unequivocally yes – the agents decisions to seek the warrants were clearly prompted by the phone seizures, and the phone information was provided to the Magistrate Judge's and certainly would have affected their decisions to issue warrants.

3. Not only is the mere existence of probable cause insufficient to establish inevitable discovery, probable cause did not exist apart from the phone seizures as of the time of the iCloud warrant.

The government attempts to circumvent this established history by arguing that AV-1 provided probable cause to seize and search Mr. Raymond's phones, and her tale was also set forth in the iCloud warrant. This fails for multiple reasons. First, probable cause on AV-1's story strongly diminished not long after the phone seizures and continued to weaken thereafter. Agents in Mexico discovered several inconsistencies in her story, toxicology reports were negative for drugging while her extreme blood alcohol content coupled with her hyperactive behavior suggests *not* that she received a sedative, but instead had mixed alcohol with a problematic medication (which turned out to be the case based on subsequent testing), all text messages with Mr. Raymond were benign, and Mr. Raymond passed a polygraph test (which was sent to the government) showing that he did not drug or sexually abuse AV-1.[11] *See* Exhibit E, charting the diminished probable cause with respect to AV-1.

Simply claiming that probable cause existed to obtain the material is insufficient – the government has to show more than a possibility of obtaining the material, but instead must offer non-speculative evidence that it *would* have obtained the material. The existence of probable cause from AV-1's story (which was dubious at best and quickly deteriorating) had nothing to do with the iCloud. Finally, the AV-1 probable cause argument fails because the government cannot show that it even *could* have, much less *would* have, obtained a sweeping seizure of Mr. Raymond's entire iCloud without the essential, tainted evidence from the phones. The affidavit itself demonstrates this fact. This is presumably why the government did not seize Mr. Raymond's

---

[11]     It is notable that the agents and prosecutors, in their subsequent warrants concerning AV-1, never mention the extensive exculpatory evidence uncovered by investigators, which had significantly degraded the government's false allegations regarding AV-1 by the time of August 2020.

iCloud until more than two months after the phone seizures, and in doing so, relied heavily on the materials found on Mr. Raymond's phones because it was the only way to justify the authority to seize the entire historical contents of Mr. Raymond's iCloud account.

### 4.   Inevitable discovery does not apply.

The ultimate question regarding inevitability is this: how likely it is that the government would have found the tainted evidence in this case without the phone seizures? The answer is demonstrated by the course and trajectory of this case prior to the phone seizures (a one-witness, he-said she-said case that was not chargeable) as compared to after the phone seizures (a multi victim voyeurism case now overcharged as sexual abuse and enticement, among other things). The initial arrest in this case says it all, given the complaint was based on alleged enticement of AV-4, photos of whom were found on Mr. Raymond's illegally-seized iPhone XR. *See* Opposition Exhibit E, ECF No. 198-1. The government did not initially charge Mr. Raymond with any offenses involving AV-1, whose story formed the basis of probable cause for the phone seizures.

### F.   The fruit of the illegal seizures includes all information and materials from the phones, other electronic devices, online accounts, and the testimony of the AVs in this case, and all such evidence must be suppressed.

"The purpose of the Fourth Amendment exclusionary rule is to deter unreasonable searches, no matter how probative their fruits." *Oregon v. Elstad*, 470 U.S. 298, 306 (1985) (citations omitted). Suppression will be imposed "where its deterrence benefits outweigh its substantial costs." *United States v. Hassanshahi*, 145 F. Supp. 3d 75, 85 (D.D.C. 2015). For these reasons, "[t]he exclusionary rule encompasses both the primary evidence obtained as a direct result of an illegal search or seizure and ... evidence later discovered and found to be derivative of an illegality, the so-called fruit of the poisonous tree." *United States v. Johnson*, 365 F. Supp. 3d 89, 95–96 (D.D.C. 2019) (citations omitted); *see also United States v. Sparks*, 594 F. Supp. 3d 9, 16 (D.D.C. 2022). Thus, suppression applies to all "evidence obtained as an <u>indirect</u> result of the

