```
1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
2
     * * * * * * * * * * * * * * *    )
3    UNITED STATES OF AMERICA,        )      Criminal Action
                                      )       No. 21-00380
4                    Plaintiff,       )
                                      )
5       vs.                           )
                                      )
6    BRIAN JEFFREY RAYMOND,           )      Washington, D.C.
                                      )      June 1, 2023
7                    Defendant.       )      9:09 a.m.
                                      )
8    * * * * * * * * * * * * * * *    )

9

10                   TRANSCRIPT OF MOTION HEARING
              BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY,
11                   UNITED STATES DISTRICT JUDGE

12

13   APPEARANCES:

14   FOR THE GOVERNMENT:      ANGELA N. BUCKNER, ESQ.
                              MEREDITH MAYER-DEMPSEY, ESQ.
15                            UNITED STATES ATTORNEY'S OFFICE
                                FOR THE DISTRICT OF COLUMBIA
16                            555 Fourth Street, Northwest
                              Eleventh Floor
17                            Washington, D.C. 20530

18

     FOR THE DEFENDANT:       JOHN P. MARSTON, ESQ.
19                            FOLEY HOAG, LLP
                              1717 K Street, Northwest
20                            Washington, D.C. 20006

21                            ANTHONY JOSEPH JAY, ESQ.
                              DENISE E. GIRAUDO, ESQ.
22                            SHEPPARD, MULLIN, RICHTER & HAMPTON,
                                LLP
23                            2099 Pennsylvania Avenue, Northwest
                              Suite 100
24                            Washington, D.C. 20006

25
```

```
 1    REPORTED BY:              LISA EDWARDS, RDR, CRR
                                Official Court Reporter
 2                              United States District Court for the
                                  District of Columbia
 3                              333 Constitution Avenue, Northwest
                                Room 6706
 4                              Washington, D.C. 20001
                                (202) 354-3269
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          I N D E X

 2

 3                                Direct      Cross        Red.

 4

     WITNESSES FOR THE GOVERNMENT:
 5
     Raymond White                 40          61          76
 6                                                          80

 7   Mikel Gajkowski               86

 8

 9
     EXHIBITS RECEIVED IN EVIDENCE                         PAGE
10
     Government's Exhibit Nos. 1A & 2                        55
11   Government's Exhibit No. 3                              57
     Government's Exhibit No. 4-A through 4-Q               95
12   Government's Exhibit No. 5                             102
     Government's Exhibit No. 9                             108
13   Government's Exhibit No. 7                             118
     Government's Exhibit No. 8                             119
14   Government's Exhibit No. 6A & 6B                       121
     Government's Exhibit No. 21                            142
15   Government's Exhibit No. 22                            145
     Government's Exhibit No. 17                            149
16   Government's Exhibit No. 19                            160
     Government's Exhibit No. 10A & 10B                     161
17   Government's Exhibit No. 11                            165
     Government's Exhibit No. 18                            169
18   Government's Exhibit No. 20                            183
     Government's Exhibit No. 12A, 12B & 12C                190
19   Government's Exhibit No. 13A, 13B & 13C                197
     Government's Exhibit No. 14                            198
20

21

22

23

24

25
```

 1              THE COURT:  Good morning, everyone.

 2              Let's call the case.

 3              THE COURTROOM DEPUTY:  Criminal Case 21-380, the

 4     United States versus Brian Jeffrey Raymond.

 5              Counsel, would you please identify yourself for

 6     the record, starting with the Government.

 7              MS. MAYER-DEMPSEY:  Good morning.  Meredith

 8     Mayer-Dempsey for the Government.  I'm joined by my

 9     colleague, Angela Buckner.

10              THE COURT:  Good morning.

11              MR. MARSTON:  Good morning, your Honor.  John

12     Marston for Mr. Raymond, who is present.  I'm joined by A.

13     Joseph Jay and Denise Giraudo.

14              THE COURT:  Good morning, everyone.

15              MR. JAY:  Good morning.

16              THE COURT:  We're here for a motion to suppress

17     with a whole series of legal issues.  I'll be dealing with a

18     specific warrant or a couple of warrants and the phone.

19              What would be helpful to me to just sort of set

20     the stage or put it in context is for the Government to go

21     through before we hear the testimony what was the probable

22     cause for each of the warrants that are at issue and exactly

23     what was included within the warrant in terms of what it

24     authorized, timing, all the key features that you would

25     have.

1          I'm assuming we would get testimony about it, but

2    it would help to put it in context for me, not that I

3    haven't looked at the papers, et cetera, but it would be

4    helpful to have it on the record, not just in pleadings.

5          MR. MARSTON:  John Marston, your Honor, for

6    Mr. Raymond.

7          I apologize.  I know you didn't call on me.  But I

8    had a couple preliminary matters very briefly I wanted to

9    raise.

10         THE COURT:  Go ahead.

11         MR. MARSTON:  I'm sorry.  I should have mentioned

12   that.

13         One is that we had filed a motion to compel, ECF

14   211.  In our view, it was -- we were seeking materials

15   relevant to this hearing.  The Government has asserted

16   privilege claims over these materials.  I just wanted to

17   note, I don't believe the Court has ruled on it.

18         And if the Court orders the Government to produce

19   additional materials, I doubt -- I don't think that it will

20   cause any kind of request to reopen the hearing.

21         And I also would note a number of the Government's

22   exhibits --

23         THE COURT:  I have to say, this case is replete

24   with motions.  So if you could be more specific about when

25   you filed it.  Was it included with the materials relating

1    to AUSA Perry or was it separate?

2           MR. MARSTON:  Well, it's any material the

3    Government -- now, frankly, it would include the *Jencks*

4    material --

5           THE COURT:  All I'm asking is, are you in essence

6    asking for *Jencks* material?

7           MR. MARSTON:  Well, now it includes -- yes, we

8    would include some *Jencks* material, which is heavily -- they

9    have produced it, but it's heavily redacted.

10          THE COURT:  For those that are going to be

11   testifying?

12          MR. MARSTON:  Right.

13          THE COURT:  Are you asking for something else?

14          MR. MARSTON:  We're asking for that as well as all

15   previously withheld relevant information concerning the

16   warrant, the preparation for it and the execution of it.

17          THE COURT:  Have you produced all of that material

18   or not?  Was there a response filed to this?  I must admit,

19   this case has so many motions that this doesn't leap out at

20   me at this point.

21          MS. BUCKNER:  Yes, your Honor.

22          So I think with more clarity, I think here's the

23   situation:  The Government has claimed privilege over a

24   number of things, attorney work product, attorney-client

25   privilege, et cetera.  That's all in our response to the

```
 1    defense motion to compel documents.

 2              They made a broad motion to compel a lot of

 3    discovery.  We've provided the discovery per our

 4    obligations, but claimed privilege over certain items.  And

 5    it's from the Government's perspective those items which the

 6    defense is now asking for the Court to ask the Government to

 7    compel at this time.

 8              I think this issue is fully briefed.  And so I

 9    would rely on the Government's papers on that.

10              THE COURT:  I take it you did a privilege log?

11              MS. BUCKNER:  I'm sorry, your Honor?

12              THE COURT:  Did you do a privilege log?

13              MS. BUCKNER:  No.  We have not done a privilege

14    log.

15              THE COURT:  Let me take a moment to go and take a

16    look at this to see how we want to proceed with it.

17              MS. BUCKNER:  Yes, your Honor.

18              THE COURT:  I'll be right back.

19              (Thereupon a recess was taken, after which the

20    following proceedings were had:)

21              THE COURT:  All right.  Although the motion has

22    not been specifically ruled on in terms of taking off the

23    hammer, in my motion to quash Perry's testimony, for

24    purposes of the motion to suppress, the vast majority of

25    what you're seeking I found immaterial.
```

1          In the order that I issued on May 25th, which

2   related to the motion to quash, but it has an overlap,

3   frankly, to your other motion, you indicated -- it was a

4   subpoena *testificandum*, so you wanted additional documents,

5   documents in Categories 3, 4 and 5, which in essence I

6   indicated -- the question is exclusively for this hearing of

7   what the police or law enforcement knew and when they knew

8   it.  The training and experience of Ms. Perry or Ms. Soni or

9   communications between them are immaterial for the present

10  inquiry.

11         So as far as I'm concerned, a good portion of what

12  you asked for in the motion to compel has actually been

13  dealt with.

14         Now, I did hold it in abeyance in terms of her

15  need.  It seemed to me that is granted in part and held in

16  abeyance in part.  And that was to wait to see what the

17  hearing was.  My initial reaction was it wasn't appropriate

18  and immaterial to have her come.

19         But at this point, I'll wait to see if that

20  changes.

21         Now, there is one issue that relates to -- the

22  motion to compel discovery that does relate to Ms. Perry,

23  where the Government has claimed privilege; and I don't know

24  whether it's an email or what it is.  It's a request from

25  Perry, a discussion with the law enforcement agent and

 1    there's a claim of attorney-client privilege, which as I

 2    understand it the Defendant has claimed there's a waiver.

 3              Preliminarily, I will just simply say the fact

 4    that they may have waived certain confidential

 5    attorney-client-privileged material doesn't mean there's a

 6    wholesale waiver.  So I don't see at this point it coming

 7    in.

 8              Is it an email or something else, the specific one

 9    that -- because most of the rest of them you did not claim

10    privileges.  It was other arguments.

11              MS. MAYER-DEMPSEY:  That's correct, your Honor.

12    It was legal advice, not pertaining to biometrics.  Just in

13    relation to the search warrant.

14              THE COURT:  Was it related to the warrant or

15    something else?

16              MS. MAYER-DEMPSEY:  It was related -- there are

17    some related to the execution of the warrant, some related

18    to what to do with the phones after the warrant.  They were

19    attached to our response to Defendant's motion to compel at

20    sealed Exhibit L for the Court to review.

21              THE COURT:  All right.  This is obviously going to

22    take us some time.  I will take a look and see whether

23    there's anything there as we progress along that appears to

24    be something that can be considered.  But at least at this

25    point, I think the majority of what you had in the motion to

 1    compel based on my ruling would not be provided to you.

 2          But, you know, it'll be something that I will keep

 3    in mind as we progress.

 4          MR. MARSTON:  I appreciate that, your Honor.

 5          I'd just note that our position is the Government

 6    disclosed an email related to the execution from the day

 7    before the execution.  It was from a lawyer to an agent

 8    giving instructions and advice to the agent.  And that that

 9    is a select -- or attempting a selective waiver, which you

10    can't do.  You have to -- you can't cherry-pick, your Honor.

11    It's *Long versus Motion Picture*.  We cited it in our motion.

12          THE COURT:  So you have it in your motion and I

13    have the material it.  I'll take a look at it as we

14    progress, as I've indicated, in terms of the issues relating

15    to Ms. Perry.

16          MR. MARSTON:  Yes, your Honor.

17          THE COURT:  I'll see whether any of it is

18    particularly relevant.

19          At this point, based on what I know of the case --

20    obviously, we're having this hearing to have it all

21    unfold -- one, it's immaterial, and I'm not sure that they

22    have waived everything relating to it.

23          MR. MARSTON:  I understand.

24          THE COURT:  So I have the material.  I can also

25    take a look at it.

```
1              MR. MARSTON:  I understand.

2              Our position would also be immateriality and

3    inadmissibility is far different from discoverable.  So

4    their obligation to produce --

5              THE COURT:  Certainly in a motion to suppress, the

6    Court can decide it's not material for the Court's decision.

7              MR. MARSTON:  Yes.

8              THE COURT:  That's what I've decided.

9              MR. MARSTON:  I understand, your Honor.

10             We have a second preliminary matter.

11             THE COURT:  It would be helpful to alert me that

12   we're going to have all of these.  What's your second

13   motion?

14             MR. MARSTON:  It's very brief, your Honor.  We

15   have an expert witness, Terry Brady, who's here.  We would

16   ask that she be allowed to sit in under Rule 615(c).  She's

17   essential to the claims or defenses of Mr. Raymond; and

18   typically, experts under that -- usually, witnesses are

19   excluded --

20             THE COURT:  What's her area of expertise?  Is she

21   testifying?  Not testifying?

22             MR. MARSTON:  Digital forensics; and she may

23   testify.

24             THE COURT:  Did you discuss this with the

25   Government?
```

```
 1              MR. MARSTON:  Yes.

 2              THE COURT:  What is their position?

 3              MR. MARSTON:  They told me this morning they would

 4     like her excluded from the hearing and the live testimony.

 5              MS. MAYER-DEMPSEY:  So, your Honor --

 6              THE COURT:  Why don't you come on up.

 7              MS. MAYER-DEMPSEY:  Thank you.

 8              We were first notified of the defense's intention

 9     to have this witness sit in this morning.  It's true she may

10     be able to sit in.  But I think that at this point, in order

11     for us to make that determination, we'd want a more fulsome

12     proffer of the scope of her expertise and what exactly

13     she'll be rendering an opinion on.

14              Clearly, she can render an opinion if she's

15     qualified on phones unlocking or anything she wants to say

16     about iPhones or the devices examined in this case.

17              But obviously, we would object to her rendering an

18     opinion on someone else's testimony or what they did without

19     her having the appropriate basis to make an opinion on that

20     material.

21              THE COURT:  Well, I'm assuming if she's -- she

22     can't comment on somebody else's testimony.

23              Did she do a report?

24              MS. MAYER-DEMPSEY:  No, your Honor.

25              THE COURT:  Did she do anything from defense
```

1    counsel?  Do you have anything about what her parameters

2    are?

3                  MS. MAYER-DEMPSEY:  So --

4                  THE COURT:  Excuse me.  I'm looking at the

5    defense.  Let me get an answer from him.

6                  Do you have anything from her that indicates what

7    she's going to testify or potentially testify to?

8                  MR. MARSTON:  Yes, your Honor.  We alerted the

9    Government that we anticipate calling Ms. Brady about search

10   and seizures of iPhones, particularly iPhone XR and 6, what

11   it means for them to be in before-first-unlocked status, so

12   powered down and restarted status, or after-first-unlocked

13   status; the viability of the agent's operations plan; for

14   the seizure in this matter and other matters related to

15   iPhone security, imaging and the use of biometrics --

16                  THE COURT:  That's a very broad category of

17   material.  And you have no report, not even anything in

18   writing for them?

19                  MR. MARSTON:  No report, your Honor.

20                  THE COURT:  So they don't really know what her

21   opinions are.  But you plan on calling her as an expert

22   without having her indicate anything as it relates to it?

23                  MR. MARSTON:  I've had many cases where I've

24   called experts without written reports.  I don't think a

25   written report --

1       THE COURT:  No.  I think part of the question is

2   that it goes further than just simply sort of biometrics.

3   It sounds as if in terms of their viability plan, it sounds

4   like it's basically an expert about the whole thing.

5       MR. MARSTON:  It's not the whole thing.

6       THE COURT:  Although generally I have allowed

7   experts to sit in, at this point, I would -- my initial

8   inclination, since you have not provided them enough

9   information, something other than what you just said is --

10   how did you provide that?

11       MR. MARSTON:  In an email, your Honor.

12       THE COURT:  Is that sufficient, counsel, for you

13   to know what roughly the person would want to testify about?

14   It doesn't necessarily mean the person would.

15       MS. MAYER-DEMPSEY:  I don't believe so, as to

16   certain aspects of the testimony, particularly --

17       THE COURT:  Let's put it in the context of her

18   listening.  Okay?  Let's not get into whether she gets to

19   testify about all of this.  Let's put it in the context of

20   her sitting in the courtroom and listening to it.

21       So is there an objection to her sitting in the

22   courtroom and listening to it?  She could certainly be

23   provided with a transcript of it afterwards.  So as a

24   practical matter, she is going to get the information.  So

25   is there a reason for her not to be able to sit there?

1          MS. MAYER-DEMPSEY:  No, your Honor.

2          THE COURT:  All right.  Then she gets to sit

3    there.  But I'm not ruling on whether she gets to opine

4    about anything.

5          MS. MAYER-DEMPSEY:  Thank you.

6          THE COURT:  Anything else, Mr. Marston?

7          MR. MARSTON:  No, your Honor.  Thank you.

8          THE COURT:  Anything else from the Government?

9          MS. MAYER-DEMPSEY:  Not on that issue.

10          THE COURT:  Then let's start with the -- with sort

11    of going over the warrant just to set it into context.

12          In terms of speaking, you can take your mask off.

13    Otherwise, we can't get a record.

14          MS. BUCKNER:  Understood, your Honor.  Thank you.

15          So I think the Court asked first and foremost

16    about each of the warrant affidavits, what probable cause

17    supported those affidavits and essentially what was

18    mentioned.

19          I know in the Government's opposition --

20          THE COURT:  Can you use the microphone?

21          MS. BUCKNER:  Sure.

22          I know in the Government's opposition to the

23    motion to suppress, we made a chart that basically said

24    whether the warrant affidavits relied on the iPhone XR

25    evidence or not.

1          THE COURT:  You can go through the chart.  I want

2     to set the stage in terms of what the testimony is going to

3     be.

4          MS. BUCKNER:  Sure.

5          THE COURT:  If you want to use the chart, that's

6     fine.  We want to know probable cause, what's in the

7     warrant.

8          MS. BUCKNER:  I think it's simpler than that.  I

9     don't think we need to go through the chart.  I know the

10    Court already has a copy of the chart.

11         So what instead I'd like to focus on is the

12    probable cause that supported the search warrant for the

13    iPhone XR, because that probable cause existed throughout

14    and would have been sufficient for the subsequent warrants

15    regardless of whether those warrants mention the iPhone XR.

16         THE COURT:  I don't have a problem with that.  But

17    I would like after that for you to go through what's in the

18    warrant and what's not in the warrant --

19         MS. BUCKNER:  Understood, your Honor.

20         THE COURT:  -- or just what's in the warrant.

21         MS. BUCKNER:  So for the --

22         THE COURT:  Do the probable cause as you've

23    suggested.  Go ahead.

24         MS. BUCKNER:  For probable cause for the iPhone

25    XR, first and foremost what was mentioned was the report

1    regarding AV-1, who reported an assault in Mexico City

2    related to Mr. Raymond.

3            The affidavit goes through the facts as they were

4    reported at that time.  The assault allegedly took place on

5    May 31st.  The affidavit for the iPhone XR was sworn out on

6    June 5th.  So it was the facts leading up to June 5th

7    regarding the assault she reported at that time.

8            The other thing that that particular warrant

9    affidavit for the iPhone XR and the iPhone 6 mentions is the

10   fact that Mr. Raymond had been interviewed two times up to

11   that point.  So the first interview took place in Mexico

12   City, where he was interviewed about what happened with

13   AV-1.

14           And again, those facts essentially were that he

15   had a consensual sexual encounter with AV-1.  On the other

16   hand, of course, AV-1 reported she was sexually assaulted,

17   though her report of sexual assault was somewhat unique in

18   that she reported it and then had no memory of reporting the

19   sexual assault.

20           I think what really goes to probable cause in

21   addition to the actual report from AV-1 and of course a

22   report from one witness is enough to sustain probable cause

23   for a warrant.

24           I think what's even more relevant and helpful in

25   the warrant affidavit for the iPhone XR is the fact that

1    Mr. Raymond was interviewed.  And during the interview with

2    Mr. Raymond, he voluntarily provided information that led

3    law enforcement to believe and know in fact that there was

4    evidence on both of his phones.

5         So for instance, he indicated that he had chatted

6    with AV-1 via Tinder, and those Tinder messages were on his

7    iPhone XR.  He also indicated that they shifted from Tinder

8    to WhatsApp.  And as he was speaking on WhatsApp, he used

9    his other phone, his work phone, his iPhone 6.

10        Not only did he volunteer that information, but he

11   also accessed his phones in front of the agents, and in

12   accessing those phones showed the agents what was on the

13   phones.  At one point, even Agent Gajkowski, as you'll hear

14   through testimony, is holding Mr. Raymond's phone herself

15   and scrolling through the messages and taking photos.

16        So at this point, we know not only that there is

17   evidence of what may or may not have happened, in other

18   words, of facts that make something more or less likely, on

19   Mr. Raymond's phones, both of them, the iPhone XR and the

20   work phone, iPhone 6, but we also know that he has

21   possession and control of those phones.  We know that

22   there's some indicia of whether this offense took place in

23   combination with a report from AV-1 that was sufficient

24   probable cause for a judge in the Eastern District of

25   Virginia to issue search warrants for both of those phones,

1    which is what took place on June 5th.

2                    THE COURT:  Let me just clarify.

3                    In terms of the interview with -- which you've

4    spoken about, his showing the phones, is that in the

5    affidavit or is it not?

6                    MS. BUCKNER:  Yes, your Honor.

7                    THE COURT:  Okay.  That's fine.  I just wanted to

8    clarify.

9                    MS. BUCKNER:  I just want to double-check, your

10   Honor, just to make sure I'm thinking of the right one.

11                   Yes, your Honor, it is.

12                   THE COURT:  Okay.  I didn't mean to interrupt you.

13   Go ahead.

14                   MS. BUCKNER:  So it's based on that information

15   that a warrant was issued.

16                   I would also state that while Mr. Raymond

17   indicated that he was not a particularly prolific user of

18   dating applications, it was clear from the agent's

19   observations on his phones that he had at least two dating

20   applications, that being Tinder and Bumble, which were on

21   his phone.  The agent also comments on sort of his demeanor

22   and her ability to navigate the phone.

23                   So the other important thing I would note here is

24   that right off the bat, agents knew that Mr. Raymond had two

25   iPhones, which is relevant to -- on an inquiry and probable

1   cause regarding whether there would be an iCloud account

2   associated with those iPhones.

3           And so that was in summary the probable cause that

4   led to that warrants.  And of course, the warrant itself

5   authorized a search and seizure to access that electronic

6   information.

7           And to the extent that the phones could be

8   accessed by biometrics, the search warrant authorized agents

9   to compel either a finger or a face with the goal of

10  unlocking the phones to obtain that evidence, that

11  electronic data, from the phones.

12          THE COURT:  So in terms of -- do you have

13  precisely what the language that was included in the

14  affidavit in terms of being able to seize the phones, the

15  purpose of it and whether there was any timing within which

16  this seizure was to take place?

17          MS. BUCKNER:  Yes, your Honor.  So there was no

18  timing as far as when the seizure was to take place.

19          THE COURT:  Okay.

20          MS. BUCKNER:  As far as the direct instructions,

21  looking at Attachment B, the very last paragraph of

22  Attachment B indicates that during the execution of the

23  search of Device 1 and Device 2 as described in --

24          THE COURT:  You're going way too fast for the

25  court reporter.

1          MS. BUCKNER:  Oh, sorry.

2          Law enforcement personnel are authorized to press

3     the fingers, including thumbs, of Brian Raymond to the touch

4     ID sensor of Device 1 and Device 2 for the purpose of

5     attempting to unlock the device via touch ID in order to

6     search the contents as authorized by this warrant.

7          Law enforcement personnel are further authorized

8     to hold Device 1 and Device 2 up to Raymond's face for the

9     purpose of attempting to unlock the devices via face ID.

10          So while the warrant itself, and specifically

11     Attachment B, authorizes the biometrics, it neither provides

12     a timeframe for the use nor instructions regarding the

13     method of how to obtain those biometrics.

14          I will note -- the one thing the Government will

15     point out to the Court, just for the record, is that there

16     is a line within the warrant affidavit that does indicate

17     that sometimes it takes up to five times to -- I'm sorry; I

18     misstated -- you have five chances to unlock a phone using

19     touch ID.

20          Now, I think that paragraph read in context could

21     mean you have five tries because the finger's not working,

22     not necessarily that the finger works and then you -- it

23     locks and then you try again.  But we did just want to, full

24     disclosure, point out that line to the Court.

25          THE COURT:  Anything else pertinent within either

1      the affidavit or the actual search warrant that the

2      magistrate judge or judge signed?

3                  MS. BUCKNER:  No, your Honor.

4                  THE COURT:  Let's proceed, then.

5                  MS. BUCKNER:  So moving from the search warrants

6      for the iPhones, the Government then got a search warrant

7      for Mr. Raymond's residence in Mexico.  But I think more

8      importantly, the Government subsequently got a search

9      warrant for the Defendant's iCloud account.

10                 And so I would like to focus, if your Honor's okay

11     with that, on the iCloud account.

12                 THE COURT:  Okay.  Did it rely on anything that --

13     what did it rely on?  Did it rely on the affidavit or any of

14     the other information or what had been found on the phone or

15     was it independent?

16                 MS. BUCKNER:  The iCloud account, your Honor?

17                 THE COURT:  Yes.

18                 MS. BUCKNER:  It relied on what was found on the

19     iPhone XR.

20                 And so the iCloud search warrant affidavit begins

21     again with the report from AV-1 and what occurred in Mexico

22     City and sort of recounts the same facts regarding AV-1 and

23     that report of assault.

24                 It then references the same interviews with

25     Mr. Raymond, the interview on May 31st and the interview on

1    June 2nd that we've already discussed, though it

2    additionally references a third interview, the interview

3    that took place when Mr. Raymond's iPhones were seized on

4    June 6.

5             After it goes through the statements that

6    Mr. Raymond made himself, it goes on to talk about the

7    iPhone XR that was seized and the fact that a forensic

8    analysis revealed fragmented files and that the fragmented

9    files revealed -- that an analysis was ongoing but that

10   there were 28 fragments and that the fragments depicted at

11   least five different women.

12            It also indicates that the women appear partially

13   nude, unconscious and the same information the Government's

14   already proffered about Mr. Raymond's manipulation of the

15   women's bodies while they appear unconscious.

16            Moving on from what is found on the iPhone XR, the

17   iCloud affidavit talks about the fact that agents went to

18   Mr. Raymond's residence in Mexico and observed his residence

19   personally, and what they saw matched the video and image

20   fragments that they saw on the iPhone XR.

21            So in other words, they had a reason to believe

22   that the photos found in the iPhone XR were taken at

23   Mr. Raymond's residence.

24            And finally, the iPhone -- excuse me -- the iCloud

25   search warrant affidavit makes mention of the fact that

1    there was search history located on Mr. Raymond's iPhone XR.

2    And the internet search history included "deep sleep," "deep

3    sleeper," and that there were YouTube viewing history

4    showing videos depicting unconscious and passed-out women.

5              So that's a long way of saying, your Honor, that

6    the iCloud search warrant affidavit did in fact reference

7    evidence located on the iPhone XR that was seized on June

8    6th.

9              And I think the Government in arguments -- after

10   you've heard from the Government's witnesses will make the

11   argument that the probable cause existed without reference

12   to the evidence found in the iPhone XR for three main

13   reasons:  one, that there was a report from Adult Victim 1;

14   two, that Mr. Raymond had already interviewed twice and

15   shown that he had access to and possession of iPhones; and,

16   three, that the access and possession -- access to and

17   possession of those iPhones would mean that an iCloud

18   warrant had been forthcoming without just the relation

19   between -- if you have an iPhone, you have an iCloud

20   account -- would have been enough to sustain probable cause

21   for a search warrant for iCloud without having mentioned any

22   of the videos or images found on the iPhone XR.

23             If the Court's okay, I'll keep going.

24             THE COURT:  Go ahead.

25             MS. BUCKNER:  So one of the other search warrants

1    that I think will be important to this case involves the

2    Defendant's Yahoo! account.  And so the Government sought a

3    search warrant for the Defendant's Yahoo! account, and that

4    search warrant did not reference any photos or videos that

5    were found on the iPhone XR.

6              THE COURT:  Was it done before or after?

7              MS. BUCKNER:  It was done after, your Honor.

8              So to give your Honor a sense, the iPhone

9    affidavit, as this Court knows, was signed or approved on

10   June 5th.  The iCloud search warrant was approved on August

11   14th.  Yahoo! was approved on November 27th.

12             THE COURT:  Okay.

13             MS. BUCKNER:  So the Yahoo! account, that search

14   warrant affidavit goes into the alleged assault of AV-1,

15   much like every warrant affidavit does.

16             It then goes on to talk about toxicology results

17   from AV-1, which at this point had been available.

18             It then again references the three different

19   interviews from Mr. Raymond:  the May 31st interview, the

20   June 2nd interview and the June 6 interview, of course,

21   where the phones were seized.  I think of the three

22   interviews of course the June 2nd interview being the most

23   important, because that's where Mr. Raymond volunteered what

24   information was on his phone and allowed agents to scroll

25   through the messages on his phone.

1           I think what's -- I think the defense's main

2     point, not to speak for them, but just relying on the

3     notices that they've already filed with this Court, I think

4     their main issue with the Yahoo! warrant is it did rely on

5     evidence located in the Defendant's iCloud.

6           So by this time, again, the iCloud search warrant

7     was signed on August 14th.  There was a return from the

8     iCloud that indicated hundreds of photos of nude women.  And

9     the Yahoo! affidavit references the results of that warrant

10    return.

11          So the -- in other words, the Yahoo! affidavit

12    talked not only about the fact that there were nude women

13    found within the Defendant's iCloud, but also the shared

14    number as well as the additional adult victims that were

15    identified as a result of the iCloud return.

16          That affidavit also references internet artefacts

17    found on other laptops that were located in Mexico City.  It

18    references the Mexico City apartment and the fact that

19    several women have been identified and interviewed.

20          I think relevant here is the fact that at least

21    one adult -- at least I think two adult victims emailed

22    Mr. Raymond using his Yahoo! email, which is how agents were

23    able to get the probable cause through that attribution

24    showing that the Defendant did in fact have a Yahoo! account

25    that he was using to speak with women; and therefore, based

1    on what the Government knew at the time, there was probable

2    cause for that warrant.

3              Here -- again, we'll speak more on this when we --

4    at the close of our evidence.  Here, I think the Government

5    will point out that even without referencing the iCloud

6    account, the search warrant affidavit of course references

7    AV-1's report, and it of course references the fact --

8              THE COURT:  Slow down.

9              MS. BUCKNER:  -- the fact that the Defendant

10   showed agents his phones.  But even without identifying

11   women in the iCloud, that is, even without knowing that

12   there were additional women who had used their Yahoo!

13   emails -- excuse me -- had contacted Mr. Raymond via his

14   Yahoo! email, the Government already knew that Mr. Raymond

15   had a Yahoo! email address even before the iPhone XR was

16   seized.

17             So even before the iPhone XR was seized, the

18   Government knew at least three things:  that there was a

19   report from AV-1; that Mr. Raymond had iPhones and was using

20   those iPhones to contact adult victims; and that Mr. Raymond

21   had a Yahoo! account.

22             THE COURT:  How did they know about the Yahoo!

23   account before the XR?

24             MS. BUCKNER:  So when -- in the days leading up to

25   seeking the search warrant for the iPhone XR, they had

1    reached out to their internal intelligence team as they

2    worked toward preservation letters.

3          And in doing so, the internal team was able to

4    pull whatever data they could find in databases regarding

5    Mr. Raymond based on the identifiers they already had.

6          So they already had a couple of phone numbers for

7    him; they already knew he had a gmail account, because he

8    emailed agents photos from his iPhones on his gmail account

9    using those identifiers; the individuals at the Department

10   of State were able to pull other email addresses, other

11   account information, and that's how they found the Yahoo!

12   account.  And that was in days before the iPhone XR was even

13   seized.

14          I want to --

15          THE COURT:  If I could just ask, in terms of the

16   iCloud account, were they aware of that as well before they

17   did all of these search warrants?  In other words, as they

18   started the search warrant with the iPhone XR and then moved

19   to the iCloud, and you've just talked about the Yahoo! for

20   the phones, obviously, with the interview you've indicated,

21   so were they all aware of the iCloud as well prior to doing

22   the -- executing the warrant on the iPhone XR or did that

23   come up with the iPhone XR?

24          MS. BUCKNER:  I think the straight answer to

25   the --

1          THE COURT:  I'm just saying, hopefully I'm making

2     sense in my question.

3          MS. BUCKNER:  I think you are, your Honor.

4          And it's a complicated answer, but I'll try to

5     give you the one word.  The one word is no, they did not

6     know what his identifiers were for his iCloud account before

7     they seized the phone.

8          THE COURT:  Okay.

9          MS. BUCKNER:  I think the more complicated answer

10    is that people who have iPhones inevitably have iCloud

11    accounts; and so just by the fact that he had the iPhones,

12    they already knew that there was an iCloud account

13    associated that they needed to try and preserve.

14         THE COURT:  Okay.  Thank you.

15         MS. BUCKNER:  Of course, there are a lot of

16    warrants in this case.  The Government -- I think Exhibits

17    4-A through 4-Q are search warrant affidavits in this case.

18         I do want to focus on one more, your Honor, just

19    so that I can sort of outline the other important medium

20    through which the Government was able to recover images.

21    And that is the MacBook Air, the Defendant's laptop.

22         As the Government's chart indicates, one of the

23    first things that the Government did in trying to find that

24    MacBook Air was they got a search warrant for the

25    Defendant's parents' residence in California.  That was on

1    October 9th.

2          So by the time they searched the residence in

3    California, they had already searched the I iPhone XR and

4    they had already submitted a search warrant to -- to Apple

5    for the iCloud.

6          So the search warrant for the California residence

7    references of course again the alleged assault of Adult

8    Victim 1, Mr. Raymond's voluntary interviews, the fact that

9    the phones were seized, the iCloud findings, the Mexico

10   residence search warrant and the account of Adult Victim 4.

11         THE COURT:  Which would be on the Yahoo! account?

12         MS. BUCKNER:  Adult Victim 4?  One second, your

13   Honor.  I just have to double-check when she was first

14   identified.

15         That would have been through the iPhone XR.  It

16   would have been the first time the Government saw photos of

17   AV-4.

18         THE COURT:  Okay.

19         MS. BUCKNER:  So the search warrant affidavit for

20   the residence in California then references both the iPhone

21   XR, evidence obtained from the iPhone XR, searches that were

22   on the iPhone XR as well as evidence obtained through the

23   iCloud.  It's through that search warrant that the

24   Defendant's MacBook Air is seized.

25         Now, the MacBook Air is then moved from California

1   to D.C.  The Government then seeks a search warrant in D.C.

2   for the MacBook Air.  The search warrant that the Government

3   sought in D.C. for the MacBook Air did not reference the

4   internet searches on the iPhone XR, nor did it reference the

5   images found on the iPhone XR.  It did reference the images

6   found in the iCloud.

7           And so --

8           THE COURT:  I take it, then, for the MacBook Air

9   that the -- well, there was a search warrant obtained in

10   California, you said?

11          MS. BUCKNER:  Yes, your Honor.

12          THE COURT:  It was never executed?  There was a

13   new one done here in D.C. and then executed?

14          MS. BUCKNER:  So it was executed.

15          THE COURT:  Where?  In California or here?

16          MS. BUCKNER:  Both.  So it was executed in

17   California.  And through the residential search warrant in

18   California, they seized the MacBook Air.  But they did not

19   search the MacBook Air until they brought it to D.C.

20          THE COURT:  And then got another warrant?

21          MS. BUCKNER:  Correct, your Honor.

22          THE COURT:  Okay.

23          MS. BUCKNER:  The MacBook Air was encrypted.  The

24   Government forensic analysis at the Department of State

25   tried to review the contents of the MacBook Air and could

 1     not.

 2              Later, the Government got that Yahoo! warrant, and

 3     it's through the return of that warrant that they found the

 4     password for the Defendant's MacBook Air.

 5              And I think finally I just want to say regarding

 6     iPhone XR, iCloud, MacBook Air, they are all linked.  I

 7     think you'll hear testimony regarding that.  If you have an

 8     iPhone, you've got an iCloud.  If you've got a MacBook Air,

 9     you've got an iCloud.  So whatever order the Government did

10     it in would have inevitably resulted in the same.

11              I think it's important to note here that the

12     Government was seeking, as you'll hear, preservation for

13     accounts before they even seized the iPhone XR.

14              And in fact you'll hear, you know, during

15     testimony one of the agents when speaking with Mr. Raymond

16     mention an iCloud account during the interview.

17              And so this is because the Government was both

18     thinking about preservation and had in fact begun seeking

19     preservation letters before the iPhone XR was even seized.

20              THE COURT:  Okay.

21              MS. BUCKNER:  I think with that, pending the

22     Court's questions, we can sort of get started with the

23     presentation of evidence.

24              If the Court has questions about any of the other

25     search warrant affidavits, the Government's happy to go

1    through them.  But we tried to focus on those that contained

2    the bulk of the evidence against Mr. Raymond and for which I

3    believe the defense has cited should all be -- the fruits of

4    which should be excluded.

5              THE COURT:  Do any of the warrants have any kind

6    of timeframe on it?  You indicated the XR did not.

7              MS. BUCKNER:  As far as when they should be

8    executed?  The residential warrant did not.  I'm just

9    pulling up -- usually, there's an on or before date.  For

10   example -- I apologize, your Honor.  I misunderstood your

11   question earlier.

12             The on or before date for the two cellular phones

13   in the possession of Brian Raymond was June 19th, 2020.

14             THE COURT:  Okay.  Presumably, each of these had

15   some sort of date?

16             MS. BUCKNER:  Exactly.  So the first page has an

17   on or before date, but the Attachment A and Attachment B

18   themselves did not provide a specific timeframe.

19             THE COURT:  Okay.

20             MS. BUCKNER:  I can provide the on or before dates

21   for the other search warrants we've discussed if you'd like,

22   your Honor.

23             THE COURT:  It may be useful to get that

24   information.

25             MS. BUCKNER:  For the iCloud account, your Honor,

1    which was approved on August 14th, 2020, there's a delayed

2    notice approved until December 12th, 2020.

3              And the on or before date for execution was August

4    28th.

5              THE COURT:  What did it relate to?

6              MS. BUCKNER:  The iCloud account.

7              THE COURT:  What was the August 14th, then?

8              MS. BUCKNER:  August 14th was when the iCloud

9    warrant was approved.

10             THE COURT:  Okay.

11             MS. BUCKNER:  The on or before date for execution

12   was August 28th, and the delayed notice was December 28th.

13             THE COURT:  Okay.

14             MS. BUCKNER:  For the Yahoo! account, which was

15   approved on November 27th, 2020, the on or before date for

16   execution was December 11, 2020.

17             And for the residence in California, which was

18   approved on October 9th, 2020, I don't have the on or before

19   date in front of me, your Honor.  I know that warrant was

20   executed on the same day.  So the MacBook Air was received

21   on August 9, 2020.

22             THE COURT:  Did any of these warrants indicate how

23   any of the searches were to be conducted?  I mean, I know

24   they indicated the biometrics for the phones.  Was there any

25   such instructions for any of the others?

1           MS. BUCKNER:  The others, no, your Honor, not to

2     that level of granularity.

3           I think the iPhone XR search warrant was very

4     particular in that, you know, the -- for instance, the

5     agents could indicate their intent to use a ruse to

6     interview Mr. Raymond and that they would try to get the

7     phones off his person and, if not, they would go to the

8     hotel.  And if it was locked, they could use biometrics.

9     It's a very step-by-step how -- of agents proffering how

10    they would execute this warrant.

11          That same step-by-step is not --

12          THE COURT:  Let me understand.  The warrant set

13    out the terms of the ruse and the other business or not?

14          MS. BUCKNER:  The affidavit itself did.

15          THE COURT:  The affidavit did?

16          MS. BUCKNER:  Yes, your Honor.

17          But the attachments are pretty lean.  The

18    attachments themselves are not particularly detailed

19    regarding instructions.  For instance, for the biometrics,

20    for the iPhone XR, it just has that one paragraph I read

21    aloud.

22          THE COURT:  Okay.  So the warrants themselves

23    other than the biometrics don't have anything in particular,

24    but the attachments to the affidavit indicate things.

25    Presumably, the judicial officer would have seen what they

1    intended to do.  Is that correct?

2              MS. BUCKNER:  Correct, your Honor.  The

3    attachments themselves don't lay out how the warrant will be

4    executed.

5              THE COURT:  You started to talk about being able

6    to do a ruse, et cetera.  So where is that?  Is that in

7    writing or not?

8              MS. BUCKNER:  It was in writing in the affidavit

9    supporting the search warrant.  And in the affidavit

10   supporting the search warrant, the agent lays out the ways

11   in which they will try to get the phone.  And there, they

12   mention that they will utilize a ruse.

13             THE COURT:  But for the rest of them, they don't

14   set out any tactics or anything --

15             MS. BUCKNER:  I would have to check.

16             THE COURT:  -- for any of the other search

17   warrants?

18             MS. BUCKNER:  Just one moment, your Honor.

19             THE COURT:  Sure.

20             MS. BUCKNER:   One more to go, your Honor.

21             THE COURT:  No problem.  It just makes it easier

22   in terms of my going back and looking for things.

23             MS. BUCKNER:  No, your Honor.  The only warrant,

24   at least of the ones I've talked about just now, that talks

25   about the methodology is the iPhone XR.

1          THE COURT:  And in the affidavit connected to the

2     report and the warrant, where it talks about this ruse,

3     et cetera, does it indicate a timing for all of this or is

4     this -- does it indicate additional visits?  All at once?

5     Does it say anything of that nature?

6          MS. BUCKNER:  It doesn't provide a timeframe.

7     Essentially, it does provide some contingencies.

8          For instance, the agents say the affiant says she

9     has reason to believe Device 1 and Device 2 are on

10    Mr. Raymond's person.  And so they would use a ruse or a

11    pretext of a brief followup interview whereupon they would

12    seize the devices.

13         And then the contingency is in the event that

14    Mr. Raymond is not amenable to a second interview, the

15    agents would approach Mr. Raymond at his residence, which at

16    the time the search warrant was sworn out was the Westin

17    Dulles Airport Hotel.

18         The Court will hear of course that he wasn't at

19    that hotel.  He was at the Fairfield.

20         And through that contingency, the agent may escort

21    Mr. Raymond into his hotel room to ensure there is no

22    destruction of evidence, but would not otherwise involve any

23    further physical intrusion onto the premises.

24         From there, it talks about that the warrant would

25    authorize agents to press the fingers or thumbs of

1    Mr. Raymond onto the phones or to hold the phones up to

2    Mr. Raymond's face for purposes of unlocking the devices.

3              THE COURT:  Do we have any -- maybe there'll be

4    testimony.  Do you know the basis for deciding it would be

5    biometrics as to opposed to something else?

6              MS. BUCKNER:  Yes.  So I think in the affidavit,

7    it does get into this a bit.  So I think I can just answer

8    the Court's question now.

9              So the agents on June 2nd, when they interviewed

10   Mr. Raymond, of course saw that the phones were in his

11   possession and saw that he was able to access and unlock

12   them, though they did not see how.

13             THE COURT:  Okay.

14             MS. BUCKNER:  The affiant then indicates through

15   her -- in the search warrant affidavit that through her

16   training and experience, she knows that iPhones, like many

17   smartphones, can unlock sometimes with a passcode and

18   sometimes with biometrics.

19             THE COURT:  But they didn't include a passcode?

20             MS. BUCKNER:  Correct.  They did not -- they

21   indicate that the passcodes were unknown and that they were

22   seeking to -- believing that these phones were in his

23   possession and he was able to access them, thought there

24   might be a chance that biometrics were assigned to the

25   phones as a way to unlock them, and therefore asked

1    permission to compel biometrics in particular, though not

2    the passcodes themselves.

3            THE COURT:  Okay.  At this point, my questions are

4    answered.  It doesn't mean you shouldn't have testimony

5    around these issues, but it makes it easier to sort of put

6    everything into context --

7            MS. BUCKNER:  Sure.

8            THE COURT:  -- and focus in on a couple of issues

9    that have come up with the motions.

10           MS. BUCKNER:  With that, your Honor, I think

11   pending the Court's questions we'll move forward with

12   calling our first witness.

13           THE COURT:  Go ahead.

14           MS. MAYER-DEMPSEY:  The Government calls Raymond

15   White.

16           THE COURTROOM DEPUTY:  Do you have an exhibit

17   list?

18           MS. MAYER-DEMPSEY:  Yes.  Let me grab it.

19           (Thereupon, Mr. Raymond White entered the

20   courtroom and the following proceedings were had:)

21           THE COURT:  If you could step up over here,

22   please, to the stand.  If I could ask you to remain

23   standing.  She's going to swear you in.

24           RAYMOND WHITE, GOVERNMENT WITNESS, SWORN.

25           THE COURTROOM DEPUTY:  Please be seated.

1          THE COURT:  Please be seated.  You can move the

2    chair up and down.  While you testify, you can take the mask

3    off so we can actually have a record.  I'd ask that you

4    speak in a loud, clear voice so we make sure that we do have

5    a record and we can all hear it.

6          Allow counsel to finish their question before you

7    start to answer, even if you know what they're going to ask

8    you, so we have the question and the answer.

9          Also, if counsel starts to stand or you hear the

10   word "objection" for any reason, if you're in the middle of

11   the answer, stop.  If you haven't started to answer, don't.

12   Let me hear what the objection is and I'll rule and then let

13   you know if you can answer or not.

14          All right?

15          THE WITNESS:  Understood.

16                        DIRECT EXAMINATION

17   BY MS. MAYER-DEMPSEY:

18   Q.  Good morning.  Could you please state and spell your

19   name for the record?

20   A.  Sure.  My name is Raymond White, R-A-Y-M-O-N-D

21   W-H-I-T-E.

22          THE COURT:  You need to speak up.

23          THE WITNESS:  Sorry.

24   BY MS. MAYER-DEMPSEY:

25   Q.  You can scoot the microphone closer to you if you need.

```
 1   A.  Okay.

 2   Q.  But the plastic blocks the sound.

 3   A.  Okay.

 4   Q.  Much better.

 5            Mr. White, where do you work?

 6   A.  I'm a contractor with the Department of State.

 7   Q.  What's your position at the Department of State?

 8   A.  I'm a digital forensic analyst.

 9   Q.  What is a digital forensic analyst?

10   A.  So in my position, I analyze digital evidence seized by

11   law enforcement.

12   Q.  And could you give us just what sort of education or

13   training you have that qualifies you to do that sort of

14   work?

15   A.  Sure.  I previously have six years of experience doing

16   digital forensics investigations and then seven years in

17   general information technology positions.

18   Q.  How long have you been -- I guess taking a step back,

19   what does CIF stand for?

20   A.  It's computer investigations and forensics.

21   Q.  And is that within the Department of State?

22   A.  Yes.

23   Q.  And is that the section that you work with?

24   A.  Yes.

25   Q.  How long have you been doing that?
```

1    A.  I have been doing that six years.

2    Q.  And through your work with CIF, were you assigned to

3    work with devices and other electronic evidence in the case

4    of U.S. versus Brian Raymond?

5    A.  Yes.

6    Q.  And were an iPhone 6 and an iPhone XR among the devices

7    you worked with?

8    A.  Yes.

9    Q.  I want to start by generally asking you a few questions

10   about cell phone extractions.

11        What is a cell phone extraction?

12   A.  A cell phone extraction, depending on the type of data

13   available, is a method to copy the data from the phone --

14   make a copy from the phone onto another medium.

15   Q.  And when you say "onto another medium," is that like

16   another computer or something else?

17   A.  It would be an -- what we call a forensic image.

18   Q.  At a very high level, how do you go about performing a

19   cell phone extraction?

20   A.  Sure.  So I connect it to a device that gives me the

21   various options available to -- in order to copy that data

22   from that device.

23   Q.  And when you say you connect it to a device, are you

24   referring to the cell phone?

25   A.  Yes.

1    Q.  And approximately how many cell phone extractions have

2    you done through the course of your career?

3    A.  I would say approximately 30 phones.

4    Q.  Are you familiar with the term "forensic tool"?

5    A.  Yes.

6    Q.  And what does that mean?

7    A.  It refers to the forensic software we use either for

8    extracting data or analyzing that data.

9    Q.  And do you use these forensic tools to extract data from

10   phones?

11   A.  Correct.

12   Q.  Or to read that data once it's extracted?

13   A.  Yes.

14   Q.  Are there any particular forensic tools that you use?

15   A.  Yes.

16   Q.  And which ones were those?

17   A.  I use what's known as Magnum AXIOM and Cellebrite UFED

18   physical analyzer.

19   Q.  Now, once the data from a phone is extracted, what

20   happens to it?

21   A.  A copy is made into a forensic image and we use that for

22   our analysis.

23   Q.  And when you say "analysis," just generally speaking,

24   what do you do?

25   A.  We go through the data either manually or we use keyword

1    searches to search through that data.

2    Q.  And are you the person who reviews the data or does

3    someone else do that?

4    A.  I do that.

5    Q.  Now, when you review data that has been extracted from a

6    phone, is it possible to see things using a forensic tool

7    that someone just holding the phone in their hand might not

8    be able to see?

9    A.  Yes.

10   Q.  I want to move on and ask you some general questions

11   about iPhones and their security features.

12          Can an iPhone user set up security features on

13   their device?

14   A.  Yes.

15   Q.  And does this include the ability to lock a phone?

16   A.  Yes.

17   Q.  And what does it mean to lock a phone?

18   A.  It means to set up some sort of authentication so that

19   the only authorized individual is the person using that

20   phone.

21   Q.  Now, if a user chooses to lock their phone, what are

22   some ways that they can choose to do that?

23   A.  Depending on the device, there's biometrics options that

24   include facial ID, a fingerprint option.  Or other than the

25   biometrics data, there's passcode options.

1    Q.   Now, can the iPhone XR be locked with a passcode option?

2    A.   Yes.

3    Q.   What about biometrics options?

4    A.   Yes.

5    Q.   Specifically, what about face ID?

6    A.   Yes.

7    Q.   Can the iPhone 6 be locked with a passcode option?

8    A.   No.

9    Q.   So can the iPhone 6 be locked with a PIN code?

10   A.   Yes.

11   Q.   Can the iPhone 6 be locked with face ID?

12   A.   No.

13   Q.   Can it be locked in any other way?

14   A.   Yes.  Via fingerprint.

15   Q.   Now, when an iPhone XR in your experience is set up to

16   unlock with face ID, does it also require a PIN code?

17   A.   Yes.

18   Q.   And if an iPhone XR is turned off and turned back on,

19   what's required to unlock it that very first time?

20   A.   The passcode.

21   Q.   After that very first unlock, what can be used to unlock

22   it?

23   A.   The facial biometric ID or the passcode.

24   Q.   When a phone is unlocked, does it typically lock

25   automatically after a certain period of time?

1    A.  Yes.

2    Q.  Does whether a phone is in low battery mode affect how

3    quickly it will automatically lock back?

4    A.  It does.

5    Q.  I want to ask you a few questions about how a forensic

6    analyst like yourself might get into a phone to perform an

7    extraction if that phone is passcode-protected.

8              First, is it possible to extract data from a phone

9    that's locked?

10   A.  Yes.

11   Q.  And are there any factors that make this more or less

12   doable?

13   A.  Yes.  It depends on the state that the iPhone is in.

14   Q.  Are you familiar with the term "before first unlock"?

15   A.  Yes.

16   Q.  What does the term before first unlock mean?

17   A.  The term before first unlock is referring to whether the

18   phone is powered off or the phone has been powered on or

19   restarted and the passcode has not been entered into the

20   phone since being powered on.

21   Q.  Now, if a phone is in a before first unlock state, so

22   turned off, turned back on, and no one's entered a passcode

23   yet, is it possible to extract data from it?

24   A.  Yes.

25   Q.  How?

1    A.  By using the same method that we would use for

2    extracting data from other mobile devices.

3    Q.  Now, back in 2020, what sort of data could be extracted

4    from an iPhone XR that was in a before first unlock state?

5    A.  There would be a limited amount of data, but it would

6    include things such as the Apple ID, which is the email

7    address associated with iCloud; other email addresses

8    associated with the device; a phone number, to name a few.

9    Q.  And is there something that a forensic analyst could do

10   to try to get more data from a phone that's in that before

11   first unlock state?

12   A.  Yes.

13   Q.  What is that?

14   A.  We would use a method called brute forcing.

15   Q.  What is brute forcing?

16   A.  So brute forcing is a trial-and-error method where an

17   application would try to guess as many passcodes or

18   passwords as possible in order to gain access to that

19   device.

20   Q.  And is this a method that you've used before?

21   A.  Yes.

22   Q.  Have you seen it work before?

23   A.  Yes.

24   Q.  Now, is there a way to predict how long it might take

25   for a forensic tool to open a phone using brute force?

White - DIRECT - By Ms. Mayer-Dempsey

1   A.  The tool will try to estimate the amount of time.  But

2   there's no definitive way to determine that.

3   Q.  Now, in preparation for your testimony, did you reach

4   out to the company Grayshift to get a sense of sort of the

5   minimum or maximum amount of time it might take to brute

6   force a phone in before first unlock state?

7   A.  Yes.

8   Q.  And back in 2020, what would be the maximum amount of

9   time according to Grayshift that it would take to brute

10  force a phone with a six-digit PIN code?

11  A.  I would have to refer to my notes.

12  Q.  I'll hand you a copy --

13          THE COURT:  Do you have the notes?  Why don't we

14  call it Government's Exhibit 1.  You're just using it to

15  refresh his recollection.

16          So if you'd look, find your notes for whatever the

17  answer is and then look up.

18          THE WITNESS:  So it would be 25 years.

19  BY MS. MAYER-DEMPSEY:

20  Q.  I can take that back from you.

21  A.  (Tenders document to counsel.)

22  Q.  So what about a four-digit PIN?

23  A.  That would take about eight months.

24  Q.  Is that time -- I guess those are the sort of outside

25  bounds of how long it might take.  Do you know how quickly

White - DIRECT - By Ms. Mayer-Dempsey

1    it could happen?

2    A.   It could happen within a few minutes.

3    Q.   Are those timeframes different today?

4    A.   Yes.

5    Q.   How so?

6    A.   The company that makes the tool that we use offers

7    continuous technological upgrades and pushes those upgrades

8    out to us that will reduce the amount of time that it takes

9    to get into these devices.

10   Q.   And now in 2022 or I guess at the time you reached out

11   to Grayshift, what was the maximum brute force time that it

12   might take for a phone with a six-digit PIN?

13   A.   It would be about six months.

14   Q.   Now, if a PIN is more than six digits or involves a

15   combination of letters and numbers, so it's alphanumeric,

16   can that affect how long brute forcing takes?

17   A.   Yes.

18   Q.   And how would that affect it?

19   A.   It would -- depending on the complexity, it would

20   increase the amount of time.

21   Q.   Aside from brute forcing, does an analyst have a way to

22   manually guess a passcode as they try to extract information

23   from the device?

24   A.   Yes.

25   Q.   And have you done that in other cases?

```
1    A.  Yes.

2    Q.  And did you in fact do that in this case?

3    A.  On a separate device, yes.

4    Q.  And did it work on the separate device that you tried it

5    on?

6    A.  Yes.

7    Q.  Okay.

8              THE COURT:  What separate device are you talking

9    about?

10             THE WITNESS:  There was a MacBook Air.

11             THE COURT:  Okay.

12   BY MS. MAYER-DEMPSEY:

13   Q.  And generally speaking, how do you come up with

14   passwords that you try to guess to get into people's

15   devices?

16   A.  Often we try to look through the available data that we

17   have and try to search for any type of evidence that could

18   be like a username and password combination.

19   Q.  And do you try dates that might be significant to that

20   person, birthdays, anniversaries, things like that?

21   A.  Yes.

22   Q.  And I want to move on to talk about devices that are in

23   an after first unlock state.

24             So if you receive a phone that is in an after

25   first unlock state, is it possible to extract data from it?
```

1    A.  Yes.

2    Q.  How would you go about doing that?

3    A.  It would be the same method as described earlier.

4    Q.  Now, back in June of 2020, if an iPhone XR was in an

5    after first unlock state, how -- would you be able to get an

6    extraction of that device?

7    A.  Yes.

8    Q.  And what would, generally speaking, be the quality of

9    that extraction?

10   A.  We would get approximately 95 percent of that phone.

11   Q.  And is that true even if you didn't know the password?

12   A.  Correct.

13   Q.  And even if the password features were still on?

14   A.  Correct.

15   Q.  I want to move on and ask you just a few questions about

16   iCloud.

17              Starting very generally, what is iCloud?

18   A.  So iCloud is a service provided by Apple that allows

19   customers to store their data with Apple, and it would be

20   accessible over the internet.

21   Q.  And generally speaking, do users of Apple devices have

22   iCloud accounts?

23   A.  I would say many do.

24   Q.  And what type of material can be stored on an iCloud

25   account?

1    A.  An assortment of data that would include, but it's not

2    limited to, things like text messages, internet history,

3    photos and videos and documents.

4    Q.  What about records associated with third-party

5    applications?  Can those be stored on an iCloud?

6    A.  Yes.

7    Q.  And does that include the third-party application

8    WhatsApp?

9    A.  Yes.

10   Q.  And what sort of credentials does someone need to set up

11   an iCloud account?

12   A.  They would need a username and password.

13   Q.  And does Apple have a certain name for the username that

14   one would use to access their iCloud account?

15   A.  They refer to it as just an iCloud email address.

16   Q.  What's an Apple ID?

17   A.  That is the username used to authenticate with iCloud.

18   Q.  Once a user has an Apple ID, can they use that ID to log

19   in to multiple devices?

20   A.  Yes.

21   Q.  And if those devices were set up to sync, could those

22   devices all sync or collect data in the iCloud?

23   A.  Yes.

24   Q.  I want to ask you specifically about the cell phones

25   that you analyzed in this case.

1          So directing your attention to June of 2020, did

2     there come a time when you were notified that there were two

3     phones coming in for you to analyze?

4     A.  Yes.

5     Q.  And did you know anything about the case at this point?

6     A.  No.

7     Q.  And how were the phones packaged when you saw them?

8     A.  They were sealed in evidence bags.

9     Q.  And did you perform the device extraction on those two

10    phones?

11    A.  Yes.

12    Q.  I'm going to show you what is marked as Government's

13    Exhibits 1 and 2.

14          THE COURT:  Why don't we make it 1-A and 2.

15          MS. MAYER-DEMPSEY:  Oh, sure.

16          THE COURTROOM DEPUTY:  What are you trying to do?

17          MS. MAYER-DEMPSEY:  I'm trying to hook my computer

18    up to the monitor, but I have physical copies for the Court,

19    if that's easier.

20    BY MS. MAYER-DEMPSEY:

21    Q.  Mr. White, can you see this up on your screen?

22    A.  Yes.

23    Q.  I want to show you what's up on the screen as

24    Government's Exhibit 1-A.

25          What is Government's Exhibit 1-A?

1    A.  This is a Cellebrite extraction report.

2    Q.  And specifically, which phone is this extraction report

3    for?

4    A.  This is for the Apple iPhone 6.

5    Q.  Using this extraction report, does it state what time

6    the extraction of this device was started?

7    A.  Yes.

8    Q.  And what time was that?

9    A.  That would be at June 10th, 2020.

10   Q.  Is that a fair and accurate copy of the extraction

11   report as it was completed from your extraction of the

12   phones?

13   A.  Yes.

14   Q.  What about Government's Exhibit 2?  What is that?

15   A.  This is also a Cellebrite extraction report.

16   Q.  Is this from an extraction that you performed?

17   A.  Yes.

18   Q.  And what phone specifically is it referencing?

19   A.  An Apple iPhone XR.

20   Q.  Is it a fair and accurate copy of the extraction report

21   that you generated?

22   A.  Yes.

23   Q.  Does it note when the extraction of the iPhone XR began?

24   A.  Yes.

25   Q.  When was that?

1    A.   June 9, 2020.

2              MS. MAYER-DEMPSEY:   At this time I'd move

3    Government's Exhibits 1-A and 2 into evidence.

4              THE COURT:   Any objections?

5              MR. MARSTON:   No objection.

6              THE COURT:   Then I'll admit without objection

7    Government's Exhibits 1-A and 2.

8              (Whereupon, Government's Exhibit Nos. 1-A and 2

9    were entered into evidence.)

10   BY MS. MAYER-DEMPSEY:

11   Q.   Now, when you analyzed the iPhone XR, did you or anyone

12   on your team find anything of interest to the case?

13   A.   Yes.

14   Q.   And very generally speaking, what was that?

15   A.   We found -- the case agent, Mikel, had found a photo --

16   explicit photo.

17   Q.   And was it a full photo or did it appear to you in some

18   other way?

19   A.   It appeared to be some sort of thumbnail.

20   Q.   A thumbnail?

21   A.   Yes.

22   Q.   And based on this photo, did you further analyze the

23   phone in any particular way?

24   A.   Yes.

25   Q.   What did you do?

1   A.  I processed it in actually a different forensic tool

2   called Magnum AXIOM.  After processing that, I came across

3   additional findings.

4   Q.  And generally speaking, what were the nature of these

5   findings?

6   A.  They appeared to be explicit videos.

7   Q.  And were they full videos or were they something else?

8   A.  No.  They appeared to be fragments.

9   Q.  What is a fragment?

10  A.  So a fragment is a portion of a -- what may have been a

11  complete video.

12  Q.  And why might a fragment appear on -- appear to you as

13  an examiner?

14  A.  It may appear if the forensic tool can't completely

15  extract that content if it's embedded within another file.

16  Q.  Now, could someone holding the physical device itself,

17  would they be able to see fragmented images just by looking

18  through the devices and scrolling through them?

19  A.  In the location I found these, no.

20  Q.  Why is that?

21  A.  That is because Apple does not allow the end user to

22  access these locations.

23  Q.  Now, in your work on this case, did you analyze

24  additional digital devices and electronic accounts?

25  A.  Yes.

1    Q.  I'm going to show you what's marked as Government's

2    Exhibit 3.  Let me know when it's on your screen.

3    A.  Okay.  It's there.

4    Q.  I'm going to flip through Government's Exhibit 3, just

5    so you have a chance to look at the pages.

6             Have you seen Government's Exhibit 3 and its

7    contents prior to your testimony?

8    A.  Yes.

9    Q.  And did you have an opportunity to review the

10   information in it to include the items of evidence as well

11   as what sort of media was eventually recovered from them?

12   A.  Yes.

13   Q.  Is that information in Government's Exhibit 3 accurate

14   to the best of your knowledge?

15   A.  To the best of my knowledge, yes.

16   Q.  And is the -- are the slides that I just showed you a

17   fair and accurate copy of the report that you reviewed prior

18   to your testimony?

19   A.  Yes.

20             MS. MAYER-DEMPSEY:  I'm going to move Government's

21   Exhibit 3 into evidence.

22             THE COURT:  Any objection?

23             MR. MARSTON:  No objection.

24             THE COURT:  I'll admit it without objection.

25             (Whereupon, Government's Exhibit No. 3 was entered

1    into evidence.)

2    BY MS. MAYER-DEMPSEY:

3    Q.  I want to start with Slide 2 on the screen.  This is

4    referring to item of evidence iPhone XR.

5              Does the Media of Victims column accurately

6    reflect what was recovered from the iPhone XR?

7    A.  From the best of my knowledge, yes.

8    Q.  Does that include media of AV-2, 3, 4, 5, 6, 7 and 19?

9    A.  Yes.

10   Q.  Moving on to the purple ASUS laptop, do the

11   miscellaneous findings including the Internet Explorer

12   history as well as media of victims AV-20 and 22 reflect

13   what was found on that laptop?

14   A.  Yes.

15   Q.  Moving on to Slide 4, the blue ASUS laptop, does the

16   Yahoo! and YouTube search results as well as media of

17   Victims 20, 21 and 22 reflect what was found on that device?

18   A.  Yes.

19   Q.  Moving on to the iCloud, does the list of media of

20   victims, including media from AVs 2, 3, 4, 5, 6, 7, 8, 9,

21   10, 11, 12, 13, 14, 15, 16, 17, 18 and 19 accurately reflect

22   what was found in the iCloud?

23   A.  Yes.

24   Q.  Moving on to the Yahoo! account, do the miscellaneous

25   findings, including email inquiries for certain drugs as

1    well as media of Victim 20, does that reflect what was found

2    in the Yahoo! account?

3    A.  Yes.

4    Q.  And moving on to Slide 7, the Kingston SD card, did it

5    include media of Victims 19, 23 and 24 as listed on this

6    slide?

7    A.  Yes.

8    Q.  And the SanDisk Cruzer, Slide 8, did it include media of

9    Victim 21 as listed on this slide?

10   A.  Yes.

11   Q.  The LG Phoenix 4 phone, did it include Google searches

12   as listed on this slide?

13   A.  Yes.

14   Q.  And finally -- not finally, but second-to-the-last --

15   moving on to the Google accounts, did you discover findings

16   including the search history as listed on this slide?

17   A.  Yes.

18   Q.  Now, you testified earlier or just a moment ago that you

19   analyzed the Defendant's Yahoo! email account.  Did anything

20   within that email account assist you in your ability to

21   access any of the digital devices that you received?

22   A.  Yes.

23   Q.  And what was that?

24   A.  It was an email that my colleague had located containing

25   what appeared to contain passwords.

1    Q.  And this was an email in the Yahoo! account that

2    contained passwords?

3    A.  Yes.

4    Q.  Okay.  And at the time your team found what appeared to

5    be this list of passwords, had you been able to access the

6    MacBook Air that was recovered from the Defendant?

7    A.  No.

8    Q.  Did this list of passwords assist you in getting into

9    the MacBook Air?

10   A.  Yes.

11   Q.  How so?

12   A.  The list of passports was provided to our imaging

13   section, and from there they were able to decrypt the

14   MacBook Air.

15   Q.  And did they do that by trying some of the passwords on

16   the list?

17   A.  Yes.

18   Q.  Directing your attention to Slide 11, do the findings as

19   well as list of media of victims accurately reflect what was

20   recovered from the MacBook Air?

21   A.  Yes.

22              MS. MAYER-DEMPSEY:  I have no further questions.

23              THE COURT:  Cross.

24                        CROSS-EXAMINATION

25

```
1    BY MR. MARSTON:

2    Q.  Good morning, Mr. White.

3    A.  Good morning.

4    Q.  I'm John Marston.  I represent Mr. Raymond in this case.

5    Thank you for being here.  I have a few questions for you.

6              THE COURT:  If you could speak up a little more.

7    Maybe move the microphone to you.

8              MR. MARSTON:  Yes, your Honor.  I'll try to bend

9    over when I can.

10   BY MR. MARSTON:

11   Q.  Mr. White, you said that when you were talking in

12   answering the prosecutor's questions -- first of all, did

13   you meet with the prosecutor to prepare for this?

14   A.  Yes.

15   Q.  And how long?

16   A.  I would say about three and a half hours.

17   Q.  How many times?

18   A.  Two.

19   Q.  Did you take notes or write things down?

20   A.  No.

21   Q.  Okay.  Type anything out?

22   A.  I typed it.

23   Q.  Okay.  And you said you had worked at the Department of

24   State as a contractor.  That's where you work now.  Right?

25   A.  Yes.
```

1    Q.  Previously, you'd been in IT, I think you said general

2    IT?

3    A.  Yes.  Previously, I've worked at a cybersecurity

4    operations center for about seven months.  And then before

5    then, I was an open-source intelligence analyst for about a

6    year and a half.  And then before then, I was a help desk

7    technician for five years.

8    Q.  Okay.  Where?

9    A.  At my university, George Washington University.

10   Q.  So you're saying you worked at the help desk at George

11   Washington?

12   A.  Yes.

13   Q.  Okay.  I think the prosecutor asked if you had

14   specialized training, but I don't think I heard an answer to

15   that.  Or if I misheard the question, I apologize.  But let

16   me ask, what training do you have in digital forensics?

17   A.  Sure.  I have a master's degree in high-tech crime

18   investigation that delved into digital forensics.  I also

19   have certifications, Cellebrite certified operator and

20   Cellebrite certified physical analyst and then Oxygen

21   forensic expert.

22   Q.  And I couldn't quite tell what you said.  I'm sorry I

23   missed it.  How many cell phone extractions have you done in

24   your time?

25   A.  I would say approximately 30.

White - CROSS - By Mr. Marston

1   Q.  Okay.  And where among the 30 do the extractions fall in

2   this case, the 6 and the XR?  You did extractions on the

3   iPhone 6 in this case?

4   A.  Right.

5   Q.  And the XR in this case?

6   A.  Yes.

7   Q.  Was that the first time you've done an iPhone

8   extraction?

9   A.  No.

10   Q.  The 30th time?  Or where in between?

11   A.  I would say towards the -- I would say I previously had

12   done about 30 phones.  So these were in addition to that.

13   Q.  Okay.  I see.

14          An iPhone 6, you can open it with your

15   fingerprint, right --

16   A.  Yes.

17   Q.  -- if it's set up to do that?

18   A.  Correct.

19   Q.  If it is set up to do that, you also have to have a

20   passcode on it.  Right?

21   A.  Correct.

22   Q.  And in this case, the iPhone 6, you didn't get it with

23   any security set up on it at all.  Right?  When you got it,

24   it had no passcode?

25   A.  Correct.

1   Q.  And no touch ID enabled anymore.  Right?

2   A.  Correct.

3   Q.  You don't know what the passcode was.  Right?

4   A.  No.

5   Q.  Did you say that it had to be a PIN or that it could

6   also be an alphanumeric password?

7   A.  Yes.  Either option.  It could be a passcode or

8   alphanumeric.

9   Q.  On the 6.  Right?

10  A.  Yes.

11  Q.  Same for the XR, although the XR doesn't have that

12  little circle for your finger.  Right?

13  A.  Correct.

14  Q.  But it can open with your face.  Right?

15  A.  Correct.

16  Q.  But when you got the XR, it didn't have any of those

17  security features enabled.  Right?

18  A.  Correct.

19  Q.  So when you did your extraction, you're able to get

20  pretty close to whatever you want.  Right?  A full

21  extraction?

22  A.  It's known as an actively unlocked state.  So yes.

23  Q.  I mean, it's like you own the phone at that point.

24  Right?

25  A.  Yes.

White - CROSS - By Mr. Marston

1    Q.  And I think you mentioned that it makes a difference,

2    doesn't it, if a phone is in what they refer to as before

3    first unlock, right --

4    A.  Yes.

5    Q.  -- in terms of what you can get off of it.  Right?

6    A.  Correct.

7    Q.  Or how easy it is to get things off of it.  Right?

8    A.  Can you clarify when you say "easy"?

9    Q.  Well, I just mean, you're not going to get -- you're not

10   necessarily going to get a full extraction when a phone is

11   in before first unlock status and it arrives at your desk?

12   A.  Correct.

13   Q.  Yeah.

14         Now, cell phone extractions can be done out in the

15   field.  Right?

16   A.  Correct.  Yes.

17   Q.  You don't have to be seated at your desk to do it.

18   Agents can take devices with them and go extract on the

19   spot.  Right?

20   A.  Yes.  Depending on the equipment they have, yes.

21   Q.  Right.  If they have the equipment.  Correct?

22   A.  Correct.

23   Q.  So, like, it's portable, potentially?

24   A.  Yes.

25   Q.  Okay.  Did anyone tell you what the scope of the search

1    warrant was in this case?  Like where to look, how far you

2    can look?

3            THE COURT:  At what point in time are you asking?

4    BY MR. MARSTON:

5    Q.  When you got the phone --

6            MR. MARSTON:  Thank you, your Honor.

7    BY MR. MARSTON:

8    Q.  When you got the phones -- so you didn't work on this

9    case before June 8.  Right?

10   A.  Correct.

11           THE COURT:  You asked two questions.  Which one do

12   you want him to answer?

13           MR. MARSTON:  Just that one.

14   BY MR. MARSTON:

15   Q.  You didn't work on this case before June 8.  Right?

16   A.  Correct.

17   Q.  You hadn't heard of it before?

18   A.  No.

19   Q.  Okay.  And that was the date phones were brought into

20   the CIF, C-I-F.  Right?

21   A.  Correct.

22   Q.  Okay.  Was the warrant delivered with the phones?

23   A.  I cannot recall.  I believe it was.

24   Q.  You believe it was?

25   A.  Yes.

1    Q.  Did you read it?

2    A.  Yes.

3    Q.  Well, now it sounds like you're certain you did get it

4    because you read it.  So which is it?  Did you get it and

5    read it or did you not get it and/or not read it?

6    A.  Well, it would have been attached to where the warrants

7    are actually uploaded to our investigative management

8    system.  But during that extraction, I would have held off

9    before searching it before reaching out to the agent to know

10   the scope of what our -- the searching and authorization is.

11   Q.  Because that's an important part of what you do.  Right?

12   A.  Yes.

13   Q.  You can't necessarily look at everything on a device.

14   It has to be what the warrant says you can look at.  Right?

15   A.  Correct.

16   Q.  Okay.  And you believe you reviewed the warrant for that

17   purpose in this case?

18   A.  Yes.

19   Q.  Okay.  Did it describe looking for fragments in places

20   like unallocated space?

21   A.  I cannot recall.

22   Q.  Were you consulted about the operation of the seizure of

23   the phones in this case?

24   A.  No.

25   Q.  You never saw the operations plan.  Right?

1    A.  No.

2    Q.  To change the lock settings on an iPhone 6 with

3    biometrics enabled, so fingerprint ID, a little circle thing

4    you touch, to change the passcode, you have to first open

5    the phone.  Right?

6    A.  To authenticate, yes.

7    Q.  You can do it with your finger if that's enabled.

8    Right?

9    A.  Yes.

10   Q.  If it's not enabled, you need the passcode.  Right?

11   A.  Correct.

12   Q.  But you got past that, let's say.  You've opened the

13   phone.  Then you go to the settings.  Right?  If you want to

14   change the passcode, you then go to the settings.  Correct?

15   A.  Correct.

16   Q.  And there's a setting called touch ID and password or

17   passcode.  Right?

18   A.  Correct.

19   Q.  You tap on that.  What does it ask you for?

20   A.  It asks for the existing passcode.

21   Q.  Are you sure?  Doesn't it ask for the touch ID again?

22   A.  To change the passcode?

23   Q.  Right.

24   A.  I cannot specifically recall.

25   Q.  Okay.  But it asks for something.  Right?

1    A.  Correct.

2    Q.  Okay.  Then if you want to, let's say, change the

3    passcode, there's a button for that, essentially.  Right?

4    A.  Correct.

5    Q.  So now you've opened the phone with the thumbprint ID or

6    passcode.  You've gotten into that setting.  Now when you

7    touch that setting to change the code, it asks you again for

8    something, doesn't it?

9    A.  Yes.

10   Q.  Okay.  And that's when it asks you for the passcode?

11   A.  Yes.

12   Q.  So you need three hurdles to clear to change a passcode

13   on an iPhone 6.  Correct?

14   A.  Yes.

15   Q.  IPhone XR, similar, but it's the face.  Right?

16   A.  I would say so.  Yes.

17   Q.  And an iPhone XR, to open it, if biometrics are enabled,

18   the face opens it.  Right?

19   A.  Correct.

20   Q.  Okay.  Or if the face isn't working at that moment,

21   you've got to type in the passcode?

22   A.  Correct.

23   Q.  If you go to that same setting, now it says settings,

24   then face ID and passcode.  Right?  That's a button you can

25   push?

1    A.  Correct.

2    Q.  And when you push that, it asks for the passcode?

3    A.  Correct.

4    Q.  You cannot change the passcode on either of these phones

5    without the passcode.  Right?

6    A.  Correct.

7    Q.  Okay.  But on an iPhone XR, if you go to turn off

8    passcode, it asks you for something else.  Right?

9    A.  My understanding is that it only prompts for a passcode.

10   Q.  If you're in an iPhone XR and you're in the settings and

11   you're in the face ID and passcode setting and you click on

12   "Turn off face ID and passcode," it asks you actually for

13   your Apple password, doesn't it?

14   A.  I don't believe so.

15   Q.  It doesn't ask you that because it needs to delink, for

16   example, cards in your wallet?  Other items on the phone

17   linked to your Apple ID and password?  It gives you a

18   warning and it says --

19           MS. MAYER-DEMPSEY:  Objection.

20           THE COURT:  You're combining a whole bunch of

21   different facts.  You need to break it down.

22           MR. MARSTON:  Yes, your Honor.

23           THE COURT:  It's difficult to follow.

24           MR. MARSTON:  I appreciate that.  I'm trying to

25   give a little premise to my question.

```
1    BY MR. MARSTON:

2    Q.  We're in an iPhone XR.  Do you understand that?

3    A.  Yes.

4    Q.  We have gone to the settings.  That's easy.  You just

5    touch it.  Right?

6    A.  Correct.

7    Q.  And you can touch face ID and passcode.  Right?

8    A.  Correct.

9    Q.  It asks you for the passcode immediately.  Right?

10   A.  Yes.

11   Q.  You can't go on from there without it.  Correct?

12   A.  Correct.

13   Q.  If you scroll down, you'll see where you can turn off

14   the passcode.  Right?

15   A.  Yes.

16   Q.  And if you touch that, it asks you for your Apple

17   password.  Isn't that right?

18   A.  I do not believe so.  No.

19   Q.  Could you be wrong about that?

20          MS. MAYER-DEMPSEY:  Objection.

21          THE COURT:  He's answered to the best of his

22   knowledge.  Let's move on.

23   BY MR. MARSTON:

24   Q.  How sure are you?

25          MS. MAYER-DEMPSEY:  Objection.
```

1          THE COURT:  I'll sustain it.  He's given his

2     answer.

3     BY MR. MARSTON:

4     Q.  You talked about your extraction and you talked about

5     using technology to do your extraction in this case.  Right?

6     A.  Yes.

7     Q.  You mentioned things like brute force.  Do you remember

8     that?

9     A.  Yes.

10    Q.  And there was no plan to use brute force in this case,

11    was there?

12    A.  No.

13          THE COURT:  By "plan," you mean the operation

14    plan?  Is that what you're talking about?

15          MR. MARSTON:  Any plan he's aware of, your Honor.

16    He's answered the question, I believe.

17          THE COURT:  Well, I'm asking, though, in terms of

18    any plans that brute force was not mentioned.  Is that

19    correct?

20          THE WITNESS:  That is correct.

21          THE COURT:  Would it be usual to have a plan

22    include brute force in your experience?

23          THE WITNESS:  Yes.  I would say the majority of

24    the phones that would come through our office, we do need to

25    brute force those devices.

White - CROSS - By Mr. Marston

1          THE COURT:  Is that in the plan or is that

2     something you generally do?

3          THE WITNESS:  It's our general policy, I would

4     say.

5          THE COURT:  But -- in terms of operational policy.

6          But I'm asking, do you wait to have it -- see it

7     in a plan in terms of using it?  Or is it something that

8     is -- as a practice or procedure in your office you'd use

9     it?

10          THE WITNESS:  I would say it's part of our

11     procedure.

12          THE COURT:  So would you use this procedure

13     whether it was in the plan or not?  Or would you consider

14     using it?  Let me ask it that way.

15          THE WITNESS:  We would always, yes, consider that.

16     It's always an option for us to do, is to get -- in order

17     for -- to get as much data as possible from a mobile device,

18     we would use brute forcing to get into that device unless

19     it's actively -- in an actively unlocked state.

20          THE COURT:  Would you be looking in terms of using

21     the brute force to see whether the warrant included it or

22     some other plan or is it something that you do automatically

23     as part of your office procedure?

24          THE WITNESS:  We would definitely consider what

25     the warrant allowed us to do.  But most of the warrants that

White - CROSS - By Mr. Marston

1    I have reviewed allowed us to continue with brute forcing to

2    get into those devices.

3              THE COURT:  Okay.  Go ahead.

4    BY MR. MARSTON:

5    Q.  In this case, you didn't have to do a brute force attack

6    on the phone because they came to you unlocked.  Right?

7    A.  Correct.

8    Q.  Okay.  When you get a phone that's locked, let's say

9    before first unlocked status, you can't guarantee what

10   you'll get off that phone.  Right?

11   A.  Correct.

12   Q.  You can't even guarantee it will open.  Right?

13   A.  Can you clarify "open," what you mean?

14   Q.  Unlock.

15   A.  Yeah.  I can't guarantee that.  No.

16   Q.  And you also can't tell how long it might take to unlock

17   it.  Right?

18   A.  Correct.  There is an estimate, but there's really no

19   definitive way to tell that.

20   Q.  Because it depends on a variety of factors.  Right?

21   A.  Correct.

22   Q.  You talked about discovering some -- is it okay to use

23   the term "carved"?  Do you know that term?

24   A.  Yes.

25   Q.  What does that mean?

1    A.  In the context of what we found in the initial video

2    fragments, file carving refers to the forensic tool actually

3    looking within -- taking a file and looking within that file

4    to see if there is anything -- any type of embedded file

5    within that, and then it'll extract that file.

6    Q.  And you got the phones on June 8th.  And you found

7    explicit videos, you said, video fragments.  Right?

8    A.  That was actually, I believe, a month later.

9    Q.  That was my question.  Thank you.  Yeah.  It was around

10   July 15th.  Does that sound right?

11   A.  Yes.

12   Q.  Okay.  What did you do between June 8 and July 15 with

13   the phones?

14   A.  I continued to try to examine them for some type of

15   evidence that was related to that one explicit photo.

16   Q.  So you were looking at one explicit photo during that

17   time?

18   A.  I was examining phones to see if there's any connection

19   to that.  Yes.

20   Q.  I see.

21        Were you examining every day all day between those

22   times, July 8 and July 15?

23        MS. MAYER-DEMPSEY:  Objection.

24        THE COURT:  Were you working on other projects at

25   the same time?

White - CROSS - By Mr. Marston

```
 1                 THE WITNESS:  Yes.

 2    BY MR. MARSTON:

 3    Q.  All right.

 4                 MR. MARSTON:  A brief indulgence, your Honor, if I

 5    may.

 6                 THE COURT:  Yes.  Go ahead.

 7                 MR. MARSTON:  I have no further questions, your

 8    Honor.

 9                 THE COURT:  Redirect?

10                      REDIRECT EXAMINATION

11    BY MS. MAYER-DEMPSEY:

12    Q.  Very briefly, Mr. White, the first step when you extract

13    data from a phone, does that first step extract just

14    everything it can from the phone?

15    A.  Depending on the option I select, which is the one that

16    I do want to try to extract as much as possible.  So yes.  I

17    would choose the option to extract as much data as possible.

18    Q.  What's the other option?

19    A.  There's other options.  The technical term is our

20    logical extractions that do not retrieve as much data as

21    possible.  But those are only attempted if I can't get as

22    much data as possible using other extraction methods.

23    Q.  So when you go in and -- initially, this first time you

24    extract data from the phone, does it let you extract data by

25    a date range?
```

White - REDIRECT - By Mr. Mayer-Dempsey

1    A.  No.

2    Q.  If, say, a search warrant included the ability only to

3    search for something within a date range, is that something

4    you would do after everything was extracted?  You would

5    filter out what's not responsive to the warrant?

6    A.  Correct.  Yes.

7    Q.  But during that initial pull, you can't differentiate by

8    really any sort of parameter like date or image type or

9    anything like that?

10   A.  No.

11   Q.  And is that just a product of how the technology works?

12   A.  Yes.

13   Q.  Now, if -- when you get a phone and are going to attempt

14   an extraction, is brute force always an option you consider?

15   A.  Yes.

16   Q.  And if a phone had -- let's say if an iPhone XR had been

17   unlocked via biometrics back in 2020, but the passwords had

18   never been changed, you didn't know the passwords, the phone

19   had just been opened with someone's face, could you get a

20   full extraction from that device?

21   A.  If it was actively unlocked using biometrics, yes.

22   Q.  What if it had locked back but had previously been

23   opened using biometrics?

24   A.  We would get about approximately 95 percent of what --

25   of the phone contents are.

```
1    Q.  The 5 percent you couldn't get, do you have a way to

2    know what that data would be?

3    A.  Some file types, yes, like, say, email we wouldn't be

4    able to get.  But I wouldn't know all the file types, no.

5    Q.  So you might not be able to get email?

6    A.  Right.

7              MS. MAYER-DEMPSEY:  I have no further questions.

8              THE COURT:  I'm going to take a break at this

9    point so I can look at my notes and see if there's anything

10   else that I want to ask.  So I won't totally excuse you from

11   the courthouse.

12             Also, it's a good time to take a break anyway for

13   the morning.

14             I have ten after 11:00.  Let's go to 11:30.  I'll

15   come back and we'll pick up at that point.

16             (Thereupon a recess was taken, after which the

17   following proceedings were had:)

18             THE COURT:  I have only one additional question,

19   if we could bring the witness back for a quick second.

20             (Thereupon, Mr. Raymond White entered the

21   courtroom and the following proceedings were had:)

22             THE COURT:  If you'd come back.  I just have one

23   additional question.

24             I was looking over my notes about brute force.

25   Why does it take less time now than, say, three years ago to
```

1    access through brute force a locked phone?  You gave some

2    indication three years ago for an alphanumeric password.  It

3    was 25 years.  It was eight months for a PIN, and you

4    indicated it took less time -- I forgot exactly what -- now.

5              What has changed?  Why?

6              THE WITNESS:  So the company will release

7    technological updates and changes, which include

8    vulnerabilities, that will get into the phones faster than

9    what was previously available.

10             THE COURT:  So how do the vulnerabilities work in

11   this context, making it shorter?  Let me backtrack.

12             Is it all a technical development in terms of just

13   improving the timeframe?  Or they've gotten better

14   information about how long it takes or what?

15             THE WITNESS:  No.  I would say advancements in

16   being able to access the devices or be able to accelerate

17   the brute forcing ability by finding exploits or weaknesses

18   within the phones that weren't previously available or

19   previously known.

20             THE COURT:  So is it the use of the brute force,

21   the form of brute force, that makes the difference?  Or just

22   the phones themselves have more vulnerabilities?

23             THE WITNESS:  Just the phones themselves have the

24   vulnerabilities that at the time, say, three years ago, the

25   companies were not aware of.

```
 1              THE COURT:  So they might have been there, but the

 2     companies weren't aware of it, but now they're aware of it

 3     so they can be exploited?  Is that what you're saying?

 4              THE WITNESS:  Yes.

 5              THE COURT:  If any of my questions have engendered

 6     questions from your end, you can ask.

 7                         REDIRECT EXAMINATION

 8     BY MS. MAYER-DEMPSEY:

 9     Q.  Mr. White, is --

10              THE COURT:  Why don't you come on up.

11     BY MS. MAYER-DEMPSEY:

12     Q.  Is this new technology that you're talking about similar

13     to, like, a software update?

14     A.  Released by the company, yes.

15     Q.  And does this software update, much like software

16     updates for your general computer, simply just make the

17     process work faster?

18     A.  Yes.

19     Q.  And do they do that because technology now is more

20     advanced than it was three years ago?

21     A.  Yes.

22     Q.  And our knowledge of that technology enables the

23     companies to create better software to try to get into the

24     devices?

25     A.  Yes.
```

White - REDIRECT - by Ms. Mayer-Dempsey

1          THE COURT:  Is it software, the brute force

2    software that you're talking about, that's improved?  Or the

3    phones?  I'm still having problems.  Which has improved?  Or

4    both?

5          THE WITNESS:  So the software has improved.  But

6    it's taking advantage of a weakness in a phone that was not

7    previously known, say, three years ago.

8          THE COURT:  So the vulnerabilities were there

9    potentially.  They weren't aware of it.  They're now aware

10    of it, so it's easier using brute force to actually access

11    them?

12          THE WITNESS:  Correct.

13          THE COURT:  Okay.  So the technology is more in

14    the brute force and the fact that they know what the

15    vulnerabilities are?

16          THE WITNESS:  Correct.  Yes.

17          THE COURT:  So three years ago, if they were aware

18    of the vulnerability, they would have been able to do it

19    faster than the 25 years or eight months?

20          THE WITNESS:  I'm sorry?  Can you repeat that?  If

21    they weren't --

22          THE COURT:  If they were aware of the

23    vulnerabilities that they now know, if they had known that

24    three years ago, would they have been able to get -- would

25    this have been a shorter period than their 25 years or eight

White - REDIRECT - by Ms. Mayer-Dempsey

1    months?

2              THE WITNESS:  Yes.  It would have been shorter.

3    BY MS. MAYER-DEMPSEY:

4    Q.  I think, just to clarify something, when you're talking

5    about vulnerabilities, you're talking about, like,

6    vulnerabilities in the model of iPhone generally?

7    A.  Yes.

8    Q.  Not, like, vulnerabilities in any one specific device?

9    A.  Correct.

10   Q.  So it is because technology companies just know more

11   about that model device that they are able to develop

12   software to take advantage of vulnerabilities that always

13   existed?

14   A.  Yes.  Once they have found those vulnerabilities.  Yes.

15   Q.  And analysts like yourself, you're not the one, like,

16   looking for these vulnerabilities?

17   A.  No.

18   Q.  Because they are again not unique to any one specific

19   device, but unique to any model of phone with a particular

20   software on it?

21   A.  Correct.

22             MS. MAYER-DEMPSEY:  Does that clarify?

23             THE COURT:  That's fine.

24             MS. MAYER-DEMPSEY:  Thank you.

25             THE COURT:  Anything you want to ask in followup?

White - REDIRECT - by Ms. Mayer-Dempsey

```
 1              MR. MARSTON:  Thank you, your Honor.
 2                      RECROSS-EXAMINATION
 3   BY MR. MARSTON:
 4   Q.  Mr. White, brute force software has improved, which can
 5   shorten the time required to get into a phone such as those
 6   at issue here.  That's what you were just saying.  Right?
 7   A.  Yes.
 8   Q.  But if that phone is before first unlock, there's still
 9   no guarantee you'll get in.  Right?
10              THE COURT:  Are you asking now?
11              MR. MARSTON:  Yeah.
12   BY MR. MARSTON:
13   Q.  Even now, even with the improvements, it still could
14   fail?
15   A.  Well, can you clarify when you say "fail"?  It just --
16   meaning --
17   Q.  Fail to unlock the phone.
18              THE COURT:  You've added little tidbits.  If you
19   could put it all in one question so we have those particular
20   facts.
21   BY MR. MARSTON:
22   Q.  With the improved brute force software that exists now,
23   you're saying it has generally shortened the time it takes
24   to force unlock a phone.  Right?
25   A.  Yes.
```

1   Q.  Okay.  But it is not now with these improvements -- it

2   is not now guaranteed that you will unlock the phone?

3   A.  I can't say with a guarantee, no.

4   Q.  Yeah.

5           And for a phone in -- before first unlock status,

6   you also cannot guarantee if you will get a full image of

7   the phone?

8   A.  Correct.

9           MR. MARSTON:  I don't have any further questions.

10          THE COURT:  And in terms of your question, before

11  first unlock, you can't guarantee that a full image of the

12  phone, are you talking about using brute force now?  I want

13  to make sure I have the facts in your question.

14          MR. MARSTON:  Yes.  I seem to be having trouble,

15  because if I load my question with too many points, it

16  becomes incomprehensible.

17          THE COURT:  I just want to make sure I understand

18  the answer in the context of what you asked.

19          MR. MARSTON:  I appreciate it, your Honor.

20  BY MR. MARSTON:

21  Q.  So yes.  With these improvements in brute force software

22  that we have now, with phones like these, if they're before

23  first unlock, you can't guarantee using brute force that

24  you'll get a full image of this phone, of these phones?

25  A.  Right.  There are different factors that could cause

White - RECROSS - By Mr. Marston

1    that to not be successful.  Correct.

2                   MR. MARSTON:  That's all.

3                   THE COURT:  I don't have any other questions.  You

4    may step down.  Thank you.

5                   (Witness excused.)

6                   THE COURT:  Your next witness?

7                   MS. BUCKNER:  The Government calls Agent Mikel

8    Gajkowski.

9                   (Thereupon, Ms. Mikel Gajkowski entered the

10   courtroom and the following proceedings were had:)

11                  THE COURT:  If you would step up over here,

12   please.  If you'd remain standing so we can swear you in.

13              MIKEL GAJKOWSKI, GOVERNMENT WITNESS, SWORN.

14                  THE COURTROOM DEPUTY:  Please be seated.

15                  THE COURT:  The chair moves around.  And if you

16   can position the microphone so we can definitely hear you.

17                  THE WITNESS:  Yes, ma'am.  Yes, your Honor.

18                  THE COURT:  And I'd ask that you let counsel

19   finish their question before you start to answer even if you

20   know what they're going to ask you so we make sure we have

21   the question and the answer.

22                  THE WITNESS:  Yes, your Honor.

23                  THE COURT:  If you hear the word "objection" or

24   counsel starts to stand, they're going to object.  If you

25   haven't started to answer, don't.  If you're in the middle

1    of your answer, please stop.  Let me hear what the objection

2    is.  Okay?

3              Go ahead.

4              If you could pronounce your name, too, to make

5    sure I say it correctly.

6              THE WITNESS:  Yes, your Honor.  It's "Gajkowski,"

7    is my last name.

8              THE COURT:  Thank you.

9                        DIRECT EXAMINATION

10   BY MS. BUCKNER:

11   Q.  Why don't we start with you stating your name and

12   spelling your last name for the record.

13   A.  Yes.  I'm Mikel Gajkowski, first name M-I-K-E-L.  The

14   last name is G-A-J-K-O-W-S-K.

15   Q.  That's pronounced "Gajkowski" with a hard G?

16   A.  Yes, it is.

17   Q.  Could you tell us, Agent Gajkowski, where do you work?

18   A.  I work for the U.S. Department of State and the Bureau

19   of Diplomatic Security.

20   Q.  What is your title?

21   A.  Special agent.

22   Q.  How long have you been a special agent?

23   A.  Since 2010.

24   Q.  What unit are you assigned to right now?

25   A.  The Office of Special Investigations.

1    Q.  Is that also known as OSI?

2    A.  It is.

3    Q.  And what is OSI?

4    A.  It's the primary investigative body for the Department

5    of State when it comes to crimes committed by or against

6    Department of State personnel or any personnel covered under

7    embassy authority.

8    Q.  How long have you been at OSI?

9    A.  Since 2019.

10   Q.  Before you were at OSI, what did you do?

11   A.  I did a range of passport and visa fraud investigations,

12   dignitary protection and also embassy security program

13   management.

14   Q.  So is it fair to say, then, that one can be a special

15   agent at Department of State but not work for OSI?

16   A.  That's correct.

17   Q.  And just -- what's the difference again between OSI and

18   every other special agent?

19   A.  OSI is a specific department within diplomatic security

20   that specializes in administrative and criminal

21   investigations.

22   Q.  What type of training is associated with being a special

23   agent?

24   A.  In addition to attending the Federal Law Enforcement

25   Training Center, there's also a period of training through

1   diplomatic security that's specific to the types of

2   investigations we do and also dignitary protection.

3   Q.  How much training is there in total?

4   A.  Approximately nine months.

5   Q.  What type of training is associated with being a special

6   agent at OSI in particular?

7   A.  There is a range of training.  It starts with basic

8   onboarding, where we cover some of the different types of

9   crimes we investigate; and then from there, specialized and

10  add-on training, depending on the types of cases we are

11  interested in and the types of investigations that we're

12  assigned to do.

13  Q.  And for you, what did that entail?

14  A.  In addition to standard OSI training, I've had

15  particular training on family-related investigations,

16  domestic abuse and sexual assault.

17  Q.  So over the course of I think you said the nine months

18  of training it takes to be a special agent, are there

19  courses on, like, the Fourth Amendment or searches?

20  A.  Yes.

21  Q.  Can you tell us a little bit about that?

22  A.  In everything that we do, making sure that we're

23  compliant with Fourth Amendment and other civil rights is

24  really paramount.  We need to make sure that any searches we

25  do are appropriately -- that we have the appropriate

1    authority to do any kind of a search or seizure.

2    Q.  And are the specifics as to sort of like the law or any

3    cases and that sort of stuff, is that sort of briefly

4    summarized or did you get instruction on that or no?

5    A.  It's covered extensively through training, and

6    repeatedly.  And in addition, for any subsequent training we

7    take throughout our career, I would say Fourth Amendment

8    considerations are repeatedly emphasized.

9    Q.  What about the Fifth Amendment, the right to remain

10   silent, *Miranda* and that sort of thing?

11   A.  They are.

12   Q.  Aside from sort of the Fourth and Fifth Amendment

13   training, do you get any sort of training specific to how

14   electronic devices work?

15   A.  Yes.

16   Q.  Can you tell us a bit about that?

17   A.  There was some instruction provided at FLETC, the

18   Federal Law Enforcement Training Center.  I had additional

19   training upon arriving at OSI and then there were specific

20   blocks that were covered in an advanced legal course that I

21   took through FLETC also and through Massachusetts police

22   sexual assault investigators training.

23   Q.  Did those trainings go into how devices open or lock,

24   for instance?

25   A.  Generally, yes.

1  Q.  And do they go into how you extract information from

2  devices?

3  A.  Not in that level of detail, no.

4  Q.  Do they through -- you know, any of these courses -- do

5  you talk about other electronic storage media such as

6  clouds, iCloud or Google Drive or that sort of thing?

7  A.  Yes.

8  Q.  So I want to now shift a little bit to some of your work

9  experience after training.

10          If you can recall, for how many search warrants

11  have you been a participant in the team that executed the

12  warrant?

13  A.  I can't provide an exact number, but several.  Maybe

14  around 10 to 12.

15  Q.  Of those 10 to 12 or any others, for how many of those

16  search warrants have you personally been the affiant?

17  A.  On several arrests, I was the affiant.  But not for any

18  residential search warrants.

19  Q.  So would it be fair to say -- and we'll get to this in a

20  little bit -- but the search warrants obtained during the

21  investigation of Mr. Raymond were the first search warrants

22  for which you were the affiant?

23  A.  Yes.  Correct.

24  Q.  How many criminal investigations have you been the lead

25  agent for?

1    A.  At this point or across the board?

2    Q.  Let's keep it to at this point.

3    A.  I would estimate between 20 to 25.

4    Q.  How about in the summer of 2020?

5    A.  If I can note, we're assigned a range of cases.  And

6    they don't always go through the entire judicial process.

7    So in terms of cases where we were pursuing an active

8    criminal investigation, again I would estimate at least ten

9    at this point.

10   Q.  Of the search warrant executions that you participated

11   in, how many of those involved the seizure of electronic

12   devices?

13   A.  I know that several of the arrests we did, there were

14   likely electronic devices seized.  But nothing outside of

15   that.

16   Q.  When you say "likely," did you personally seize any

17   electronic devices?

18   A.  Yes.

19   Q.  And were those electronic devices phones, laptops or

20   something else?

21   A.  Certainly phones, laptops, computers, modems, other

22   digital devices.

23   Q.  For the execution of those search warrants, did you

24   yourself take part in rendering the devices unlocked or

25   extracting any data from those devices?

```
 1    A.  No.

 2    Q.  So I want to talk just a little bit specifically about

 3    biometrics provisions.

 4              In June of 2020, had you ever participated in the

 5    execution of a search warrant that included a biometric

 6    provision?

 7    A.  No.

 8    Q.  Let's talk a little bit about the investigation of

 9    Mr. Brian Jeffrey Raymond.  Are you familiar with that

10    investigation?

11    A.  I am.

12    Q.  Are you the lead agent at the Department of State for

13    that investigation?

14    A.  Yes.

15    Q.  Do you see that individual here today?

16    A.  I do.

17    Q.  Where do you see him?

18    A.  He is seated at the front in orange and wearing glasses.

19              MS. BUCKNER:  Your Honor, I'd like the record to

20    reflect the witness made an in-court identification of

21    Mr. Raymond.

22              THE COURT:  I assume there's no objection?

23              MR. MARSTON:  No objection, your Honor.

24              THE COURT:  So reflected in the record.

25
```

```
 1    BY MS. BUCKNER:
 2    Q.  As part of your investigation, did you or your fellow
 3    investigators on the team seek and obtain several search
 4    warrants for devices in certain residences?
 5    A.  Yes.
 6    Q.  Did you have a chance to review those search warrants
 7    and search warrant affidavits before your testimony here
 8    today?
 9    A.  Yes.
10    Q.  I'm just going to pull up my screen here at the podium.
11    Let me know when you can see my screen.
12    A.  I can.
13    Q.  So there's a list of search warrant affidavits here
14    starting with 4-A, starting with 4-A and going through 4-Q.
15    "Two iPhones warrant" is the first one I'm going to click
16    on.  It's 31 pages?
17              MR. MARSTON:  Your Honor, objection.  Is this list
18    going to be admitted as an exhibit?  It seems like we're
19    showing her the screen.
20              THE COURT:  She hasn't asked to have anything
21    admitted so far, so I'm assuming it's not the whole thing.
22              MR. MARSTON:  Understood.
23    BY MS. BUCKNER:
24    Q.  I'm opening 4-A.  And looking down at 4-A, do you
25    recognize this?
```

```
1    A.  Yes.

2    Q.  What is it?

3    A.  It is a search warrant.

4    Q.  And for which device was the search warrant?

5    A.  For two cellular telephones in the possession of Brian

6    Raymond.

7    Q.  Is this one of the search warrant affidavits that you

8    reviewed for your testimony here today?

9    A.  Yes.

10   Q.  Is this a fair and accurate representation of the search

11   warrant affidavit that you already reviewed and that was

12   obtained in this case?

13   A.  Yes, it is.

14   Q.  So I'm now going to --

15            MS. BUCKNER:  Your Honor, I can -- if the defense

16   has no objection, it's going to be the same questions for

17   4-A through 4-Q.  The Government can move them all in now.

18   But if the defense wants us to go step by step --

19            MR. MARSTON:  They can all be admitted now, your

20   Honor.

21            THE COURT:  Okay.

22            MS. BUCKNER:  The Government moves Exhibits 4-A

23   through 4-Q into evidence at this time.

24            THE COURT:  Since there's no objection, I'll

25   admitted Government's Exhibits 4-A through 4-Q without
```

1    objection.

2                (Whereupon, Government's Exhibit Nos. 4-A through

3    4-Q were entered into evidence.)

4                MS. BUCKNER:  For the record, Exhibit 4-A is the

5    two iPhones.

6                4-B is the Mexico residence warrant.

7                4-C is the iCloud warrant.

8                4-D is the Tinder warrant.

9                4-E are the five devices seized in Mexico.

10               4-F is the cell site warrant.

11               4-G is the California residence and devices.

12               4-H is the LG Phoenix phone.

13               4-I is the Mexico residence second search warrant.

14               4-J is the Bumble warrant.

15               4-K is the second Tinder warrant.

16               4-L is the Google warrant.

17               4-M is the Yahoo! warrant.

18               4-N is the five devices seized in California.

19               4-O is the storage unit warrant.

20               4-P is the T-Mobile warrant.

21               And 4-Q is the Hinge warrant.

22               Your Honor, the Government has sought and obtained

23   permission from the various jurisdictions where these

24   warrants were obtained to use them in this case, use them as

25   exhibits, provide them to defense and provide them to the

 1    Court.

 2              At this time, given the fact that they do

 3    reference sensitive information regarding alleged victims in

 4    this case, the Government would ask that the Court consider

 5    these warrants but that they remain as sealed exhibits for

 6    this hearing.

 7              THE COURT:  Any objection as to that?

 8              MR. MARSTON:  The defense doesn't object, your

 9    Honor.

10              THE COURT:  So they'll remain sealed.

11              If the exhibits remain sealed, does that mean --

12    if they're shown, you don't want anybody to be able to see

13    it.

14              Dorothy, if you could turn the larger screens off.

15    It will be strictly presumably the parties and counsel and

16    the witness and the Court.

17              MS. BUCKNER:  So while we have I think this

18    arrangement with the monitors, I'll just go ahead and talk

19    about, your Honor --

20              THE COURT:  Why don't you wait until she turns

21    them off.

22              Are they off or not?

23              MS. GIRAUDO:  This one hasn't been.  If you can

24    just plug something in, we'll see.

25              MS. BUCKNER:  Sure.

1            MS. GIRAUDO:  There we go.  You're good.

2            THE COURT:  How about the one to my left?  Is that

3       one also off?

4            MS. GIRAUDO:  This one just has the seal.  This

5       one -- now this one has a seal.  We're good.

6            THE COURT:  That's fine.

7            Is there another computer that's looking towards

8       the gallery?  Just turn it around, please.

9            MS. MAYER-DEMPSEY:  (Complies.)

10           THE COURT:  I think that's it.  Go ahead.

11      BY MS. BUCKNER:

12      Q.  Agent Gajkowski, when did you first learn -- when were

13      you first assigned the case of Mr. Raymond?

14      A.  On June 1st, 2020.

15      Q.  At the time the case was assigned, what was your

16      understanding of what had occurred?

17           MR. MARSTON:  Your Honor, we're seeing the

18      questions, just to let you know.

19           MS. BUCKNER:  I'm sorry.  I'm still plugged in.

20      The secrets are out.  I appreciate it.

21      BY MS. BUCKNER:

22      Q.  At the time the case was assigned, what was your

23      understanding of what had occurred?

24      A.  That a naked female was reported screaming from the

25      balcony of one of our embassy-leased apartments in Mexico

1    City.

2    Q.  Was the -- that woman later assigned the identifier

3    AV-1?

4    A.  Yes.

5    Q.  And AV-1 stands for adult victim?

6    A.  Yes, it does.

7    Q.  So why would you be assigned a case that happened in

8    Mexico?

9    A.  Because our office has investigative purview over crimes

10   that occur on embassy property.

11   Q.  But why not just pick someone that's -- that works for

12   OSI that's already in Mexico?

13   A.  Because our agents are only assigned in the D.C. area

14   and we would need to travel.

15   Q.  And in June of 2020, were you a special agent at OSI?

16   A.  Yes.

17   Q.  And so at that point, how long had you been an agent to

18   OSI?

19   A.  Approximately six months.

20           MS. BUCKNER:  So I want to take this moment to

21   talk about a couple of parts of the search warrant

22   affidavit, your Honor --

23           THE COURT:  Go ahead.

24           MS. BUCKNER:  -- while we have this arrangement,

25   and then we'll double back.

1          THE COURTROOM DEPUTY:  Do you have a paper copy?

2          MS. BUCKNER:  I do.  I was just going to pull it

3    up on the screen.  We're still on the Court -- the Court can

4    see only.

5    BY MS. BUCKNER:

6    Q.  So I'm pulling up the search warrant.  This is

7    Government's Exhibit 4-A, two cellular phones in the

8    possession of Mr. Raymond.

9          Were you the affiant for this?

10   A.  I was.

11   Q.  And just briefly, looking at Attachment B -- and we'll

12   talk a little bit more about this later -- does this appear,

13   looking at Attachment A and Attachment B, to be part of the

14   biometrics provision that you executed on June 6th?

15   A.  Yes.

16   Q.  And this is the line that starts with "During the

17   execution of the search"?

18   A.  Yes.

19   Q.  All right.  I'm going to scroll down.  And again, we'll

20   talk a little bit about what led to this in a moment.  But I

21   also want to point out -- the Court's indulgence -- on

22   Page 20, Paragraph 35, where it says "Manner of execution,"

23   do you see that?

24   A.  I do.

25   Q.  And a few -- three lines down, it says, "Accordingly,

 1   our intent would be to ruse Raymond into meeting with OSI

 2   agents under the pretext of a brief followup interview."

 3           Do you see that part?

 4   A.  I do.

 5   Q.  And "whereupon, the devices would be seized in a public

 6   setting."  Do you see that?

 7   A.  Yes.

 8   Q.  We'll talk a little bit more about that later.

 9           Up at the top, do you see where it says, "You are

10   commanded to execute this warrant on or before June 19,

11   2020"?

12   A.  Yes.

13   Q.  And the date that a -- and time it was issued is June

14   5th, 2020.  Is that accurate to your recollection?

15   A.  That's correct.

16   Q.  So I'm going to close out this sealed exhibit.

17           MS. BUCKNER:  The next few exhibits, the

18   Government is not asking that they be sealed.

19           THE COURT REPORTER:  Just, do I need to seal any

20   portion of the record?

21           THE COURT:  Are you asking for anything to be

22   sealed?

23           MS. BUCKNER:  No, your Honor.

24           THE COURT:  I think it's just being able to

25   visually see it.

1    BY MS. BUCKNER:

2    Q.  After you were assigned the case, I think you said on

3    June 1st of 2020 -- is that correct?

4    A.  Yes.

5    Q.  Did you reach out to Mr. Raymond for an interview?

6    A.  I did.

7    Q.  Why did you want to interview him?

8    A.  Because I wanted to hear what happened.

9    Q.  Where did you meet?

10   A.  At Lake Fairfax Park.

11   Q.  At this point, was he in Mexico or in Virginia?

12   A.  He was in Virginia.

13   Q.  Why did you meet at Lake Fairfax Park?

14   A.  Mr. Raymond suggested that location.

15   Q.  Why did you let Mr. Raymond choose the location?

16   A.  I wanted us to meet in an area where he'd feel

17   comfortable and he would understand the meeting was

18   voluntary.

19   Q.  Just for clarification, when did this meeting take

20   place?

21   A.  June 2nd, 2020.

22   Q.  I'm going to pull up Government's Exhibit 5 for ID.

23         MS. BUCKNER:  I'm plugging in my laptop for the

24   witness.

25

Gajkowski - DIRECT - By Ms. Buckner

1    BY MS. BUCKNER:

2    Q.  Do you recognize what I've just pulled up into the

3    screen?

4    A.  I do.

5    Q.  What is it?

6    A.  It appears it be my messages with Mr. Raymond.

7    Q.  Is this a fair and accurate depiction of your texts with

8    Mr. Raymond from the dates of June 1st through June 6th?

9    A.  It is.

10            MS. BUCKNER:  Your Honor, I move Government's

11   Exhibit 5 into evidence.

12            MR. MARSTON:  No objection.

13            THE COURT:  I'll admit Government's Exhibit 5

14   without objection.

15            (Whereupon, Government's Exhibit No. 5 was entered

16   into evidence.)

17            MS. BUCKNER:  May I publish, your Honor?

18            THE COURT:  Yes.

19   BY MS. BUCKNER:

20   Q.  So now looking at this exhibit, there's a blue bubble

21   with some writing in it.  Who's the blue?

22   A.  Those are my messages.

23   Q.  And on the left-hand side, there are gray bubbles.

24   Who's the gray?

25   A.  Those are from Mr. Raymond.

1    Q.  So the first message on June 1st says, "Hi, Brian.  So

2    sorry to text so late."

3              Is this where you're introducing yourself to

4    Mr. Raymond?

5    A.  Yes.

6    Q.  And is this also where you reach out to try and set up a

7    time to meet with him?

8    A.  Yes.

9    Q.  And I'm going to scroll down now to the next blue bubble

10   that says, "Hi, Brian.  That's great.  Is there a time you

11   prefer?"

12             Do you see that?

13   A.  I do.

14   Q.  And here, looking at the next several messages, is this

15   you communicating with Mr. Raymond trying to set up a time

16   to meet on June 2nd?

17   A.  Yes.

18   Q.  And now looking at the bottom of the screen in the

19   left-hand side, do you see the gray messages --

20   A.  Yes.

21   Q.  -- or gray message, I should say, that starts with "Will

22   Lake Fairfax Park work?"

23   A.  Yes.

24   Q.  Is that where Mr. Raymond suggested the park?

25   A.  It is.

1    Q.  I'm going to keep scrolling.  And again, is this just

2    additional messages exchanged between you and Mr. Raymond

3    regarding meeting on June 2nd?

4    A.  Yes.

5    Q.  And at one point, it says -- there's a bubble that says,

6    "Also, just a heads-up, my friend Matt will be coming, too."

7             Who is your friend Matt?

8    A.  My colleague Matthew Knolle, M-A-T-T-H-E-W K-N-O-L-L-E.

9    Q.  So was Matt assigned to this case?

10   A.  No, he wasn't.

11   Q.  So why did he come along?

12   A.  Because I needed a secondary to accompany -- join me for

13   that interview.

14   Q.  Why?

15   A.  Because all of the interviews that we do we do in pairs.

16   Q.  Why is that?

17   A.  To both have a witness as to what transpired and to --

18   for officer safety reasons.

19   Q.  I'm going to keep scrolling still in Government's

20   Exhibit 5.  And I see here it looks like a Google pin to a

21   location.

22             Do you see that?

23   A.  I do.

24   Q.  Can you tell us what that's for?

25   A.  That is the location that I was sharing with

1     Mr. Raymond.

2     Q.  And looking at the date, is this on June 2nd?

3     A.  Yes.

4     Q.  Why were you sharing your location with Mr. Raymond?

5     A.  Because I wanted him to know where we were meeting.

6     Q.  Okay.  I'm taking down Government's Exhibit 5.  So when

7     you and -- I'm sorry.  What was the other agent's name?

8     A.  Special Agent Knolle.

9     Q.  When you and Agent Knolle arrived, were you the first

10    ones there?

11    A.  We were.

12    Q.  Did you find somewhere to sit?

13    A.  We did.

14    Q.  Where did you sit?

15    A.  We sat underneath a gazebo at a picnic bench.

16    Q.  And did eventually Mr. Raymond come to meet you there?

17    A.  He did.

18    Q.  Was we with anyone?

19    A.  No.

20    Q.  Did Mr. Raymond sit down with you two?

21    A.  He did.

22    Q.  Was anyone else in the same gazebo or pavilion that you

23    guys were in?

24    A.  No.

25    Q.  Were there people walking around the park?

1   A.  Yes, there were.

2   Q.  About what time was it?

3   A.  It was approximately noon.

4   Q.  When Mr. Raymond sat down, did you advise him that he

5   was free to leave?

6   A.  I did.

7   Q.  After telling Mr. Raymond that he was free to leave, did

8   he agree to chat with you?

9   A.  He did.

10  Q.  Did you record that interview?

11  A.  Yes.

12  Q.  Did Mr. Raymond know that he was being recorded?

13  A.  Yes.

14  Q.  How do you know he knew?

15  A.  Because he signed a consent form, and the audio

16  recording was on the table.

17  Q.  What did you use for the recording?

18  A.  A handheld audio recorder.

19          MS. BUCKNER:  Your Honor, at this time I'm going

20  to play just a couple of seconds of what's been marked for

21  ID as Government's Exhibit 7.

22          THE COURT:  Are you asking to have that admitted?

23          MS. BUCKNER:  It's Exhibit 9.  I'm sorry.

24  Government's Exhibit 9 for ID.  I just want to play just a

25  second of it for the agent to identify it.

1          (Whereupon, segments of Government's Exhibit No. 9

2     were published in open court.)

3     BY MS. BUCKNER:

4     Q.  I played from the beginning of the recording to five

5     seconds.

6          Agent Gajkowski, do you recognize what you just

7     heard?

8     A.  Yes.

9     Q.  What is it?

10    A.  That is the beginning of the audio recording from June

11    2nd.

12    Q.  And is that a -- have you listened to that entire

13    recording?

14    A.  I have.

15    Q.  Were you present for that entire interview?

16    A.  I was.

17    Q.  Were you in fact the person doing the recording?

18    A.  Yes.

19    Q.  Is this recording, Government's Exhibit 9, a fair and

20    accurate depiction of that recording?

21    A.  Yes, it is.

22          THE COURT:  You have to slow down.

23          MS. BUCKNER:  I'm sorry.  Yes, your Honor.

24          Your Honor, I move Government's Exhibit 9 into

25    evidence.

```
 1              THE COURT:  Any objection?

 2              MR. MARSTON:  No objection.

 3              THE COURT:  I'll admit it without objection.

 4              (Whereupon, Government's Exhibit No. 9 was entered

 5     into evidence.)

 6              MS. BUCKNER:  Your Honor, we're going to play some

 7     clips from this recording from the Government's table.

 8     We're going to play the recording from the Government's

 9     table.

10              Your Honor, Government's Exhibit 9 has been broken

11     down into clips.  We intend to play those clips publicly in

12     the courtroom.

13              The remainder of those recordings, though, we're

14     asking that it be admitted under seal for the same reasons

15     both regarding the mention of AV-1's name in the recording

16     as well as information regarding Mr. Raymond's employment.

17     Our clips are particularized.  If the defense has some other

18     clips that they'd like to play, the Government has no

19     objection to those parts not being under seal, as long as

20     they don't mention AV-1's name or go into any great detail

21     about the nature of Mr. Raymond's employment.

22              THE COURT:  I'm assuming, Mr. Marston, you don't

23     have any problem with this approach?

24              MR. MARSTON:  No objection, your Honor.

25              THE COURT:  So it's basically -- are we seeing it
```

1    or hearing it?

2              MS. BUCKNER:  We're hearing it, your Honor.

3              THE COURT:  Okay.

4              MS. BUCKNER:  I'm going to start with Government's

5    Exhibit -- this is Clip 8 -- excuse me -- 9-A.  And this is

6    going to be at timestamp -- from the beginning of the

7    recording to one minute and 15 seconds.

8              (Whereupon, Government's Exhibit No. 9-A was

9    published in open court.)

10   BY MS. BUCKNER:

11   Q.  That's the end of the first clip, 9-A.

12             Agent Gajkowski, after that introduction we just

13   heard, did you proceed then to ask Mr. Raymond questions

14   about what happened with AV-1?

15   A.  I did.

16   Q.  And over the course of that interview and those

17   questions, did Mr. Raymond describe the nature of his

18   communications with AV-1?

19   A.  He did.

20   Q.  And did he describe how he communicated with AV-1

21   initially?

22   A.  Yes.

23             MS. BUCKNER:  I'm going to play now clip 9-B,

24   which will start at one minute and 50 seconds.

25             (Whereupon, Government's Exhibit No. 9-B was

```
 1    published in open court.)

 2    BY MS. BUCKNER:

 3    Q.  So after Mr. Raymond sort of explains how they initially

 4    met, did he then go on to explain the subsequent encounter

 5    with AV-1?

 6    A.  Yes.

 7    Q.  And once Mr. Raymond had sort of finished his account of

 8    what happened, did you have followup questions?

 9    A.  Yes, I did.

10         MS. BUCKNER:  I'm going to play now Government's

11    Exhibit 9-C, starting at ten minutes and 45 seconds into the

12    recording.

13         (Whereupon, Government's Exhibit No. 9-C was

14    published in open court.)

15    BY MS. BUCKNER:

16    Q.  So after Mr. Raymond indicated that he would be willing

17    to show you those messages, did he in fact pull out his

18    phones and show you?

19    A.  Yes.

20         MS. BUCKNER:  I'm going to play now Government's

21    Exhibit 9-D, which starts at minute 11:35 in the recording.

22         (Whereupon, Government's Exhibit No. 9-D was

23    published in open court.)

24    BY MS. BUCKNER:

25    Q.  What is that sound going on in the background of the
```

1   recording?

2   A.  I believe there's some sort of bird in the area.

3   Q.  During the recording, you seem to be saying, you know,

4   Do you mind if I see or what do you -- something that's,

5   like, What's happening or What's happening here?  Can you

6   just sort of help me understand why you were saying that?

7   A.  Mr. Raymond was about to show me the messages and I

8   understood he was doing something with the device out of my

9   view.

10  Q.  How do you mean, out of your view?  Where were you

11  sitting?

12  A.  I was seated across from him, across the table, and

13  Mr. Raymond kept his device down low in his lap; and I was

14  confused about what he was doing out of sight.

15  Q.  You said something about hand sanitizer.  Is that -- why

16  did you mention hand sanitizer?

17  A.  This interview took place really at the onset of the

18  COVID-19 pandemic, and we wanted to take extra precaution to

19  make sure that everyone was safe and healthy.

20  Q.  When you used the hand sanitizer, did you subsequently

21  get the phones from Mr. Raymond?

22  A.  Yes.

23  Q.  At some point just now in that recording, did you hear

24  yourself ask Mr. Raymond which was his personal phone and

25  which one was his work phone?

1   A.  Yes.

2   Q.  Did he tell you which was personal and which was work?

3   A.  He did.

4   Q.  So I want to double back to the warrant affidavit for

5   the two iPhones for which you were the affiant.

6          Do you remember that affidavit we talked about

7   earlier?

8   A.  I do.

9   Q.  So in that affidavit, you indicate that Mr. Raymond --

10  you weren't sure essentially which phone was which.  Do you

11  remember that?

12  A.  Yes.  That's correct.

13  Q.  So we -- we just heard in the recording that he tells

14  you which phone is which.  Did you hear that?

15  A.  I did.

16  Q.  So why is the affidavit different?

17  A.  There was some confusion on my part about which device

18  was which.  And I didn't review that recording in

19  preparation -- in preparing that affidavit.

20  Q.  So I want to go back to the recording, then.  So we're

21  at Government's Exhibit 9-D, starting at minute 12:32.  Oh,

22  it's 9-E.

23          (Whereupon, Government's Exhibit No. 9-E was

24  published in open court.)

25

1    BY MS. BUCKNER:

2    Q.  Did you actually hold the phones in your hand?

3    A.  I did.

4    Q.  When you received the phones from Mr. Raymond, were they

5    locked or unlocked?

6    A.  They were unlocked.

7    Q.  Did you navigate through the messages yourself such as,

8    in other words, scroll up or down?

9    A.  I did.

10   Q.  And when looking at the messages, did you also navigate

11   around -- within the application?

12   A.  Yes.

13   Q.  And by the "application," I'm talking about Tinder.  Is

14   that correct?

15   A.  Correct.

16   Q.  And so as you're navigating both within the application

17   and up and down through the messages, did you take photos?

18   A.  I did.

19   Q.  So I'm going to now move to Government's Exhibit 9-F at

20   minute 13:50.

21          (Whereupon, Government's Exhibit No. 9-F was

22   published in open court.)

23   BY MS. BUCKNER:

24   Q.  So here in this clip, are you asking Mr. Raymond whether

25   you guys can take his phones from him?

1    A.  Yes.

2    Q.  And did you hear that he declined?

3    A.  Yes.

4    Q.  And subsequently, he offers instead to send law

5    enforcement the pictures of the messages that you're looking

6    at?

7    A.  Correct.

8    Q.  That clip ended at 14:18.  The next clip, Government's

9    Exhibit 9-G, will begin at 15:50.

10          (Whereupon, Government's Exhibit No. 9-G was

11   published in open court.)

12   BY MS. BUCKNER:

13   Q.  You said Snapchat right before you told him he could

14   take a break.  What were you talking about?

15   A.  I was referencing WhatsApp and misspoke.

16   Q.  So when you said Snapchat there, you were actually

17   talking about WhatsApp?

18   A.  That's correct.

19   Q.  Did he show you WhatsApp messages?

20   A.  Yes, he did.

21   Q.  Were those on the same phone that you were looking at or

22   a different phone?

23   A.  A different device.

24          MS. BUCKNER:  Now moving to Government's Exhibit

25   9-H, starting at 16 minutes and 28 seconds.

```
 1                    (Whereupon, Government's Exhibit No. 9-H was

 2          published in open court.)

 3          BY MS. BUCKNER:

 4          Q.  So there is kind of a gap of time where it's sort of

 5          silent.  Are you still holding his phone and going through

 6          his messages at that point for that length of time?

 7          A.  I believe so.

 8          Q.  And as you're going through the messages in each phones,

 9          are you noticing anything else other than the actual

10          messages that you're looking at?

11          A.  Yes.

12          Q.  What are you noticing?

13          A.  At one point in navigating the application, I saw that

14          there were messages that appeared to be with other women.

15          Q.  And aside from messages with other women, did you notice

16          any other applications or anything like that on the phone?

17          A.  I did.

18          Q.  Can you tell us about that?

19          A.  I momentarily saw an icon for Bumble.

20          Q.  As you're going through the messages and navigating the

21          applications, did you see any photos of nude women?

22          A.  No.

23                    MS. BUCKNER:  The Government's now going to play

24          Government's Exhibit 9-I.

25                    (Whereupon, Government's Exhibit No. 9-I was
```

1   published in open court.)

2   BY MS. BUCKNER:

3   Q.  So there, you start asking Mr. Raymond if he's talking

4   to any other women or if he's using any other apps.  Was

5   that in response to what you were seeing on his phone?

6   A.  Yes.

7           MS. BUCKNER:  The Government's now going to move

8   to Exhibit 9-J, which starts at nine minutes and 40 seconds.

9           (Whereupon, Government's Exhibit No. 9-J was

10  published in open court.)

11  BY MS. BUCKNER:

12  Q.  Again, at this point, are you still holding the phones?

13  A.  I am.

14          MS. BUCKNER:  The Government's now going to play

15  9-K, which starts at 19 minutes and 40 seconds.

16          (Whereupon, Government's Exhibit No. 9-K was

17  published in open court.)

18  BY MS. BUCKNER:

19  Q.  Was that clunk you handing the phones back to

20  Mr. Raymond?

21  A.  Yes.

22  Q.  The whole time that you are speaking during the clips in

23  the minutes we played, are you still holding Mr. Raymond's

24  phone and navigating through messages?

25  A.  Yes.

1    Q.  At any point as you're navigating through the messages

2    or reviewing what's on the phone, did Mr. Raymond ask you to

3    stop or give his phone back?

4    A.  No.

5              MS. BUCKNER:  So I'm now going to pull up

6    Government's Exhibit -- the Court's indulgence just one

7    moment.  I'm pulling up Government's Exhibits 7 and 8 for

8    just a moment.

9    BY MS. BUCKNER:

10   Q.  I've pulled up what's been marked for ID as Government's

11   Exhibit 7.  Agent Gajkowski, do you recognize what's

12   Government's Exhibit 7?

13   A.  I do.

14   Q.  What is it?

15   A.  It appears to be a picture that I took of Mr. Raymond's

16   screen.

17   Q.  I'm sorry?  I didn't catch the last part.

18   A.  Of Mr. Raymond's device screen.

19   Q.  Did you take multiple photos that day?

20   A.  I did.

21             MS. BUCKNER:  And so this is just for the witness.

22   If you could just scroll through quickly.

23   BY MS. BUCKER:

24   Q.  Agent Gajkowski, can you sort of look through what we're

25   scrolling through and confirm that that's a fair and

1    accurate depiction of the photos that you took on that day

2    aside from the added redactions?

3    A.  (No response.)

4    Q.  Can you confirm, Agent Gajkowski?

5    A.  Yes.  It looks accurate.

6            MS. BUCKNER:  I'm going to move Government's

7    Exhibit 7 into evidence, your Honor.

8            MR. MARSTON:  No objection.

9            THE COURT:  I'll admit Government's Exhibit 7

10   without objection.

11           (Whereupon, Government's Exhibit No. 7 was entered

12   into evidence.)

13           MS. BUCKNER:  We're going to pull up now

14   Government's Exhibit 8.

15   BY MS. BUCKNER:

16   Q.  Same question, Agent Gajkowski:  Looking at Government's

17   Exhibit 8, please.  Once it's on your screen, let us know

18   what it is.

19   A.  This appears to be photos I took of the other one of

20   Mr. Raymond's devices.

21   Q.  Did you take multiple photos that day?

22   A.  Yes.

23   Q.  And scrolling through this now, is this a fair and

24   accurate depiction of the photos you took that day aside

25   from the redactions?

```
 1    A.  Yes.

 2                MS. BUCKNER:  At this time, the Government moves

 3    Exhibit 8 into evidence as well.

 4                MR. MARSTON:  No objection.

 5                THE COURT:  I'll admit Government's Exhibit 8

 6    without objection.

 7                (Whereupon, Government's Exhibit No. 8 was entered

 8    into evidence.)

 9                MS. BUCKNER:  Your Honor, may we have permission

10    to publish Exhibits 7 and 8?

11                THE COURT:  Yes.

12    BY MS. BUCKNER:

13    Q.  Now I want to go -- I want to start with Exhibit 8.  And

14    looking at Exhibit 8, do you see up at the top of each

15    picture there's a cracked screen?

16    A.  Yes.

17    Q.  And did you at that time know which phone had the

18    cracked screen?

19    A.  I don't believe I did.

20    Q.  Looking at the hand -- scrolling down a little bit -- so

21    now looking at the hand holding a glass, did you understand

22    that you were looking at a text message exchange between

23    Mr. Raymond and another woman?

24    A.  Yes.

25    Q.  And as you were scrolling through taking these photos,
```

1    at any point did the phone lock?

2    A.  No, it did not.

3    Q.  And looking at this phone, are these messages Tinder

4    messages or WhatsApp messages?

5    A.  These appear to be WhatsApp messages.

6    Q.  I now want to shift over to -- and was this the phone,

7    if you recall, that you described in your affidavit as the

8    iPhone 6 or 7 or was this the phone you described as the

9    iPhone XR?

10   A.  I described this device as an iPhone 6 or 7.

11   Q.  Now I'm going to shift from Government's Exhibit 8 to

12   Government's Exhibit 7.  Looking at Government's Exhibit 7,

13   is that your hand holding the phone?

14   A.  Yes, it is.

15   Q.  Now, is this the phone you described as the iPhone 6 or

16   7 or the iPhone XR in your affidavit or something else?

17   A.  As an iPhone XR.

18   Q.  What kind of messages are we looking at here?

19   A.  These appear to be Tinder messages.

20   Q.  As you were scrolling through this phone, at any point,

21   did it lock?

22   A.  No.

23            MS. BUCKNER:  The Government is now going to pull

24   up Government's Exhibit 6-A and 6-B marked for ID, just for

25   the witness only.

Gajkowski - DIRECT - By Ms. Buckner

 1    BY MS. BUCKNER:

 2    Q.  So looking at what's been marked for ID as Government's

 3    Exhibits 6-A and 6-B, what are we looking at, Agent

 4    Gajkowski?

 5    A.  The gazebo where we met Mr. Raymond.

 6    Q.  Are these fair and accurate depictions of how the gazebo

 7    looked on June 2nd, 2020?

 8    A.  Yes.

 9          MS. BUCKNER:  And so at this point I'd like to

10    move Government's Exhibits 6-A and 6-B into evidence.

11          MR. MARSTON:  No objection.

12          THE COURT:  I'll admit 6-A and 6-B without

13    objection.

14          (Whereupon, Government's Exhibit Nos. 6-A and 6-B

15    were entered into evidence.)

16          MS. BUCKNER:  Your Honor, may we publish?

17          THE COURT:  Yes.

18    BY MS. BUCKNER:

19    Q.  I want to focus on Government's Exhibit 6-B.  You were

20    mentioning that Mr. Raymond was holding his phones down in a

21    way that did not allow you to see how -- what he was doing

22    on his phone.  Did I get that right?

23    A.  That's correct.

24    Q.  Another question I had is whether you could see how his

25    phones -- how he unlocked his phones.

1   A.  I did not.

2   Q.  Why couldn't you see -- for instance, when he handed you

3   the phones to show you the pictures, why couldn't you see

4   how the phones unlocked?

5   A.  Because at that point the devices were unlocked.

6   Q.  And how come you couldn't see the moment when he

7   unlocked the phones?

8   A.  Because I didn't see him unlock or open them.  He kept,

9   as I indicated, his devices down towards his lap.

10  Q.  Is this -- looking at Government's Exhibit 6-B, can you

11  just help us understand where he was sitting relative to

12  where you were sitting?

13  A.  Yes.  The bench closest to us, the seat there is where

14  both myself and Special Agent Knolle were located, right

15  about there.  And Mr. Raymond was seated opposite from us,

16  approximately right here.

17  Q.  So for the record, is that -- is that you drawing?  I'm

18  not sure who just drew.

19  A.  I did.  I'm sorry.

20          MS. BUCKNER:  For the record, the witness circled

21  the bench that's closest to the view of the camera and

22  furthest on the other side of the picnic table.  She drew an

23  arrow pointing to the other bench on the opposite side.

24  BY MS. BUCKNER:

25  Q.  So you guys were sitting opposite one another and

Gajkowski - DIRECT - By Ms. Buckner

1   Mr. Raymond was holding his phone down low in his lap.  Is

2   that correct?

3   A.  That's correct.

4   Q.  For that reason, you weren't able to see how he unlocked

5   his phones?

6   A.  That's correct.

7   Q.  So over the course of this interview on June 2nd, what

8   was Mr. Raymond's demeanor like?

9   A.  He seemed very calm, polite, maybe a little bit -- maybe

10   a little bit quiet.

11   Q.  What was his demeanor like after you took the photos of

12   his phone?

13   A.  I didn't notice any change.  Again, cooperative, calm,

14   polite.

15   Q.  After the interview, did Mr. Raymond follow through with

16   sending the screenshots as he had offered?

17   A.  Yes, he did.

18   Q.  How did he send them?

19   A.  He emailed them to me.

20   Q.  Do you know what email account he used?

21   A.  It was from a gmail account.  I would need to -- I'd

22   need to refresh my recollection to tell you specifically.

23   Q.  After you met with Mr. Raymond, was a determination made

24   to seize and search the phones that you had viewed?

25   A.  Yes.

1    Q.  Was that determination made in conjunction with the

2    Department of Justice?

3    A.  Yes.

4    Q.  Who specifically at the Department of Justice?

5    A.  With Ms. Jamie Perry.

6    Q.  And what is Ms. Perry's role at the Department of

7    Justice at that time?

8    A.  She was a trial attorney in the office of human rights

9    and special prosecutions.

10   Q.  Did you seek -- did you in fact seek a search warrant to

11   seize and search Mr. Raymond's phones?

12   A.  Yes.

13   Q.  I think we already covered this.  You were the affiant

14   for that warrant?

15   A.  I was.

16   Q.  Briefly, just sort of in general, what types of things

17   did the warrant authorize you to search for?

18   A.  Specific to both devices, we were looking at any kind of

19   text communication, web activity, phone calls, photos,

20   videos, geolocation data as well as other types of data.

21   Q.  Why were you looking for this information?

22   A.  Because all of it could be potential evidence for our

23   investigation.

24   Q.  And at this point, what were you investigating?

25   A.  We were investigating a possible sexual assault.

1    Q.  And was that regarding the woman who we've identified as

2    AV-1?

3    A.  Correct.

4    Q.  Now, the search warrant that you -- for which you were

5    the affiant for these two phones, did it have a biometric

6    provision?

7    A.  It did.

8    Q.  I think we already covered this, that you had not

9    executed a warrant with biometrics.  But in June 2020, did

10   you know what the term "biometrics" meant?

11   A.  Yes.

12   Q.  For this warrant in particular for the two iPhones, did

13   you personally add the biometric language?

14   A.  No, I did not.

15   Q.  Do you know who added the biometric language?

16   A.  Yes.

17   Q.  Who?

18   A.  Ms. Perry.

19   Q.  Did you read the biometric language before you swore out

20   the affidavit?

21   A.  Yes, I did.

22   Q.  What was your -- and I should say, did you do any

23   independent research such as publicly available information

24   regarding how biometrics in particular works?

25   A.  No.

1    Q.  What is your understanding -- what was your

2    understanding at that time in June 2020 of what biometrics

3    do as far as locking or unlocking a phone?

4    A.  I understood that facial recognition or a fingerprint

5    could unlock a device.

6    Q.  At this point, did you know the passcodes to

7    Mr. Raymond's two phones?

8    A.  No.

9    Q.  As you were preparing to execute this warrant, did you

10   seek any guidance regarding how to execute the biometrics

11   provision?

12   A.  Yes.

13   Q.  And from whom did you receive that guidance?

14   A.  I talked with Ms. Perry.

15   Q.  And regarding the biometric -- regarding executing the

16   biometric provision, what did Ms. Perry say?

17   A.  Ms. Perry said that the warrant authorized us to compel

18   biometrics, meaning specifically that if Mr. Raymond

19   wouldn't comply and provide those, that we even had the

20   authority to temporarily detain or restrain him, to include

21   using handcuffs if needed.

22   Q.  Did Ms. Perry during this conversation offer any other

23   guidance regarding passcodes?

24   A.  Yes.

25   Q.  And what about that did she say?

1   A.  She said that we needed to be very careful because we

2   couldn't compel passcodes or PINs.  She said that any of

3   those would have to be voluntarily provided.

4   Q.  Did Ms. Perry follow up with this advice in an email?

5   A.  Yes.

6   Q.  Now, after that conversation with Ms. Perry in

7   particular, what was your understanding regarding whether

8   you could ask Mr. Raymond for the passcodes to his phone?

9   A.  I understood that I could and should ask, but that if he

10  declined, there was nothing else I could do.

11  Q.  What was your understanding regarding executing the

12  biometric provision?

13  A.  I understood that if the phones were locked by

14  biometrics, that we could compel the entry of those -- of

15  that input.

16  Q.  And to be clear, did you know for a fact that

17  Mr. Raymond's phones were locked using biometrics?

18  A.  I didn't know for a fact, no.

19  Q.  What is an operations plan?

20  A.  It's an overview of how we plan to execute a given

21  operation.

22  Q.  And who drafts those?

23  A.  The agents responsible for any given operation.

24  Q.  What are some example of operations?

25  A.  For example, an arrest, a residential search warrant, a

1    surveillance operation, anything formal that we're doing in

2    the field.

3    Q.  Did you draft an operations plan for the execution of

4    this search warrant for his cell phones, Mr. Raymond?

5    A.  I did.

6    Q.  When you drafted the operations plan, how many had you

7    drafted in the past?

8    A.  The only ones I had done previously would have been in

9    training.

10   Q.  So put another way, had you drafted any operations plans

11   for actual arrests in the field?

12   A.  No.

13   Q.  As part of operations planning, do you find personnel to

14   participate in a warrant execution?

15   A.  Yes.

16   Q.  And as part of applications planning, is the plan you

17   draft approved by someone?

18   A.  Yes.  It had to go through both my supervisor and our

19   office director.

20   Q.  Okay.  So then going back to personnel, who chose what

21   personnel would be present to execute this warrant?

22   A.  I did.

23   Q.  And can you just sort of walk us through who you chose

24   and why?

25   A.  Yes.  I -- my supervisor, Supervisory Special Agent

1    Viktor Karabin, said that he would go on behalf of OSI

2    leadership.  I selected Special Agent David Palmer-Jones

3    because I knew him to be a good agent.  And I selected

4    Special Agent Ted Nelson because I knew he had the most

5    experience of anybody in our office.

6              THE COURT REPORTER:  Could I get a spelling for

7    Karabin, please?

8              THE WITNESS:  K-A-R-A-B-I-N.

9    BY MS. BUCKNER:

10   Q.  And Viktor is spelled with a K instead of a C.  Is that

11   correct?

12   A.  Yes.

13   Q.  Okay.  So in addition to the special agents, including

14   your supervisor that you chose to accompany you, did you

15   have anyone who was like a -- worked at the CIF for -- a

16   forensic technician?

17   A.  No.

18   Q.  Do you know what the CIF is?

19   A.  I do.

20   Q.  Do you know what it stands for?

21   A.  For computer investigations and forensics.

22   Q.  Had you ever worked with the CIF before the execution of

23   this warrant?

24   A.  I had.

25   Q.  How many different occasions?

1   A.  On one occasion that I can recall.

2   Q.  Why didn't you have -- and what is your understanding of

3   what CIF does?

4   A.  CIF is the office of experts when it comes to seizing,

5   analyzing and searching digital devices.

6   Q.  All right.  So why didn't you have someone from the CIF

7   on your team as part of your applications plan?

8   A.  Because they said they couldn't send anyone.

9   Q.  Who said that?

10  A.  I spoke with either Brian Christen or Ryan Stitzer, and

11  that's what they indicated.

12  Q.  What do you mean, "either/or"?  Do you not know?

13  A.  I don't remember specifically which one.

14  Q.  Help me understand what they said about this.

15  A.  They had said that due to the COVID-19 pandemic that

16  hardly anyone was in the office at that point.  They also

17  said that they need weeks' worth of advance notice before

18  they can adjust the schedules of the contractors that would

19  typically come out in the field and do this kind of work.

20  Q.  Were you able to get any assistance from anyone who

21  worked at CIF?

22  A.  Yes.

23  Q.  Who was that?

24  A.  Ms. Karen Stedman.

25  Q.  Regarding Karen Stedman, was she a forensic analyst?

Gajkowski - DIRECT - By Ms. Buckner

1    A.  My understanding was that she was an evidence

2    technician.

3    Q.  When you spoke with Ms. Stedman, was it over the phone,

4    by email, in person or something else?

5    A.  It was in person.

6    Q.  When you went in person, tell us a little bit about what

7    happened there.

8    A.  CIF had said that I could come to the office and meet

9    with someone that could talk me through what I needed to do

10   when I seized the devices.

11          When I met Ms. Stedman there, she identified

12   herself as the only one in the office.  And I asked her to

13   tell me as much as she could about proper procedures once I

14   seized the phones.

15   Q.  So let's break that down a little bit.

16          Did she provide you with any information regarding

17   what to do after you seized devices?

18   A.  Yes.

19   Q.  And what did she say?

20

21

22

23

24

25

1    A.   She said that depending on whether the phone -- if the

2    phone was unlocked, for example, that I should navigate to

3    the settings and either change the passcode or remove the

4    lock feature.   And then after that, she said to place the

5    phone in airplane mode, I believe also low battery mode, and

6    put it in a Faraday bag.

7    Q.   What's a Faraday bag?

8    A.   It's a special kind of bag that's used in electronic

9    device seizures.   It prohibits the device from sending or

10   receiving signals.   It looks like a silver aluminum-type

11   bag.

12   Q.   Did you speak with Ms. Stedman about the various methods

13   by which a phone might be locked?

14   A.   Yes.

15   Q.   What did she say, if anything, about that?

16   A.   We discussed two scenarios.   We discussed that if the

17   phones were locked by PIN, that certainly we would ask if he

18   would be willing to provide the PIN.   And then we discussed

19   if the phones were unlocked by biometrics, then we would

20   compel biometrics, go into the settings and remove the lock

21   features.

22   Q.   In June of 2020, had you yourself ever navigated to the

23   lock feature in an iPhone and tried to change the password?

24   A.   I believe so.

25   Q.   And had you been successful?

1    A.  Yes.

2    Q.  After you found out that no one from CIF would be

3    available on June 6th, did you notify anyone?

4    A.  I did.

5    Q.  Who did you notify?

6    A.  I spoke with my supervisor, certainly with our office

7    director and with several colleagues.

8    Q.  Did your supervisor still approve going forward with the

9    execution of the warrant on June 6th?

10   A.  Yes.

11   Q.  Did you discuss the fact that CIF would not be available

12   with the trial attorney, Ms. Perry?

13   A.  Yes.

14   Q.  What, if anything, did that conversation entail?

15   A.  I expressed my frustration and she said she understood.

16   Q.  So I now want to move to June 6th, 2020.

17           Do you recall if that was a Saturday?

18   A.  Yes.  It was a Saturday.

19   Q.  You mentioned Ted Nelson as one of the special agents

20   that you picked for your operations team.

21           Did he in fact take part on June 6th?

22   A.  Yes.

23           THE COURT:  I just want to mention, we're going to

24   break for lunch at around 1:00.  So just figure out at what

25   point you want to stop.

1           MS. BUCKNER:  This might be a good point to stop,

2     your Honor.

3           THE COURT:  All right.  So let me ask you to come

4     back at 2:00, and we'll resume the testimony at that point.

5           Since you're on the stand, I'd ask that you not

6     discuss your testimony with anyone.

7           THE WITNESS:  Yes, your Honor.

8           (Thereupon, a luncheon recess was taken, after

9     which the following proceedings were had:)

10          THE COURT:  Good afternoon.

11          Sorry to do this, but I thought of this one

12    additional question for our first witness, and I wanted to

13    look at the transcript to make sure that I recalled the

14    evidence.

15          So I would like to re-call him at some point.  I

16    have one -- I don't know whether it's better to do it now,

17    although it's in the middle of the testimony, or wait.  I

18    don't know if he's in the courthouse or not.

19          MS. MAYER-DEMPSEY:  He is.  We have him just right

20    outside.  So it might be best.

21          THE COURT:  If you don't mind, what I'll do is,

22    why don't we bring him out and I can ask my question.  Then

23    we'll return to the agent.

24          MS. MAYER-DEMPSEY:  Yes, your Honor.

25          THE COURT:  That's what's nice about realtime.

```
1                    (Thereupon, Mr. Raymond White entered the

2        courtroom and the following proceedings were had:)

3                    THE COURT:  Come on back up.

4                    Please go ahead.  I recalled something and I

5        looked at the transcript, so I wanted to make sure.  I had

6        an additional question here.

7                    If you could just give us your name again just for

8        the record purposes.

9                    MR. RAYMOND WHITE:  Sure.  It's Raymond White.

10                   THE COURT:  In the last set of question of

11       Mr. Marston, it was -- the question was:  With the improved

12       brute force software that exists now, you're saying it has

13       generally shortened the time it takes to force unlock a

14       phone.  Right?

15                   You said yes.

16                   Then the question is:  But it's not now with these

17       improvements -- it's not now guaranteed that you will unlock

18       the phone?

19                   You answered:  I can't say with a guarantee, no.

20                   And it goes on.

21                   And for a phone in before-first-unlock status, you

22       also cannot guarantee if you will get a full image of the

23       phone?

24                   And your answer is:  Correct.

25                   So I'm following up on that in terms of what
```

1       "guarantee" means.

2              So as I understood it, for instance, if the

3       biometrics doesn't work, doesn't unlock the phone, you lack

4       the password, you're using brute force.

5              As I understand it, that's the only method,

6       mechanism, to unlock the phones unless you have the

7       biometrics or the password.  Am I correct?

8              MR. RAYMOND WHITE:  That's correct.

9              THE COURT:  So when you say that brute force is

10      not "guaranteed," in quotes, what do you mean by that?  I

11      mean, in other words, what -- how does that translate into

12      how often this comes up?

13             MR. RAYMOND WHITE:  I think I probably have to ask

14      for clarification from the defense who asked me what the

15      word --

16             THE COURT:  If you need my question clarified, go

17      ahead.

18             MR. RAYMOND WHITE:  Okay.  Yes.  I would need

19      clarification on the word "guarantee."

20             THE COURT:  What I was trying to find out is, when

21      you agreed with "guarantee," what did you interpret

22      "guarantee" as?

23             MR. RAYMOND WHITE:  My understanding when --

24      "guarantee" means an absolute, that it would without any

25      doubt be able to unlock the phone.  There's multiple

1    different variables to take into account:  Even though it is

2    brute forcing, there could be power failures or, in other

3    instances, the application that's brute forcing the phone,

4    something could happen with that and then it ends and then

5    you have to restart the process again.

6             There's multiple other reasons why -- that it

7    could not be an absolute like that.

8             THE COURT:  Okay.  In your experience, how

9    frequently does it fail?  Or do you have some information

10   that would indicate how often there is a failure?

11            MR. RAYMOND WHITE:  Unfortunately, I don't have

12   that information.

13            THE COURT:  Well, how about from your own

14   experience, just in terms of -- how many have you, say, over

15   the course of your career, have you used brute force to go

16   in?

17            MR. RAYMOND WHITE:  From my own experience, I have

18   not seen any failures as of yet.

19            Most of the phones that I've encountered continue

20   to brute force and continue to do so.

21            THE COURT:  How many phones have you looked at

22   where brute force has been involved and you've had to rely

23   on that?  Approximately how many?

24            MR. RAYMOND WHITE:  I would say at least 20.

25            THE COURT:  Okay.  Just trying to get a better

 1    sense of what the guarantee was.

 2              Thank you.

 3              Does anybody want to follow up with anything?

 4              MS. MAYER-DEMPSEY:  Just one.

 5              THE COURT:  Sure.

 6              MS. MAYER-DEMPSEY:  Mr. White, is it true that you

 7    use brute force when a phone is in a before-first-unlock

 8    state?

 9              MR. RAYMOND WHITE:  Yes.  It can also be used in

10    an after first unlock.  But yes.

11              MS. MAYER-DEMPSEY:  And if a phone is in an

12    after-first-unlock state, say it's been opened with

13    biometrics, would you need to use brute force?

14              MR. RAYMOND WHITE:  No.

15              MS. MAYER-DEMPSEY:  That's all.

16              THE COURT:  Anything from you, Mr. Marston?

17              MR. MARSTON:  One of the reasons it's not an

18    absolute certainty in terms of getting into a phone is it

19    could have a complicated passcode, an alphanumeric passcode.

20    Right?

21              MR. RAYMOND WHITE:  That is possible.  Yes.

22              MR. MARSTON:  Okay.  That's one of the variables.

23              And how many of the phones you've accessed through

24    brute force did you -- I'm sorry.  I was confused.

25              Let me back up a second, your Honor, if I may.

```
 1                    THE COURT:  Can you talk into the microphone?  All
 2       you need to do is to straighten it up.  That's it.
 3                    MR. MARSTON:  Okay.  I was trying to understand,
 4       did you say that you have some phones still running?
 5                    MR. RAYMOND WHITE:  Yes.
 6                    MR. MARSTON:  Okay.  So you have some phones that
 7       have not opened; you hope they will?
 8                    MR. RAYMOND WHITE:  Correct.
 9                    MR. MARSTON:  Through the brute force?
10                    MR. RAYMOND WHITE:  Yes.
11                    MR. MARSTON:  Okay.  And how many of the 20 you
12       talked about were in before-first-unlock status when you got
13       them?
14                    MR. RAYMOND WHITE:  I don't recall exactly how
15       many.  I would probably say the majority of those,
16       before-first-unlock state.
17                    MR. MARSTON:  Like they'd been powered down?
18                    MR. RAYMOND WHITE:  Yes.
19                    MR. MARSTON:  Okay.  Nothing further, your Honor.
20                    THE COURT:  Thank you.  I appreciate your
21       answering my additional questions.  Thank you.
22                    (Thereupon, Mr. Raymond White retired from the
23       courtroom and the following proceedings were had:)
24                    THE COURT:  If we could get the second witness
25       back up and we'll proceed.
```

```
1              (Thereupon, Ms. Mikel Gajkowski entered the
2      courtroom and the following proceedings were had:)
3              THE COURT:  Mr. Marston, I notice that you have
4      the same witness as your witness.  Can we have it so that
5      you ask all the questions so we're not calling her twice?  I
6      should have mentioned that earlier.
7              MR. MARSTON:  Yes, your Honor.  That's our
8      intention.  Thank you.
9              THE COURT:  Perfect.  Thank you.
10             We can resume at this point.
11             Good afternoon.
12             MS. BUCKNER:  Thank you, your Honor.  Just one
13     moment while I pull up the exhibits, your Honor.
14     BY MS. BUCKNER:
15     Q.  Good afternoon, Agent Gajkowski.
16     A.  Good afternoon.
17     Q.  So I want to just for a moment go back in time to June
18     2nd, the day that you first interviewed Mr. Raymond.
19     A.  Yes.
20     Q.  So after the interview with Mr. Raymond, did you seek
21     any preservation letters?
22     A.  I did.
23     Q.  Had you ever sought preservation letters before?
24     A.  No.
25     Q.  Who told you, if anyone, that you needed to seek
```

1    preservation letters?

2    A.  I don't recall specifically.

3    Q.  When you -- when I say "sought preservation letters,"

4    what does that mean to you?

5    A.  It means to contact respective service providers for

6    online accounts and ensure that data is preserved in case

7    there's any attempt to delete it.

8    Q.  And here, did you have some concerns about deletion?

9    A.  Yes.

10   Q.  And so looking at -- having looked at Mr. Raymond's

11   phones and Tinder messages and the WhatsApp messages, what

12   sort of accounts had you contemplated preserving?

13   A.  Certainly the Tinder accounts, potentially a Bumble

14   account; and then, as the devices were iPhones, I knew that

15   iCloud accounts would also be important.

16   Q.  What's about WhatsApp?  Did you think about that one?

17   A.  WhatsApp.  Yes.

18            MS. BUCKNER:  I'm going to pull up for ID

19   Government's Exhibit 21.  Just for the witness, please.

20            THE COURT:  I don't have a 21 listed, but that's

21   all right.

22            MS. BUCKNER:  I'm sorry, your Honor.  We added

23   some exhibits.

24            This is going to be an email between Agent

25   Gajkowski and a Mr. Passis, P-A-S-S-I-S.

```
 1    BY MS. BUCKNER:

 2    Q.  Looking at Government's Exhibit 21, Agent Gajkowski, do

 3    you recognize it?

 4    A.  I do.

 5    Q.  What is it?

 6    A.  That is an email exchange between myself and an

 7    investigative analyst name David Passis.

 8              MS. BUCKNER:  Can you scroll down to the bottom,

 9    please.

10    BY MS. BUCKNER:

11    Q.  Having scrolled through it, do you recognize this email

12    exchange?

13    A.  I do.

14    Q.  Is it an accurate depiction of the email exchange

15    between you and the investigative analyst in June of 2020 --

16    A.  Yes, it is.

17    Q.  -- aside from the redactions?

18    A.  Yes.

19              MS. BUCKNER:  Your Honor, at this point the

20    Government moves Government's Exhibit 21 into evidence.

21              MR. MARSTON:  No objection.

22              THE COURT:  I'll admit it without objection.

23              (Whereupon, Government's Exhibit No. 21 was

24    entered into evidence.)

25              MS. BUCKNER:  Your Honor, may I publish?
```

```
 1              THE COURT:  Yes.
 2   BY MS. BUCKNER:
 3   Q.  So I want to start with what's on the screen right now.
 4   Do you see at the top where it says June 2nd?
 5   A.  Yes.
 6   Q.  What's the subject of that email?
 7   A.  "May need your help drafting preservation order."
 8   Q.  And briefly, what is it that this email communicates?
 9   A.  I was trying to get assistance in putting in
10   preservation orders.
11   Q.  And what is an investigative analyst?
12   A.  These are personnel assigned to our office that help
13   with more routine aspects of investigations, administrative
14   tasks, reviewing certain things.
15   Q.  Do they have access to systems that allow them to figure
16   out identifiers for a subject?
17   A.  Yes, they do.
18   Q.  The date of this email, June 2nd, is that the same day
19   that you interviewed Mr. Raymond?
20   A.  Yes, it is.
21   Q.  What is the time of this email?
22   A.  It's 11:06 p.m.
23              MS. BUCKNER:  Keep scrolling up, please.
24   BY MS. BUCKNER:
25   Q.  As we scroll up, is that the investigative analyst
```

1    responding to you?

2    A.  Yes, it is.

3            MS. BUCKNER:  Keep scrolling, please.

4    BY MS. BUCKNER:

5    Q.  The analyst says, "Just email or message me."  Do you

6    see that?

7    A.  Yes.

8            MS. BUCKNER:  Keep scrolling.

9    BY MS. BUCKNER:

10   Q.  And now we're on June 3rd.  Do you see that date at the

11   top?

12   A.  Yes, I do.

13   Q.  And based on this email exchange, it appears that you

14   guys still have not had a chance to connect.  Is that

15   correct?

16   A.  That's correct.

17           MS. BUCKNER:  I'm now going to pull up for the

18   witness only Government's Exhibit 22.  We'll title this

19   "Email between Agent Gajkowski and Mr. Passis dated June 4."

20   BY MS. BUCKNER:

21   Q.  Do you recognize this email?

22   A.  I do.

23   Q.  What is it?

24   A.  This is an email from myself to Mr. Passis.

25           MS. BUCKNER:  And if you could please just scroll

1    all the way to the bottom.

2    BY MS. BUCKNER:

3    Q.  Scrolling through that, is that a fair and accurate

4    depiction of the email exchange?

5    A.  Yes, it is.

6    Q.  So starting with --

7              MS. BUCKNER:  I'm sorry, your Honor.  I move

8    Government's Exhibit 22 into evidence.

9              MR. MARSTON:  No objection.

10             THE COURT:  I'll admit it.  That's Exhibit 22

11   without objection.

12             (Whereupon, Government's Exhibit No. 22 was

13   entered into evidence.)

14             MS. BUCKNER:  May I publish it?

15             THE COURT:  Yes.

16             MS. BUCKNER:  Thank you, your Honor.

17   BY MS. BUCKNER:

18   Q.  Looking now at what's on the screen, is this an email

19   from you to Mr. Passis providing the identifiers that you

20   had for Mr. Raymond thus far?

21   A.  Yes.

22   Q.  And I see among other things you've got a gmail address.

23   Do you see that there?

24   A.  Yes.

25   Q.  Was that the gmail address that Mr. Raymond used to send

1    you photos of the chats from his phones?

2    A.  Yes.

3            MS. BUCKNER:  Could you scroll up, please.  Keep

4    scrolling.  Just a little bit more.

5    BY MS. BUCKNER:

6    Q.  So now we have an email response from Mr. Passis.  Do

7    you see that?

8    A.  Yes.

9    Q.  And in summary, Mr. Passis says he found an additional

10   email address, the Yahoo! email address.

11           Do you see that?

12   A.  Yes.

13           MS. BUCKNER:  Keep scrolling up, please.

14   BY MS. BUCKNER:

15   Q.  And then you respond with additional identifiers.  Is

16   that correct?

17   A.  Yes.

18   Q.  And this email exchange ends on June 4th.  Do you see

19   that?

20   A.  Yes.

21   Q.  Thank you.

22           Now, I want to ask you a quick question about CIF.

23   So you had said CIF was not available on June 6th, when you

24   had planned to execute this warrant.  Do you remember that?

25   A.  Yes.

1    Q.  So why not wait, you know, like a week or two or even a

2    few days for CIF to become available?

3    A.  We decided that with every day we waited there was a

4    greater risk of losing potential evidence.

5    Q.  What sort of evidence -- what do you mean by "losing

6    evidence"?

7    A.  That as time passed, that certain types of data might be

8    deleted, that it would also become harder and harder to meet

9    up with Mr. Raymond as well.

10   Q.  And one more question before we get to June 6th.  We had

11   talked before lunch about the fact that you sought some

12   advice from Ms. Perry regarding biometrics.  Do you remember

13   that question?

14   A.  Yes.

15           MS. BUCKNER:  So, your Honor, I'm going to pull up

16   an exhibit to the Government's motion at Docket No. ECF

17   217-11.

18           THE COURT:  Can we call this Government's Exhibit

19   23, then?

20           MS. BUCKNER:  Yes, your Honor.

21   BY MS. BUCKNER:

22   Q.  I asked you if Ms. Perry had followed up with some

23   advice via email.  Do you remember that question?

24   A.  I do.

25   Q.  Is this the email she followed up with?

1    A.  Yes, it is.

2    Q.  So returning to June 6th, on June 6th, you had said that

3    there were several agents that you had asked to join you as

4    part of your operations planning.  Do you remember that?

5    A.  Yes.

6    Q.  One of the agents you named was a Special Agent Nelson,

7    who was at the time -- worked at the Department of State.

8    Is that correct?

9    A.  That's correct.

10   Q.  Did you exchange text messages with Agent Nelson leading

11   up to June 6th?

12   A.  Yes, I did.

13        MS. BUCKNER:  I'm going to pull up what's been

14   marked for ID for the witness only as Government's Exhibit

15   17, your Honor.  This is another addition.  We'll title this

16   "Texts between Agent Gajkowski and Agent Nelson."

17   BY MS. BUCKNER:

18   Q.  Do you recognize what is in front of you?

19   A.  Yes, I do.

20   Q.  What is it?

21   A.  These appear to be messages exchanged between myself and

22   Special Agent Nelson.

23   Q.  So let's start just -- is this a fair and accurate

24   depiction of the messages that you exchanged beginning on

25   June 2nd of 2020?

1   A.  Yes.

2            MS. BUCKNER:  Your Honor, I move Government's

3   Exhibit 17 into evidence.

4            THE COURT:  Any objection?

5            MR. MARSTON:  No objection.

6            THE COURT:  I'll admit it without objection.

7   Government's Exhibit 17.

8            (Whereupon, Government's Exhibit No. 17 was

9   entered into evidence.)

10  BY MS. BUCKNER:

11  Q.  So starting on June 2nd, who is speaking in the blue?

12  A.  That's me.

13  Q.  Who is in the gray?

14  A.  Special Agent Nelson.

15  Q.  So looking at this message that starts with, "Great.

16  Thank you," can you read that aloud?

17  A.  Yes.  "Great.  Thank you.  Need to write an affidavit

18  for seizure tonight.  Viktor is getting exemplar."

19  Q.  Who is Viktor?

20  A.  My supervisor.

21  Q.  Was Viktor there on June 6th?

22  A.  Yes, he was.

23  Q.  And do you see where Agent Nelson responds, "Excellent.

24  What are you seizing?"

25  A.  Yes.

```
 1    Q.  How do you respond?

 2    A.  "Two phones for now."

 3              MS. BUCKNER:  Keep scrolling, please.

 4    BY MS. BUCKNER:

 5    Q.  And here, you ask Mr. Nelson whether you can forward him

 6    a video.  Is that correct?

 7    A.  That's correct.

 8    Q.  And in the second blue bubble, can you read that aloud?

 9    A.  Yes.  "It will be relevant for the interview because he

10    stated she wasn't at all drunk."

11    Q.  Here, what are you talking about?

12    A.  A video that was provided by special agents in Mexico

13    City.

14    Q.  And are you comparing that video to the statements

15    provided to you by Mr. Raymond on June 2nd?

16    A.  Yes.

17              MS. BUCKNER:  Can you scroll down.

18    BY MS. BUCKNER:

19    Q.  So now we're at June 5th.  And in gray, it says, "Let me

20    know if you think we're going to try this tonight."

21              Was there an original plan to execute the warrant

22    on June 5th?

23    A.  We were looking at that as a possibility.

24    Q.  Ultimately, though, did you decide on the next morning,

25    June 6th?
```

1    A.  That's correct.

2    Q.  Why is that?

3    A.  Because we found out that Mr. Raymond was actually

4    staying at a different hotel.

5    Q.  How did that affect your planning?

6    A.  The entire ops plan was written specific to the Westin

7    Dulles Hotel.

8    Q.  Was there anything about the search itself that

9    indicated that hotel?

10   A.  Yes.  It was located -- the warrant was specific to that

11   location.

12   Q.  And can you just say a little bit more about what you

13   mean, "the warrant was specific to that location"?

14   A.  Yes.  I know that warrants must be particular to

15   locations and the items to be seized.  And in that warrant

16   that was signed by the judge the night of June 5th, it was

17   specific to devices located on Mr. Raymond's person or

18   located in his hotel, which we identified as the Westin

19   Dulles.

20   Q.  If the phones weren't on Mr. Raymond's person, the

21   warrant authorized agents to go to his hotel, but the

22   warrant listed the wrong hotel.  Did I get that right?

23   A.  That's correct.

24   Q.  We're going to keep scrolling just a little bit.  On the

25   left, it says -- again, this is Agent Nelson speaking --

Gajkowski - DIRECT - by Ms. Buckner

1    "Late-night interview work better.  People are usually tired

2    and more willing to talk.  LOL."

3              How do you respond?

4    A.  "Agreed.  Saturday makes it seem urgent."

5    Q.  We're going to keep scrolling.  We're still on June 5th.

6    Agent Nelson says, "Hey, this will go smooth when we do it.

7    Easy pleasy [sic].  So don't sweat it.  It's all in our

8    salesmanship, and between the two of us we'll be fine."

9              Did you see that message?

10   A.  Yes.

11   Q.  So in between or among those messages, let's start with

12   "People are usually tired and more willing to talk."

13             What did you understand that to mean?

14   A.  I understood that people tend to be more talkative when

15   they're tired.

16   Q.  And now looking at the "Easy pleasy, don't sweat it,

17   it's all in our salesmanship," what did you understand that

18   to mean?

19   A.  That in the way that we approached Mr. Raymond and spoke

20   with him, we could have an effect on how cooperative he

21   might be.

22             MS. BUCKNER:  Could you keep scrolling, please.

23   BY MS. BUCKNER:

24   Q.  We're still on June 5th; is that correct?

25   A.  Yes.

1    Q.  And what do you say in blue?

2    A.  "Meeting him at 10:00 a.m. tomorrow."

3            MS. BUCKNER:  Keep scrolling, please.

4    BY MS. BUCKNER:

5    Q.  And what do you say there in blue?

6    A.  "I need to figure it out.  He's changed hotels (or lied

7    about where he's staying)."

8    Q.  And what do you say next?

9    A.  "I'll tell him to bring his phones."

10   Q.  And Agent Nelson responds, "I would wait.  We can get

11   them.  If you tip him, he might flake."

12           Do you see that?

13   A.  Yes.

14           MS. BUCKNER:  Keep scrolling, please.

15   BY MS. BUCKNER:

16   Q.  How do you respond?

17   A.  Okay.  "Even if we meet somewhere nearby?"

18   Q.  And Nelson says, "I'm sure he'll have both with him.  We

19   can escort him back to the hotel.  Have Viktor wait on the

20   lobby ahead of us.  It's going to be his personal phone we

21   really want.  Your call."

22           Do you see those messages?

23   A.  Yes.

24           MS. BUCKNER:  Keep scrolling.

25

1   BY MS. BUCKNER:

2   Q.  How do you respond?

3   A.  "Makes sense."

4   Q.  And Agent Nelson responds, "We can secure his hotel room

5   till he gives us the phone -- gives up the phone.  We'll get

6   it.  Verbal judo."

7          What did you understand "verbal judo" to mean?

8   A.  Again, the way that we spoke and interacted with

9   Mr. Raymond could provide a cooperative scenario.

10  Q.  So we talked a little bit just now about the fact that

11  Mr. Raymond, you found out, was staying at a different

12  hotel.

13  A.  Yes.

14  Q.  Aside from this exchange with Agent Nelson, did you

15  discuss the contingency of Mr. Raymond staying at another

16  hotel with anyone other than Agent Nelson?

17  A.  Can you -- I'm not sure I understand your question.

18  Q.  Yeah.  I'll reword it.

19          Let's start with your supervisor.

20  A.  Yes.

21  Q.  Did you talk with your supervisor about how the fact

22  that Mr. Raymond was at a different hotel may affect your

23  plan?

24  A.  Yes, I did.

25  Q.  Can you tell us about that?

1   A.  Yes.  I called him after I spoke with Mr. Raymond and

2   discovered he was in fact staying at a different hotel.

3           And I told him that this was of concern because

4   the warrant had been signed and it was specific to the

5   Westin Dulles.

6   Q.  And how did your supervisor respond, if you recall?

7   A.  I think he was inclined to postpone the operation to

8   give us some time to update the ops plan and, yeah, I think

9   just allow us a little more time.

10  Q.  All right.  So in addition to Agent Karabin, did you

11  speak with anyone else regarding the fact that the affidavit

12  and the approved search warrant mentioned a different hotel?

13  A.  Yes.  I spoke with Ms. Perry.

14  Q.  Tell us about that conversation.

15  A.  Ms. Perry was concerned because she said that we would

16  need to do an amended warrant that I would need to swear to

17  if Mr. Raymond didn't have his phones on his person.

18  Q.  Okay.  So let's talk about that morning on June 6th.

19  And I think we already established that was a Saturday.  Is

20  that correct?

21  A.  Yes.

22  Q.  Did you contact Mr. Raymond ahead of time to meet?

23  A.  Yes.

24  Q.  Is that when he told you that he was at a different

25  hotel?

1    A.   Yes.

2    Q.   Did you tell him why you wanted to meet?

3    A.   I told him part of the reason.

4         MS. BUCKNER:   I'm going to pull up what's already

5    been marked as Exhibit 5, text messages between Agent

6    Gajkowski and the Defendant.

7         THE COURT:   This is the one that's already been

8    admitted?

9         MS. BUCKNER:   Yes, your Honor.

10   BY MS. BUCKNER:

11   Q.   So we left off looking at these text messages when we

12   were talking about June 2nd and you dropped a pin for Lake

13   Fairfax Park.

14        Do you remember that?

15   A.   Yes.

16   Q.   So now we're on June 5th.   And in the left-hand side, in

17   the gray box, which again is Mr. Raymond, he says, "Hey

18   Mikel, and the address of my hotel."   And he provides the

19   address.

20        Do you see that?

21   A.   Yes, I do.

22   Q.   And then he says, "There's a Panera very close, 460

23   Elden Street.   It has outdoor seating."

24        Do you see that?

25   A.   I do.

1    Q.  Tell us why he's volunteering that information.

2    A.  I believe he was suggesting it as a potential meet-up

3    point for the interview.

4    Q.  Why were you letting Mr. Raymond pick where you guys

5    met?

6    A.  Once again, because I wanted to make sure he felt

7    comfortable.

8              MS. BUCKNER:  Keep scrolling, please.

9    BY MS. BUCKNER:

10   Q.  And here, on the blue side, what do you say?

11   A.  "Perfect.  My buddy Ted lives out that way, so he's

12   free.  He's cool.  You'll like him."

13   Q.  When you say "your buddy Ted," who are you talking

14   about?

15   A.  Special Agent Ted Nelson.

16   Q.  Again, was this one of the agents that you had planned

17   to join you for this?

18   A.  Yes.

19   Q.  As we continue, you talk about -- say, "Panera works."

20             And then he responds.  And can you read that

21   aloud?

22   A.  "Ha.  I understand.  There are quite a few other places

23   around, and we can always walk a bit if necessary."

24   Q.  How do you respond?

25   A.  "Kewl.  Sounds good."

```
 1              MS. BUCKNER:  Keep scrolling, please.

 2   BY MS. BUCKNER:

 3   Q.  So now we're at June 6th, 2020.  And what's the time

 4   there?

 5   A.  9:54 a.m.

 6   Q.  And what does the Defendant say?

 7   A.  "Hi, Mikel.  I just arrived, and surprisingly there are

 8   some people sitting outside, so not quite as private as I

 9   would have hoped."

10   Q.  And do you respond?

11   A.  "Ugh.  Not ideal.  What's your preference?  We could do

12   hotel lobby?  Or another restaurant?  I'm like five to ten

13   out.  Sorry."

14              MS. BUCKNER:  Keep scrolling.

15   BY MS. BUCKNER:

16   Q.  Mr. Raymond responds, "No worries.  I'm looking if there

17   are other options.  Found some empty tables and chairs at

18   the Jimmy John's nearby.  No one around."

19              And how do you respond?

20   A.  "Sounds good."

21   Q.  How did he respond?

22   A.  "It is 454 Elden Street."

23   Q.  Did you guys in fact meet at the Jimmy John's?

24   A.  Yes, we did.

25   Q.  When you met at the Jimmy John's, who was with you?
```

```
1    A.  Special Agent Nelson.

2    Q.  What about all the other people you mentioned who are

3    part of this operations plan?

4    A.  The other two agents, Supervisory Special Agent Karabin

5    and Special Agent Jones, were in a vehicle doing --

6    basically, driving the nearby area.

7    Q.  Could you see where they were?

8    A.  No.

9    Q.  Was there a group text message?

10   A.  Yes, there was.

11           MS. BUCKNER:  We're going to pull up what's been

12   marked for identification as Government's Exhibit 18.  We'll

13   call this "Group text message."  It's for the witness only.

14   I'm sorry.  It's Government's Exhibit 19.

15           THE COURT:  Is it 18 or 19?

16           MS. BUCKNER:  19, your Honor.

17           For the record, 18 will be a text message with

18   Special Agent Viktor Karabin.

19           THE COURT:  Okay.

20   BY MS. BUCKNER:

21   Q.  Do you see the messages on the screen in front of you?

22   A.  I do not yet.

23           Yes.

24   Q.  Do you recognize these messages?

25   A.  I do.
```

Gajkowski - DIRECT - by Ms. Buckner

1    Q.  What are they?

2    A.  This is a group text between myself, Special Agent

3    Jones, Supervisory Special Agent Viktor Karabin and

4    Ms. Perry.

5    Q.  Is it a fair and accurate representation of the text

6    messages -- the group message on that day?

7    A.  Yes.

8          MS. BUCKNER:  Your Honor, I move Government's

9    Exhibit 19 into evidence.

10          MR. MARSTON:  No objection.

11          THE COURT:  I'll admit Government's Exhibit 19

12    without objection.

13          (Whereupon, Government's Exhibit No. 19 was

14    entered into evidence.)

15          MS. BUCKNER:  Your Honor, may I publish?

16          THE COURT:  Yes.

17    BY MS. BUCKNER:

18    Q.  So up top, are the blue messages you?

19    A.  Yes.

20    Q.  And what do you say?

21    A.  "Jim John's is new location, outside."  And then I say

22    "Jimmy John's."

23    Q.  All right.

24          MS. BUCKNER:  So I'm going to pull up for ID only

25    what's been marked as Government's Exhibit 10.  It will be

1    10-A and 10-B for the witness only.

2    BY MS. BUCKNER:

3    Q.  What am I showing you, Agent Gajkowski?

4    A.  These are photos of the outside of Jimmy John's.

5    Q.  And are these a fair and accurate representation of how

6    Jimmy John's looked on June 6th of 2020?

7    A.  Yes.

8              MS. BUCKNER:  Your Honor, I move Government's

9    Exhibits 10-A and 10-B into evidence.

10             MR. MARSTON:  No objection.

11             THE COURT:  I'll admit Government's Exhibits 10-A

12   and 10-B.

13             (Whereupon, Government's Exhibit Nos. 10-A and

14   10-B were entered into evidence.)

15             THE COURT:  And you can publish.

16   BY MS. BUCKNER:

17   Q.  I want to start with 10-A.  Is this the table that you

18   guys were sitting at outside of Jimmy John's?

19   A.  Yes.  The one on the left.

20   Q.  And I'm going to move now to 10-B.  Now, looking at this

21   table, could you please tell us where you were sitting?

22   A.  Yes.  I was seated at the chair on the right next to the

23   garbage can.

24   Q.  Where was Mr. Raymond seated?

25   A.  On the left side closest to that -- to the pillar.

1    Q.  Where was Agent Nelson seated?

2    A.  He was seated next to the window.

3    Q.  So that chair in between you where you and Mr. Raymond

4    were?

5    A.  Correct.

6    Q.  As you guys were seated there, were you armed?

7    A.  Yes.

8    Q.  Was your weapon visible?

9    A.  No.

10   Q.  Did you have handcuffs on you?

11   A.  Yes.

12   Q.  Were your handcuffs visible?

13   A.  No, they were not.

14   Q.  How about your badge?  Did you have a badge with you?

15   A.  Yes.

16   Q.  Was your badge visible?

17   A.  No.

18   Q.  Let's talk about now Agent Nelson.  Could you see a

19   firearm on Agent Nelson?

20   A.  No.

21   Q.  Could you see handcuffs on Agent Nelson?

22   A.  No.

23   Q.  Did you see Agent Nelson's badge?

24   A.  No.

25   Q.  As you guys were at this table, was there any point

1    during this interview where you stood up?  Or do you remain

2    seated the entire time?

3    A.  There was a point when I got up.

4    Q.  At what point was that?

5    A.  At some point I received a phone call or a text message.

6    Q.  Aside from that time when you stood up, were there any

7    other times where you stood up and moved closer to

8    Mr. Raymond?

9    A.  No.

10   Q.  When you spoke with Mr. Raymond, did you tell him that

11   he was free to leave?

12   A.  I believe so.

13   Q.  After telling Mr. Raymond that he was free to leave, did

14   he agree to an interview?

15   A.  Yes.

16   Q.  Did you record the interview?

17   A.  Yes.

18   Q.  Did Mr. Raymond know that he was being recorded?

19   A.  Yes.

20   Q.  What did you use for that recording?

21   A.  A same handheld mobile recorder.

22   Q.  What was Mr. Raymond's demeanor like when he first

23   arrived at Jimmy John's?

24   A.  Much as our earlier interview:  very calm, collected,

25   agreeable.

1           MS. BUCKNER:  Your Honor, I'm going to pull up

2     what's been marked for ID as Exhibit 6.  It's a recording,

3     audio recording of the June 6th interview.

4           THE COURT:  It looks like photographs, according

5     to this.

6           MS. BUCKNER:  Oh, I'm sorry.  Exhibit 11.  I'm

7     sorry, your Honor.  Exhibit 11.

8           THE COURT:  Okay.

9           MS. BUCKNER:  Much like the audio recording from

10    June 2nd, the Government will play specific clips and ask

11    that the recording otherwise remain under seal.

12           THE COURT:  Okay.

13    BY MS. BUCKNER:

14    Q.  I'm going to play just a couple seconds for you, Agent

15    Gajkowski.

16           (Whereupon, segments of Government's Exhibit No.

17    11 were published in open court.)

18    BY MS. BUCKNER:

19    Q.  Do you recognize your voice in that recording?

20    A.  I do.

21    Q.  Have you listened to this recording in its entirety?

22    A.  Yes, I have.

23    Q.  Are you in fact the person making the recording?

24    A.  I am.

25    Q.  Is this a fair and accurate representation of the

1   recording that took place on June 6th of 2020?

2   A.  Yes, it is.

3          MR. BUCKNER:  I'm going to start that clip at the

4   beginning and we're going to play until timestamp one minute

5   and five seconds.

6          (Whereupon, segments of Government's Exhibit No.

7   11 were published in open court.)

8          THE COURT:  You didn't ask to have this admitted,

9   did you?

10         MS. BUCKNER:  We move to admit, your Honor, and

11  publish.

12         THE COURT:  Any objection?

13         MR. MARSTON:  No objection.

14         THE COURT:  I'll admit without objection

15  Government's Exhibit 11.

16         (Whereupon, Government's Exhibit No. 11 was

17  entered into evidence.)

18         (Whereupon, segments of Government's Exhibit No.

19  11 were published in open court.)

20  BY MS. BUCKNER:

21  Q.  So during that clip, did you hear Agent Nelson say, Turn

22  your phones on vibrate or -- I'm sorry -- that he was trying

23  to turn his phone on vibrate?

24  A.  I'm aware that he says it in the recording, yes.

25  Q.  Do you have an independent memory of that?

1    A.  Yes.

2    Q.  And so right afterwards, or sort of underneath what

3    Agent Nelson is saying, Mr. Raymond says something to the

4    effect of, He's trying to turn them off.

5    A.  Yes.  He says that.

6    Q.  Did you hear that?

7    A.  I did in the recording.  Yes.

8    Q.  Do you have an independent memory from that day of him

9    saying, "Trying to turn phones off"?

10   A.  I don't remember.

11          MS. BUCKNER:  I'm going to now move to timestamp

12   one minute and 38 seconds, and we're going to play until one

13   minute and 45 seconds.

14          (Whereupon, segments of Government's Exhibit No.

15   11 were published in open court.)

16   BY MS. BUCKNER:

17   Q.  So you say, "Someone's at the protest today and I'm

18   F'd."  What are you talking about?

19   A.  We knew that there would be periods where I'd have to

20   step away from the interview, and I wanted to have some sort

21   of explanation.  And so we decided that I would say that I

22   had a boyfriend at the protest and he was checking in with

23   me.

24   Q.  At the point where you say that, are you looking at your

25   phone or handling your phone?

1  A.  Yes.  I believe I had received a message or a phone call

2  at that point.

3  Q.  And when you say "We had decided," who are you talking

4  about?

5  A.  Myself and the team out in the field that day.

6  Q.  And so this was -- would it be fair to call it like a

7  way to communicate without Mr. Raymond knowing what you were

8  doing?

9  A.  Yes.

10          MS. BUCKNER:  I'm going to forward now to eight

11  minutes and 20 seconds.  And we're going to play until eight

12  minutes and 30 seconds.

13          (Whereupon, segments of Government's Exhibit No.

14  11 were published in open court.)

15  BY MS. BUCKNER:

16  Q.  At that point, what's happening?

17  A.  I received a phone call and stepped away.

18  Q.  Who was the phone call from?

19  A.  From my supervisor, Supervisory Special Agent Viktor

20  Karabin.

21  Q.  What did he want?

22  A.  He wanted to confirm that we were all right and that

23  Mr. Raymond had his phones on him.

24  Q.  Once you returned, did you and Agent Nelson then

25  interview Mr. Raymond again about what happened with AV-1?

1    A.  Yes, we did.

2    Q.  Would it be fair to say that interview lasted over an

3    hour?

4    A.  Yes.

5           MS. BUCKNER:  So I'm going to now play timestamp

6    one hour, 37 minutes and 55 seconds.  We're going to stop at

7    one minute, 39 seconds and five -- 39 minutes and five

8    seconds.

9           MR. MARSTON:  I'm sorry.  Could you repeat that?

10   I think you confused hours and minutes at one point.

11          MS. BUCKNER:  One minute -- one hour, 37 minutes

12   and 55 seconds to one hour, 39 minutes and five seconds.

13          (Whereupon, segments of Government's Exhibit No.

14   11 were published in open court.)

15   BY MS. BUCKNER:

16   Q.  Was that Agent Nelson's voice on the recording?

17   A.  Yes, it was.

18   Q.  So Agent Nelson in that clip of the recording is asking

19   Mr. Raymond how he thought the interview went.  Did you hear

20   that?

21   A.  Yes.

22   Q.  How would you describe Agent Nelson's demeanor

23   throughout the course of that interview?

24   A.  He was a little more assertive or direct in that

25   interview, but also very conversational.

 1                  MS. BUCKNER:  I'm pulling up for the witness only

 2       what's been marked for ID as Government's Exhibit 18.

 3                  THE COURT:  I'm sorry.  18?

 4                  MS. BUCKNER:  18.  This is for the witness only.

 5       Thank you.

 6                  Scroll down a little bit.

 7       BY MS. BUCKNER:

 8       Q.  Looking at these messages, Agent Gajkowski, what am I

 9       showing you?

10       A.  These are messages that I exchanged with Supervisory

11       Special Agent Karabin.

12       Q.  Are they a fair and accurate depiction of the messages

13       that you sent on that day?

14       A.  Yes.

15       Q.  Aside from redactions again?

16       A.  Yes.

17                  MS. BUCKNER:  Your Honor, I move Government's

18       Exhibit 18 into evidence.

19                  MR. MARSTON:  No objection.

20                  THE COURT:  I'll admit Government's Exhibit 18

21       without objection.

22                  (Whereupon, Government's Exhibit No. 18 was

23       entered into evidence.)

24       BY MS. BUCKNER:

25       Q.  So I'm going to scroll down in Government's Exhibit 18

1    to June 6, 2020, at 10:33 a.m.

2    A.  Yes.

3    Q.  At this point, you're interviewing Mr. Raymond at Jimmy

4    John's.  Is that fair to say?

5    A.  Yes.

6    Q.  And who is the bubble in gray on the left?

7    A.  That's Supervisory Special Agent Karabin.

8    Q.  And who is the bubble on the right?

9    A.  That is me.

10   Q.  So Special Agent Karabin says, "All good?"  Do you see

11   that?

12   A.  Yes.

13   Q.  How do you respond?

14   A.  "All good.  Ted is getting confrontational for

15   interview.  Nothing bad."

16   Q.  And Agent Karabin responds, "Copy"?

17   A.  Yes.

18   Q.  Okay.  How did Mr. Raymond from what you could tell

19   respond to Agent Nelson's demeanor?

20   A.  He seemed a little more -- he seemed a little more

21   uncertain of his answers.

22   Q.  How did Mr. Raymond's demeanor during this interview up

23   until that point on June 6th compare to his demeanor on June

24   2nd?

25   A.  It was largely the same.  Ted had remarked that he

1   seemed very -- very controlled, very -- really sure of

2   himself and in his mannerisms.

3               MS. BUCKNER:  I'm now going to pull up a clip back

4   in Government's Exhibit 11, the recording from June 6th.

5   The timestamp is one hour, 39 minutes, 50 seconds.  We're

6   going to play until one hour, 40 minutes and 20 seconds.

7               (Whereupon, segments of Government's Exhibit No.

8   11 were published in open court.)

9   BY MS. BUCKNER:

10  Q.  Did you hear Mr. Raymond ask whether you guys thought he

11  should hire an attorney?

12  A.  Yes.

13  Q.  And Agent Nelson responded, I doesn't give any advice,

14  but it's something to think about, in summary?

15  A.  Yes.

16  Q.  Did there come a time subsequent to this portion of the

17  interview where Mr. Raymond's demeanor changed?

18  A.  Yes.

19  Q.  How did it change?

20  A.  When we took the devices, he seemed to -- he seemed to

21  stiffen and he seemed to be panicked.

22              MS. BUCKNER:  I'm now going to play a clip from

23  Government's Exhibit 11.  This is one hour, 41 minutes, 20

24  seconds; and we're going to play until one hour, 41 minutes

25  and 30 seconds.

1          (Whereupon, segments of Government's Exhibit No.

2     11 were published in open court.)

3     BY MS. BUCKNER:

4     Q.  So at the point where Agent Nelson, as we just heard,

5     asks Mr. Raymond whether he's got phones on him, were the

6     phones visible?

7     A.  No.

8     Q.  Where were the phones, if you know?

9     A.  I observed that Mr. Raymond had them I believe in a

10    pocket, but it was on his left-hand side, so out of my view.

11    Q.  Pants pocket, jacket pocket or what?

12    A.  I believe a pants pocket.

13          MS. BUCKNER:  I'm now going to continue the clip

14    at one hour, 41 minutes and 30 seconds; and we're going to

15    stop it at one hour, 42 minutes and zero seconds.

16          (Whereupon, segments of Government's Exhibit No.

17    11 were published in open court.)

18    BY MS. BUCKNER:

19    Q.  So I actually stopped it at one minute -- one hour, 42

20    minutes and 30 seconds.

21          So there, you express some confusion about which

22    phone is which.  Did you hear that?

23    A.  Yes.

24    Q.  And also during that portion, Mr. Raymond indicates that

25    he did delete or remove some items from his phone.  Did you

1    hear that part?

2    A.  Yes.

3         MS. BUCKNER:  The Court's indulgence.

4    BY MS. BUCKNER:

5    Q.  And toward maybe 20 seconds before we stopped, there was

6    a moment where Mr. Nelson asked about Mr. Raymond's cloud

7    accounts.  Did you hear that part?

8    A.  Yes.

9    Q.  And what was your understanding of what cloud account we

10   were talking about?

11   A.  I understood it to be in reference to the account where

12   his iPhones were backing up data or at least his personal

13   iPhone.

14   Q.  Why would you guys ask him if he had deleted anything?

15   A.  Because it was important to know if we were losing

16   evidence.

17        MS. BUCKNER:  We are going to hit play at -- we

18   are going to go forward to one hour, 43 minutes and 20

19   seconds; and we're going to stop at one hour, 43 minutes and

20   40 seconds.

21        (Whereupon, segments of Government's Exhibit No.

22   11 were published in open court.)

23   BY MS. BUCKNER:

24   Q.  There, did Mr. Raymond indicate that he had deleted

25   items from both phones?

1    A.  Yes.

2    Q.  And regarding the items that he deleted, did he explain

3    that it was, I think, removing -- changing the profile photo

4    for one and removing photos associated with another?

5    A.  Yes.

6    Q.  Did you know -- understand at the time which phone he

7    was referencing for which?

8    A.  I don't think in that level of detail.  No.

9              MS. BUCKNER:  So now we're going to go forward to

10   one hour, 44 minutes and 25 seconds.  And we're going to

11   stop at one hour, 44 minutes and 35 seconds.

12             (Whereupon, segments of Government's Exhibit No.

13   11 were published in open court.)

14   BY MS. BUCKNER:

15   Q.  There, are you asking Mr. Raymond how his phones are

16   locked?

17   A.  Yes.

18   Q.  He responds:  With a PIN?

19   A.  Yes.

20   Q.  What did that, if anything, indicate to you regarding

21   how you could open the phones?

22   A.  I understood that if they were locked by a PIN, I could

23   only ask if he was willing to provide it.

24             MS. BUCKNER:  And so we're going to keep playing

25   starting at one hour, 44 minutes and 35 seconds; and we're

1    going to stop at one hour, 45 minutes and zero seconds.

2              (Whereupon, segments of Government's Exhibit No.

3    11 were published in open court.)

4    BY MS. BUCKNER:

5    Q.  So is this the point that you described earlier where

6    Mr. Raymond's demeanor changed?

7    A.  Yes.

8    Q.  And he mentions a lawyer here.  Did you hear that?

9    A.  I did.

10   Q.  What did you understand him to be referencing?

11   A.  That we didn't have legal authority to seize the

12   devices.

13             MS. BUCKNER:  I'm now advancing to one hour, 46

14   minutes and 20 seconds; and we will stop at one hour, 47

15   minutes and ten seconds.

16             (Whereupon, segments of Government's Exhibit No.

17   11 were published in open court.)

18   BY MS. BUCKNER:

19   Q.  First off, who is Agent Nelson talking to when he says,

20   "Ma'am," and asks that person to step away?

21   A.  I think there was someone standing outside of the nail

22   salon.

23   Q.  Were businesses open when you were sitting outside of

24   Jimmy John's?

25   A.  Yes.

1    Q.  Were people walking around?

2    A.  A few, yes.

3    Q.  And at some point, Mr. Raymond says he's got naked

4    photos on his phone.  Did you hear that part?

5    A.  Yes.

6    Q.  What did you think he meant when he said that?

7    A.  I believed that he would have the types of photos that a

8    single man in his 40s might have.

9    Q.  I'm going to just seek a little bit of clarification on

10   that.

11          When you say "a single man in his 40s," do you

12   mean -- can you explain just a little more what you mean by

13   that?

14   A.  I understood it was possible that he might have photos

15   of himself or photos of women that had been exchanged,

16   either naked photos or provocative photos.

17          MS. BUCKNER:  I'm now going to forward to one

18   hour, 47 minutes and 20 seconds; and we will stop at one

19   hour, 48 minutes and 24 seconds.

20          (Whereupon, segments of Government's Exhibit No.

21   11 were published in open court.)

22   BY MS. BUCKNER:

23   Q.  So there, Mr. Raymond mentioned a lawyer.  What did you

24   understand he was mentioning a lawyer in reference to?

25   A.  I understood that to mean that he wouldn't provide the

Gajkowski - DIRECT - by Ms. Buckner

1    PINs without a lawyer.

2    Q.  And did you hear your response regarding whether he was

3    required to provide PINs or passcodes?

4    A.  I told him that we couldn't force him to give us the

5    PINs.  That was his decision.

6         MS. BUCKNER:  I'm going to forward now to one

7    hour, 48 minutes and 45 seconds.  This clip will end at one

8    hour, 49 minutes and five seconds.

9         (Whereupon, segments of Government's Exhibit No.

10   11 were published in open court.)

11   BY MS. BUCKNER:

12   Q.  So did you bring a copy of the search warrant with you?

13   A.  I had Supervisory Special Agent Karabin bring the

14   copies.

15   Q.  And did you have them just now when we were listening --

16   did you have that copy on your person?

17   A.  Yes, I did.

18   Q.  Did you show that copy to Mr. Raymond?

19   A.  Yes, I did.

20   Q.  Was this the same copy that indicated that you could

21   compel biometrics?

22   A.  It was the first page of that warrant.  Yes.

23   Q.  Did you have the other pages?

24   A.  Yes.

25   Q.  And to clarify, did you have the other pages with you?

1    A.  Yes, I did.

2    Q.  Did you show Mr. Raymond all of the pages?

3    A.  No.

4    Q.  Why not?

5    A.  Ms. Perry advised that if we showed him Attachment B,

6    that it would give him a very specific sense of the kinds of

7    evidence we were looking for.  And that might not be

8    beneficial to the investigation.

9    Q.  In what way might it not be beneficial?

10   A.  It might increase the risk that Mr. Raymond might try to

11   delete those types of evidence.

12   Q.  To be clear, just stepping back for a second, did you go

13   over the search warrant with the team before June 6th?

14   A.  I went through the warrant with the team the morning of

15   June the 6th.

16   Q.  Did that include the biometrics provision?

17   A.  Yes.

18   Q.  And how about specifically Agent Nelson?  Did you point

19   out the biometrics provision to him?

20   A.  Yes.  We discussed it.

21   Q.  When discussing the biometrics provision, did you all

22   discuss how you might execute that provision?

23   A.  Yes, we did.

24   Q.  Can you tell us about that?

25   A.  I understood that this part of the warrant was extremely

1    important, and so we talked through the different scenarios

2    that we'd be looking at.  And if we learned that the devices

3    were locked by biometrics, we could ask Mr. Raymond to

4    comply, to cooperate; and, if not, that we were authorized

5    in that moment to briefly detain him.  And that included the

6    use of handcuffs, if need be.

7    Q.  What would be the point of that brief detention?

8    A.  So that we could press the fingers against the touch --

9    the touch ID button and to hold the devices up to

10   Mr. Raymond's face.

11   Q.  Did you show Mr. Raymond that part of the search

12   warrant?

13   A.  Not at that moment, no.

14          MR. BUCKNER:  I'm going to start the recording

15   again.  We're at hour -- one hour, 50 minutes and 25

16   seconds.  We're going to stop at one hour, 50 minutes and 40

17   seconds.

18          (Whereupon, segments of Government's Exhibit No.

19   11 were published in open court.)

20   BY MS. BUCKNER:

21   Q.  So again, the mention of naked photos, did you just hear

22   that?

23   A.  I did.

24   Q.  What did you understand Mr. Raymond to be referencing?

25   A.  Once again, I understood those to be pictures that he

1   had exchanged with women.

2   Q.  Did you think he was referencing pictures relevant to

3   what you were authorized to search for pursuant to the

4   warrant?

5   A.  At that moment, no.

6           MS. BUCKNER:  I'm going to advance now to one

7   hour, 54 minutes and 50 seconds.  And we're going to stop at

8   one hour, 55 minutes and zero seconds.

9           (Whereupon, segments of Government's Exhibit No.

10  11 were published in open court.)

11  BY MS. BUCKNER:

12  Q.  At that point, you're offering to Mr. Raymond that he

13  could take a break.  Did you hear that part?

14  A.  Yes.

15  Q.  And Agent Nelson says, Just because we seized your

16  phones doesn't mean you're detained, or words to that

17  effect?

18  A.  Yes.

19  Q.  And then at the end, Mr. Raymond says, I know?

20  A.  Yes.

21  Q.  What was going to take a while?

22  A.  I had to write out multiple copies of the property

23  receipts.

24          MS. BUCKNER:  So I'm now going to skip from one

25  hour and 55 minutes to one hour, 57 minutes and zero

1    seconds.  We're going to stop this clip at one hour, 57

2    minutes and 25 seconds.

3                (Whereupon, segments of Government's Exhibit No.

4    11 were published in open court.)

5    BY MS. BUCKNER:

6    Q.  At this point, that's you trying to figure out how to

7    put the phones on airplane mode?

8    A.  Yes.

9    Q.  Mr. Raymond declines to unlock the phones.  Is that

10   correct?

11   A.  That is correct.

12               MS. BUCKNER:  I'm going to advance now to two

13   hours, 13 minutes and zero seconds.

14   BY MR. BUCKNER:

15   Q.  And before we hit play, I just want to ask, over the

16   course of this 15 minutes or so between the last clip and

17   this next clip, what were you doing?

18   A.  I was filling out copies of the property receipts.

19   Also, marking the chain of custody bag and at some point

20   trying to figure out how to put the devices into airplane

21   mode.

22               MS. BUCKNER:  We're going to hit play at two hours

23   and 13 minutes.

24               (Whereupon, segments of Government's Exhibit No.

25   11 were published in open court.)

1   BY MS. BUCKNER:

2   Q.  So you heard -- for the record, that was the end of the

3   recording.

4           You heard a loud -- that you noted the time at

5   12:26 in the afternoon on Saturday.  Did you hear that part?

6   A.  Yes.

7   Q.  And after you announced the time, you indicate that you

8   are done with the search and seizure of the phones.  Did you

9   hear that part?

10  A.  Yes.

11  Q.  Did you think you were done?

12  A.  Yes.

13          MS. BUCKNER:  So I want to pull up an additional

14  exhibit marked as Exhibit 20, titled "Texts to Jamie Perry,"

15  for the witness only.

16  BY MS. BUCKNER:

17  Q.  Do you recognize these messages?

18  A.  I do.

19  Q.  What are they?

20  A.  They are messages that I sent to Ms. Perry.

21  Q.  Aside from the redactions, are they a fair and accurate

22  depiction of the messages between you and Ms. Perry on June

23  6?

24  A.  Yes.

25          MS. BUCKNER:  Your Honor, at this time I move

 1    Government's Exhibit 20 into evidence and ask that it be

 2    published.

 3              MR. MARSTON:  No objection.

 4              THE COURT:  I'll admit Government's Exhibit 20

 5    without objection.

 6              (Whereupon, Government's Exhibit No. 20 was

 7    entered into evidence.)

 8              THE COURT:  You may publish.

 9    BY MS. BUCKNER:

10    Q.  Looking at Page 2 of the text messages between you and

11    Ms. Perry, on the left-hand side, in gray, who is that?

12    A.  That is Ms. Perry.

13    Q.  What does she say?

14    A.  "Only two phones.  Right?"

15    Q.  And how do you respond?

16    A.  "Yes.  Do not have codes."

17    Q.  And up top, what time was that -- what time is notated

18    at the top?

19    A.  12:28 p.m.

20    Q.  I'm now going to shift to what's already been admitted

21    as Government's Exhibit 19, a group text message.  We're

22    going to scroll down right there.

23              This is the group text message where you told the

24    group at the beginning that you were at Jimmy John's.  Do

25    you see that part?

```
 1    A.  Yes.

 2            MS. BUCKNER:  Scroll down, please.

 3    BY MS. BUCKNER:

 4    Q.  Now it's June 6th, 2020, at 11:51 a.m.  And what do you

 5    say?

 6    A.  "Haven't told him anything.  Wrapping up.  Have the

 7    phones.  He's upset, but fine."

 8    Q.  How does Dave Palmer-Jones respond?

 9    A.  He says, "Copy all."

10            MS. BUCKNER:  Keep scrolling.

11    BY MS. BUCKNER:

12    Q.  And how do you respond?

13    A.  "Just signing forms.  He's done and we're all done.

14    He's left."

15    Q.  How does Viktor Karabin respond?

16    A.  "Copy."

17    Q.  And what does Ms. Perry say?

18    A.  "Great job."

19    Q.  How do you respond?

20    A.  "Kewl.  Done.  Mind meeting back at our rendezvous for a

21    quick debrief?"

22    Q.  How does Dave Palmer-Jones respond?

23    A.  "Copy rally point.  En route."

24    Q.  After you left Jimmy John's, where did you go?

25    A.  We went back to our same meet-up point behind an Outback
```

Gajkowski - DIRECT - by Ms. Buckner

1   Steakhouse.

2   Q.  Why did you go to the Outback Steakhouse?

3   A.  That was the same point that we had chosen for our

4   meet-up for a pre-op brief.

5   Q.  What did you do there?

6   A.  We did a quick debrief.

7   Q.  What does that mean?

8   A.  We discussed generally how the interview went and how

9   the seizure went.

10  Q.  Who was there?

11  A.  Supervisory Special Agent Viktor Karabin, myself,

12  Special Agent Jones and Special Agent Nelson.

13  Q.  After the debrief, where did everyone go, if you know?

14  A.  I understood that everyone was going home for the day.

15  Q.  What did you do next?

16  A.  I called Ms. Perry.

17  Q.  What did you tell Ms. Perry?

18  A.  I told her that we had the phones, but that Mr. Raymond

19  had declined to provide a PIN.

20  Q.  What did she say?

21  A.  She asked if we tried by biometrics.

22  Q.  What did you say?

23  A.  I told her we did not because Mr. Raymond said that the

24  phones were locked by PIN.

25  Q.  What did she say?

```
 1    A.  She seemed upset that we hadn't at least tried and done
 2    biometrics while we were there.
 3    Q.  Is that what she said or -- I just want to make sure I
 4    understand --
 5    A.  She -- she told us that -- she said:  You need to do
 6    biometrics.  You need to go back and do -- at least attempt
 7    biometrics.
 8    Q.  Did she say anything else?
 9    A.  Yes.  She said:  Hold on.  I'm going to check with my --
10    essentially, with her office.
11           And I told her that I would need to call the team
12    back.
13    Q.  Did the call end after that?
14    A.  Yes.
15    Q.  What did you do next?
16    A.  I contacted members of the team.
17    Q.  Where were the members of the team, if you know?
18    A.  I don't remember who I called first and if one of them
19    might have called someone else as a phone tree.  But I
20    understood that Special Agents Nelson and Jones were at a
21    Chick-fil-A.
22    Q.  I want to back up just for a second.  When you spoke
23    with Ms. Perry, did you understand that she would be calling
24    you back?
25    A.  Yes.
```

1   Q.  Before you got off the phone with Ms. Perry, did you

2   tell her about the times during the interview where

3   Mr. Raymond mentioned an attorney?

4   A.  No, I did not.

5   Q.  Aside from the text message that we just saw, where you

6   notify Ms. Perry that you don't have the passcodes, was

7   there any additional discussion about passcodes?

8   A.  No.  Only that Mr. Raymond had declined to provide them.

9   Q.  I think you said Mr. Nelson was at Chick-fil-A.  Did I

10  hear it right?

11  A.  I believe so.

12  Q.  Did the rest of the group join you at Chick-fil-A?

13  A.  Yes.

14          MS. BUCKNER:  I'm going to pull up just briefly

15  Government's Exhibit 17, which has already been admitted

16  into evidence.

17  BY MS. BUCKNER:

18  Q.  Looking at the screen, it says June 6, 2020.  It's 1:03

19  p.m.  And Agent Nelson is sending you a link for

20  Chick-fil-A.  Do you see that?

21  A.  I do.

22  Q.  Do you see the address below it?

23  A.  Yes.

24  Q.  Is that because you guys were meeting up at Chick-fil-A?

25  A.  Yes.

1    Q.  After the team met up at Chick-fil-A, what happened

2    next?

3    A.  We discussed a plan moving forward and we awaited a call

4    from Ms. Perry.

5    Q.  Did Ms. Perry call you back?

6    A.  She did.

7    Q.  Tell us about that.

8    A.  She indicated that she had received approval from her

9    office for us to go back and engage Mr. Raymond to compel

10   biometrics.

11   Q.  Did you mention that Mr. Raymond talked about an

12   attorney during the interview for this call?

13   A.  No, I did not.

14   Q.  Did you talk about passcodes during this call?

15   A.  No.

16   Q.  Did you talk about how you may execute the biometric

17   provision during this call?

18   A.  Yes, we did.

19   Q.  Tell us about that.

20   A.  Again, I wanted to clarify the limits of our authority

21   and confirm that if Mr. Raymond wasn't cooperative and

22   declined to provide those biometrics, that we could detain

23   him if needed.

24   Q.  How did Ms. Perry respond to that?

25   A.  She confirmed that was the case.

1    Q.  Anything else you guys discussed during that call?

2    A.  Yes.  I told her that it was my preference to have a

3    local law enforcement officer present.

4    Q.  Why was that your preference?

5    A.  Because if we were in a situation where we needed to go

6    hands on, I wanted to make sure that there was an official

7    law enforcement officer present in case there were problems,

8    in case there was any kind of escalation and certainly any

9    kind of an emergency.

10   Q.  When you say "hands on," what do you mean?

11   A.  In the event that we had to physically restrain

12   Mr. Raymond.  Where all of us were in plainclothes, I wanted

13   to have someone in uniform present to deal with any

14   inquiries or concerns from the public.

15   Q.  Why would you have to restrain Mr. Raymond?

16   A.  In the event that he wouldn't be cooperative in

17   providing biometrics and we had to physically restrain him

18   to compel the biometrics.

19   Q.  Anything else you discussed with Ms. Perry at that time?

20   A.  Not that I recall.

21        MS. BUCKNER:  I'm going to pull up for the witness

22   only what's been previously marked as Government's Exhibit

23   No. 12.  This is going to be 12-A, B and C.

24   BY MS. BUCKNER:

25   Q.  Looking at Government's Exhibit 12-A, what is it?

1   A.  This appears to be a map of the local area around Jimmy

2   John's.

3   Q.  I'm going to shift now to Government's Exhibit 12-B.

4   What's 12-B?

5   A.  This looks to be a map of the distance between Jimmy

6   John's to the location of the Outback Steakhouse.

7   Q.  And now moving over to 12-C, what is that?

8   A.  That's a larger area map that includes Jimmy John's, our

9   meet-up location behind the Outback and Chick-fil-A.

10  Q.  Now, looking at Government's Exhibits 12-A, B and C, are

11  each of them a fair and accurate depiction of the area on

12  June 6th, 2020, when you encountered Mr. Raymond?

13  A.  Yes.

14          MS. BUCKNER:  Your Honor, the Government moves

15  Exhibits 12-A, B and C into evidence, and asks for

16  permission to publish.

17          MR. MARSTON:  No objection.

18          THE COURT:  I'll admit Government's Exhibits 12-A,

19  B and C without opposition.  And you can publish.

20          (Whereupon, Government's Exhibit Nos. 12-A, 12-B

21  and 12-C were entered into evidence.)

22  BY MS. BUCKNER:

23  Q.  So let's start with Government's Exhibit 12-A.  Do you

24  see the Jimmy John's depicted?

25  A.  I do.

```
 1    Q.  And in fact, it says Jimmy John's on the map?

 2    A.  Yes.

 3    Q.  Do you see the Fairfield Inn and Suites depicted?

 4    A.  I do.

 5    Q.  Why was that location important?

 6    A.  Because that is where Mr. Raymond was ultimately

 7    staying.

 8    Q.  You see on the map it indicates that that's about a

 9    four-minute walk?

10    A.  Yes.

11            I'll note that we were on the Elden Street side of

12    that Jimmy John's.  So -- but essentially, yes.

13    Q.  So closer than this map would indicate?

14    A.  Yes.

15            MS. BUCKNER:  Can you go now to 12-B.

16    BY MS. BUCKNER:

17    Q.  Looking at 12-B, do you see the Jimmy John's?

18    A.  I do.

19    Q.  Do you see the address 150 Elden Street?

20    A.  Yes.

21    Q.  What was that the address of?

22    A.  That was the location of the Outback Steakhouse where we

23    met up.

24    Q.  So from Jimmy John's to the meet-up place, it was about

25    half a mile?
```

1    A.  Yes.

2    Q.  And now we're going to go to Government's Exhibit 12-C.

3              Do you see the Chick-fil-A at the bottom of this

4    map?

5    A.  Yes.

6    Q.  Do you see where the 150 Elden Street is?

7    A.  Yes.

8    Q.  And the Jimmy John's?

9    A.  Yes.

10   Q.  The total route was about 2 miles?

11   A.  Yes.

12   Q.  And so when you met with the team for the debrief, that

13   was at the 150 Elden Street marker?

14   A.  Yes.

15   Q.  And just to be clear for the record, back in 2020, there

16   was an Outback Steakhouse there.  But it's not there

17   anymore.  Is that fair to say?

18   A.  Correct.

19   Q.  And after you got off the phone with Ms. Perry and the

20   team met back up to reengage with Mr. Raymond, is that the

21   Chick-fil-A you met at?

22   A.  Yes.

23   Q.  And again, just for the record, looking at this image,

24   the Jimmy John's is essentially across the street from where

25   the Defendant's hotel was.  Is that correct?

1    A.  Yes.

2    Q.  So I know we talked about your conversation with

3    Ms. Perry, and I want to talk a little bit more about your

4    conversation at Chick-fil-A with your team.

5             Did you all look at the warrant again?

6    A.  Not that I recall.

7    Q.  Did you have a copy of the warrant with you?

8    A.  Yes.

9    Q.  Why didn't you look at it?

10   A.  Because we had reviewed it earlier in the day.

11   Q.  Did you discuss what you would do if Mr. Raymond refused

12   to provide biometrics?

13   A.  Yes.

14   Q.  And what was that?

15   A.  We discussed that either Ted or myself would approach

16   him and restrain him and, if need be, place handcuffs on

17   him.

18   Q.  Did you guys talk about whether you could compel or ask

19   for Mr. Raymond's passcode?

20   A.  No.  We didn't discuss that.

21   Q.  Did you in fact seek law enforcement assistance in

22   addition to who was already there?

23   A.  Yes.

24   Q.  And when I say "law enforcement assistance," do you know

25   what I mean?

1   A.  I understand that you mean the local police officer in

2   question.

3   Q.  Okay.  So where did you go next?

4   A.  We went to Mr. Raymond's hotel.

5           THE COURT:  We need to take an afternoon break.  I

6   don't know whether this is a good time.  Once you get in

7   with the next encounter with Mr. Raymond, I think I'd prefer

8   not to have any interruptions at that point.

9           MS. BUCKNER:  This is a great time, your Honor.

10          THE COURT:  We'll take a break now.  I was

11  reminded that I actually have a call on another matter I

12  need to make.

13          It's 3:30.  3:45.

14          MS. BUCKNER:  Yes, your Honor.

15          THE COURT:  So we're on a break at this point.

16          (Thereupon a recess was taken, after which the

17  following proceedings were had:)

18          THE COURT:  Could we have our witness?  Yes.

19  Please come on back.

20          MS. BUCKNER:  Your Honor, before we begin, I was

21  notified through counsel that the marshals may take

22  Mr. Raymond back at around 4:30.  So I'm not sure --

23          THE COURT:  Oh, okay.

24          MS. BUCKNER:  Just so the Court knows.

25          THE COURT:  We cannot make it any later than that?

 1          THE U.S. MARSHAL:  Your Honor, we have to -- I

 2     mean, I can call again, but I just called my supervisor and

 3     he advised me that we had to get him ready for transport.

 4     There are other inmates as well.  If you want me to call the

 5     supervisor, I can do that.

 6          THE COURT:  Just make a phone call.  If you can't,

 7     that's fine.  I'm not going to create further issues.  I

 8     know you've got other people you need to take back.

 9          THE U.S. MARSHAL:  Yes, ma'am.

10          THE COURT:  Let's proceed.

11     BY MS. BUCKNER:

12     Q.  Agent Gajkowski, in the phone calls that you had with

13     Ms. Perry before you went to Chick-fil-A and after you went

14     to Chick-fil-A and the text messages that you had Ms. Perry,

15     aside from the group we just looked at, was anyone else

16     listening in on those messages?

17     A.  No.

18     Q.  Let me reword that a little bit.

19          So when you were on the phone with Ms. Perry,

20     talking about executing the biometrics provision, were you

21     on speakerphone sitting in the car with the other agents?

22     A.  It's possible, but I don't remember if we put her on

23     speakerphone or not.

24     Q.  Were you on any sort of three-way calls with the agents

25     and Ms. Perry during these conversations?

1    A.  No.  There was a point at which I remember speaking with

2    Ms. Perry and I was surrounded by the other three agents.

3    Q.  It's safe to say that you were in the presence of the

4    other agents, but you were the only person on the phone with

5    Ms. Perry?

6    A.  Yes.

7    Q.  I want to now move to the hotel, the Fairfield Inn.

8             MR. BUCKNER:  I'm going to pull up what's been

9    marked for identification as Government's Exhibit 13-A

10   through C, for the witness only.

11   BY MS. BUCKNER:

12   Q.  I'm going to show you A, B and C quickly.  What am I

13   showing you there?

14   A.  These appear to be photos of the Fairfield Inn and

15   Suites.

16   Q.  Is that a fair and accurate depiction of how the hotel

17   looked on June 6, 2020?

18   A.  Yes.

19            MS. BUCKNER:  Your Honor, the Government moves

20   Exhibits 13-A, B and C into evidence and asks that they be

21   published.

22            MR. MARSTON:  No objection.

23            THE COURT:  Then I'll admit without opposition

24   Government's Exhibits 13-A through C.  And they may be

25   published.

1          (Whereupon, Government's Exhibit Nos. 13-A, 13-B

2     and 13-C were entered into evidence.)

3     BY MS. BUCKNER:

4     Q.   Starting with Government's Exhibit 13-A, what are we

5     looking at here?

6     A.   This is part of the exterior of the Fairfield Inn and

7     Suites.

8     Q.   Is that a door to the street ahead in the photo?

9     A.   Yes, it is.   It leads to the lobby.

10    Q.   And to the right, is that a driveway where you could

11    pull up with your car?

12    A.   Yes.

13    Q.   Let's go now to 13-B.

14          What are we looking at here?

15    A.   This is the hallway behind the lobby.

16    Q.   And now advancing to C, what's this?

17    A.   This is from that same hallway approaching the lobby

18    area.

19          MS. BUCKNER:   So now I'm going to pull up what's

20    been marked for ID as Government's Exhibit 14, for the

21    witness only.

22          Just hit pause there.

23    BY MS. BUCKNER:

24    Q.   Agent Gajkowski, looking now at the screen, what's up

25    there for you?

```
 1    A.  This is body-camera footage provided by the Herndon

 2    police officer.

 3    Q.  Who's in that footage?  Do you see yourself?

 4    A.  Yes, I do.

 5    Q.  Have you watched this footage?

 6    A.  Yes, I have.

 7    Q.  Is this a fair and accurate depiction of you at the

 8    hotel on June 6, 2020?

 9    A.  Yes.

10          MS. BUCKNER:  Your Honor, we move that

11    Government's Exhibit 6 be moved into evidence and

12    published -- excuse me -- Exhibit 14.

13          THE COURT:  What number?

14          MS. BUCKNER:  This is Exhibit 14, your Honor.

15          THE COURT:  Any objection?

16          MR. MARSTON:  No objection.

17          THE COURT:  I'll admit without objection

18    Government's Exhibit 14.

19          (Whereupon, Government's Exhibit No. 14 was

20    entered into evidence.)

21          THE COURT:  You may publish.

22    BY MS. BUCKNER:

23    Q.  Who's in this still image?

24    A.  Myself, Special Agent Nelson in the middle and Special

25    Agent David Palmer-Jones on the left.
```

1   Q.  Is this the same thing you were wearing at Jimmy John's?

2   A.  Yes.

3   Q.  What had happened before this body camera started?

4   A.  We --

5   Q.  At the hotel?  I'm sorry.  Let me clarify my question.

6           What had arrived at the hotel before the footage

7   started?

8           THE COURT REPORTER:  "What had arrived?"

9   BY MS. BUCKNER:

10  Q.  Sorry.  What had occurred at the hotel before the

11  footage started?

12  A.  We got there and I went to speak with a lady at the

13  front desk.

14  Q.  Why did you do that?

15  A.  I identified myself as a law enforcement officer and I

16  asked if she could call Mr. Raymond's room.

17  Q.  Did she agree to call?

18  A.  Yes.

19  Q.  Had Mr. Raymond come down yet?

20  A.  No.

21  Q.  And just for the record, the timestamp in the top left,

22  June 6, 2020, the timestamp is 13:30:17, or 1:30 in the

23  afternoon.

24          THE COURT:  Can I ask a question?  I'm sorry.

25          In terms of going to the front desk, that was

1    before or after Chick-fil-A?  Or where is it in timing here?

2              THE WITNESS:  It was after the Chick-fil-A, your

3    Honor.

4              THE COURT:  All right.  Go ahead.

5    BY MS. BUCKNER:

6    Q.  In other words, you all had met at the Chick-fil-A; and

7    you left from the Chick-fil-A and went to the hotel?

8    A.  Correct.

9    Q.  At the hotel, you approached the front desk and asked

10   them to call Mr. Raymond down to the lobby?

11   A.  Yes.

12   Q.  And between -- had you seen Mr. Raymond in person since

13   you left Jimmy John's?

14   A.  No.

15   Q.  Had you spoken with him on the phone?

16   A.  No.

17   Q.  Had you exchanged any messages with Mr. Raymond?

18   A.  No.

19             MS. BUCKNER:  We're going to hit play here.  The

20   timestamp up top is 13:30:17.

21             (Whereupon, segments of Government's Exhibit No.

22   14 were published in open court.)

23   BY MS. BUCKNER:

24   Q.  So we've stopped the camera.  The time up top is

25   13:32:02.  And the timestamp of the file itself is one

1    minute and 48 seconds.

2              So here, one of the law enforcement officers has

3    engaged with the -- excuse me -- one of the DS agents has

4    engaged with a law enforcement officer.  What agent is that

5    in the striped shirt?

6    A.  The agent in the striped shirt is Special Agent

7    Palmer-Jones.

8    Q.  Do you see yourself and Agent Nelson down in the corner

9    on the right-hand side?

10   A.  Yes.

11   Q.  You guys are talking.  Do you recall what you were

12   talking about?

13   A.  I don't remember specifically.

14   Q.  Right to the right of your head there's a door.  Do you

15   see that?

16   A.  I do.

17   Q.  Is that the same door we were looking at in Government's

18   Exhibit 13-A?

19   A.  Yes.

20   Q.  At this point, what are you guys waiting on?

21   A.  We're waiting on Mr. Raymond to come down to the lobby.

22              MS. BUCKNER:  We are going to hit play, continuing

23   from the last stop.

24              (Whereupon, segments of Government's Exhibit No.

25   14 were published in open court.)

1    BY MS. BUCKNER:

2    Q.  Did you hear Agent Dave Palmer-Jones just now say that

3    he was stepping outside?

4    A.  Yes.

5    Q.  And because he didn't want to overwhelm the guy?

6    A.  Yes.

7    Q.  And to your knowledge, where were Agent Palmer-Jones and

8    Agent Karabin for the remainder of this first initial

9    encounter?

10   A.  They were outside of the front doors.

11   Q.  And I just -- just so I'm not making any assumptions, I

12   know we see Agent Palmer-Jones on video in the striped

13   shirt.  Was Agent Viktor Karabin in fact there?

14   A.  Yes.  I believe he was.

15   Q.  When you say "standing outside the door," were they

16   blocking the sliding doors to exit?

17   A.  No.

18   Q.  Which doors were they standing in front of?

19   A.  From what we see in the video, the doors on the left, I

20   believe they were standing on either side of those doors.

21              MS. BUCKNER:  Hit play.

22              (Whereupon, segments of Government's Exhibit No.

23   14 were published in open court.)

24   BY MS. BUCKNER:

25   Q.  We just stopped the recording.  Up top, it's June 6,

```
1    2020.  The timestamp is 13:33:37.  The timestamp of the file

2    itself is three minutes and 23 seconds.

3              So here, did you hear Agent Nelson just say:

4    Ma'am, what floor is he on?

5    A.  Yes.

6    Q.  Who is he talking to?

7    A.  I believe the woman at the front desk.

8    Q.  And so at this point, are you still waiting for

9    Mr. Raymond to come down?

10   A.  Yes.

11   Q.  And again, in the corner on the far left, do you see the

12   man in the striped shirt?

13   A.  Yes.

14   Q.  Is that Agent Palmer-Jones?

15   A.  Yes.

16   Q.  Still standing outside?

17   A.  Yes.

18             MS. BUCKNER:  We're going to hit play here.

19             (Whereupon, segments of Government's Exhibit No.

20   14 were published in open court.)

21   BY MS. BUCKNER:

22   Q.  I just stopped the video at -- the audio file itself is

23   four minutes and 37 seconds.  The timestamp up top is

24   13:34:52.

25             Did you hear Agent Nelson say -- ask the law
```

1    enforcement officer whether he could have a copy of the

2    video?

3    A.  Yes.

4    Q.  And did you hear him say it would be good just in case

5    there's a suppression hearing?

6    A.  Yes.

7              MS. BUCKNER:  We're going to hit play there.

8              (Whereupon, segments of Government's Exhibit No.

9    14 were published in open court.)

10   BY MS. BUCKNER:

11   Q.  So these last few seconds -- for the record, I stopped

12   it at 13:35:45.  The minute for the audio file is five

13   minutes and 31 seconds.

14             So at this point, you and Agent Nelson have been

15   talking in the corner for just a second.  What were you guys

16   talking about?

17   A.  I don't remember specifically.  I know that at one point

18   I was expressing my frustration that we didn't have CIF

19   present.

20   Q.  And you just said -- did you hear yourself say, Hey,

21   Brian?

22   A.  Yes.

23   Q.  Why was that?

24   A.  Because Mr. Raymond had come down to the lobby.

25             MS. BUCKNER:  Hit play.  We're going to play this

1     for about ten seconds and then hit pause again.

2                 (Whereupon, segments of Government's Exhibit No.

3     14 were published in open court.)

4     BY MS. BUCKNER:

5     Q.  At this point, did you hear -- we've stopped at 13:35:58

6     in the top upper left-hand corner, and the timestamp on the

7     video file itself is five minutes and 44 seconds.

8                 Did you hear Agent Nelson say:  No trouble; you're

9     not under arrest?

10    A.  Yes.

11    Q.  And you are holding something in your hand in this clip

12    and pointing something out to Mr. Raymond.  What are you

13    doing?

14    A.  I'm showing him the biometric portion of the warrant.

15    Q.  You had said earlier that you were hesitant to show him

16    that portion, because there were concerns that he may then

17    know or take some action based on what he sees there.

18                 Do you remember that testimony?

19    A.  I remember referencing that I didn't want to show him

20    Attachment B in its entirety.

21    Q.  Are you showing him Attachment B here?

22    A.  I would have to refresh my recollection in looking at

23    the copy of the warrant.

24    Q.  So right now, do you know what you showed him?

25    A.  I know that I showed him the biometric portion of the

 1    warrant that lists what we are authorized to do.

 2    Q.  But you don't know where the biometrics portion was?

 3    A.  I would need to refresh my recollection.

 4    Q.  Understood.

 5             MS. BUCKNER:  The Court's indulgence.

 6             THE COURT:  Sure.

 7             MS. BUCKNER:  Your Honor, may I approach the

 8    witness just with a paper copy?

 9             THE COURT:  Yes.  Just so Mr. Marston knows what

10    you're showing.

11             MS. BUCKNER:  Yes, your Honor.  This is part of

12    Government's Exhibit 4-A.

13             (Tenders document to opposing counsel.)

14    BY MS. BUCKNER:

15    Q.  (Tenders document to the witness.)

16    A.  Thank you.

17             THE COURT:  Look through it.  Once your

18    recollection has been refreshed, look up.

19             THE WITNESS:  Yes.  My recollection has been

20    refreshed.

21    BY MS. BUCKNER:

22    Q.  Okay.  So now, having looked at Attachment B, is that

23    where the biometrics provision was located?

24    A.  Yes.

25    Q.  Is that what you showed Mr. Raymond?

1   A.  Yes.

2   Q.  Why were you now willing to show him that provision?

3   A.  Because I wanted to make sure that he knew what we were

4   authorized to do.

5           (Whereupon, segments of Government's Exhibit No.

6   14 were published in open court.)

7   BY MS. BUCKNER:

8   Q.  We just stopped the audio file at six minutes and five

9   seconds.  The upper left-hand corner is 13:36:19.

10          So did you see yourself actually read the

11  biometrics provision to Mr. Raymond?

12  A.  Yes.

13  Q.  And afterwards, did he agree?

14  A.  Yes.

15  Q.  And after that, did you hear yourself say, "Not the

16  codes"?

17  A.  Yes.

18          MS. BUCKNER:  We're going to hit play.

19          (Whereupon, segments of Government's Exhibit No.

20  14 were published in open court.)

21  BY MS. BUCKNER:

22  Q.  I just paused the audio file at six minutes, 28 seconds.

23  The upper left-hand corner is 13:36:43.

24          So you stepped away from Mr. Raymond.  Why was

25  that?

1    A.  Because it looked as though he was entering in his PIN.

2    Q.  Had you -- this is after the last clip where you just

3    said he was not compelled to provide his password.

4    A.  Correct.

5    Q.  And nonetheless, he began typing something in the phone.

6    Is that what you saw?

7    A.  Yes.

8    Q.  And did you in stepping away indicate that you could not

9    see anything about his -- you weren't permitted to see

10   anything about his passcode?

11   A.  Yes.

12           MS. BUCKNER:  We are going to hit play.

13           (Whereupon, segments of Government's Exhibit No.

14   14 were published in open court.)

15   BY MS. BUCKNER:

16   Q.  We paused the recording at 13:385.  The timestamp for

17   the audio file itself is eight minutes and 43 seconds.

18           So I want to talk a little bit about the clip that

19   we just watched.  So just now, did you hear Agent Nelson

20   thank Mr. Raymond and Mr. Raymond walked off?

21   A.  Yes.

22   Q.  And before that moment, each of you handed Mr. Raymond

23   the phone -- each of you, being you and Agent Nelson, each

24   handed Mr. Raymond his phones on two separate occasions for

25   him to unlock it.

1              Did you see those?

2       A.  I did.

3       Q.  And upon the second time that you asked for him to

4       unlock the phone, he asked for clarification.  Did you hear

5       that part?

6       A.  Yes.

7       Q.  When he asked for clarification, he says he doesn't

8       understand, which prompted you then to respond that he's

9       compelled for biometrics, but not for codes.  Did you hear

10      that part?

11      A.  Yes.

12      Q.  What understanding did you have, if any, about whether

13      you could hand the phone to him a second time for him to

14      unlock it using biometrics a second time?

15      A.  I understood that if the device were unlocked by

16      biometrics, that I could ask for his assistance in doing

17      that.

18      Q.  Did you have any previous understanding of the number of

19      times that you could unlock the phones using biometrics?

20      A.  No.  I don't think we discussed a specific number of

21      times.

22      Q.  Why did you ask him to unlock the phone a second time

23      after he had done it the first time?

24      A.  Because I believed that it had locked again.

25      Q.  And what sort of technical difficulties, if any, were

1    you encountering after he unlocked the phone?

2    A.  I learned that I couldn't change any of the lock

3    settings without entering the device PIN.

4    Q.  Was that surprising to you?

5    A.  Yes, it was.

6    Q.  Why?

7    A.  Because when I had met with Ms. Stedman and we talked

8    about what I was going to do upon seizing the devices, my

9    understanding was that I could simply remove the lock

10   settings once the device was open and unlocked.

11          MS. BUCKNER:  We're going to hit play here.

12          (Whereupon, segments of Government's Exhibit No.

13   14 were published in open court.)

14   BY MS. BUCKNER:

15   Q.  We just stopped the video file at ten minutes and seven

16   seconds.  The time stamp in the upper left-hand corner is

17   13:40:21.

18          So walk us through what just happened here.

19   A.  We were wrapping up.  We thought we had concluded.  And

20   the larger device, it appears the iPhone XR had locked

21   again.

22   Q.  Was this surprising to you?

23   A.  Yes.

24   Q.  Had you -- aside from attempting to change the passcode,

25   had you changed any other settings on the phone?

1   A.  Yes.

2   Q.  Could you tell us about that?

3   A.  I believe I put the device on low power mode and

4   airplane mode.

5   Q.  And did you do that for each of the devices?

6   A.  I believe so.

7   Q.  So looking -- now you're looking down at the iPhone XR

8   and it has locked again.  Is that fair to say?

9   A.  Yes.

10   Q.  And what's going through your head at that point?

11   A.  I was frustrated.

12   Q.  At this point -- and I think you sort of mentioned this,

13   but up to and at that point, did you think you were done?

14   A.  Yes.

15          MS. BUCKNER:  We're going to hit play here.

16          (Whereupon, segments of Government's Exhibit No.

17   14 were published in open court.)

18   BY MS. BUCKNER:

19   Q.  Stopping the video file at ten minutes and 39 seconds.

20   In the top left-hand corner, it's 13:40:53.

21          So here you say, if you heard, that you want to

22   engage with Mr. Raymond one more time.  Did you hear that?

23   A.  Yes.

24   Q.  Or I'm not sure if you said "one more time," but at

25   least "again."  Did you hear that?

1    A.  Yes.

2    Q.  And you say, We're compelled to do so.  Did you hear

3    that?

4    A.  Yes.

5    Q.  What did you mean by that?

6    A.  I was referencing that the warrant gave us authority to

7    do that.

8    Q.  Is that the warrant -- it's just out of view right now,

9    but was that the warrant sitting right in front of you on

10   that counter?

11   A.  Yes.

12   Q.  Had you consulted or analyzed the warrant regarding

13   whether you could try again?

14   A.  I don't recall if I did at that point.

15           MS. BUCKNER:  We're going to hit play here.

16           (Whereupon, segments of Government's Exhibit No.

17   14 were published in open court.)

18   BY MS. BUCKNER:

19   Q.  Stopping the video recording at 11 minutes and 40

20   seconds into the video file.  In the upper left-hand corner,

21   it's 13:42:04.

22           So at this point, Agent Gajkowski, you're still

23   talking about the fact that the phones keep locking.  Do you

24   hear yourself saying that?

25   A.  Yes.

1    Q.  And you repeat again that you can't change the passcode

2    without knowing what the password is?

3    A.  That's correct.

4    Q.  And at this point, the agents outside are asking if you

5    want them to accompany you upstairs to speak with

6    Mr. Raymond.  Did you hear that part?

7    A.  Yes.

8    Q.  You told him you -- you said no.  Did you hear that?

9    A.  Yes.

10   Q.  Why was that?

11   A.  Because I didn't think we needed any assistance.

12   Q.  So afterwards, Agent Nelson says something to the effect

13   of, You need to call Jamie.  Did you hear that?

14   A.  Yes.

15   Q.  Is that Trial Attorney Jamie Perry?

16   A.  Yes.

17   Q.  And to this point, had you consulted her, for instance,

18   after you arrived at the hotel?

19   A.  No.

20          MS. BUCKNER:  Your Honor, I just -- looking at the

21   time, I'm not sure if your Honor wants to keep going.

22          THE COURT:  Wherever you are, wherever you want to

23   stop.  If you want to stop at this point --

24          MS. BUCKNER:  Yes, your Honor.

25          THE COURT:  If I can just ask one question.

1     Earlier on the camera in the lobby, Mr. Raymond

2 was there and there were two phones.  You had one and I

3 guess Mr. Nelson had the other.  Which phone -- and both

4 were handed at one point to Mr. Raymond.  Which phone did

5 you have?

6     THE WITNESS:  Your Honor, I had the iPhone 6 and I

7 handed the iPhone XR to Special Agent Nelson.

8     THE COURT:  So you handed it to -- you handed

9 the -- not the XR; you handed the other phone to

10 Mr. Raymond?

11     THE WITNESS:  Correct.

12     THE COURT:  And then he did what with it?

13     THE WITNESS:  It appeared that he entered his PIN

14 to open the device, your Honor.

15     THE COURT:  And was it opened?

16     THE WITNESS:  Yes, it was.

17     THE COURT:  Okay.  And so that one I take it

18 didn't lock up again?

19     THE WITNESS:  Not at first, your Honor.

20     THE COURT:  Okay.

21     THE WITNESS:  If I can --

22     THE COURT:  Go ahead.

23     THE WITNESS:  I'm sorry, your Honor.

24     It appears from the video that it locked again,

25 because I handed it back to him and said, Again, it says

1    touch ID or passcode.

2              THE COURT:  What did he do at that point?

3              THE WITNESS:  I would have to check the video,

4    your Honor, but he unlocked it again.

5              THE COURT:  And then he handed it back to you?

6              THE WITNESS:  Correct.

7              THE COURT:  And Agent Nelson handed the XR, I take

8    it --

9              THE WITNESS:  That's correct.

10             THE COURT:  -- to him.  So we have whatever

11   Mr. Raymond did with that, which was the biometric.

12             THE WITNESS:  It appears that way, your Honor.

13             THE COURT:  I just wanted to make sure I knew

14   which phones had been handed.

15             THE WITNESS:  Yes.

16             MS. BUCKNER:  If I could, just for the record,

17   your Honor, when Agent Nelson hands Mr. Raymond the phone,

18   Mr. Raymond actually pulls down his face mask for that

19   phone, indicating that that was the phone with the facial

20   ID, which was the iPhone XR.

21             THE COURT:  All right.  I just wanted to make

22   sure.

23             Why don't we stop here in terms of at least

24   Mr. Raymond.  We can do a few scheduling things after he's

25   gone.

Let me adjourn in terms of Mr. Raymond. Hopefully, we can get him in so we can pick up tomorrow at 9:00.

Dorothy, if we could do the come-up.

If you could put in a good word, Deputy, downstairs that hopefully we can get him in so we can start and continue with this.

THE U.S. MARSHAL: Yes, ma'am.

THE COURT: Have a good evening.

Mr. Raymond, have a good evening. Take care.

(Thereupon, the Defendant retired from the courtroom and the following proceedings were had:)

THE COURT: I'm going to ask you to step down. We're going to do scheduling stuff.

THE WITNESS: Yes, your Honor.

(Witness excused.)

THE COURT: One question that I have is -- this is the last witness, presumably, from the Government.

From the defense, I assume -- I've knocked out at least at this point Ms. Perry and Ms. Soni. You will be asking whatever questions you would have asked if you had put this last agent on.

At this point -- I won't hold you to it if you change your mind overnight, but which witnesses -- I'm trying to do planning in case we don't get this done

1    tomorrow.

2              MR. MARSTON:  Understood, your Honor.

3              THE COURT:  It's a very tight schedule next week

4    for me.

5              MR. MARSTON:  Understood, your Honor.  Yes.

6              I think most likely we would call -- I mean, we

7    would cross-examine Agent Gajkowski.  We may call Agent

8    Nelson.  It appears the Government is not going to call

9    Agent Nelson.  And we may call our expert, Tara Brady.

10   Those are the most likely.  We're not waiving any other

11   people on the list at this moment until things have fully

12   developed.  But I think that's most likely.

13             THE COURT:  All right.  Anything else at this

14   point?

15             MS. BUCKNER:  Not from the Government, your Honor.

16             THE COURT:  Then I'll see you all tomorrow at

17   9:00.  Hopefully, we'll be able to start on time.

18             MR. MARSTON:  Thank you, your Honor.

19             THE COURT:  Thank you.  Take care.  Everybody have

20   a good evening.

21             (Proceedings concluded.)

22

23

24

25

1                        **<u>CERTIFICATE</u>**

2

3                I, LISA EDWARDS, RDR, CRR, do hereby

4     certify that the foregoing constitutes a true and accurate

5     transcript of my stenographic notes, and is a full, true,

6     and complete transcript of the proceedings produced to the

7     best of my ability.

8

9

10               Dated this 11th day of June, 2023.

11

12          <u>/s/ Lisa Edwards, RDR, CRR</u>
            Official Court Reporter
13          United States District Court for the
              District of Columbia
14          333 Constitution Avenue, Northwest
            Washington, D.C. 20001
15          (202) 354-3269

16

17

18

19

20

21

22

23

24

25

## /

**/s** [1] - 218:12

## 1

**1** [9] - 1:6, 20:23, 21:4, 21:8, 24:13, 30:8, 37:9, 48:14, 53:13
**1-A** [6] - 53:14, 53:24, 53:25, 55:3, 55:7, 55:8
**10** [4] - 58:21, 90:14, 90:15, 160:25
**10-A** [5] - 161:1, 161:9, 161:11, 161:13, 161:17
**10-B** [5] - 161:1, 161:9, 161:12, 161:14, 161:20
**100** [1] - 1:23
**102** [1] - 3:12
**108** [1] - 3:12
**10:00** [1] - 153:2
**10:33** [1] - 170:1
**10A** [1] - 3:16
**10B** [1] - 3:16
**10th** [1] - 54:9
**11** [30] - 3:17, 34:16, 58:21, 60:18, 164:6, 164:7, 164:17, 165:7, 165:15, 165:16, 165:19, 166:15, 167:14, 168:14, 171:4, 171:8, 171:23, 172:2, 172:17, 173:22, 174:13, 175:3, 175:17, 176:21, 177:10, 179:19, 180:10, 181:4, 181:25, 212:19
**118** [1] - 3:13
**119** [1] - 3:13
**11:00** [1] - 78:14
**11:06** [1] - 143:22
**11:30** [1] - 78:14
**11:35** [1] - 110:21
**11:51** [1] - 184:4
**11th** [1] - 218:10
**12** [4] - 58:21, 90:14, 90:15, 189:23
**12-A** [7] - 189:23, 189:25, 190:10, 190:15, 190:18, 190:20, 190:23
**12-B** [5] - 190:3, 190:4, 190:20,

191:15, 191:17
**12-C** [3] - 190:7, 190:21, 192:2
**121** [1] - 3:14
**12:26** [1] - 182:5
**12:28** [1] - 183:19
**12:32** [1] - 112:21
**12A** [1] - 3:18
**12B** [1] - 3:18
**12C** [1] - 3:18
**12th** [1] - 34:2
**13** [3] - 58:21, 181:13, 181:23
**13-A** [6] - 196:9, 196:20, 196:24, 197:1, 197:4, 201:18
**13-B** [2] - 197:1, 197:13
**13-C** [1] - 197:2
**13:30:17** [2] - 199:22, 200:20
**13:32:02** [1] - 200:25
**13:33:37** [1] - 203:1
**13:34:52** [1] - 203:24
**13:35:45** [1] - 204:12
**13:35:58** [1] - 205:5
**13:36:19** [1] - 207:9
**13:36:43** [1] - 207:23
**13:385** [1] - 208:16
**13:40:21** [1] - 210:17
**13:40:53** [1] - 211:20
**13:42:04** [1] - 212:21
**13:50** [1] - 113:20
**13A** [1] - 3:19
**13B** [1] - 3:19
**13C** [1] - 3:19
**14** [19] - 3:19, 58:21, 197:20, 198:12, 198:14, 198:18, 198:19, 200:22, 201:25, 202:23, 203:20, 204:9, 205:3, 207:6, 207:20, 208:14, 210:13, 211:17, 212:17
**142** [1] - 3:14
**145** [1] - 3:15
**149** [1] - 3:15
**14:18** [1] - 114:8
**14th** [5] - 25:11, 26:7, 34:1, 34:7, 34:8
**15** [5] - 58:21, 75:12, 75:22, 109:7, 181:16
**150** [3] - 191:19, 192:6, 192:13
**15:50** [1] - 114:9
**15th** [1] - 75:10
**16** [2] - 58:21, 114:25
**160** [1] - 3:16

**161** [1] - 3:16
**165** [1] - 3:17
**169** [1] - 3:17
**17** [7] - 3:15, 58:21, 148:15, 149:3, 149:7, 149:8, 187:15
**1717** [1] - 1:19
**18** [12] - 3:17, 58:21, 159:12, 159:15, 159:17, 169:2, 169:3, 169:4, 169:18, 169:20, 169:22, 169:25
**183** [1] - 3:18
**19** [13] - 3:16, 58:8, 58:21, 59:5, 100:10, 116:15, 159:14, 159:15, 159:16, 160:9, 160:11, 160:13, 183:21
**190** [1] - 3:18
**197** [1] - 3:19
**198** [1] - 3:19
**19th** [1] - 33:13
**1:00** [1] - 133:24
**1:03** [1] - 187:18
**1:30** [1] - 199:22
**1A** [1] - 3:10
**1st** [4] - 97:14, 101:3, 102:8, 103:1

## 2

**2** [15] - 3:10, 20:23, 21:4, 21:8, 37:9, 53:13, 53:14, 54:14, 55:3, 55:7, 55:8, 58:3, 58:20, 183:10, 192:10
**20** [18] - 3:18, 58:17, 59:1, 91:3, 99:22, 137:24, 139:11, 167:11, 171:6, 171:23, 173:5, 173:18, 175:14, 176:18, 182:14, 183:1, 183:4, 183:6
**20001** [2] - 2:4, 218:14
**20006** [2] - 1:20, 1:24
**2010** [1] - 86:23
**2019** [1] - 87:9
**202** [2] - 2:4, 218:15
**2020** [41] - 33:13, 34:1, 34:2, 34:15, 34:16, 34:18, 34:21, 47:3, 48:8, 51:4, 53:1, 54:9, 55:1, 77:17, 91:4, 92:4, 97:14, 98:15, 100:11,

100:14, 101:3, 101:21, 121:7, 125:9, 126:2, 132:22, 133:16, 142:15, 148:25, 158:3, 161:6, 165:1, 170:1, 184:4, 187:18, 190:12, 192:15, 196:17, 198:8, 199:22, 203:1
**2022** [1] - 49:10
**2023** [2] - 1:6, 218:10
**20530** [1] - 1:17
**2099** [1] - 1:23
**21** [8] - 3:14, 58:17, 59:9, 141:19, 141:20, 142:2, 142:20, 142:23
**21-00380** [1] - 1:3
**21-380** [1] - 4:3
**211** [1] - 5:14
**217-11** [1] - 147:17
**22** [7] - 3:15, 58:12, 58:17, 144:18, 145:8, 145:10, 145:12
**23** [2] - 59:5, 147:19, 203:2
**24** [2] - 59:5, 176:19
**25** [8] - 48:18, 79:3, 81:19, 81:25, 91:3, 174:10, 179:15, 181:2
**25th** [1] - 8:1
**27th** [2] - 25:11, 34:15
**28** [3] - 23:10, 114:25, 207:22
**28th** [3] - 34:4, 34:12
**2:00** [1] - 134:4
**2nd** [20] - 23:1, 25:20, 25:22, 38:9, 101:21, 103:16, 104:3, 105:2, 107:11, 121:7, 123:7, 140:18, 143:4, 143:18, 148:25, 149:11, 150:15, 156:12, 164:10, 170:24

## 3

**3** [10] - 3:11, 8:5, 57:2, 57:4, 57:6, 57:13, 57:21, 57:25, 58:8, 58:20
**30** [8] - 43:3, 62:25, 63:1, 63:12, 167:12, 171:25, 172:14, 172:20
**30th** [1] - 63:10
**31** [2] - 93:16, 204:13
**31st** [3] - 17:5, 22:25,

25:19
**333** [2] - 2:3, 218:14
**35** [3] - 99:22, 174:11, 174:25
**354-3269** [2] - 2:4, 218:15
**37** [3] - 168:6, 168:11, 203:23
**38** [1] - 166:12
**39** [5] - 168:7, 168:12, 171:5, 211:19
**3:30** [1] - 194:13
**3:45** [1] - 194:13
**3rd** [1] - 144:10

## 4

**4** [8] - 8:5, 30:10, 30:12, 58:8, 58:15, 58:20, 59:11, 144:19
**4-A** [13] - 3:11, 29:17, 93:14, 93:24, 94:17, 94:22, 94:25, 95:2, 95:4, 99:7, 206:12
**4-B** [1] - 95:6
**4-C** [1] - 95:7
**4-D** [1] - 95:8
**4-E** [1] - 95:9
**4-F** [1] - 95:10
**4-G** [1] - 95:11
**4-H** [1] - 95:12
**4-I** [1] - 95:13
**4-J** [1] - 95:14
**4-K** [1] - 95:15
**4-L** [1] - 95:16
**4-M** [1] - 95:17
**4-N** [1] - 95:18
**4-O** [1] - 95:19
**4-P** [1] - 95:20
**4-Q** [8] - 3:11, 29:17, 93:14, 94:17, 94:23, 94:25, 95:3, 95:21
**40** [7] - 3:5, 116:8, 116:15, 171:6, 173:20, 179:16, 212:19
**40s** [2] - 176:8, 176:11
**41** [3] - 171:23, 171:24, 172:14
**42** [2] - 172:15, 172:19
**43** [3] - 173:18, 173:19, 208:17
**44** [4] - 174:10, 174:11, 174:25, 205:7
**45** [4] - 110:11, 166:13, 175:1, 177:7
**454** [1] - 158:22

**46** [1] - 175:13
**460** [1] - 156:22
**47** [2] - 175:14, 176:18
**48** [3] - 176:19, 177:7, 201:1
**49** [1] - 177:8
**4:30** [1] - 194:22
**4th** [1] - 146:18

**5**

**5** [12] - 3:12, 8:5, 58:8, 58:20, 78:1, 101:22, 102:11, 102:13, 102:15, 104:20, 105:6, 156:5
**50** [5] - 109:24, 171:5, 179:15, 179:16, 180:7
**54** [1] - 180:7
**55** [5] - 3:10, 168:6, 168:12, 180:8, 180:25
**555** [1] - 1:16
**57** [3] - 3:11, 180:25, 181:1
**5th** [11] - 17:6, 19:1, 25:10, 100:14, 150:19, 150:22, 151:16, 152:5, 152:24, 156:16

**6**

**6** [33] - 13:10, 17:9, 18:9, 18:20, 23:4, 25:20, 42:6, 45:7, 45:9, 45:11, 54:4, 58:8, 58:20, 63:2, 63:3, 63:14, 63:22, 64:9, 68:2, 69:13, 120:8, 120:10, 120:15, 164:2, 170:1, 182:23, 187:18, 196:17, 198:8, 198:11, 199:22, 202:25, 214:6
**6-A** [5] - 120:24, 121:3, 121:10, 121:12, 121:14
**6-B** [7] - 120:24, 121:3, 121:10, 121:12, 121:14, 121:19, 122:10
**61** [1] - 3:5
**615(c)** [1] - 11:16
**6706** [1] - 2:3
**6A** [1] - 3:14
**6B** [1] - 3:14

**6th** [25] - 24:8, 99:14, 102:8, 133:3, 133:9, 133:16, 133:21, 146:23, 147:10, 148:2, 148:11, 149:21, 150:25, 155:18, 158:3, 161:6, 164:3, 165:1, 170:23, 171:4, 178:13, 178:15, 184:4, 190:12

**7**

**7** [17] - 3:13, 58:8, 58:20, 59:4, 106:21, 117:7, 117:11, 117:12, 118:7, 118:9, 118:11, 119:10, 120:8, 120:10, 120:12, 120:16
**76** [1] - 3:5

**8**

**8** [18] - 3:13, 58:20, 59:8, 66:9, 66:15, 75:12, 75:22, 109:5, 117:7, 118:14, 118:17, 119:3, 119:5, 119:7, 119:10, 119:13, 119:14, 120:11
**80** [1] - 3:6
**86** [1] - 3:7
**8th** [1] - 75:6

**9**

**9** [11] - 3:12, 34:21, 55:1, 58:20, 106:23, 106:24, 107:1, 107:19, 107:24, 108:4, 108:10
**9-A** [3] - 109:5, 109:8, 109:11
**9-B** [2] - 109:23, 109:25
**9-C** [2] - 110:11, 110:13
**9-D** [3] - 110:21, 110:22, 112:21
**9-E** [2] - 112:22, 112:23
**9-F** [2] - 113:19, 113:21
**9-G** [2] - 114:9, 114:10
**9-H** [2] - 114:25,

115:1
**9-I** [2] - 115:24, 115:25
**9-J** [2] - 116:8, 116:9
**9-K** [2] - 116:15, 116:16
**95** [3] - 3:11, 51:10, 77:24
**9:00** [2] - 216:3, 217:17
**9:09** [1] - 1:7
**9:54** [1] - 158:5
**9th** [2] - 30:1, 34:18

**A**

**a.m** [5] - 1:7, 153:2, 158:5, 170:1, 184:4
**abeyance** [2] - 8:14, 8:16
**ability** [6] - 19:22, 44:15, 59:20, 77:2, 79:17, 218:7
**able** [29] - 12:10, 14:25, 20:14, 26:23, 28:3, 28:10, 29:20, 36:5, 38:11, 38:23, 44:8, 51:5, 56:17, 60:5, 60:13, 64:19, 78:4, 78:5, 79:16, 81:18, 81:24, 82:11, 96:12, 100:24, 123:4, 130:20, 136:25, 217:17
**absolute** [3] - 136:24, 137:7, 138:18
**abuse** [1] - 88:16
**accelerate** [1] - 79:16
**access** [15] - 20:5, 24:15, 24:16, 38:11, 38:23, 47:18, 52:14, 56:22, 59:21, 60:5, 79:1, 79:16, 81:10, 143:15
**accessed** [3] - 18:11, 20:8, 138:23
**accessible** [1] - 51:20
**accessing** [1] - 18:12
**accompany** [3] - 104:12, 129:14, 213:5
**according** [2] - 48:9, 164:4
**accordingly** [1] - 99:25
**account** [40] - 20:1, 22:9, 22:11, 22:16,

24:20, 25:2, 25:3, 25:13, 26:24, 27:6, 27:21, 27:23, 28:7, 28:8, 28:11, 28:12, 28:16, 29:6, 29:12, 30:10, 30:11, 32:16, 33:25, 34:6, 34:14, 51:25, 52:11, 52:14, 58:24, 59:2, 59:19, 59:20, 60:1, 110:7, 123:20, 123:21, 137:1, 141:14, 173:9, 173:11
**accounts** [10] - 29:11, 32:13, 51:22, 56:24, 59:15, 141:6, 141:12, 141:13, 141:15, 173:7
**accurate** [24] - 54:10, 54:20, 57:13, 57:17, 94:10, 100:14, 102:7, 107:20, 118:1, 118:5, 118:24, 121:6, 142:14, 145:3, 148:23, 160:5, 161:5, 164:25, 169:12, 182:21, 190:11, 196:16, 198:7, 218:4
**accurately** [3] - 58:5, 58:21, 60:19
**Action** [1] - 1:3
**action** [1] - 205:17
**active** [1] - 91:7
**actively** [4] - 64:22, 73:19, 77:21
**activity** [1] - 124:19
**actual** [4] - 17:21, 22:1, 115:9, 128:17
**add** [2] - 88:10, 125:13
**add-on** [1] - 88:10
**added** [4] - 83:18, 118:2, 125:15, 141:22
**addition** [9] - 17:21, 63:12, 87:24, 88:14, 89:6, 129:13, 148:15, 155:10, 193:22
**additional** [18] - 5:19, 8:4, 26:14, 27:12, 37:4, 56:3, 56:24, 78:18, 78:23, 89:18, 104:2, 134:12, 135:6, 139:21, 146:9, 146:15, 182:13, 187:7
**additionally** [1] - 23:2
**address** [12] - 27:15, 47:7, 52:15, 145:22, 145:25, 146:10, 156:18, 156:19,

187:22, 191:19, 191:21
**addresses** [2] - 28:10, 47:7
**adjourn** [1] - 216:1
**adjust** [1] - 130:18
**administrative** [2] - 87:20, 143:13
**admit** [20] - 6:18, 55:6, 57:24, 102:13, 108:3, 118:9, 119:5, 121:12, 142:22, 145:10, 149:6, 160:11, 161:11, 165:10, 165:14, 169:20, 183:4, 190:18, 196:23, 198:17
**admitted** [10] - 93:18, 93:21, 94:19, 94:25, 106:22, 108:14, 156:8, 165:8, 183:20, 187:15
**Adult** [4] - 24:13, 30:7, 30:10, 30:12
**adult** [5] - 26:14, 26:21, 27:20, 98:5
**advance** [3] - 130:17, 180:6, 181:12
**advanced** [2] - 80:20, 89:20
**advancements** [1] - 79:15
**advancing** [2] - 175:13, 197:16
**advantage** [2] - 81:6, 82:12
**advice** [6] - 9:12, 10:8, 127:4, 147:12, 147:23, 171:13
**advise** [1] - 106:4
**advised** [2] - 178:5, 195:3
**affect** [5] - 46:2, 49:16, 49:18, 151:5, 154:22
**affiant** [1] - 37:8, 38:14, 90:16, 90:17, 90:22, 99:9, 112:5, 124:13, 125:5
**affidavit** [41] - 17:3, 17:5, 17:9, 17:25, 19:5, 20:14, 21:16, 22:1, 22:13, 22:20, 23:17, 23:25, 24:6, 25:9, 25:14, 25:15, 26:9, 26:11, 26:16, 27:6, 30:19, 35:14, 35:15, 35:24, 36:8, 36:9, 37:1, 38:6,

38:15, 94:11, 98:22, 112:4, 112:6, 112:9, 112:16, 112:19, 120:7, 120:16, 125:20, 149:17, 155:11

**affidavits** [8] - 15:16, 15:17, 15:24, 29:17, 32:25, 93:7, 93:13, 94:7

**after-first-unlock** [1] - 138:12

**after-first-unlocked** [1] - 13:12

**afternoon** [7] - 134:10, 140:11, 140:15, 140:16, 182:5, 194:5, 199:23

**afterwards** [4] - 14:23, 166:2, 207:13, 213:12

**agent** [25] - 8:25, 10:7, 10:8, 19:21, 36:10, 37:20, 55:15, 67:9, 86:21, 86:22, 87:15, 87:18, 87:23, 88:6, 88:18, 90:25, 92:12, 98:15, 98:17, 106:25, 129:3, 134:23, 201:4, 201:6, 216:22

**Agent** [99] - 18:13, 85:7, 86:17, 97:12, 105:8, 105:9, 107:6, 109:12, 117:11, 117:24, 118:4, 118:16, 121:3, 122:14, 128:25, 129:2, 129:4, 140:15, 141:24, 142:2, 144:19, 148:6, 148:10, 148:16, 148:22, 149:14, 149:23, 151:25, 152:6, 153:10, 154:4, 154:14, 154:16, 155:10, 156:5, 157:15, 159:1, 159:4, 159:5, 159:18, 160:2, 160:3, 161:3, 162:1, 162:18, 162:19, 162:21, 162:23, 164:14, 165:21, 166:3, 167:19, 167:24, 168:16, 168:18, 168:22, 169:8, 169:11, 170:7, 170:10, 170:16, 170:19, 171:13, 172:4, 175:19,

177:13, 178:18, 180:15, 185:11, 185:12, 187:19, 195:12, 197:24, 198:24, 198:25, 201:6, 201:8, 202:2, 202:7, 202:8, 202:12, 202:13, 203:3, 203:14, 203:25, 204:14, 205:8, 208:19, 208:23, 212:22, 213:12, 214:7, 215:7, 215:17, 217:7, 217:9

**agent's** [3] - 13:13, 19:18, 105:7

**Agents** [1] - 186:20

**agents** [34] - 18:11, 18:12, 19:24, 20:8, 23:17, 25:24, 26:22, 27:10, 28:8, 32:15, 35:5, 35:9, 37:8, 37:15, 37:25, 38:9, 65:18, 98:13, 100:2, 127:23, 129:13, 133:19, 148:3, 148:6, 150:12, 151:21, 157:16, 159:4, 195:21, 195:24, 196:2, 196:4, 201:3, 213:4

**ago** [8] - 59:18, 78:25, 79:2, 79:24, 80:20, 81:7, 81:17, 81:24

**agree** [4] - 106:8, 163:14, 199:17, 207:13

**agreeable** [1] - 163:25

**agreed** [2] - 136:21, 152:4

**ahead** [18] - 5:10, 16:23, 19:13, 24:24, 39:13, 74:3, 76:6, 86:3, 96:18, 97:10, 98:23, 135:4, 136:17, 153:20, 155:22, 197:8, 200:4, 214:22

**Air** [20] - 29:21, 29:24, 30:24, 30:25, 31:2, 31:3, 31:8, 31:18, 31:19, 31:23, 31:25, 32:4, 32:6, 32:8, 34:20, 50:10, 60:6, 60:9, 60:14, 60:20

**airplane** [4] - 132:5, 181:7, 181:20, 211:4

**Airport** [1] - 37:17

**alert** [1] - 11:11

**alerted** [1] - 13:8

**alleged** [3] - 25:14, 30:7, 96:3

**allegedly** [1] - 17:4

**allow** [5] - 40:6, 56:21, 121:21, 143:15, 155:9

**allowed** [5] - 11:16, 14:6, 25:24, 73:25, 74:1

**allows** [1] - 51:18

**aloud** [4] - 35:21, 149:16, 150:8, 157:21

**alphanumeric** [5] - 49:15, 64:6, 64:8, 79:2, 138:19

**aluminum** [1] - 132:10

**aluminum-type** [1] - 132:10

**amenable** [1] - 37:14

**amended** [1] - 155:16

**Amendment** [5] - 88:19, 88:23, 89:7, 89:9, 89:12

**AMERICA** [1] - 1:3

**amount** [6] - 47:5, 48:1, 48:5, 48:8, 49:8, 49:20

**analysis** [5] - 23:8, 23:9, 31:24, 43:22, 43:23

**analyst** [13] - 41:8, 41:9, 46:6, 47:9, 49:21, 62:5, 62:20, 130:25, 142:7, 142:15, 143:11, 143:25, 144:5

**analysts** [1] - 82:15

**analyze** [4] - 41:10, 53:3, 55:22, 56:23

**analyzed** [4] - 52:25, 55:11, 59:19, 212:12

**analyzer** [1] - 43:18

**analyzing** [2] - 43:8, 130:5

**ANGELA** [1] - 1:14

**Angela** [1] - 4:9

**anniversaries** [1] - 50:20

**announced** [1] - 182:7

**answer** [20] - 13:5, 28:24, 29:4, 29:9, 38:7, 40:7, 40:8, 40:11, 40:13, 48:17, 62:14, 66:12, 72:2, 84:18, 85:19, 85:21,

85:25, 86:1, 135:24

**answered** [4] - 39:4, 71:21, 72:16, 135:19

**answering** [2] - 61:12, 139:21

**answers** [1] - 170:21

**ANTHONY** [1] - 1:21

**anticipate** [1] - 13:9

**anyway** [1] - 78:12

**apartment** [1] - 26:18

**apartments** [1] - 97:25

**apologize** [3] - 5:7, 33:10, 62:15

**appear** [11] - 23:12, 23:15, 55:17, 56:12, 56:14, 99:12, 120:5, 120:19, 148:21, 196:14

**aPPEARANCES** [1] - 1:13

**appeared** [7] - 55:19, 56:6, 56:8, 59:25, 60:4, 115:14, 214:13

**Apple** [14] - 30:4, 47:6, 51:18, 51:19, 51:21, 52:13, 52:16, 52:18, 54:4, 54:19, 56:21, 70:13, 70:17, 71:16

**application** [7] - 47:17, 52:7, 113:11, 113:13, 113:16, 115:13, 137:3

**applications** [7] - 19:18, 19:20, 52:5, 115:16, 115:21, 128:16, 130:7

**appreciate** [5] - 10:4, 70:24, 84:19, 97:20, 139:20

**approach** [4] - 37:15, 108:23, 193:15, 206:7

**approached** [2] - 152:19, 200:9

**approaching** [1] - 197:17

**appropriate** [3] - 8:17, 12:19, 88:25

**appropriately** [1] - 88:25

**approval** [1] - 188:8

**approve** [1] - 133:8

**approved** [10] - 25:9, 25:10, 25:11, 34:1, 34:2, 34:9, 34:15, 34:18, 128:17, 155:12

**apps** [1] - 116:4

**area** [9] - 11:20,

98:13, 101:16, 111:2, 159:6, 190:1, 190:8, 190:11, 197:18

**argument** [1] - 24:11

**arguments** [2] - 9:10, 24:9

**armed** [1] - 162:6

**arrangement** [2] - 96:18, 98:24

**arrest** [2] - 127:25, 205:9

**arrests** [3] - 90:17, 91:13, 128:11

**arrived** [6] - 105:9, 158:7, 163:23, 199:6, 199:8, 213:18

**arrives** [1] - 65:11

**arriving** [1] - 89:19

**arrow** [1] - 122:23

**artefacts** [1] - 26:16

**aside** [3] - 49:21, 89:12, 115:15, 118:2, 118:24, 142:17, 154:14, 163:6, 169:15, 182:21, 187:5, 195:15, 210:24

**aspects** [2] - 14:16, 143:13

**assault** [11] - 17:1, 17:4, 17:7, 17:17, 17:19, 22:23, 25:14, 30:7, 88:16, 89:22, 124:25

**assaulted** [1] - 17:16

**asserted** [1] - 5:15

**assertive** [1] - 168:24

**assigned** [14] - 38:24, 42:2, 86:24, 88:12, 91:5, 97:13, 97:15, 97:22, 98:2, 98:7, 98:13, 101:2, 104:9, 143:12

**assist** [2] - 59:20, 60:8

**assistance** [6] - 130:20, 143:9, 193:21, 193:24, 209:16, 213:11

**associated** [8] - 20:2, 29:13, 47:7, 47:8, 52:4, 87:22, 88:5, 174:4

**assortment** [1] - 52:1

**assume** [2] - 92:22, 216:19

**assuming** [4] - 5:1, 12:21, 93:21, 108:22

**assumptions** [1] -

202:11

**ASUS** [2] - 58:10, 58:15

**attached** [2] - 9:19, 67:6

**Attachment** [12] - 20:21, 20:22, 21:11, 33:17, 99:11, 99:13, 178:5, 205:20, 205:21, 206:22

**attachments** [4] - 35:17, 35:18, 35:24, 36:3

**attack** [1] - 74:5

**attempt** [3] - 77:13, 141:7, 186:6

**attempted** [1] - 76:21

**attempting** [4] - 10:9, 21:5, 21:9, 210:24

**attending** [1] - 87:24

**attention** [2] - 53:1, 60:18

**Attorney** [1] - 213:15

**attorney** [9] - 6:24, 9:1, 9:5, 124:8, 133:12, 171:11, 187:3, 188:12

**ATTORNEY'S** [1] - 1:15

**attorney-client** [2] - 6:24, 9:1

**attorney-client-privileged** [1] - 9:5

**attribution** [1] - 26:23

**audio** [10] - 106:15, 106:18, 107:10, 164:3, 164:9, 203:22, 204:12, 207:8, 207:22, 208:17

**August** [8] - 25:10, 26:7, 34:1, 34:3, 34:7, 34:8, 34:12, 34:21

**AUSA** [1] - 6:1

**authenticate** [2] - 52:17, 68:6

**authentication** [1] - 44:18

**authority** [6] - 87:7, 89:1, 126:20, 175:11, 188:20, 212:6

**authorization** [1] - 67:10

**authorize** [2] - 37:25, 124:17

**authorized** [13] - 4:24, 20:5, 20:8, 21:2, 21:6, 21:7, 44:19, 126:17, 151:21,

179:4, 180:3, 206:1, 207:4

**authorizes** [1] - 21:11

**automatically** [3] - 45:25, 46:3, 73:22

**AV-1** [20] - 17:1, 17:13, 17:15, 17:16, 17:21, 18:6, 18:23, 22:21, 22:22, 25:14, 25:17, 27:19, 98:3, 98:5, 109:14, 109:18, 109:20, 110:5, 125:2, 167:25

**AV-1's** [3] - 27:7, 108:15, 108:20

**AV-2** [1] - 58:8

**AV-20** [1] - 58:12

**AV-4** [1] - 30:17

**available** [11] - 25:17, 42:13, 42:21, 50:16, 79:9, 79:18, 125:23, 133:3, 133:11, 146:23, 147:2

**Avenue** [3] - 1:23, 2:3, 218:14

**AVs** [1] - 58:20

**awaited** [1] - 188:3

**aware** [11] - 28:16, 28:21, 72:15, 79:25, 80:2, 81:9, 81:17, 81:22, 165:24

**AXIOM** [2] - 43:17, 56:2

## B

**background** [1] - 110:25

**backing** [1] - 173:12

**backtrack** [1] - 79:11

**bad** [1] - 170:15

**badge** [4] - 162:14, 162:16, 162:23

**bag** [5] - 132:6, 132:7, 132:8, 132:11, 181:19

**bags** [1] - 53:8

**balcony** [1] - 97:25

**based** [8] - 10:1, 10:19, 19:14, 26:25, 28:5, 55:22, 144:13, 205:17

**basic** [1] - 88:7

**basis** [2] - 12:19, 38:4

**bat** [1] - 19:24

**battery** [2] - 46:2, 132:5

**become** [1] - 147:2, 147:8

**becomes** [1] - 84:16

**BEFORE** [1] - 1:10

**before-first-unlock** [4] - 135:21, 138:7, 139:12, 139:16

**before-first-unlocked** [1] - 13:11

**began** [2] - 54:23, 208:5

**begin** [2] - 114:9, 194:20

**beginning** [6] - 107:4, 107:10, 109:6, 148:24, 165:4, 183:24

**begins** [1] - 22:20

**begun** [1] - 32:18

**behalf** [1] - 129:1

**behind** [3] - 184:25, 190:9, 197:15

**below** [1] - 187:22

**bench** [4] - 105:15, 122:13, 122:21, 122:23

**bend** [1] - 61:8

**beneficial** [2] - 178:8, 178:9

**best** [6] - 57:15, 57:15, 58:7, 71:21, 134:20, 218:7

**better** [6] - 41:4, 79:13, 80:23, 134:16, 137:25, 152:1

**between** [25] - 8:9, 24:19, 63:10, 75:12, 75:21, 87:17, 91:3, 104:2, 119:22, 141:24, 142:6, 142:15, 144:19, 148:16, 148:21, 152:8, 152:11, 156:5, 160:2, 162:3, 181:16, 182:22, 183:10, 190:5, 200:12

**biometric** [13] - 45:23, 92:5, 125:5, 125:13, 125:15, 125:19, 126:15, 126:16, 127:12, 188:16, 205:14, 205:25, 215:11

**biometrics** [60] - 9:12, 13:15, 14:2, 20:8, 21:11, 21:13, 34:24, 35:8, 35:19, 35:23, 38:5, 38:18, 38:24, 39:1, 44:23, 44:25, 45:3, 68:3, 69:17, 77:17, 77:21,

77:23, 92:3, 99:14, 125:9, 125:10, 125:24, 126:2, 126:10, 126:18, 127:14, 127:17, 132:19, 132:20, 136:3, 136:7, 138:13, 147:12, 177:21, 178:16, 178:19, 178:21, 179:3, 185:21, 186:2, 186:6, 186:7, 188:10, 188:22, 189:17, 189:18, 193:12, 195:20, 206:2, 206:23, 207:11, 209:9, 209:14, 209:16, 209:19

**bird** [1] - 111:2

**birthdays** [1] - 50:20

**bit** [25] - 38:7, 88:21, 89:16, 90:8, 90:20, 92:2, 92:8, 99:12, 99:20, 100:8, 119:20, 123:9, 123:10, 131:6, 131:15, 146:4, 151:12, 151:24, 154:10, 157:23, 169:6, 176:9, 193:3, 195:18, 208:18

**blocking** [1] - 202:16

**blocks** [2] - 41:2, 89:20

**blue** [10] - 58:15, 102:20, 102:21, 103:9, 149:11, 150:8, 153:1, 153:5, 157:10, 160:18

**board** [1] - 91:1

**bodies** [1] - 23:15

**body** [3] - 87:4, 198:1, 199:3

**body-camera** [1] - 198:1

**bottom** [4] - 103:18, 142:8, 145:1, 192:3

**bounds** [1] - 48:25

**box** [1] - 156:17

**boyfriend** [1] - 166:22

**Brady** [3] - 11:15, 13:9, 217:9

**break** [10] - 70:21, 78:8, 78:12, 114:14, 131:15, 133:24, 180:13, 194:5, 194:10, 194:15

**BRIAN** [1] - 1:6

**Brian** [10] - 4:4, 21:3, 33:13, 42:4, 92:9,

94:5, 103:1, 103:10, 130:10, 204:21

**brief** [6] - 11:14, 37:11, 76:4, 100:2, 179:7, 185:4

**briefed** [1] - 7:8

**briefly** [8] - 5:8, 76:12, 89:3, 99:11, 124:16, 143:8, 179:5, 187:14

**bring** [5] - 78:19, 134:22, 153:9, 177:12, 177:13

**broad** [2] - 7:2, 13:16

**broken** [1] - 108:10

**brought** [2] - 31:19, 66:19

**brute** [44] - 47:14, 47:15, 47:16, 47:25, 48:5, 48:9, 49:11, 49:16, 49:21, 72:7, 72:10, 72:18, 72:22, 72:25, 73:18, 73:21, 74:1, 74:5, 77:14, 78:24, 79:1, 79:17, 79:20, 79:21, 81:1, 81:10, 81:14, 83:4, 83:22, 84:12, 84:21, 84:23, 135:12, 136:4, 136:9, 137:2, 137:3, 137:15, 137:20, 137:22, 138:7, 138:13, 138:24, 139:9

**bubble** [6] - 102:20, 103:9, 104:5, 150:8, 170:6, 170:8

**bubbles** [1] - 102:23

**BUCKER** [1] - 117:23

**Buckner** [1] - 4:9

**BUCKNER** [310] - 1:14, 6:21, 7:11, 7:13, 7:17, 15:14, 15:21, 16:4, 16:8, 16:19, 16:21, 16:24, 19:6, 19:9, 19:14, 20:17, 20:20, 21:1, 22:3, 22:5, 22:16, 22:18, 24:25, 25:7, 25:13, 27:9, 27:24, 28:24, 29:3, 29:9, 29:15, 30:12, 30:19, 31:11, 31:14, 31:16, 31:21, 31:23, 32:21, 33:7, 33:16, 33:20, 33:25, 34:6, 34:8, 34:11, 34:14, 35:1, 35:14, 35:16, 36:2, 36:8, 36:15, 36:18, 36:20, 36:23, 37:6, 38:6,

38:14, 38:20, 39:7,
39:10, 85:7, 86:10,
92:19, 93:1, 93:23,
94:15, 94:22, 95:4,
96:17, 96:25, 97:11,
97:19, 97:21, 98:20,
98:24, 99:2, 99:5,
100:17, 100:23,
101:1, 101:23, 102:1,
102:10, 102:17,
102:19, 106:19,
106:23, 107:3,
107:23, 108:6, 109:2,
109:4, 109:10,
109:23, 110:2,
110:10, 110:15,
110:20, 110:24,
113:1, 113:23,
114:12, 114:24,
115:3, 115:23, 116:2,
116:7, 116:11,
116:14, 116:18,
117:5, 117:9, 117:21,
118:6, 118:13,
118:15, 119:2, 119:9,
119:12, 120:23,
121:1, 121:9, 121:16,
121:18, 122:20,
122:24, 129:9, 134:1,
140:12, 140:14,
141:18, 141:22,
142:1, 142:8, 142:10,
142:19, 142:25,
143:2, 143:23,
143:24, 144:3, 144:4,
144:8, 144:9, 144:17,
144:20, 144:25,
145:2, 145:7, 145:14,
145:16, 145:17,
146:3, 146:5, 146:13,
146:14, 147:15,
147:20, 147:21,
148:13, 148:17,
149:2, 149:10, 150:3,
150:4, 150:17,
150:18, 152:22,
152:23, 153:3, 153:4,
153:14, 153:15,
153:24, 154:1, 156:4,
156:9, 156:10, 157:8,
157:9, 158:1, 158:2,
158:14, 158:15,
159:11, 159:16,
159:20, 160:8,
160:15, 160:17,
160:24, 161:2, 161:8,
161:16, 164:1, 164:6,
164:9, 164:13,
164:18, 165:3,
165:10, 165:20,
166:11, 166:16,

167:10, 167:15,
168:5, 168:11,
168:15, 169:1, 169:4,
169:7, 169:17,
169:24, 171:3, 171:9,
171:22, 172:3,
172:13, 172:18,
173:3, 173:4, 173:17,
173:23, 174:9,
174:14, 174:24,
175:4, 175:13,
175:18, 176:17,
176:22, 177:6,
177:11, 179:14,
179:20, 180:6,
180:11, 180:24,
181:5, 181:12,
181:14, 181:22,
182:1, 182:13,
182:16, 182:25,
183:9, 184:2, 184:3,
184:10, 184:11,
187:14, 187:17,
189:21, 189:24,
190:14, 190:22,
191:15, 191:16,
194:9, 194:14,
194:20, 194:24,
195:11, 196:8,
196:11, 196:19,
197:3, 197:19,
197:23, 198:10,
198:14, 198:22,
199:9, 200:5, 200:19,
200:23, 201:22,
202:1, 202:21,
202:24, 203:18,
203:21, 204:7,
204:10, 204:25,
205:4, 206:5, 206:7,
206:11, 206:14,
206:21, 207:7,
207:18, 207:21,
208:12, 208:15,
210:11, 210:14,
211:15, 211:18,
212:15, 212:18,
213:20, 213:24,
215:16, 217:15
   **buddy** [2] - 157:11,
157:13
   **bulk** [1] - 33:2
   **Bumble** [4] - 19:20,
95:14, 115:19, 141:13
   **bunch** [1] - 70:20
   **Bureau** [1] - 86:18
   **business** [1] - 35:13
   **businesses** [1] -
175:23
   **button** [3] - 69:3,

69:24, 179:9
   **BY** [136] - 2:1, 40:17,
40:24, 48:19, 50:12,
53:20, 55:10, 58:2,
61:1, 61:10, 66:4,
66:7, 66:14, 71:1,
71:23, 72:3, 74:4,
76:2, 76:11, 80:8,
80:11, 82:3, 83:3,
83:12, 83:21, 84:20,
86:10, 93:1, 93:23,
97:11, 97:21, 99:5,
101:1, 102:1, 102:19,
107:3, 109:10, 110:2,
110:15, 110:24,
113:1, 113:23,
114:12, 115:3, 116:2,
116:11, 116:18,
117:9, 117:23,
118:15, 119:12,
121:1, 121:18,
122:24, 129:9,
140:14, 142:1,
142:10, 143:2,
143:24, 144:4, 144:9,
144:20, 145:2,
145:17, 146:5,
146:14, 147:21,
148:17, 149:10,
150:4, 150:18,
152:23, 153:4,
153:15, 154:1,
156:10, 157:9, 158:2,
158:15, 159:20,
160:17, 161:2,
161:16, 164:13,
164:18, 165:20,
166:16, 169:7,
169:24, 171:9, 172:3,
172:18, 173:4,
173:23, 174:14,
175:4, 175:18,
176:22, 177:11,
179:20, 180:11,
181:5, 181:14, 182:1,
182:16, 183:9, 184:3,
184:11, 187:17,
189:24, 190:22,
191:16, 195:11,
196:11, 197:3,
197:23, 198:22,
199:9, 200:5, 200:23,
202:1, 202:24,
203:21, 204:10,
205:4, 206:14,
206:21, 207:7,
207:21, 208:15,
210:14, 211:18,
212:18

**C**

   **C-I-F** [1] - 66:20
   **California** [12] -
29:25, 30:3, 30:6,
30:20, 30:25, 31:10,
31:15, 31:17, 31:18,
34:17, 95:11, 95:18
   **calm** [3] - 123:9,
123:13, 163:24
   **camera** [5] - 122:21,
198:1, 199:3, 200:24,
214:1
   **cannot** [7] - 66:23,
67:21, 68:24, 70:4,
84:6, 135:22, 194:25
   **car** [2] - 195:21,
197:11
   **card** [1] - 59:4
   **cards** [1] - 70:16
   **care** [2] - 216:10,
217:19
   **career** [3] - 43:2,
89:7, 137:15
   **careful** [1] - 127:1
   **carved** [1] - 74:23
   **carving** [1] - 75:2
   **case** [43] - 4:2, 5:23,
6:19, 10:19, 12:16,
25:1, 29:16, 29:17,
42:3, 50:2, 52:25,
53:5, 55:12, 55:15,
56:23, 61:4, 63:2,
63:3, 63:5, 63:22,
66:1, 66:9, 66:15,
67:17, 67:23, 72:5,
72:10, 74:5, 94:12,
95:24, 96:4, 97:13,
97:15, 97:22, 98:7,
101:2, 104:9, 141:6,
188:25, 189:7, 189:8,
204:4, 216:25
   **Case** [1] - 4:3
   **cases** [6] - 13:23,
49:25, 88:10, 89:3,
91:5, 91:7
   **catch** [1] - 117:17
   **Categories** [1] - 8:5
   **category** [1] - 13:16
   **cell** [11] - 42:10,
42:11, 42:12, 42:19,
42:24, 43:1, 52:24,
62:23, 65:14, 95:10,
128:4
   **Cellebrite** [5] -
43:17, 54:1, 54:15,
62:19, 62:20
   **cellular** [3] - 33:12,
94:5, 99:7

   **Center** [2] - 87:25,
89:18
   **center** [1] - 62:4
   **certain** [10] - 7:4,
9:4, 14:16, 45:25,
52:13, 58:25, 67:3,
93:4, 143:14, 147:7
   **certainly** [7] - 11:5,
14:22, 91:21, 132:17,
133:6, 141:13, 189:8
   **certainty** [1] - 138:18
   **CERTIFICATE** [1] -
218:1
   **certifications** [1] -
62:19
   **certified** [2] - 62:19,
62:20
   **certify** [1] - 218:4
   **cetera** [4] - 5:3, 6:25,
36:6, 37:3
   **chain** [1] - 181:19
   **chair** [4] - 40:2,
85:15, 161:22, 162:3
   **chairs** [1] - 158:17
   **chance** [4] - 38:24,
57:5, 93:6, 144:14
   **chances** [1] - 21:18
   **change** [16] - 68:2,
68:4, 68:14, 68:22,
69:2, 69:7, 69:12,
70:4, 123:13, 132:3,
132:23, 171:19,
210:2, 210:24, 213:1,
216:24
   **changed** [6] - 77:18,
79:5, 153:6, 171:17,
175:6, 210:25
   **changes** [2] - 8:20,
79:7
   **changing** [1] - 174:3
   **chart** [6] - 15:23,
16:1, 16:5, 16:9,
16:10, 29:22
   **chat** [1] - 106:8
   **chats** [1] - 146:1
   **chatted** [1] - 18:5
   **check** [5] - 19:9,
30:13, 36:15, 186:9,
215:3
   **checking** [1] -
166:22
   **cherry** [1] - 10:10
   **cherry-pick** [1] -
10:10
   **Chick** [16] - 186:21,
187:9, 187:12,
187:20, 187:24,
188:1, 190:9, 192:3,
192:21, 193:4,
195:13, 195:14,

200:1, 200:2, 200:6, 200:7

**Chick-fil-A** [16] - 186:21, 187:9, 187:12, 187:20, 187:24, 188:1, 190:9, 192:3, 192:21, 193:4, 195:13, 195:14, 200:1, 200:2, 200:6, 200:7

**choose** [3] - 44:22, 76:17, 101:15

**chooses** [1] - 44:21

**chose** [3] - 128:20, 128:23, 129:14

**chosen** [1] - 185:3

**Christen** [1] - 130:10

**CIF** [17] - 41:19, 42:2, 66:20, 129:15, 129:18, 129:22, 130:3, 130:4, 130:6, 130:21, 131:8, 133:2, 133:11, 146:22, 146:23, 147:2, 204:18

**circle** [2] - 64:12, 68:3

**circled** [1] - 122:20

**cited** [2] - 10:11, 33:3

**City** [7] - 17:1, 17:12, 22:22, 26:17, 26:18, 98:1, 150:13

**civil** [1] - 88:23

**claim** [2] - 9:1, 9:9

**claimed** [4] - 6:23, 7:4, 8:23, 9:2

**claims** [2] - 5:16, 11:17

**clarification** [6] - 101:19, 136:14, 136:19, 176:9, 209:4, 209:7

**clarified** [1] - 136:16

**clarify** [10] - 19:2, 19:8, 65:8, 74:13, 82:4, 82:22, 83:15, 177:25, 188:20, 199:5

**clarity** [1] - 6:22

**clear** [6] - 19:18, 40:4, 69:12, 127:16, 178:12, 192:15

**clearly** [1] - 12:14

**click** [2] - 70:11, 93:15

**client** [3] - 6:24, 9:1, 9:5

**Clip** [1] - 109:5

**clip** [18] - 109:11, 109:23, 113:24, 114:8, 165:3, 165:21,

168:18, 171:3, 171:22, 172:13, 177:7, 181:1, 181:16, 181:17, 205:11, 208:2, 208:18

**clips** [7] - 108:7, 108:11, 108:17, 108:18, 116:22, 164:10

**close** [4] - 27:4, 64:20, 100:16, 156:22

**closer** [3] - 40:25, 163:7, 191:13

**closest** [3] - 122:13, 122:21, 161:25

**cloud** [2] - 173:6, 173:9

**clouds** [1] - 90:6

**clunk** [1] - 116:19

**code** [4] - 45:9, 45:16, 48:10, 69:7

**codes** [3] - 183:16, 207:16, 209:9

**colleague** [4] - 4:9, 59:24, 104:8

**colleagues** [1] - 133:7

**collect** [1] - 52:22

**collected** [1] - 163:24

**COLLEEN** [1] - 1:10

**Columbia** [2] - 2:2, 218:13

**COLUMBIA** [2] - 1:1, 1:15

**column** [1] - 58:5

**combination** [3] - 18:23, 49:15, 50:18

**combining** [1] - 70:20

**come-up** [1] - 216:4

**comfortable** [2] - 101:17, 157:7

**coming** [3] - 9:6, 53:3, 104:6

**commanded** [1] - 100:10

**comment** [1] - 12:22

**comments** [1] - 19:21

**committed** [1] - 87:5

**communicate** [1] - 167:7

**communicated** [1] - 109:20

**communicates** [1] - 143:8

**communicating** [1] - 103:15

**communication** [1] -

124:19

**communications** [2] - 8:9, 109:18

**companies** [4] - 79:25, 80:2, 80:23, 82:10

**company** [4] - 48:4, 49:6, 79:6, 80:14

**compare** [1] - 170:23

**comparing** [1] - 150:14

**compel** [18] - 5:13, 7:1, 7:2, 7:7, 8:12, 8:22, 9:19, 10:1, 20:9, 39:1, 126:17, 127:2, 127:14, 132:20, 177:21, 188:9, 189:18, 193:18

**compelled** [3] - 208:3, 209:9, 212:2

**complete** [2] - 56:11, 218:6

**completed** [1] - 54:11

**completely** [1] - 56:14

**complexity** [1] - 49:19

**compliant** [1] - 88:23

**complicated** [3] - 29:4, 29:9, 138:19

**complies** [1] - 97:9

**comply** [2] - 126:19, 179:4

**computer** [6] - 41:20, 42:16, 53:17, 80:16, 97:7, 129:21

**computers** [1] - 91:21

**concern** [1] - 155:3

**concerned** [2] - 8:11, 155:15

**concerning** [1] - 6:15

**concerns** [3] - 141:8, 189:14, 205:16

**concluded** [2] - 210:19, 217:21

**conducted** [1] - 34:23

**confidential** [1] - 9:4

**confirm** [4] - 117:25, 118:4, 167:22, 188:21

**confirmed** [1] - 188:25

**confrontational** [1] - 170:14

**confused** [3] - 111:14, 138:24, 168:10

**confusion** [2] - 112:17, 172:21

**conjunction** [1] - 124:1

**connect** [3] - 42:20, 42:23, 144:14

**connected** [1] - 37:1

**connection** [1] - 75:18

**consensual** [1] - 17:15

**consent** [1] - 106:15

**consider** [5] - 73:13, 73:15, 73:24, 77:14, 96:4

**considerations** [1] - 89:8

**considered** [1] - 9:24

**constitutes** [1] - 218:4

**Constitution** [2] - 2:3, 218:14

**consulted** [3] - 67:22, 212:12, 213:17

**contact** [3] - 27:20, 141:5, 155:22

**contacted** [2] - 27:13, 186:16

**contain** [1] - 59:25

**contained** [2] - 33:1, 60:2

**containing** [1] - 59:24

**contemplated** [1] - 141:12

**content** [1] - 56:15

**contents** [4] - 21:6, 31:25, 57:7, 77:25

**context** [10] - 4:20, 5:2, 14:17, 14:19, 15:11, 21:20, 39:6, 75:1, 79:11, 84:18

**contingencies** [1] - 37:7

**contingency** [3] - 37:13, 37:20, 154:15

**continue** [6] - 74:1, 137:19, 137:20, 157:19, 172:13, 216:7

**continued** [1] - 75:14

**continuing** [1] - 201:22

**continuous** [1] - 49:7

**contractor** [2] - 41:6, 61:24

**contractors** [1] - 130:18

**control** [1] - 18:21

**controlled** [1] -

171:1

**conversation** [6] - 126:22, 127:6, 133:14, 155:14, 193:2, 193:4

**conversational** [1] - 168:25

**conversations** [1] - 195:25

**cool** [1] - 157:12

**cooperate** [1] - 179:4

**cooperative** [5] - 123:13, 152:20, 154:9, 188:21, 189:16

**copies** [4] - 53:18, 177:14, 180:22, 181:18

**copy** [22] - 16:10, 42:13, 42:14, 42:21, 43:21, 48:12, 54:10, 54:20, 57:17, 99:1, 170:16, 177:12, 177:18, 177:20, 184:9, 184:16, 184:23, 193:7, 204:1, 205:23, 206:8

**corner** [9] - 201:8, 203:11, 204:15, 205:6, 207:9, 207:23, 210:16, 211:20, 212:20

**correct** [94] - 9:11, 31:21, 36:1, 36:2, 38:20, 43:11, 51:12, 51:14, 63:18, 63:21, 63:25, 64:2, 64:13, 64:15, 64:18, 65:6, 65:12, 65:16, 65:21, 65:22, 66:10, 66:16, 66:21, 67:15, 68:11, 68:14, 68:15, 68:18, 69:1, 69:4, 69:13, 69:19, 69:22, 70:1, 70:3, 70:6, 71:6, 71:8, 71:11, 71:12, 72:19, 72:20, 74:7, 74:11, 74:18, 74:21, 77:6, 81:12, 81:16, 82:9, 82:21, 84:8, 85:1, 87:16, 90:23, 100:15, 101:3, 112:12, 113:14, 113:15, 114:7, 114:18, 121:23, 123:2, 123:3, 123:6, 125:3, 129:11, 135:24, 136:7, 136:8, 139:8, 144:15, 144:16, 146:16, 148:8, 148:9, 150:6,

150:7, 151:1, 151:23, 152:24, 155:20, 162:5, 181:10, 181:11, 192:18, 192:25, 200:8, 208:4, 213:3, 214:11, 215:6, 215:9
  **correctly** [1] - 86:5
  **counsel** [11] - 4:5, 13:1, 14:12, 40:6, 40:9, 48:21, 85:18, 85:24, 96:15, 194:21, 206:13
  **counter** [1] - 212:10
  **couple** [7] - 4:18, 5:8, 28:6, 39:8, 98:21, 106:20, 164:14
  **course** [19] - 17:16, 17:21, 20:4, 25:20, 25:22, 27:6, 27:7, 29:15, 30:7, 37:18, 38:10, 43:2, 88:17, 89:20, 109:16, 123:7, 137:15, 168:23, 181:16
  **courses** [2] - 88:19, 90:4
  **Court** [24] - 2:1, 2:2, 5:17, 5:18, 7:6, 9:20, 11:6, 15:15, 16:10, 21:15, 21:24, 25:9, 26:3, 32:24, 37:18, 53:18, 96:1, 96:4, 96:16, 99:3, 194:24, 218:12, 218:13
  **court** [45] - 20:25, 92:20, 107:2, 109:9, 110:1, 110:14, 110:23, 112:24, 113:22, 114:11, 115:2, 116:1, 116:10, 116:17, 164:17, 165:7, 165:19, 166:15, 167:14, 168:14, 171:8, 172:2, 172:17, 173:22, 174:13, 175:3, 175:17, 176:21, 177:10, 179:19, 180:10, 181:4, 181:25, 200:22, 201:25, 202:23, 203:20, 204:9, 205:3, 207:6, 207:20, 208:14, 210:13, 211:17, 212:17
  **COURT** [271] - 1:1, 4:1, 4:10, 4:14, 4:16, 5:10, 5:23, 6:5, 6:10, 6:13, 6:17, 7:10, 7:12,

7:15, 7:18, 7:21, 9:14, 9:21, 10:12, 10:17, 10:24, 11:5, 11:8, 11:11, 11:20, 11:24, 12:2, 12:6, 12:21, 12:25, 13:4, 13:16, 13:20, 14:1, 14:6, 14:12, 14:17, 15:2, 15:6, 15:8, 15:10, 15:20, 16:1, 16:5, 16:16, 16:20, 16:22, 19:2, 19:7, 19:12, 20:12, 20:19, 20:24, 21:25, 22:4, 22:12, 22:17, 24:24, 25:6, 25:12, 27:8, 27:22, 28:15, 29:1, 29:8, 29:14, 30:11, 30:18, 31:8, 31:12, 31:15, 31:20, 31:22, 32:20, 33:5, 33:14, 33:19, 33:23, 34:5, 34:7, 34:10, 34:13, 34:22, 35:12, 35:15, 35:22, 36:5, 36:13, 36:16, 36:19, 36:21, 37:1, 38:3, 38:13, 38:19, 39:3, 39:8, 39:13, 39:21, 40:1, 40:22, 48:13, 50:8, 50:11, 53:14, 55:4, 55:6, 57:22, 57:24, 60:23, 61:6, 66:3, 66:11, 70:20, 70:23, 71:21, 72:1, 72:13, 72:17, 72:21, 73:1, 73:5, 73:12, 73:20, 74:3, 75:24, 76:6, 76:9, 78:8, 78:18, 78:22, 79:10, 79:20, 80:1, 80:5, 80:10, 81:1, 81:8, 81:13, 81:17, 81:22, 82:23, 82:25, 83:10, 83:18, 84:10, 84:17, 85:3, 85:6, 85:11, 85:15, 85:18, 85:23, 86:8, 92:22, 92:24, 93:20, 94:21, 94:24, 96:7, 96:10, 96:20, 97:2, 97:6, 97:10, 98:23, 100:19, 100:21, 100:24, 102:13, 102:18, 106:22, 107:22, 108:1, 108:3, 108:22, 108:25, 109:3, 118:9, 119:5, 119:11, 121:12, 121:17, 129:6, 133:23, 134:3, 134:10, 134:21, 134:25, 135:3,

135:10, 136:9, 136:16, 136:20, 137:8, 137:13, 137:21, 137:25, 138:5, 138:16, 139:1, 139:20, 139:24, 140:3, 140:9, 141:20, 142:22, 143:1, 145:10, 145:15, 147:18, 149:4, 149:6, 156:7, 159:15, 159:19, 160:11, 160:16, 161:11, 161:15, 164:4, 164:8, 164:12, 165:8, 165:12, 165:14, 169:3, 169:20, 183:4, 183:8, 190:18, 194:5, 194:10, 194:15, 194:18, 194:23, 194:25, 195:6, 195:10, 196:23, 198:13, 198:15, 198:17, 198:21, 199:8, 199:24, 200:4, 206:6, 206:9, 206:17, 213:22, 213:25, 214:8, 214:12, 214:15, 214:17, 214:20, 214:22, 215:2, 215:5, 215:7, 215:10, 215:13, 215:21, 216:9, 216:13, 216:17, 217:3, 217:13, 217:16, 217:19
  **Court's** [9] - 11:6, 24:23, 32:22, 38:8, 39:11, 99:21, 117:6, 173:3, 206:5
  **courthouse** [2] - 78:11, 134:18
  **COURTROOM** [6] - 4:3, 39:16, 39:25, 53:16, 85:14, 99:1
  **courtroom** [10] - 14:20, 14:22, 39:20, 78:21, 85:10, 108:12, 135:2, 139:23, 140:2, 216:12
  **cover** [1] - 88:8
  **covered** [5] - 87:6, 89:5, 89:20, 124:13, 125:8
  **COVID-19** [2] - 111:18, 130:15
  **cracked** [1] - 119:15, 119:18
  **create** [2] - 80:23, 195:7

  **credentials** [1] - 52:10
  **crime** [1] - 62:17
  **crimes** [3] - 87:5, 88:9, 98:9
  **Criminal** [1] - 1:3
  **criminal** [4] - 4:3, 87:20, 90:24, 91:8
  **Cross** [1] - 3:3
  **cross** [2] - 60:23, 217:7
  **CROSS** [1] - 60:24
  **CROSS-EXAMINATION** [1] - 60:24
  **cross-examine** [1] - 217:7
  **CRR** [3] - 2:1, 218:3, 218:12
  **Cruzer** [1] - 59:8
  **custody** [1] - 181:19
  **customers** [1] - 51:19
  **cybersecurity** [1] - 62:3

# D

  **D.C** [12] - 1:6, 1:17, 1:20, 1:24, 2:4, 31:1, 31:3, 31:13, 31:19, 98:13, 218:14
  **data** [40] - 20:11, 28:4, 42:12, 42:13, 42:21, 43:8, 43:9, 43:12, 43:19, 43:25, 44:1, 44:2, 44:5, 44:25, 46:8, 46:23, 47:2, 47:3, 47:5, 47:10, 50:16, 50:25, 51:19, 52:1, 52:22, 73:17, 76:13, 76:17, 76:20, 76:22, 76:24, 78:2, 91:25, 124:20, 141:6, 147:7, 173:12
  **databases** [1] - 28:4
  **date** [16] - 33:9, 33:12, 33:15, 33:17, 34:3, 34:11, 34:15, 34:19, 66:19, 76:25, 77:3, 77:8, 100:13, 105:2, 143:18, 144:10
  **Dated** [1] - 218:10
  **dated** [1] - 144:19
  **dates** [3] - 33:20, 50:19, 102:8
  **dating** [2] - 19:18, 19:19
  **Dave** [3] - 184:8,

184:22, 202:2
  **David** [3] - 129:2, 142:7, 198:25
  **days** [3] - 27:24, 28:12, 147:2
  **deal** [1] - 189:13
  **dealing** [1] - 4:17
  **dealt** [1] - 8:13
  **debrief** [4] - 184:21, 185:6, 185:13, 192:12
  **December** [3] - 34:2, 34:12, 34:16
  **decide** [2] - 11:6, 150:24
  **decided** [4] - 11:8, 147:3, 166:21, 167:3
  **deciding** [1] - 38:4
  **decision** [2] - 11:6, 177:5
  **declined** [5] - 114:2, 127:10, 185:19, 187:8, 188:22
  **declines** [1] - 181:9
  **decrypt** [1] - 60:13
  **deep** [2] - 24:2
  **Defendant** [8] - 1:7, 9:2, 26:24, 27:9, 60:6, 156:6, 158:6, 216:11
  **DEFENDANT** [1] - 1:18
  **Defendant's** [12] - 9:19, 22:9, 25:2, 25:3, 26:5, 26:13, 29:21, 29:25, 30:24, 32:4, 59:19, 192:25
  **defense** [12] - 7:1, 7:6, 12:25, 13:5, 33:3, 94:15, 94:18, 95:25, 96:8, 108:17, 136:14, 216:19
  **defense's** [2] - 12:8, 26:1
  **defenses** [1] - 11:17
  **definitely** [2] - 73:24, 85:16
  **definitive** [2] - 48:2, 74:19
  **degree** [1] - 62:17
  **delayed** [2] - 34:1, 34:12
  **delete** [3] - 141:7, 172:25, 178:11
  **deleted** [4] - 147:8, 173:14, 173:24, 174:2
  **deletion** [1] - 141:8
  **delink** [1] - 70:15
  **delivered** [1] - 66:22
  **delved** [1] - 62:18
  **demeanor** [10] - 19:21, 123:8, 123:11,

163:22, 168:22,
170:19, 170:22,
170:23, 171:17, 175:6
**Dempsey** [1] - 4:8
**DEMPSEY** [44] -
1:14, 4:7, 9:11, 9:16,
12:5, 12:7, 12:24,
13:3, 14:15, 15:1,
15:5, 15:9, 39:14,
39:18, 40:17, 40:24,
48:19, 50:12, 53:15,
53:17, 53:20, 55:2,
55:10, 57:20, 58:2,
60:22, 70:19, 71:20,
71:25, 75:23, 76:11,
78:7, 80:8, 80:11,
82:3, 82:22, 82:24,
97:9, 134:19, 134:24,
138:4, 138:6, 138:11,
138:15
**DENISE** [1] - 1:21
**Denise** [1] - 4:13
**department** [1] -
87:19
**Department** [15] -
28:9, 31:24, 41:6,
41:7, 41:21, 61:23,
86:18, 87:4, 87:6,
87:15, 92:12, 124:2,
124:4, 124:6, 148:7
**depicted** [3] - 23:10,
190:24, 191:3
**depicting** [1] - 24:4
**depiction** [12] -
102:7, 107:20, 118:1,
118:24, 142:14,
145:4, 148:24,
169:12, 182:22,
190:11, 196:16, 198:7
**depictions** [1] -
121:6
**DEPUTY** [6] - 4:3,
39:16, 39:25, 53:16,
85:14, 99:1
**Deputy** [1] - 216:5
**describe** [4] - 67:19,
109:17, 109:20,
168:22
**described** [7] -
20:23, 51:3, 120:7,
120:8, 120:10,
120:15, 175:5
**desk** [8] - 62:6,
62:10, 65:11, 65:17,
199:13, 199:25,
200:9, 203:7
**destruction** [1] -
37:22
**detail** [3] - 90:3,
108:20, 174:8

**detailed** [1] - 35:18
**detain** [3] - 126:20,
179:5, 188:22
**detained** [1] - 180:16
**detention** [1] - 179:7
**determination** [3] -
12:11, 123:23, 124:1
**determine** [1] - 48:2
**develop** [1] - 82:11
**developed** [1] -
217:12
**development** [1] -
79:12
**Device** [8] - 20:23,
21:4, 21:8, 37:9
**device** [40] - 21:5,
42:20, 42:22, 42:23,
44:13, 44:23, 47:8,
47:19, 49:23, 50:3,
50:4, 50:8, 51:6, 53:9,
54:6, 56:16, 58:17,
67:13, 73:17, 73:18,
77:20, 82:8, 82:11,
82:19, 94:4, 111:8,
111:13, 112:17,
114:23, 117:18,
120:10, 126:5, 132:9,
209:15, 210:3,
210:10, 210:20,
211:3, 214:14
**devices** [53] - 12:16,
21:9, 37:12, 38:2,
42:3, 42:6, 47:2, 49:9,
50:15, 50:22, 51:21,
52:19, 52:21, 52:22,
56:18, 56:24, 59:21,
65:18, 72:25, 74:2,
76:8, 80:24, 89:14,
89:23, 90:2, 91:12,
91:14, 91:17, 91:19,
91:22, 91:24, 91:25,
93:4, 95:9, 95:11,
95:18, 100:15, 118:20,
122:5, 122:9, 124:18,
124:25, 130:10,
131:17, 141:14,
151:17, 171:20,
175:12, 179:2, 179:9,
181:20, 210:8, 211:5
**difference** [3] - 65:1,
79:21, 87:17
**different** [20] - 11:3,
23:11, 25:18, 49:3,
56:1, 70:21, 84:25,
88:8, 112:16, 114:22,
114:23, 129:25,
137:1, 151:4, 154:11,
154:22, 155:2,
155:12, 155:24, 179:1
**differentiate** [1] -

77:7
**difficult** [1] - 70:23
**difficulties** [1] -
209:25
**digit** [3] - 48:10,
48:22, 49:12
**digital** [11] - 11:22,
41:8, 41:9, 41:10,
41:16, 56:24, 59:21,
62:16, 62:18, 91:22,
130:5
**digits** [1] - 49:14
**dignitary** [2] - 87:12,
88:2
**Diplomatic** [1] -
86:19
**diplomatic** [2] -
87:19, 88:1
**DIRECT** [2] - 40:16,
86:9
**direct** [2] - 20:20,
168:24
**Direct** [1] - 3:3
**directing** [2] - 53:1,
60:18
**director** [2] - 128:19,
133:7
**disclosed** [1] - 10:6
**disclosure** [1] -
21:24
**discover** [1] - 59:15
**discoverable** [1] -
11:3
**discovered** [1] -
155:2
**discovering** [1] -
74:22
**discovery** [3] - 7:3,
8:22
**discuss** [7] - 11:24,
133:11, 134:6,
154:15, 178:22,
193:11, 193:20
**discussed** [12] -
23:1, 33:21, 132:16,
132:18, 178:20,
185:8, 188:3, 189:1,
189:19, 193:15,
209:20
**discussing** [1] -
178:21
**discussion** [2] -
8:25, 187:7
**distance** [1] - 190:5
**District** [4] - 2:2, 2:2,
18:24, 218:13
**district** [1] - 218:13
**DISTRICT** [4] - 1:1,
1:1, 1:11, 1:15
**doable** [1] - 46:12

**Docket** [1] - 147:16
**document** [3] -
48:21, 206:13, 206:15
**documents** [4] - 7:1,
8:4, 8:5, 52:3
**domestic** [1] - 88:16
**done** [20] - 7:13,
25:6, 25:7, 31:13,
43:2, 49:25, 62:23,
63:7, 63:12, 65:14,
128:8, 182:8, 182:11,
184:13, 184:20,
186:1, 209:23,
211:13, 216:25
**door** [4] - 197:8,
201:14, 201:17,
202:15
**doors** [5] - 202:10,
202:16, 202:18,
202:19, 202:20
**Dorothy** [2] - 96:14,
216:4
**double** [4] - 19:9,
30:13, 98:25, 112:4
**double-check** [2] -
19:9, 30:13
**doubt** [2] - 5:19,
136:25
**down** [40] - 13:12,
27:8, 40:2, 61:19,
70:21, 71:13, 85:4,
93:24, 99:19, 99:25,
103:9, 105:6, 105:20,
106:4, 107:22,
108:11, 111:13,
113:8, 113:17,
119:20, 121:20,
122:9, 123:1, 131:15,
139:17, 142:8,
150:17, 169:6,
169:25, 183:22,
184:2, 199:19,
200:10, 201:8,
201:21, 203:9,
204:24, 211:7,
215:18, 216:13
**downstairs** [1] -
216:6
**draft** [2] - 128:3,
128:17
**drafted** [1] - 128:6,
128:7, 128:10
**drafting** [1] - 143:7
**drafts** [1] - 127:22
**drawing** [1] - 122:17
**drew** [2] - 122:18,
122:22
**Drive** [1] - 90:6
**driveway** [1] - 197:10
**driving** [1] - 159:6

**dropped** [1] - 156:12
**drugs** [1] - 58:25
**drunk** [1] - 150:10
**DS** [1] - 201:3
**due** [1] - 130:15
**Dulles** [4] - 37:17,
151:7, 151:19, 155:5
**during** [22] - 18:1,
20:22, 32:14, 32:16,
67:8, 75:16, 77:7,
90:20, 99:16, 111:3,
116:22, 126:22,
163:1, 165:21,
170:22, 172:24,
187:2, 188:12,
188:14, 188:17,
189:1, 195:25

## E

**easier** [4] - 36:21,
39:5, 53:19, 81:10
**Eastern** [1] - 18:24
**easy** [5] - 65:7, 65:8,
71:4, 152:7, 152:16
**ECF** [2] - 5:13,
147:16
**education** [1] - 41:12
**Edwards** [1] - 218:12
**EDWARDS** [2] - 2:1,
218:3
**effect** [4] - 152:20,
166:4, 180:17, 213:12
**eight** [7] - 48:23,
79:3, 81:19, 81:25,
167:10, 167:11,
208:17
**either** [11] - 20:9,
21:25, 43:7, 43:25,
64:7, 70:4, 130:10,
132:3, 176:16,
193:15, 202:20
**either/or** [1] - 130:12
**Elden** [6] - 156:23,
158:22, 191:11,
191:19, 192:6, 192:13
**electronic** [11] -
20:5, 20:11, 42:3,
56:24, 89:14, 90:5,
91:11, 91:14, 91:17,
91:19, 132:8
**Eleventh** [1] - 1:16
**Email** [1] - 144:19
**email** [41] - 8:24, 9:8,
10:6, 14:11, 26:22,
27:14, 27:15, 28:10,
47:6, 47:7, 52:15,
58:25, 59:19, 59:20,
59:24, 60:1, 78:3,

78:5, 123:20, 127:4,
131:4, 141:24, 142:6,
142:11, 142:14,
143:6, 143:8, 143:18,
143:21, 144:5,
144:13, 144:21,
144:24, 145:4,
145:18, 146:6,
146:10, 146:18,
147:23, 147:25
  **emailed** [3] - 26:21,
28:8, 123:19
  **emails** [1] - 27:13
  **embassy** [4] - 87:7,
87:12, 97:25, 98:10
  **embassy-leased** [1]
- 97:25
  **embedded** [2] -
56:15, 75:4
  **emergency** [1] -
189:9
  **emphasized** [1] -
89:8
  **employment** [2] -
108:16, 108:21
  **empty** [1] - 158:17
  **en** [1] - 184:23
  **enabled** [6] - 64:1,
64:17, 68:3, 68:7,
68:10, 69:17
  **enables** [1] - 80:22
  **encounter** [4] -
17:15, 110:4, 194:7,
202:9
  **encountered** [2] -
137:19, 190:12
  **encountering** [1] -
210:1
  **encrypted** [1] - 31:23
  **end** [7] - 56:21, 80:6,
109:11, 177:7,
180:19, 182:2, 186:13
  **ended** [1] - 114:8
  **ends** [2] - 137:4,
146:18
  **enforcement** [15] -
8:7, 8:25, 18:3, 21:2,
21:7, 41:11, 114:5,
189:3, 189:7, 193:21,
193:24, 199:15,
201:2, 201:4, 204:1
  **Enforcement** [2] -
87:24, 89:18
  **engage** [2] - 188:9,
211:22
  **engaged** [2] - 201:3,
201:4
  **engendered** [1] -
80:5
  **ensure** [2] - 37:21,

141:6
  **entail** [2] - 88:13,
133:14
  **entered** [27] - 39:19,
46:19, 46:22, 55:9,
57:25, 78:20, 85:9,
95:3, 102:15, 108:4,
118:11, 119:7,
121:15, 135:1, 140:1,
142:24, 145:13,
149:9, 160:14,
161:14, 165:17,
169:23, 183:7,
190:21, 197:2,
198:20, 214:13
  **entering** [2] - 208:1,
210:3
  **entire** [5] - 91:6,
107:12, 107:15,
151:6, 163:2
  **entirety** [2] - 164:21,
205:20
  **entry** [1] - 127:14
  **equipment** [2] -
65:20, 65:21
  **error** [1] - 47:16
  **escalation** [1] -
189:8
  **escort** [2] - 37:20,
153:19
  **ESQ** [5] - 1:14, 1:14,
1:18, 1:21, 1:21
  **essence** [2] - 6:5, 8:5
  **essential** [1] - 11:17
  **essentially** [8] -
15:17, 17:14, 37:7,
69:3, 112:10, 186:10,
191:12, 192:24
  **established** [1] -
155:19
  **estimate** [4] - 48:1,
74:18, 91:3, 91:8
  **et** [4] - 5:3, 6:25,
36:6, 37:3
  **evening** [3] - 216:9,
216:10, 217:20
  **event** [3] - 37:13,
189:11, 189:16
  **eventually** [2] -
57:11, 105:16
  **evidence** [67] -
15:25, 18:4, 18:17,
20:10, 24:7, 24:12,
26:5, 27:4, 30:21,
30:22, 32:23, 33:2,
37:22, 41:10, 42:3,
50:17, 53:8, 55:3,
55:9, 57:10, 57:21,
58:1, 58:4, 75:15,
94:23, 95:3, 102:11,

102:16, 107:25,
108:5, 118:7, 118:12,
119:3, 119:8, 121:10,
121:15, 124:22,
131:1, 134:14,
142:20, 142:24,
145:8, 145:13, 147:4,
147:5, 147:6, 149:3,
149:9, 160:9, 160:14,
161:9, 161:14,
165:17, 169:18,
169:23, 173:16,
178:7, 178:11, 183:1,
183:7, 187:16,
190:15, 190:21,
196:20, 197:2,
198:11, 198:20
  **EVIDENCE** [1] - 3:9
  **exact** [1] - 90:13
  **exactly** [5] - 4:22,
12:12, 33:16, 79:4,
139:14
  **EXAMINATION** [6] -
40:16, 60:24, 76:10,
80:7, 83:2, 86:9
  **examine** [2] - 75:14,
217:7
  **examined** [1] - 12:16
  **examiner** [1] - 56:13
  **examining** [2] -
75:18, 75:21
  **example** [5] - 33:10,
70:16, 127:24,
127:25, 132:2
  **excellent** [1] -
149:23
  **exchange** [9] -
119:22, 142:6,
142:12, 142:14,
144:13, 145:4,
146:18, 148:10,
154:14
  **exchanged** [7] -
104:2, 148:21,
148:24, 169:10,
176:15, 180:1, 200:17
  **excluded** [3] - 11:19,
12:4, 33:4
  **exclusively** [1] - 8:6
  **excuse** [7] - 13:4,
23:24, 27:13, 78:10,
109:5, 198:12, 201:3
  **excused** [2] - 85:5,
216:16
  **execute** [10] - 35:10,
100:10, 126:9,
126:10, 127:20,
128:21, 146:24,
150:21, 178:22,
188:16

  **executed** [10] -
31:12, 31:13, 31:14,
31:16, 33:8, 34:20,
36:4, 90:11, 99:14,
125:9
  **executing** [4] -
28:22, 126:15,
127:11, 195:20
  **execution** [16] -
6:16, 9:17, 10:6, 10:7,
20:22, 34:3, 34:11,
34:16, 91:23, 92:5,
99:17, 99:22, 128:3,
128:14, 129:22, 133:9
  **executions** [1] -
91:10
  **exemplar** [1] -
149:18
  **exhibit** [6] - 39:16,
93:18, 100:16,
102:20, 147:16,
182:14
  **Exhibit** [175] - 3:10,
3:11, 3:11, 3:12, 3:12,
3:13, 3:13, 3:14, 3:14,
3:15, 3:15, 3:16, 3:16,
3:17, 3:17, 3:18, 3:18,
3:19, 3:19, 9:20,
48:14, 53:24, 53:25,
54:14, 55:8, 57:2,
57:4, 57:6, 57:13,
57:21, 57:25, 95:2,
95:4, 99:7, 101:22,
102:11, 102:13,
102:15, 104:20,
105:6, 106:21,
106:23, 106:24,
107:1, 107:19,
107:24, 108:4,
108:10, 109:5, 109:8,
109:25, 110:11,
110:13, 110:21,
110:22, 112:21,
112:23, 113:19,
113:21, 114:9,
114:10, 114:24,
115:1, 115:24,
115:25, 116:8, 116:9,
116:16, 117:6,
117:11, 117:12,
118:7, 118:9, 118:11,
118:14, 118:17,
119:3, 119:5, 119:7,
119:13, 119:14,
120:11, 120:12,
120:24, 121:14,
121:19, 122:10,
141:19, 142:2,
142:20, 142:23,
144:18, 145:8,

145:10, 145:12,
147:18, 148:14,
149:3, 149:7, 149:8,
156:5, 159:12,
159:14, 160:9,
160:11, 160:13,
160:25, 161:13,
164:2, 164:6, 164:7,
164:16, 165:6,
165:15, 165:16,
165:18, 166:14,
167:13, 168:13,
169:2, 169:18,
169:20, 169:22,
169:25, 171:4, 171:7,
171:23, 172:1,
172:16, 173:21,
174:12, 175:2,
175:16, 176:20,
177:9, 179:18, 180:9,
181:3, 181:24,
182:14, 183:1, 183:4,
183:6, 183:21,
187:15, 189:22,
189:25, 190:3,
190:20, 190:23,
192:2, 196:9, 197:1,
197:4, 197:20,
198:11, 198:12,
198:14, 198:18,
198:19, 200:21,
201:18, 201:24,
202:22, 203:19,
204:8, 205:2, 206:12,
207:5, 207:19,
208:13, 210:12,
211:16, 212:16
  **Exhibits** [17] - 29:16,
53:13, 55:3, 55:7,
94:22, 94:25, 117:7,
119:10, 121:3,
121:10, 161:9,
161:11, 190:10,
190:15, 190:18,
196:20, 196:24
  **exhibits** [7] - 5:22,
95:25, 96:5, 96:11,
100:17, 140:13,
141:23
  **EXHIBITS** [1] - 3:9
  **existed** [3] - 16:13,
24:11, 82:13
  **existing** [1] - 68:20
  **exists** [2] - 83:22,
135:12
  **exit** [1] - 202:16
  **experience** [10] - 8:8,
38:16, 41:15, 45:15,
72:22, 90:9, 129:5,
137:8, 137:14, 137:17

**expert** [5] - 11:15,
13:21, 14:4, 62:21,
217:9
  **expertise** [2] - 11:20,
12:12
  **experts** [4] - 11:18,
13:24, 14:7, 130:4
  **explain** [3] - 110:4,
174:2, 176:12
  **explains** [1] - 110:3
  **explanation** [1] -
166:21
  **explicit** [5] - 55:16,
56:6, 75:7, 75:15,
75:16
  **exploited** [1] - 80:3
  **exploits** [1] - 79:17
  **Explorer** [1] - 58:11
  **express** [1] - 172:21
  **expressed** [1] -
133:15
  **expressing** [1] -
204:18
  **extensively** [1] - 89:5
  **extent** [1] - 20:7
  **exterior** [1] - 197:6
  **extra** [1] - 111:18
  **extract** [15] - 43:9,
46:8, 46:23, 49:22,
50:25, 56:15, 65:18,
75:5, 76:12, 76:13,
76:16, 76:17, 76:24,
90:1
  **extracted** [5] - 43:12,
43:19, 44:5, 47:3,
77:4
  **extracting** [3] - 43:8,
47:2, 91:25
  **extraction** [27] -
42:11, 42:12, 42:19,
46:7, 51:6, 51:9, 53:9,
54:1, 54:2, 54:5, 54:6,
54:10, 54:11, 54:15,
54:16, 54:20, 54:23,
63:8, 64:19, 64:21,
65:10, 67:8, 72:4,
72:5, 76:22, 77:14,
77:20
  **extractions** [7] -
42:10, 43:1, 62:23,
63:1, 63:2, 65:14,
76:20
  **extremely** [1] -
178:25

## F

  **F'd** [1] - 166:18
  **face** [18] - 20:9, 21:8,

21:9, 38:2, 45:5,
45:11, 45:16, 64:14,
69:15, 69:18, 69:20,
69:24, 70:11, 70:12,
71:7, 77:19, 179:10,
215:18
  **facial** [4] - 44:24,
45:23, 126:4, 215:19
  **fact** [39] - 9:3, 17:10,
17:25, 18:3, 23:7,
23:17, 23:25, 24:6,
26:12, 26:18, 26:20,
26:24, 27:7, 27:9,
29:11, 30:8, 32:14,
32:18, 50:2, 81:14,
96:2, 107:17, 110:17,
124:10, 127:16,
127:18, 133:11,
133:21, 147:11,
154:10, 154:21,
155:2, 155:11,
158:23, 164:23,
191:1, 193:21,
202:13, 212:23
  **factors** [3] - 46:11,
74:20, 84:25
  **facts** [8] - 17:3, 17:6,
17:14, 18:18, 22:22,
70:21, 83:20, 84:13
  **fail** [4] - 83:14, 83:15,
83:17, 137:9
  **failure** [1] - 137:10
  **fairness** [2] - 137:2,
137:18
  **fair** [26] - 54:10,
54:20, 57:17, 87:14,
90:19, 94:10, 102:7,
107:19, 117:25,
118:23, 121:6, 145:3,
148:23, 160:5, 161:5,
164:25, 167:6, 168:2,
169:12, 170:4,
182:21, 190:11,
192:17, 196:16,
198:7, 211:8
  **Fairfax** [4] - 101:10,
101:13, 103:22,
156:13
  **Fairfield** [5] - 37:19,
191:3, 196:7, 196:14,
197:6
  **fall** [1] - 63:1
  **familiar** [3] - 43:4,
46:14, 92:9
  **family** [1] - 88:15
  **family-related** [1] -
88:15
  **far** [10] - 8:11, 11:3,
20:18, 20:20, 33:7,
66:1, 93:21, 126:3,

145:20, 203:11
  **Faraday** [2] - 132:6,
132:7
  **fast** [1] - 20:24
  **faster** [3] - 79:8,
80:17, 81:19
  **feature** [2] - 132:4,
132:23
  **features** [6] - 4:24,
44:11, 44:12, 51:13,
64:17, 132:21
  **Federal** [2] - 87:24,
89:18
  **fellow** [1] - 93:2
  **felt** [1] - 157:6
  **female** [1] - 97:24
  **few** [13] - 42:9, 46:5,
47:8, 49:2, 51:15,
61:5, 99:25, 100:17,
147:2, 157:22, 176:2,
204:11, 215:24
  **field** [5] - 65:15,
128:2, 128:11,
130:19, 167:5
  **Fifth** [2] - 89:9, 89:12
  **figure** [5] - 133:24,
143:15, 153:6, 181:6,
181:20
  **fil** [16] - 186:21,
187:9, 187:12,
187:20, 187:24,
188:1, 190:9, 192:3,
192:21, 193:4,
195:13, 195:14,
200:1, 200:2, 200:6,
200:7
  **file** [19] - 56:15, 75:2,
75:3, 75:4, 75:5, 78:3,
78:4, 200:25, 203:1,
203:22, 204:12,
205:7, 207:8, 207:22,
208:17, 210:15,
211:19, 212:20
  **filed** [4] - 5:13, 5:25,
6:18, 26:3
  **files** [2] - 23:8, 23:9
  **filling** [1] - 181:18
  **filter** [1] - 77:5
  **finally** [4] - 23:24,
32:5, 59:14
  **findings** [7] - 30:9,
56:3, 56:5, 58:11,
58:25, 59:15, 60:18
  **fine** [7] - 16:6, 19:7,
82:23, 97:6, 152:8,
184:7, 195:7
  **finger** [4] - 20:9,
21:22, 64:12, 68:7
  **finger's** [1] - 21:21
  **fingerprint** [5] -

44:24, 45:14, 63:15,
68:3, 126:4
  **fingers** [3] - 21:3,
37:25, 179:8
  **finish** [2] - 40:6,
85:19
  **finished** [1] - 110:7
  **firearm** [1] - 162:19
  **first** [60] - 12:8,
13:11, 13:12, 15:15,
16:25, 17:11, 29:23,
30:13, 30:16, 33:16,
39:12, 45:19, 45:21,
46:8, 46:14, 46:16,
46:17, 46:21, 47:4,
47:11, 48:6, 50:23,
50:25, 51:5, 61:12,
63:7, 65:3, 65:11,
68:4, 74:9, 76:12,
76:13, 76:23, 83:8,
84:5, 84:11, 84:23,
86:13, 90:21, 93:15,
97:12, 97:13, 103:1,
105:9, 109:11,
134:12, 135:21,
138:7, 138:10,
138:12, 139:12,
139:16, 140:18,
163:22, 175:19,
177:22, 186:18,
202:8, 209:23, 214:19
  **five** [17] - 21:17,
21:18, 21:21, 23:11,
62:7, 95:9, 95:18,
107:4, 158:12, 165:5,
168:7, 168:12, 177:8,
204:12, 205:7, 207:8
  **flake** [1] - 153:11
  **FLETC** [2] - 89:17,
89:21
  **flip** [1] - 57:4
  **floor** [1] - 203:4
  **Floor** [1] - 1:16
  **focus** [6] - 16:11,
22:10, 29:18, 33:1,
39:8, 121:19
  **FOLEY** [1] - 1:19
  **follow** [4] - 70:23,
123:15, 127:4, 138:3
  **followed** [2] -
147:22, 147:25
  **following** [12] - 7:20,
39:20, 78:17, 78:21,
85:10, 134:9, 135:2,
135:25, 139:23,
140:2, 194:17, 216:12
  **followup** [4] - 37:11,
82:25, 100:2, 110:8
  **footage** [5] - 198:1,
198:3, 198:5, 199:6,

199:11
  **FOR** [5] - 1:1, 1:14,
1:15, 1:18, 3:4
  **force** [37] - 47:25,
48:6, 48:10, 49:11,
72:7, 72:10, 72:18,
72:22, 72:25, 73:21,
74:5, 77:14, 78:24,
79:1, 79:20, 79:21,
81:1, 81:10, 81:14,
83:4, 83:22, 83:24,
84:12, 84:21, 84:23,
135:12, 135:13,
136:4, 136:9, 137:15,
137:20, 137:22,
138:7, 138:13,
138:24, 139:9, 177:4
  **forcing** [10] - 47:14,
47:15, 47:16, 49:16,
49:21, 73:18, 74:1,
79:17, 137:2, 137:3
  **foregoing** [1] - 218:4
  **foremost** [2] - 15:15,
16:25
  **forensic** [20] - 23:7,
31:24, 41:8, 41:9,
42:17, 43:4, 43:7,
43:9, 43:14, 43:21,
44:6, 46:5, 47:9,
47:25, 56:1, 56:14,
62:21, 75:2, 129:16,
130:25
  **forensics** [6] - 11:22,
41:16, 41:20, 62:16,
62:18, 129:21
  **forgot** [1] - 79:4
  **form** [2] - 79:21,
106:15
  **formal** [1] - 128:1
  **forms** [1] - 184:13
  **forthcoming** [1] -
24:18
  **forward** [9] - 39:11,
133:8, 150:5, 167:10,
173:18, 174:9,
176:17, 177:6, 188:3
  **four** [3] - 48:22,
191:9, 203:23
  **four-digit** [1] - 48:22
  **four-minute** [1] -
191:9
  **Fourth** [5] - 1:16,
88:19, 88:23, 89:7,
89:12
  **fragment** [3] - 56:9,
56:10, 56:12
  **fragmented** [3] -
23:8, 56:17
  **fragments** [7] -
23:10, 23:20, 56:8,

67:19, 75:2, 75:7
**frankly** [2] - 6:3, 8:3
**fraud** [1] - 87:11
**free** [5] - 106:5, 106:7, 157:12, 163:11, 163:13
**frequently** [1] - 137:9
**friend** [2] - 104:6, 104:7
**front** [12] - 18:11, 34:19, 92:18, 148:18, 159:21, 199:13, 199:25, 200:9, 202:10, 202:18, 203:7, 212:9
**fruits** [1] - 33:3
**frustrated** [1] - 211:11
**frustration** [2] - 133:15, 204:18
**full** [11] - 21:23, 55:17, 56:7, 64:20, 65:10, 77:20, 84:6, 84:11, 84:24, 135:22, 218:5
**fully** [2] - 7:8, 217:11
**fulsome** [1] - 12:11
**furthest** [1] - 122:22

## G

**G-A-J-K-O-W-S-K** [1] - 86:14
**gain** [1] - 47:18
**Gajkowski** [30] - 3:7, 18:13, 85:8, 85:9, 86:6, 86:13, 86:15, 86:17, 97:12, 107:6, 109:12, 117:11, 117:24, 118:4, 118:16, 121:4, 140:1, 140:15, 141:25, 142:2, 144:19, 148:16, 156:6, 161:3, 164:15, 169:8, 195:12, 197:24, 212:22, 217:7
**GAJKOWSKI** [1] - 85:13
**gallery** [1] - 97:8
**gap** [1] - 115:4
**garbage** [1] - 161:23
**gazebo** [4] - 105:15, 105:22, 121:5, 121:6
**general** [6] - 41:17, 44:10, 62:1, 73:3, 80:16, 124:16
**generally** [15] - 14:6,

42:9, 43:23, 50:13, 51:8, 51:17, 51:21, 55:14, 56:4, 73:2, 82:6, 83:23, 89:25, 135:13, 185:8
**generated** [1] - 54:21
**geolocation** [1] - 124:20
**George** [2] - 62:9, 62:10
**GIRAUDO** [4] - 1:21, 96:23, 97:1, 97:4
**Giraudo** [1] - 4:13
**given** [4] - 72:1, 96:2, 127:20, 127:23
**glass** [1] - 119:21
**glasses** [1] - 92:18
**gmail** [5] - 28:7, 28:8, 123:21, 145:22, 145:25
**goal** [1] - 20:9
**Google** [5] - 59:11, 59:15, 90:6, 95:16, 104:20
**GOVERNMENT** [4] - 1:14, 3:4, 39:24, 85:13
**Government** [50] - 4:6, 4:8, 4:20, 5:15, 5:18, 6:3, 6:23, 7:6, 8:23, 10:5, 11:25, 13:9, 15:8, 21:14, 22:6, 22:8, 24:9, 25:2, 27:1, 27:4, 27:14, 27:18, 29:16, 29:20, 29:23, 30:16, 31:1, 31:2, 31:24, 32:2, 32:9, 32:12, 32:17, 39:14, 85:7, 94:17, 94:22, 95:22, 96:4, 100:18, 108:18, 119:2, 120:23, 142:20, 164:10, 190:14, 196:19, 216:18, 217:8, 217:15
**Government's** [169] - 3:10, 5:21, 7:5, 7:9, 15:19, 15:22, 23:13, 24:10, 29:22, 32:25, 48:14, 53:12, 53:24, 53:25, 54:14, 55:3, 55:7, 55:8, 57:1, 57:4, 57:6, 57:13, 57:20, 57:25, 94:25, 95:2, 99:7, 101:22, 102:10, 102:13, 102:15, 104:19, 105:6, 106:21, 106:24, 107:1, 107:19, 107:24, 108:4, 108:7,

108:8, 108:10, 109:4, 109:8, 109:25, 110:10, 110:13, 110:20, 110:22, 112:21, 112:23, 113:19, 113:21, 114:8, 114:10, 114:24, 115:1, 115:23, 115:24, 115:25, 116:7, 116:9, 116:14, 116:16, 117:6, 117:7, 117:10, 117:12, 118:6, 118:9, 118:11, 118:14, 118:16, 119:5, 119:7, 120:11, 120:12, 120:24, 121:2, 121:10, 121:14, 121:19, 122:10, 141:19, 142:2, 142:20, 142:23, 144:18, 145:8, 145:12, 147:16, 147:18, 148:14, 149:2, 149:7, 149:8, 159:12, 159:14, 160:8, 160:11, 160:13, 160:25, 161:8, 161:11, 161:13, 164:16, 165:6, 165:15, 165:16, 165:18, 166:14, 167:13, 168:13, 169:2, 169:17, 169:20, 169:22, 169:25, 171:4, 171:7, 171:23, 172:1, 172:16, 173:21, 174:12, 175:2, 175:16, 176:20, 177:9, 179:18, 180:9, 181:3, 181:24, 183:1, 183:4, 183:6, 183:21, 187:15, 189:22, 189:25, 190:3, 190:10, 190:18, 190:20, 190:23, 192:2, 196:9, 196:24, 197:1, 197:4, 197:20, 198:11, 198:18, 198:19, 200:21, 201:17, 201:24, 202:22, 203:19, 204:8, 205:2, 206:12, 207:5, 207:19, 208:13, 210:12, 211:16, 212:16
**government's** [18] - 3:11, 3:11, 3:12, 3:12, 3:13, 3:13, 3:14, 3:14,

3:15, 3:15, 3:16, 3:16, 3:17, 3:17, 3:18, 3:18, 3:19, 3:19
**grab** [1] - 39:18
**granted** [1] - 8:15
**granularity** [1] - 35:2
**gray** [9] - 102:23, 102:24, 103:19, 103:21, 149:13, 150:19, 156:17, 170:6, 183:11
**Grayshift** [3] - 48:4, 48:9, 49:11
**great** [6] - 103:10, 108:20, 149:15, 149:17, 184:18, 194:9
**greater** [1] - 147:4
**group** [9] - 159:9, 159:13, 160:2, 160:6, 183:21, 183:23, 183:24, 187:12, 195:15
**guarantee** [16] - 74:9, 74:12, 74:15, 83:9, 84:3, 84:6, 84:11, 84:23, 135:19, 135:22, 136:1, 136:19, 136:21, 136:22, 136:24, 138:1
**guaranteed** [3] - 84:2, 135:17, 136:10
**guess** [7] - 41:18, 47:17, 48:24, 49:10, 49:22, 50:14, 214:3
**guidance** [3] - 126:10, 126:13, 126:23
**guy** [1] - 202:5
**guys** [17] - 105:23, 113:25, 122:25, 144:14, 157:4, 158:23, 161:18, 162:6, 162:25, 171:10, 173:14, 187:24, 189:1, 193:18, 201:11, 201:20, 204:15

## H

**half** [3] - 61:16, 62:6, 191:25
**hallway** [2] - 197:15, 197:17
**hammer** [1] - 7:23
**HAMPTON** [1] - 1:22
**hand** [24] - 17:16, 44:7, 48:12, 102:23, 103:19, 111:15,

111:16, 111:20, 113:2, 119:20, 119:21, 120:13, 156:16, 172:10, 183:11, 201:9, 205:6, 205:11, 207:9, 207:23, 209:13, 210:16, 211:20, 212:20
**handcuffs** [6] - 126:21, 162:10, 162:12, 162:21, 179:6, 193:16
**handed** [12] - 122:2, 208:22, 208:24, 214:4, 214:7, 214:8, 214:9, 214:25, 215:5, 215:7, 215:14
**handheld** [2] - 106:18, 163:21
**handing** [1] - 116:19
**handling** [1] - 166:25
**hands** [3] - 189:6, 189:10, 215:17
**happy** [1] - 32:25
**hard** [1] - 86:15
**harder** [2] - 147:8
**hardly** [1] - 130:16
**head** [2] - 201:14, 211:10
**heads** [1] - 104:6
**heads-up** [1] - 104:6
**healthy** [1] - 111:19
**hear** [49] - 4:21, 18:13, 32:7, 32:12, 32:14, 37:18, 40:5, 40:9, 40:12, 85:16, 85:23, 86:1, 101:8, 111:23, 112:14, 114:2, 165:21, 166:6, 168:19, 171:10, 172:22, 173:1, 173:7, 175:8, 176:4, 177:2, 179:21, 180:13, 182:5, 182:9, 187:10, 202:2, 203:3, 203:25, 204:4, 204:20, 205:5, 205:8, 207:15, 208:19, 209:4, 209:9, 211:22, 211:25, 212:2, 212:24, 213:6, 213:8, 213:13
**heard** [10] - 24:10, 62:14, 66:17, 107:7, 109:13, 112:13, 172:4, 182:2, 182:4, 211:21
**hearing** [10] - 5:15, 5:20, 8:6, 8:17, 10:20, 12:4, 96:6, 109:1,

109:2, 204:5
**HEARING** [1] - 1:10
**heavily** [2] - 6:8, 6:9
**held** [2] - 8:15, 67:8
**help** [8] - 5:2, 62:6, 62:10, 111:6, 122:11, 130:14, 143:7, 143:12
**helpful** [4] - 4:19, 5:4, 11:11, 17:24
**hereby** [1] - 218:3
**Herndon** [1] - 198:1
**herself** [2] - 18:14, 131:12
**hesitant** [1] - 205:15
**Hi** [1] - 103:1
**hi** [2] - 103:10, 158:7
**high** [2] - 42:18, 62:17
**high-tech** [1] - 62:17
**himself** [3] - 23:6, 171:2, 176:15
**Hinge** [1] - 95:21
**hire** [1] - 171:11
**history** [6] - 24:1, 24:2, 24:3, 52:2, 58:12, 59:16
**hit** [16] - 173:17, 181:15, 181:22, 197:22, 200:19, 201:22, 202:21, 203:18, 204:7, 204:25, 205:1, 207:18, 208:12, 210:11, 211:15, 212:15
**HOAG** [1] - 1:19
**hold** [7] - 8:14, 21:8, 38:1, 113:2, 179:9, 186:9, 216:23
**holding** [11] - 18:14, 44:7, 56:16, 115:5, 116:12, 116:23, 119:21, 120:13, 121:20, 123:1, 205:11
**home** [1] - 185:14
**Honor** [132] - 4:11, 5:5, 6:21, 7:11, 7:17, 9:11, 10:4, 10:10, 10:16, 11:9, 11:14, 12:5, 12:24, 13:8, 13:19, 14:11, 15:1, 15:7, 15:14, 16:19, 19:6, 19:10, 19:11, 20:17, 22:3, 22:16, 24:5, 25:7, 25:8, 29:3, 29:18, 30:13, 31:11, 31:21, 33:10, 33:22, 33:25, 34:19, 35:1, 35:16, 36:2, 36:18, 36:20, 36:23, 39:10,

61:8, 66:6, 70:22, 72:15, 76:4, 76:8, 83:1, 84:19, 85:17, 85:22, 86:6, 92:19, 92:23, 93:17, 94:15, 94:20, 95:22, 96:9, 96:19, 97:17, 98:22, 100:23, 102:10, 102:17, 106:19, 107:23, 107:24, 108:6, 108:10, 108:24, 109:2, 118:7, 119:9, 121:16, 134:2, 134:7, 134:24, 138:25, 139:19, 140:7, 140:12, 140:13, 141:22, 142:19, 142:25, 145:7, 145:16, 147:15, 147:20, 148:15, 149:2, 156:9, 159:16, 160:8, 160:15, 161:8, 164:1, 164:7, 165:10, 169:17, 182:25, 190:14, 194:9, 194:14, 194:20, 195:1, 196:19, 198:10, 198:14, 200:3, 206:7, 206:11, 213:20, 213:21, 213:24, 214:6, 214:14, 214:19, 214:23, 215:4, 215:12, 215:17, 216:15, 217:2, 217:5, 217:15, 217:18
**Honor's** [1] - 22:10
**HONORABLE** [1] - 1:10
**hook** [1] - 53:17
**hope** [1] - 139:7
**hoped** [1] - 158:9
**hopefully** [4] - 29:1, 216:2, 216:6, 217:17
**hotel** [29] - 35:8, 37:19, 37:21, 151:4, 151:9, 151:18, 151:21, 151:22, 153:19, 154:4, 154:12, 154:16, 154:22, 155:2, 155:12, 155:25, 156:18, 158:12, 192:25, 194:4, 196:7, 196:16, 198:8, 199:5, 199:6, 199:10, 200:7, 200:9, 213:18
**Hotel** [2] - 37:17, 151:7

**hotels** [1] - 153:6
**hour** [31] - 168:3, 168:6, 168:11, 168:12, 171:5, 171:6, 171:23, 171:24, 172:14, 172:15, 172:19, 173:18, 173:19, 174:10, 174:11, 174:25, 175:1, 175:13, 175:14, 176:18, 176:19, 177:7, 177:8, 179:15, 179:16, 180:7, 180:8, 180:25, 181:1
**hours** [4] - 61:16, 168:10, 181:13, 181:22
**human** [1] - 124:8
**hundreds** [1] - 26:8
**hurdles** [1] - 69:12

## I

**iCloud** [53] - 20:1, 22:9, 22:11, 22:16, 22:20, 23:17, 23:24, 24:6, 24:17, 24:19, 24:21, 25:10, 26:5, 26:6, 26:8, 26:13, 26:15, 27:5, 27:11, 28:16, 28:19, 28:21, 29:6, 29:10, 29:12, 30:5, 30:9, 30:23, 31:6, 32:6, 32:8, 32:9, 32:16, 33:25, 34:6, 34:8, 47:7, 51:16, 51:17, 51:18, 51:22, 51:24, 52:5, 52:11, 52:14, 52:15, 52:17, 52:22, 58:19, 58:22, 90:6, 95:7, 141:15
**icon** [1] - 115:19
**ID** [38] - 21:4, 21:5, 21:9, 21:19, 44:24, 45:5, 45:11, 45:16, 45:23, 47:6, 52:16, 52:18, 64:1, 68:3, 68:16, 68:21, 69:5, 69:24, 70:11, 70:12, 70:17, 71:7, 101:22, 106:21, 106:24, 117:10, 120:24, 121:2, 141:18, 148:14, 160:24, 164:2, 169:2, 179:9, 197:20, 215:1, 215:20
**ideal** [1] - 158:11
**identification** [3] - 92:20, 159:12, 196:9

**identified** [7] - 26:15, 26:19, 30:14, 125:1, 131:11, 151:18, 199:15
**identifier** [1] - 98:2
**identifiers** [6] - 28:5, 28:9, 29:6, 143:16, 145:19, 146:15
**identify** [2] - 4:5, 106:25
**identifying** [1] - 27:10
**image** [10] - 23:19, 42:17, 43:21, 77:8, 84:6, 84:11, 84:24, 135:22, 192:23, 198:23
**images** [5] - 24:22, 29:20, 31:5, 56:17
**imaging** [2] - 13:15, 60:12
**immaterial** [4] - 7:25, 8:9, 8:18, 10:21
**immateriality** [1] - 11:2
**immediately** [1] - 71:9
**important** [10] - 19:23, 25:1, 25:23, 29:19, 32:11, 67:11, 141:15, 173:15, 179:1, 191:5
**importantly** [1] - 22:8
**improved** [6] - 81:2, 81:3, 81:5, 83:4, 83:22, 135:11
**improvements** [4] - 83:13, 84:1, 84:21, 135:17
**improving** [1] - 79:13
**IN** [1] - 3:9
**in-court** [1] - 92:20
**inadmissibility** [1] - 11:3
**inclination** [1] - 14:8
**inclined** [1] - 155:7
**include** [17] - 6:3, 6:8, 38:19, 44:15, 44:24, 47:6, 52:1, 52:7, 57:10, 58:8, 59:5, 59:8, 59:11, 72:22, 79:7, 126:20, 178:16
**included** [8] - 4:23, 5:25, 20:13, 24:2, 73:21, 77:2, 92:5, 179:5
**includes** [2] - 6:7,

190:8
**including** [6] - 21:3, 58:11, 58:20, 58:25, 59:16, 129:13
**incomprehensible** [1] - 84:16
**increase** [2] - 49:20, 178:10
**independent** [4] - 22:15, 125:23, 165:25, 166:8
**indicate** [15] - 13:22, 21:16, 34:22, 35:5, 35:24, 37:3, 37:4, 38:21, 112:9, 137:10, 173:24, 174:20, 182:7, 191:13, 208:8
**indicated** [17] - 8:3, 8:6, 10:14, 18:5, 18:7, 19:17, 26:8, 28:20, 33:6, 34:24, 79:4, 110:16, 122:9, 130:11, 151:9, 177:20, 188:8
**indicates** [7] - 13:6, 20:22, 23:12, 29:22, 38:14, 172:24, 191:8
**indicating** [1] - 215:19
**indication** [1] - 79:2
**indicia** [1] - 18:22
**individual** [2] - 44:19, 92:15
**individuals** [1] - 28:9
**indulgence** [5] - 76:4, 99:21, 117:6, 173:3, 206:5
**inevitably** [2] - 29:10, 32:10
**information** [26] - 6:15, 14:9, 14:24, 18:2, 18:10, 19:14, 20:6, 22:14, 23:13, 25:24, 28:11, 33:24, 41:17, 49:22, 57:10, 57:13, 79:14, 90:1, 96:3, 108:16, 124:21, 125:23, 131:16, 137:9, 137:12, 157:1
**initial** [5] - 8:17, 14:7, 75:1, 77:7, 202:8
**inmates** [1] - 195:4
**Inn** [4] - 191:3, 196:7, 196:14, 197:6
**input** [1] - 127:15
**inquiries** [2] - 58:25, 189:14
**inquiry** [2] - 8:10, 19:25

**instance** [8] - 18:5, 35:4, 35:19, 37:8, 89:24, 122:2, 136:2, 213:17
**instances** [1] - 137:3
**instead** [3] - 16:11, 114:4, 129:10
**instruction** [2] - 89:4, 89:17
**instructions** [5] - 10:8, 20:20, 21:12, 34:25, 35:19
**intelligence** [2] - 28:1, 62:5
**intend** [1] - 108:11
**intended** [1] - 36:1
**intent** [2] - 35:5, 100:1
**intention** [2] - 12:8, 140:8
**interacted** [1] - 154:8
**interest** [1] - 55:12
**interested** [1] - 88:11
**internal** [2] - 28:1, 28:3
**Internet** [1] - 58:11
**internet** [5] - 24:2, 26:16, 31:4, 51:20, 52:2
**interpret** [1] - 136:21
**interrupt** [1] - 19:12
**interruptions** [1] - 194:8
**interview** [47] - 17:11, 18:1, 19:3, 22:25, 23:2, 25:19, 25:20, 25:22, 28:20, 32:16, 35:6, 37:11, 37:14, 100:2, 101:5, 101:7, 104:13, 106:10, 107:15, 109:16, 111:17, 123:7, 123:15, 140:20, 150:9, 152:1, 157:3, 163:1, 163:14, 163:16, 163:24, 164:3, 166:20, 167:25, 168:2, 168:19, 168:23, 168:25, 170:15, 170:22, 171:17, 185:8, 187:2, 188:12
**interviewed** [8] - 17:10, 17:12, 18:1, 24:14, 26:19, 38:9, 140:18, 143:19
**interviewing** [1] - 170:3
**interviews** [5] - 22:24, 25:19, 25:22,

30:8, 104:15
**introducing** [1] - 103:3
**introduction** [1] - 109:12
**intrusion** [1] - 37:23
**investigate** [1] - 88:9
**investigating** [2] - 124:24, 124:25
**investigation** [9] - 62:18, 90:21, 91:8, 92:8, 92:10, 92:13, 93:2, 124:23, 178:8
**investigations** [10] - 41:16, 41:20, 87:11, 87:21, 88:2, 88:11, 88:15, 90:24, 129:21, 143:13
**Investigations** [1] - 86:25
**investigative** [7] - 67:7, 87:4, 98:9, 142:7, 142:15, 143:11, 143:25
**investigators** [2] - 89:22, 93:3
**involve** [1] - 37:22
**involved** [2] - 91:11, 137:22
**involves** [2] - 25:1, 49:14
**iPhone** [92] - 13:10, 13:15, 15:24, 16:13, 16:15, 16:24, 17:5, 17:9, 17:25, 18:7, 18:9, 18:19, 18:20, 22:19, 23:7, 23:16, 23:20, 23:22, 23:24, 24:1, 24:7, 24:12, 24:19, 24:22, 25:5, 25:8, 27:15, 27:17, 27:25, 28:12, 28:18, 28:22, 28:23, 30:3, 30:15, 30:20, 30:21, 30:22, 31:4, 31:5, 32:6, 32:8, 32:13, 32:19, 35:3, 35:20, 36:25, 42:6, 44:12, 45:1, 45:7, 45:9, 45:11, 45:15, 45:18, 46:13, 47:4, 51:4, 54:4, 54:19, 54:23, 55:11, 58:4, 58:6, 63:3, 63:7, 63:14, 63:22, 68:2, 69:13, 69:15, 69:17, 70:7, 70:10, 71:2, 77:16, 82:6, 120:8, 120:9, 120:10, 120:15, 120:16, 120:17,

132:23, 173:13, 210:20, 211:7, 214:6, 214:7, 215:20
**iPhones** [21] - 12:16, 13:10, 19:25, 20:2, 22:6, 23:3, 24:15, 24:17, 27:19, 27:20, 28:8, 29:10, 29:11, 38:16, 44:11, 93:15, 95:5, 112:5, 125:12, 141:14, 173:12
**issue** [7] - 4:22, 7:8, 8:21, 15:9, 18:25, 26:4, 83:6
**issued** [3] - 8:1, 19:15, 100:13
**issues** [5] - 4:17, 10:14, 39:5, 39:8, 195:7
**IT** [2] - 62:1, 62:2
**it'll** [2] - 10:2, 75:5
**item** [1] - 58:4
**items** [8] - 7:4, 7:5, 57:10, 70:16, 151:15, 172:25, 173:25, 174:2
**itself** [10] - 20:4, 21:10, 35:14, 56:16, 151:8, 200:25, 203:2, 203:22, 205:7, 208:17

**J**

**jacket** [1] - 172:11
**Jamie** [4] - 124:5, 182:14, 213:13, 213:15
**JAY** [2] - 1:21, 4:15
**Jay** [1] - 4:13
**Jeffrey** [2] - 4:4, 92:9
**JEFFREY** [1] - 1:6
**Jencks** [3] - 6:3, 6:6, 6:8
**Jim** [1] - 160:21
**Jimmy** [24] - 158:18, 158:23, 158:25, 160:22, 161:4, 161:6, 161:18, 163:23, 170:3, 175:24, 183:24, 184:24, 190:1, 190:5, 190:8, 190:24, 191:1, 191:12, 191:17, 191:24, 192:8, 192:24, 199:1, 200:13
**job** [1] - 184:18
**John** [3] - 4:11, 5:5, 61:4
**JOHN** [1] - 1:18
**John's** [25] - 158:18,

158:23, 158:25, 160:21, 160:22, 161:4, 161:6, 161:18, 163:23, 170:4, 175:24, 183:24, 184:24, 190:2, 190:6, 190:8, 190:24, 191:1, 191:12, 191:17, 191:24, 192:8, 192:24, 199:1, 200:13
**join** [4] - 104:12, 148:3, 157:17, 187:12
**joined** [2] - 4:8, 4:12
**Jones** [13] - 129:2, 159:5, 160:3, 184:8, 184:22, 185:12, 186:20, 198:25, 201:7, 202:2, 202:7, 202:12, 203:14
**Joseph** [1] - 4:13
**JOSEPH** [1] - 1:21
**judge** [4] - 18:24, 22:2, 151:16
**JUDGE** [1] - 1:11
**judicial** [2] - 35:25, 91:6
**judo** [2] - 154:6, 154:7
**July** [4] - 75:10, 75:12, 75:22
**June** [90] - 1:6, 17:6, 19:1, 23:1, 23:4, 24:7, 25:10, 25:20, 25:22, 33:13, 38:9, 51:4, 53:1, 54:9, 55:1, 66:9, 66:15, 75:6, 75:12, 92:4, 97:14, 98:15, 99:14, 100:10, 100:13, 101:3, 101:21, 102:8, 103:1, 103:16, 104:3, 105:2, 107:10, 121:7, 123:7, 125:9, 126:2, 132:22, 133:3, 133:9, 133:16, 133:21, 140:17, 142:15, 143:4, 143:18, 144:10, 144:19, 146:18, 146:23, 147:10, 148:2, 148:11, 148:25, 149:11, 149:21, 150:15, 150:19, 150:22, 150:25, 151:16, 152:5, 152:24, 155:18, 156:12, 156:16, 158:3, 161:6, 164:3, 164:10, 165:1, 170:1, 170:23, 171:4, 178:13, 178:15,

182:22, 184:4, 187:18, 190:12, 196:17, 198:8, 199:22, 202:25, 218:10
**jurisdictions** [1] - 95:23
**Justice** [3] - 124:2, 124:4, 124:7

**K**

**K-A-R-A-B-I-N** [1] - 129:8
**K-N-O-L-L-E** [1] - 104:8
**Karabin** [16] - 129:1, 129:7, 155:10, 159:4, 159:18, 160:3, 167:20, 169:11, 170:7, 170:10, 170:16, 177:13, 184:15, 185:11, 202:8, 202:13
**Karen** [2] - 130:24, 130:25
**keep** [24] - 10:2, 24:23, 91:2, 104:1, 104:19, 143:23, 144:3, 144:8, 146:3, 146:13, 150:3, 151:24, 152:5, 152:22, 153:3, 153:14, 153:24, 157:8, 158:1, 158:14, 174:24, 184:10, 212:23, 213:21
**kept** [2] - 111:13, 122:8
**kewl** [2] - 157:25, 184:20
**key** [1] - 4:24
**keyword** [1] - 43:25
**kind** [10] - 5:20, 33:5, 89:1, 115:4, 120:18, 124:18, 130:19, 132:8, 189:8, 189:9
**kinds** [1] - 178:6
**Kingston** [1] - 59:4
**knocked** [1] - 216:19
**Knolle** [4] - 104:8, 105:8, 105:9, 122:14
**knowing** [3] - 27:11, 167:7, 213:2
**knowledge** [6] - 57:14, 57:15, 58:7, 71:22, 80:22, 202:7
**known** [6] - 43:17, 64:22, 79:19, 81:7,

81:23, 87:1
**knows** [4] - 25:9,
38:16, 194:24, 206:9
**KOLLAR** [1] - 1:10
**KOLLAR-KOTELLY**
[1] - 1:10
**KOTELLY** [1] - 1:10

## L

**lack** [1] - 136:3
**lady** [1] - 199:12
**Lake** [4] - 101:10,
101:13, 103:22,
156:12
**language** [4] - 20:13,
125:13, 125:15,
125:19
**lap** [3] - 111:13,
122:9, 123:1
**laptop** [5] - 29:21,
58:10, 58:13, 58:15,
101:23
**laptops** [3] - 26:17,
91:19, 91:21
**largely** [1] - 170:25
**larger** [3] - 96:14,
190:8, 210:20
**last** [13] - 20:21,
59:14, 86:7, 86:12,
86:14, 117:17,
135:10, 181:16,
201:23, 204:11,
208:2, 216:18, 216:22
**lasted** [1] - 168:2
**late** [2] - 103:2, 152:1
**late-night** [1] - 152:1
**Law** [2] - 87:24,
89:18
**law** [16] - 8:7, 8:25,
18:3, 21:2, 21:7,
41:11, 89:2, 114:4,
189:3, 189:7, 193:21,
193:24, 199:15,
201:2, 201:4, 203:25
**lawyer** [5] - 10:7,
175:8, 176:23,
176:24, 177:1
**lay** [1] - 36:3
**lays** [1] - 36:10
**lead** [2] - 90:24,
92:12
**leadership** [1] -
129:2
**leading** [3] - 17:6,
27:24, 148:10
**leads** [1] - 197:9
**lean** [1] - 35:17
**leap** [1] - 6:19

**learn** [1] - 97:12
**learned** [2] - 179:2,
210:2
**leased** [1] - 97:25
**least** [15] - 9:24,
19:19, 23:11, 26:20,
26:21, 27:18, 36:24,
91:8, 137:24, 173:12,
186:1, 186:6, 211:25,
215:23, 216:20
**leave** [4] - 106:5,
106:7, 163:11, 163:13
**led** [3] - 18:2, 20:4,
99:20
**left** [25] - 97:2,
102:23, 103:19,
151:25, 156:11,
156:16, 161:19,
161:25, 170:6,
172:10, 183:11,
184:14, 184:24,
198:25, 199:21,
200:7, 200:13,
202:19, 203:11,
205:6, 207:9, 207:23,
210:16, 211:20,
212:20
**left-hand** [11] -
102:23, 103:19,
156:16, 172:10,
183:11, 205:6, 207:9,
207:23, 210:16,
211:20, 212:20
**legal** [4] - 4:17, 9:12,
89:20, 175:11
**length** [1] - 115:6
**less** [4] - 18:18,
46:11, 78:25, 79:4
**letters** [7] - 28:2,
32:19, 49:15, 140:21,
140:23, 141:1, 141:3
**letting** [1] - 157:4
**level** [4] - 35:2,
42:18, 90:3, 174:8
**LG** [2] - 59:11, 95:12
**lied** [1] - 153:6
**likely** [6] - 18:18,
91:14, 91:16, 217:6,
217:10, 217:12
**limited** [2] - 47:5,
52:2
**limits** [1] - 188:20
**line** [3] - 21:16,
21:24, 99:16
**lines** [1] - 99:25
**link** [1] - 187:19
**linked** [2] - 32:6,
70:17
**LISA** [2] - 2:1, 218:3
**Lisa** [1] - 218:12

**list** [10] - 39:17,
58:19, 60:5, 60:8,
60:12, 60:16, 60:19,
93:13, 93:17, 217:11
**listed** [6] - 59:5,
59:9, 59:12, 59:16,
141:20, 151:22
**listened** [1] - 107:12,
164:21
**listening** [5] - 14:18,
14:20, 14:22, 177:15,
195:16
**lists** [1] - 206:1
**live** [1] - 12:4
**lives** [1] - 157:11
**LLP** [2] - 1:19, 1:22
**load** [1] - 84:15
**lobby** [9] - 153:20,
158:12, 197:9,
197:15, 197:17,
200:10, 201:21,
204:24, 214:1
**local** [3] - 189:3,
190:1, 194:1
**located** [10] - 24:1,
24:7, 26:5, 26:17,
59:24, 122:14,
151:10, 151:17,
151:18, 206:23
**location** [13] - 56:19,
101:14, 101:15,
104:21, 104:25,
105:4, 151:11,
151:13, 160:21,
190:6, 190:9, 191:5,
191:22
**locations** [2] - 56:22,
151:15
**lock** [15] - 44:15,
44:17, 44:21, 45:24,
46:3, 68:2, 89:23,
120:1, 120:21, 132:4,
132:20, 132:23,
210:2, 210:9, 214:18
**locked** [3] - 35:8,
45:1, 45:7, 45:9,
45:11, 45:13, 46:9,
74:8, 77:22, 79:1,
113:5, 127:13,
127:17, 132:13,
132:17, 174:16,
174:22, 179:3,
185:24, 209:24,
210:20, 211:8, 214:24
**locking** [2] - 126:3,
212:23
**locks** [1] - 21:23
**log** [4] - 7:10, 7:12,
7:14, 52:18
**logical** [1] - 76:20

**LOL** [1] - 152:2
**look** [19] - 7:16, 9:22,
10:13, 10:25, 48:16,
48:17, 50:16, 57:5,
66:1, 66:2, 67:13,
67:14, 78:9, 117:24,
134:13, 193:5, 193:9,
206:17, 206:18
**looked** [10] - 5:3,
121:7, 135:5, 137:21,
141:10, 161:6,
195:15, 196:17,
206:22, 208:1
**looking** [63] - 13:4,
20:21, 36:22, 56:17,
67:19, 73:20, 75:3,
75:16, 78:24, 82:16,
93:24, 97:7, 99:11,
99:13, 102:20,
103:14, 103:18,
105:2, 113:10, 114:5,
114:21, 115:10,
118:16, 119:14,
119:20, 119:21,
119:22, 120:3,
120:12, 120:18,
121:2, 121:3, 122:10,
124:18, 124:21,
141:10, 142:2,
145:18, 149:15,
150:23, 152:16,
156:11, 158:16,
161:20, 166:24,
169:8, 178:7, 179:2,
183:10, 187:18,
189:25, 190:10,
191:17, 192:23,
197:5, 197:14,
197:24, 201:17,
205:22, 211:7, 213:20
**looks** [5] - 104:20,
118:5, 132:10, 164:4,
190:5
**losing** [3] - 147:4,
147:5, 173:15
**loud** [2] - 40:4, 182:4
**low** [5] - 46:2,
111:13, 123:1, 132:5,
211:3
**lunch** [2] - 133:24,
147:11
**luncheon** [1] - 134:8

## M

**M-I-K-E-L** [1] - 86:13
**ma'am** [5] - 85:17,
175:20, 195:9, 203:4,
216:8
**MacBook** [20] -

29:21, 29:24, 30:24,
30:25, 31:2, 31:3,
31:8, 31:18, 31:19,
31:23, 31:25, 32:4,
32:6, 32:8, 34:20,
50:10, 60:6, 60:9,
60:14, 60:20
**magistrate** [1] - 22:2
**Magnum** [2] - 43:17,
56:2
**main** [3] - 24:12,
26:1, 26:4
**majority** [4] - 7:24,
9:25, 72:23, 139:15
**man** [3] - 176:8,
176:11, 203:12
**management** [2] -
67:7, 87:13
**manipulation** [1] -
23:14
**manner** [1] - 99:22
**mannerisms** [1] -
171:2
**manually** [2] - 43:25,
49:22
**map** [7] - 190:1,
190:5, 190:8, 191:1,
191:8, 191:13, 192:4
**marked** [16] - 53:12,
57:1, 106:20, 117:10,
120:24, 121:2,
148:14, 156:5,
159:12, 160:25,
164:2, 169:2, 182:14,
189:22, 196:9, 197:20
**marker** [1] - 192:13
**marking** [1] - 181:19
**MARSHAL** [3] -
195:1, 195:9, 216:8
**marshals** [1] -
194:21
**MARSTON** [90] -
1:18, 4:11, 5:5, 5:11,
6:2, 6:7, 6:12, 6:14,
10:4, 10:16, 10:23,
11:1, 11:7, 11:9,
11:14, 11:22, 12:1,
12:3, 13:8, 13:19,
13:23, 14:5, 14:11,
15:7, 55:5, 57:23,
61:1, 61:8, 61:10,
66:4, 66:6, 66:7,
66:13, 66:14, 70:22,
70:24, 71:1, 71:23,
72:3, 72:15, 74:4,
76:2, 76:4, 76:7, 83:1,
83:3, 83:11, 83:12,
83:21, 84:9, 84:14,
84:19, 84:20, 85:2,
92:23, 93:17, 93:22,

94:19, 96:8, 97:17,
102:12, 108:2,
108:24, 118:8, 119:4,
121:11, 138:17,
138:22, 139:3, 139:6,
139:9, 139:11,
139:17, 139:19,
140:7, 142:21, 145:9,
149:5, 160:10,
161:10, 165:13,
168:9, 169:19, 183:3,
190:17, 196:22,
198:16, 217:2, 217:5,
217:18
   **Marston** [9] - 4:12,
5:5, 15:6, 61:4,
108:22, 135:11,
138:16, 140:3, 206:9
   **mask** [3] - 15:12,
40:2, 215:18
   **Massachusetts** [1] -
89:21
   **master's** [1] - 62:17
   **matched** [1] - 23:19
   **material** [12] - 6:2,
6:4, 6:6, 6:8, 6:17,
9:5, 10:13, 10:24,
11:6, 12:20, 13:17,
51:24
   **materials** [4] - 5:14,
5:16, 5:19, 5:25
   **Matt** [3] - 104:6,
104:7, 104:9
   **matter** [4] - 11:10,
13:14, 14:24, 194:11
   **matters** [2] - 5:8,
13:14
   **Matthew** [1] - 104:8
   **MATTHEW** [1] -
104:8
   **maximum** [3] - 48:5,
48:8, 49:11
   **MAYER** [44] - 1:14,
4:7, 9:11, 9:16, 12:5,
12:7, 12:24, 13:3,
14:15, 15:1, 15:5,
15:9, 39:14, 39:18,
40:17, 40:24, 48:19,
50:12, 53:15, 53:17,
53:20, 55:2, 55:10,
57:20, 58:2, 60:22,
70:19, 71:20, 71:25,
75:23, 76:11, 78:7,
80:8, 80:11, 82:3,
82:22, 82:24, 97:9,
134:19, 134:24,
138:4, 138:6, 138:11,
138:15
   **Mayer** [1] - 4:8
   **MAYER-DEMPSEY**

[44] - 1:14, 4:7, 9:11,
9:16, 12:5, 12:7,
12:24, 13:3, 14:15,
15:1, 15:5, 15:9,
39:14, 39:18, 40:17,
40:24, 48:19, 50:12,
53:15, 53:17, 53:20,
55:2, 55:10, 57:20,
58:2, 60:22, 70:19,
71:20, 71:25, 75:23,
76:11, 78:7, 80:8,
80:11, 82:3, 82:22,
82:24, 97:9, 134:19,
134:24, 138:4, 138:6,
138:11, 138:15
   **Mayer-Dempsey** [1]
- 4:8
   **mean** [34] - 9:5,
14:14, 19:12, 21:21,
24:17, 34:23, 39:4,
43:6, 44:17, 46:16,
64:23, 65:9, 72:13,
74:13, 74:25, 96:11,
111:10, 130:12,
136:10, 136:11,
141:4, 147:5, 151:13,
152:13, 152:18,
154:7, 176:12,
176:25, 180:16,
185:7, 189:10,
193:25, 194:1, 195:2,
212:5, 217:6
   **meaning** [2] - 83:16,
126:18
   **means** [5] - 13:11,
44:18, 136:1, 136:24,
141:5
   **meant** [2] - 125:10,
176:6
   **mechanism** [1] -
136:6
   **Media** [1] - 58:5
   **media** [11] - 57:11,
58:8, 58:12, 58:16,
58:19, 58:20, 59:1,
59:5, 59:8, 60:19,
90:5
   **medium** [3] - 29:19,
42:14, 42:15
   **meet** [6] - 61:13,
101:9, 101:13,
101:16, 103:7,
103:16, 105:16,
131:8, 147:8, 153:17,
155:22, 156:2, 157:2,
158:23, 184:25,
185:4, 190:9, 191:24
   **meet-up** [5] - 157:2,
184:25, 185:4, 190:9,
191:24

**meeting** [8] - 100:1,
101:17, 101:19,
104:3, 105:5, 153:2,
184:20, 187:24
   **members** [2] -
186:16, 186:17
   **memory** [3] - 17:18,
165:25, 166:8
   **mention** [10] - 16:15,
23:25, 32:16, 36:12,
108:15, 108:20,
111:16, 133:23,
179:21, 188:11
   **mentioned** [14] -
5:11, 15:18, 16:25,
24:21, 65:1, 72:7,
72:18, 133:19, 140:6,
155:12, 159:2,
176:23, 187:3, 211:12
   **mentioning** [2] -
121:20, 176:24
   **mentions** [2] - 17:9,
175:8
   **MEREDITH** [1] - 1:14
   **Meredith** [1] - 4:7
   **message** [15] -
103:1, 103:21,
119:22, 144:5,
149:15, 152:9, 159:9,
159:13, 159:17,
160:6, 163:5, 167:1,
183:21, 183:23, 187:5
   **messages** [53] -
18:6, 18:15, 25:25,
52:2, 102:6, 102:22,
103:14, 103:19,
104:2, 110:17, 111:7,
113:7, 113:10,
113:17, 114:5,
114:19, 115:6, 115:8,
115:10, 115:14,
115:15, 115:20,
116:24, 117:1, 120:3,
120:4, 120:5, 120:18,
120:19, 141:11,
148:10, 148:21,
148:24, 152:11,
153:22, 156:5,
156:11, 159:21,
159:24, 160:6,
160:18, 169:8,
169:10, 169:12,
182:17, 182:20,
182:22, 183:10,
195:14, 195:16,
200:17
   **met** [13] - 110:4,
121:5, 123:23,
131:11, 157:5,
158:25, 188:1,

191:23, 192:12,
192:20, 192:21,
200:6, 210:7
   **method** [8] - 21:13,
42:13, 47:1, 47:14,
47:16, 47:20, 51:3,
136:5
   **methodology** [1] -
36:25
   **methods** [2] - 76:22,
132:12
   **Mexico** [16] - 17:1,
17:11, 22:7, 22:21,
23:18, 26:17, 26:18,
30:9, 95:6, 95:9,
95:13, 97:25, 98:8,
98:12, 101:11, 150:12
   **microphone** [5] -
15:20, 40:25, 61:7,
85:16, 139:1
   **middle** [4] - 40:10,
85:25, 134:17, 198:24
   **might** [26] - 38:24,
44:7, 46:6, 47:24,
48:5, 48:25, 49:12,
50:19, 56:12, 74:16,
78:5, 80:1, 132:13,
134:1, 134:20, 147:7,
152:21, 153:11,
176:8, 176:14, 178:7,
178:9, 178:10,
178:22, 186:19
   **Mikel** [8] - 3:7, 55:15,
85:7, 85:9, 86:13,
140:1, 156:18, 158:7
   **MIKEL** [1] - 85:13
   **mile** [1] - 191:25
   **miles** [1] - 192:10
   **mind** [5] - 10:3,
111:4, 134:21,
184:20, 216:24
   **minimum** [1] - 48:5
   **minute** [4] - 109:7,
109:24, 110:21,
112:21, 113:20,
165:4, 166:12,
166:13, 168:7,
168:11, 172:19,
191:9, 201:1, 204:12
   **minutes** [52] - 49:2,
110:11, 114:25,
116:8, 116:15,
116:23, 167:11,
167:12, 168:6, 168:7,
168:10, 168:11,
168:12, 171:5, 171:6,
171:23, 171:24,
172:14, 172:15,
172:20, 173:18,
173:19, 174:10,

174:11, 174:25,
175:1, 175:14,
175:15, 176:18,
176:19, 177:7, 177:8,
179:15, 179:16,
180:7, 180:8, 180:25,
181:2, 181:13,
181:16, 181:23,
203:2, 203:23,
204:13, 205:7, 207:8,
207:22, 208:17,
210:15, 211:19,
212:19
   **Miranda** [1] - 89:10
   **miscellaneous** [2] -
58:11, 58:24
   **misheard** [1] - 62:15
   **missed** [1] - 62:23
   **misspoke** [1] -
114:15
   **misstated** [1] - 21:18
   **misunderstood** [1] -
33:10
   **Mobile** [1] - 95:20
   **mobile** [3] - 47:2,
73:17, 163:21
   **mode** [7] - 46:2,
132:5, 181:7, 181:21,
211:3, 211:4
   **model** [3] - 82:6,
82:11, 82:19
   **modems** [1] - 91:21
   **moment** [17] - 7:15,
36:18, 59:18, 69:20,
98:20, 99:20, 117:7,
117:8, 122:6, 140:13,
140:17, 173:6, 179:5,
179:13, 180:5,
208:22, 217:11
   **momentarily** [1] -
115:19
   **monitor** [1] - 53:18
   **monitors** [1] - 96:18
   **month** [1] - 75:8
   **months** [9] - 48:23,
49:13, 62:4, 79:3,
81:19, 82:1, 88:4,
88:17, 98:19
   **morning** [15] - 4:1,
4:7, 4:10, 4:11, 4:14,
4:15, 12:3, 12:9,
40:18, 61:2, 61:3,
78:13, 150:24,
155:18, 178:14
   **most** [8] - 9:9, 25:22,
73:25, 129:4, 137:19,
217:6, 217:10, 217:12
   **Motion** [1] - 10:11
   **motion** [19] - 4:16,
5:13, 7:1, 7:2, 7:21,

7:23, 7:24, 8:2, 8:3,
8:12, 8:22, 9:19, 9:25,
10:11, 10:12, 11:5,
11:13, 15:23, 147:16
  **MOTION** [1] - 1:10
  **motions** [3] - 5:24,
6:19, 39:9
  **move** [28] - 39:11,
40:1, 44:10, 50:22,
51:15, 55:2, 57:20,
61:7, 71:22, 94:17,
102:10, 107:24,
113:19, 116:7, 118:6,
121:10, 133:16,
145:7, 149:2, 160:8,
161:8, 161:20,
165:10, 166:11,
169:17, 182:25,
196:7, 198:10
  **moved** [4] - 28:18,
30:25, 163:7, 198:11
  **moves** [6] - 85:15,
94:22, 119:2, 142:20,
190:14, 196:19
  **moving** [11] - 22:5,
23:16, 58:10, 58:15,
58:19, 58:24, 59:4,
59:15, 114:24, 188:3,
190:7
  **MR** [109] - 4:11, 4:15,
5:5, 5:11, 6:2, 6:7,
6:12, 6:14, 10:4,
10:16, 10:23, 11:1,
11:7, 11:9, 11:14,
11:22, 12:1, 12:3,
13:8, 13:19, 13:23,
14:5, 14:11, 15:7,
55:5, 57:23, 61:1,
61:8, 61:10, 66:4,
66:6, 66:7, 66:13,
66:14, 70:22, 70:24,
71:1, 71:23, 72:3,
72:15, 74:4, 76:2,
76:4, 76:7, 83:1, 83:3,
83:11, 83:12, 83:21,
84:9, 84:14, 84:19,
84:20, 85:2, 93:17,
93:22, 94:19, 96:8,
97:17, 102:12, 108:2,
108:24, 118:8, 119:4,
121:11, 135:9, 136:8,
136:13, 136:18,
136:23, 137:11,
137:17, 137:24,
138:9, 138:14,
138:17, 138:21,
138:22, 139:3, 139:5,
139:6, 139:8, 139:9,
139:10, 139:11,
139:14, 139:17,

139:18, 139:19,
140:7, 142:21, 145:9,
149:5, 160:10,
161:10, 165:3,
165:13, 168:9,
169:19, 179:14,
181:14, 183:3,
190:17, 196:8,
196:22, 198:16,
217:2, 217:5, 217:18
  **MS** [351] - 4:7, 6:21,
7:11, 7:13, 7:17, 9:11,
9:16, 12:5, 12:7,
12:24, 13:3, 14:15,
15:1, 15:5, 15:9,
15:14, 15:21, 16:4,
16:8, 16:19, 16:21,
16:24, 19:6, 19:9,
19:14, 20:17, 20:20,
21:1, 22:3, 22:5,
22:16, 22:18, 24:25,
25:7, 25:13, 27:9,
27:24, 28:24, 29:3,
29:9, 29:15, 30:12,
30:19, 31:11, 31:14,
31:16, 31:21, 31:23,
32:21, 33:7, 33:16,
33:20, 33:25, 34:6,
34:8, 34:11, 34:14,
35:1, 35:14, 35:16,
36:2, 36:8, 36:15,
36:18, 36:20, 36:23,
37:6, 38:6, 38:14,
38:20, 39:7, 39:10,
39:14, 39:18, 40:17,
40:24, 48:19, 50:12,
53:15, 53:17, 53:20,
55:2, 55:10, 57:20,
58:2, 60:22, 70:19,
71:20, 71:25, 75:23,
76:11, 78:7, 80:8,
80:11, 82:3, 82:22,
82:24, 85:7, 86:10,
92:19, 93:1, 93:23,
94:15, 94:22, 95:4,
96:17, 96:23, 96:25,
97:1, 97:4, 97:9,
97:11, 97:19, 97:21,
98:20, 98:24, 99:2,
99:5, 100:17, 100:23,
101:1, 101:23, 102:1,
102:10, 102:17,
102:19, 106:19,
106:23, 107:3,
107:23, 108:6, 109:2,
109:4, 109:10,
109:23, 110:2,
110:10, 110:15,
110:20, 110:24,
113:1, 113:23,
114:12, 114:24,

115:3, 115:23, 116:2,
116:7, 116:11,
116:14, 116:18,
117:5, 117:9, 117:21,
117:23, 118:6,
118:13, 118:15,
119:2, 119:9, 119:12,
120:23, 121:1, 121:9,
121:16, 121:18,
122:20, 122:24,
129:9, 134:1, 134:19,
134:24, 138:4, 138:6,
138:11, 138:15,
140:12, 140:14,
141:18, 141:22,
142:1, 142:8, 142:10,
142:19, 142:25,
143:2, 143:23,
143:24, 144:3, 144:4,
144:8, 144:9, 144:17,
144:20, 144:25,
145:2, 145:7, 145:14,
145:16, 145:17,
146:3, 146:5, 146:13,
146:14, 147:15,
147:20, 147:21,
148:13, 148:17,
149:2, 149:10, 150:3,
150:4, 150:17,
150:18, 152:22,
152:23, 153:3, 153:4,
153:14, 153:15,
153:24, 154:1, 156:4,
156:9, 156:10, 157:8,
157:9, 158:1, 158:2,
158:14, 158:15,
159:11, 159:16,
159:20, 160:8,
160:15, 160:17,
160:24, 161:2, 161:8,
161:16, 164:1, 164:6,
164:9, 164:13,
164:18, 165:10,
165:20, 166:11,
166:16, 167:10,
167:15, 168:5,
168:11, 168:15,
169:1, 169:4, 169:7,
169:17, 169:24,
171:3, 171:9, 171:22,
172:3, 172:13,
172:18, 173:3, 173:4,
173:17, 173:23,
174:9, 174:14,
174:24, 175:4,
175:13, 175:18,
176:17, 176:22,
177:6, 177:11,
179:20, 180:6,
180:11, 180:24,
181:5, 181:12,

181:22, 182:1,
182:16, 182:25,
183:9, 184:2, 184:3,
184:10, 184:11,
187:14, 187:17,
189:21, 189:24,
190:14, 190:22,
191:15, 191:16,
194:9, 194:14,
194:20, 194:24,
195:11, 196:11,
196:19, 197:3,
197:19, 197:23,
198:10, 198:14,
198:22, 199:9, 200:5,
200:19, 200:23,
201:22, 202:1,
202:21, 202:24,
203:18, 203:21,
204:7, 204:10,
204:25, 205:4, 206:5,
206:7, 206:11,
206:14, 206:21,
207:7, 207:18,
207:21, 208:12,
208:15, 210:11,
210:14, 211:15,
211:18, 212:15,
212:18, 213:20,
213:24, 215:16,
217:15
  **MULLIN** [1] - 1:22
  **multiple** [6] - 52:19,
117:19, 118:21,
136:25, 137:6, 180:22
  **must** [2] - 6:18,
151:14

# N

  **nail** [1] - 175:21
  **naked** [4] - 97:24,
176:3, 176:16, 179:21
  **name** [15] - 40:19,
40:20, 47:8, 52:13,
86:4, 86:7, 86:11,
86:12, 86:13, 86:14,
105:7, 108:15,
108:20, 135:7, 142:7
  **named** [1] - 148:6
  **nature** [4] - 37:5,
56:4, 108:21, 109:17
  **navigate** [4] - 19:22,
113:7, 113:10, 132:2
  **navigated** [1] -
132:22
  **navigating** [5] -
113:16, 115:13,
115:20, 116:24, 117:1
  **nearby** [3] - 153:17,

158:18, 159:6
  **necessarily** [4] -
14:14, 21:22, 65:10,
67:13
  **necessary** [1] -
157:23
  **need** [35] - 8:15,
16:9, 40:22, 40:25,
52:10, 52:12, 68:10,
69:12, 70:21, 72:24,
88:24, 98:14, 100:19,
123:21, 123:22,
130:17, 136:16,
136:18, 138:13,
139:2, 143:7, 149:17,
153:6, 155:16, 179:6,
186:5, 186:6, 186:11,
193:16, 194:5,
194:12, 195:8, 206:3,
213:13
  **needed** [9] - 29:13,
104:12, 126:21,
127:1, 131:19, 140:25,
188:23, 189:5, 213:11
  **needs** [1] - 70:15
  **Nelson** [51] - 129:4,
133:19, 148:6,
148:10, 148:16,
148:22, 149:14,
149:23, 150:5,
151:25, 152:6,
153:10, 153:18,
154:4, 154:14,
154:16, 157:15,
159:1, 162:1, 162:18,
162:19, 162:21,
165:21, 166:3,
167:24, 168:18,
171:13, 172:4, 173:6,
175:19, 178:18,
180:15, 185:12,
186:20, 187:9,
187:19, 198:24,
201:8, 203:3, 203:25,
204:14, 205:8,
208:19, 208:23,
213:12, 214:3, 214:7,
215:7, 215:17, 217:8,
217:9
  **Nelson's** [4] -
162:23, 168:16,
168:22, 170:19
  **never** [3] - 31:12,
67:25, 77:18
  **new** [3] - 31:13,
80:12, 160:21
  **next** [16] - 85:6,
100:17, 103:9,
103:14, 114:8,
150:24, 153:8,

161:22, 162:2,
181:17, 185:15,
186:15, 188:2, 194:3,
194:7, 217:3
 **nice** [1] - 134:25
 **night** [2] - 151:16,
152:1
 **nine** [3] - 88:4,
88:17, 116:8
 **nonetheless** [1] -
208:5
 **noon** [1] - 106:3
 **Northwest** [5] - 1:16,
1:19, 1:23, 2:3,
218:14
 **Nos** [7] - 3:10, 55:8,
95:2, 121:14, 161:13,
190:20, 197:1
 **notated** [1] - 183:17
 **note** [9] - 5:17, 5:21,
10:5, 19:23, 21:14,
32:11, 54:23, 91:5,
191:11
 **noted** [1] - 182:4
 **notes** [7] - 48:11,
48:13, 48:16, 61:19,
78:9, 78:24, 218:5
 **nothing** [4] - 91:14,
127:10, 139:19,
170:15
 **notice** [6] - 34:2,
34:12, 115:15,
123:13, 130:17, 140:3
 **notices** [1] - 26:3
 **noticing** [2] - 115:9,
115:12
 **notified** [3] - 12:8,
53:2, 194:21
 **notify** [3] - 133:3,
133:5, 187:6
 **November** [2] -
25:11, 34:15
 **nude** [4] - 23:13,
26:8, 26:12, 115:21
 **number** [8] - 5:21,
6:24, 26:14, 47:8,
90:13, 198:13,
209:18, 209:20
 **numbers** [2] - 28:6,
49:15

## O

 **object** [3] - 12:17,
85:24, 96:8
 **objection** [56] -
14:21, 40:10, 40:12,
55:5, 55:6, 57:22,
57:23, 57:24, 70:19,

71:20, 71:25, 75:23,
85:23, 86:1, 92:22,
92:23, 93:17, 94:16,
94:24, 95:1, 96:7,
102:12, 102:14,
108:1, 108:2, 108:3,
108:19, 108:24,
118:8, 118:10, 119:4,
119:6, 121:11,
121:13, 142:21,
142:22, 145:9,
145:11, 149:4, 149:5,
149:6, 160:10,
160:12, 161:10,
165:12, 165:13,
165:14, 169:19,
169:21, 183:3, 183:5,
190:17, 196:22,
198:15, 198:16,
198:17
 **objections** [1] - 55:4
 **obligation** [1] - 11:4
 **obligations** [1] - 7:4
 **observations** [1] -
19:19
 **observed** [2] - 23:18,
172:9
 **obtain** [2] - 20:10,
21:13, 93:3
 **obtained** [7] - 30:21,
30:22, 31:9, 90:20,
94:12, 95:22, 95:24
 **obviously** [4] - 9:21,
10:20, 12:17, 28:20
 **occasion** [1] - 130:1
 **occasions** [2] -
129:25, 208:24
 **occur** [1] - 98:10
 **occurred** [4] - 22:21,
97:16, 97:23, 199:10
 **October** [2] - 30:1,
34:18
 **OF** [4] - 1:1, 1:3,
1:10, 1:15
 **offense** [1] - 18:22
 **offer** [1] - 126:22
 **offered** [1] - 123:16
 **offering** [1] - 180:12
 **offers** [2] - 49:6,
114:4
 **office** [15] - 72:24,
73:8, 73:23, 98:9,
124:8, 128:19, 129:5,
130:4, 130:16, 131:8,
131:12, 133:6,
143:12, 186:10, 188:9
 **Office** [1] - 86:25
 **OFFICE** [1] - 1:15
 **officer** [9] - 35:25,
104:18, 189:3, 189:7,

194:1, 198:2, 199:15,
201:4, 204:1
 **officers** [1] - 201:2
 **Official** [1] - 2:1
 **official** [2] - 189:6,
218:12
 **often** [3] - 50:16,
136:12, 137:10
 **onboarding** [1] -
88:8
 **once** [14] - 37:4,
43:12, 43:19, 52:18,
82:14, 110:7, 118:17,
131:13, 157:6,
167:24, 179:25,
194:6, 206:17, 210:10
 **one** [118] - 5:13,
8:21, 9:8, 10:21,
17:22, 18:13, 19:10,
21:14, 24:13, 24:25,
26:21, 29:5, 29:18,
29:22, 30:12, 31:13,
32:15, 35:20, 36:18,
36:20, 52:14, 66:11,
66:13, 75:15, 75:16,
76:15, 78:18, 78:22,
82:8, 82:15, 82:18,
83:19, 87:14, 93:15,
94:7, 96:23, 97:2,
97:3, 97:4, 97:5,
97:25, 104:5, 109:7,
109:24, 111:25,
115:13, 117:6,
118:19, 122:25,
130:1, 130:13,
131:12, 133:2,
133:19, 134:11,
134:16, 138:4,
138:17, 138:22,
140:12, 141:16,
147:10, 148:6, 156:7,
157:16, 158:18,
161:19, 165:4,
166:12, 168:6, 168:7,
168:10, 168:11,
168:12, 171:5, 171:6,
171:23, 171:24,
172:14, 172:15,
172:19, 173:18,
173:19, 174:4,
174:10, 174:11,
174:25, 175:1,
175:13, 175:14,
176:17, 176:18,
177:6, 177:7, 179:15,
179:16, 180:6, 180:8,
180:24, 180:25,
181:1, 186:18,
200:25, 201:2, 201:3,
204:17, 211:22,

211:24, 213:25,
214:2, 214:4, 214:17,
216:17
 **one's** [1] - 46:22
 **ones** [4] - 36:24,
43:16, 105:10, 128:9
 **ongoing** [1] - 23:9
 **online** [1] - 141:6
 **onset** [1] - 111:17
 **op** [1] - 185:4
 **open** [57] - 47:25,
62:5, 63:14, 64:14,
68:4, 69:17, 74:12,
74:13, 89:23, 107:2,
109:9, 110:1, 110:14,
110:23, 112:24,
113:22, 114:11,
115:2, 116:1, 116:10,
116:17, 122:8,
164:17, 165:7,
165:19, 166:15,
167:14, 168:14,
171:8, 172:2, 172:17,
173:22, 174:13,
174:21, 175:3,
175:17, 175:23,
176:21, 177:10,
179:19, 180:10,
181:4, 181:25,
200:22, 201:25,
202:23, 203:20,
204:9, 205:3, 207:6,
207:20, 208:14,
210:10, 210:13,
211:17, 212:17,
214:14
 **open-source** [1] -
62:5
 **opened** [7] - 68:12,
69:5, 77:19, 77:23,
138:12, 139:7, 214:15
 **opening** [1] - 93:24
 **opens** [1] - 69:18
 **operation** [6] -
67:22, 72:13, 127:21,
127:23, 128:1, 155:7
 **operational** [1] -
73:5
 **operations** [12] -
13:13, 62:4, 67:25,
127:19, 127:24,
128:3, 128:6, 128:10,
128:13, 133:20,
148:4, 159:3
 **operator** [1] - 62:19
 **opine** [1] - 15:3
 **opinion** [4] - 12:13,
12:14, 12:18, 12:19
 **opinions** [1] - 13:21
 **opportunity** [1] -

57:9
 **opposed** [1] - 38:5
 **opposing** [1] -
206:13
 **opposite** [3] -
122:15, 122:23,
122:25
 **opposition** [4] -
15:19, 15:22, 190:19,
196:23
 **ops** [2] - 151:6,
155:8
 **option** [9] - 44:24,
45:1, 45:7, 64:7,
73:16, 76:15, 76:17,
76:18, 77:14
 **options** [6] - 42:21,
44:23, 44:25, 45:3,
76:19, 158:17
 **orange** [1] - 92:18
 **order** [8] - 8:1, 12:10,
21:5, 32:9, 42:21,
47:18, 73:16, 143:7
 **orders** [2] - 5:18,
143:10
 **original** [1] - 150:21
 **OSI** [15] - 87:1, 87:3,
87:8, 87:10, 87:15,
87:17, 87:19, 88:6,
88:14, 89:19, 98:12,
98:15, 98:18, 100:1,
129:1
 **otherwise** [3] -
15:13, 37:22, 164:11
 **Outback** [6] -
184:25, 185:2, 190:6,
190:9, 191:22, 192:16
 **outdoor** [1] - 156:23
 **outline** [1] - 29:19
 **outside** [14] - 48:24,
91:14, 134:20, 158:8,
160:21, 161:4,
161:18, 175:21,
175:23, 202:3,
202:10, 202:15,
203:16, 213:4
 **overlap** [1] - 8:2
 **overnight** [1] -
216:24
 **overview** [1] - 127:20
 **overwhelm** [1] -
202:5
 **own** [3] - 64:23,
137:13, 137:17
 **Oxygen** [1] - 62:20

## P

 **P-A-S-S-I-S** [1] -

141:25
**p.m** [3] - 143:22, 183:19, 187:19
**packaged** [1] - 53:7
**Page** [2] - 99:22, 183:10
**PAGE** [1] - 3:9
**page** [2] - 33:16, 177:22
**pages** [5] - 57:5, 93:16, 177:23, 177:25, 178:2
**pairs** [1] - 104:15
**Palmer** [9] - 129:2, 184:8, 184:22, 198:25, 201:7, 202:2, 202:7, 202:12, 203:14
**Palmer-Jones** [9] - 129:2, 184:8, 184:22, 198:25, 201:7, 202:2, 202:7, 202:12, 203:14
**pandemic** [2] - 111:18, 130:15
**Panera** [2] - 156:22, 157:19
**panicked** [1] - 171:21
**pants** [2] - 172:11, 172:12
**paper** [2] - 99:1, 206:8
**papers** [2] - 5:3, 7:9
**paragraph** [3] - 20:21, 21:20, 35:20
**Paragraph** [1] - 99:22
**parameter** [1] - 77:8
**parameters** [1] - 13:1
**paramount** [1] - 88:24
**parents'** [1] - 29:25
**park** [2] - 103:24, 105:25
**Park** [4] - 101:10, 101:13, 103:22, 156:13
**part** [33] - 8:15, 8:16, 14:1, 67:11, 73:10, 73:23, 91:24, 93:2, 99:13, 100:3, 112:17, 117:17, 128:13, 128:16, 130:7, 133:21, 148:4, 156:3, 159:3, 173:1, 173:7, 176:4, 178:25, 179:11, 180:13, 182:5, 182:9, 183:25, 197:6, 206:11, 209:5, 209:10, 213:6
**partially** [1] - 23:12

**participant** [1] - 90:11
**participate** [1] - 128:14
**participated** [2] - 91:10, 92:4
**particular** [14] - 17:8, 35:4, 35:23, 39:1, 43:14, 55:23, 82:19, 83:19, 88:6, 88:15, 125:12, 125:24, 127:7, 151:14
**particularized** [1] - 108:17
**particularly** [5] - 10:18, 13:10, 14:16, 19:17, 35:18
**parties** [1] - 96:15
**parts** [2] - 98:21, 108:19
**party** [2] - 52:4, 52:7
**passcode** [45] - 38:17, 38:19, 44:25, 45:1, 45:7, 45:20, 45:23, 46:7, 46:19, 46:22, 49:22, 63:20, 63:24, 64:3, 64:7, 68:4, 68:10, 68:14, 68:17, 68:20, 68:22, 69:3, 69:6, 69:10, 69:12, 69:21, 69:24, 70:2, 70:4, 70:5, 70:8, 70:9, 70:11, 70:12, 71:7, 71:9, 71:14, 132:3, 138:19, 193:19, 208:10, 210:24, 213:1, 215:1
**passcode-protected** [1] - 46:7
**passcodes** [11] - 38:21, 39:2, 47:17, 126:6, 126:23, 127:2, 127:8, 177:3, 187:6, 187:7, 188:14
**passed** [2] - 24:4, 147:7
**passed-out** [1] - 24:4
**passis** [1] - 141:25
**Passis** [6] - 142:7, 144:19, 144:24, 145:19, 146:6, 146:9
**passport** [1] - 87:11
**passports** [1] - 60:12
**password** [16] - 32:4, 50:18, 51:11, 51:13, 52:12, 64:6, 68:16, 70:13, 70:17, 71:17, 79:2, 132:23, 136:4, 136:7, 208:3, 213:2

**passwords** [9] - 47:18, 50:14, 59:25, 60:2, 60:5, 60:8, 60:15, 77:17, 77:18
**past** [2] - 68:12, 128:7
**pause** [2] - 197:22, 205:1
**paused** [2] - 207:22, 208:16
**pavilion** [1] - 105:22
**pending** [2] - 32:21, 39:11
**Pennsylvania** [1] - 1:23
**people** [10] - 29:10, 105:25, 152:1, 152:12, 152:14, 158:8, 159:2, 176:1, 195:8, 217:11
**people's** [1] - 50:14
**per** [1] - 7:3
**percent** [3] - 51:10, 77:24, 78:1
**perfect** [2] - 140:9, 157:11
**perform** [2] - 46:6, 53:9
**performed** [1] - 54:16
**performing** [1] - 42:18
**period** [3] - 45:25, 81:25, 87:25
**periods** [1] - 166:19
**permission** [4] - 39:1, 95:23, 119:9, 190:16
**permitted** [1] - 208:9
**perry** [1] - 182:20
**Perry** [44] - 6:1, 8:8, 8:22, 8:25, 10:15, 124:5, 125:18, 126:14, 126:16, 126:17, 126:22, 127:4, 127:6, 133:12, 147:12, 147:22, 155:13, 155:15, 160:4, 178:5, 182:14, 182:22, 183:11, 183:12, 184:17, 185:16, 185:17, 186:23, 187:1, 187:6, 188:4, 188:5, 188:24, 189:19, 192:19, 193:3, 195:13, 195:14, 195:19, 195:25, 196:2, 196:5, 213:15, 216:20
**Perry's** [2] - 7:23,

124:6
**person** [19] - 14:13, 14:14, 35:7, 37:10, 44:2, 44:19, 50:20, 107:17, 131:4, 131:5, 131:6, 151:17, 151:20, 155:17, 164:23, 175:20, 177:16, 196:4, 200:12
**personal** [4] - 111:24, 112:2, 153:20, 173:12
**personally** [4] - 23:19, 90:16, 91:16, 125:13
**personnel** [8] - 21:2, 21:7, 87:6, 128:13, 128:20, 128:21, 143:12
**perspective** [1] - 7:5
**pertaining** [1] - 9:12
**pertinent** [1] - 21:25
**Phoenix** [2] - 59:11, 95:12
**phone** [159] - 4:18, 18:9, 18:14, 18:20, 19:21, 19:22, 21:18, 22:14, 25:24, 25:25, 28:6, 29:7, 36:11, 42:10, 42:11, 42:12, 42:13, 42:14, 42:19, 42:24, 43:1, 43:19, 44:6, 44:7, 44:15, 44:17, 44:20, 44:21, 45:24, 46:2, 46:6, 46:7, 46:8, 46:18, 46:20, 46:21, 47:8, 47:10, 47:25, 48:6, 48:10, 49:12, 50:24, 51:10, 54:2, 54:18, 55:23, 59:11, 62:23, 64:23, 65:2, 65:10, 65:14, 66:5, 68:5, 68:13, 69:5, 70:16, 74:6, 74:8, 74:10, 76:13, 76:14, 76:24, 77:13, 77:16, 77:18, 77:25, 79:1, 81:6, 82:19, 83:5, 83:8, 83:17, 83:24, 84:2, 84:5, 84:7, 84:12, 84:24, 95:12, 111:24, 111:25, 112:10, 112:14, 114:21, 114:22, 115:5, 115:16, 116:5, 116:24, 117:2, 117:3, 119:17, 120:1, 120:3, 120:6, 120:8, 120:13, 120:15, 120:20,

121:22, 123:1, 123:12, 124:19, 126:3, 127:8, 131:3, 132:1, 132:2, 132:5, 132:13, 135:14, 135:18, 135:21, 135:23, 136:3, 136:25, 137:3, 138:7, 138:11, 138:18, 153:20, 154:5, 163:5, 165:23, 166:25, 167:1, 167:17, 167:18, 172:22, 172:25, 174:6, 176:4, 186:19, 187:1, 192:19, 195:6, 195:12, 195:19, 196:4, 200:15, 208:5, 208:23, 209:4, 209:13, 209:22, 210:1, 210:25, 214:3, 214:4, 214:9, 215:17, 215:19
**phones** [113] - 9:18, 12:15, 18:4, 18:11, 18:12, 18:13, 18:19, 18:21, 18:25, 19:4, 19:19, 20:7, 20:10, 20:11, 20:14, 25:21, 27:10, 28:20, 30:9, 33:12, 34:24, 35:7, 38:1, 38:10, 38:22, 38:25, 43:3, 43:10, 52:24, 53:3, 53:7, 53:10, 54:12, 63:12, 66:8, 66:19, 66:22, 67:23, 70:4, 72:24, 75:6, 75:13, 75:18, 79:8, 79:18, 79:22, 79:23, 81:3, 84:22, 84:24, 91:19, 91:21, 99:7, 110:18, 111:21, 113:2, 113:4, 113:25, 115:8, 116:12, 116:19, 121:20, 121:25, 122:3, 122:4, 122:7, 123:5, 123:24, 124:11, 125:5, 126:7, 127:13, 127:17, 128:4, 131:14, 132:17, 132:19, 136:6, 137:19, 137:21, 138:23, 139:4, 139:6, 141:11, 146:1, 150:2, 151:20, 153:9, 155:17, 165:22, 166:9, 167:23, 172:5, 172:6, 172:8, 173:25, 174:15, 174:21, 180:16, 181:7, 181:9,

182:8, 183:14, 184:7,
185:18, 185:24,
208:24, 209:19,
212:23, 214:2, 215:14
**photo** [8] - 55:15,
55:16, 55:17, 55:22,
75:15, 75:16, 174:3,
197:8
**photographs** [1] -
164:4
**photos** [28] - 18:15,
23:22, 25:4, 26:8,
28:8, 30:16, 52:3,
113:17, 115:21,
117:19, 118:1,
118:19, 118:21,
118:24, 119:25,
123:11, 124:19,
146:1, 161:4, 174:4,
176:4, 176:7, 176:14,
176:15, 176:16,
179:21, 196:14
**physical** [5] - 37:23,
43:18, 53:18, 56:16,
62:20
**physically** [2] -
189:11, 189:17
**pick** [5] - 10:10,
78:15, 98:11, 157:4,
216:2
**picked** [1] - 133:20
**picnic** [2] - 105:15,
122:22
**picture** [2] - 117:15,
119:15
**Picture** [1] - 10:11
**pictures** [4] - 114:5,
122:3, 179:25, 180:2
**pillar** [1] - 161:25
**pin** [2] - 104:20,
156:12
**PIN** [17] - 45:9,
45:16, 48:10, 48:22,
49:12, 49:14, 64:5,
79:3, 132:17, 132:18,
174:18, 174:22,
185:19, 185:24,
208:1, 210:3, 214:13
**PINs** [4] - 127:2,
177:1, 177:3, 177:5
**place** [13] - 17:4,
17:11, 18:22, 19:1,
20:16, 20:18, 23:3,
101:20, 111:17,
132:4, 165:1, 191:24,
193:16
**places** [2] - 67:19,
157:22
**plainclothes** [1] -
189:12

**Plaintiff** [1] - 1:4
**plan** [25] - 13:13,
13:21, 14:3, 67:25,
72:10, 72:13, 72:14,
72:15, 72:21, 73:1,
73:7, 73:13, 73:22,
127:19, 127:20,
128:3, 128:6, 128:16,
130:7, 150:21, 151:6,
154:23, 155:8, 159:3,
188:3
**planned** [2] - 146:24,
157:16
**planning** [5] -
128:13, 128:16,
148:4, 151:5, 216:25
**plans** [2] - 72:18,
128:10
**plastic** [1] - 41:2
**play** [35] - 106:20,
106:24, 108:6, 108:8,
108:11, 108:18,
109:23, 110:10,
110:20, 115:23,
116:14, 164:10,
164:14, 165:4,
166:12, 167:11,
168:5, 171:6, 171:22,
171:24, 173:17,
181:15, 181:22,
200:19, 201:22,
202:21, 203:18,
204:7, 204:25,
207:18, 208:12,
210:11, 211:15,
212:15
**played** [2] - 107:4,
116:23
**playing** [1] - 174:24
**pleadings** [1] - 5:4
**pleasy** [2] - 152:7,
152:16
**plug** [1] - 96:24
**plugged** [1] - 97:19
**plugging** [1] - 101:23
**pocket** [4] - 172:10,
172:11, 172:12
**podium** [1] - 93:10
**point** [89] - 6:20,
8:19, 9:6, 9:25, 10:19,
12:10, 14:7, 17:11,
18:13, 18:16, 21:15,
21:24, 25:17, 26:2,
27:5, 39:3, 53:5,
64:23, 66:3, 78:9,
78:15, 91:1, 91:2,
91:9, 98:17, 99:21,
101:11, 104:5,
111:23, 115:6,
115:13, 116:12,

117:1, 120:1, 120:20,
121:9, 122:5, 124:24,
126:6, 130:16,
133:25, 134:1, 134:4,
134:15, 140:10,
142:19, 157:3,
162:25, 163:3, 163:4,
163:5, 166:24, 167:2,
167:16, 168:10,
170:3, 170:23, 172:4,
175:5, 176:3, 178:18,
179:7, 180:12, 181:6,
181:19, 184:23,
184:25, 185:3, 194:8,
194:15, 196:1,
201:20, 203:8,
204:14, 204:17,
205:5, 211:10,
211:12, 211:13,
212:14, 212:22,
213:4, 213:17,
213:23, 214:4, 215:2,
216:20, 216:23,
217:14
**pointing** [2] - 122:23,
205:12
**points** [1] - 84:15
**police** [4] - 8:7,
89:21, 194:1, 198:2
**policy** [2] - 73:3,
73:5
**polite** [2] - 123:9,
123:14
**portable** [1] - 65:23
**portion** [9] - 8:11,
56:10, 100:20,
171:16, 172:24,
205:14, 205:16,
205:25, 206:2
**position** [6] - 10:5,
11:2, 12:2, 41:7,
41:10, 85:16
**positions** [1] - 41:17
**possession** [9] -
18:21, 24:15, 24:16,
24:17, 33:13, 38:11,
38:23, 94:5, 99:8
**possibility** [1] -
150:23
**possible** [14] - 44:6,
46:8, 46:23, 47:18,
50:25, 73:17, 76:16,
76:17, 76:21, 76:22,
124:25, 138:21,
176:14, 195:22
**postpone** [1] - 155:7
**potential** [3] -
124:22, 147:4, 157:2
**potentially** [4] - 13:7,
65:23, 81:9, 141:13

**power** [2] - 137:2,
211:3
**powered** [5] - 13:12,
46:18, 46:20, 139:17
**practical** [1] - 14:24
**practice** [1] - 73:8
**pre** [1] - 185:4
**pre-op** [1] - 185:4
**precaution** [1] -
111:18
**precisely** [1] - 20:13
**predict** [1] - 47:24
**prefer** [2] - 103:11,
194:7
**preference** [3] -
158:11, 189:2, 189:4
**preliminarily** [1] -
9:3
**preliminary** [2] - 5:8,
11:10
**premise** [1] - 70:25
**premises** [1] - 37:23
**preparation** [3] -
8:16, 48:3, 112:19
**prepare** [1] - 61:13
**preparing** [2] -
112:19, 126:9
**presence** [1] - 196:3
**present** [8] - 4:12,
8:9, 107:15, 128:21,
189:3, 189:7, 189:13,
204:19
**presentation** [1] -
32:23
**preservation** [10] -
28:2, 32:12, 32:18,
32:19, 140:21,
140:23, 141:1, 141:3,
143:7, 143:10
**preserve** [1] - 29:13
**preserved** [1] - 141:6
**preserving** [1] -
141:12
**press** [3] - 21:2,
37:25, 179:8
**presumably** [4] -
33:14, 35:25, 96:15,
216:18
**pretext** [2] - 37:11,
100:2
**pretty** [2] - 35:17,
64:20
**previous** [1] - 209:18
**previously** [12] -
6:15, 41:15, 62:1,
62:3, 63:11, 77:22,
79:9, 79:18, 79:19,
81:7, 128:8, 189:22
**primary** [1] - 87:4
**private** [1] - 158:8

**privilege** [9] - 5:16,
6:23, 6:25, 7:4, 7:10,
7:12, 7:13, 8:23, 9:1
**privileged** [1] - 9:5
**privileges** [1] - 9:10
**probable** [16] - 4:21,
15:16, 16:6, 16:12,
16:13, 16:22, 16:24,
17:20, 17:22, 18:24,
19:25, 20:3, 24:11,
24:20, 26:23, 27:1
**problem** [3] - 16:16,
36:21, 108:23
**problems** [2] - 81:3,
189:7
**procedure** [4] - 73:8,
73:11, 73:12, 73:23
**procedures** [1] -
131:13
**proceed** [5] - 7:16,
22:4, 109:13, 139:25,
195:10
**Proceedings** [1] -
217:21
**proceedings** [12] -
7:20, 39:20, 78:17,
78:21, 85:10, 134:9,
135:2, 139:23, 140:2,
194:17, 216:12, 218:6
**process** [3] - 80:17,
91:6, 137:5
**processed** [1] - 56:1
**processing** [1] - 56:2
**produce** [2] - 5:18,
11:4
**produced** [3] - 6:9,
6:17, 218:6
**product** [2] - 6:24,
77:11
**proffer** [1] - 12:12
**proffered** [1] - 23:14
**proffering** [1] - 35:9
**profile** [1] - 174:3
**program** [1] - 87:12
**progress** [3] - 9:23,
10:3, 10:14
**prohibits** [1] - 132:9
**projects** [1] - 75:24
**prolific** [1] - 19:17
**prompted** [1] - 209:8
**prompts** [1] - 70:9
**pronounce** [1] - 86:4
**pronounced** [1] -
86:15
**proper** [1] - 131:13
**property** [3] - 98:10,
180:22, 181:18
**prosecutions** [1] -
124:9
**prosecutor** [2] -

61:13, 62:13
  **prosecutor's** [1] -
61:12
  **protected** [1] - 46:7
  **protection** [2] -
87:12, 88:2
  **protest** [2] - 166:17,
166:22
  **provide** [20] - 14:10,
33:18, 33:20, 37:6,
37:7, 90:13, 95:25,
126:19, 131:16,
132:18, 154:9,
174:23, 176:25,
177:3, 185:19, 187:8,
188:22, 193:12, 208:3
  **provided** [12] - 7:3,
10:1, 14:8, 14:23,
18:2, 51:18, 60:12,
89:17, 127:3, 150:12,
150:15, 198:1
  **providers** [1] - 141:5
  **provides** [2] - 21:11,
156:18
  **providing** [2] -
145:19, 189:17
  **provision** [15] - 92:6,
99:14, 125:6, 126:11,
126:16, 127:12,
178:16, 178:19,
178:21, 178:22,
188:17, 195:20,
206:23, 207:2, 207:11
  **provisions** [1] - 92:3
  **provocative** [1] -
176:16
  **public** [2] - 100:5,
189:14
  **publicly** [2] - 108:11,
125:23
  **publish** [12] -
102:17, 119:10,
121:16, 142:25,
145:14, 160:15,
161:15, 165:11,
183:8, 190:16,
190:19, 198:21
  **published** [47] -
107:2, 109:9, 110:1,
110:14, 110:23,
112:24, 113:22,
114:11, 115:2, 116:1,
116:10, 116:17,
164:17, 165:7,
165:19, 166:15,
167:14, 168:14,
171:8, 172:2, 172:17,
173:22, 174:13,
175:3, 175:17,
176:21, 177:10,

179:19, 180:10,
181:4, 181:25, 183:2,
196:21, 196:25,
198:12, 200:22,
201:25, 202:23,
203:20, 204:9, 205:3,
207:6, 207:20,
208:14, 210:13,
211:17, 212:17
  **pull** [26] - 28:4,
28:10, 77:7, 93:10,
99:2, 101:22, 110:17,
117:5, 118:13,
120:23, 140:13,
141:18, 144:17,
147:15, 148:13,
156:4, 159:11,
160:24, 164:1, 171:3,
182:13, 187:14,
189:21, 196:8,
197:11, 197:19
  **pulled** [2] - 102:2,
117:10
  **pulling** [4] - 33:9,
99:6, 117:7, 169:1
  **pulls** [1] - 215:18
  **purple** [1] - 58:10
  **purpose** [4] - 20:15,
21:4, 21:9, 67:17
  **purposes** [3] - 7:24,
38:2, 135:8
  **pursuant** [1] - 180:3
  **pursuing** [1] - 91:7
  **purview** [1] - 98:9
  **push** [2] - 69:25,
70:2
  **pushes** [1] - 49:7
  **put** [14] - 4:20, 5:2,
14:17, 14:19, 39:5,
83:19, 128:10, 132:6,
181:7, 181:20,
195:22, 211:3, 216:5,
216:22
  **putting** [1] - 143:9

**Q**

  **qualified** [1] - 12:15
  **qualifies** [1] - 41:13
  **quality** [1] - 51:8
  **quash** [2] - 7:23, 8:2
  **questions** [26] -
32:22, 32:24, 39:3,
39:11, 42:9, 44:10,
46:5, 51:15, 60:22,
61:5, 61:12, 66:11,
76:7, 78:7, 80:5, 80:6,
84:9, 85:3, 94:16,
97:18, 109:13,

109:17, 110:8,
139:21, 140:5, 216:21
  **quick** [4] - 78:19,
146:22, 184:21, 185:6
  **quickly** [4] - 46:3,
48:25, 117:22, 196:12
  **quiet** [1] - 123:10
  **quite** [3] - 62:22,
157:22, 158:8
  **quotes** [1] - 136:10

**R**

  **raise** [1] - 5:9
  **rally** [1] - 184:23
  **range** [5] - 76:25,
77:3, 87:11, 88:7,
91:5
  **RAYMOND** [19] - 1:6,
39:24, 40:20, 135:9,
136:8, 136:13,
136:18, 136:23,
137:11, 137:17,
137:24, 138:9,
138:14, 138:21,
139:5, 139:8, 139:10,
139:14, 139:18
  **Raymond** [180] - 3:5,
4:4, 4:12, 5:6, 11:17,
17:2, 17:10, 18:1,
18:2, 19:16, 19:24,
21:3, 22:25, 23:6,
24:14, 25:19, 25:23,
26:22, 27:13, 27:14,
27:19, 27:20, 28:5,
32:15, 33:2, 33:13,
35:6, 37:14, 37:15,
37:21, 38:1, 38:10,
39:14, 39:19, 40:20,
42:4, 61:4, 78:20,
90:21, 92:9, 92:21,
94:6, 97:13, 99:8,
100:1, 101:5, 101:14,
101:15, 102:6, 102:8,
102:25, 103:4,
103:15, 103:24,
104:2, 105:1, 105:4,
105:16, 105:20,
106:4, 106:7, 106:12,
109:13, 109:17,
110:3, 110:7, 110:16,
111:7, 111:13,
111:21, 111:24,
112:9, 113:4, 113:24,
116:3, 116:20, 117:2,
119:23, 121:5,
121:20, 122:15,
123:1, 123:15,
123:23, 126:18,
127:8, 128:4, 135:1,

135:9, 139:22,
140:18, 140:20,
143:19, 145:20,
145:25, 147:9,
150:15, 151:3,
152:19, 154:9,
154:11, 154:15,
154:22, 155:1,
155:17, 155:22,
156:17, 157:4,
158:16, 161:24,
162:3, 163:8, 163:10,
163:13, 163:18,
166:3, 167:7, 167:23,
167:25, 168:19,
170:3, 170:18,
171:10, 172:5, 172:9,
172:24, 173:24,
174:15, 176:3,
176:23, 177:18,
178:2, 178:10, 179:3,
179:11, 179:24,
180:12, 180:19,
181:9, 185:18,
185:23, 187:3, 187:8,
188:9, 188:11,
188:21, 189:12,
189:15, 190:12,
191:6, 192:20,
193:11, 194:7,
194:22, 199:19,
200:10, 200:12,
200:17, 201:21,
203:9, 204:24,
205:12, 206:25,
207:11, 207:24,
208:20, 208:22,
208:24, 211:22,
213:6, 214:1, 214:4,
214:10, 215:11,
215:17, 215:18,
215:24, 216:1, 216:10
  **Raymond's** [34] -
18:14, 18:19, 21:8,
22:7, 23:3, 23:14,
23:18, 23:23, 24:1,
30:8, 37:10, 38:2,
108:16, 108:21,
116:23, 117:15,
117:18, 118:20,
123:8, 124:11, 126:7,
127:17, 141:10,
151:17, 151:20,
163:22, 170:22,
171:17, 173:6, 175:6,
179:10, 193:19,
194:4, 199:16
  **RDR** [3] - 2:1, 218:3,
218:12
  **re** [1] - 134:15
  **re-call** [1] - 134:15

  **reach** [3] - 48:3,
101:5, 103:6
  **reached** [2] - 28:1,
49:10
  **reaching** [1] - 67:9
  **reaction** [1] - 8:17
  **read** [12] - 21:20,
35:20, 43:12, 67:1,
67:4, 67:5, 125:19,
149:16, 150:8,
157:20, 207:10
  **ready** [1] - 195:3
  **really** [8] - 13:20,
17:20, 74:18, 77:8,
88:24, 111:17,
153:21, 171:1
  **realtime** [1] - 134:25
  **reason** [6] - 14:25,
23:21, 37:9, 40:10,
123:4, 156:3
  **reasons** [5] - 24:13,
104:18, 108:14,
137:6, 138:17
  **recalled** [2] - 134:13,
135:4
  **receipts** [2] - 180:23,
181:18
  **receive** [2] - 50:24,
126:13
  **RECEIVED** [1] - 3:9
  **received** [7] - 34:20,
59:21, 113:4, 163:5,
167:1, 167:17, 188:8
  **receiving** [1] -
132:10
  **recess** [4] - 7:19,
78:16, 134:8, 194:16
  **recognition** [1] -
126:4
  **recognize** [11] -
93:25, 102:2, 107:6,
117:11, 142:3,
142:11, 144:21,
148:18, 159:24,
164:19, 182:17
  **recollection** [7] -
48:15, 100:14,
123:22, 205:22,
206:3, 206:18, 206:19
  **record** [24] - 4:6, 5:4,
15:13, 21:15, 40:3,
40:5, 40:19, 86:12,
92:19, 92:24, 95:4,
100:20, 106:10,
122:17, 122:20,
135:8, 159:17,
163:16, 182:2,
192:15, 192:23,
199:21, 204:11,
215:16

**recorded** [2] - 106:12, 163:18
**recorder** [2] - 106:18, 163:21
**recording** [39] - 106:16, 106:17, 107:4, 107:10, 107:13, 107:17, 107:19, 107:20, 108:7, 108:8, 108:15, 109:7, 110:12, 110:21, 111:1, 111:3, 111:23, 112:13, 112:18, 112:20, 163:20, 164:2, 164:3, 164:9, 164:11, 164:19, 164:21, 164:23, 165:1, 165:24, 166:7, 168:16, 168:18, 171:4, 179:14, 182:3, 202:25, 208:16, 212:19
**recordings** [1] - 108:13
**records** [1] - 52:4
**recounts** [1] - 22:22
**recover** [1] - 29:20
**recovered** [4] - 57:11, 58:6, 60:6, 60:20
**RECROSS** [1] - 83:2
**RECROSS-EXAMINATION** [1] - 83:2
**Red** [1] - 3:3
**redacted** [1] - 6:9
**redactions** [5] - 118:2, 118:25, 142:17, 169:15, 182:21
**redirect** [1] - 76:9
**REDIRECT** [2] - 76:10, 80:7
**reduce** [1] - 49:8
**reengage** [1] - 192:20
**refer** [3] - 48:11, 52:15, 65:2
**reference** [9] - 24:6, 24:11, 25:4, 31:3, 31:4, 31:5, 96:3, 173:11, 176:24
**references** [10] - 22:24, 23:2, 25:18, 26:9, 26:16, 26:18, 27:6, 27:7, 30:7, 30:20
**referencing** [9] - 27:5, 54:18, 114:15,

174:7, 175:10, 179:24, 180:2, 205:19, 212:6
**referring** [3] - 42:24, 46:17, 58:4
**refers** [2] - 43:7, 75:2
**reflect** [7] - 58:6, 58:12, 58:17, 58:21, 59:1, 60:19, 92:20
**reflected** [1] - 92:24
**refresh** [4] - 48:15, 123:22, 205:22, 206:3
**refreshed** [2] - 206:18, 206:20
**refused** [1] - 193:11
**regarding** [29] - 17:1, 17:7, 20:1, 21:12, 22:22, 28:4, 32:5, 32:7, 35:19, 96:3, 104:3, 108:15, 108:16, 125:1, 125:24, 126:10, 126:15, 126:23, 127:7, 127:11, 130:25, 131:16, 147:12, 155:11, 174:2, 174:20, 177:2, 212:12
**regardless** [1] - 16:15
**relate** [2] - 8:22, 34:5
**related** [10] - 8:2, 9:14, 9:16, 9:17, 10:6, 13:14, 17:2, 75:15, 88:15
**relates** [2] - 8:21, 13:22
**relating** [3] - 5:25, 10:14, 10:22
**relation** [2] - 9:13, 24:18
**relative** [1] - 122:11
**release** [1] - 79:6
**released** [1] - 80:14
**relevant** [8] - 5:15, 6:15, 10:18, 17:24, 19:25, 26:20, 150:9, 180:2
**relied** [2] - 15:24, 22:18
**rely** [6] - 7:9, 22:12, 22:13, 26:4, 137:22
**relying** [1] - 26:2
**remain** [8] - 39:22, 85:12, 89:9, 96:5, 96:10, 96:11, 163:1, 164:11
**remainder** [2] - 108:13, 202:8
**remarked** [1] -

170:25
**remember** [17] - 72:7, 112:6, 112:11, 130:13, 146:24, 147:12, 147:23, 148:4, 156:14, 166:10, 186:18, 195:22, 196:1, 201:13, 204:17, 205:18, 205:19
**reminded** [1] - 194:11
**remove** [4] - 132:3, 132:20, 172:25, 210:9
**removing** [2] - 174:3, 174:4
**render** [1] - 12:14
**rendering** [3] - 12:13, 12:17, 91:24
**rendezvous** [1] - 184:20
**reopen** [1] - 5:20
**repeat** [3] - 81:20, 168:9, 213:1
**repeatedly** [2] - 89:6, 89:8
**replete** [1] - 5:23
**report** [22] - 12:23, 13:17, 13:19, 13:25, 16:25, 17:17, 17:21, 17:22, 18:23, 22:21, 22:23, 24:13, 27:7, 27:19, 37:2, 54:1, 54:2, 54:5, 54:11, 54:15, 54:20, 57:17
**REPORTED** [1] - 2:1
**reported** [6] - 17:1, 17:4, 17:7, 17:16, 17:18, 97:24
**REPORTER** [3] - 100:19, 129:6, 199:8
**Reporter** [2] - 2:1, 218:12
**reporter** [1] - 20:25
**reporting** [1] - 17:18
**reports** [1] - 13:24
**represent** [1] - 61:4
**representation** [4] - 94:10, 160:5, 161:5, 164:25
**request** [2] - 5:20, 8:24
**require** [1] - 45:16
**required** [3] - 45:19, 83:5, 177:3
**research** [1] - 125:23
**residence** [14] - 22:7, 23:18, 23:23, 29:25, 30:2, 30:6, 30:10, 30:20, 34:17, 37:15,

95:6, 95:11, 95:13
**residences** [1] - 93:4
**residential** [4] - 31:17, 33:8, 90:18, 127:25
**respective** [1] - 141:5
**respond** [20] - 146:15, 150:1, 152:3, 153:16, 154:2, 155:6, 157:24, 158:10, 158:19, 158:21, 170:13, 170:19, 183:15, 184:8, 184:12, 184:15, 184:19, 184:22, 188:24, 209:8
**responded** [1] - 171:13
**responding** [1] - 144:1
**responds** [7] - 149:23, 153:10, 154:4, 157:20, 158:16, 170:16, 174:18
**response** [7] - 6:18, 6:25, 9:19, 116:5, 118:3, 146:6, 177:2
**responsible** [1] - 127:23
**responsive** [1] - 77:5
**rest** [3] - 9:9, 36:13, 187:12
**restart** [1] - 137:5
**restarted** [2] - 13:12, 46:19
**restaurant** [1] - 158:12
**restrain** [5] - 126:20, 189:11, 189:15, 189:17, 193:16
**result** [1] - 26:15
**resulted** [1] - 32:10
**results** [3] - 25:16, 26:9, 58:16
**resume** [2] - 134:4, 140:10
**retired** [2] - 139:22, 216:11
**retrieve** [1] - 76:20
**return** [5] - 26:7, 26:10, 26:15, 32:3, 134:23
**returned** [1] - 167:24
**returning** [1] - 148:2
**revealed** [2] - 23:8, 23:9
**review** [6] - 9:20, 31:25, 44:5, 57:9,

93:6, 112:18
**reviewed** [6] - 57:17, 67:16, 74:1, 94:8, 94:11, 193:10
**reviewing** [2] - 117:2, 143:14
**reviews** [1] - 44:2
**reword** [2] - 154:18, 195:18
**RICHTER** [1] - 1:22
**right-hand** [1] - 201:9
**rights** [2] - 88:23, 124:8
**risk** [2] - 147:4, 178:10
**role** [1] - 124:6
**room** [3] - 37:21, 154:4, 199:16
**Room** [1] - 2:3
**roughly** [1] - 14:13
**route** [2] - 184:23, 192:10
**routine** [1] - 143:13
**Rule** [1] - 11:16
**rule** [1] - 40:12
**ruled** [2] - 5:17, 7:22
**ruling** [2] - 10:1, 15:3
**running** [1] - 139:4
**ruse** [7] - 35:5, 35:13, 36:6, 36:12, 37:2, 37:10, 100:1
**Ryan** [1] - 130:10

**S**

**safe** [2] - 111:19, 196:3
**safety** [1] - 104:18
**salesmanship** [2] - 152:8, 152:17
**salon** [1] - 175:22
**SanDisk** [1] - 59:8
**sanitizer** [3] - 111:15, 111:16, 111:20
**sat** [2] - 105:15, 106:4
**Saturday** [5] - 133:17, 133:18, 152:4, 155:19, 182:5
**saw** [11] - 23:19, 23:20, 30:16, 38:10, 38:11, 53:7, 67:25, 115:13, 115:19, 187:5, 208:6
**scenario** [1] - 154:9
**scenarios** [2] - 132:16, 179:1

**schedule** [1] - 217:3
**schedules** [1] -
130:18
**scheduling** [2] -
215:24, 216:14
**scoot** [1] - 40:25
**scope** [3] - 12:12,
65:25, 67:10
**screaming** [1] -
97:24
**screen** [20] - 53:21,
53:23, 57:2, 58:3,
93:10, 93:11, 93:19,
99:3, 102:3, 103:18,
117:16, 117:18,
118:17, 119:15,
119:18, 143:3,
145:18, 159:21,
187:18, 197:24
**screens** [1] - 96:14
**screenshots** [1] -
123:16
**scroll** [15] - 25:24,
71:13, 99:19, 103:9,
113:8, 117:22, 142:8,
143:25, 144:25,
146:3, 150:17, 169:6,
169:25, 183:22, 184:2
**scrolled** [1] - 142:11
**scrolling** [26] -
18:15, 56:18, 104:1,
104:19, 117:25,
118:23, 119:20,
119:25, 120:20,
143:23, 144:3, 144:8,
145:3, 146:4, 146:13,
150:3, 151:24, 152:5,
152:22, 153:3,
153:14, 153:24,
157:8, 158:1, 158:14,
184:10
**SD** [1] - 59:4
**seal** [6] - 97:4, 97:5,
100:19, 108:14,
108:19, 164:11
**sealed** [8] - 9:20,
53:8, 96:5, 96:10,
96:11, 100:16,
100:18, 100:22
**search** [90] - 9:13,
13:9, 16:12, 18:25,
20:5, 20:8, 20:23,
21:6, 22:1, 22:5, 22:6,
22:8, 22:20, 23:25,
24:1, 24:2, 24:6,
24:21, 24:25, 25:3,
25:4, 25:10, 25:13,
26:6, 27:6, 27:25,
28:17, 28:18, 29:17,
29:24, 30:4, 30:6,

30:10, 30:19, 30:23,
31:1, 31:2, 31:9,
31:17, 31:19, 32:25,
33:21, 35:3, 36:9,
36:10, 36:16, 37:16,
38:15, 44:1, 50:17,
58:16, 59:16, 65:25,
77:2, 77:3, 89:1,
90:10, 90:16, 90:18,
90:20, 90:21, 91:10,
91:23, 92:5, 93:3,
93:6, 93:7, 93:13,
94:3, 94:4, 94:7,
94:10, 95:13, 98:21,
99:6, 99:17, 123:24,
124:10, 124:11,
124:17, 125:4,
127:25, 128:4, 151:8,
155:12, 177:12,
178:13, 179:11,
180:3, 182:8
**searched** [2] - 30:2,
30:3
**searches** [7] - 30:21,
31:4, 34:23, 44:1,
59:11, 88:19, 88:24
**searching** [3] - 67:9,
67:10, 130:5
**seat** [1] - 122:13
**seated** [13] - 39:25,
40:1, 65:17, 85:14,
92:18, 111:12,
122:15, 161:22,
161:24, 162:1, 162:2,
162:6, 163:2
**seating** [1] - 156:23
**second** [19] - 11:10,
11:12, 30:12, 37:14,
59:14, 78:19, 95:13,
95:15, 106:25,
138:25, 139:24,
150:8, 178:12,
186:22, 204:15,
209:3, 209:13,
209:14, 209:22
**second-to-the-last**
[1] - 59:14
**secondary** [1] -
104:12
**seconds** [59] -
106:20, 107:5, 109:7,
109:24, 110:11,
114:25, 116:8,
116:15, 164:14,
165:5, 166:12,
166:13, 167:11,
167:12, 168:6, 168:7,
168:8, 168:12, 171:5,
171:6, 171:24,
171:25, 172:14,

172:15, 172:20,
173:5, 173:19,
173:20, 174:10,
174:11, 174:25,
175:1, 175:14,
175:15, 176:18,
176:19, 177:7, 177:8,
179:16, 179:17,
180:7, 180:8, 181:1,
181:2, 181:13, 201:1,
203:2, 203:23,
204:11, 204:13,
205:1, 205:7, 207:9,
207:22, 208:17,
210:16, 211:19,
212:20
**secrets** [1] - 97:20
**section** [2] - 41:23,
60:13
**secure** [1] - 154:4
**Security** [1] - 86:19
**security** [8] - 13:15,
44:11, 44:12, 63:23,
64:17, 87:12, 87:19,
88:1
**see** [85] - 7:16, 8:16,
8:19, 9:6, 9:22, 10:17,
38:12, 44:6, 44:8,
53:21, 56:17, 63:13,
71:13, 73:6, 73:21,
75:4, 75:18, 75:20,
78:9, 92:15, 92:17,
93:11, 96:12, 96:24,
99:4, 99:23, 100:3,
100:6, 100:9, 100:25,
103:12, 103:19,
104:20, 104:22,
111:4, 115:21,
119:14, 121:21,
121:24, 122:2, 122:3,
122:6, 122:8, 123:4,
143:4, 144:6, 144:10,
145:22, 145:23,
146:7, 146:11,
146:18, 149:23,
152:9, 153:12,
153:22, 156:24,
156:24, 159:7,
159:21, 162:18,
162:21, 162:23,
170:10, 183:25,
187:20, 187:22,
190:24, 191:3, 191:8,
191:17, 191:19,
192:3, 192:6, 198:3,
201:8, 201:15,
202:12, 202:19,
203:11, 207:10,
208:9, 209:1, 217:16
**seeing** [3] - 97:17,

108:25, 116:5
**seek** [8] - 93:3,
124:10, 126:10,
140:20, 140:25,
176:9, 193:21
**seeking** [6] - 5:14,
7:25, 27:25, 32:12,
32:18, 38:22
**seeks** [1] - 31:1
**seem** [3] - 84:14,
111:3, 152:4
**sees** [1] - 205:17
**segments** [32] -
107:1, 164:16, 165:6,
165:18, 166:14,
167:13, 168:13,
171:7, 172:1, 172:16,
173:21, 174:12,
175:2, 175:16,
176:20, 177:9,
179:18, 180:9, 181:3,
181:24, 200:21,
201:24, 202:22,
203:19, 204:8, 205:2,
207:5, 207:19,
208:13, 210:12,
211:16, 212:16
**seize** [6] - 20:14,
37:12, 91:16, 123:24,
124:11, 175:11
**seized** [23] - 23:3,
23:7, 24:7, 25:21,
27:16, 27:17, 28:13,
29:7, 30:9, 30:24,
31:18, 32:13, 32:19,
41:10, 91:14, 95:9,
95:18, 100:5, 131:10,
131:14, 131:17,
151:15, 180:15
**seizing** [3] - 130:4,
149:24, 210:8
**seizure** [10] - 13:14,
20:5, 20:16, 20:18,
67:22, 89:1, 91:11,
149:18, 182:8, 185:9
**seizures** [2] - 13:10,
132:9
**select** [2] - 10:9,
76:15
**selected** [2] - 129:2,
129:3
**selective** [1] - 10:9
**send** [4] - 114:4,
123:18, 130:8, 145:25
**sending** [3] - 123:16,
132:9, 187:19
**sense** [6] - 25:8,
29:2, 48:4, 138:1,
154:3, 178:6
**sensitive** [1] - 96:3

**sensor** [1] - 21:4
**sent** [2] - 169:13,
182:20
**separate** [5] - 6:1,
50:3, 50:4, 50:8,
208:24
**series** [1] - 4:17
**service** [2] - 51:18,
141:5
**set** [16] - 4:19, 15:11,
16:2, 35:12, 36:14,
44:12, 44:18, 45:15,
52:10, 52:21, 63:17,
63:19, 63:23, 103:6,
103:15, 135:10
**setting** [6] - 68:16,
69:6, 69:7, 69:23,
70:11, 100:6
**settings** [11] - 68:2,
68:13, 68:14, 69:23,
70:10, 71:4, 132:3,
132:20, 210:3,
210:10, 210:25
**seven** [3] - 41:16,
62:4, 210:15
**several** [8] - 26:19,
90:13, 90:17, 91:13,
93:3, 103:14, 133:7,
148:3
**sexual** [6] - 17:15,
17:17, 17:19, 88:16,
89:22, 124:25
**sexually** [1] - 17:16
**shared** [1] - 26:13
**sharing** [2] - 104:25,
105:4
**SHEPPARD** [1] -
1:22
**shift** [5] - 90:8,
120:6, 120:11,
183:20, 190:3
**shifted** [1] - 18:7
**shirt** [4] - 201:5,
201:6, 202:13, 203:12
**shorten** [1] - 83:5
**shortened** [2] -
83:23, 135:13
**shorter** [3] - 79:11,
81:25, 82:2
**show** [15] - 53:12,
53:23, 57:1, 110:17,
110:18, 111:7,
114:19, 122:3,
177:18, 178:2,
179:11, 196:12,
205:15, 205:19, 207:2
**showed** [7] - 18:12,
27:10, 57:16, 178:5,
205:24, 205:25,
206:25

**showing** [10] - 19:4,
24:4, 26:24, 93:19,
161:3, 169:9, 196:13,
205:14, 205:21,
206:10
**shown** [2] - 24:15,
96:12
**sic]** [1] - 152:7
**side** [12] - 102:23,
103:19, 122:22,
122:23, 156:16,
157:10, 161:25,
172:10, 183:11,
191:11, 201:9, 202:20
**sight** [1] - 111:14
**signals** [1] - 132:10
**signed** [6] - 22:2,
25:9, 26:7, 106:15,
151:16, 155:4
**significant** [1] -
50:19
**signing** [1] - 184:13
**silent** [2] - 89:10,
115:5
**silver** [1] - 132:10
**similar** [2] - 69:15,
80:12
**simpler** [1] - 16:8
**simply** [4] - 9:3,
14:2, 80:16, 210:9
**single** [2] - 176:8,
176:11
**sit** [9] - 11:16, 12:9,
12:10, 14:7, 14:25,
15:2, 105:12, 105:14,
105:20
**site** [1] - 95:10
**sitting** [12] - 14:20,
14:21, 111:11,
122:11, 122:12,
122:25, 158:8,
161:18, 161:21,
175:23, 195:21, 212:9
**situation** [2] - 6:23,
189:5
**six** [9] - 41:15, 42:1,
48:10, 49:12, 49:13,
49:14, 98:19, 207:8,
207:22
**six-digit** [2] - 48:10,
49:12
**skip** [1] - 180:24
**sleep** [1] - 24:2
**sleeper** [1] - 24:3
**Slide** [5] - 58:3,
58:15, 59:4, 59:8,
60:18
**slide** [4] - 59:6, 59:9,
59:12, 59:16
**slides** [1] - 57:16

**sliding** [1] - 202:16
**slow** [2] - 27:8,
107:22
**smartphones** [1] -
38:17
**smooth** [1] - 152:6
**Snapchat** [2] -
114:13, 114:16
**software** [14] - 43:7,
80:13, 80:15, 80:23,
81:1, 81:2, 81:5,
82:12, 82:20, 83:4,
83:22, 84:21, 135:12
**someone** [12] -
12:18, 44:3, 44:7,
52:10, 56:16, 98:11,
128:17, 130:6, 131:9,
175:21, 186:19,
189:13
**sometimes** [3] -
21:17, 38:17, 38:18
**somewhat** [1] -
17:17
**somewhere** [2] -
105:12, 153:17
**Soni** [2] - 8:8, 216:20
**sorry** [29] - 5:11,
7:11, 21:1, 21:17,
40:23, 62:22, 81:20,
97:19, 103:2, 105:7,
106:23, 107:23,
117:17, 122:19,
134:11, 138:24,
141:22, 145:7,
158:13, 159:14,
164:6, 164:7, 165:22,
168:9, 169:3, 199:5,
199:10, 199:24,
214:23
**sort** [41] - 4:19, 14:2,
15:10, 19:21, 22:22,
29:19, 32:22, 33:15,
39:5, 41:12, 41:13,
44:18, 47:3, 48:4,
48:24, 52:10, 55:19,
57:11, 77:8, 89:2,
89:3, 89:10, 89:12,
89:13, 90:6, 110:3,
110:7, 111:2, 111:6,
115:4, 117:24,
124:16, 128:23,
141:12, 147:5, 166:2,
166:20, 195:24,
209:25, 211:12
**sought** [6] - 25:2,
31:3, 95:22, 140:23,
141:3, 147:11
**sound** [3] - 41:2,
75:10, 110:25
**sounds** [5] - 14:3,

67:3, 157:25, 158:20
**source** [1] - 62:5
**space** [1] - 67:20
**speakerphone** [2] -
195:21, 195:23
**speaking** [13] -
15:12, 18:8, 32:15,
43:23, 50:13, 51:8,
51:21, 55:14, 56:4,
116:22, 149:11,
151:25, 196:1
**special** [13] - 86:21,
86:22, 87:14, 87:18,
87:22, 88:5, 88:18,
98:15, 124:9, 129:13,
132:8, 133:19, 150:12
**Special** [29] - 86:25,
105:8, 122:14,
128:25, 129:2, 129:4,
148:6, 148:22,
149:14, 157:15,
159:1, 159:4, 159:5,
159:18, 160:2, 160:3,
167:19, 169:11,
170:7, 170:10,
177:13, 185:11,
185:12, 186:20,
198:24, 201:6, 214:7
**specialized** [2] -
62:14, 88:9
**specializes** [1] -
87:20
**specific** [19] - 4:18,
5:24, 9:8, 33:18, 82:8,
82:18, 87:19, 88:1,
89:13, 89:19, 124:18,
151:6, 151:10,
151:13, 151:17,
155:4, 164:10, 178:6,
209:20
**specifically** [16] -
7:22, 21:10, 45:5,
52:24, 54:2, 54:18,
68:24, 92:2, 123:22,
124:4, 126:18,
130:13, 141:2,
178:18, 201:13,
204:17
**specifics** [1] - 89:2
**spell** [1] - 40:18
**spelled** [1] - 129:10
**spelling** [2] - 86:12,
129:6
**spoken** [2] - 19:4,
200:15
**spot** [1] - 65:19
**stage** [2] - 4:20, 16:2
**stamp** [1] - 210:16
**stand** [5] - 39:22,
40:9, 41:19, 85:24,

134:5
**standard** [1] - 88:14
**standing** [7] - 39:23,
85:12, 175:21,
202:15, 202:18,
202:20, 203:16
**stands** [2] - 98:5,
129:20
**start** [20] - 15:10,
40:7, 42:9, 58:3,
85:19, 86:11, 109:4,
109:24, 116:3,
119:13, 143:3,
148:23, 152:11,
154:19, 161:17,
165:3, 179:14,
190:23, 216:6, 217:17
**started** [9] - 28:18,
32:22, 36:5, 40:11,
54:6, 85:25, 199:3,
199:7, 199:11
**starting** [11] - 4:6,
51:17, 93:14, 110:11,
112:21, 114:25,
145:6, 149:11,
174:25, 197:4
**starts** [9] - 40:9,
85:24, 88:7, 99:16,
103:21, 110:21,
116:8, 116:15, 149:15
**State** [12] - 28:10,
31:24, 41:6, 41:7,
41:21, 61:24, 86:18,
87:5, 87:6, 87:15,
92:12, 148:7
**state** [16] - 19:16,
40:18, 46:13, 46:21,
47:4, 47:11, 48:6,
50:23, 50:25, 51:5,
54:5, 64:22, 73:19,
138:8, 138:12, 139:16
**statements** [2] -
23:5, 150:14
**States** [3] - 2:2, 4:4,
218:13
**STATES** [4] - 1:1,
1:3, 1:11, 1:15
**stating** [1] - 86:11
**status** [8] - 13:11,
13:12, 13:13, 65:11,
74:9, 84:5, 135:21,
139:12
**staying** [5] - 151:4,
154:11, 154:15,
155:2, 191:7
**staying)** [1] - 153:7
**Steakhouse** [5] -
185:1, 185:2, 190:6,
191:22, 192:16
**Stedman** [6] -

130:24, 130:25,
131:3, 131:11,
132:12, 210:7
**stenographic** [1] -
218:5
**step** [15] - 35:9,
35:11, 39:21, 41:18,
76:12, 76:13, 85:4,
85:11, 94:18, 166:20,
175:20, 216:13
**step-by-step** [2] -
35:9, 35:11
**stepped** [2] - 167:17,
207:24
**stepping** [3] -
178:12, 202:3, 208:8
**stiffen** [1] - 171:21
**still** [19] - 51:13,
81:3, 83:8, 83:13,
97:19, 99:3, 104:19,
115:5, 116:12,
116:23, 133:8, 139:4,
144:14, 152:5,
152:24, 198:23,
203:8, 203:16, 212:22
**Stitzer** [1] - 130:10
**stood** [3] - 163:1,
163:6, 163:7
**stop** [19] - 40:11,
86:1, 117:3, 133:25,
134:1, 168:6, 172:15,
173:19, 174:11,
175:1, 175:14,
176:18, 179:16,
180:7, 181:1, 201:23,
213:23, 215:23
**stopped** [9] - 172:19,
173:5, 200:24,
202:25, 203:22,
204:11, 205:5, 207:8,
210:15
**stopping** [2] -
211:19, 212:19
**storage** [2] - 90:5,
95:19
**store** [1] - 51:19
**stored** [2] - 51:24,
52:5
**straight** [1] - 28:24
**straighten** [1] -
139:2
**Street** [8] - 1:16,
1:19, 156:23, 158:22,
191:11, 191:19,
192:6, 192:13
**street** [2] - 192:24,
197:8
**strictly** [1] - 96:15
**striped** [4] - 201:5,
201:6, 202:12, 203:12

**stuff** [2] - 89:3, 216:14
**subject** [2] - 143:6, 143:16
**submitted** [1] - 30:4
**subpoena** [1] - 8:4
**subsequent** [4] - 16:14, 89:6, 110:4, 171:16
**subsequently** [3] - 22:8, 111:20, 114:4
**successful** [2] - 85:1, 132:25
**sufficient** [3] - 14:12, 16:14, 18:23
**suggested** [3] - 16:23, 101:14, 103:24
**suggesting** [1] - 157:2
**Suite** [1] - 1:23
**Suites** [3] - 191:3, 196:15, 197:7
**summarized** [1] - 89:4
**summary** [3] - 20:3, 146:9, 171:14
**summer** [1] - 91:4
**supervisor** [12] - 128:18, 128:25, 129:14, 133:6, 133:8, 149:20, 154:19, 154:21, 155:6, 167:19, 195:2, 195:5
**Supervisory** [8] - 128:25, 159:4, 160:3, 167:19, 169:10, 170:7, 177:13, 185:11
**supported** [2] - 15:17, 16:12
**supporting** [2] - 36:9, 36:10
**suppress** [4] - 4:16, 7:24, 11:5, 15:23
**suppression** [1] - 204:5
**surprising** [2] - 210:4, 210:22
**surprisingly** [1] - 158:7
**surrounded** [1] - 196:2
**surveillance** [1] - 128:1
**sustain** [3] - 17:22, 24:20, 72:1
**swear** [3] - 39:23, 85:12, 155:16
**sweat** [2] - 152:7, 152:16
**swore** [1] - 125:19

**sworn** [2] - 17:5, 37:16
**SWORN** [2] - 39:24, 85:13
**sync** [2] - 52:21, 52:22
**system** [1] - 67:8
**systems** [1] - 143:15

# T

**T-Mobile** [1] - 95:20
**table** [8] - 106:16, 108:7, 108:9, 111:12, 122:22, 161:17, 161:21, 162:25
**tables** [1] - 158:17
**tactics** [1] - 36:14
**talkative** [1] - 152:14
**talks** [4] - 23:17, 36:24, 37:2, 37:24
**tap** [1] - 68:19
**Tara** [1] - 217:9
**tasks** [1] - 143:14
**team** [18] - 28:1, 28:3, 55:12, 60:4, 90:11, 93:3, 130:7, 133:20, 167:5, 178:13, 178:14, 186:11, 186:16, 186:17, 188:1, 192:12, 192:20, 193:4
**tech** [1] - 62:17
**technical** [3] - 76:19, 79:12, 209:25
**technician** [3] - 62:7, 129:16, 131:2
**technological** [2] - 49:7, 79:7
**technology** [8] - 41:17, 72:5, 77:11, 80:12, 80:19, 80:22, 81:13, 82:10
**Ted** [8] - 129:4, 133:19, 157:11, 157:13, 157:15, 170:14, 170:25, 193:15
**telephones** [1] - 94:5
**temporarily** [1] - 126:20
**ten** [8] - 78:14, 91:8, 110:11, 158:12, 175:15, 205:1, 210:15, 211:19
**tend** [1] - 152:14
**tenders** [2] - 206:13, 206:15
**Tenders** [1] - 48:21

**term** [8] - 43:4, 46:14, 46:16, 46:17, 74:23, 76:19, 125:10
**terms** [27] - 4:23, 7:22, 8:14, 10:14, 14:3, 15:12, 16:2, 19:3, 20:12, 20:14, 28:15, 35:13, 36:22, 65:5, 72:17, 73:5, 73:7, 73:20, 79:12, 84:10, 91:7, 135:25, 137:14, 138:18, 199:25, 215:23, 216:1
**Terry** [1] - 11:15
**testificandum** [1] - 8:4
**testified** [1] - 59:18
**testify** [6] - 11:23, 13:7, 14:13, 14:19, 40:2
**testifying** [3] - 6:11, 11:21
**testimony** [22] - 4:21, 5:1, 7:23, 12:4, 12:18, 12:22, 14:16, 16:2, 18:14, 32:7, 32:15, 38:4, 39:4, 48:3, 57:7, 57:18, 93:7, 94:8, 134:4, 134:6, 134:17, 205:18
**text** [18] - 52:2, 103:2, 119:22, 124:19, 148:10, 156:5, 156:11, 159:9, 159:13, 159:17, 160:2, 160:5, 163:5, 183:10, 183:21, 183:23, 187:5, 195:14
**texts** [2] - 102:7, 182:14
**Texts** [1] - 148:16
**THE** [325] - 1:1, 1:10, 1:14, 1:15, 1:18, 3:4, 4:1, 4:3, 4:10, 4:14, 4:16, 5:10, 5:23, 6:5, 6:10, 6:13, 6:17, 7:10, 7:12, 7:15, 7:18, 7:21, 9:14, 9:21, 10:12, 10:17, 10:24, 11:5, 11:8, 11:11, 11:20, 11:24, 12:2, 12:6, 12:21, 12:25, 13:4, 13:16, 13:20, 14:1, 14:6, 14:12, 14:17, 15:2, 15:6, 15:8, 15:10, 15:20, 16:1, 16:5, 16:16, 16:20, 16:22, 19:2, 19:7, 19:12, 20:12, 20:19, 20:24, 21:25, 22:4,

22:12, 22:17, 24:24, 25:6, 25:12, 27:8, 27:22, 28:15, 29:1, 29:8, 29:14, 30:11, 30:18, 31:8, 31:12, 31:15, 31:20, 31:22, 32:20, 33:5, 33:14, 33:19, 33:23, 34:5, 34:7, 34:10, 34:13, 34:22, 35:12, 35:15, 35:22, 36:5, 36:13, 36:16, 36:19, 36:21, 37:1, 38:3, 38:13, 38:19, 39:3, 39:8, 39:13, 39:16, 39:21, 39:25, 40:1, 40:15, 40:22, 40:23, 48:13, 48:18, 50:8, 50:10, 50:11, 53:14, 53:16, 55:4, 55:6, 57:22, 57:24, 60:23, 61:6, 66:3, 66:11, 70:20, 70:23, 71:21, 72:1, 72:13, 72:17, 72:20, 72:21, 72:23, 73:1, 73:3, 73:5, 73:10, 73:12, 73:15, 73:20, 73:24, 74:3, 75:24, 76:1, 76:6, 76:9, 78:8, 78:18, 78:22, 79:6, 79:10, 79:15, 79:20, 79:23, 80:1, 80:4, 80:5, 80:10, 81:1, 81:5, 81:8, 81:12, 81:13, 81:16, 81:17, 81:20, 81:22, 82:2, 82:23, 82:25, 83:10, 83:18, 84:10, 84:17, 85:3, 85:6, 85:11, 85:14, 85:15, 85:17, 85:18, 85:22, 85:23, 86:6, 86:8, 92:22, 92:24, 93:20, 94:21, 94:24, 96:7, 96:10, 96:20, 97:2, 97:6, 97:10, 98:23, 99:1, 100:19, 100:21, 100:24, 102:13, 102:18, 106:22, 107:22, 108:1, 108:3, 108:22, 108:25, 109:3, 118:9, 119:5, 119:11, 121:12, 121:17, 129:6, 129:8, 133:23, 134:3, 134:7, 134:10, 134:21, 134:25, 135:3, 135:10, 136:9, 136:16, 136:20, 137:8, 137:13, 137:21, 137:25,

138:5, 138:16, 139:1, 139:20, 139:24, 140:3, 140:9, 141:20, 142:22, 143:1, 145:10, 145:15, 147:18, 149:4, 149:6, 156:7, 159:15, 159:19, 160:11, 160:16, 161:11, 161:15, 164:4, 164:8, 164:12, 165:8, 165:12, 165:14, 169:3, 169:20, 183:4, 183:8, 190:18, 194:5, 194:10, 194:15, 194:18, 194:23, 194:25, 195:1, 195:6, 195:9, 195:10, 196:23, 198:13, 198:15, 198:17, 198:21, 199:8, 199:24, 200:2, 200:4, 200:6, 206:9, 206:17, 206:19, 213:22, 213:25, 214:6, 214:8, 214:11, 214:12, 214:13, 214:15, 214:16, 214:17, 214:19, 214:20, 214:21, 214:22, 214:23, 215:2, 215:3, 215:5, 215:6, 215:7, 215:9, 215:10, 215:12, 215:13, 215:15, 215:21, 216:8, 216:9, 216:13, 216:15, 216:17, 217:3, 217:13, 217:16, 217:19
**themselves** [7] - 33:18, 35:18, 35:22, 36:3, 39:2, 79:22, 79:23
**there'll** [1] - 38:3
**therefore** [2] - 26:25, 38:25
**Thereupon** [11] - 7:19, 39:19, 78:16, 78:20, 85:9, 134:8, 135:1, 139:22, 140:1, 194:16, 216:11
**they've** [2] - 26:3, 79:13
**thinking** [2] - 19:10, 32:18
**third** [3] - 23:2, 52:4, 52:7
**third-party** [2] - 52:4, 52:7
**three** [18] - 24:12,

24:16, 25:18, 25:21, 27:18, 61:16, 69:12, 78:25, 79:2, 79:24, 80:20, 81:7, 81:17, 81:24, 99:25, 195:24, 196:2, 203:2
**three-way** [1] - 195:24
**throughout** [3] - 16:13, 89:7, 168:23
**thumbnail** [2] - 55:19, 55:20
**thumbprint** [1] - 69:5
**thumbs** [2] - 21:3, 37:25
**tidbits** [1] - 83:18
**tight** [1] - 217:3
**timeframe** [5] - 21:12, 33:6, 33:18, 37:6, 79:13
**timeframes** [1] - 49:3
**timestamp** [14] - 109:6, 165:4, 166:11, 168:5, 171:5, 199:21, 199:22, 200:20, 200:25, 203:1, 203:23, 205:6, 208:16
**timing** [5] - 4:24, 20:15, 20:18, 37:3, 200:1
**Tinder** [11] - 18:6, 18:7, 19:20, 95:8, 95:15, 113:13, 120:3, 120:19, 141:11, 141:13
**tip** [1] - 153:11
**tired** [3] - 152:1, 152:12, 152:15
**title** [3] - 86:20, 144:18, 148:15
**titled** [1] - 182:14
**today** [5] - 49:3, 92:15, 93:8, 94:8, 166:17
**tomorrow** [4] - 153:2, 216:2, 217:1, 217:16
**tonight** [2] - 149:18, 150:20
**took** [15] - 17:4, 17:11, 18:22, 19:1, 23:3, 79:4, 89:21, 111:17, 117:15, 118:1, 118:19, 118:24, 123:11, 165:1, 171:20
**tool** [8] - 43:4, 44:6, 47:25, 48:1, 49:6, 56:1, 56:14, 75:2
**tools** [2] - 43:9,

43:14
**top** [14] - 100:9, 119:14, 143:4, 144:11, 160:18, 183:17, 183:18, 199:21, 200:20, 200:24, 202:25, 203:23, 205:6, 211:20
**total** [2] - 88:3, 192:10
**totally** [1] - 78:10
**touch** [14] - 21:3, 21:5, 21:19, 64:1, 68:4, 68:16, 68:21, 69:7, 71:5, 71:7, 71:16, 179:8, 179:9, 215:1
**toward** [2] - 28:2, 173:5
**towards** [3] - 63:11, 97:7, 122:9
**toxicology** [1] - 25:16
**Training** [2] - 87:25, 89:18
**training** [22] - 8:8, 38:16, 41:13, 62:14, 62:16, 87:22, 87:25, 88:3, 88:5, 88:7, 88:10, 88:14, 88:15, 88:18, 89:5, 89:6, 89:13, 89:19, 89:22, 90:9, 128:9
**trainings** [1] - 89:23
**TRANSCRIPT** [1] - 1:10
**transcript** [5] - 14:23, 134:13, 135:5, 218:5, 218:6
**translate** [1] - 136:11
**transpired** [1] - 104:17
**transport** [1] - 195:3
**travel** [1] - 98:14
**tree** [1] - 186:19
**Trial** [1] - 213:15
**trial** [3] - 47:16, 124:8, 133:12
**trial-and-error** [1] - 47:16
**tried** [6] - 31:25, 33:1, 50:4, 132:23, 185:21, 186:1
**tries** [1] - 21:21
**trouble** [2] - 84:14, 205:8
**true** [5] - 12:9, 51:11, 138:6, 218:4, 218:5
**try** [21] - 21:23, 29:4, 29:13, 35:6, 36:11,

47:10, 47:17, 48:1, 49:22, 50:14, 50:16, 50:17, 50:19, 61:8, 75:14, 76:16, 80:23, 103:6, 150:20, 178:10, 212:13
**trying** [16] - 29:23, 53:16, 53:17, 60:15, 70:24, 103:15, 136:20, 137:25, 139:3, 143:9, 165:22, 166:4, 166:9, 181:6, 181:20, 216:25
**Turn** [1] - 165:21
**turn** [8] - 70:7, 70:12, 71:13, 96:14, 97:8, 165:23, 166:4, 166:9
**turned** [4] - 45:18, 46:22
**turns** [1] - 96:20
**twice** [2] - 24:14, 140:5
**two** [29] - 17:10, 19:19, 19:24, 24:14, 26:21, 33:12, 53:2, 53:9, 61:18, 66:11, 93:15, 94:5, 95:5, 99:7, 105:20, 112:5, 125:5, 125:12, 126:7, 132:16, 147:1, 150:2, 152:8, 159:4, 181:12, 181:22, 183:14, 208:24, 214:2
**type** [11] - 42:12, 50:17, 51:24, 61:21, 69:21, 75:4, 75:14, 77:8, 87:22, 88:5, 132:10
**typed** [1] - 61:22
**types** [11] - 78:3, 78:4, 88:1, 88:8, 88:10, 88:11, 124:16, 124:20, 147:7, 176:7, 178:11
**typically** [3] - 11:18, 45:24, 130:19
**typing** [1] - 208:5

## U

**U.S** [5] - 42:4, 86:18, 195:1, 195:9, 216:8
**UFED** [1] - 43:17
**ugh** [1] - 158:11
**ultimately** [2] - 150:24, 191:6
**unallocated** [1] - 67:20
**uncertain** [1] -

170:21
**unconscious** [3] - 23:13, 23:15, 24:4
**under** [8] - 11:16, 11:18, 87:6, 100:2, 108:14, 108:19, 164:11, 205:9
**underneath** [2] - 105:15, 166:2
**understood** [23] - 15:14, 16:19, 40:15, 93:22, 111:8, 126:4, 127:9, 127:13, 133:15, 136:2, 152:14, 173:11, 174:22, 176:14, 176:25, 178:25, 179:25, 185:14, 186:20, 206:4, 209:15, 217:2, 217:5
**unfold** [1] - 10:21
**unfortunately** [1] - 137:11
**uniform** [1] - 189:13
**unique** [3] - 17:17, 82:18, 82:19
**unit** [2] - 86:24, 95:19
**United** [2] - 4:4, 218:13
**united** [1] - 2:2
**UNITED** [4] - 1:1, 1:3, 1:11, 1:15
**university** [1] - 62:9
**University** [1] - 62:9
**unknown** [1] - 38:21
**unless** [2] - 73:18, 136:6
**unlock** [50] - 21:5, 21:9, 21:18, 38:11, 38:17, 38:25, 45:16, 45:19, 45:21, 46:14, 46:16, 46:17, 46:21, 47:4, 47:11, 48:6, 50:23, 50:25, 51:5, 65:3, 65:11, 74:14, 74:16, 83:8, 83:17, 83:24, 84:2, 84:5, 84:11, 84:23, 122:8, 126:5, 135:13, 135:17, 135:21, 136:3, 136:6, 136:25, 138:7, 138:10, 138:12, 139:12, 139:16, 181:9, 208:25, 209:4, 209:14, 209:19, 209:22
**unlocked** [23] - 13:11, 13:12, 45:24,

64:22, 73:19, 74:6, 74:9, 77:17, 77:21, 91:24, 113:5, 113:6, 121:25, 122:4, 122:5, 122:7, 123:4, 132:2, 132:19, 209:15, 210:1, 210:10, 215:4
**unlocking** [4] - 12:15, 20:10, 38:2, 126:3
**up** [112] - 12:6, 17:6, 17:10, 21:8, 21:17, 27:24, 28:23, 33:9, 38:1, 39:9, 39:21, 40:2, 40:22, 44:12, 44:18, 45:15, 48:17, 50:13, 52:10, 52:21, 53:18, 53:21, 53:23, 61:6, 63:17, 63:19, 63:23, 78:15, 80:10, 85:11, 93:10, 99:3, 99:6, 100:9, 101:22, 102:2, 103:6, 103:15, 104:6, 113:8, 113:17, 117:5, 117:7, 117:10, 118:13, 119:14, 120:24, 127:4, 135:3, 135:25, 136:12, 138:3, 138:25, 139:2, 139:25, 140:13, 141:18, 143:23, 143:25, 144:17, 146:3, 146:13, 147:9, 147:15, 147:22, 147:25, 148:11, 148:13, 154:5, 156:4, 157:2, 159:11, 160:18, 160:24, 163:1, 163:3, 163:6, 163:7, 164:1, 169:1, 170:22, 171:3, 173:12, 179:9, 182:13, 183:17, 184:6, 184:25, 185:4, 186:22, 187:14, 187:24, 188:1, 189:21, 190:9, 191:23, 191:24, 192:20, 196:8, 197:11, 197:19, 197:24, 200:20, 200:24, 202:25, 203:23, 206:18, 210:19, 211:13, 214:18, 216:2, 216:4
**update** [3] - 80:13, 80:15, 155:8
**updates** [1] - 79:7, 80:16
**upgrades** [2] - 49:7

**uploaded** [1] - 67:7
**upper** [5] - 205:6, 207:9, 207:23, 210:16, 212:20
**upset** [2] - 184:7, 186:1
**upstairs** [1] - 213:5
**urgent** [1] - 152:4
**useful** [1] - 33:23
**user** [5] - 19:17, 44:12, 44:21, 52:18, 56:21
**username** [4] - 50:18, 52:12, 52:13, 52:17
**users** [1] - 51:21
**usual** [1] - 72:21
**utilize** [1] - 36:12

---

**V**

**variables** [2] - 137:1, 138:22
**variety** [1] - 74:20
**various** [3] - 42:21, 95:23, 132:12
**vast** [1] - 7:24
**vehicle** [1] - 159:5
**verbal** [2] - 154:6, 154:7
**versus** [3] - 4:4, 10:11, 42:4
**via** [7] - 18:6, 21:5, 21:9, 27:13, 45:14, 77:17, 147:23
**viability** [2] - 13:13, 14:3
**vibrate** [2] - 165:22, 165:23
**victim** [1] - 98:5
**Victim** [6] - 24:13, 30:8, 30:10, 30:12, 59:1, 59:9
**Victims** [3] - 58:5, 58:17, 59:5
**victims** [7] - 26:14, 26:21, 27:20, 58:12, 58:20, 60:19, 96:3
**video** [18] - 23:19, 56:11, 75:1, 75:7, 150:6, 150:12, 150:14, 202:12, 202:19, 203:22, 204:2, 205:7, 210:15, 211:19, 212:19, 212:20, 214:24, 215:3
**videos** [8] - 24:4, 24:22, 25:4, 52:3, 56:6, 56:7, 75:7,

124:20
**view** [6] - 5:14, 111:9, 111:10, 122:21, 172:10, 212:8
**viewed** [1] - 123:24
**viewing** [1] - 24:3
**Viktor** [12] - 129:1, 129:10, 149:18, 149:19, 149:21, 153:19, 159:18, 160:3, 167:19, 184:15, 185:11, 202:13
**Virginia** [3] - 18:25, 101:11, 101:12
**visa** [1] - 87:11
**visible** [4] - 162:8, 162:12, 162:16, 172:6
**visits** [1] - 37:4
**visually** [1] - 100:25
**voice** [3] - 40:4, 164:19, 168:16
**voluntarily** [2] - 18:2, 127:3
**voluntary** [2] - 30:8, 101:18
**volunteer** [1] - 18:10
**volunteered** [1] - 25:23
**volunteering** [1] - 157:1
**vs** [1] - 1:5
**vulnerabilities** [13] - 79:8, 79:10, 79:22, 79:24, 81:8, 81:15, 81:23, 82:5, 82:6, 82:8, 82:12, 82:14, 82:16
**vulnerability** [1] - 81:18

---

**W**

**W-H-I-T-E** [1] - 40:21
**wait** [8] - 8:16, 8:19, 73:6, 96:20, 134:17, 147:1, 153:10, 153:19
**waited** [1] - 147:3
**waiting** [3] - 201:20, 201:21, 203:8
**waived** [2] - 9:4, 10:22
**waiver** [3] - 9:2, 9:6, 10:9
**waiving** [1] - 217:10
**walk** [4] - 128:23, 157:23, 191:9, 210:18
**walked** [1] - 208:20
**walking** [2] - 105:25,

176:1
**wallet** [1] - 70:16
**wants** [3] - 12:15, 94:18, 213:21
**warning** [1] - 70:18
**warrant** [148] - 4:18, 4:23, 6:16, 9:13, 9:14, 9:17, 9:18, 15:11, 15:16, 15:24, 16:7, 16:12, 16:18, 16:20, 17:8, 17:23, 17:25, 19:15, 20:4, 20:8, 21:6, 21:10, 21:16, 22:1, 22:6, 22:9, 22:20, 23:25, 24:6, 24:18, 24:21, 25:3, 25:4, 25:10, 25:14, 25:15, 26:4, 26:6, 26:9, 27:2, 27:6, 27:25, 28:18, 28:22, 29:17, 29:24, 30:4, 30:6, 30:10, 30:19, 30:23, 31:1, 31:2, 31:9, 31:17, 31:20, 32:2, 32:3, 32:25, 33:8, 34:9, 34:19, 35:3, 35:10, 35:12, 36:3, 36:9, 36:10, 36:23, 37:2, 37:16, 37:24, 38:15, 66:1, 66:22, 67:14, 67:16, 73:21, 73:25, 77:2, 77:5, 90:12, 91:10, 92:5, 93:7, 93:13, 93:15, 94:3, 94:4, 94:7, 94:11, 95:6, 95:7, 95:8, 95:10, 95:13, 95:14, 95:15, 95:16, 95:17, 95:19, 95:20, 95:21, 98:21, 99:6, 100:10, 112:4, 124:10, 124:14, 124:17, 125:4, 125:9, 125:12, 126:9, 126:17, 127:25, 128:4, 128:14, 128:21, 129:23, 133:9, 146:24, 150:21, 151:10, 151:13, 151:15, 151:21, 151:22, 155:4, 155:12, 155:16, 177:12, 177:22, 178:13, 178:14, 178:25, 179:12, 180:4, 193:5, 193:7, 205:14, 205:23, 206:1, 212:6, 212:8, 212:9, 212:12
**warrants** [28] - 4:18,

4:22, 16:14, 16:15, 18:25, 20:4, 22:5, 24:25, 28:17, 29:16, 33:5, 33:21, 34:22, 35:22, 36:17, 67:6, 73:25, 90:10, 90:16, 90:18, 90:20, 90:21, 91:23, 93:4, 93:6, 95:24, 96:5, 151:14
**Washington** [8] - 1:6, 1:17, 1:20, 1:24, 2:4, 62:9, 62:11, 218:14
**watched** [2] - 198:5, 208:19
**ways** [2] - 36:10, 44:22
**weakness** [1] - 81:6
**weaknesses** [1] - 79:17
**weapon** [1] - 162:8
**wearing** [2] - 92:18, 199:1
**web** [1] - 124:19
**week** [2] - 147:1, 217:3
**weeks'** [1] - 130:17
**Westin** [4] - 37:16, 151:6, 151:18, 155:5
**WhatsApp** [11] - 18:8, 52:8, 114:15, 114:17, 114:19, 120:4, 120:5, 141:11, 141:16, 141:17
**WHITE** [17] - 39:24, 135:9, 136:8, 136:13, 136:18, 136:23, 137:11, 137:17, 137:24, 138:9, 138:14, 138:21, 139:5, 139:8, 139:10, 139:14, 139:18
**White** [8] - 3:5, 39:15, 39:19, 40:20, 78:20, 135:1, 135:9, 139:22
**white** [8] - 41:5, 53:21, 61:2, 61:11, 76:12, 80:9, 83:4, 138:6
**whole** [6] - 4:17, 14:4, 14:5, 70:20, 93:21, 116:22
**wholesale** [1] - 9:6
**willing** [6] - 110:16, 132:18, 152:2, 152:12, 174:23, 207:2
**window** [1] - 162:2
**withheld** [1] - 6:15
**witness** [34] - 11:15,

12:9, 17:22, 39:12, 78:19, 85:5, 85:6, 92:20, 96:16, 101:24, 104:17, 117:21, 120:25, 122:20, 134:12, 139:24, 140:4, 141:19, 144:18, 148:14, 159:13, 161:1, 169:1, 169:4, 182:15, 189:21, 194:18, 196:10, 197:21, 206:8, 206:15, 216:16, 216:18
**WITNESS** [42] - 39:24, 40:15, 40:23, 48:18, 50:10, 72:20, 72:23, 73:3, 73:10, 73:15, 73:24, 76:1, 79:6, 79:15, 79:23, 80:4, 81:5, 81:12, 81:16, 81:20, 82:2, 85:13, 85:17, 85:22, 86:6, 129:8, 134:7, 200:2, 206:19, 214:6, 214:11, 214:13, 214:16, 214:19, 214:21, 214:23, 215:3, 215:6, 215:9, 215:12, 215:15, 216:15
**WITNESSES** [1] - 3:4
**witnesses** [3] - 11:18, 24:10, 216:24
**woman** [4] - 98:2, 119:23, 125:1, 203:7
**women** [15] - 23:11, 23:12, 24:4, 26:8, 26:12, 26:19, 26:25, 27:11, 27:12, 115:14, 115:15, 115:21, 116:4, 176:15, 180:1
**women's** [1] - 23:15
**word** [7] - 29:5, 40:10, 85:23, 136:15, 136:19, 216:5
**words** [8] - 18:18, 23:21, 26:11, 28:17, 113:8, 136:11, 180:16, 200:6
**works** [5] - 21:22, 77:11, 98:11, 125:24, 157:19
**worries** [1] - 158:16
**worth** [1] - 130:17
**wrapping** [2] - 184:6, 210:19
**write** [3] - 61:19, 149:17, 180:22
**writing** [4] - 13:18,

36:7, 36:8, 102:21
**written** [3] - 13:24, 13:25, 151:6

## X

**XR** [73] - 13:10, 15:24, 16:13, 16:15, 16:25, 17:5, 17:9, 17:25, 18:7, 18:19, 22:19, 23:7, 23:16, 23:20, 23:22, 24:1, 24:7, 24:12, 24:22, 25:5, 27:15, 27:17, 27:23, 27:25, 28:12, 28:18, 28:22, 28:23, 30:3, 30:15, 30:21, 30:22, 31:4, 31:5, 32:6, 32:13, 32:19, 33:6, 35:3, 35:20, 36:25, 42:6, 45:1, 45:15, 45:18, 47:4, 51:4, 54:19, 54:23, 55:11, 58:4, 58:6, 63:2, 63:5, 64:11, 64:16, 69:15, 69:17, 70:7, 70:10, 71:2, 77:16, 120:9, 120:16, 120:17, 210:20, 211:7, 214:7, 214:9, 215:7, 215:20

## Y

**Yahoo** [26] - 25:2, 25:3, 25:11, 25:13, 26:4, 26:9, 26:11, 26:22, 26:24, 27:12, 27:14, 27:15, 27:21, 27:22, 28:11, 28:19, 30:11, 32:2, 34:14, 58:16, 58:24, 59:2, 59:19, 60:1, 95:17, 146:10
**year** [1] - 62:6
**years** [15] - 41:15, 41:16, 42:1, 48:18, 62:7, 78:25, 79:2, 79:3, 79:24, 80:20, 81:7, 81:17, 81:19, 81:24, 81:25
**yourself** [14] - 4:5, 46:6, 82:15, 91:24, 103:3, 111:24, 113:7, 132:22, 198:3, 201:8, 204:20, 207:10, 207:15, 212:24
**YouTube** [2] - 24:3, 58:16

## Z

**zero** [5] - 172:15, 175:1, 180:8, 180:25, 181:13