**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Criminal No. 1:21-cr-00380-CKK** |
| | : | |
| **BRIAN JEFFREY RAYMOND** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SUPPLMENTAL BRIEFING ON**
**DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

## I.   PROPOSED FINDINGS OF FACT

Pursuant to the Court's June 15, 2023, Minute Order, the government proposes the following findings of fact[1]:

### A.  The Seizure of the iPhones

The investigation in this case began with a report of sexual assault involving AV-1, which was alleged to have occurred on May 31, 2020, at the defendant's embassy leased housing in Mexico. Diplomatic Security Service ("DSS") Special Agent Mikel Gajkowski testified that on June 1, 2020, the day after the alleged assault of AV-1, the defendant returned to the United States. Gov't Ex. 26, June 1, 2023 Mot. Hr'g Tr. at 101:12. On June 2, 2020, Agent Gajkowski arranged to interview the defendant at a location of his choosing. *Id*. at 101:9-21. There is no dispute among the parties that this was a voluntary, noncustodial interview, and the Court finds that it was.[2]

During the June 2 interview, the defendant stated that he met AV-1 on Tinder, a mobile

---

[1] The government references the testimony and exhibits presented at the hearing on the motion to suppress. At the Court's request, the exhibits have been embedded in the PDF file of the brief. The brief with embedded files and links will be hand delivered to the Court, along with a separate copy of all the exhibits. The exhibit list is attached to this supplemental brief and includes the hearing transcripts cited herein.

[2] *See* Gov't Ex. 9-A. The interview was audio-recorded and admitted as Gov't Ex. 9 without objection. By agreement of the parties, certain portions of the recording were admitted and played in open court. The rest of the exhibit was placed under seal.

dating application. The defendant agreed to show the agents the conversations within the Tinder application on his personal phone, an iPhone XR. *Id*. at 108:10-24; Gov't Ex. 9-C. Agent Gajkowski asked the defendant whether she could take photographs of the Tinder messages, and the defendant told her to "go ahead" and volunteered that he also had WhatsApp messages. Gov't Ex. 9-E. At one point, the defendant let Agent Gajkowski hold his iPhone XR and maneuver within the Tinder application herself. Gov't Ex. 26 at 113:1-18; Gov't Ex. 9-E.

In addition to letting the agents view Tinder messages on his iPhone XR, the defendant showed the agents his conversations with AV-1 within the WhatsApp messaging application on his iPhone 6, a work-provided phone. Gov't Ex. 26 at 114:13-23; Gov't Ex. 9-G. Agent Gajkowski scrolled through the WhatsApp messages on the iPhone 6 and took photos.[3] The defendant declined to allow the agents to take his phones, but offered to send them screenshots of the conversations, which he did later that same day. Gov't Ex. 26 at 113:24-25, 114:1-7, 123:15-22; Gov't Ex. 9-F. Though the defendant indicated that he had only dabbled in online dating and had not often used the Tinder application, Gov't Ex. 9-H and 9-I, as Agent Gajkowski navigated through the Tinder application, she noticed numerous messages from other women on Tinder and that, additionally, the defendant had downloaded Bumble, another mobile dating application. Gov't Ex. 26 at 115:13-19.

Following the June 2 interview, Agent Gajkowski applied for a warrant to seize and search the defendant's phones. Gov't Ex. 26 at 124:10-15. Probable cause for the warrant was established through AV-1's report of assault, AV-1's sex assault examination, witnesses who observed AV-1 shortly after the alleged assault, the defendant's statements to investigators (which were contradicted by investigators' observations both on May 31 and June 2, *see* Gov't Ex. 27, June 2

---

[3] Gov't Ex. 7 and 8; *see generally* Gov't Ex. 26 at 118-120.

Mot. Hr'g Tr. at 45:21-23), and the agents' observations and screenshots of the defendant's phones. *See* Gov't Ex. 29, June 8, 2023 Mot. Hr'g Tr. at 70-73; *see also* Gov't Ex. 4-A at ¶¶ 5, 12, 17-25 (Under Seal). The search warrant was approved on June 5, 2020.

In addition to seizing the physical devices, the warrant authorized agents to compel the defendant to open the iPhones using biometrics. Govt' Ex. 26 at 125; Gov't Ex. 4-A at Attachment B (Under Seal). Agent Gajkowski testified that, after consulting with the then-assigned prosecutor, she understood that the warrant authorized agents to compel the defendant to provide his biometrics, but not his passcodes, to unlock the phones. Govt' Ex. at 126:6-15. Agent Gajkowski also consulted with an evidence technician at the DS Computer Investigations and Forensic Division ("CIF") as to what steps to take once the phones were unlocked with biometrics. Agent Gajkowski understood that once the phones were unlocked, she could navigate to the settings and change the phones' passwords. *Id*. at 132:1-4, 16-25, 133:1.[4]

The seizure took place on June 6, 2020, at a Jimmy John's sandwich shop near the defendant's hotel.[5] Before meeting with the defendant, a team of four agents, including Agent Gajkowski, then DSS Special Agent Ted Nelson, DSS Special Agent Viktor Karabin, and DSS Special Agent David Palmer Jones, met nearby to discuss and review the warrant, including the biometric provision. Gov't Ex. 26 at 178:12-25, 179:1-13, 193:5-10. On cross examination, neither Agent Gajkowski nor Agent Nelson recalled any specific details as to the discussion or whether they read the warrant together. Gov't Ex. 26 at 66:14-25, 67:1-4; Gov't Ex. 28, June 5, 2023 Mot.

---

[4] The parties agreed by stipulation that the evidence technician did not have the necessary qualifications to advise Agent Gajkowski as to the technology related aspects of the search warrant for the iPhones, nor its execution. *See* ECF No. 224. Agent Gajkowski testified to the same, though she indicated that she was not aware of that fact at the time that she sought guidance. *See generally* Gov't Ex. 27 at 177-185.

[5] Upon learning that the defendant was staying at a different hotel than the one referenced in the search warrant, Agent Gajkowski discussed with her supervisor and with DOJ the possibility of having to seek an additional search warrant if the defendant did not have his phones on his person. *See* Gov't Ex. 26 at 155:10-17.

Hr'g Tr. at 8:8-14; Gov't Ex. 30, June 9, 2023 Mot. Hr'g Tr. at 56-58. Regardless, Agent Nelson

testified on direct examination that it was "very clear" that agents could not compel the defendant

to provide passcodes. Gov't Ex. 30 at 13:18-23.

After the meeting, Agent Gajkowski and Agent Nelson proceeded to the Jimmy John's to

interview the defendant.[6] Agent Karabin and Agent Jones were in a vehicle nearby. Gov't Ex. 26

at 159:1-8. The interview began at 10:12 a.m. *See* Gov't Ex. 11-A. Agent Nelson asked the

defendant to turn his phones on vibrate, in part to determine whether the defendant had brought

his phones. Gov't Ex. 11-A; Gov't Ex. 30 at 17:4-11. The defendant responded, "yea." Gov't Ex.

11-A. Shortly after, the defendant indicated that he was trying to turn "this phone off." *Id*. Agent

Nelson responded, "if it rings, we'll understand." *Id*. Neither Agent Gajkowski nor Agent Nelson

independently recalled that the defendant mentioned turning his phone off, nor did they recall

whether the phones were in fact powered off. Gov't Ex. 26 at 166:8-11; Gov't Ex. 30 at 17:18-20.

At the end of the interview, Agent Nelson asked the defendant whether he felt like he had been

threatened, forced, or coerced to make any statements. Gov't Ex. 11-D. The defendant responded,

"no" and that he just "want[ed] it to go away." Gov't Ex. 11-D.[7]

At the end of the interview, Agent Nelson asked the defendant, "you got two phones on

you, right?" Gov't Ex. 11-F. The defendant confirmed that he did. Gov't Ex. 11-F, 11-G, 11-S.

Agent Gajkowski then said, "to prove that just, that these are the phones, can you just turn them

---

[6] Like the June 2, 2020, interview, there is no dispute among the parties that this was a voluntary, noncustodial encounter, and the Court finds that it was. *See* Gov't Ex. 11-A. The interview was audio-recorded and admitted without objection as Gov't Ex. 11. By agreement of the parties, certain portions of the recording were admitted and played in open court. The rest of the exhibit was placed under seal.

[7] At the hearing, both parties highlighted Agent Nelson's demeanor throughout the June 6 interview. Gov't Ex. 26 at 168: 24-25; Gov't Ex. 30 at 32:22-25, 33. On direct examination, Agent Gajkowski described Agent Nelson's demeanor as conversational, assertive, and direct. The government produced a text message from Agent Gajkowski to her supervisor, stating that Agent Nelson was "getting confrontational for interview. Nothing bad." Gov't Ex. 18. As for the defendant, Agent Gajkowski described his demeanor as calm and polite. Gov't Ex. 26 at 123:9, 170:25. The defendant's demeanor changed, however, when agents announced that they had a search warrant for the defendant's phones. Gov't Ex. 26 at 171:16-20.

on for me?" Gov't Ex. 11-G.  On cross examination, the defense asked Agent Gajkowski whether, because the phones had been powered down and then turned back on, agents knew they needed passcodes for there to be any chance of obtaining data from the phones. Agent Gajkowski testified that she was not sure about the "technicalities" but confirmed that the affidavit supporting the search warrant for the iPhones indicated as much. Gov't Ex. 28 at 34:11-20. According to Agent Gajkowski, however, she did not know whether the phones were powered off but observed that the screen(s) were black. Gov't Ex. 27 at 47:11-22; Gov't Ex. 28 at 27; Gov't Ex. 29 at 44-45.

