**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | Criminal No. 1:21-cr-00380-CKK |
| BRIAN JEFFREY RAYMOND, | : | |
| | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |

**DEFENDANT'S POST-HEARING BRIEF IN SUPPORT OF**
**MOTION TO SUPPRESS EVIDENCE**

Defendant Brian Jeffrey Raymond respectfully submits this Post-Hearing Brief pursuant to this Court's June 15, 2023 Minute Order (the "Minute Order") requesting briefing addressing three specific questions relevant to Defendant's Motion to Suppress (the "Suppression Motion").[1]  In response to that request, Defendant respectfully states as follows:

**INTRODUCTION**

The evidence adduced at the five-day suppression hearing establishes two overarching truths that, taken together, entitle Mr. Raymond to the full relief sought by his Suppression Motion.

*First*, the Agents violated Mr. Raymond's Fourth and Fifth Amendment rights on June 6, 2020 when they repeatedly engaged Mr. Raymond under the purported authority of a concluded

---

[1] The Court requested that the parties hyperlink to the exhibits and transcripts cited in their post-hearing briefs.  To comply with that request, contemporaneous with this electronic filing, Mr. Raymond's counsel has provided the Court with a thumb drive containing a copy of this as-filed brief with hyperlinks.  It also contains the exhibits and transcripts cited in the brief, as well as courtesy copies of the cases cited below. If the Court reviews the copy of the brief on the thumb drive, it will have access to the hyperlinked materials, which have not yet been publicly filed elsewhere and therefore could not be linked to via the public docket.

search and seizure warrant, unlawfully over-represented the scope of such warrant, and then repeatedly disregarded his efforts to invoke his right to silence in response to requests for his pass codes. Assuming that the warrant for Mr. Raymond's iPhones "was fully executed at the end of law enforcement's first interaction with Defendant" pursuant to Rule 41(e)(2)(B)—as the Court instructed the parties to do in its Minute Order and which the testimony at the suppression hearing confirms occurred—the Government violated Mr. Raymond's rights under the Fourth and Fifth Amendments in myriad ways. Special Agent Nelson violated Mr. Raymond's Fourth and Fifth Amendment rights when he elicited Mr. Raymond's pass codes by falsely representing to him on multiple occasions that a now-expired search warrant for biometric information "compels you to open your phones." 6/9/23 Tr. at 30:15-21; Gov. Exhibit 14 at 13:35:33. The agents then exacerbated those constitutional violations when, despite having already gained access to Mr. Raymond's phones through Special Agent Nelson's prior illegal conduct, they summoned Mr. Raymond yet again and executed the now-defunct warrant for a *third* time. The record leaves no doubt: the warrantless seizures of the contents of Mr. Raymond's phones were illegal.

*Second*, and of direct relevance to the questions posed by the Court's Minute Order, the record establishes unequivocally that the evidence obtained from those illegal seizures and all fruits thereof must be excluded. The evidence adduced at the suppression hearing confirmed that the Government cannot avoid suppression of Mr. Raymond's iPhone 6 by characterizing that device as his "work" phone. The Government adduced no evidence showing that the device was an "official" United States government phone. And no matter who owned the device, the record is entirely one-sided as to whether Mr. Raymond possessed a reasonable expectation of privacy in its contents—he did.

The record further confirms that the Government cannot avoid exclusion of the contents of Mr. Raymond's iPhone XR by invoking the "inevitable discovery" doctrine.  As the Government's own witness acknowledged, it was far from certain that the Government would *ever* be able to access Mr. Raymond's phones absent obtaining the pass codes for those devices.

And the testimony and documentary evidence presented at the suppression hearing demonstrates that the Government cannot satisfy its "onerous burden" of showing that the independent source doctrine applies to their search of Mr. Raymond's iCloud account.  That is true because the evidence overwhelmingly reflects that the unlawfully seized contents of the iPhones affected both law enforcement's decision to seek a warrant for that account and was the sole basis for the judge's decision to grant that warrant.

Simply put, the evidentiary hearing only underscored Mr. Raymond's core position:  the Government's flagrant violation of his Fourth and Fifth Amendment rights in this case requires the exclusion of the evidence and the fruits thereof that was obtained through that illegal conduct.  This Court should grant Mr. Raymond's Suppression Motion in its entirety.

## ARGUMENT

**I. The Record Confirms That Mr. Raymond Maintained A Reasonable Expectation of Privacy In The iPhone 6.**

The Court first asked the parties to address "whether Defendant maintained some degree of privacy interest in the iPhone 6."  June 15, 2023 Minute Order.  The evidence adduced at the Suppression Hearing answers that question definitively:  Mr. Raymond plainly did.

### A. To Defeat Mr. Raymond's Expectation Of Privacy In His "Work" Device, The Government Must Point To Evidence Rendering That Expectation Unreasonable.

It is beyond dispute that society now recognizes that individuals possess a reasonable expectation of privacy in the contents of their electronic devices.  *See, e.g.*, *Riley v. California*,

573 U.S. 373, 386 (2014) (because "[c]ell phones … place vast quantities of personal information literally in the hands of individuals … officers must generally secure a warrant before" searching such devices).  It is equally axiomatic that this reasonable expectation of privacy is not automatically vitiated simply because the electronic device in question belongs to an employer.  *See e.g.*, *O'Connor v. Ortega*, 480 U.S. 709, 719 (1987) (plurality op.) (holding that individual "had a reasonable expectation of privacy at least in his desk and file cabinets" at his workplace, even though that property belonged to his government employer); *see also City of Ontario v. Quon*, 560 U.S. 746, 760 (2010) (assuming without deciding that public employee had a "reasonable expectation of privacy in [] text messages sent on the pager provided to him by the City"); *Convertino v. United States DOJ*, 674 F. Supp. 2d 97, 110 (D.D.C. 2009) (DOJ employee had reasonable expectation of privacy in personal emails sent from DOJ email account).  Instead, "[g]iven the great variety of work environments …. whether an employee has a reasonable expectation of privacy" in the contents of their employer-provided devices "must be addressed on a case-by-case basis."  *O'Connor*, 480 U.S. at 718 (plurality op.).

Consistent with that instruction, courts consider a number of factors to determine whether an employee has a legitimate expectation of privacy in their employer-owned devices.  In *City of Ontario v. Quon*, for instance, the Supreme Court suggested that whether an employer maintained a written policy explaining that "'[u]sers should have no expectation of privacy or confidentiality when using' City computers"—as well as whether management at that entity conveyed an intention to enforce that policy—could "bear on the legitimacy of an employee's privacy expectation."  560 U.S. at 758.

Following *Quon*, a court in this District concluded that a Bureau of Prisons ("BOP") employee lacked a reasonable expectation of privacy in a BOP-issued cell phone and tablet when

the record showed that: (1) the employee was informed by BOP's employee handbook that she "had no reasonable expectation of privacy in the information stored on" the phones and tablet; and (2) each time she logged onto the devices, she received a warning informing her that she had "no reasonable expectation of privacy regarding any communications transmitted through or data stored on this information system," and that "[a]t any time, the government may monitor, intercept, search and/or seize data transiting or stored on this information system." *United States v. Hill*, 319 F. Supp. 3d 44, 50 (D.D.C. 2018). Confronted with evidence of that policy and those daily warnings, *Hill* held that the employee "should have known that her actions were likely to come under legal scrutiny" and therefore lacked a "reasonable expectation of privacy in her personal information on the [] BOP-owned electronic devices." *Id.*

By contrast, when an employer maintained a policy regarding personal use, but that policy failed to apprise employees that they lacked an expectation of privacy in certain electronic data accessed on that device for personal reasons, the court in *Bowers v. Cnty. of Taylor* held that the employee *did* maintain a reasonable expectation of privacy. 598 F. Supp. 3d 719, 729-30 (W.D. Wis. 2022). Even though the employee's decision to link a private account to his "work email blurs the boundary between his work and private spaces," the court agreed that, "[i]n the absence of a clearer notice from the county, [the employee] was entitled to assume that a private account was private." *Id.* at 730.

