**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | Criminal No. 1:21-cr-00380-CKK |
| BRIAN JEFFREY RAYMOND, | : | |
| | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |

**DEFENDANT'S RESPONSE TO THE GOVERNMENT'S POST-HEARING BRIEF
ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

**INTRODUCTION**

Mr. Raymond has shown that every single investigatory step law enforcement took after it illegally seized the contents of his iPhones on June 6, 2020 was a direct result of the constitutional violations agents perpetrated on that day. The record plainly shows that the forensic analysis of the iPhones prompted law enforcement to seek a warrant for Mr. Raymond's iCloud accounts on August 14, 2020. Law enforcement then used the information it obtained from searching Mr. Raymond's iCloud to justify every other warrant it sought and obtained after that date. That is not an exaggeration: the Government's warrant applications for searching Mr. Raymond's parents' home in California, his MacBook Air, his Kingston SD Card, his SanDisk USB, his LG Phoenix, and his Yahoo and Google accounts were each predicated on the information obtained from the prior search of Mr. Raymond's iCloud accounts. Thus, the record shows that the Government's illegal conduct on June 6, 2020 poisoned virtually *all* of the

1

evidence of this case.  *See* Defendant's Reply in Support of Motion to Suppress, ECF No. 204, at 1-2 (filed April 14, 2023).

The Government's Post-Hearing Brief (ECF No. 235, "Gov. Br.") is most notable for what it does not dispute.  The Government concedes that after Agent Gajkowski asked Mr. Raymond to "turn [his phones] on for me" and then seized the devices during their first encounter on June 6 2020, she "announced … that the 'search and seizure' was complete and that, at the time, she thought it was."  Gov. Br. 4-5, 7; *cf.* Defendant's Post-Hearing Brief, ECF 236 at 26-27 ("Def. Br.").  The Government also does not dispute that when Agent Gajkowski and Special Agent Nelson reengaged Mr. Raymond approximately one hour later, Special Agent Nelson misrepresented what that now-complete warrant authorized:  first to an accompanying officer (telling him that "DOJ gave us clear direction to go back and compel [defendant] to open [his cell phones]" and that "[w]e'll detain him until we get the passwords") and then to Mr. Raymond, telling him that "[t]he search warrant compels you to open your phone."  Gov. Br. 8-9; *cf.* Def. Br. 29-30.  As the Government admits, Special Agent Nelson made those misstatements despite purportedly understanding "that it was 'very clear' that agents could not compel the defendant to provide passcodes."  Gov. Br. 4; *cf.* Def. Br. 29-30.  And the Government concedes that Special Agent Nelson's inaccurate statements confused Mr. Raymond, acknowledging (as they must, given the bodycam footage) that Mr. Raymond told the agents "I don't understand… Aren't I compelled to –" when asked whether he wanted to provide his pass codes just one minute after he had already opened the phones in response to Special Agent Nelson's unauthorized command.  Gov. Br. 10; *cf.* Def. Br. 30.

The Government also does not dispute critical aspects of the events post-dating the agents' June 6, 2020 repeated and unconstitutional encounters with Mr. Raymond.  Relevant

here, the Government acknowledges that Agent Gajkowski did not apply for a warrant for Mr. Raymond's iCloud account until August 14, 2020, Gov. Br. 18—nearly two months later, and only after she learned of the illegally seized contents of Mr. Raymond's phones and, in her words, the "scope" of the investigation "expanded." *Cf.* Def. Br. 32-34. The Government further concedes that the iCloud search warrant application "relied on material recovered *from the phones*, including internet searches, messages with women, explicit photographs and videos found on the iPhone XR, and the aforementioned internet search history located on the iPhone 6." Gov. Br. 18 (emphasis added); Def. Br. 34. And the Government does not dispute that it declined to introduce any evidence establishing that Mr. Raymond's iPhone 6 was an official government phone and, if so, whether the device was subject to any policy or notice apprising Mr. Raymond that he lacked a reasonable expectation of privacy in that device. Gov. Br. 20; Def. Br. 23 n.6.

Those undisputed facts[1] are dispositive here. The facts upon which the Government and Mr. Raymond agree confirm that the Government violated Mr. Raymond's Fourth and Fifth Amendment rights in multiple different ways on June 6, 2020. And they show that none of the Government's attempts to excuse those constitutional violations—whether it be by arguing that Mr. Raymond lacked a reasonable expectation of privacy in the iPhone 6, the inevitable

---

[1] While the Court can grant Mr. Raymond's suppression motion based upon the undisputed facts highlighted above, the Government and Mr. Raymond disagree on many other aspects of the factual record. Mr. Raymond has endeavored to address the Government's most egregious misrepresentations in this Response. For the remaining inconsistent proposed findings of "fact", the lack of a direct response herein to any of the Government's contrary proposed findings of fact should not be construed as agreement with the Government's characterization. Rather, Mr. Raymond respectfully submits that his proposed findings of fact correctly characterize the factual record, and that the Court should credit his proposed findings over any contrary "facts" proposed by the Government.

discovery and independent source doctrines, voluntariness, or good faith—are rooted in the factual record.

