UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Criminal No. 1:21-cr-00380-CKK |
| : | |
| BRIAN JEFFREY RAYMOND : | |
| : | |
| Defendant. : | |

## GOVERNMENT'S REPLY TO DEFENDANT'S POST-HEARING BRIEF ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

The United States, by and through the undersigned attorneys, respectfully submits this reply to the defendant's post-hearing brief in support of his motion to suppress evidence, ECF No. 236, filed through counsel. The record and the law soundly defeat the defendant's position that neither the inevitable discovery doctrine nor the independent source doctrine preserve admissibility of the evidence obtained from the defendant's iPhones or iCloud. ECF No. 236 at 8.[1] First, as to inevitable discovery, the government presented credible, nonspeculative evidence that the iPhones would have been accessed without the defendant's passcodes using software that was available in 2020. Second, as to the independent source doctrine, corroborated testimony established that the government would have sought an iCloud search warrant regardless of what evidence, if any, was found on the defendant's iPhones. Additionally, the legally obtained evidence referenced in the iCloud search warrant affidavit provided ample probable cause independent of anything found on the iPhones, soundly establishing that the warrant would have been approved

---

[1] The Court's June 15, 2023, minute order instructed the parties to "assume that the warrant for the defendant's iPhones was fully executed at the end of law enforcement's first interaction with the defendant, such that further search and seizure of the defendant was warrantless." The Government has done so for the purpose of responding to the Court's inquiry but maintains that the agent's delayed use of the biometric provision was lawful, that the defendant voluntarily agreed to provide his phone passcodes to agents, and, in any event, agents acted in good faith. *See* ECF No. 198.

1

irrespective of the evidence in dispute here. The Court should deny the defendant's motion to suppress.

I. **THE GOVERNMENT WOULD HAVE INEVITABLY GAINED ACCESS TO THE CONTENTS OF THE DEFENDANT'S PHONES**

The evidence before this Court establishes, by a preponderance of the evidence, that law enforcement would have inevitably discovered the contents of the defendant's iPhones through an unlocking mechanism called brute force.[2] The defendant disputes this, claiming that the government's ability to access the phones via brute force is speculative and thus insufficient to satisfy the inevitable discovery standard. *See* ECF No 236 at 10 – 11.[3]

For inevitable discovery to apply, the government must demonstrate, by a preponderance of the evidence, that evidence illegally seized would have been inevitably discovered. *United States v. Holmes*, 505 F.3d 1288, 1293 (D.C. Cir. 2007). As this Court instructed in *Martinez v. District of Columbia*, "[t]o establish a fact by a preponderance of the evidence is to prove that it is more likely so than not so." 503 F. Supp. 2d 353, 356 (D.D.C. 2007) (citing Jury Instruction 2.08 (Blue Book)).

Here, the testimony of Digital Forensic Analyst Raymond White demonstrates, by a preponderance of the evidence, that law enforcement would have inevitably discovered the contents of the defendant's phones through brute force. Mr. White testified that, had he received the iPhones in a "before first unlock state," he would have attempted to access the phones using a

---

[2] Brute force would have been used if 1) the agents did not reengage the defendant at his hotel or had been unsuccessful unlocking the devices via biometrics (after obtaining an additional warrant, if necessary); or 2) the defendant did not voluntarily change his passcodes.

[3] The defendant's most recent filing did not address whether agents would have inevitably discovered the contents of the devices by applying for a warrant to reengage the defendant to compel biometrics. The Government maintains, as an alternative avenue to inevitable discovery, that agents would have acquired such a warrant had they believed one was necessary. *See* Gov't Supplemental Briefing on Defendant's Motion to Suppress Evidence, ECF No. 235 at 24-25.

2

method called "brute force," whereby a software program guesses the phones' passcodes.[4] Gov't Ex. 26, June 1, 2023 Mot. Hr'g Tr. at 47:14-19, 77:13-15. Mr. White explained that the "brute force" method would allow analysts to gain access to a phone's data, even if the phone was received in a "before first unlock state." *Id*. at 47:9-14. Importantly, the software available at the time the phones were seized was in fact capable of accessing them. Mr. White further testified that, in 2020, the available brute force software had the capability of guessing a phone's six-digit passcode within a timeframe Mr. White described as from "within a few minutes" to 25 years. *Id*. at 48:8-18; 49:1-2. By 2022, however, due to advances in technology, the maximum amount of time it would take to access the same phone via brute force would be "about six months." *Id*. at 49:10-13. In other words, at latest, the defendant's phones would have been accessed and their data extracted well over a year in advance of the currently scheduled trial date.

