

U.S. Department of Justice

MATTHEW M. GRAVES
United States Attorney

District of Columbia

*Judiciary Center*
*601 D Street NW*
*Washington, DC 20530*

October 1, 2023

**By Email**

| | |
|---|---|
| Anthony Joseph Jay, III, Esq. | John Peter Marston, Esq. |
| Denise Elizabeth Giraudo, Esq. | James Gross, Esq. |
| SHEPPARD MULLIN RICHTER & HAMPTON LLP | FOLEY HOAG LLP |
| 2099 Pennsylvania Avenue, NW Suite 100 | 1717 K Street, NW |
| Washington, DC 20006 | Washington, DC 20006 |
| (202) 747-1953 | (202) 261-7321 |
| (202) 747-1906 | (212) 812-0422 |
| Email: jjay@sheppardmullin.com | Fax: (202) 785-6687 |
| Email: dgiraudo@sheppardmullin.com | Email: jmarston@foleyhoag.com |
| | Email: jgross@foleyhoag.com |

    Re:    United States v. Brian Jeffrey Raymond
             Case No.: 21-cr-380 (CKK)
             Expert Notice – First Supplement

Dear Counsel:

       Pursuant to Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure, the United States hereby provides supplemental notice that it may introduce the testimony of an expert in the fields of digital forensics, forensic chemistry, forensic genetics, medical toxicology, and sexual assault examination. As required by Rule 16, such disclosures include a complete statement of all opinions rendered by these witness that the government intends to use during its case-in-chief at trial under Federal Rules of Evidence 702, 703, or 705, or during its rebuttal to counter testimony that the defendant has timely disclosed under (b)(1)(C). It additionally includes the bases and reasons for the opinions of the witness, the qualifications of the witness, publications authored by the witness in the previous 10 years, and a list of all other cases in which, during the previous 4 years, the witness has testified as an expert.

I.   **DIGITAL FORENSICS**

   **A. Joesph Soeka**

As you know, the government intends to call Department of Justice Senior Digital Investigative Analyst Joseph Soeka as an expert in the field of Digital Forensics. *See* ECF Nos. 252-1, 262. As previously indicated in our filing at ECF No. 252-1, a full summary of Mr. Soeka's professional credentials is included in his curriculum vitae. The government writes to provide the following additional information regarding his training and qualifications:

First, and as outlined in the government's filing at ECF No. 262 at 18, Mr. Soeka has conducted forensic analysis of approximately 200 seized computer systems, servers, mobile devices, and other media to provide investigative and analytical support to prosecutors and law enforcement agencies. Relevant here, in the last year alone, Mr. Soeka has conducted or assisted with approximately 52 iCloud Forensic Supports.

In our filing at ECF No. 262 at 17, we note that Mr. Soeka's CV includes in the "Training and Continued Education" section the following training:

- DF320 Advanced Digital Forensic Analysis: MAC OS (June 2021)
- DF330 Advanced Digital Forensic Analysis: IOS and Android (January 2022)
- FOR518: MACOS and IOS Forensics (May 2023)[1]

Mr. Soeka will explain that these trainings involve not only analysis of the Apple device itself, but also of the linked cloud services. Furthermore, the "Professional Certifications" section of Mr. Soeka's CV lists, among other certifications, the following:

- Advanced Smartphone Forensic Examiner (December 2018)
- Certified Forensic Examiner (November 2020)
- Certified Forensic Analyst (August 2022)

Mr. Soeka will explain that certifications regarding digital forensic analysis include not only the literal analysis of devices, but also the analysis of linked accounts, including cloud accounts. This is in part because sometimes the only way to analyze the contents of a device is to review the "backup"[2] located in the linked cloud account.

More broadly, Mr. Soeka will explain how phones interact with cloud services, such as iCloud. This includes the fact that requests for the analysis of Apple devices often includes the analysis of iCloud productions. This sometimes occurs because analysts cannot gain access to the Apple device itself and instead analyze the device contents through the "backups" located in the

---

[1] MAC OS is the Apple operating system on computers and laptops. iOS is the mobile operating system that runs on mobile devices.

[2] A "backup" is a copy of data on a device created, among other reasons, in case the original data is lost.

iCloud. The iCloud "backup" is organized much like the linked device itself such that the data located in the iCloud includes very similar file and folder paths. Relevant to Mr. Soeka's Cellebrite certifications, Mr. Soeka will explain that analysts often load the data from an iCloud account into Cellebrite for analysis.