illegal seizure [which is] the fruit of the poisoned tree." *United States v. Scios*, 590 F.2d 956, 959–60 (D.C. Cir. 1978) (emphasis added) (citing *Silverthorne Lumber Co. v. United States*, 251 U.S. 385 (1920) and *Wong Sun v. United States*, 371 U.S. 471 (1963)). Indirect, suppression-worthy fruit of the poisoned tree includes testimony obtained as a result of an illegal seizure. *See United States v. Alston*, 311 F. Supp. 296, 299 (D.D.C 1970) ("If deterrence of improper police conduct is to be effective, the exclusionary rule must be strict. To permit the prosecution to use testimony directly obtained as a result of illegal police conduct, no matter how inadvertent, will frustrate the objectives of the Fourth Amendment just as much as would use of a seized article itself.").

To determine whether evidence is fruit of an illegal seizure, the Court must determine whether the illegal seizure was "a but-for cause of the discovery of the evidence," and "if the causal chain has not become 'too attenuated to justify exclusion.'" *United States v. Brodie*, 742 F.3d 1058, 1062-63 (D.C. Cir. 2014) (citing *Hudson v. Michigan*, 547 U.S. 586, 592 (2006)). *See also United States v. Sparks*, 594 F. Supp. 3d 9, 28–29 (D.D.C. 2022). The test for attenuation, in turn, relies on three factors: "(1) the amount of time between the illegality and the discovery of the evidence, (2) the presence of intervening circumstances, and (3) the purpose and flagrancy of the illegal [seizure] conduct" by law enforcement. *Brodie*, 742 F.3d at 1063 (citing *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975)). In terms of "intervening circumstances," those "circumstances that militate in favor of attenuation must be sufficiently important to ensure that potentially tainted evidence was come at by way of some process other than the exploitation of an illegal search." *United States v. Washington*, 387 F.3d 1060, 1074 (9th Cir. 2004) (citing *Wong*). In terms of "flagrancy" of the violation, the Supreme Court has held that "when the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the benefits of exclusion tend to outweigh the costs." *Davis v. United States*, 564 U.S. 229, 238 (2011).

In summary, the inquiry is whether "circumstances have … 'purged [the subsequent evidence] of the primary taint.'" *Brodie*, 742 F.3d at 1063 (citing *Wong Sun v. United States*, 371 U.S. 471 (1963)). As stated in *United States v. Jones*, 374 F. Supp. 2d 143, 155 (D.D.C. 2005) (citing *Wong*), "to determine the admissibility of evidence obtained through a chain of causation that began with illegal police action, the test is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

In this case, Mr. Raymond asserts that the Court should conclude that fundamental constitutional violations occurred, and that suppression of evidence is required in order to deter the unreasonable, seemingly intentional (or at least grossly negligent) misconduct on multiple occasions by law enforcement. Mr. Raymond further asserts that information and materials from at least the following sources are subject to suppression: (1) both iPhones; (2) two laptops seized from Mr. Raymond's Mexico City apartment; (3) the iCloud account; (4) devices seized at Mr. Raymond's parents' home; (5) Mr. Raymond's online accounts, to include his Yahoo! email account; and (6) the testimony of each alleged victim in this case other than AV-1 (or at least such testimony up to the point the government showed each alleged victim tainted evidence, i.e., photographs).