At this point in the encounter, Agent Gajkowski asked the defendant how the phones were locked, and he indicated that they were locked with a PIN. Gov't Ex. 11-J. Agent Gajkowski testified that she understood the defendant's statement to mean that the phones were locked *only* with a passcode, and not biometrics[8]; therefore, even though she knew the warrant authorized it, she did not compel biometrics.[9] Gov't Ex. 26 at 126:1-5; 174:20-23; Gov't Ex. 27 at 43:4-9, 46:14-19, 101-102, 184:14-25, 185:1-12, 204:3; Gov't Ex. 28 at 29-30; Gov't Ex. 29 at 68-69.

Following this exchange, Agent Nelson informed the defendant for the first time that the agents had a warrant to seize his phones. Gov't Ex. 11-K. The defendant responded, "I can't, I can't let you do that without a lawyer present…I can't authorize that without a lawyer." *Id*. Agent Gajkowski testified that she understood this to mean the defendant did not believe the agents had legal authorization to seize his phones. Gov't Ex. 26 at 175:11-12. The defendant expressed concern regarding how he would function without his phones, and the following occurred:

**NELSON:**   …let us get you the contacts you need. We need your PIN numbers for these phones so we can access them. Okay?"

---

[8] Agent Gajkowski testified that though she saw the defendant access the iPhones on June 2, 2020, she did not see how they were locked. Gov't Ex. 26 at 121-122; Gov't Ex. 27 at 200.

[9] Agent Gajkowski testified on cross examination that she had a general understanding of how iPhones locked, but that her personal phone was not an iPhone. Her work phone, on the other hand, was an iPhone 6. Biometrics was not activated on her iPhone 6. Gov't Ex. 27. at 90:1-11; 79:17-25, 204:1-9.

| | |
|---|---|
| **DEFENDANT:** | I, I have to consult a lawyer, honestly. I can't – it's just something I have to do. |
| **GAJKOWSKI:** | Okay |
| **DEFENDANT:** | You know, I don't know what my rights are in this situation. |
| **NELSON:** | You're right, but we are seizing the phones. What we need to do, though, is we need to unlock them and at least put them on airplane mode. Okay? |
| **DEFENDANT:** | I can't do that until I talk with my lawyer. I just don't understand what's going on here right now. |
| **GAJKOWSKI:** | So – so, what we are going to do, because I, I just want to be clear, so you're not willing to voluntarily give us your PIN. Correct? |
| **DEFENDANT:** | No, not until I consult with a lawyer. |
| **GAJKOWSKI:** | Okay, understood. |
| **NELSON:** | Yeah. Okay. |
| **GAJKOWSKI:** | So that's all right. |
| **DEFENDANT:** | I don't understand. |
| **GAJKOWSKI:** | If, if there is a number that you would like us to pull from it and you're willing to give us the PIN, because for destruction of evidence and kind of an exigency circumstance, I can't just give you the phone and let you go through it. But if you're willing to work with us, like, in tandem, again, you get to decide if you want to give us that passcode, we can hook you up with a couple phone numbers from the phone. But that is your decision. We can't coerce you to give us any PINs. Okay? |
| **NELSON:** | Brian, we're being straightforward with you. We're not playing games. If you need the information, we'll get it to you. You want to know the truth? The truth is, one way or another, we're getting into the phones. That's what we do, right? So whether you want to comply with that or make that a difficult process is up to you. I'm not going to force you, man. Okay? |

Gov't Ex. 11-M; Def. Ex. 6, June 6, 2020, Transcript of June 6 Audio Interview at 189-191.

Following this exchange, Agent Gajkowski showed the defendant the first page of the warrant, but not the Attachment containing the biometric provision, and told the defendant that they would provide a property receipt for the phones. Gov't Ex. 11-N; Gov't Ex. 26 at 177:12-25, 178:1-11; Gov't Ex. 28 at 28:12-17. While completing copies of the property receipts, Agents Gajkowski and Nelson reiterated that the defendant was not under arrest and was free to leave.

The defendant affirmed his understanding, stating "I know." Gov't Ex. 11-P. Agent Gajkowski asked the defendant to tell her how to put the phones in airplane mode. Gov't Ex. 11-Q. The defendant responded, "I'd have to, I'd have to unlock it, honestly." Agent Gajkowski responded, "That's your choice," and the defendant declined. *Id*. While Agent Gajkowski completed the paperwork, Agent Nelson and the defendant casually discussed various unrelated topics. Gov't Ex. 30 at 46:1-21. The interview ended at 12:26 p.m. Gov't Ex. 11-R. Agent Gajkowski testified that she announced for the audio recording that the "search and seizure" was complete and that, at the time, she thought it was. Gov't Ex. 26 at 182:4-12.[10]

### B. The Execution of the Biometric Provision of the Search Warrant

After agents left the immediate area, Agent Gajkowski called the assigned prosecutor and told her that the defendant had declined to provide the passcodes and that the agents did not compel biometrics. Gov't Ex. 26 at 185:16-25. The prosecutor responded that the agents should have executed the biometrics provision and said that she was going to consult with a supervisor. While awaiting a response, Agent Gajkowski summoned the other agents back to the area. Gov't Ex. 26 at 186:1-21. The prosecutor then called Agent Gajkowski back and instructed her to reengage the defendant, who at this point had returned to his hotel, and compel biometrics. Gov't Ex. 26 at 189:8-10; Gov't Ex. 27 at 50:15-16. Agent Gajkowski did not recall whether the agents, prior to going to the defendant's hotel to compel his biometrics, discussed the biometrics portion of the warrant again. Gov't Ex. 26 at 193:5-10; Gov't Ex. 27 at 66:14-23.

Before reengaging the defendant, the agents requested the presence of a local uniformed

---

[10] The Government proposes the following findings: The Court credits Agent Gajkowski's testimony that she did not know how the defendant's iPhones locked on or before June 6, 2020, and that because the defendant indicated on June 6 that the iPhones locked by passcode, she did not attempt biometrics. The Court finds that the agents failed to execute the biometric provision explicitly authorized in Attachment B of the search warrant and that the execution of the warrant was therefore incomplete.

police officer.[11] Gov't Ex. 26 at 189:2-9, 193:21-23. That officer's body worn camera captured agents outside of the hotel at 1:30 p.m., approximately one hour after the agents' prior contact with the defendant had concluded. Gov't Ex. 14. In addition to Agents Gajkowski and Nelson, Agent Jones and Agent Karabin were present. All agents were in plain clothes. Once at the hotel, the agents asked the front desk attendant to call the defendant down to the lobby. Gov't Ex. 26 at 200:9-11. While waiting for the defendant, Agent Nelson explained to the officer,

> So the idea is we have a search warrant for his, uh, cell phones. And we seized his phones, but DOJ gave us clear direction to go back and compel him to open it, so we're going to have him to open it politely. If he doesn't, we may cuff him and then use his thumb to open it. We'll detain him until we get the passwords.[12]

Gov't Ex. 14 at 13:30:30-13:30:47.

Shortly after their arrival at the hotel, Agents Jones and Karabin stepped outside so as not to "overwhelm" the defendant. *See* Gov't Ex. 14 at 13:32:32-13:32:38. They stood far enough from the hotel exit/entrance that the automatic doors were not triggered.

When the defendant entered the hotel lobby, Agent Nelson and Agent Gajkowski greeted him and informed him he was not under arrest. *See* Gov't Ex. 14 at 13:35:37. Agent Nelson and Agent Gajkowski stood on one side of the hotel lobby. The uniformed officer stood on the other side of the lobby. Agent Gajkowski testified that the defendant made no indication that he was aware of the presence of Agents Jones or Karabin, Gov't Ex. 27 at 34:14-22, and the body worn camera does not indicate that he did. Agents informed the defendant that they were there to compel him to open his phones using his biometrics. The following exchange then occurred:

---

[11] Agent Gajkowski testified that having an officer present was precautionary, Gov't Ex. 26 at 189:1-18, and that the agents hoped to avoid detaining the defendant to compel biometrics, Gov't Ex. 27 at 54:18-25, 55:1-5, 56.