Other factors, too, are relevant to whether an employee's expectation of privacy in the contents of his employer-owned device is reasonable. For instance, courts considering whether an employee's use of a work device to consult with attorneys about private matters destroys the attorney-client privilege—an analysis akin to those undertaken by "Fourth Amendment cases addressing an individual's reasonable expectation of privacy in the context of electronic

communications," *e.g.*, *Bingham v. BayCare Health Sys.*, No. 8:14-cv-73-T-23JSS, 2016 U.S. Dist. LEXIS 94590, at *7 & n.2 (M.D. Fla. July 20, 2016)—have developed a four-part test for determining reasonableness.  Those parts are:  "(1) does the corporation maintain a policy banning personal or other objectionable use; (2) does the company monitor the use of the employee's computer or e-mail; (3) do third parties have a right of access to the computer or e-mails, and (4) did the corporation notify the employee, or was the employee aware, of the use and monitoring policies."  *Convertino v. United States DOJ*, 674 F. Supp. 2d 97, 110 (D.D.C. 2009) (quoting *In re Asia Global Crossing, Ltd.*, 322 B.R. 247, 257 (S.D.N.Y. 2005)) (concluding that individual maintained reasonable expectation of privacy in personal emails sent from DOJ email because DOJ's policy "does not ban personal use of the company email" and the employee "was unaware that [DOJ] would be regularly accessing and saving e-mails sent from his account").

The single thread running through all of those cases is that employer ownership of a device, standing alone, does *not* defeat an employee's reasonable expectation of privacy into the contents thereof.  Instead, an employee's expectation of privacy is deemed unreasonable only when there is evidence showing that the employee had some knowledge—whether constructive or actual—that personal use of the device would be subject to employer scrutiny.  The record is devoid of any such evidence here, as the next section explains.

### B. The Record Is Devoid Of Any Evidence Showing That The iPhone 6 Is An "Official" Government Device, Let Alone That Mr. Raymond Lacked A Reasonable Expectation Of Privacy In Its Contents.

As a threshold matter, it is not at all clear whether the iPhone 6 belongs to Mr. Raymond's employer; i.e., the United State Government.  While the Government characterized the iPhone 6 in its briefing as a "government issued phone," ECF 198 at 26, they adduced no evidence confirming that to be true at the suppression hearing.  In fact, the only evidence

presented on this point suggests the opposite.  In Government Exhibit 11S, Mr. Raymond can be

heard saying that the iPhone 6 "belongs to Mexico."  6/8/23 Tr. at 85:13-14; Gov. Exhibit 11S at

1:41:25 – 1:41:33.  The Government's failure to demonstrate through evidence that the iPhone 6

is an "official" government-issued device should end the inquiry.[2]

But even if the Government had established that the iPhone 6 was "government-

issued"—and again, the Government made no such showing—there is absolutely no evidence

demonstrating that Mr. Raymond lacked a reasonable expectation of privacy in that device.  That

is not hyperbole.  At no point did the Government attempt to introduce any policy regarding

personal use of official Government devices, let alone one that would have put Mr. Raymond on

notice that he lacked an expectation of privacy in the contents of the iPhone 6.  Nor did the

Government present evidence that, like the BOP-issued devices at issue in *Hill*, the iPhone 6

carried a banner or other warning informing the user that the device was subject to monitoring

and/or search and seizure.  That is because no such evidence exists.  As even a cursory review of

the iPhone 6 itself (Defense Exhibit 52) reveals, the device is devoid of any United States

Government-affiliated programs, configurations, or systems, and is not even connected to a

United States Government server.  Indeed, it was incapable of any official United States

Government communications.  And the Government otherwise made no attempt to introduce any

other evidence which could evince an awareness by Mr. Raymond that his desire to keep the

contents of his iPhone 6 private was unreasonable.

---

[2] On June 28, 2023, for the first time, the Government alerted Mr. Raymond and his counsel that they intended to rely upon an alleged regulation from Mr. Raymond's employer which they believe somehow controls Mr. Raymond's use of the iPhone 6.  This regulation was not introduced at the hearing, was not previously disclosed to Mr. Raymond or his counsel, and has not been previously relied upon by the Government.  While Mr. Raymond will address this meritless stretch by the Government, it is clear that this latest gamesmanship is nothing more than a red-herring and post-hoc attempt by the Government to save their illegal seizure of the contents of the iPhone 6.

To the contrary, all of the evidence in the record shows that Mr. Raymond used the phone for personal use only and not for any official government purposes.  The iPhone 6 device information report (Government Exhibit 1) shows that the only Apple ID affiliated with the device was Mr. Raymond's personal yahoo account; no government-affiliated email address is mentioned.  In fact, the iPhone 6 was not even configured for Mr. Raymond to access his work email on the device.  *Cf.* Defense Exhibit 52.  And the phone is otherwise replete with personal applications which likely could not even be installed on an official government phone.  *Cf.* Defense Exhibit 52.

The upshot of this one-sided record is that Mr. Raymond maintained a reasonable expectation of privacy in his iPhone 6.  As such, it was illegal for the Government to access the phone's contents without a warrant—the exact conduct that the Government engaged in during their second and third encounters with Mr. Raymond on June 6, 2020.

## II.   Neither The Inevitable Discovery Doctrine Nor The Independent Source Doctrine Salvages The Government's Illegal Search And Seizure Of Mr. Raymond's iPhones.

The Court also asked the parties to address two separate but related questions:  (1) "whether the independent source doctrine or the inevitable discovery doctrine is more applicable to the execution of the warrant for Defendant's phones and/or the warrant for Defendant's iCloud account"; and (2) "assuming that the independent source doctrine is more applicable for the execution of the warrant for Defendant's iCloud account, whether that doctrine excuses any purportedly unlawful search or seizure of Defendant as to the iPhones."  June 15, 2023 Minute Order.

Mr. Raymond respectfully submits that on this record, *neither* doctrine applies.  To the extent that the Government maintains that it would have eventually accessed Mr. Raymond's iPhones even if the investigators had not illegally obtained his pass codes, the inevitable

discovery doctrine provides the proper analytical framework.  But here, the Government comes nowhere close to satisfying the high evidentiary burden that doctrine imposes.  Indeed, the Government's own witness acknowledged that he could not guarantee that the Government would *ever* gain access to those devices without the pass codes.  For the Government to nonetheless claim that it "inevitably" would have discovered the contents of Mr. Raymond's iPhones requires the very type of baseless speculation that the Supreme Court and D.C. Circuit have rejected.

The independent source doctrine is likewise no help to the Government.  That doctrine—which Mr. Raymond understands would govern an argument by the Government that the contents of Mr. Raymond's cell phones should not be excluded because much of that data was also found on his iCloud—requires the Government to show that it discovered the iCloud by means wholly independent of any constitutional violation.  The Government cannot do so, both because (1) the record overwhelmingly demonstrates and the Government concedes that the investigators' decision to seek a warrant for the iCloud was prompted by what they found following their illegal seizures of the contents of Mr. Raymond's phones, and (2) the magistrate's decision to issue that warrant was affected by the results of the investigators' prior, illegal seizures, as the plain text of the warrant application—which expressly invoked the tainted evidence as the sole justification for determining probable cause—confirms.

As such, this is the exact case where the exclusionary rule should be applied.  All the fruits of the investigators' illegal seizures—including any evidence obtained from Mr. Raymond's iCloud account—must be suppressed.