Instead, the evidentiary record here points to only one conclusion:  All the evidence obtained during the Government's illegal search and seizure of the contents of Mr. Raymond's phones on June 6, 2020 and all the evidence that the Government obtained because of investigatory steps prompted by what was found on the iPhones are subject to the exclusionary rule.  This Court should grant Mr. Raymond's motion to suppress in its entirety.

**ARGUMENT**

I.    **Mr. Raymond Showed That He Maintained A Reasonable Expectation of Privacy In The iPhone 6, And The Government Has Provided No Evidence To The Contrary.**

In his post-hearing Brief, Mr. Raymond established that under binding Supreme Court precedent and its progeny, whether his expectation of privacy in a "work" iPhone was reasonable depends upon whether there is any evidence demonstrating that he was on notice that the device's contents could be subject to Government scrutiny.  Def. Br. 3-6.  There is no such evidence in the record here.  Def. Br. 6-8.  Indeed, the defense admitted the iPhone 6 as evidence, and a review of the settings and applications on that phone affirmatively establishes that the device was personal and private, and had no indicia of government affiliation, much less ownership or scrutiny.  As Mr. Raymond explained, the Government failed to present during the suppression hearing (or at any time during discovery prior to the hearing) any evidence demonstrating (a) that the iPhone 6 was an official government phone, (b) if so, that the United States put Mr. Raymond on notice that he lacked a reasonable expectation of privacy in the device's contents, or (c) that the device was even capable of U.S. government communications.  Def. Br. 6-8.  Thus, Mr. Raymond maintained a reasonable expectation of privacy in the contents

4

of his iPhone 6, and the Government violated that reasonable expectation through their conduct on June 6, 2020.  Def. Br. 3-8.

The Government does not dispute in its post-hearing brief that it failed to introduce during the suppression hearing *any* evidence suggesting that Mr. Raymond lacked a reasonable expectation of privacy in his iPhone 6.  Notwithstanding that admitted dearth of evidence, the Government claims for the first time in its post-hearing brief that a previously undisclosed, outdated Agency Regulation put Mr. Raymond on notice that he lacked an expectation of privacy in "any U.S. Government office equipment at any time."  Gov. Br. 21.  The Government claims that this outdated regulation (which the Government acknowledges was superseded in November 2018, nearly 2 years before the agents seized Mr. Raymond's iPhone 6), combined with the fact that Mr. Raymond referred to the iPhone 6 as his "work phone," rendered unreasonable Mr. Raymond's otherwise legitimate expectation of privacy in the device.  Gov. Br. 21-22.

The Government is wrong.  Even setting aside the Government's improper attempt to rely on new evidence not introduced during the suppression hearing[2] and the fact that the Government has not introduced the AR it claims is currently in effect—and the Court should not excuse those defects—the AR fails to plug the evidentiary gaps that are fatal to the Government's argument.

---

[2] The Government made no reference to this AR during the five-day suppression hearing held between June 1 and June 9, 2023.  Rather, the Government first alerted Mr. Raymond of its intention to rely on the AR on the evening of June 28, 2023—less than 48 hours before the parties were required to submit their post-hearing briefs.  The Government's failure to "provide a reasonable explanation for its failure to present its proffered evidence initially at the first suppression hearing" precludes it from raising this new argument now.  *See United States v. Watson*, 391 F. Supp. 2d 89, 94 n.3 (D.D.C. 2005).  Regardless, delinquency aside, the Government's reliance on the AR is too little too late for the reasons detailed above.

For one thing, there is no evidence that this AR or any subsequent regulation applied to the iPhone 6. As the Government acknowledges, the outdated AR applies only to U.S. "'government office equipment,' including 'cellular telephones.'" Gov. Br. 21. Here, however, the record contains literally no evidence that the iPhone 6 was an official government phone subject to monitoring. In its filing, the Government ignores that the iPhone itself—the full contents of which were admitted into evidence at the suppression hearing—does not contain any such indication, as it lacks any United States Government-affiliated programs, configurations, systems, or markings. *See* Def. Br. 7. The Government otherwise declined to introduce any evidence (whether in the form of witness testimony or otherwise) demonstrating that this device was used by Mr. Raymond in connection with his employment with the U.S. Government. Undoubtedly the Government did so because no such evidence exists. And while Mr. Raymond at times referred to the phone as his "work" phone, he never indicated that the device was a U.S. government phone capable of government communications. To the contrary, both parties agree that Mr. Raymond said that the iPhone 6 "belongs to Mexico." Gov. Br. 20 (quoting Gov. Ex. 11S at 1:41:25 – 33); *cf.* Def. Br. 7 (quoting same).