The defendant relies on *United States v. Booker*, 561 F. Supp. 3d 924, 934-35 (S.D. Cal. 2021) and *United States v. Coleman*, 554 F. Supp. 3d 1124, 1157 (D.N.M. 2021) for the proposition that inevitable discovery is inapplicable on these facts. *See* ECF No. 236 at 11. Each case is readily distinguishable. In *Booker*, law enforcement seized Booker's iPhone 6 Plus and subsequently obtained a warrant to search it in June of 2017. 561 F. Supp. 3d at 929-30. The warrant required that the device be extracted and analyzed within 90 days. *Id*. at 933. To access the phone's contents, law enforcement used the software program Cellebrite and Booker's passcode, which had been obtained in violation of his Fourth Amendment rights. *Id*. at 932. At the time, however, Cellebrite was incapable of extracting data from an iPhone 6 Plus without the phone's passcode, though such technology was developed in July of 2017. *Id*. at 933. The court in *Booker* declined to apply inevitable discovery, noting that, to do so, it would have had to assume that "the Government

---

[4] Even assuming the conditions set forth in the Court's June 15, 2023 Minute Order, any attempts to use brute force would have been lawful.

3

would have sent the phone to Cellebrite in June 2017 with the hopes that suitable forensic tools would eventually become available; that the technology Cellebrite developed later in the summer of 2017 was sufficiently reliable to ensure the phone could be unlocked within the 90-day time period provided in the search warrant; and that the information on the phone would not be compromised through attempts to unlock it." *Id*. at 934.

Here, however, the Department of State's Computer Investigation and Forensics Division ("CIF") indisputably had the technological capabilities to use brute force to access the devices at the time they were seized and would have done so had the phones been received in a before first unlock state. *See* Gov't Ex. 26 at 47:14-19, 77:13-15. Moreover, language in the warrant itself specified that—had CIF been somehow incapable of completing the search of the devices—the devices would have been sent to a private company that specializes in data extraction from iPhones and other electronics. *See* Gov't Ex. 4-A (Under Seal) at ¶ 37. Finally, the warrant to search the phones did not require the extractions to be complete within a particular timeframe. *See* Gov't Ex. 4-A (Under Seal).[5] Consequently, the very conditions the court in *Booker* would have needed are satisfied in this case.

The defendant's reliance on *Coleman* is similarly misplaced. There, the court considered whether the government would have inevitably discovered the contents of an iPhone and Galaxy

---

[5] *Compare with* Gov't Ex. 4-G (Under Seal) at Attachment B ("The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant, and for any cellular phones not to exceed 90 days from the date of the execution of the warrant. The government will not search the digital device(s) and/or forensic image(s) thereof beyond the 120-day period without obtaining a separate authorization from this or another Court (an extension or second search warrant), and the government will not search any cellular phones and/or forensic image(s) thereof beyond the 90-day period without obtaining a separate authorization from this or another Court (an extension or second search warrant).

phone by bypassing the phones' passcodes.[6] 554 F. Supp. 3d at 1155-57. The only testimony on this issue was the agent's statement that "if [they got a warrant], then the Galaxy [phone is] much easier for our software to get into than the iPhones in this case." *Id*. at 1157. Notably, the court found this testimony alone sufficient to apply inevitable discovery to the Galaxy phone. *Id*. As to the iPhone, however, there was no additional testimony establishing whether law enforcement would have been able to access the device, and thus the court found the Government had not met its burden of proving the factual basis to apply the inevitable discovery doctrine to the iPhone. *Id*.