Second, in addition to the training and experience outlined above and in our filing at ECF No. 262, last week, Mr. Soeka completed a four-month long certification in the field of MacOS and iOS Forensics, the GIAC iOS and MacOS Examiner (GIME) practitioner certification. The exam certification objectives and outcomes cover the following topics and statements:

- **Apple Application Analysis**: The candidate will analyze configurations and data for contacts, notes, wallet, photos, maps, screen time and apple watch applications.

- **Apple File System Artifacts**: The candidate will examine event artifacts created by file system operations, operating system use, Spotlight, and removable media devices.

- **Apple Systems Triage**: The candidate will prepare system triage with fundamental system artifacts. Triage information includes system identifiers, OS installation and backup dates, management profiles, network information, and user accounts.

- **Application Fundamentals**: The candidate will identify basic application data structures and construct SQL queries to examine the data.

- **Document and iCloud analysis**: The candidate will distinguish changes across document versions and iCloud data.

- **Incident Response**: The candidate will examine artifacts created by malicious code and analyze volatile system artifacts.

- **Introduction to Apple Operating Systems**: The candidate will differentiate between system acquisition and data types available for analysis.

- **Introduction to Disk and File Systems**: The candidate will identify key data types associated with Apple systems and mount system images for analysis.

- **Log Analysis and Timeline Creation**: The candidate will correlate key log types and create an event timeline.

- **Memory and Encrypted Container Analysis**: The candidate will analyze memory captures and use brute force techniques to access encrypted data for analysis.

- **Pattern of Life**: The candidate will organize system-based artifacts to track user behavior and habits.

- **Productivity Application Analysis**: The candidate will analyze configurations and data for mail, safari, communication, calendar, and reminder applications.

- **User Data and System Configuration**: The candidate will identify artifacts created from system configuration and user data.

Course information is located here: GIAC iOS and macOS Examiner | Cybersecurity Certification.

Finally, we have added to **Exhibit C** (Mr. Soeka's CV) six separate certifications:

1. Certified Forensic Computer Examiner
2. Certified Mobile Device Examiner
3. GIAC Certified Forensic Examiner – GCFE
4. GIAC Certified Forensic Analyst – GFCA
5. GIAC Certified Forensic Examiner – GCFE
6. GIAC iOS and macOS Examiner (GIME)

The updated Exhibit C is attached to this letter.

## II.    FORENSIC CHEMISTRY AND FORENSIC GENETICS

The government recently received permission to meet with several of the experts who examined AV-1, conducted testing of samples, and/or or issued findings regarding AV-1. These meetings took place from Tuesday, September 26 to Friday, September 29. During those meetings, the government spoke with each expert individually about their training, qualifications, and report of findings. A summary of the information gathered from those meetings is included below. A 302 documenting each meeting and attaching the agent's notes is also forthcoming.

As to CVs, the government has sought permission from the Government of Mexico through diplomatic channels to obtain a copy of each expert's CV. Once permission is received, the expert will transmit the CV to the government. In the interim, the government is requesting from each expert an unofficial copy.

Regarding the laboratory testing done in this case, the laboratories in Mexico are accredited and follow the standards laid out by the International Organization for Standardization ("ISO"). *See* https://www.iso.org/home.html. Specifically, laboratories follow ISO 9001 for quality management systems and ISO 17025 for testing and calibration laboratories.

Finally, the government directs your attention to the Fiscalia General de la Republica case summary of the investigation involving AV-1. The summary was previously disclosed at Bates Number 15775 and is attached to this letter as **Exhibit L**.[3]

### A. Estela Valdes Figueroa

Ms. Estela Valdes Figueroa is a forensic genetics expert assigned to the Genetica Forense de La Coordinacion General de Servicios Periciales de la Fiscalia General de la Ciudad de Mexico. She has held this position for 28 years. For the last 20 years, she has worked in genetics. The genetics laboratory provides a variety of services, including serology testing, general DNA testing, paternity testing, and testing related to the identification of missing and deceased person.

---

[3] For clarity, exhibit numbering is based off the government's initial expert notice.

Ms. Valdes Figueroa studied for four and a half years at Universidad del Valle de Mexico, after which she received her degree in chemical pharmaceutical biology. Ms. Valdes Figueroa also possesses a law degree. Ms. Valdes Figueroa's additional diplomas and certifications include criminalistics, forensic medicine, and biological sampling. Ms. Valdes Figueroa is a licensed professional expert, and her profession requires that she complete continuing education courses every year. Ms. Valdes Figueroa also teaches courses for other experts.