In obtaining each of these items, the government openly exploited the contents of the phones and the fruit that directly flowed from them. The government would not have discovered the evidence it obtained from these sources "but for" the illegal phone seizures. The government has not put forward any argument to the contrary. Nor could it. Further, as related to subsequent, indirect fruit from the phones, the taint of the phone seizures was not "too attenuated" or "purged" in any way. As seen further below, the government essentially did everything it could to renew the

taint by further exploiting the iPhone's contents, rather than let it fade. Put another way, nothing changed between the phone seizures and the gathering of other evidence, except that the government's reliance on the tainted evidence *actually increased*. Finally, the flagrancy of the unconstitutional conduct in this case shows that suppression of all fruit, including witness testimony, is required. The government violated both the Fourth and Fifth Amendments, not once, but multiple times, seized Mr. Raymond three separate times on a single warrant, misled Mr. Raymond when talking to him, ignored his multiple invocations of his right to silence, violated Rule 41(e)(2)(B), and violated Magistrate Judge Harvey's rule in *In re Search of* [Redacted].

The remainder of this section addresses the six categories of evidence noted above, from the iPhones to witness testimony, and demonstrates that each is inextricably linked to the illegal seizures and should be suppressed.

### 1.   The iPhones.

The materials and information obtained from Mr. Raymond's iPhones is the primary fruit of the illegal seizures, and it is subject to suppression. Undoubtedly, but for the illegal seizures, the government would not have gained access to these phones. Further, the materials from the phones are not at all attenuated to the illegal seizures. Essentially no time passed, no intervening circumstances occurred, and the agent and prosecutor misconduct in carrying out these illegal seizures and violating Mr. Raymond's Fifth Amendment rights was as flagrant as imaginable. The materials and information obtained from Mr. Raymond's iPhones, which includes six photos and 24 videos involving AVs 2 through 7 and 19, certain internet search history, YouTube viewing history, and messages must be suppressed.

### 2.   The Asus laptops from the Mexico City apartment.

Five days after seizing Mr. Raymond's phones, the government obtained a search warrant for Mr. Raymond's Mexico City Apartment. The government executed that warrant on June 14,

2020, after it had already analyzed Mr. Raymond's phones and observed at least some of the videos at issue. More than two months later, on August 19, 2020, the government obtained a search warrant authorizing the search of various electronic devices seized from the Mexico City apartment, which included two Asus laptops. The warrant and affidavit in support thereof are attached as Exhibit A. These Asus laptops were several years old and in disuse when the government seized them. The government could not have and would not have obtained, nor did it obtain, the search warrant for these devices on the basis of the AV-1 story.[12] Indeed, the devices could not have, and did not, contain any information concerning AV-1. For these reasons, the materials from Mr. Raymond's iPhone XR played a prominent and critical role in obtaining expansive authority to search these two laptop devices. The affidavit described the videos from Mr. Raymond's phone in detail, and linked the videos to Mr. Raymond and his apartment. The affidavit described historical internet searches and YouTube viewing history, all of which came from Mr. Raymond's phone. The affidavit also mentioned messages and "thousands of cached images of women from multiple online dating websites," all recovered from Mr. Raymond's phones. In its warrant chart (Opposition at 15) the government acknowledges that the iPhone seizures tainted the Asus laptop searches.

But just to make it clear, the affidavit expressly stated as follows:

> **Based upon forensic analysis of RAYMOND'S cellular telephones**, and based on my training and experience, I believe that the electronic devices recovered during the execution of the June 14, 2020 residential search warrant may contain video and/or photographic evidence" relevant to the investigation…. **Based upon the video fragments recovered form RAYMOND's iPhone,** there is probable cause to believe that RAYMOND is keeping, or has previously kept, these types of materials on his electronic devices.

---

[12]     If it could have, presumably it would have done so at the time of the initial apartment search in June, rather than over two months later.

Exhibit A, at Affidavit p. 12, para. 26 (emphasis added). The government simply cannot deny the essential role the phone seizures played in this device search warrant.