[12] Agent Nelson testified that his statements to the officer were not the exact direction provided by DOJ via Agent Gajkowski, but instead the "general premise of why [the agents] were there." Gov't Ex. 30 at 26:13-23, 27:8-16.

| NELSON: | Here's the problem.  We have a search warrant.  The search warrant compels you to open your phone.  So we got to come back and get you to open your phone.[13] |
|---|---|
| DEFENDANT: | Okay. |
| GAJKOWSKI: | So during the execution of the devices, law enforcement personnel authorized to press the fingers, including thumb onto the device, and further to hold the phone up to your face.[14] |
| DEFENDANT: | Okay. |
| GAJKOWSKI: | Okay? |
| NELSON: | Is that cool, can you open the phone for us? |
| DEFENDANT: | Yeah.  If I'm compelled to do it, sure. |
| NELSON: | You are – [15] |
| GAJKOWSKI: | Not the codes.  Because that's not what you have to provide. |

Gov't Ex. 14 at 13:35:40 - 13:36:18; Gov't Ex. 24, Transcript of Body Worn Camera at 9.

Agent Gajkowski handed the iPhone 6 to the defendant.[16] The defendant appeared to type something into his phone. As seen on the body camera footage, upon noticing this, Agent Gajkowski physically turned her head away, stating "okay, but I can't – did you want to give me your code?" The defendant responded, "No, but it's open, it's open right." Gov't Ex. 14 at 13:36:28-13:36:35. Agent Nelson then handed the defendant the iPhone XR. *Id*. at 13:36:51. The defendant pulled down his face mask in an apparent attempt to unlock the phone using biometrics. The video then depicts the defendant typing something into iPhone XR before handing it back to

---

[13] Agent Nelson testified that based on his conversations with Agent Gajkowski, he understood that they could only compel the defendant to open the phones using biometrics. Gov't Ex. 30 at 30-31.

[14] Agent Gajkowski read the biometric provision of the warrant to the defendant. *Id*. at 13:35:55.

[15] Agent Nelson's statements are captured in the video, but not the transcript. *Compare* Gov't Ex. 14 at 13:36:10-13:36:30 *with* Gov't Ex. 24 at 9. When asked by defense, Agent Nelson testified that he did not complete his sentence. Gov't Ex. 30 at 32-33.

[16] Though not immediately apparent from the video footage, Agent Gajkowski testified as to which phone was the iPhone XR. *See* Gov't Ex. 26 at 214:6-7; Gov't Ex. 27 at 5:18-25, 6:1-2.

Agent Nelson and saying, "here you go." *Id.* at 13:36:51-13:37:03. Agent Nelson apologized to the defendant. After the defendant opened the iPhone XR, Agent Gajkowski indicated that she was trying to change the password on the iPhone 6 but that the phone was asking for touch ID. *Id.* at 13:37:05. The defendant placed a finger on the phone and then handed it back to Agent Gajkowski. While handling the phone, Agent Gajkowski again asked the defendant whether changing the password required a thumb print or password. The following exchange occurred:

| | |
|---|---|
| **GAJKOWSKI:** | Okay.  So I want to be clear.  You don't have to -- is this by thumbprint or is this by password? |
| **DEFENDANT:** | Fingerprint. |
| **GAJKOWSKI:** | Oh, it's by fingerprint. |
| **DEFENDANT:** | And a password. |
| **GAJKOWSKI:** | Okay. So it's up to you if you want to enter the passcode, you don't have to. |
| **DEFENDANT:** | I don't understand.  Aren't I compelled to – |
| **NELSON:** | You're compelled to – |
| **GAJKOWSKI:** | You are not compelled to give us the code, only the thumbprint, so I want to be clear on that. |
| **DEFENDANT:** | Well, I'd rather -- I mean, just for privacy reasons. |

Gov't Ex. 14 at 13:37:23-13:37:53; Gov't Ex. 24 at 11.

During the above exchange, the iPhone XR locked, and Agent Nelson asked the defendant to unlock it again using biometrics. The defendant took the phone and appeared to slide his finger across the screen before handing it back to Agent Nelson. *Id.* at 13:37:55-13:38:08. Agent Nelson repeatedly touched the screen, commenting that he was trying to stop the phone from "freezing back up on [him]." The defendant chuckled. *Id.* at 13:38:08-13:38:22.

During the entire encounter, the defendant stood calmly by an exterior exit door (a different door than the exit/entrance where plain clothes officers stood outside), often with his hands in his pockets. Agent Gajkowski told Agent Nelson regarding the iPhone 6, "I can't change the password

without the code. So I'm going to change a couple settings here and we'll go from there." *Id.* at 13:38:00. Agent Gajkowski testified that she did not know that the passcode was going to be required to change any settings. Gov't Ex. 26 at 210:1-10; Gov't Ex. 27 at 100:12-15. Both Agent Nelson and Agent Gajkowski thanked the defendant for his time. Agent Nelson apologized for having a uniformed officer present and told the defendant "good luck." The defendant walked away. The entire exchange lasted approximately five minutes. On cross examination, Agent Gajkowski testified that she thought at this point they were done with the warrant execution. Gov't Ex. 27 at 109:1-10.[17]

### C. Changing the Passcodes on the iPhones

As the agents prepared to leave the hotel, Agent Gajkowski realized that, despite her attempts to change the settings and turn off the passcode requirement, the phones had relocked. Gov't Ex. 14 at 13:40:00, 13:41:40. Agent Gajkowski expressed frustration, stating "normally, you go and you change the lock setting, and I have done that and it never auto locks" *Id.* at 13:46:59-13:47:06. Notwithstanding language in the warrant affidavit indicating that unlocking phones may affect the government's ability to access data on them, Agent Gajkowski testified that, at the time, she did not understand that because the phones had already been unlocked, they were in an "after first unlock" state, which would have precluded any further need to unlock the phones again. Gov't Ex. 27 at 6, 7:21-23; 116:7-15.

---

[17] The government proposes the following findings: The body worn camera, admitted without objection as Gov't Ex. 14 and 15, indicates that the defendant unlocked his phones by typing something on the screen, followed immediately by what appears to be use of biometrics. As to the video evidence indicating, at least circumstantially, that the defendant unlocked his phones first by passcode, any such action was voluntary. The defendant was not subjected to a coercive environment, nor was he ordered or directed to enter his passcode. To the contrary, the video evidence clearly depicts Agent Gajkowski advising the defendant on multiple occasions that he could not be compelled to unlock the phones with the use of passcode, and any misdirection provided by Agent Nelson was immediately corrected by Agent Gajkowski. The Court finds that, after the phones were unlocked using biometrics, the search warrant was fully executed. As to the defendant unlocking his devices with biometrics on more than one occasion during this encounter, the Court finds that the agents' actions were reasonable and did not run afoul of their legal authorization pursuant to the search warrant.

For the remaining approximately ten minutes of Gov't Ex. 14, the agents discussed among themselves strategies regarding how to keep the phones unlocked. Agent Gajkowski made several calls, including to CIF, to other special agents, and to the assigned prosecutor. Several times throughout the video, Agent Gajkowski indicated that the passcodes could not be compelled. At one point, Agent Jones asked whether the agents could "compel" the defendant to change his passcode, or whether the defendant could change the passcode for the agents.[18] Agent Gajkowski posed the question to the prosecutor, who was on the phone ("I'm being asked if -- is there any way, you know, he voluntarily open the phone?  There's no way we could keep -- really he's saying he doesn't want to voluntarily provide the passcode or change the passcode.). *Id*. at 13:51:45-13:52:03. Ultimately, the agents decided to engage the defendant "one more time," *id*. at 13:46:22-13:46:30, 13:47:07-13:47:15, *see also* Gov't Ex. 27 at 17:25, 18:1-4, and ask him to voluntarily open his phones, Gov't Ex. 27 at 15-17.

Approximately 40 minutes after the agents ended their initial encounter with the defendant in the hotel lobby (from 13:39:00 in Gov't Ex. 14 to 14:21:09 in Gov't Ex. 15), the agents asked the defendant (via the desk attendant) to return. As before, Agents Karabin and Jones waited outside. The uniformed officer stood on the other side of the lobby. Agents Gajkowski and Nelson explained to the defendant that they were having trouble keeping the phones unlocked, and Agent Nelson told the defendant that while not required, his cooperation would be appreciated. *See* Gov't Ex. 15 at 14:21:10 -14:21:38 ("we're trying to respect your privacy, and we can't make you change your password … So, we're trying to make it so we can keep your phone open so we can access it), 14:21:39-14:21:50 (We can't compel you or force you. Any cooperation would be greatly --

---

[18] Agent Jones's exact statement is captured in the video, but not the transcript. *Compare* Gov't Ex. 14 at 13:51:45-13:51:50 *with* Gov't Ex. 24 at 29. Earlier in the video, Agent Jones made a similar suggestion. *Id*. at 13:43:45-13:43:50 ("He can't change the password for you to password 1, 2, 3 or whatever?").

we don't want to keep bothering you because it's an inconvenience.  But we want respect your

rights.  So I don't know if you can meet us halfway or what. You don't have to, but God it would

be helpful.").

The defendant expressed some reluctance, before stating, "I want to help." *Id*. at 14:21:49.