**A. The Government's Own Witness Acknowledged That It Was *Not* Inevitable That The Government Would Gain Access To Mr. Raymond's Phones.**

The inevitable discovery doctrine is an exception to the exclusionary rule that permits the introduction of illegally obtained evidence if that evidence "would inevitably have been discovered." *Nix v. Williams*, 467 U.S. 431, 446 (1984). In *Nix*, the Government had already deployed a search team to canvas an area where a victim's body would later be found. As the team closed in on the body, a separate team of law enforcement officers unlawfully interrogated the defendant, which resulted in the defendant agreeing to guide those officers to the site of the victim's body. The Supreme Court held that because the record showed "that the search parties were approaching the actual location of the body" and "the body inevitably would have been found" by that team without the use of the confession illegally obtained from the defendant, the exclusionary rule did not apply. *Id.* at 446, 449-50.

Since *Nix*, the D.C. Circuit has instructed that to prevail under the inevitable discovery doctrine, "the government must prove by a preponderance of the evidence that, even without the unlawful seizure, the evidence it seeks to admit would have been discovered anyway." *United States v. Holmes*, 505 F.3d 1288, 1293 (D.C. Cir. 2007). That is a high bar. Both the Supreme Court and D.C. Circuit have emphasized that "inevitable discovery involves no speculative elements." *Id.* (quoting *Nix*, 467 U.S. at 444 n.5). Rather, the government must prove inevitability through "historical facts capable of ready verification or impeachment." *Id.*; *see also United States v. Wills*, 316 F. Supp. 3d 437, 450 (D.D.C. 2018) ("'Would—not 'could' or 'might'—is the word the Supreme Court used in *Nix v. Williams* and is, therefore, the 'constitutional standard.'" (quoting *Gore v. United States*, 145 A.3d 540, 549 (D.C. 2016))). Anything short of such historical facts does not suffice. *See, e.g.*, *Holmes*, 505 F.3d at 1293 (rejecting government's claim that it would have inevitably discovered defendant's car and the

pistol therein even "absent the unlawful seizure of" his keys because other evidence in the record rendered that claim "at best, speculative"); *United States v. $639,558 in United States Currency*, 955 F.2d 712, 721 (D.C. Cir. 1992) (government's contention that it would have conducted an inventory search "was merely hypothetical" and therefore did not satisfy the inevitable discovery standard); *United States v. Wills*, 316 F. Supp. 3d 437, 450 (D.D.C. 2018) (government's claim that they would have inevitably searched defendant's backpack as incident to his arrest required the precise sort of "hypothesizing and speculation [that] is the very antithesis of the inevitable discovery doctrine").

Those standards apply with equal force when evaluating whether the Government would have inevitably discovered the contents of a defendant's phone.  When the Government fails to adduce non-speculative, historical evidence showing that it would have accessed a phone's contents through means other than use of a defendant's pass codes, the inevitable source doctrine is not satisfied and the evidence must be suppressed.  *See, e.g.*, *United States v. Booker*, 561 F. Supp. 3d 924, 934-35 (S.D. Cal. 2021) (Government failed to satisfy its burden of proof under inevitable discovery doctrine when record showed "some likelihood that the Government would have ultimately unlocked the iPhone 6 Plus and accessed the information from the phone without having obtained [defendant's] passcode," but there was "also a non-negligible possibility that they would not have"); *United States v. Coleman*, 554 F. Supp. 3d 1124, 1157 (D.N.M. 2021) (because "record does not establish that agents had a high likelihood of discovering the contents of [iPhones] without the unlawfully obtained passcodes," Government failed to satisfies its "burden of proving the factual basis for the inevitable discovery doctrine" and therefore the contents of iPhones must be suppressed).

Speculation as to whether it would have inevitably gained access to Mr. Raymond's phones is the most that the Government can muster here.  During the suppression hearing, the Government elicited lay testimony from Raymond White, a digital forensic analyst contractor at the Department of State, regarding the Government's ability to access the contents of Mr. Raymond's iPhones without having his pass codes.  Mr. White testified that while it was possible for the Government to gain access to Mr. Raymond's cellphones using "brute force" tactics, entry was far from "inevitable."  Specifically, Mr. White explained that because the investigators had seized Mr. Raymond's phones in a "first unlock state,"[3] it could have taken as long as "25 years" to open those phones using brute force when they were seized in 2020.  6/1/23 Tr. at 48:8-18.  And even then, Mr. White acknowledged that the Government may never gain entry:

> Q: "When you get a phone that's locked, let's say before first unlocked status, you can't guarantee what you'll get of that phone.  Right?"
>
> A: "Correct."
>
> Q: "You can't even guarantee it will open.  Right?"
>
> A: "Can you clarify 'open,' what you mean?"
>
> Q: "Unlock."
>
> A: "Yeah.  I can't guarantee that.  No."

6/1/23 Tr. at 74:8-15.

Mr. White could not offer that guarantee because "[t]here's multiple different variables to take into account."  6/1/23 Tr. at 136:23 – 137:1.  As Mr. White explained: "Even though it is brute forcing, there could be power failures or, in other instances, the application that's brute

---

[3] The term "first unlock" refers to the fact that when an iPhone is "powered on or restarted," the user must input his password to access the device; the use of biometrics do not suffice.  6/1/23 Tr. 46:14-20.  Once the user has inputted that pass code, then he can use his biometric information to unlock the phone going forward until the phone is next turned off or restarted.  Because Mr. Raymond had turned off his phones before they were seized by investigators, the Government received them in a "first unlock" state and therefore needed his pin code in order to access their contents.

forcing the phone, something could happen with that and then it ends and then you have to restart

the process again.  There's multiple other reasons why – that it could not be an absolute like

that."  6/1/23 Tr. at 137:1-7.  Those limitations persist notwithstanding recent technological

advancements in the years since the contents of Mr. Raymond's phones were seized illegally.  As

Mr. White explained:

> Q:  "With the improved brute force software that exists now, you're saying it has
> generally shortened the time it takes to force unlock a phone.  Right?
>
> A:  "Yes."
>
> Q:  "Okay.  But it is not now with these improvements – it is not now guaranteed that you
> will unlock the phone?"
>
> A:  "I can't say with a guarantee, no."
>
> Q:  "Yeah.  And for a phone in – before first unlock status, you also cannot guarantee if
> you will get a full image of the phone?"
>
> A:  "Correct."

6/1/23 Tr. 83:22 – 84:8.

Mr. White's testimony confirms that this case is nothing like *Nix*, where the record left no

doubt that investigators would have found the body even if the defendant had not led them to the

site.  Rather, the Government's own witness in this case acknowledged that the most he could

say as to whether the Government could gain access to Mr. Raymond's phones without having

his pass codes was that it could take decades and even then, was merely possible.  As cases like

*Holmes*, *Hill*, *Booker*, *Coleman*, and even *Nix* itself make clear, that is not enough.

The foregoing shows that the Government has the burden of proving inevitable discovery

by a preponderance of the evidence.  And the record confirms that the Government has not come

anywhere close to satisfying that burden by showing that it inevitably would have gained access

to Mr. Raymond's cellphones using brute force tactics.  Accordingly, the contents of those phones must be excluded.

### B.  The Independent Source Doctrine Likewise Does Not Permit The Government To Introduce The Contents Of Mr. Raymond's iCloud.

The independent source doctrine is a related but "distinct" doctrine from the inevitable discovery doctrine that permits the Government to introduce "evidence that has been discovered by means wholly independent of any constitutional violation." *Murray v. United States*, 487 U.S. 533, 544 (1988) (internal quotation marks omitted).  The doctrine "rest[s] … upon the policy that, while the government should not profit from its illegal activity, neither should it be placed in a worse position than it would otherwise have occupied." *Id.*  As the Court explained in *Murray*, "so long as a later, lawful seizure is genuinely independent of an earlier, tainted one," then the independent source doctrine applies.  *Id.* at 542.