Moreover, nothing in the record suggests that the phone was subject to the AR, let alone that Mr. Raymond was on notice that the AR defeated his otherwise reasonable expectation of privacy in the iPhone 6's contents. As even the cases cited by the Government (at Gov. Br. 21) reflect, for an employer's policy to defeat an employee's otherwise reasonable expectation of privacy, there must be evidence that the employee had at least constructive knowledge of that policy. *See United States v. Simons*, 206 F.3d 392, 398 n.8 (4th Cir. 2000) ("Simons does not assert that he was unaware of, or that he had not consented to the Internet policy."); *Biby v. Board of Regents*, 419 F.3d 845, 848 (8th Cir. 2005) (record showed that employer had faxed

employee copy of policy and employee was aware of its contents); *United States v. Thorn*, 375 F.3d 679, 683 (8th Cir. 2004) (defendant "was fully aware of the computer use policy, as evidenced by his written acknowledgement of the limits imposed on his computer access rights in 2000"); *see also* Def. Br. 3-6 (collecting authorities).  Here again, the record contains no relevant evidence that supports the Government's argument.  The iPhone 6 does not contain a banner or other warning that apprised Mr. Raymond that the phone's contents were subject to search or monitoring.  Nor did the Government present any evidence (via testimony or otherwise) suggesting that the iPhone 6 was covered by the AR, let alone that Mr. Raymond understood it applied to the iPhone 6, as it was not used for any government communications.  On this record, there is simply nothing that the Government can point to demonstrating that Mr. Raymond was made aware (via a regulation or otherwise) that he lacked a reasonable expectation of privacy in the iPhone 6.

    Unable to point to any record evidence in support of their argument, the Government makes the last-ditch claim that the fact that Mr. Raymond referred to the device as his "work phone" diminished his reasonable expectation of privacy therein.  Gov. Br. 22.  But as even the Government concedes, "ownership of [an] item seized is not determinative" under the Fourth Amendment.  Gov. Br. 22.  Rather, as Mr. Raymond set forth in his post-hearing brief, employer ownership, standing alone, does *not* defeat an employee's reasonable expectation of privacy.  Def. Br. 3-6.  Something more is needed to render an expectation of privacy unreasonable, and the Government has not identified any such evidence satisfying that requirement.  That ends the inquiry.

**II.      The Government Has Not Shown That It Inevitably Would Have Discovered The Contents Of Mr. Raymond's iPhones.**

Mr. Raymond next showed that the Government cannot avoid the exclusion of the evidence illegally obtained from his iPhones and all fruits thereof by invoking the inevitable discovery doctrine.  Def. Br. 10-14.  To avail itself of this doctrine, the Government must prove, by a preponderance of the evidence and through "historical facts capable of ready verification or impeachment," that it inevitably would have discovered the contents of Mr. Raymond's iPhones even without the unlawful seizure.  Def. Br. 10-12.  "Would—not 'could' or 'might'—is the word the Supreme Court used in *Nix v. Williams* and is, therefore, the constitutional standard."  Def. Br. 10 (quoting *United States v. Willis*, 316 F. Supp. 3d 437, 450 (D.D.C. 2018) (quoting *Gore v. United States*, 145 A.3d 540, 549 (D.C. 2016))).

The Government comes nowhere close to satisfying its evidentiary burden here.  Def. Br. 12-14.  Indeed, the Government's own witness testified that it was *not* inevitable that the Government would have gained access to the contents of Mr. Raymond's iPhones.  As Raymond White, a digital forensic analyst contractor at the U.S. Department of State called by the Government to testify at the suppression hearing explained, because those devices had been seized in a "first unlock state"[3] in 2020, it could have taken as long as 25 years to access them

---

[3] The Government strains to avoid admitting that the iPhones were seized in a "first unlock state," and attempts to hide behind Agent Gajkowski's and Special Agent's Nelson's purported lack of "recall[]" that the defendant mentioned turning his phone off" or "whether the phones were in fact powered off."  Gov. Br. 4.  Try as it might, the Government cannot avoid the tape which, as even the Government admits, recounts Mr. Raymond telling agents he was trying to turn "this phone off" and Agent Gajkowski later asking him to "turn them on for me."  Gov. Br. 4.  Nor can it avoid the body camera footage showing that Mr. Raymond had to input his pass codes to open his phones during the second June 6, 2020 encounter.  Gov. Br. 9 (noting that "[t]he defendant appeared to type something into his phone").