Mr. White's testimony in this case, on the other hand, plainly established that CIF had the technology to access the devices at issue. He further testified to specific information from Grayshift, the company who manufactures the brute force software "Graykey," regarding the various timeframes within which the devices at issue could be accessed through brute force. Gov't Ex. 26 at 48:8-18; 49:1-2; 49:10-13. Unlike in *Booker*, where it was unclear that the devices would have been extracted in the period allowed per the warrant, or *Coleman*, where it was unclear to what extent the technology would even be able to access the device, this Court has more than sufficient evidence to conclude that a search would have occurred and would have ultimately been successful at guessing the phones' passcodes. Thus, the record here is replete with "demonstrated historical facts capable of ready verification or impeachment" demonstrating that law enforcement would have successfully accessed the phones in this manner. *See Holmes*, 505 F.3d at 1293, citing *Nix v. Williams*, 467 U.S. 431, 444 n.5 (1984) (noting that the "inevitable discovery doctrine involves no speculative elements, but focuses on demonstrated historical facts" and "does not require a departure from the usual burden of proof at suppression hearings."). In other words, the

---

[6] The court addressed this issue after first concluding that it was inevitable that law enforcement would have sought a warrant for the devices absent the prior illegality and that warrant would have been granted. *Coleman*, 554 F. Supp. 3d at 1155.

equivocal nature of the evidence in *Booker* or *Coleman* is nothing like the state of the evidence as established here before the Court.

Glossing over this critical testimony, the defendant focuses instead on Mr. White's statement that he could not "guarantee" the phones would open. Gov't Ex. 26 at 84:1-3. But Mr. White later clarified that he defined "guarantee" as "an absolute." *Id*. at 136:23-24. While Mr. White acknowledged that there were circumstances such as a power failure or an application glitch that may cause brute force to fail, he testified that in his own experience of using brute force on at least twenty devices, he "had not seen any failures as of yet." *Id*. at 137:13-18. Mr. White's testimony is more than sufficient to establish the evidence would have been inevitably discovered, particularly where, as this Court has instructed, proof by preponderance of the evidence "does not mean that the proof must produce absolute or mathematical certainty." *Martinez*, 503 F. Supp. 2d at 356 (internal citations omitted).

Nor do *United States v. Holmes*, 505 F.3d 1288 (D.C. Cir. 2007) or *United States v. $639,558 in United States Currency*, 955 F.2d 712, 721 (D.C. Cir. 1992) advance the defendant's argument. In each case, the court declined to apply the inevitable discovery doctrine where it was unclear whether law enforcement would have taken the steps necessary to discover the contraband but for the illegality. In *Holmes*, the D.C. Circuit analyzed whether the inevitable discovery doctrine was applicable where police illegally seized car keys from Holmes' pocket during a pat-down and used the keys to locate and unlock the car, ultimately recovering a gun from inside. 505 F.3d at 1290-92. There, the government argued officers would have inevitably located the car and the gun absent the unlawful seizure of the keys because officers "would have continued questioning [Holmes] until they had persuaded [Holmes] to lead them to his car." *Id*. at 1293. But the court declined to apply inevitable discovery because there was no affirmative evidence in the

6

record to show that this would have actually happened. *Id*. Similarly, in *United States v. $639,558 in United States Currency*, the D.C. Court of Appeals declined to apply the inevitable discovery doctrine where there was nothing on the record to suggest that evidence recovered from a bag pursuant to an illegal search would inevitably have been discovered pursuant to a lawful inventory search. 955 F.2d 712, 721 (D.C. Cir. 1992). And, to the contrary, there was evidence that police would not have arrested the defendant and inventoried his bag but for the illegal search. *Id.* Here, no such barrier to applying inevitable discovery exists because Mr. White testified that he "would use brute forcing to get into [a device] unless it's [ ] in an actively unlocked state", Gov't Ex. 26 at 73:12-19, and brute force is always an option when attempting a phone extraction, *Id*. at 77:13-15. Thus, this Court can firmly conclude that law enforcement would have attempted to access the phones via brute force, assuming they were received in a before first unlock state.[7]

Reliance on *United States v. Wills*, 316 F. Supp. 3d 437 (D.D.C. 2018), too, is inapposite, as the court there did not only consider whether officers would have inevitably searched the backpack at issue and uncovered contraband, but whether that search would have been lawful. *Id*. at 448-450. Ultimately, the court found that there were too many variables for it to conclude that the search would have been lawful and therefore could not say that lawful discovery of the evidence at issue was inevitable. *Id*. at 449-50. Here, there is no claim that law enforcement lacked the authority to search the devices or access their contents via brute force.