Ms. Valdes Figueroa has not testified as an expert in the United States. She has testified as an expert in the areas of forensic genetics and forensic chemistry in Mexico City, Mexico. Ms. Valdes Figueroa testifies approximately 40 times per year.

**As to AV-1, Ms. Valdes Figueroa conducted testing for the presence of semen based on samples collected from AV-1's body.** *See* **Bates Numbers 9390, 15778. Ms. Valdes Figueroa's report includes her methods and results.**

When she testifies, Ms. Valdes Figueroa will provide general background information regarding DNA and serology testing, the steps that the Forensic Genetics Laboratory takes to ensure quality control, and what factors may affect whether a sample would test positive or negative for DNA or serology. Ms. Valdes Figueroa will testify to conclusions consistent with those included in her report of analysis. She will testify to what the conclusions were and how she reached them. Ms. Valdes Figueroa's report was disclosed to defense on or about June 16, 2021. The file containing the report begins at Bates Number 9371, and Ms. Valdes Figueroa's findings begin at Bates Number 9390. In keeping with the exhibit number associated with the government's initial notice, the report is also attached as **Exhibit F-1**. *See also* Bates Numbers 4424, 6223, 6814.

### B. Magnolia Cabrera Amaro

Ms. Magnolia Cabrera Amaro is a forensic chemistry expert assigned to the laboratorio de quimica de la Coordinacion General de Servicios Periciales de La Fiscalia General de la Ciudad de Mexico. She has held this position for 13 years. The laboratory performs a variety of services, including conducting toxicology testing.

Ms. Cabrera Amaro studied for seven years at Universidad Nacional Autonoma de Mexico, after which she received her degree in chemical pharmaceutical biology. Ms. Cabrera Amaro also possesses a master's degree in criminalistics from the Colegio Libre de Estudios Universitarios (CLEU) in Mexico City, Mexico. Ms. Cabrera Amaro's additional diplomas and certifications include forensic medicine. Ms. Cabrera Amaro is a licensed professional expert, and her profession requires that she complete continuing education courses every year. Ms. Cabrera Amaro also teaches forensic chemistry at CLEU.

Ms. Cabrera Amaro has not testified as an expert in the United States. She has testified as an expert in forensic chemistry in Mexico City, Mexico. Ms. Cabrera Amaro testifies, on average, approximately two or three times per year.

**As to AV-1, Ms. Cabrera Amaro determined that AV-1's urine sample did not reveal the consumption of cocaine, cannabis, barbiturates, benzodiazepines, amphetamines, or**

**opioids.** *See* **Bates Number 15778, 9392. Ms. Cabrera Amaro also made a determination regarding AV-1's urine alcohol level. Ms. Cabrera Amaro's report includes her methods and results.**

Ms. Cabrera Amaro will provide general background information regarding sample testing, the steps that the Forensic Chemistry Laboratory takes to ensure quality control, and what factors may affect whether a sample would test positive or negative for a substance. Ms. Cabrera Amaro will testify to conclusions consistent with those included in her report of analysis. She will testify to what the conclusions were and how she reached them. Ms. Cabrera Amaro's report was disclosed to defense on or about June 16, 2021. The file containing the report begins at Bates Stamp number 9371, and Ms. Cabrera Amaro's findings begin at Bates Number 9392. The report is also attached as **Exhibit F-2**. Ms. Cabrera Amaro's testimony will be consistent with her March 29, 2021 interview, disclosed to the defense on March 8, 2022, Bates Number 18797. *See also* Bates Numbers 4424, 6223, 6814.

### C.  Dr. Carla America Juarez Rocha

Dr. Carla America Juarez Rocha is a medical doctor and professional medical expert, a position she has held for approximately nine years. Dr. Juarez Rocha is assigned to the Coordinacion General de Servicios Periciales de La Fiscalia General de la Ciudad de Mexico.