Thus, the illegal seizures of Mr. Raymond's phones were a but-for cause of recovering further photos from these two laptops. In addition, although over two months had passed between the illegal phone seizures and the search of these laptops, that passage of time did not purge the taint from the phones, particularly where no intervening circumstances caused the taint to somehow play no role, or even a lesser role, in the search of the Asus laptops. Indeed, the warrant affidavit referred several times to the "ongoing analysis" of the phones, indicating the freshness of the taint at that time. *See, e.g.*, Exhibit A at Affidavit p. 10, para. 21. For these reasons, the contents of these laptops must be suppressed, including 43 photos and videos depicting AVs 20, 21, and 22, and all "internet artifacts" showing certain searches the government believes are relevant in this case.

### 3.  The iCloud.

On August 14, 2020, the government obtained a search warrant for Mr. Raymond's iCloud account. The warrant and the application in support thereof are attached as Exhibit B. The government undertook this action after the phone seizures and Mexico City apartment search, but just five days before the device warrant for the two laptops seized from the Mexico City apartment discussed above. The affidavit in support of the iCloud search warrant uses essentially the same language concerning Mr. Raymond's phones as the Asus laptop search warrant. Just like with the Asus laptops, the government could not have and would not have obtained, nor did it obtain, this iCloud search warrant on the basis of AV-1's story. Once again, the affidavit makes clear the central role the phone seizures played, stating: "**Based upon the ongoing forensic analysis of RAYMOND's cellular telephones,** and based on my training and experience, there is probable

cause to believe that RAYMOND's iCloud account contains video and/or images and other evidence" relevant to the investigation. Exhibit B, at Affidavit p. 10, para. 23.

Here again, the illegal seizures of Mr. Raymond's phones were a but-for cause of the searches of the iCloud account. The passage of time did not purge the taint from the illegal phone seizures, particularly where no intervening circumstances lessened the impact of the materials from the phones. As with the laptops, the warrant affidavit referred to the "ongoing analysis" of the phones, indicating the freshness of the taint at that time. The phone seizures played a central and necessary role in the iCloud search warrant application. For these reasons, all materials seized from the iCloud account, including the 400 photos and videos depicting AVs 2 through 19, must be suppressed.

### 4.   The devices from Mr. Raymond's parents' home in California.

On October 9, 2020, the day Mr. Raymond was arrested, the government obtained a search warrant authorizing the search of Mr. Raymond's parents' home in California. This warrant, as the government acknowledges, relied on information from Mr. Raymond's iPhones. Opposition at 15. On November 27, 2020, after Mr. Raymond's arrest, the government obtained a search warrant for various electronic devices seized during this California premises search. The warrant and affidavit in support thereof are attached as Exhibit C. Of particular relevance are an Apple Macbook computer, an SD memory card, and a USB flash drive, from which the government recovered over 500 photos and videos (mostly from the Macbook) depicting AVs 2-7, 12-13, 15, 17-21, 23-25, and 28. Many of these are duplicative of photos and videos recovered from Mr. Raymond's iCloud and iPhone XR.

The affidavit in support of this device warrant mentions the iPhone XR seizure, and although it uses much of the same language as prior affidavits to describe certain portions of the evidence gathered, it states that the source of much of that evidence was Mr. Raymond's iCloud

account. In addition, the affidavit discusses certain "internet artifacts" showing searches for things like "Ambien" on one of the Asus laptops discussed above. But of course, the only way the government got access to the iCloud and that Asus laptop was through the illegal seizures of Mr. Raymond's phones, as demonstrated above.

Rather than diminishing the taint from the illegal seizures, the taint in fact significantly increased by this time. For example, the affidavit goes into detail concerning AV-4, a person who was depicted in videos recovered from the iPhone XR. As the affidavit states, by the time of the warrant for the Macbook and other California devices, the government had identified AV-4 using photos and messages recovered from prior device and iCloud searches, all of which relied on the iPhone seizures. As it did with the majority of the AVs, the government conducted a "preliminary interview" of AV-4, in which she did not incriminate Mr. Raymond. Exhibit C, at Affidavit p. 11, para. 27. The affidavit states that at the end of that interview "AV-4 was shown the video and photographs" seized from Mr. Raymond's phone and iCloud. *Id.* Then, three days later, the government conducted what it called "[t]he full interview." *Id.* The government relied on the iPhone XR materials in developing AV-4's story, which it then baked into this California device warrant. Thus, this entire AV-4 story is based upon, and tainted by, the iPhone seizures, and the California device warrant is thereby also entirely tainted.