Agent Gajkowski asked the defendant to open the iPhone XR using facial recognition. Noticing

that the defendant began typing into the phone, Agent Gajkowski asked "is it a passcode?" The

defendant explained that sometimes he must use the passcode if something has been changed.

Agent Gajkowski responded, "Okay, okay. So passcode is voluntary. We can compel face. But

that's what—I just want to reiterate that." *Id*. at 14:22:18. The defendant showed no reaction to

Agent Gajkowski's statement and handed the now unlocked phone to her, stating "there it is."

Agent Gajkowski then asked the defendant if he would "feel comfortable" setting the password to

something easy, like 1, 2, 3, 4, and the defendant replied, "sure." *Id*. at 14:22:30-14:22:45. The

defendant then added, in substance, that the password may need to be 6 digits. As the defendant

navigated through the settings while Agent Gajkowski looked on, they noticed an option to set up

an alternate appearance (presumably to change the face associated with the Facial ID). Agent

Gajkowski joked that he would not want her face to be on his phone, and the agents and the

defendant laughed. *Id*. at 14:23:05-14:23:20. When they eventually found the setting to turn off

the passcode feature, rather than change the code itself, the defendant asked if he should instead

turn the passcode off. In doing so, as he did earlier, he turned his phone towards Agent Gajkowski,

who realized that he was going to type in his passcode to change the setting. *Id*. at 14:23:40. Agent

Gajkowski stepped away as he entered his passcode. *Id*. at 14:23:45. The defendant then changed

the settings on the iPhone 6. *Id*. at 14:23:45-14:25:25.

Throughout this additional encounter in the hotel lobby, the defendant's demeanor was

calm and cooperative. *See generally* Gov't Ex. 15; *see also* Gov't Ex. 30 at 52-53. Upon confirming that both phones were permanently unlocked, the defendant said, "thanks guys" and turned to walk away. Gov't Ex. 15 at 14:25:41. The entire exchange lasted approximately five minutes. Agent Gajkowski then secured the phones. Neither she, nor any other agent, further accessed the phones, which were turned over to CIF on June 8, 2020.  CIF then used forensic tools to extract and image the contents of the devices. The iPhone XR was imaged on June 9, and the iPhone 6 was imaged on June 10. The analysis of both devices began on June 12, 2020. *See* Gov't Ex. 26 at 54-55; Gov't Ex. 1-B, 2; *see also* ECF No. 198 at 16.[19]

### D.  Obtaining the iPhone Evidence by Other Means

Digital Forensic Analyst Raymond White testified that iPhones feature biometric device lock options as a means by which the user can unlock his device using certain physical characteristics, such as a fingerprint or facial scan. Gov't Ex. 26 at 44:23-24. Apart from biometrics options, users may also lock iPhones with a passcode. *Id*. at 44:24-25. Relevant here, Mr. White testified that the iPhone XR could be locked by passcode (alphanumeric or otherwise) and Face ID. Gov't Ex. 26 at 45:1-6, 64:7-8. The iPhone 6, on the other hand, could be locked by passcode or fingerprint, but not Face ID. *Id*. at 45:7-14, 64:7-13. Both phones required a passcode before changing any settings, such as turning off the lock features. *Id*. at 68-70. Additionally, if either iPhone was powered off and then powered on, a passcode would be required the first time a user sought to unlock either device. *Id*. at 45:18-20. After that first unlock, the iPhone XR could be accessed by either Face ID or with the passcode. *Id*. at 45:21-23.

---

[19] The Government proposes the following findings: Nothing about the encounter, the entirety of which is video recorded, indicates that agents overcame the will of the defendant or coerced him into providing his passcodes to the agents. The Court finds that the defendant, without providing the passcodes themselves to agents, voluntarily changed the passcodes on his phones.

Mr. White testified that analysts could extract data from a locked phone, with the amount of data extracted depending on whether the phone is in a "before first unlock" or "after first unlock" state. Mr. White testified that in 2020, analysts could extract a limited amount of data, such as Apple ID and email addresses, from an iPhone XR in "before first unlock" state. Gov't Ex. 26 at 47:3-8. To extract anything more, analysts would have to use a method called "brute force" in which a forensic tool tries to guess the phone's passcode. *Id.* at 47:9-23. Depending on several factors, including the length and complexity of the passcode, as well as what version of the brute force software is available, accessing a phone via brute force could happen within minutes or take several years, with the maximum amount of time being approximately 25 years. *Id.* at 48-49, 78:6-9, 79:12-25, 81-82. Mr. White further explained that he had successfully used this method before, that it was typical to plan to use brute force to extract data from a device, and in fact, the "majority of the phones that would come through [CIF's] office" would need to be accessed via brute force. *Id.* at 72:21-25.

In addition to using brute force, analysts may themselves input specific passcodes based on known information, such as birthdates and anniversaries. Gov't Ex. 26 at 50:13-21. Here, Mr. White testified that analysts were able to gain access to the defendant's MacBook Air in this manner following a review of the defendant's Yahoo! account, which revealed an email containing what appeared to be various passwords. *Id.* at 50:2-10; 59:18-25. One of those passwords unlocked the MacBook Air. *Id.* at 58:12-14. Finally, Mr. White testified that when a device is in an "after first unlock" state, analysts can extract approximately 95% of data on the device, even if the phone is locked and the passcode is unknown. Gov't Ex. 26 at 51:4-14, 77:16-25. In other words, if a device is in an "after first unlock" state, brute force is not needed. *Id.* at 138:11-14.[20]

---

[20] The Government proposes the following findings: The Court credits Mr. White's testimony that an iPhone in "before first unlock" state would have eventually been unlocked via the brute force method. Additionally, the Court credits

### E.  The Preservation of the Defendant's iCloud Account

Agent Gajkowski testified that, after the June 2, 2020, interview, investigators were concerned that the defendant may try to delete evidence from his devices and accounts. Gov't Ex. 26 at 141:5-9, 147:1-9. Therefore, Agent Gajkowski sought assistance from co-workers with submitting preservation letters to Tinder, Bumble, WhatsApp, and Apple (to preserve his iCloud accounts because the defendant had iPhones). Gov't Ex. 26 at 141:10-17. The government produced two emails chains indicating that the process of submitting preservation letters began on June 2, 2020. Gov't Ex. 21, 22. Subsequent investigation revealed that the defendant had in fact deleted material from his accounts. For example, during the June 6, 2020, interview, Agent Nelson asked the defendant whether he erased "any data from his phones" or "erased any of [his] cloud accounts."[21] Gov't Ex. 11-G. The defendant admitted to deleting photographs from both phones, including profile pictures from his Tinder and WhatsApp. Gov't Ex. 11-G; 11-I. Agent Gajkowski testified that, after the agents left the hotel, Agent Gajkowski spoke with the assigned prosecutor again, who advised that the agents needed to submit preservation letters as soon as possible because they were concerned that, now that the defendant was aware agents had seized his devices, he may try to "move quickly to delete evidence." Gov't Ex. 27 at 36. Accordingly, Agent Gajkowski sent a preservation letter to Apple that evening. Gov't Ex. 27 at 38-39; Gov't Ex. 16.

Agent Gajkowski testified that the preservation request was made in anticipation of seeking an iCloud warrant regardless of whether any evidence was found on the iPhones. Gov't Ex. 29 at 85:21-25, 86:1-4. As to the delay in seeking a warrant for the defendant's iCloud, which was

_____

testimony that forensic analysts can extract approximately 95% of data from a phone in "after first unlock" state, regardless of whether the phone was locked at the time the extraction was attempted.

[21] Agent Gajkowski testified that she understood "cloud account" to reference the account location where his iPhones were backing up data, again concerned that he was deleting evidence. Gov't Ex. 26 at 173:5-16.

approved on August 14, 2020, Agent Gajkowski explained that there were "simultaneous priorities in the investigation," including the need to execute the Mexico City residential search warrant and conduct a forensic interview of AV-1. Gov't Ex. 29 at 86:7-15; Gov't Ex. 28 at 54:17-25. Thus, while obtaining a search warrant for the iCloud account was a priority, the preservation request ensured that they could first handle other more pressing matters. Gov't Ex. 29 at 86:12-15.[22]

### F. The Use of the iPhone Evidence in Subsequent Search Warrants

Days after the phones were seized, forensic analyst Raymond White began a forensic review of the devices. The initial review revealed one explicit photograph which appeared to depict a nude, unconscious woman. Gov't Ex. 26 at 55:11-19; Gov't Ex. 27 at 42:1-16. After viewing the photograph, Mr. White used a different forensic tool to determine whether there were other, similar images. Gov't Ex. 26 at 56:1-3. Ultimately, forensic analysis revealed the presence of 30 explicit photographs and videos on the iPhone XR. *Id*. at 58:3-9; Gov't Ex. 3 at 2. Mr. White explained that the explicit photographs and videos were "carved files" depicting several adult victims. "Carving" refers to the forensic tool used to extract file fragments. Gov't Ex. 26 at 56:7-15, 74:22-25, 75:1-11.[23] According to Mr. White, none of the photographs or videos would have been visible to the end user of the device. *Id*. at 56:16-22. The iPhone XR also contained Tinder messages with AV-1 and internet searches.