To determine whether a subsequent lawful seizure was indeed "genuinely independent" from an earlier constitutional violation, the government bears the "onerous burden of" proving two things. *Id.* at 540.  First, the Government must show that the officers' later decision to seek a warrant for the independent source was not "prompted by the illegally obtained information." *E.g.*, *United States v. Redrick*, 48 F. Supp. 3d 91, 106 n.11 (quoting *Murray*, 487 U.S. at 542 (brackets omitted)).  Second, they must demonstrate that, when the investigators sought that subsequent warrant, the "illegally obtained information was [not] presented to the judge and [did not] affect[] his decision to issue the warrant." *Id.* (quoting *Murray*, 487 U.S. 542 (brackets omitted)).

The record here confirms that, with respect to the Government's search of Mr. Raymond's iCloud account, the Government has not cleared either hurdle.

>    i.   The Record Confirms That The Illegal Searches Of Mr. Raymond's
>         iPhones Prompted The Government To Search Mr. Raymond's iCloud.

Any attempt by the Government to invoke the independent source doctrine to justify the

introduction of the contents of Mr. Raymond's iCloud account fails out of the gate because the

Government has not and cannot satisfy its "onerous burden of convincing [this] court that no

information gained from the illegal" search of Mr. Raymond's phones "affected the law

enforcement officers' decision to seek a warrant for" his iCloud account.  *Murray*, 487 U.S. at

540.

Determining what motivated the investigators is a "fact-based inquiry" requiring a full

"assess[ment of] the record."  *United States v. Williams*, 656 F. App'x 751, 754 (6th Cir. 2016);

*see also United States v. Hernandez*, No. 19 CR 0097(VM), 2020 U.S. Dist. LEXIS 104882, at

*79 (S.D.N.Y. June 16, 2020) ("When assessing whether the Government has satisfied *Murray*'s

first requirement, courts consider context to assess the officers' motivations.").  That inquiry

requires an evaluation of more than just the testimony of the investigating officers.  As the

Supreme Court explained in *Murray*, courts should not "give dispositive effect to police officers'

assurances" as to their motivations.  487 U.S. at 540 n.2.  "Where the facts render those

assurances implausible, the independent source doctrine will not apply."  *Id.*

That is what occurred in *Williams*.  There, law enforcement attempted to excuse an initial

unconstitutional search by arguing that "evidence obtained through [a] subsequent warranted

search … was obtained independently of any constitutional violation."  656 F. App'x at 753.  In

support of that argument, the government introduced the testimony of a sergeant involved in the

search, who averred at the suppression hearing that the prior illegal search had "no bearing on

police serving the search warrant" that he claimed was "already being prepared" when the

officers conducted the initial, unconstitutional search.  *Id.* at 754.  Both the district court and

Sixth Circuit rejected that testimony as incredible, holding instead that the sergeant's "inconsistent testimony and other facts speak louder than [his] self-serving assurance." *Id.* Accordingly, the Sixth Circuit affirmed the district court's order suppressing all of the evidence obtained during the subsequent search. *Id.* Other courts have held similarly. *See, e.g.*, *United States v. Siciliano*, 578 F.3d 61, 71 (1st Cir. 2009) (upholding trial court's finding that testimony from law enforcement and other factors did not establish that a second search was not an independent source of evidence discovered during a prior, illegal search); *United States v. Kopankov*, No. 19-cr-00178-JSC-1, 2023 U.S. Dist. LEXIS 83332, at *14-15 (N.D. Cal. May 11, 2023) (independent source doctrine did not apply when record showed that government investigator illegally obtained contents of a cell phone, generated a report regarding the phone's contents "and forwarded that report to other government agents," and "[o]nly then, days (not minutes) later, did the government seek a warrant").

Here, the full hearing testimony of the investigating agents, the exhibits introduced at the suppression hearing, and the Government's own concessions all point to one, unmistakable conclusion:  the Government's decision to search Mr. Raymond's iCloud was the direct result of its prior unconstitutional search of the phones.  Most prominently, both the testimony and contemporaneous records of Agent Gajkowski—the investigator who filed the affidavit in support of the iCloud search warrant—reflect that she first contemplated seeking a search warrant for Mr. Raymond's iCloud only *after* learning of the iPhone's contents.  On this point, Agent Gajkowski testified that the "scope of the case expanded" more than a month after law enforcement illegally seized the contents of Mr. Raymond's iPhones.  6/5/23 Tr. at 52:20-22. Whereas law enforcement previously considered the matter to be a "single-incident case" predicated entirely on Mr. Raymond's encounter with AV1, 6/5/23 Tr. at 52:17-19, Agent

Gajkowski testified that the finding of video fragments on Mr. Raymond's iPhone XR on July 15, 2020 prompted law enforcement to add the FBI and U.S. Attorney's Office to the case. 6/5/23 Tr. at 53:16-54:8; *see also* Defense Exhibit 26 at 2 ("Scope has expanded.  BAU element. Need to identify dozens of women.").

Contemporaneously with that expansion, Agent Gajkowski sent herself an email on July 24, 2020 with a to-do list detailing new investigative steps to take.  That updated to-do list included the following entry:  "Warrants – iCloud, Tinder, CA stuff."  Defense Exhibit 28. When asked about that entry, Agent Gajkowski admitted that it reflected "one of the ways [the investigation] expanded" after learning of the contents of Mr. Raymond's iPhone:  she "started to plan for warrants for iCloud, Tinder, and CA stuff."  6/5/23 Tr. at 58:12-20.  Agent Gajkowski further testified that while she did not know whether she "plan[ned] to get a warrant for Mr. Raymond's iCloud" before July 24, 2020, she was "not aware" of any other "written document saying [she] had a plan prior to that time to get a warrant for Mr. Raymond's iCloud."  6/5/23 Tr. at 3-8.  And Agent Gajkowski took other steps to further the investigation after learning of the contents of Defendant's iPhones, such as pulling evidence from storage on August 5, 2020 that had been seized from Mr. Raymond's apartment a month and a half earlier.  Defense Exhibit 25 at [PDF] 15.  That evidence had not been touched since the seizure, as evidenced by Agent Gajkowski's note that she discarded "three envelopes containing bags of moldy food" found in the evidence boxes.  Defense Exhibit 25 at [PDF] 15.

Agent Gajkowski's testimony and internal records reflecting that she did not contemplate seeking a warrant for Mr. Raymond's iCloud until after learning of the contents of his iPhone are hardly the only evidence on this point.  For instance, the mere fact that the Government sought a warrant for "Apple iCloud accounts associated with" two of Mr. Raymond's email addresses and

two phone numbers demonstrates that the searches of Mr. Raymond's phones prompted the request for the iCloud warrant. While the Government was aware of those email addresses and phone numbers from other sources before law enforcement took Mr. Raymond's phones on June 6, 2020, it did *not* know that those email addresses and phone numbers were connected with his iCloud account. The Government conceded as much at the suppression hearing: "[N]o, they did not know what [Mr. Raymond's identifiers] were for his iCloud account before they seized the phone." 6/2/23 Tr. at 29:5-7. Moreover, as noted above, the Government took no steps towards obtaining a warrant for Mr. Raymond's iCloud for several weeks after illegally seizing the contents of his iPhones.