In any event, it is the Government's burden to prove that it inevitably would have discovered the phones' contents.  Def. Br. 10.  The Government's rank speculation that,

through "brute force" tactics, and even then, entry was not guaranteed due to "multiple different variables." Def. Br. 12-13.

The Government offers two arguments as to why it inevitably would have gained access to Mr. Raymond's iPhones. Neither is correct.[4]

*First*, the Government claims it inevitably would have discovered the iPhones contents because "there is ample evidence on the record to support a finding that law enforcement would have sought an additional search warrant to compel biometrics." Gov. Br. 24. In support of that claim, the Government points to the "sheer effort devoted to executing the biometric provision of

---

notwithstanding the conversation and actions caught on tape discussed above, Mr. Raymond's devices were seized in a state other than "first unlock" (and therefore would have been easier to access) comes nowhere close to satisfying that burden. *Cf.* Gov. Br. 26 (acknowledging that "[t]here is evidence on the record, through the defendant's statements during the June 6, 2020 record interview, that the defendant turned his phones off and then back on prior to their seizure," but trying to discount that contemporaneous evidence because "neither Agent Gajkowski or Agent Nelson could confirm what state the phones were in at the time they were seized" when testifying at a suppression hearing held three years later).

[4] Although not included in its "Argument" section, the Government suggests in a footnote in its proposed findings of fact that when Mr. Raymond unlocked his phones by passcode during the second encounter on June 6, 2020, he did so voluntarily. Gov. Br. 11 n.17. To the extent the Government seeks to raise a belated argument that no constitutional violation occurred because Mr. Raymond's actions were "voluntary," that argument fails. As Mr. Raymond has already detailed at length, during the agents' second and third encounters with Mr. Raymond on June 6, 2020, the agents not only misrepresented that they had a valid warrant, Special Agent Nelson knowingly misrepresented to Mr. Raymond that the then-expired warrant "compel[led]" him to "open [his] phones." Def. Br. 29-30. No matter how "polite" the agents may have been, Mr. Raymond's responses to those instructions were not voluntary in those circumstances, as case law confirms. *See, e.g.*, *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968) (rejecting government's argument that defendant had consented to search "when that 'consent' has been given only after the official conducting the search has asserted that he possesses a warrant," because "[w]here there is coercion"—as is the case any time "a law enforcement officer claims authority to search a home under a warrant"—"there cannot be consent"); *United States v. Rush*, 808 F.3d 1007, 1012 (4th Cir. 2015) (concluding that an objectively reasonable officer "would have known that consent to search is not valid if given after the police falsely claim to have a search warrant," and holding that officer who "knew with certainty that he did not possess a search warrant, but deliberately chose to tell Defendant otherwise … is precisely the type of action that the exclusionary rule seeks to deter").

the warrant," and claims that the agents supposedly "were not deterred by the effort associated with getting a new warrant."  Gov. Br. 24-25.

The Government's argument is a red herring.  The question posed by the inevitable discovery doctrine is whether, setting aside the agents' illegal conduct, the agents would have gained access to the iPhones contents.  Whether the Government could have obtained another warrant authorizing Mr. Raymond's biometric information has no bearing on that question.  That is because the phones had been seized in "first unlock" state and therefore could not be unlocked via biometrics alone.  Indeed, Agent Gajkowski testified that she understood as much at the end of the agents first encounter with Mr. Raymond on June 6, 2020, explaining that she "understood or thought [the phones] were locked by pin," that biometrics would not "work at this point," and that she "saw that a pin was required" to open the phones.  Def. Br. 28-29 (quoting 6/5/23 Tr. at 30:16-17, 30:18-20, and 19:1-23).  Thus, even if the Government had obtained another warrant for biometric information, it would have been no closer to accessing the phone's contents.  Given the phone's "first unlock" state, it still would have needed to obtain Mr. Raymond's pass codes to open the device—information that the "historical record" here shows the Government sought to obtain through illegal conduct.  Further, obtaining one's biometrics has nothing to do with completing the execution of a warrant pursuant to Rule 41(e)(2)(B).  *See, e.g.*, *United States v. Estime*, 2020 U.S. Dist. LEXIS 191242, at *39-40 (S.D.N.Y. Oct. 14, 2020) (agreeing "with the majority of courts that, under Rule 41(e)(2)(B), a search warrant for ESI is … accomplished when the physical storage device is in the custody of the government").