This Court should therefore apply inevitable discovery to the contents of the defendant's phones because the record establishes by a preponderance of the evidence that law enforcement would have been able to access the devices' contents using brute force. *See e.g.*, *United States v.*

---

[7] Had the phones been in an "after first unlock state," Mr. White testified that analysts would have been able to extract approximately 95% of the phone's data without unlocking the phones, thereby making brute force unnecessary. Gov't Ex. 26 at 51:4-14, 77:16-25, 138:11-14.

*Ramirez*, 2019 U.S. Dist. LEXIS 83680, *28 n. 10 (N.D. Ga. Apr. 22, 2019) (government would have inevitably discovered evidence on the cell phone despite not having the technology to search the phone when it was first seized because updated software tools became available within several months); *United States v. Todd*, 2017 U.S. Dist. LEXIS 48181, *39 (S.D. Ga. Feb. 10, 2017) (evidence from cell phone admissible despite passcode being obtained in violation of defendant's *Miranda* rights where agents had technological capability to bypass code and access phone's contents); *United States v. Ashmore*, 2016 U.S. Dist. LEXIS 185939, *18 (W.D. Ark. May 11, 2016) (cell phone evidence admissible under inevitable discovery doctrine where available software could bypass phone's passcodes); *United States v. Will*, 2015 U.S. Dist. LEXIS 79883, *23 (N.D.W. Va. April 29, 2015) (suppression of phone contents not warranted where evidence demonstrated contents could have been extracted without the phone's passcode).

## II.     THE INDEPENDENT SOURCE DOCTRINE ALLOWS FOR THE INTRODUCTION OF THE ICLOUD EVIDENCE

The record directly contradicts the defendant's argument that, "the unlawfully seized contents of the iPhones affected both law enforcement's decision to seek a warrant for [the iCloud] account and was the sole basis for the judge's decision to grant that warrant." ECF No. 236 at 3. First, Diplomatic Security Service Special Agent Mikel Gajkowski testified credibly that investigators would have sought a warrant for the iCloud regardless of what was found on the defendant's iPhones, and her testimony is corroborated with audio recordings and email communications. Second, the evidence found on the iPhones was *not* the sole basis for the iCloud search warrant. The iCloud warrant affidavit relied on independent evidence that was legally obtained and sufficient on its own to establish probable cause for the search. Thus, the independent source doctrine permits use at trial of the evidence obtained from the defendant's iCloud account, notwithstanding the alleged impropriety. *See Murray v. United States*, 487 U.S. 533, 538 (1988)

8

(for the independent source exception to apply, the court must find both that law enforcement would have applied for the warrant had they not acquired the tainted information and that the tainted information did not affect the Magistrate's decision to issue the warrant); *United States v. Halliman*, 923 F.2d 873, 880-81 (D.C. Cir. 1991) (same).

### A. *Murray's* First Prong is Satisfied Because the Agents Would Have Sought a Search Warrant for the iCloud Regardless of Whether the iPhones Were Ever Searched.

The defendant asks this Court to discredit Agent Gajkowski's sworn testimony that law enforcement would have sought a search warrant for the iCloud regardless of whether the iPhones were searched. ECF No. 236 at 15-16. But the other evidence before this Court corroborates her testimony and demonstrates its reliability. Agent Gajkowski demonstrated her intent to seek a search warrant for the iCloud account days before the defendant's iPhones were seized and searched. Agent Gajkowski testified that, after her initial interview with the defendant on June 2, 2020, she sought assistance from co-workers with submitting preservation letters to Tinder, Bumble, WhatsApp, and Apple. Gov't Ex. 26 at 141:10-17. She explained that because agents observed during the interview that the defendant had two iPhones, she knew that preserving his iCloud accounts would be important. *Id*. at 141:3-17. Agent Gajkowski's testimony is corroborated by two emails chains, indicating that agents began the process of submitting preservation letters on June 2, 2020, four days before the phones were seized. Gov't Ex. 21, 22.