Dr. Juarez Rocha received her medical degree from the Universidad Nacional Autonoma de Mexico after six years of study. Dr. Juarez Rocha's additional diplomas and certifications include forensic medicine and prevention and treatment of sexual violence and abuse. Dr. Juarez Rocha is a licensed professional expert. Dr. Juarez Rocha's profession requires that she complete continuing education courses every year. Some of Dr. Juarez Rocha's qualifications are documented at Bates Numbers 4593-4596. Dr. Juarez Rocha routinely renders opinions in the fields of sexual assault, child abuse, and forensic chemistry. Rendering an opinion sometimes requires conducting a physical evaluation of an alleged victim or interviewing the alleged victim or the accused perpetrator. Other times, Dr. Juarez's opinion is based off a review of the case file.

Dr. Juarez Rocha has not testified as an expert in the United States. She has testified as an expert in the areas of sexual assault, forensic chemistry, and child abuse in Mexico City. Dr. Juarez Rocha testifies, on average, once a month.

**As to AV-1, Dr. Juarez Rocha reviewed AV-1's urine results and determined, based on those results, AV-1's estimated blood alcohol level at the time of the alleged offense.** *See* **Bates Number 15779, 4591.[4] Dr. Juarez Rocha's report includes her methods and results.**

---

[4] The opinion located at Bates Number 4591 is that of Dr. Juarez Rocha. In the first page of that document, the "Background" section references AV-1. There is a different version of this report in which the "Background" section references the wrong alleged victim, a person with the initials P.V. The government has included both versions of the first page, the one referencing AV-1 and the one referencing P.V. When opening the report, there will be three copies of the first page of the report: (1) original Spanish for AV-1, (2) original Spanish for wrong victim, (3) English

At trial, Dr. Juarez Rocha will testify about her training, qualifications, and experience consistent with her curriculum vitae. Dr. Juarez Rocha will testify to conclusions consistent with those included in her report She will testify to what the conclusions were and how she reached them. The report is attached as **Exhibit F-3**. *See also* Bates Numbers 4424, 4591, 6223, 6814.

### D.  Carlos Christian Cortes Serrano

Mr. Cortes Serrano is a forensic chemistry expert assigned to the Coordinacion General de Servicios Periciales de esta Dependencia, Fiscalia General de la Republica in Mexico City. He has held this position for approximately 17 years. Whereas the experts listed above work for the City of Mexico, Mr. Cortes Serrano works for the federal government covering all 31 districts in the country of Mexico. His laboratory provides services related to toxicology screening, testing of heavy metals, firearm residue testing, and the identification of explosives. The laboratory also responds to crime scenes to take samples.

Mr. Cortes Serrano received his degree in chemical pharmaceutical biology from the Universidad Veracruzana after four and a half years of study. Mr. Cortes Serrano's additional certifications include that he is a licensed professional expert. Mr. Cortes Serrano's profession requires that he complete continuing education courses every year.

Mr. Cortes Serrano routinely renders opinions in the field of forensic chemistry, either as the primary expert, or as part of a second review ordered by the court. When opinions are rendered, they are reviewed by a supervisor for both technical and administrative accuracy. Mr. Serrano also serves as a technical advisor at trial, advising the prosecutor on what questions to ask the defense expert.

Mr. Cortes Serrano has not testified as an expert in the United States. He has testified as an expert in forensic chemistry in Mexico. Mr. Cortes Serrano's testifies, on average, once or twice a year.

**As to AV-1, Mr. Cortes Serrano became involved in the case after the initial testing was done, as the effort to identify what drug incapacitated AV-1 continued.** *See*, *e.g.*, **Bates Numbers 5010, 5023, 5050. Mr. Cortes Serrano performed multiple tests and determined that AV-1's urine sample did not reveal the consumption of cannabis (marijuana), cocaine, opioids, amphetamines, benzodiazepines, or methamphetamines.** *See* **Bates Number 15782. Mr. Cortes Serrano's report includes his methods and results.**

At trial, Mr. Cortes Serrano will testify about his training, qualifications, and experience consistent with his curriculum vitae. Mr. Cortes Serrano may provide general background

---

translation of first page referencing wrong victim. The remaining two pages are the same in both versions of the report. Dr. Juarez Rocha will confirm that the "Background" section referencing the person with the initials P.V. is not the correct version of the report.

information regarding toxicology examinations, the steps that the Criminal Laboratories takes to ensure quality control, and what factors may affect whether certain drugs may be detected in a sample. Mr. Cortes Serrano will also testify regarding the Laboratory's reporting mechanisms, to include the amount of a substance that must be contained within a sample to report it as "detected" and what factors may affect that analysis. Mr. Cores Serrano will explain how the laboratory determines which substances to test for, and the factors that may lead to an unexplained result.