This particular warrant demonstrates how this case hinges on the illegal phone seizures, and rather than diminishing with time, the taint from those phone seizures only grew. The government's continual, and indeed increasing, reliance on tainted materials was once again made clear in the affidavit, which stated:

> **Based on the forensic examination of RAYMOND's laptops, the review of RAYMOND's iCloud account, and the investigation so far**, it is evident that he used several of his electronic devices to store videos and photographs…

…

> **To date, both laptops seized and the iCloud account (***which was
> associated with multiple of RAYMOND's <u>cellular phones</u> and
> used to backup content***) contained relevant evidence**, to include
> pertinent browsing history, messages, photographs, videos,
> contacts, and/or information that helped identify when and where
> offenses took place, along with the identities of potential victims.

Exhibit C, at Affidavit p. 16, paras. 37-38  (emphases added).

Thus, the illegal iPhone seizures were once again a but-for cause of these California device searches, and not at all attenuated therefrom. The materials and information obtained from the California devices (Macbook, SD card, and flash drive), which includes over 500 photos and videos, must be suppressed.

### 5.   Other accounts, such as Yahoo!

On the same date as the California device warrant, November 27, 2020, the government obtained warrants authorizing the seizure and search of other accounts, including Yahoo!, Google, Bumble, and Tinder.[13] Only the Yahoo! account produced photographs (seven of them, all depicting AV-20) that the government seeks to use in this case. While the discussion here focuses on the Yahoo! warrant and affidavit in support thereof, which are attached as Exhibit D, the same analysis applies to all other online account warrants obtained by the government.

In significant part, the Yahoo! warrant application mirrored the California device application discussed above. It mentioned the seizure of the iPhone XR, as well as the Asus laptops and the iCloud account. It discussed the photos and videos recovered from the iCloud account, and the "internet artifacts" showing searches for things like "Ambien" from one of the Asus laptops. Exhibit D, at Affidavit p. 11, para. 21. The affidavit also included details concerning how and

---

[13]      The government obtained two Tinder search warrants in this case, one on August 19, 2020, which largely mirrored the other warrants issued around that time, and one on November 27, 2020, which largely mirrored the other warrants issued around that time.

when certain AVs were contacted through Mr. Raymond's Yahoo! email account, thus tying that account to the probable cause established through the photos and videos and related evidence. These AVs, of course, had been identified through photos obtained from the laptop and iCloud search warrants.

The sweeping scope of this warrant (which allowed the seizure of information dating to 2011) would not have been possible but for the iPhone seizures and the other tainted searches that flowed directly out of those seizures, which thoroughly infected this Yahoo! warrant. The affidavit relies heavily on photos seized through the iCloud account, going into significant detail about the photos and how they led to interviews of AVs, which tied into those AVs receiving emails from the Yahoo! account. Notably, the affidavit again states, in the paragraph discussing the iPhone XR, the Asus laptops, and iCloud, that "[f]orensic analysis of the devices is ongoing." Exhibit D, at Affidavit p. 9, para. 17. The freshness, and thoroughness of the taint from the illegal iPhone seizures is readily apparent from this affidavit. The iPhone seizures were a but-for cause of this Yahoo! search and seizure, and they were not at all attenuated therefrom.[14]

6. Witness testimony.

To date, the government has interviewed several AVs in this case, including all 14 named in the First Superseding Indictment (ECF No. 184). Of those 14, two (AVs 1 and 26) had no photos/videos taken. Of the remaining 12 (AVs 2, 4-9, 12, 15, 17, 22, and 23), the government's interviews followed a general pattern: 1) conduct a brief initial interview in which the AV confirms she dated Mr. Raymond and consumed alcohol with him; 2) towards the end of the interview, show the AV photos and videos recovered from the iPhone XR, other devices, or the iCloud; 3) conduct