Analysis of the iPhone 6 revealed WhatsApp messages with multiple charged victims. There was also an internet search for "snoring Asian girl." Additionally, this analysis revealed that

---

[22]The Government proposes the following findings: The Court credits Agent Gajkowski's testimony that agents contemplated preserving the defendant's iCloud account as early as June 2, 2020, and that the agents would have sought an iCloud warrant regardless of whether any relevant evidence was found on the defendant's iPhones.

[23] The government maintains that this is circumstantial evidence that the defendant deleted obscene material from his iPhone XR and that the original images were backed up to the defendant's iCloud account. *See* ECF No. 220 at 2.

the iPhone 6 appeared to be backing up to the defendant's iCloud account, though subsequent analysis of the iCloud account revealed no iPhone 6 backups. *See* ECF No. 198 at 16-17.

The defense suggested, through cross examination of Agent Gajkowski, that the government only sought additional warrants in this case after viewing what was on the defendant's iPhones. Gov't Ex. 28 at 62:15-24. The defendant argues that because the evidence on the iPhone XR and iPhone 6 were, in their view, illegally obtained, any evidence obtained as a result of warrants that relied on the iPhone evidence should also be suppressed.

Relevant to the Court's inquiry, therefore, are two search warrants that specifically referenced evidence located on the iPhone XR and iPhone 6: the search warrant for the devices seized in Mexico,[24] approved on August 19, 2020, Gov't Ex. 4-E (Under Seal); and the search warrant for the defendant's iCloud account, approved on August 14, 2020, Gov't Ex. 4-C (Under Seal). Both affidavits submitted in support of these warrants relied on the same facts supporting probable cause as the initial warrant to seize and search the defendant's iPhone XR and iPhone 6. *See supra* at Section I.A; *see also* Gov't Ex. 4-C at ¶¶ 8-16; Gov't Ex. 4-E at ¶¶ 11-19.[25] However, the affidavits additionally relied on material recovered from the phones, including internet searches, messages with women, explicit photographs and videos found on the iPhone XR, and the aforementioned internet search history located on the iPhone 6. *See* Gov't Ex. 4-C at ¶¶ 17-22; Gov't Ex. 4-E at ¶¶ 20-25.

As to the probable cause supporting the iCloud warrant specifically, in addition to the aforementioned information, the affidavit included that (1) many users of Apple devices have iCloud accounts; (2) the defendant had two iPhones; (3) iCloud accounts store information such

---

[24] The affidavit supporting the residential search warrant that led to the seizure of these devices did not reference the defendant's iPhone XR, nor any evidence found on that device.

[25] The affidavits additionally outlined AV-1's visible injuries and provided AV-1's urine alcohol concentration.

as text messages, internet history, photos and videos, and records associated with third-party applications, such as WhatsApp; (4) that the defendant had communicated with AV-1 on such third party applications; and (5) that Apple users receive a certain amount of free iCloud storage space. Gov't Ex. 4-C at ¶¶ 12, 16 -17, 23-38.

When investigators received the iCloud search warrant return, they located device registration dates and times for an Apple account associated with the defendant's Yahoo email address. Among other devices, an iPhone XR, an iPhone 6, and a MacBook Air were associated with the account. A forensic examination of the iCloud account revealed WhatsApp messages and/or iMessages with several of the charged victims in this case. Finally, 400 explicit images were recovered from the iCloud account depicting charged and uncharged victims. *See* Gov't Ex. 26 at 58:19-23; Gov't Ex. 3 at 5; *see also* ECF No. 198 at 18-20.

As to the devices seized in Mexico, on the purple Asus Laptop, internet searches included, "Asian girl and passed out and street." Additionally, 34 explicit images depicting two different victims were recovered. Gov't Ex. 26 at 58:10-14, Gov't Ex. 3 at 3; *see also* ECF No. 198 at 18. On the blue Asus Laptop, there were internet searches for various terms related to passed out or drugged women and there were nine explicit images depicting two different victims. Gov't Ex. 26 at 58:15-18, Gov't Ex. 3 at 4; *see also* ECF No. 198 at 18.

Subsequent search warrants relied on the same facts supporting probable cause as the search warrant for the defendant's phones (AV-1's report of assault, AV-1's sex assault examination, witnesses' observations, the defendant's statements, and the agents' observations). *See* Gov't Ex. 4-G (Under Seal), "California Residence and Devices," at ¶¶ 8-15; Gov't Ex. 4-N (Under Seal), "Five Devices Seized in California," at ¶¶ 9-15; Gov't Ex. 4-M (Under Seal), "Yahoo," at ¶¶ 8-15; and Gov't Ex. 4-L (Under Seal), "Google," at ¶¶ 7-14. Those warrants

additionally outlined the evidence obtained from the defendant's iCloud account.[26]

### G.  Ownership of the iPhone 6

During the June 2, 2020, interview with agents, the defendant was asked whether one of the phones was his "personal phone or [his] work phone" and the defendant identified his iPhone XR as his "personal" phone. Gov't Ex. 9-D. Later, the defendant called the iPhone 6 the "Mexican number phone." Gov't Ex. 9-H. When asked again whether the iPhone 6 was his work phone, the defendant responded "correct…the Mexican number." Gov't Ex. 9-I.

During the June 6, 2020, interview, Agent Nelson asked the defendant, "you got two phones on you right? Let me see, one's a personal and one's a work?" to which the defendant responded, "yep" and volunteered that he did not know "how long [he would] have the work since it belongs to Mexico." Gov't Ex. 11-F and 11-S. Agent Nelson asked again, "which one's work and which one's personal?" and the defendant responded, "personal." Gov't Ex. 11-S. Later, the defendant showed the agents which phone was his work phone. Gov't Ex. 11-H.[27]

## II.    ARGUMENT

In response to the Court's June 15, 2023, Minute Order, and as set forth in detail below: (1) the defendant did not have a reasonable expectation of privacy in the government-issued iPhone 6; (2) the independent source doctrine is more applicable to the iCloud warrant and the inevitable discovery doctrine is more applicable to the iPhone warrant; and (3) the independent source doctrine as applied to the iCloud search cures any purported illegality in the search of the iPhones.

---

[26] The Government proposes the following findings: The Court finds that the probable cause supporting the search warrants for the iCloud and the devices seized in Mexico relied on legally obtained evidence, separate from the iPhone XR, and that the independently obtained evidence would have been sufficient to support a finding of probable cause.

[27] The Government proposes the following findings: Setting aside for later the Court's determination regarding the defendant's expectation of privacy in the iPhone 6, the Court finds that the iPhone was the defendant's government-issued phone.

### A. The Defendant Had No Reasonable Expectation of Privacy in His Government Issued iPhone 6.

"Where a government employee is told that an electronic device is 'subject to auditing,' he should be on notice that a search may take place." *United States v. Hill*, 319 F. Supp. 3d 44, 50 (D.D.C. 2018) (quoting *City of Ontario, Cal. v. Quon*, 560 U.S. 746, 755-56 (2010)). Indeed, where an employer had policies in place informing the employee that their use of a work-issued device was monitored, courts have regularly determined that the employee has no reasonable expectation of privacy in it. *See, e.g.*, *United States v. Simmons*, 206 F.3d 392, 398 (4th Cir. 2000) (upholding warrantless search of CIA employee's computer, where court determined employee had no reasonable expectation of privacy in the files based on the CIA's policy that it would "periodically audit, inspect, and/or monitor [each] user's Internet access as deemed appropriate," and that such auditing would be implemented "to support identification, termination, and prosecution of unauthorized activity"); *Biby v. Board of Regents*, 419 F.3d 845, 850-51 (8th Cir. 2005) (university policy stating that computer files and emails may be searched in response to litigation discovery requests eliminated employee's reasonable expectation of privacy in computer); *United States v. Thorn*, 375 F.3d 679, 683 (8th Cir. 2004) (computer use policy eliminated employee's reasonable expectation of privacy in computer). Here, the defendant's employer promulgated internal regulations governing "government office equipment," including "cellular telephones." Gov't Ex. 31 at 1.[28] The regulation explicitly states that personnel "do not have a right, nor should they have an expectation, of privacy while using any U.S. Government office equipment at any time." *Id.* at 7.

---

[28] This AR was in effect as of July 17, 2015, but was replaced with a revised version in November 2018. The November 2018 version has very similar language but is at a higher classification level and cannot be publicly disseminated. Gov't Ex. 31 was not admitted during the motion hearing. A copy of this regulation was received by the government on June 29, 2023, and disclosed to the defense on that same date.