The plain text of Agent Gajkowski's affidavit in support of the iCloud warrant application, too, demonstrates that the warrant application was the product of law enforcement's earlier, illegal searches. Though the first portion of that affidavit repeats various details about AV-1 and Mr. Raymond's voluntary interviews that were also included in the application for the warrant for Mr. Raymond's iPhones, *cf.* Gov. Exhibit 4C ¶¶6-16, those details are not mentioned anywhere in the portion of Agent Gajkowski's affidavit (¶ 23) that sums up the probable cause for searching Mr. Raymond's iCloud account. *Cf.* Gov. Exhibit 4C. Rather, Agent Gajkowski's probable cause determination relied exclusively on the forensic analysis of Mr. Raymond's phones:



████████████████████████████████████████
████████████████████████████████

Gov. Exhibit 4C ¶ 23 (emphases added).  And if the above text is not clear enough, the

Government expressly conceded during the suppression hearing that the affidavit for the iCloud

warrant "relied on what was found on the iPhone XR."  6/1/23 Tr. at 22:12-19.[4]

Tellingly, it was not until later in the hearing that Agent Gajkowski attempted to assure

the Court that the Government "without question" planned on seeking a warrant for the iCloud

independent of what was found on the phones, using the preservation request sent on the evening

of June 6, 2020—only *after* she had already seized Mr. Raymond's phones—to buttress that

claim.  6/8/23 Tr. at 85:21 – 86:15.  But like the sergeant's testimony in *Williams*, that self-

serving assurance is incompatible with the rest of the extensive record.  Not only had Agent

Gajkowski testified just days earlier that—contrary to her later assurances to the Court—she did

*not* know whether she "plan[ned] to get a warrant for Mr. Raymond's iCloud" prior to July 24,

2020, 6/5/23 Tr. at 59:3-5, the body of evidence from the record marshalled above reflects that

she had no plan to seek a warrant for the iCloud and took no steps towards doing so prior to

learning of the contents of Mr. Raymond's phone.

---

[4] The full exchange leading to this quote is as follows:

The Court:  Okay.  Did [the warrant for Defendant's iCloud account] rely on anything that – what did it
rely on?  Did it rely on the affidavit or any of the other information or what had been found on the phone
or was it independent?

Ms. Bucker:  The iCloud account, your Honor?

The Court:  Yes.

Ms. Buckner.  **It relied on what was found on the iPhone XR**.

6/1/23 Tr. at 22:12-19 (emphasis added).

Thus, this case is of the exact type that the Supreme Court instructed in *Murray* does *not* merit the application of the independent source doctrine.  Because the only evidence adduced by the Government with respect to law enforcement's decision to seek a warrant for Mr. Raymond's iCloud is Agent Gajkowski's naked and self-serving assurances, and because that testimony is entirely inconsistent with the rest of the record, the Government has failed to meet its "onerous burden" of showing that "no information gained from" its illegal search of Mr. Raymond's phone affected law enforcement's decision to seek the iCloud warrant.  *Cf. Murray*, 487 U.S. at 547.

> *ii.   The Record Confirms That The Tainted Information Included In The iCloud Search Warrant Affidavit Affected The Judge's Decision To Issue That Warrant.*

The Government's failure to prove that its decision to seek the iCloud warrant was unaffected by what it learned from the illegal seizures of the contents of Mr. Raymond's iPhones alone precludes the application of the independent source doctrine.  The doctrine is also inapplicable for a separate reason:  the Government has not and cannot prove that the tainted evidence did not affect the magistrate's decision to issue the iCloud search warrant.  Indeed, the portion of the Government's application explaining the basis for probable cause for that warrant relied *entirely* on the illegally obtained contents of Mr. Raymond's iPhones, as the Government itself concedes.

In addition to proving that its decision to seek a warrant was free from the fruits of a prior illegal search or seizure, for the independent source doctrine to apply, the Government also bears the "onerous burden" of proving that "no information gained from the illegal entry affected … the magistrate's decision to grant" that warrant.  *Murray*, 487 U.S. at 540.  "If information obtained during [a prior illegal search or seizure] was presented to the Magistrate and affected his decision to issue the warrant," the independent source doctrine does not apply.  *Id.* at 542.

Courts have taken different approaches to evaluating whether the Government has satisfied this requirement.  Some—including the D.C. Circuit, albeit in an unpublished, non-precedential decision—have ruled that the Government cannot merely point to whether "independent facts would have provided a sufficient basis on which a magistrate *could* have issued a valid search warrant," but instead must prove that "the magistrate *did in fact* issue the warrant based on only that untainted information."  *E.g.*, *United States v. Devoux*, No. 87-3003, 1998 U.S. App. LEXIS 18810, at *4 (D.C. Circ. Dec. 30, 1988) (emphasis in original) (non-precedential opinion); *State v. Boll*, 651 N.W.2d 710, 719 (S.D. 2002) (independent source doctrine did not apply because illegally obtained information was "included in the affidavit that was presented to the magistrate judge," and thus "that information clearly affected the magistrate's decision to issue the warrant"); *cf. United States v. Hanhardt*, 155 F. Supp. 2d 840, 847 (N.D. Ill. 2001) (magistrate's decision to issue warrant unaffected by tainted evidence when all parties agreed that the "Government did not attempt to use facts found during the [prior] illegal search in order to bootstrap a finding of probable cause to search the briefcase").  Other courts have adopted an approach that evaluates "the sufficiency of the untainted affidavit to see if probable cause exists without the tainted information."  *E.g.*, *United States v. Jenkins*, 396 F.3d 751, 760 (6th Cir. 2005); *see also United States v. Halliman*, 923 F.2d 873, 881 (D.C. Cir. 1991) (taking similar approach).  Under this standard, and assuming that the Government's decision to seek a warrant was not prompted by the illegally obtained evidence, the Government must show that the warrant affidavit justification, stripped of all aspects tainted by the prior illegal search, still would have supported a finding of probable cause.  *See Jenkins*, 396 F.3d at 760.

The plain text of Agent Gajkowski's affidavit submitted in support of the iCloud warrant confirms that the Government cannot satisfy its burden under either test.  It is undisputed that he

affidavit "relied on what was found on the iPhone XR."  6/1/23 Tr. at 22:12-19.  In fact, the

probable cause portion of the affidavit relied *only* on that illegally obtained evidence.  As

detailed above, while Agent Gajkowski's affidavit referenced information regarding AV-1,[5] that

information was not included in the justification detailing the basis for finding probable cause to

search Mr. Raymond's iCloud account.  That paragraph instead relied entirely on the contents of

Mr. Raymond's iPhones:  ███████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████  Gov. Exhibit 4C ¶ 23 (emphasis added).

Indeed, Agent Gajkowski's affidavit explained that the purpose of the iCloud warrant was to

assist in ███████████████████████████  that had been located on Mr.

Raymond's iPhones.  Gov. Exhibit 4C ¶ 23 (███████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████.

---

[5] As the Government conceded at the suppression hearing, the AV-1-related information included in the iCloud warrant differed from what had been included in the earlier-obtained warrants for Mr. Raymond's iPhones.  6/8/23 Tr. at 8:24-25.  Specifically, unlike the iPhone warrants, the iCloud warrant included information regarding AV-1's toxicology report prepared by the Mexican authorities, which did not reveal the presence of any substances other than alcohol.  Other intervening events, too, had cast doubt on the reliability of AV-1:  a separate toxicology report showed that she had *not* been drugged, but instead had mixed alcohol with a problematic medication, and the Government had since obtained and reviewed text messages between AV-1 and Defendant that revealed nothing out of the ordinary.  Thus, as Mr. Raymond has already argued elsewhere, even if the Government had attempted to use AV-1 information to justify a probable cause determination for the iCloud warrant—and the Government attempted no such thing—that effort was far from a given because "probable cause on AV-1's story strongly diminished not long after the phone seizures and continued to weaken thereafter."  *See* Defendant's Reply in Support of Motion to Suppress at 22, ECF 204 & Exhibit E thereto (filed April 13, 2023).