Irrelevancy aside, the Government's contention that it would have inevitably sought and obtained another warrant for Mr. Raymond's biometric information is belied by the record.  As the Government acknowledges, "inevitable discovery involves no speculative elements but

focuses on demonstrated historical facts capable of ready verification." Gov. Br. 24-25 (quoting *United States v. Holmes*, 505 F.3d 1288, 1293 (D.C. Cir. 2007)). And here, the historical record reflects that far from demonstrating a willingness to "get[] a new warrant," the agents went out of their way to *avoid* having to apply for a warrant anew. The agents not once, but twice re-engaged Mr. Raymond without seeking a new warrant, even though Agent Gajkowski, following the first June 6, 2020 encounter and in accordance with Rule 41(e)(2)(B), "announced for the audio recording that the 'search and seizure' was complete and that, at the time, she thought it was." Gov. Br. 7 (citing Gov. Ex. 26 at 182:4-12). While the Government maintains that the agents did so in "good faith," Gov. Br. 25 n.33, Mr. Raymond showed that on multiple occasions, Agent Gajkowski and Special Agent Nelson avoided telling their colleagues and DOJ attorneys the full truth as to whether they had successfully opened the iPhones using biometrics alone. Def. Br. 31-32 (collecting cites and examples). And Special Agent Nelson told an accompanying officer and then instructed Mr. Raymond on multiple occasions that the then-defunct biometric search warrant compelled Mr. Raymond to open his phones, despite purportedly understanding that the warrant compelled no such thing. Def. Br. 29-30. None of that record evidence supports the Government's assertion that the agents acted in good faith when reengaging Mr. Raymond and would have otherwise "inevitably" obtained another biometric warrant.

*Second*, the Government maintains that it inevitably would have gained "access to the data on the phones using 'brute force.'" Gov. Br. 26. Not so. As Mr. Raymond highlighted in his post-hearing brief but the Government ignores altogether in its submission, the Government's forensic witness was asked directly whether it was "guaranteed" that the Government would gain access to Mr. Raymond's phones. Def. Br. 12-13. The Government's witness responded with an

equally direct answer: "I can't say with a guarantee, no." Def. Br. 13 (quoting 6/1/23 Tr. 83:22 – 84:8). The Government's witness confirmed this to be the case notwithstanding recent improvements in brute force software, which had significantly shortened the amount of time it can take to force unlock a phone. Def. Br. 13. As the witness explained, "there's multiple variables to take into account"—such as "power failures" or "the application that's brute forcing the phone, something could happen with that and then it ends and you have to restart the process again"—that prevented him from agreeing to "an absolute like that." Def. Br. 12-13 (quoting 6/1/23 Tr. at 137:1-7).

That unequivocal testimony renders this case completely unlike those cited by the Government (at Gov. Br. 26), where the record included testimony that "it would take the system no more than two days to identify an unknown PIN on [defendant's] device, and because of a finite number of digit combinations, the chance of success was 100 percent." *United States v. Beck*, 2021 CCA LEXIS 186, at *15 (A.F.C.C.A. April 21, 2021); *see also United States v. Daniells*, 2018 U.S. Dist. LEXIS 57925, at *12-13 (D. Mass. Apr. 5, 2018) (record showed that "government was also able to use technology known as IP-Box, which would … inevitably unlock the phone" and that "Cellebrite released its own unlocking tool that worked on iPhone 5s as long as it was, like Daniells' phone, operating on an iOS below 8.0"). Instead, this case is akin to those cited by Mr. Raymond where, even though the record showed "some likelihood that the Government would have ultimately unlocked the iPhone 6 … without having obtained [defendant's passcode]," the "non-negligible possibility that they would not have" gained access rendered the inevitable discovery doctrine inapplicable. Def. Br. 11 (quoting *United States v. Booker*, 561 F. Supp. 3d 924, 934-35 (S.D. Cal. 2021) and collecting cases holding same). Because the Government's own witness testified that it was far from inevitable that the

Government would ever gain access to the contents of Mr. Raymond's phones without the pass codes, the Government has not satisfied its burden of proof and the inevitable discovery doctrine does not apply.[5]

### III.   The Government Has Not Satisfied Its "Onerous Burden" Of Showing That The Independent Source Doctrine Excuses Its Constitutional Violations.