Furthermore, Agent Gajkowski testified that agents were concerned that the defendant had or would delete material from his devices or accounts, adding urgency to preserving the iCloud data. Gov't Ex. 26 at 141:5-9, 147:1-9. The recorded interviews with the defendant corroborate Agent Gajkowski's testimony. During the June 2, 2020, interview, Agent Gajkowski asked the defendant whether he had deleted anything. Gov't Ex. 9-D. During the June 6, 2020, interview, Agent Nelson asked the defendant whether he erased "any data from his phones" or "erased any

9

of [his] cloud accounts."[8] Gov't Ex. 11-G. The defendant admitted to deleting photographs from both phones, including profile pictures from his Tinder and WhatsApp. Gov't Ex. 11-G; 11-I. The risk of deleted evidence provided agents with yet another reason, before the iPhones were searched or additional evidence was discovered, to preserve the iCloud. As Mr. White testified, iCloud provides backup storage for data on a user's connected devices. Gov't Ex. 26 at 51:24-25; 52:1-9. And, of course, with a preservation letter submitted and the account preserved, any data would remain accessible to law enforcement regardless of whether the user subsequently deleted the data. *Id*. at 141:3-7.

Moreover, Agent Gajkowski testified that, after the agents left the hotel following the final encounter with the defendant, she spoke with the assigned prosecutor, who advised that the agents needed to submit preservation letters as soon as possible because, now that the defendant was aware agents had seized his devices, he may try to "move quickly to delete evidence." Gov't Ex. 27, June 2 Mot. Hr'g Tr. at 36. This too is corroborated. After learning that no preservations letters had been submitted yet, *id*. at 37:1-5, Agent Gajkowski completed that process and sent a preservation letter to Apple on June 6, 2020, the same day the iPhones were seized. Gov't Ex. 27 at 38-39; Gov't Ex. 16. Notably, this occurred before the phones had even been turned over to CIF. Gov't Ex. 27 at 41:2-15. The record clearly establishes, as Agent Gajkowski testified, that the preservation request was made in anticipation of seeking an iCloud warrant regardless of the results of the search of the iPhones. Gov't Ex. 29, June 8, 2023 Mot. Hr'g Tr. at 85:21-25, 86:1-4.

Given this corroborated testimony, this case is easily distinguishable from those cited by the defendant. In *United States v. Siciliano*, the court declined to apply independent source where

---

[8] Agent Gajkowski testified that she understood "cloud account" to reference the account location where his iPhones were backing up data, again concerned that he was deleting evidence. Gov't Ex. 26 at 173:5-16.

there was no unambiguous testimony on the record establishing that officers were not prompted to acquire a warrant based on an illegal search. 578 F.3d 61, 70 (1st Cir. 2009). Similarly, in *United States v. Kopankov*, the court found independent source did not apply where the government provided "no contrary evidence" to suggest a new warrant application was not prompted by a prior unlawful search. 2023 U.S. Dist. LEXIS 83332, *2-5 (N.D. Ca. May 11, 2023). Here, as outlined above, there is unambiguous testimony, corroborated by evidence on the record, directly establishing that agents would have sought a warrant for the defendant's iCloud account regardless of the search of his phones.

The defendant argues that agents did not contemplate seeking a search warrant for the iCloud until after the iPhones were searched. ECF No. 236 at 16. To support this assertion, the defendant cherry-picks and distorts the record. In one instance, for example, the defendant claims that Agent Gajkowski testified that she "did not know whether she 'plan[ed] to get a warrant for Mr. Raymond's iCloud'" before July 24, 2020. ECF No. 236 at 17. This is misleading. Instead, Agent Gajkowski stated the following:

| | |
|---|---|
| **MR. MARSTON** | Prior to July 24, 2020, you didn't have a plan to get a warrant for Mr. Raymond's iCloud; right? |
| **AGENT GAJKOWSKI** | I don't know if that's accurate. |
| **MR. MARSTON** | There's no written document saying you had a plan prior to that time to get a warrant for Mr. Raymond's iCloud; right? |
| **AGENT GAJKOWSKI** | I'm not aware if there was. |

Gov't Ex. 28, June 5, 2023 Mot. Hr'g Tr. at 59:3-8.