Mr. Cortes Serrano will testify to conclusions consistent with those included in his report of analysis. He will testify to what the conclusions were and how he reached them. The report is also attached as **Exhibit M**. In addition to his report, Mr. Cortes Serrano's testimony will be consistent with his April 6, 2021 and September 29, 2021 interviews. *See* Bates Numbers 18801, 20623.

### III.   MEDICAL TOXICOLOGY

As you know, the government intends to call Dr. Michael Levine as an expert in the field of Medical Toxicology. *See* ECF Nos. 252-1, 262. The government writes to provide the following additional information:

Dr. Levine will testify as to the methodology used for his analysis in this case. He will explain that the methodology is essentially the same process he and other doctors use when assessing a patient who presents at the emergency room for treatment: he takes a medical history from the patient and then observes and analyzes any physical symptoms.

Dr. Levine will testify that a "medical history" does not necessarily mean a full history of the patient or even a history of the patient beyond the events which brought them into the E.R. In fact, doctors routinely treat E.R. patients without access to their full medical history or medical records. Sometimes, the patient can communicate with the doctor about their history and symptoms. Other times, due to the nature of the patient's ailment, the doctor may not be able to directly communicate with the patient. In these circumstances, Dr. Levine and doctors in his field must sometimes rely on information from third parties, such as family members or witnesses to the patient's behavior, to the extent that such information is available.

While Dr. Levine will note and consider in his analysis the lack of certain information, such as a fulsome review of medical records or medical history beyond the acute event, the lack of this information does not prevent Dr. Levine from using the data before him to opine as to a patient's condition and form a treatment plan. This approach and methodology are pervasive throughout the medical community, widely accepted, and in fact, routine.

Dr. Levine will testify that, here, he analyzed the prior statements of the Adult Victims ("AVs") in the same manner that he would analyze a patient history from an emergency room

patient. And, like the vast majority of patients in the emergency room, the lack of a full medical history and prior medical records from the AVs in no way prevented him from analyzing the symptoms and root cause. Dr. Levine will further testify that, much as he analyzes the physical symptoms of patients in the emergency room, he analyzed the AV's physical symptoms using the photographs and videos provided, where available.

As to absence of toxicology results, Dr. Levine will testify that this in no way renders him incapable of issuing an opinion. In fact, Dr. Levine will testify that due to the inaccuracy of rapid tests and the length of time more fulsome testing takes, toxicology tests are not routinely used in the emergency room to diagnose a patient's condition. Instead, he and other doctors in his field must routinely determine the cause of a patient's ailments and propose a course of treatment without the benefit of such tests.

Dr. Levine's experience is not theoretical or based solely on academic research. He is a medical doctor with vast experience in clinical practice dealing with live patients – a qualification a toxicologist holding a PhD alone does not have. Thus, his ability to opine based on his observations of a patient's condition and reported medical history, even if limited, is supported by his years of experience. Further, Dr. Levine will testify that the above-described methodology is virtually uniformly practiced by doctors, widely accepted in the medical community, and in fact, taught in medical school.

Additionally, Dr. Levine will testify that different substances have their own toxidrome, or combinations of signs and symptoms associated with a specific class of a substance. He will further explain that recognizing a toxidrome for a particular class of substances is central to the practice of toxicology and routinely used to determine whether a specific class of toxin is responsible for a patient's symptoms. This sort of analysis is widely accepted in the medical field and in the field of toxicology specifically.

Dr. Levine will testify that, in his nearly 20 years of practice, he has regularly come across patients in the emergency room under the influence of alcohol, GHB, powerful sedatives, and dissociative agents and is familiar with the toxidrome of these substances. In his years of practice, Dr. Levine has routinely interacted with patients under the influence of GHB, for a total of at approximately 75 - 100 cases. Moreover, in recent months, there has been an increase in the number of patients admitted to the E.R. under the influence of GHB. As to powerful sedatives and dissociative agents, Dr. Levine has not only observed their effects on patients who present at the emergency room under their influence but has himself administered these substances to patients to treat them. Dr. Levine has observed thousands of patients under the influence of such substances. And, Dr. Levine has observed thousands of patients admitted to the emergency under the influence of alcohol. Notably, Dr. Levine has observed thousands of patients under the influence of a combination of alcohol and another incapacitating agent, to include sedatives, dissociative agents,

and GHB. As a result, he is able, and in fact routinely does, analyze patients to opine on the substances most likely causing their symptoms.