---

[14]     The government repeatedly attempts to mislead the Court by asserting that, with regard to various warrants obtained after the iCloud and Mexico laptop seizures, "[t]he affidavit did not reference any photograph or video evidence found on the iPhone XR." *See, e.g.*, Opposition at 17, 21, 22, and 23. Each of these affidavits relied on the iCloud and/or the laptops from Mexico, which in turn relied directly (and completely) on the phone seizures.

a "full interview" at a later time, after the AV has had time to think about the photos and videos (and perhaps also absorb press releases or other information the government conveyed). Out of the 12 AVs listed in the First Superseding Indictment, the government showed 10 of them photos and videos, and told the other two of them about the photos and videos. Thus, for each of the AVs listed in the First Superseding Indictment, where photos and videos are applicable, the government has tainted their testimony with poisonous fruit.

The expected witness testimony from the AVs is tainted by the iPhone seizures in two critical ways. First, the government identified the AVs (other than AV-1) through use of the photos and videos. But for the photos, all of which were obtained from or as a direct result of the iPhone seizures, the government would not have identified these AVs. Second, the government used the photos and videos in its interviews with the AVs. If these AVs testified, it would be impossible for them to separate out the existence of those photos and videos and testify only from their memories of their dates with Mr. Raymond. For these reasons, the testimony of the AVs (other than AV-1) must be suppressed.

## III.    CONCLUSION.

The government committed clear Fourth and Fifth Amendment violations in this case in seizing Mr. Raymond and his phones three times, and compelling him to open the phones with PIN codes after he had invoked his right to refuse to do so. The violations are documented, recorded, and beyond dispute. They are also flagrant, and appear intentional. At a minimum, they constitute gross negligence. As a result, suppression of the materials obtained from the phones is required.

The phone seizures also completely changed the course of the investigation, and led to virtually all evidence the government obtained thereafter. This government exploited the tainted

evidence to advance its entire investigation. It was the discovery of photographic and video graphic evidence on the phones that spawned the government's pursuit of everything it found thereafter. The government all but ditched the AV-1 he-said, she-said case, which was crumbling, and pivoted to doing everything it could with the photo and video evidence it gathered. To demonstrate more concretely: the phones are the poisonous tree. Each and every warrant, subpoena, interview, or other evidence is a limb that hangs from that tree, and all of the photos, videos, online histories, messages, and witness accounts are the fruit hanging from those branches.

Mr. Raymond requests the Court to do what it must in this case – to suppress all evidence that is fruit of the poisonous tree, to include, without limitation, the evidence from the phones, the iCloud, the laptops recovered in Mexico, the devices recovered in California, the online accounts including Yahoo!, and the tainted witness testimony. In short, Mr. Raymond requests that the Court reset the clock to the morning of June 6, 2020 before the illegal seizures and search of his phones and leave the government with the only evidence it legally has obtained.

Dated: April 14, 2023          Respectfully submitted,

s/John Marston
John Peter Marston (D.C. No. 493012)
**FOLEY HOAG LLP**
1717 K Street, NW
Washington, DC 20006
(202) 261-7321
Fax: (202) 785-6687
jmarston@foleyhoag.com

s/A. Joseph Jay III
A. Joseph Jay III (D.C. No. 501646)
Denise Giraudo (D.C. No. 499348)
**SHEPPARD, MULLIN, RICHTER &HAMPTON, LLP**
2099 Pennsylvania Avenue, NW
Washington, D.C. 20006
(202) 747-1900
JJay@sheppardmullin.com;
DGiraudo@sheppardmullin.com

*Counsel for Brian Jeffrey Raymond*