The defendant's lack of ownership of the iPhone 6 also weighs against any claimed expectation of privacy. *See United States v. Anderson*, 154 F.3d 1225, 1229 (10th Cir. 1998) (ownership of item seized is not determinative, but "an important consideration in determining the existence and extent" of Fourth Amendment interests); *United States v. Angevine*, 281 F.3d 1130, 1134-35 (10th Cir. 2002) (no reasonable expectation of privacy in university computer where university owned the device and had policies warning employees about use of equipment and legal ramifications). Here, the defendant's iPhone 6 was the defendant's work phone and, in fact, the defendant himself disavowed ownership of the device. Gov't Ex. 11-F and 11-S. Moreover, the defendant was a U.S. Government employee at the time of the alleged conduct. Thus, in addition to the employer's internal regulations, the nature of the defendant's employment weighs against any claim that he had an expectation of privacy in his device. *See Quon*, 560 U.S. at 762 (noting that Quon's status as a law enforcement officer would or should have informed him that his actions were likely to come under legal scrutiny, and that this might entail an analysis of his on-the-job communications). Therefore, the defendant cannot claim a reasonable expectation of privacy in his work-issued device.[29]

**B. The Inevitable Discovery Doctrine is More Applicable to Evidence Recovered from the Defendant's Phones, While the Independent Source Doctrine is More Applicable to the Warrant for the Defendant's iCloud Account.[30]**

The inevitable discovery doctrine applies where evidence obtained through an illegal source is not also found through a separate source but, hypothetically, would have been lawfully

---

[29] The Government recognizes that the initial search here was not conducted by the defendant's employer for work-related purposes but by law enforcement. Nonetheless, as in *Quon*, given the unique nature of the defendant's employment, the defendant should have anticipated that material on his work-issued device was subject to review by the U.S. Government, to include DOJ. Moreover, though the initial search in *Simmons* was conducted by a division of the CIA, the defendant's employer, the illicit material was turned over to and used by the FBI to seek search warrants for his office and physical computer and prosecute him for criminal offenses. 206 F.3d at 396-97.

[30] The government makes this argument in accordance with the Court's order. By arguing that one doctrine is more applicable to a particular search, the government does not concede that the other doctrine is inapplicable.

obtained regardless. *Nix v. Williams*, 476 U.S. 431, 448-50 (1984) (where officers illegally obtained incriminating statements regarding the location of a dead body and therefore called off the search, the body was nonetheless admissible because a search had been under way which would have discovered the body, had it not been called off). The independent source doctrine, on the other hand, applies when evidence discovered through an illegal source is also found through a source separate from any illegality. *Murray v. United States*, 487 U.S. 533, 538 (1988) (officer's illegal entry upon private premises and observations of contraband did not require suppression of that contraband when it was also subsequently discovered while executing a search warrant obtained on the basis of information unconnected with the initial entry).

The inevitable discovery doctrine applies to evidence recovered through the search of the defendant's iPhones. First, the evidence on the phones would have been inevitably discovered because, had agents not immediately reengaged the defendant to execute the biometrics portion of the warrant, they would have sought an additional warrant to do so. Because probable cause was still then-existing, that warrant would have been granted. Second, even if the agents had not sought an additional warrant and even assuming the phones were in a "before first unlock" state, agents would have gained access to their data using a method called "brute force."[31]

Separately, the independent source doctrine applies to the search of the defendant's iCloud account because, even assuming the iPhone evidence referenced in the iCloud warrant was unlawfully obtained, the iCloud warrant affidavit relied on independent evidence that was legally obtained, to include AV-1's report of assault, witness observations of AV-1, AV-1's electronic

---

[31] The government also maintains that law enforcement would have inevitably proceeded with the search of the defendant's other accounts and devices and come across much of the same evidence. This argument was addressed in the Government's original submission (ECF No. 198 at 47-50) and is incorporated here by reference. As indicated in the Government's Notice Regarding Evidence Obtained from the iPhone XR (ECF No. 220), the fragment files are unique to the iPhone XR and provide circumstantial evidence that the defendant both transported obscene material and then deleted the originals from his phone. However, the government recovered media from the defendant's other devices and accounts which depicted the same victims captured in the iPhone XR carved files.

communications with the defendant, and agents' interviews of the defendant and observations of his phones. *See United States v. Halliman*, 923 F.2d 873, 880-81 (D.C. Cir. 1991) (the independent source doctrine governs evidence which is initially discovered during an illegal search but subsequently acquired through an independent and lawful search).

1. Law Enforcement Would Have Inevitably Discovered the Evidence Located on the Defendant's Phones.

"The inevitable discovery exception to the exclusionary rule allows evidence initially detected as the result of unlawful government conduct to be introduced nonetheless '[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.'" *United States v. Redrick*, 48 F. Supp. 3d 91, 107 (D.D.C. 2014) (quoting *Nix v. Williams*, 467 U.S. at 444). In analyzing whether evidence would inevitably have been discovered through a search pursuant to a proper warrant, courts have considered whether law enforcement would have inevitably sought such a warrant and whether it would have been issued. *See, e.g., Redrick*, 48 F. Supp. 3d at 106-07 (applying inevitable discovery doctrine where, inter alia, "police would have obtained a search warrant and turned up [the contraband] had they not illegally discovered those items first").

Here, there is ample evidence on the record to support a finding that law enforcement would have sought an additional search warrant to compel biometrics and that such a warrant would have been granted.[32] First, the sheer effort devoted to executing the biometric provision of the warrant demonstrates that, had agents believed a new warrant was needed, they would have gotten one. *See United States v. Holmes*, 505 F.3d 1288, 1293-94 (D.C. Cir. 2007) ("inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready

---

[32] Pursuant to the Court's Minute Order, the Government assumes, but does not concede, that the second and third encounters with the defendant were warrantless. As outlined in the Government's original filing, the Government maintains that these encounters were reasonable continuations of the original search and also voluntary.

verification"). After the initial seizure of the devices, the assigned prosecutor instructed agents to reengage the defendant to execute the biometrics provision. *See* Gov't Ex. 26 at 186:1-12. To that end, agents reconvened the entire operation. *Id*. at 192:19-22. They employed local law enforcement to assist. *Id*. at 193:21-23. They discussed a plan. *Id*. at 193:2-20. They traveled to the defendant's hotel to enact it. *Id*. at 199:5-18. Agents then made and attempted numerous phone calls to the assigned prosecutor, other agents, and forensic specialists, all in an effort to ensure that biometrics were properly attempted. *See* Gov't Ex. 14 and 15.

Furthermore, the agents were not deterred by the effort associated with getting a new warrant. Agents had already anticipated the possibility of having to seek an additional search warrant on the day of the seizure if the defendant did not have his phones on his person. *See* Gov't Ex. 26 at 155:10-17. This is powerful evidence that agents would have sought an additional warrant if, after seizing the phones, they thought they were not allowed to reengage the defendant to compel biometrics. *See United States v. Procopio*, 88 F.3d 21, 27 (1st Cir. 1997) (inevitable discovery doctrine allowed admission of evidence illegally uncovered in a briefcase where there was "little reason to doubt" that, even without the information obtained during the illegal search, agents would have sought a warrant). Additionally, there can be no serious question as to whether a magistrate judge would have authorized an additional warrant to compel biometrics because it was authorized in the original warrant the day before and probable cause remained the same.[33]

---

[33] To the extent that other courts have raised concerns that the inevitable discovery doctrine may incentivize police misconduct or undermine the warrant requirement, *see, e.g., United States v. Echegoven*, 799 F.2d 1271, 1280 (9th Cir. 1986), such issues are not presented on these facts. Here, agents acted in good faith when they proceeded with the purportedly unlawful search and seizure because they reasonably believed they were authorized to do so under the original warrant. *See United States v. Gerber*, 994 F.2d 1556, 1561 (11th Cir. 1993) (evidence should not be suppressed due to an inadvertent, rather than intentional, failure to conform with Rule 41); *see also* Gov't Opp'n to Def. Mot. to Suppress Evidence, ECF No. 198 at 33-36. Because law enforcement acted in good faith and would have inevitably sought and obtained an additional warrant, this Court should not exclude the evidence recovered from the defendant's iPhones. *See also* Section II.C. *infra*.

Second, even if agents had not sought an additional warrant and even assuming the phones were in a "before first unlock" state, law enforcement would have gained access to the data on the phones using "brute force."[34] *See* Gov't Ex. 26 at 48:9-23. In fact, the forensic analyst testified that he had successfully used this method before. *Id*. at 72:21-25. Thus, assuming agents had never compelled biometrics or the defendant never agreed to unlock his phones using his passcode, law enforcement still would have inevitably accessed the evidence on the devices.[35]

Courts have applied the inevitable discovery doctrine under these circumstances. In *United States v. Daniells*, 2018 U.S. Dist. LEXIS 57925, *17018 (D. Mass. April 5, 2018), the Massachusetts District Court found that, where credible evidence at the hearing demonstrated that the government would have been able to unlock and access iPhone data without the defendant's cooperation, including by utilizing software to unlock the phone by brute force, the extraction of the data from the defendant's iPhone was inevitable. *See also United States v. Beck*, 2021 CCA LEXIS 186, *39 – 40 (A.F.C.C.A. April 21, 2021) (applying the inevitable discovery doctrine where the government demonstrated that, had investigators not obtained the defendant's phone passcodes in violation of his rights, they nonetheless would have pursued ways to forensically access the device, including "brute force identification").