Thus, the Government cannot show that the magistrate's decision to issue the iCloud warrant was unaffected by tainted evidence because tainted evidence (the contents of Mr. Raymond's iPhones) is all that the magistrate judge was asked to consider when assessing probable cause.  Nor can the Government show that the iCloud warrant would have been supported by probable cause once the tainted evidence was removed, as there would be nothing left of the key paragraph purporting to justify the probable cause that supported issuing the warrant.  Accordingly, the Government's inability to show that the magistrate's decision to issue the warrant was unaffected by the tainted evidence obtained from Mr. Raymond's iPhones separately dooms any argument that the independent source doctrine applies.

## PROPOSED FINDINGS OF FACT

Finally, the Court instructed the parties to "propose findings of fact to the Court, with special attention paid to Agent Ted Nelson's interactions with Defendant."  June 15, 2023 Minute Order.  Mr. Raymond's proposed findings of fact are as follows.

\*     \*     \*

Defendant Brian Raymond's Motion to Suppress (ECF 190) focuses primarily on the June 6, 2020 seizure of his two cellphones—an iPhone 6[6] and an iPhone XR—and the impact that seizure had on subsequent warrants sought and obtained by the Government.  The Court held an evidentiary hearing on Defendant's Motion over five days between June 1 – June 9, 2023.

---

[6] Although the Government at times referred to the iPhone 6 as Defendant's "work phone," there is no evidence in the record reflecting that the device was an official United States Government phone.  The device—which was admitted into evidence during the suppression hearing—does not contain a banner warning the user that it is the property of the United States government or that the user lacks any expectation of privacy in its contents.  Nor was the device connected to any government-affiliated email accounts, applications, configurations, or servers, as the phone was not even capable of any official United States Government communications.  To the contrary, all the record evidence shows that Defendant used the phone for purely personal purposes.

Based upon the parties' submissions, the evidence adduced at the evidentiary hearing, and the rest of the record, the Court makes the following findings of fact.

> **A.    Agents Tasked With Executing A Warrant for Defendant's iPhones Are Expressly Informed And Understand That It Authorizes Them To Compel Defendant To Provide Biometric Information, But Not His Pass Codes.**

On June 5, 2020, the Government sought and obtained a search warrant authorizing the seizure and search of "two cellular telephones in the possession of Brian Raymond currently located on his person or in his hotel room."  Gov. Exhibit 4A.  The Government did so following an interview with an individual (AV-1) who claimed that she was sexually assaulted by Defendant following an afternoon of drinking, as well as a voluntary interview with Defendant on June 2, 2020 in which he acknowledged drinking with AV-1 but maintained that the two engaged in consensual sexual intercourse.  According to the affidavit from Agent Mikel Gajkowski submitted in support of the warrant application, the Government sought Defendant's phones in order to obtain evidence regarding Defendant's relationship with AV-1, including any evidence regarding whether Defendant had perpetrated "drug or alcohol-facilitated sexual assault."  Gov. Exhibit 4A at [PDF] 17.

Because Agent Gajkowski had observed Defendant unlock and access his phones with biometrics during his June 2, 2020 voluntary interview, the Government sought and the magistrate judge authorized law enforcement "to press the fingers (including thumbs) of [Defendant] to the Touch ID sensor of [the iPhones] for the purpose of attempting to unlock the device via Touch ID" when executing the warrant.  Gov. Exhibit 4A at [PDF] 11.  The warrant further authorized law enforcement "to hold [the iPhones] up to [Defendant's] face for the purpose of attempting to unlock the devices via Face ID."  Gov. Exhibit 4A at [PDF] 12.

Notwithstanding that authorization, Agent Gajkowski claimed that she understood that Defendant's biometric information, standing alone, may not be sufficient to unlock the contents

of Defendant's iPhones.  Specifically, Agent Gajkowski explained in her affidavit submitted in support of the warrant application that "[i]n some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode or password must be used instead." Gov. Exhibit 4A at [PDF] 10.  Agent Gajkowski further averred that one such circumstance is when "the device has been turned off or restarted" (otherwise known as a "first unlock" state). Gov. Exhibit 4A at [PDF] 10.  The Government's forensic analyst, Raymond White, corroborated Agent Gajkowski's averments at the suppression hearing, testifying that if the iPhones had been turned off, the pass code was required to unlock them in the first instance; biometric information would not suffice.  6/1/23 Tr. at 45:18-20.

Nothing in the warrant, however, authorized law enforcement to obtain Defendant's pass codes—a fact which was emphasized to Agent Gajkowski by Government counsel Jamie Perry in advance of the warrant's execution.  Specifically, on June 5, 2020, Ms. Perry informed Agent Gajkowski :

> We have to be careful not to compel any sort of testimonial information. Compelling him to place his fingerprint on the touch ID sensor, for example, is not testimonial – the warrant compels him to do so…. Compelling him to give his passcode is testimonial. You can ask him if he's willing to voluntarily provide his passcode. You should not state or otherwise imply that the warrant requires him to provide such information…. I'd be very cautions with this if, for example, you have to briefly take him into custody to retrieve the phones – at that point, any voluntariness is likely overwhelmed by the restraint.

Defense Exhibit 50.  Agent Gajkowski indicated that she understood those instructions, testifying at the suppression hearing that she understood that the warrant did not authorize law enforcement to "ask [Defendant] to open" the iPhones using his passcodes or to "detain [Defendant] until he gives passcodes."  6/2/23 Tr. at 54:18 – 56:1.

Despite knowing that (1) an iPhone that has been turned off must be opened with a pass code, rather than biometric information and (2) the warrant did not authorize law enforcement to compel Defendant to provide his pass codes, Agent Gajkowski did not develop an operations plan that accounted for encountering an iPhone in "first unlock" state.  Agent Gajkowski offered no credible reason for that failure, stating at the suppression hearing only that she "forgot" the facts averred in her affidavit with respect to opening phones in "first unlock" state when drafting her operations plan.  6/2/23 Tr. at 207:1-25.

### B.    The Agents Execute The Warrant And Seize Defendant's Phones But Do Not Gain Access To The Phones' Contents.

On June 6, 2020, Agent Gajkowski and Special Agent Ted Nelson sought to execute the warrant while meeting with the Defendant at a restaurant near his hotel in Virginia.[7]  The encounter began with Special Agent Nelson stating "I'm just going to make sure I shut my phone down" and asking Defendant to put his phone on vibrate.  ECF 119-5 at 2:10-12.  Defendant responded by informing the agents he was "trying to …. [t]urn this phone off."  ECF 119-5 at 2:10-12.  Defendant was successful in doing so, as evidenced by a later request from law enforcement to "turn them back on," 6/2/23 Tr. at 47:19-20, as well as the fact that Defendant's biometrics failed to open the phones in a later interaction between Defendant and the agents, *see* Gov. Exhibit 14 at 13:36:23-40.

After asking Mr. Raymond to turn his iPhones back on, Agent Gajkowski asked:  "How do you secure these phones?  Like, how – like are they locked."  ECF 119-5 at 184:2-4.  Defendant responded:  "Yeah.  They're locked with a PIN."  ECF 119-5 at 184:5-6.  Upon

---

[7] Agent Gajkowski was the lead agent for the search and seizure operation.  6/2/23 Tr. at 187:13-17.  She chose Special Agent Nelson to accompany her because he was "the most experienced among the group."  6/2/23 Tr. at 188:12-22.

hearing that answer, Special Agent Nelson informed Defendant that he had a warrant for his iPhones and was going to "take the phones." ECF 119-5 at 184:13-18.