Finally, Mr. Raymond established that his iCloud account was not an "independent source" of the information illegally obtained from his iPhones.  Def. Br. 14-23.  The record shows that law enforcement's decision to seek a warrant for Mr. Raymond's iCloud accounts (as well as other subsequent warrants) was the direct result of what it learned from a review of his illegally searched iPhones.  That is apparent from Agent Gajkowski's contemporaneous notes, the lengthy period of inaction by the investigation team following the June 6, 2020 encounters with Mr. Raymond, the plain text of the iCloud search warrant, and even Agent Gajkowski's testimony during cross-examination at the suppression hearing.  Def. Br. 14-20.  The record independently shows that the information gleaned from the illegally searched iPhones affected the magistrate judge's decision to issue the iCloud warrant.  On this point, the affidavit submitted by Agent Gajkowski speaks for itself:  it expressly asserted that there was probable cause to search Mr. Raymond's iCloud "████████████████████████████████████████ ████████████████" and submitted that information from that iCloud "████████████████████ ██████████████████████████" found on the iPhones.  Def. Br. 21-22 (quoting Gov. Exhibit 4C ¶ 23).  The encounter with AV-1 in May 2020 was mentioned nowhere in that key

---

[5] The Government also points to its witness's testimony that he had "successfully used [brute force tactics] before" and accessed Mr. Raymond's MacBook Air (a device protected by a different pass code) to support its inevitably argument.  Gov. Br. 27.  As individuals in the legal and financial industries are all too aware from mandatory disclosure requirements, however, past performance does not guarantee future results.

paragraph.  Accordingly, the Government cannot meet its "onerous burden" of showing that the search and seizure of Mr. Raymond's iCloud account was "genuinely independent" of the agents' prior illegal search and seizure of the iPhones.

The Government disputes both points.  Relying entirely on Agent Gajkowski's conclusory, unsupported, and contradicted testimony that law enforcement "without question" would have sought a warrant for Mr. Raymond's iPhones, the Government claims that "Investigators would have applied for the iCloud warrant regardless of what evidence was found on the iPhones."  Gov. Br. 28-31.  The Government further asserts that, even though information obtained from the iPhones featured prominently in the iCloud warrant application, that information "did not affect the magistrate's decision to issue the warrant."  Gov. Br. 31-34.

Neither assertion finds *any* support in the record, let alone the support the Government needs to satisfy its "onerous burden" of proof.  *See Murray v. United States*, 487 U.S. 533, 540 (1988).  Accordingly, the independent source doctrine does not apply and any evidence obtained from the iCloud warrant (and any other fruits of the Government's illegal conduct on June 6, 2020) must be suppressed.

### A. The Record Belies The Government's Naked Assertion That Investigators Would Have Applied For An iCloud Warrant Regardless Of What Was Found On The iPhones.

Even the Government acknowledges that when assessing what motivated an officer to apply for a warrant, this Court must evaluate all relevant facts, rather than rely upon an agent's testimony alone.  Gov. Br. 28; *see also* Def. Br. 15-16.  As the Government concedes, if an agent's testimony "lacks credibility or if objective factors render her assurances 'implausible,'" that testimony should be disregarded.  Gov. Br. 28.

"Implausible" testimony from Agent Gajkowski is all that the Government offers here. The Government asks the Court to credit Agent Gajkowski's testimony that the Government

"without question" would have sought a warrant for Mr. Raymond's iCloud account because they claim that she "testified credibly throughout the hearing." Gov. Br. 29. That claim is false. As Mr. Raymond pointed out in his own brief but the Government conveniently omits from its submission, just three days before Agent Gajkowski claimed that the Government "without question" would have sought a warrant, she gave a different answer under cross-examination:

> Q:   "Prior to July 24, 2020, you didn't have a plan to get a warrant for Mr. Raymond's iCloud; right?"
>
> A:   "I don't know if that's accurate."
>
> Q:   "There's no written document saying you had a plan prior to that time to get a warrant for Mr. Raymond's iCloud; right?"
>
> A:   "I'm not aware if there was."
>
> Q:   "But by August 14, 2020, you were prepared and did swear out a search warrant for Mr. Raymond's iCloud; correct?"
>
> A:   "I will just note that the best source for confirming that information would be the warrant itself, as this was a draft document."

6/5/23 Tr. at 59:3-13. Agent Gajkowski's testimony on June 5, 2023 was clear: she did not remember whether she planned to apply for a warrant for Mr. Raymond's iCloud account prior to July 24, 2020. Yet, when asked the same question three days later, Agent Gajkowski suddenly recalled that she "without question" planned to obtain a warrant for Mr. Raymond's iCloud account regardless of what was found on his iPhones.