This Court should not consider one statement, taken out of context, to assess an agent's motivations. *See United States v. Flores*, 888 F.3d 537, 546 (1st Cir. 2018) (the question of an officer's subjective intent to pursue a warrant depends on the totality of the circumstances). Here,

11

the testimony and evidence demonstrate that affirmative steps were made, prior to the seizure of the phones, to focus on the iCloud account separately and independently.

The defendant further points to Agent Gajkowski's testimony that the scope of the investigation expanded after agents observed photographs and videos on the defendant's iPhone XR. ECF No. 236 at 16-17. Reliance on the independent source doctrine does not fail merely because the iPhone evidence potentially influenced the scope of the investigation. In *United States v. Soto*, the First Circuit found the independent source doctrine applied despite the defendant's argument that the unlawful search "catapulted the investigation" forward where the totality of the circumstances supported the agent's assurances that he would have sought a warrant regardless. 799 F.3d 68, 84 (1st Cir. 2015) ("The question is not whether the evidence did influence the officer's decision – how could it not? – but whether the same decision would have been made if the evidence had not been known."). Likewise, here, although the discovery of additional victims undoubtedly affected the scope and direction of the investigation, the fact remains that regardless of whether additional victims were identified, agents were still investigating an alleged sexual assault where the target (1) had Apple devices; (2) admitted to communicating with the victim via third-party applications that could backup to an iCloud account; (3) admitted to deleting photos associated within those applications; and (4) had continued access to any iCloud accounts that might exist. Nothing located on the defendant's iPhones changed these facts nor the trajectory of this portion of the investigation. Consequently, it is manifest that, under the totality of circumstances, investigators in this case would have sought a warrant for the defendant's iCloud account regardless of what was on his iPhones.

The defendant claims that Agent Gajkowski could not have contemplated seeking an iCloud search warrant because investigators did not know that the defendant's identifiers (such as

phone numbers and email addresses) were linked to his iCloud account until after the iPhone XR and iPhone 6 were searched. ECF No. 236 at 18. This argument is fatally flawed because law enforcement does not need to know whether phone numbers or email addresses link to an iCloud in order to seek a preservation letter or a search warrant for it. It is for that very reason that law enforcement often provides a service provider with all of a target's known identifiers, as they did here. The Court has evidence soundly disputing the defendant's assertions because agents were able to preserve the defendant's iCloud account via a preservation letter on June 6, 2020, weeks before they knew which identifiers were actually associated with his iCloud account. Gov't Ex. 27 at 38:18-25, 39-40.

The notion that investigators did not seek an iCloud search warrant until they confirmed via the phones that the defendant had an iCloud account similarly fails. Agents did not need to search the iPhones for confirmation of this fact. Mr. White testified that many users of Apple devices have iCloud accounts. Gov't Ex. 26 at 51:21-23. Indeed, the affidavit supporting the iCloud search warrant indicated that, as to the probable cause, (1) many users of Apple devices have iCloud accounts; and (2) the defendant had two iPhones. Gov't Ex. 4-C (Under Seal) at ¶ 26.c., ¶ 32. Additionally, agents were in fact able to preserve the defendant's iCloud account before analysts extracted data from the iPhones. Gov't Ex. 27 at 38-39; Gov't Ex. 16. Therefore, the agents did not need to search the iPhones for confirmation that an iCloud existed.

Finally, as to any delay in seeking the iCloud warrant, Agent Gajkowski explained that the preservation request ensured agents could handle other more pressing priorities – such as executing additional warrants and conducting forensic interviews – before obtaining it. Gov't Ex. 29 at 86:12-15. Agent Gajkowski's reasons are far from "implausible" because agents did in fact tackle these time-sensitive priorities prior to applying for the iCloud warrant. *See, e.g.*, Def. Ex. 25 (Under

13

Seal) (outlining investigatory steps taken between June 6, 2020 and August 14, 2020); Gov't Ex. 4-B (Under Seal); *see also Murray,* 487 U.S. at 540 n.2 (noting that, in assessing officers' motivations in seeking a warrant, the court should assess all of the facts to determine if the facts render an officer's assertions implausible).