Finally, in addition to his personal experience treating patients of this type, Dr. Levine is well-versed in the academic literature involving the diagnoses of substances, has been published numerous times, and has on multiple occasions provided expert testimony in this area.

Please note that the government has made certain other disclosures in an email dated September 30, 2023.

IV.   **SEXUAL ASSAULT EXAMINATION**

   A. **Dr. Nemesis Guadalupe Rodriguez Ortega**

Dr. Nemesis Guadalupe Rodriguez Ortega is a medical doctor and sexual assault expert, a position she has held for more than eight years. She is assigned to La Fiscalia General de Justicia de la Ciudad de Mexico.

Dr. Rodriguez Ortega received her medical degree from the Universidad Nacional Autonoma de Mexico after six years of study. Dr. Rodriguez Ortega also possesses a master's degree in criminalistics. Additionally, Dr. Rodriguez Ortega is a licensed professional expert. Dr. Rodriguez Ortega's profession requires that she complete continuing education courses every year. Some of Dr. Rodriguez Ortega's qualifications are documented at Bates Numbers 4444-4446. Dr. Rodriguez Ortega's prior work experience includes work with victims of human trafficking. In that position, she conducted sexual assault examinations.

Dr. Rodriguez Ortega has not testified as an expert in the United States. She has testified as an expert in the area of sexual assault in Mexico City, Mexico. Dr. Rodriguez Ortega testifies, on average, once a week.

**As to AV-1, Dr. Rodriguez Ortega will describe what she observed during her May 31, 2020 examination of AV-1 in this case, as documented in the report disclosed to the defense team on or about January 27, 2021 and June 3, 2021. The file containing the report begins at Bates Numbers 603 and 4435, respectively. Dr. Rodriguez Ortega determined that AV-1 had injuries consistent with a friction mechanism and a hard object with blunt edges. *See* Bates Numbers 610, 4887, 15777.**

At trial, Dr. Rodriguez Ortega will testify about her training, qualifications, and experience consistent with her curriculum vitae. Dr. Rodriguez Ortega will testify as an expert in sexual assault examination and sexual assault injuries, mechanisms of injury, and the physical appearances/manifestations of injuries. Her testimony will include information on sexual assault examinations, including how they are typically conducted. Dr. Rodriguez Ortega's description of sexual assault examinations will include information such as whether and what type of questions are asked, how those questions inform the examination, and whether examinations include findings.

Dr. Rodriguez Ortega's testimony will include information on genital anatomy, the healing of injuries, the most common types of injuries observed, the significance of the presence or absence of genital injury in sexual assaults, and the potential causes of such injuries (e.g., how injuries to this area may or may not be incurred as a result of penetration by a foreign object, such as a penis). She also will testify regarding how quickly various types of injuries heal and what may and may not be gleaned from the presence or absence of certain injuries in cases involving allegations of sexual assault. Dr. Rodriguez Ortega will testify as to the frequency and types of injuries she has observed in her own practice. She may utilize or reference a diagram or model of the genital anatomy during the course of her testimony at trial.

Dr. Rodriguez Ortega will explain how and why she reaches a conclusion regarding genital injury. In rendering her opinion, Dr. Rodriguez Ortega will testify with respect to some of the factors that can affect whether an injury is observed during the examination of an individual who has been the victim of a sexual assault. She will base this on her own experiences, which is corroborated by her training and education in this area.

Dr. Rodriguez Ortega may testify about the prophylactic medications offered to sexual assault victims at the conclusion of a sexual assault examination and their side effects.

As with the forensic chemists and forensic geneticist, the government has sought permission from the Government of Mexico through diplomatic channels to obtain a copy of the expert's CV. Once permission is received, the expert will transmit the CV to the government. In the interim, the government is requesting an official copy.

Please let us know if you have any questions.

Sincerely,

| | |
|---|---|
| MATTHEW M. GRAVES<br>UNITED STATES ATTORNEY<br>United States Attorney's Office<br>for the District of Columbia | NICOLE M. ARGENTIERI<br>ACTING ASSISTANT ATTORNEY<br>GENERAL<br>U.S. Department of Justice<br>Criminal Division |
| /s/<br>Meredith E. Mayer-Dempsey<br>Assistant United States Attorney | /s/<br>Angela N. Buckner<br>Katharine A. Wagner<br>Trial Attorneys |