Here, too, the Court should apply inevitable discovery because the record demonstrates it is more likely than not that law enforcement would have inevitably accessed the defendant's

---

[34] The Government assumes for the sake of argument, but does not concede, that the phones were in a "before first unlock" state when they were seized at Jimmy John's on June 6, 2020. Though there is evidence on the record, through the defendant's statements during the June 6, 2020, recorded interview, that the defendant turned his phones off and then back on prior to their seizure, neither Agent Gajkowski or Agent Nelson could confirm what state the phones were in at the time they were seized.

[35] Pursuant to the Court's Minute Order, the Government assumes, but does not concede, that the second and third encounters with the defendant were unlawful. As outlined in the Government's original filing, the Government maintains that these encounters were reasonable continuations of the original search and voluntary. Because the phones were in an "after first unlock" state after the agents' encounter with the defendant at the hotel, law enforcement would have inevitably accessed 95% of the data on the phones.

devices via brute force. *See, generally, Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 136 (1997)

(defining "preponderance of the evidence" standard). This remains true despite the length of time

it might take to access a device via brute force. Testimony on the record establishes that, while in

2020, the amount of time it took to break into an iPhone XR with a 6-digit passcode using brute

force was anywhere between a few minutes and 25 years, by 2022, the maximum brute force time

that it would take to access that same iPhone was "about six months." *See* Gov't Ex. 26 at

48:3-18; 49:10-13. Furthermore, analysts could have manually entered passcodes into the

software program in an attempt to access the phones, which Mr. White successfully did to

access the defendant's MacBook Air. *Id.* at 59:21-24; 60:4-17.[36] Moreover, any

claim that  the prosecution of this case would not have proceeded due to the length of time

it might take to access data on the defendant's devices via brute force is belied by the

current charges, which date back to 2013. *See* Superseding Indictment, ECF No. 184; *see*

*also* 18 U.S.C. § 3299 (no statute of limitations for any felony under chapter 109A and 117).

Thus, even assuming that it took law enforcement years to access the phones via brute force –

which the testimony suggests it would not – the nature of the images and videos recovered

would support a prosecution for such conduct.

2.  The Warrant Issued for the Defendant's iCloud Relied on an Independent Source
    of Evidence Obtained Lawfully.

The independent source exception to the exclusionary rule applies where evidence is

discovered by or through unlawful means, but later obtained through an independent and lawful

source, so long as that source is genuinely independent. *Murray*, 487 U.S. at 542. *Murray* instructs

courts to tackle this inquiry in two parts. For the independent source exception to apply, the district

court must find: 1) that law enforcement would have applied for the warrant had they not acquired

---

[36] While neither the defendant's MacBook Air passcode nor his cell phone passcodes were explicitly identified in this list, many of the passwords listed contained different iterations of the same words and number combinations, which Mr. White used to successfully gain access to the MacBook Air. *See* Gov't Ex. 26 at 60:1-17.

the tainted information; and 2) that the tainted information did not affect the Magistrate's decision to issue the warrant. *Id*. Here, the record establishes that law enforcement would have applied for a warrant to search the defendant's iCloud account notwithstanding the evidence recovered from the defendant's phones and the affidavit in support of the iCloud warrant established probable cause without reference to that evidence.

      a. <u>Investigators would have applied for the iCloud warrant regardless of what evidence was found on the iPhones.</u>

When evaluating *Murray's* first prong, this Court must make a factual finding as to whether law enforcement's decision to seek the iCloud warrant was motivated by what the officers saw during the purported unlawful search of the defendant's phones. "The question of an officer's subjective intent to pursue a warrant depends on the totality of the circumstances." *United States v. Flores*, 888 F.3d 537, 546 (1st Cir. 2018). The court may consider an agent's testimony regarding her intent but is not bound by it if she "lacks credibility or if objective factors render [her] assurances 'implausible.'" *Id*. (quoting *United States v. Dessesaure*, 429 F.3d 359, 369 (1st Cir. 2005). Courts may consider, among others, such factors as the time at which the officers first evinced an intent to seek a warrant, *United States v. Hassan*, 83 F.3d 693, 699 (5th Cir. 1996), whether probable cause existed without information lawfully obtained, *United States v. Johnson*, 994 F.2d 980, 987 (2d Cir. 1993), and whether officers had independent reason to want to search the location identified in the subsequent warrant, *Flores*, 888 F.3d at 547.

Each factor bearing on intent weighs heavily in the government's favor. Here, probable cause to search the defendant's iCloud account existed prior to the discovery of explicit material on his phones and there is direct evidence on the record that law enforcement intended to seek such a warrant prior to finding illicit materials in the defendant's phones. Agent Gajkowski was aware of AV-1's allegation of sexual assault as early as June 1, 2020. *See* Gov't Ex. 26 at 97:12-

25, 98:1. Law enforcement knew that AV-1 and the defendant communicated through the messaging platforms Tinder and WhatsApp prior to the alleged assault because they observed these communications on two iPhones belonging to the defendant during the June 2, 2020 interview. *See* Gov't Ex. 26 at 101:5-10, 109:16-22; Gov't Ex. 7 and 8. This evidence, in combination with the types of evidence that can back up to an iCloud account (including photos, conversations, and other digital keepsakes, as well as internet research, *see* Gov't Ex. 4-C at ¶ 24), is sufficient to support a finding of probable cause.

Additionally, this Court should credit Agent Gajkowski's uncontroverted testimony that law enforcement "without question" would have sought a warrant for the defendant's iCloud independent of what was on the iPhones. *See* Gov't Ex. 29 at 86:4. Not only did Agent Gajkowski testify credibly throughout the hearing, but her testimony on this particular point is heavily corroborated for three reasons. First, emails demonstrate that, as early as June 2, 2020 – four days before the phones were seized – Agent Gajkowski intended to preserve the defendant's accounts. *See* Gov't Ex. 21, 22. Second, the account preservation request for the defendant's iCloud account was submitted on June 6, 2020. *See* Gov't Ex. 16.[37] The iPhone XR extraction began three days later, on June 9, 2020 and the iPhone 6 extraction began four days later, on June 10, 2020. *See* Gov't Ex. 1-B and 2. Third, in addition to the preservation requests, agents explicitly asked the defendant whether he had deleted data from his devices or cloud accounts prior to the phone seizures. *See* Gov't Ex. 11-T. The agents' conduct shows their interest in his iCloud account as well as their concerns that he had deleted material from both his devices and accounts. *See* Def. Ex. 6 178:11-18; 180:11-20. In fact, their interview with the defendant confirmed that he had

---

[37] *See also* 18 U.S.C § 2703(f)(1) ("A provider of wire or electronic communication services or a remote computing service, upon the request of a governmental entity, shall take all necessary steps to preserve records and other evidence in its possession pending the issuance of a court order or other process.").

already deleted material from his devices. *Id*. Because agents knew that material on a user's Apple devices can back up to their iCloud account, it is virtually inconceivable that law enforcement would not have sought a warrant when they had direct knowledge that material had been deleted from the phones. *See United States v. Sable,* 633 F.3d 219, 245 (3d Cir. 2011) (reasoning that officers would have sought a warrant had they not unlawfully opened and reviewed files containing child pornography because it would be "inconceivable" that officers would not seek a warrant after lawfully viewing file names indicative of child pornography); *Flores*, 888 F.3d at 547 (where officers had "very good reason" to believe evidence would be found in a hotel room and had a demonstrated interest in the room prior to any purported misconduct, *Murray's* first prong was satisfied).

Finally, the search of the defendant's phones was in no way conducted to determine whether an iCloud warrant was necessary. "To determine whether the decision to obtain a warrant was influenced by a prior illegality, lower courts must conduct a factual inquiry into what motivated the officers to conduct the prior illegal action." *See United States v. Hernandez*, 2020 U.S. Dist. LEXIS 104882, *79 (S.D.N.Y June 16, 2020). In doing so, courts consider whether the agents "acted unlawfully because they mistakenly assumed that exigency or consent justified their warrantless actions." *Id. at* *80 (citing *Murray*, 487 U.S. at 540 n.2 (contrasting unlawful actions motivated by a mistaken belief as to exigency with unlawful actions motivated by a "search first, warrant later" mentality). This inquiry is intended to protect against the "so-called Confirmatory search," where officers conduct an unlawful search to know whether evidence exists that will make the process of getting a warrant worth the time and effort. *Id. at* *78-79. As discussed above, seeking the iCloud warrant was a separate undertaking initiated before agents even had a warrant for, let alone a plan regarding, the defendant's phones. Moreover, agents had no guarantee that

material would be recovered from an iCloud account simply because it was also found on a corresponding iPhone. In fact, here, the material on the phones did not mirror the iCloud. *See* Gov't Ex. 3 at 2, 5. But, more importantly, any purported unlawful conduct as to the search of the defendant's devices was done in good faith and was not due to intentional police misconduct. *See* Section II.B.1. at 25, n.33; *see also* Gov't Opp'n to Def. Mot. to Suppress Evidence, ECF No. 198 at 33-36. This supports a conclusion that agents' motivations in seeking the iCloud warrant were benign. *Johnson*, 994 F.2d at 987 (first prong satisfied where there was probable cause for the warrant, law enforcement had a good reason to want to review the tapes at issue, and the only reason they did not first apply for a warrant prior to listening to the tapes was their mistaken belief that they were entitled to do so).

   b.   The "tainted" information did not affect the magistrate's decision to issue the warrant.