While executing the warrant, Special Agent Nelson told Defendant: "We need your PIN numbers for these phones so we can access them. Okay?" Defendant responded by invoking his right to refuse to provide his pass codes, as the following exchange reflects:

> MR. RAYMOND: I, I have to consult a lawyer, honestly. I can't – it's just something I have to do.
>
> MS GAJKOWSKI: Okay.
>
> MR. RAYMOND: You know, I don't know what my rights are in this situation.
>
> MS. GAJKOWSKI: (Inaudible.)
>
> MR. NELSON: You're right, but we are seizing the phones. What we need to do, though, is we need to unlock them and at least put them in airplane mode. Okay?
>
> MR. RAYMOND: I can't do that until I talk with my lawyer. I just don't understand what's going on here right now.
>
> MS. GAJKOWSKI: So -- so, what we are going to do, because I, I just want to be clear, so you're not willing to voluntarily give us your PIN. Correct?
>
> MR. RAYMOND: No, not until I consult with a lawyer.
>
> MS. GAJKOWSKI: Ok, understood.

ECF 119-5 at 189-190.

The encounter ended with Agent Gajkowski and Special Agent Nelson seizing Defendant's phones, providing Defendant with a property receipt, and announcing that the execution of the warrant was complete. At no point during that seizure did they attempt to use his biometric information to unlock the devices—an action which would have been futile given that the phones had been seized while in "first unlock" state and therefore needed to be opened

with Defendant's pass codes, as Defendant explained to the agents when asked.  Nor did the

agents obtain Defendant's pass codes, as Defendant had declined several times to provide them

voluntarily.

The result was that the Government lacked a surefire way of accessing the contents of

either seized iPhone.  As the Government's forensic analyst explained at the suppression hearing,

because the iPhones had been seized in a "first unlock" state, the only way for the Government to

try to access their contents without the pass codes was to employ what are known as "brute

force" tactics.  At the time the phones were seized in June 2020, that tactic could take as long as

25 years to complete.  6/1/23 Tr. at 48:8-18.  Although that time frame may have lessened

thereafter due to improvements in brute force technology, even then, Mr. White acknowledged

that the Government may never gain entry.  As Mr. White explained, among other factors, the

risk of "power failures" in the device or the need to restart the brute force process meant that it

was not "an absolute" that the Government could access the contents of Defendant's iPhones

using brute force.  6/1/23 Tr. at 136:23 – 137:1-7.

### C. Despite Having Already Executed The Warrant, The Agents Again Contact Defendant On June 6, 2020, And This Time Special Agent Nelson Tells Him That The Warrant Compels Him To Open His Phones.

The search warrant for Mr. Raymond's iPhones was fully executed at the end of law

enforcement's first interaction with Defendant pursuant to Rule 41(e)(2)(B).  Yet, law

enforcement was directed to reengage Defendant hours after the conclusion of the agents' first

encounter with him on June 6, 2020.  The Government claims that they did so in order to

"compel the defendant to open the phones using biometric procedures," ECF 147 at 36, despite

the fact that the phones were seized in "first unlock" state and therefore could not be accessed

through biometrics alone and Defendant had declined on multiple occasions to provide his pass

codes.  As Agent Gajkowski testified, as of that moment, she "understood or thought [the

phones] were locked by pin," 6/5/23 Tr. at 30:16-17, that biometrics would not "work at that

point," 6/5/23 Tr. at 30:18-20, and that prior to the time of reengaging Defendant she "saw that a

pin was required" to open the phones, 6/5/23 Tr. at 19:1-23.

Notwithstanding that the agents did not have a valid reason for re-engaging Defendant,

approximately two hours after their initial encounter with Defendant, Agent Gajkowski, Special

Agent Nelson, a uniformed police officer from the Herndon police department, and two other

agents traveled to Defendant's hotel to re-engage Defendant.  Upon arrival, Special Agent

Nelson told the uniformed police officer that they were there because "DOJ gave us clear

direction to go back and compel him to open" his iPhones.  6/9/23 Tr. at 26:13-16; *see also* Gov.

Exhibit 14 at 13:30:30 – 40.  Special Agent Nelson then said:  "We're going to ask him to open it

politely.  If he doesn't, we may cuff him and then use his thumb to open it and we'll detain him

until he gives pass [words]."  6/9/23 Tr. at 27:8-12; *see also* Gov. Exhibit 14 at 13:30:40 – 46.

When asked about that statement at the suppression hearing—a statement that Agent Gajkowski

testified did not correspond with what the agents were authorized to do under the warrant, 6/2/23

Tr. at 207:1-25—Special Agent Nelson characterized it as a "summary of me speaking to the

police officer about the totality of what could occur there that day."  6/9/23 Tr. at 27:13-16.

Special Agent Nelson also admitted that he had not read the warrant or the affidavit in support

thereof prior to the seizure operation that day.  6/9/23 Tr. at 10:6-12, 11:15-20.

After taking their positions, the agents summoned Defendant from his hotel room.  As

Defendant arrived, Special Agent Nelson said to him the following:  "Hey Brian, listen, …

you're not under arrest.  Here's the problem.  For the search warrant, the search warrant compels

you to open your phones, so we got to come back and [get] you to open your phones."  6/9/23 Tr.

at 30:15-21; *see also* Gov. Exhibit 14 at 13:35:33 – 13:35:56.  Special Agent Nelson uttered that

statement despite knowing that the search warrant was more circumscribed; as he testified at the hearing, the warrant authorized only the use of "biometrics to open the phone," but did not compel Defendant to provide pass codes.  6/9/23 Tr. at 30-31.  Special Agent Nelson then followed up his initial statement by saying "Is that cool, can you open the phones for us," to which Defendant replied:  "If I'm compelled to do it, sure."  6/9/23 Tr. at 32:5-11; *see also* Gov. Exhibit 14 at 13:36:10 - 14.  Special Agent Nelson responded definitively, stating: "You are." Gov. Exhibit 14 at 13:36:14.

Upon hearing Special Agent Nelson's command, Agent Gajkowski handed the phone to Defendant and he entered his pass code, opening the device.  Gov. Exhibit 14 at 13:36:23 – 28. Video footage confirms that Defendant did so against his will.  After Defendant had already entered his pass code, which reenabled biometrics, Agent Gajkowski asked Defendant whether he "want[ed] to give me your code."  Gov. Exhibit 14 at 13:36:28 – 30.  Defendant replied "No, but it's open, so -- ."  Gov. Exhibit 14 at 13:36:30 – 34.  One minute later, when Agent Gajkowski asked Defendant to input his code again to change the settings on his iPhone, Defendant replied "I don't understand, aren't I compelled to?"  Gov. Exhibit 14 at 13:37:42 – 45. It was only after Agent Gajkowski explained that he was compelled to provide biometric information only that Defendant returned to his earlier stance that he'd "rather not" provide his pass code information for "privacy" reasons.  Gov. Exhibit 14 at 13:37:48 – 50.  The agents advised Defendant for a second time that the execution of the warrant was complete and he returned to his hotel room.  Gov. Exhibit 14 at 13:38:30 – 59.

### D.    The Agents Engage Defendant For A Third Time On June 6, 2020 To Yet Again Attempt To Access The Contents Of His Phones.

Approximately one hour after their second encounter with Defendant, and approximately three hours after fully executing the search warrant for Defendant's iPhones, law enforcement

engaged Defendant for a third time.  Law enforcement did so because despite having obtained

Defendant's pass codes against his will in the second encounter, the phones had re-locked yet

again.  In this third encounter, the agents yet again attempted to act under authority of the

warrant.  6/5/23 Tr. at 48:22 – 49:2 (testimony of Agent Gajkowski) ("Q: Your authority for

asking [Defendant for his biometric information during the third encounter] was under the

warrant; right?  A:  That was my understanding.  Q:  And so this was further execution of the

warrant at that point; right?  A:  Yes.").