Agent Gajkowski's about-face regarding whether the Government planned to apply for a search warrant for his iCloud account is hardly the only time she gave contradictory testimony. As even the Government acknowledges, Agent Gajkowski waffled during her testimony as to whether she understood that phones seized in a "first unlock" state could not be opened with biometrics alone, claiming that she was "not sure about the 'technicalities.'" Gov. Br. 5 (quoting

Gov. Ex. 28 at 34:11-20).  Yet Agent Gajkowski had said the opposite both in her sworn affidavit in support of the iPhones search warrant, Def. Br. 24-25, and at other points in the suppression hearing, Def. Br. 28-29; *see also supra* p.8.  Those critical and self-serving inconsistencies are of the very same type that others courts have concluded render an agent's testimony not credible when evaluating the applicability of the independent source doctrine. Def. Br. 15-16 (collecting cases).

Other record evidence ignored by the Government, too, confirms that Agent Gajkowski's naked claim that law enforcement "without question" planned to seek an iCloud warrant regardless of what was found on his iPhones is implausible.  Agent Gajkowski's self-serving assurance is belied by her own contemporaneous notes from July 24, 2020, which detailed for the first time that she "started to plan for warrants for iCloud, Tinder, and CA stuff" after she received the forensic report on Mr. Raymond's phones and the scope of the investigation "expanded."  Def. Br. 17, 32-34.  It is belied by the Government's inaction in the case following the seizure of Mr. Raymond's iPhones on June 6, 2020, as is apparent from the fact that (i) agents needed to discard bags of "moldy food" found in Mr. Raymond's untouched belongings when they pulled them out of storage in August 2020 and (ii) waited to apply for an iCloud warrant until August 14, 2020, weeks after the Government's so-called "competing priorities" had been completed.  Def. Br. 33-34.  It is belied by the Government's concession that prior to searching the contents of Mr. Raymond's phones, agents "did not know what [Mr. Raymond's identifiers] were for his iCloud accounts before they seized the phone."  Def. Br. 18.  And it is belied by the plain text of the iCloud search warrant, which predicated its assertion of probable cause entirely on "███████████████████████████████████," and

expressly sought to obtain additional information that "███████████████████

████████████████████" found on Mr. Raymond's phones.  Def. Br. 18-19, 34.

Apparently recognizing these problems, the Government attempts to rehabilitate Agent

Gajkowski's testimony after the fact in a number of ways.  It first claims that her testimony was

"heavily corroborated" by emails showing that she intended to send a preservation request as

early as June 2, 2020, and then sent such a request on June 6, 2020 before extraction of the

seized iPhones began.  Gov. Br. 29.  As noted above, however, it was not until the Government

illegally accessed Mr. Raymond's iPhones that it even knew what his iCloud identifiers were.

Moreover, Mr. Raymond is unaware of and the Government has not cited to any case law

holding that a preservation request (which obviously requires far less effort than a warrant

application and does not require a probable cause showing), standing alone, evidences an intent

by law enforcement to seek a warrant or that they would have obtained one.

The Government next asserts that Agent Gajkowski's testimony was also corroborated by

the fact that the agents' "interview with the defendant confirmed that he had already deleted

material from his devices."  Gov. Br. 29-30.  That is a gross mischaracterization of the record.

Mr. Raymond did *not* tell investigators that he had deleted information from "his devices" on

June 6, 2020.  Gov. Ex. 11T at 1:43:00 – 1:44:00.  Rather, he informed law enforcement that he

had removed certain photographs from his Facebook and Tinder apps—while still maintaining

those apps on his phone, as instructed by law enforcement—and replaced them with images of

landscapes so that other users of those apps could not publicly disseminate his likeness.[6]  Mr.

Raymond understands, however, that those images still remain on the device itself—a fact that

---

[6] When Mr. Raymond explained this to Agent Gajkowski and reiterated that he had not deleted
anything from his phone, Agent Gajkowski expressed her understanding and said "yeah, that's
smart."  Gov. Ex. 11T at 1:43:55 – 1:44:00.

the Government can easily confirm by reviewing the phones currently in its possession.  The Government apparently declined to do so before making this argument.

The Government's remaining arguments are equally unavailing.  While the Government claims that "whether probable cause existed without information lawfully [sic] obtained" is a factor bearing on whether tainted evidence affected law enforcement's decision to seek a warrant, the lone case the Government cites in support thereof does not stand for that proposition.  Gov. Br. 28 (citing *United States v. Johnson*, 994 F.2d 980, 987 (2d Cir. 1993)). *Johnson* held that whether probable cause existed for the warrant independent of any tainted information may be relevant to determining whether the tainted evidence affected the judge's decision to issue that warrant—the prong discussed immediately below—and *not* the prong at issue here; i.e., whether law enforcement's "decision to seek the warrant [was] prompted by information gleaned from the illegal conduct."  994 F.2d at 987.  The Government also claims that the "the search of the defendant's phones was in no way conducted to determine whether an iCloud warrant was necessary."  Gov. Br. 30.  As even the Government tacitly acknowledges, however, the exclusionary rule is not limited to evidence obtained via so-called "Confirmatory searches."  *See* Gov. Br. 30.  And while the Government again attempts to claim that "the search of the defendant's devices was done in good faith and was not due to intentional police misconduct," Gov. Br. 31, that argument cannot be squared with the record evidence showing that Special Agent Nelson knowingly misrepresented to Mr. Raymond what the then-completed warrant compelled him to do, and both Agent Gajkowski and Special Agent Nelson failed to report key facts to their supervisors and DOJ counsel.  *See* Def. Br. 28-32.