### B. *Murray's* Second Prong is Satisfied Because the Evidence Found on the iPhones Was Not the Sole Basis for Probable Cause.

The defendant's claim that the iPhones were the "sole basis" for the magistrate judge's decision to grant the iCloud search warrant is likewise inaccurate, as a plain reading of the affidavit reveals. In addition to evidence obtained from the phones, the affidavit referenced legally obtained information sufficient on its own to establish probable cause for the search. For example, the affidavit discusses the fact that AV-1 was seen screaming for help on the defendant's balcony. Gov't Ex. 4-C (Under Seal) at ¶ 9. It contained information detailing that AV-1 was physically unstable, required assistance to walk, and appeared heavily intoxicated. *Id*. The affidavit relayed information provided by AV-1, including that she met the defendant on Tinder, a dating application (*id*. at ¶ 12), and that after going to the defendant's residence, she did not remember anything, including whether any sexual acts or contact occurred (*id*. at ¶ 13). The affidavit further described how Department of State personnel noticed bruising on AV-1's body (*id*. at ¶ 14). It also reported the results of AV-1's medical evaluations, including bruising on her body, genital injury, and AV-1's blood urine content. *Id*. at ¶ 15. This is more than sufficient to establish probable cause. *See, e.g., Acosta v. Ames Dep't Stores, Inc.,* 386 F.3d 5, 10 (1st Cir. 2004) ("[U]ncorroborated testimony of a victim or other percipient witness, standing alone, ordinarily

can support a finding of probable cause."); *accord.*: *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999); *United States v. Golden*, 545 Fed. Appx. 920, 921-22 (11th Cir. 2013).[9]

Going a step further, the affidavit outlined the agents' own observations in the days before the iPhones were seized, including the fact that agents personally observed third party applications with messages pertaining to AV-1. *Id*. at ¶ 16. Finally, the affidavit informed the magistrate that the defendant's two iPhones were seized and that a preservation letter for the iCloud was submitted on that same date. *Id*. at ¶ 17. The mere fact that the phones were seized is not illegally obtained evidence.

It is true that the affidavit did describe photographs and videos found on the iPhone XR. *Id*. at ¶ 18-22. Here again, however, the affidavit itself clearly demonstrates that the evidence found on the iPhone XR was not the sole basis for the search warrant:

> ***Based upon my training and experience***, as well as publicly available information provided by Apple, I know that a user's iCloud account serves as back-up storage for content contained on the user's iPhones and other electronic devices. Based upon the ongoing forensic analysis of RAYMOND's cellular telephones, ***and based on my training and experience***, there is probable cause to believe that RAYMOND's iCloud account contains communications with and photographs of women RAYMOND intended to meet in person.

*Id*. at ¶ 23 (Emphasis Added). The next paragraph then further described Agent Gajkowski's training and experience, specifically that, "perpetrators of drug or alcohol-facilitated sexual assault

---

[9] During the motion hearing, the defense introduced three exhibits summarizing the ways in which AV-1's statements were different from other witness statements (including the defendant's). *See* Gov't Ex. 29 at 4-22; *See* Def. Ex.35, 36, 37 (all Under Seal). These exhibits do nothing to refute probable cause. Especially here, where videos and witness statements confirm that AV-1 was hysterical and appeared to be heavily intoxicated, *see* Gov't Ex. 4-C at ¶ 9-10, and where the affidavit supporting the iCloud search warrant explicitly indicates that, shortly after screaming for help, AV-1 did not remember screaming for help or that any sexual contact had occurred. *See* Gov't Ex. 4-C at ¶ 13. Notably, the affidavit included the defendant's self-serving statement that he engaged in consensual sex acts with AV-1. *Id*. at ¶ 16.

frequently store photos, conversations, and other digital "keepsakes" and that they "use the Internet to plan and prepare…by researching potential drugs." *Id*. at ¶ 24.