With respect to *Murray's* second prong, every circuit to consider the issue has found that the appropriate inquiry is not whether the tainted information affected the magistrate's decision in any sense, but whether the affidavit supports probable cause after the tainted information has been redacted from it. *See Halliman*, 923 F.3d at 880 (finding warrant an independent source despite magistrate judge being informed of the tainted information where there were independent grounds for probable cause); *Dessesaure*, 429 F.3d at 366 ("Indeed, since illegally obtained information could 'affect' the decision of the magistrate without changing the ultimate decision to grant the warrant, broad application of the additional analysis suggested by *Murray* would work against the principle that the 'fruit of the poisonous tree' doctrine not be used to place the government in a worse position than it would have been in absent its illegal conduct."); *accord*: *United States v. Whitehorn*, 829 F.2d 1225, 1231 (2d Cir. 1987); *United States v. Herrold*, 962 F.2d 1131, 1141 (3d Cir. 1992); *United States v. Gillenwaters*, 890 F.2d 679, 682 (4th Cir. 1989); *United States v.*

31

*Restrepo*, 966 F.2d 964, 970 (5th Cir. 1992); *United States v. Jenkins*, 396 F.3d 751, 758-60 (6th Cir. 2005); *United States v. Markling*, 7 F.3d 1309, 1316 (7th Cir. 1993); *United States v. Swope*, 542 F.3d 609, 614 (8th Cir. 2008); *United States v. Heckenkamp*, 482 F.3d 1142, 1149 (9th Cir. 2007); *United States v. Davis*, 313 F.3d 1300, 1304 (11th Cir. 2002).

To find probable cause, a judge reviewing an affidavit must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . .there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Washington*, 775 F.3d 405, 407 (D.C. Cir. 2014) (citing *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983)). Here, the affidavit in support of the warrant to search the defendant's iCloud account remains sufficient to establish probable cause after excising information regarding the search of the defendant's phones. The iCloud warrant affidavit outlined AV-1's report of sexual assault, to include information that she had injuries consistent with penetration and visible bruising on her body. *See* Gov't Ex. 4-C, Affidavit in Support of the iCloud Warrant ¶¶ 12-15.[38] Included in this summary is information provided by AV-1 that she met the defendant on Tinder, a mobile dating application, and communicated with him on the mobile messaging application WhatsApp. *Id.* at ¶ 12. The warrant affidavit also informed the magistrate judge that (1) a user's iCloud account "serves as back-up storage for content contained on the user's iPhones and other electronic devices" (*id.* at ¶ 23); (2) there was probable cause to believe that the defendant's iCloud account contained communications with women the defendant intended to meet in person (*id.*); (3) iCloud can be used to store communications such as instant messages and data from third party messaging

---

[38] During the motion hearing, the defense introduced three exhibits summarizing the ways in which AV-1's statements were different from other witness statements (including the defendant's). *See* Gov't Ex. 29 at 4-22; *See* Def. Ex.36, 37, 38 (all Under Seal). These exhibits do nothing to refute probable cause. Especially here, where videos and witness statements confirm that AV-1 was hysterical and appeared to be heavily intoxicated, *see* Gov't Ex. 4-C at ¶ 9-10, and where the affidavit supporting the iCloud search warrant explicitly indicates that, shortly after screaming for help, AV-1 did not remember screaming for help or that any sexual contact had occurred. *See* Gov't Ex. 4-C at ¶ 13.

applications (*id*. at ¶ 34); and (4) that the iOS app for WhatsApp specifically can be configured to regularly back up a user's instant messages on iCloud Drive (*id*. at ¶ 32). The statements of AV-1 and the aforementioned information regarding the likelihood of evidence being found in an iCloud account are sufficient to support a finding of probable cause. *See, e.g., Acosta v. Ames Dep't Stores, Inc.,* 386 F.3d 5, 10 (1st Cir. 2004) ("[U]ncorroborated testimony of a victim or other percipient witness, standing alone, ordinarily can support a finding of probable cause."); *accord.*: *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999); *United States v. Golden*, 545 Fed. Appx. 920, 921-22 (11th Cir. 2013).

Nevertheless, the iCloud warrant affidavit provided substantial additional corroboration supporting probable cause, including that the defendant participated in three voluntary interviews.[39] *See* Gov't Ex. 4-C at ¶ 16. As outlined in the affidavit, during these interviews, the defendant confirmed his use of Tinder and WhatsApp to communicate with AV-1 and showed agents portions of these messages on two separate iPhones. *Id*. Thus, the magistrate court could consider AV-1's account, the defendant's statements, and agents' direct observations of material related to the investigation contained on the defendant's iPhones. These sources, in combination with the types of evidence that can back up to an iCloud account (including photos, conversations, and other digital keepsakes, as well internet research, *see* Gov't Ex. 4-C at ¶ 24), overwhelmingly demonstrate a "fair probability" that evidence of a crime would be found in the defendant's iCloud account. *See, e.g., United States v. Goerig*, 2021 U.S. Dist. LEXIS 246286, *28 – 29 (E.D. Pa. Dec. 28, 2021) (upholding search of defendant's cell phones and iCloud account despite inclusion in warrant affidavits of unlawfully seized evidence, where probable cause was otherwise supported by, inter alia, the victim's statements, communications with the defendant on her phone, and the

---

[39] Each interview occurred prior to the seizure of the defendant's iPhones on June 6, 2020.

defendant's history); *United States v. Brown*, 2022 U.S. Dist. LEXIS 166119, \*34 – 35 (E.D.N.Y. Sept. 14, 2022) (finding probable cause to support issuance of a warrant to search a defendant's iCloud account based on his use of social media to demonstrate his association with the gang in question and text communications between defendant and other gang members observed on other member's cell phones).

### C.  The Independent Source Doctrine Cures Any Purportedly Unlawful Seizure or Search of the Defendant as to His iPhones.

The exclusionary rule generally prohibits the introduction of evidence seized as a direct result of an illegal search or seizure as well as evidence discovered later but derived from the illegality. *Nardone v. United States*, 308 U.S. 338, 341 (1939). However, evidence "improperly obtained [does] not 'become sacred and inaccessible.'" *Id.* (citing *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 393 (1920)). Where challenged evidence is acquired through an independent source, it is sufficiently attenuated from the taint of any illegality and the exclusionary rule is inapplicable. *Swope*, 542 F.3d at 614. Further, if the independent source doctrine applies to challenged evidence such that the exclusionary rule is inapplicable, there is no additional penalty for the alleged police misconduct. As the Supreme Court articulated in *Nix*:

> [T]he interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse*, position that they would have been in if no police error or misconduct had occurred. . . . When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.

467 U.S. at 443. Here, "the government has gained no advantage at trial and the defendant has suffered no prejudice" from admitting evidence lawfully recovered from the defendant's iCloud account independent from "any overreaching by police." *Id.* at 447. Exclusion of evidence would therefore be inappropriate. *See Murray,* 487 U.S. at 541 (finding that, though knowledge of certain

contraband was "assuredly acquired at the time of the unlawful entry" it was "also acquired at the time of entry pursuant to the warrant, and if that later acquisition was not the result of the earlier entry" exclusion of evidence "would put the police (and society) not in the same position they would have occupied if no violation occurred, but in a worse one."); *United States v. Glover*, 681 F.3d 411, 418 (D.C. Cir. 2012) (finding defendant could not use an initial unlawful entry by police into his home "as the hook to suppress evidence later seized pursuant to a valid and independently obtained search warrant").

## CONCLUSION

Accordingly, the government respectfully requests that this Court deny the defendant's motion to suppress evidence.

Respectfully Submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
District of Columbia

KENNETH A. POLITE, JR.
ASSISTANT ATTORNEY GENERAL
U.S. Department of Justice
Criminal Division

___/s/_____
Meredith E. Mayer-Dempsey
NY Bar No. 5213202
Assistant United States Attorney
United States Attorney's Office
for the District of Columbia
601 D Street, Northwest
Washington, D.C. 20530
(202) 252-7259
Meredith.Mayer-Dempsey@usdoj.gov

___/s/_____
Angela N. Buckner
DC Bar No. 1022880
Trial Attorney
U.S. Dept. of Justice, Criminal Division
Human Rights and Special Prosecutions
1301 New York Avenue, Northwest
Washington, D.C. 20530
(202) 616-0238
Angela.Buckner.2@usdoj.gov