As with their prior encounter, Special Agent Nelson again pressured the Defendant to

provide law enforcement with his pass codes, though this time he refrained from claiming

incorrectly that the search warrant compelled Defendant to open the phones.  *See* ECF 119-6.  In

response to the agents' repeated requests for Defendant to input his pass codes, Defendant

eventually relented and entered his PIN code and Apple password into the phones so that the

agents could remove the pass code settings and establish permanent access to the phones.

Despite having finally obtained access to Defendant's iPhones via pass code during both

the second and third encounters, neither Agent Gajkowski nor Special Agent Nelson conveyed

that fact to others.  For instance, after their second encounter with Defendant during which

Defendant entered his pass codes after being told by Special Agent Nelson that the warrant

compelled him to do so, Agent Gajkowski called (at Special Agent Nelson's suggestion)

Government attorney Jamie Perry to provide her with an update.  6/2/23 Tr. at 120 – 121.

During that call, Agent Gajkowski told Ms. Perry that "Facial ID worked"—a false statement—

but did not tell her that Defendant "typed the PIN on the iPhone 6."  6/2/23 Tr. at 120:19 –

121:8.  Similarly, when speaking with Special Agent Dave Palmer-Jones regarding their

interactions with Defendant, Special Agent Nelson stated that they were "dead in the water"

because Defendant had not given the agents his pass codes.  6/2/23 Tr. at 122:3-4.  But in fact, Defendant had already inputted his pass codes—a fact that neither agent mentioned to Special Agent Palmer-Jones.  6/2/23 Tr. at 122.  In another instance, Government attorney Perry asked Agent Gajkowski directly whether Defendant had "open[ed] the phones with codes."  6/2/23 Tr. at 162:4-7.  Agent Gajkowski responded inaccurately, stating:  "That is correct.  Well, no.  He did not use them."  6/2/23 Tr. at 162:23 – 163:1.  And while Agent Gajkowski maintained detailed notes regarding the steps she took in the investigation, nowhere in those notes did she memorialize informing anyone that the agents gained access to Defendants' iPhones via his pass codes.

### E. Law Enforcement Relies Upon The Contents Of Defendants' iPhones To Justify A Subsequent Search And Seizure Of Defendant's iCloud Account.

After seizing Defendant's iPhones and gaining access to their contents, on the evening of June 6, 2020, Agent Gajkowski sent an email to Apple asking them to preserve the contents of any iCloud accounts affiliated with certain email addresses and numbers known to be associated with Defendant.  Agent Gajkowski, however, took no further steps to obtain any information from those iCloud accounts, to the extent such iCloud accounts even existed.[8]

That changed in mid-July 2020 after Agent Gajkowski learned that the iPhones appeared to contain fragments of photographs and videos of unconscious or sleeping women.  Whereas law enforcement previously considered the matter to be a "single-incident case" predicated

---

[8] On the final day of the suppression hearing, Agent Gajkowski testified that the Government "without question" planned on seeking a warrant for the iCloud regardless of what was found on the iPhones.  Earlier in that same proceeding, however, Agent Gajkowski gave a different answer to that same question, stating that she did not know whether she "plan[ned] to get a warrant for Mr. Raymond's iCloud" prior to July 24, 2020.  6/5/23 Tr. at 59:3-5.  Given that inconsistent testimony, and based on the body of contrary evidence in the record, the Court deems Agent Gajkowski's testimony that the Government "without question" would have sought a warrant for Defendant's iCloud account regardless of what else happened in the investigation to be incredible and affords it no weight.

entirely on Mr. Raymond's encounter with AV1, 6/5/23 Tr. at 52:17-19, a July 22, 2020 note authored by Agent Gajkowski observed an expanded investigation.  That note reads:  "Scope has expanded.  BAU element.  Need to identify dozens of women."  Defense Exhibit 26 at 2.  Agent Gajkowski explained that the "BAU element" referred to the addition of the FBI's Behavior Analysis Unit to the case, and also noted that both the FBI and U.S. Attorney's Office came on board.  6/5/23 Tr. at 54:1-8.

The increased scope of the investigation spurred by the discovery of the contents of Defendant's iPhone prompted Agent Gajkowski to take additional investigatory steps.  Relevant here, the forensic report on the iPhones caused Agent Gajkowski to seek additional warrants for Defendant's belongings.  For instance, in a July 24, 2020 to-do list of new investigative steps that Agent Gajkowski wrote to herself, she wrote:  "Warrants – iCloud, Tinder, CA stuff." Defense Exhibit 28.  Agent Gajkowski acknowledged that this entry reflected "one of the ways [the investigation] expanded" after learning of the contents of Mr. Raymond's iPhone:  she "started to plan for warrants for iCloud, Tinder, and CA stuff."  6/5/23 Tr. at 58:12-20.  On August 5, 2020 Agent Gajkowski also pulled from storage evidence seized from Defendant's apartment a month and a half earlier.  Defense Exhibit 25 at [PDF] 15.  The Government had not previously taken any investigatory steps with respect to this evidence, as was apparent from the need to discard "three envelopes containing bags of moldy food" after accessing the boxes from storage.  Defense Exhibit 25 at [PDF] 15.

Consistent with her written plans, on August 14, 2020, Agent Gajkowski sought and obtained a warrant for Defendant's iCloud account.  As with the iPhones warrant, the first portion of Agent Gajkowski's affidavit submitted in support of the warrant application referenced the interviews with AV1 and Mr. Raymond's voluntary interviews.  *Cf.* Gov. Exhibit

4C ¶¶6-16.  Unlike the iPhone warrant application, however, Agent Gajkowski's affidavit also discussed extensively the contents of Defendant's iPhones that the Government had discovered as a result of the seizure of those devise.  In fact, the paragraph of the affidavit summing up the probable cause justifying a seizure and search of Mr. Raymond's iCloud account relied exclusively on the forensic analysis of Mr. Raymond's phones and described the purpose of the search as seeking additional information about what was found on those phones:



Gov. Exhibit 4C ¶ 23 (emphases added).  As the text of Agent Gajkowski's affidavit makes clear, and the Government otherwise conceded at the suppression hearing, the affidavit for the iCloud warrant "relied on what was found on the iPhone XR."  6/1/23 Tr. at 22:12-19.

Following execution of the iCloud warrant, the Government obtained much (but not all) of the photographs and video evidence that it had already discovered on Defendant's iPhones. Those discoveries, in turn, served as the predicate for numerous other search warrants sought and executed in the subsequent months.

## CONCLUSION

For the foregoing reasons, Mr. Raymond requests that the Court grant his Suppression

Motion in its entirety.


Dated: June 30, 2023                    Respectfully submitted,


                                        s/John Marston
                                        John Peter Marston
                                        **FOLEY HOAG LLP**
                                        1717 K Street, NW
                                        Washington, DC 20006
                                        (202) 261-7321
                                        Fax: (202) 785-6687
                                        jmarston@foleyhoag.com

                                        James M. Gross (*pro hac vice* forthcoming)
                                        **FOLEY HOAG LLP**
                                        1301 Ave. of the Americas, 25th Floor
                                        New York, NY 10019
                                        (212) 812-0422
                                        jgross@foleyhoag.com


                                        s/A. Joseph Jay III
                                        A. Joseph Jay III (D.C. No. 501646)
                                        Denise Giraudo (D.C. No. 499348)
                                        **SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP**
                                        2099 Pennsylvania Avenue, NW
                                        Washington, D.C. 20006
                                        (202) 747-1900
                                        JJay@sheppardmullin.com;
                                        DGiraudo@sheppardmullin.com

                                        *Counsel for Brian Jeffrey Raymond*

**CERTIFICATE OF SERVICE**

I hereby certify that on this **30th** day of **June**, 2023, I caused the foregoing brief to be filed using the Court's CM/ECF system, which gave notice to all counsel of record.

/s/ John P. Marston

**John P. Marston**