**B. The Government's Claim That The Judge's Decision To Issue The Warrant Was Unaffected By The Tainted Evidence Cannot Be Squared With The Plain Text Of The iCloud Warrant Application.**

Mr. Raymond explained that the Government's inability to show that its decision to seek a warrant for his iCloud account was not affected by the tainted information obtained from his iPhones should end the analysis—the independent source doctrine does not apply, full stop. Mr. Raymond further explained, however, that the Government also fails to satisfy the second requirement of the *Murray* test because the Government has not shown and cannot show that the magistrate's decision to issue the search warrant was unaffected by the illegally obtained information from the iPhones. For this reason, too, the independent source doctrine does not save the Government from the exclusionary rule.

The Government takes a different view, claiming that it must show only that "the affidavit supports probable cause after the tainted information has been redacted from it." Gov. Br. 31. Because the affidavit submitted in support of the iCloud search warrant recounted some of the same information regarding AV-1 that had been included in the iPhone warrant application, the Government maintains that the affidavit submitted in support of the iCloud warrant application "remains sufficient to establish probable cause after excising information regarding the search of the defendant's phones." Gov. Br. 32.

Even under the Government's preferred test, *but see* Def. Br. 21, the Government is wrong. This is not a circumstance where the search warrant affidavit repeated information that had been included in other warrant applications, and then represented that this information plus other, tainted information, supported a finding of probable cause. Rather, while the outset of Agent Gajkowski's warrant affidavit repeated certain information regarding AV-1, that information *is omitted altogether from the paragraph setting forth the basis for finding probable cause.* That paragraph instead references *only* information from Mr. Raymond's iPhones,

stating: " 

" Def. Br. 22 (quoting Gov. Ex. 4C ¶ 23) (emphasis added).  And this key

paragraph explains that the information obtained from searching Mr. Raymond's iCloud "

"—that is, the video fragments

found on Mr. Raymond's iPhones.  The Government conceded as much at the hearing,

acknowledging that the iCloud warrant affidavit "relied on what was found on the iPhone XR."

Def. Br. 19 (quoting 6/1/23 Tr. at 22:12-19).

Thus, if the Court were to redact from the warrant application any illegally obtained

information, as suggested by the Government, nothing in the affidavit's key paragraph would

remain.  Instead, the affidavit would consist of only a few paragraphs describing the May 31,

2020 incident with AV-1.  It would contain *no* information regarding Mr. Raymond's encounters

with other individuals during other time frames.  Accordingly, even under the Government's

proposed test, it cannot show that the magistrate judge would have issued the iCloud search

warrant—which authorized the Government to seize large swaths of files, including files related

to "

" Gov. Ex. 4C—absent the

inclusion of the tainted evidence.  For this reason, too, the independent source doctrine does not

apply.

## CONCLUSION

For the foregoing reasons, Mr. Raymond requests that the Court grant his Suppression

Motion in its entirety.

Dated: July 14, 2023                    Respectfully submitted,

s/ John Marston
John Peter Marston
**FOLEY HOAG LLP**
1717 K Street, NW
Washington, DC 20006
(202) 261-7321
Fax: (202) 785-6687
jmarston@foleyhoag.com

James M. Gross (*pro hac vice* forthcoming)
**FOLEY HOAG LLP**
1301 Ave. of the Americas, 25th Floor
New York, NY 10019
(212) 812-0422
jgross@foleyhoag.com

s/ A. Joseph Jay III
A. Joseph Jay III (D.C. No. 501646)
Denise Giraudo (D.C. No. 499348)
**SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP**
2099 Pennsylvania Avenue, NW
Washington, D.C. 20006
(202) 747-1900
JJay@sheppardmullin.com;
DGiraudo@sheppardmullin.com

*Counsel for Brian Jeffrey Raymond*

**CERTIFICATE OF SERVICE**

I hereby certify that on this **14th** day of **July**, 2023, I caused the foregoing brief to be filed using the Court's CM/ECF system, which gave notice to all counsel of record.

s/ John P. Marston

**John P. Marston**