As the government pointed out in its initial supplemental brief, with respect to *Murray's* second prong, every circuit to consider the issue has found that the appropriate inquiry is not whether the tainted information affected the magistrate's decision in any sense, but whether the affidavit supports probable cause after the tainted information has been excised. ECF No. 235 at 31. Here, the magistrate court could lawfully consider AV-1's account, the defendant's statements, and agents' direct observations of material related to the investigation contained on the defendant's iPhones, in combination with the types of evidence that can back up to an iCloud account, when finding a "fair probability" that evidence of a crime would be found in the defendant's iCloud account. The evidence, as established by the record, is far more formidable than mere probable cause, and thus, the standard is met in this case.

### III.   THE IPHONE 6 WAS THE DEFENDANT'S WORK PHONE

The defendant argues that the government failed to demonstrate "through evidence that the iPhone 6 is an official government-issued device." ECF No. 236 at 7. In support of his argument, the defendant makes the wholly unsupported claims that the iPhone 6 was "not even connected to a United States Government server," was "incapable of any United States Government communications," and was "replete with personal applications which likely could not even be installed on an official government phone." *Id*.

At the evidentiary hearing, the government established that the defendant was a government employee assigned to Mexico through several exhibits, all admitted without objection. *See*, *e.g*., Gov't Ex. 4-A (Under Seal) at ¶ 16-17, Gov't Ex. 4-C (Under Seal) at ¶ 7-8, and 4-G (Under Seal) at ¶ 9, 16; *see also* Gov't Ex. 4-B (Under Seal) at ¶ 6, 8; Gov't Ex. 4-D (Under Seal)

at ¶ 7-8; Gov't Ex. 4-E (Under Seal) at ¶ 9, 11; Gov't Ex. 4-F (Under Seal) at ¶ 12; Gov't Ex. 4-H (Under Seal) at ¶ 9; Gov't Ex. 4-I (Under Seal) at ¶ 6, 8; Gov't Ex. 4-J (Under Seal) at ¶ 7-8; Gov't Ex. 4-K (Under Seal) at ¶ 7-8; Gov't Ex. 4-L (Under Seal) at ¶ 6-7; Gov't Ex. 4-M (Under Seal) at ¶ 7-8; Gov't Ex. 4-N (Under Seal) at ¶ 9, 16; Gov't Ex. 4-O (Under Seal) at ¶ 9; Gov't Ex. 4-P (Under Seal) at ¶ 11; Gov't Ex. 4-Q (Under Seal) at ¶ 7. Additionally, the defendant mentions his work in the sealed portions of the June 2 and June 6, 2020 interviews. *See* Gov't Ex. 9, 11, 25; Def. Ex. 6. When the defendant mentioned his "work" phone or the "Mexico" phone, he was referencing the iPhone 6 because the iPhone 6 was his government-issued work phone. It strains credulity to argue otherwise. To the extent that the Court has additional questions regarding whether the iPhone 6 was "an 'official' government-issued device," ECF No. 236 at 7, including how the work phone was issued or whether it was utilized for work purposes or communications, the government can utilize the CIPA process to provide that information.[10]

---

[10] Before the government filed its post-hearing supplemental brief, the government offered to discuss these matters with the defense team in a secured environment.

## **CONCLUSION**

Accordingly, the government respectfully requests that this Court deny the defendant's motion to suppress evidence.


Respectfully Submitted,

| | |
|---|---|
| MATTHEW M. GRAVES<br>UNITED STATES ATTORNEY<br>District of Columbia | KENNETH A. POLITE, JR.<br>ASSISTANT ATTORNEY GENERAL<br>U.S. Department of Justice<br>Criminal Division |
| /s/<br>Meredith E. Mayer-Dempsey<br>NY Bar No. 5213202<br>Assistant United States Attorney<br>United States Attorney's Office<br>for the District of Columbia<br>601 D Street, Northwest<br>Washington, D.C. 20530<br>(202) 252-7259<br>Meredith.Mayer-Dempsey@usdoj.gov | /s/<br>Angela N. Buckner<br>DC Bar No. 1022880<br>Trial Attorney<br>U.S. Dept. of Justice, Criminal Division<br>Human Rights and Special Prosecutions<br>1301 New York Avenue, Northwest<br>Washington, D.C. 20530<br>(202) 616-0238<br>Angela.Buckner.2@usdoj.gov |