UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.

BRIAN JEFFREY RAYMOND,

Defendant

Criminal Action No. 21-380 (CKK)

**MEMORANDUM OPINION AND ORDER**
(October 5, 2023)

Defendant Brian Jeffrey Raymond ("Defendant") is charged by indictment with various sex offenses allegedly committed in, among other countries, Mexico and the United States. [1] Six of the twenty-five counts in the operative indictment charge Defendant with using "a drug, intoxicant, [or] other similar substance" in order to render a victim unconscious before sexually assaulting her. *See generally* Indictment, ECF No. 184 (Feb. 23, 2023). To prove this charge, the Government intends to introduce expert testimony by Dr. Michael Levine, an expert in medical toxicology. Before the Court is Defendant's [258] Motion to Exclude the Testimony of [Dr.] Michael Levine ("Motion" or "Mot."). To resolve the Motion, the Court held a *Daubert* hearing on October 2, 2023, at which both the defense and the Government questioned Dr. Levine. Upon consideration of that voir dire, the parties' briefing, the relevant legal authority, and the entire record, the Court **GRANTS IN PART AND DENIES IN PART** Defendant's [258] Motion to Exclude the Testimony of [Dr.] Michael Levine. The Court will permit Dr. Levine to opine that certain victims were under the influence of an intoxicant or dissociative agent, but will not permit

---

[1] The Court assumes the reader's familiarity with the factual and procedural background of this case. For background, the Court refers the reader to *United States v. Raymond*, 640 F. Supp. 3d 9 (D.D.C. Oct. 26, 2022) ("*Raymond I*", *United States v. Raymond*, 2023 WL 3040453 (D.D.C. Apr. 21, 2023), and *United States v. Raymond*, 2023 WL 6294178 (D.D.C. Sept. 27, 2023).

1

Dr. Levine to opine as to the identity of a particular intoxicant or dissociative agent.

I.  **BACKGROUND**

An investigation of Mr. Raymond began after police responded, on May 31, 2020, to reports of a naked woman ("AV-1") screaming on the balcony of Defendant's residence in Mexico City, Mexico, leased by the United States Government for Embassy employees. When Mr. Raymond was interviewed in Mexico City by Mexican and American authorities, he indicated that he had met AV-1 online, and the two had gone to his apartment, had drinks, and engaged in consensual intercourse. *See Raymond I*, 640 F. Supp. 3d at 14. A June 2, 2020 interview with AV-1 indicated that she had met with Mr. Raymond outdoors, and he brought wine in a backpack. *Id.* After going to his apartment, where they drank more wine and ate light snacks, she could not remember anything—including intercourse or standing and screaming on his balcony—until she awoke in an ambulance. *Id.* When the Federal Bureau of Investigation ("FBI") ran an analysis on AV-1's urine sample in connection with the incident, they found cocaine, methamphetamine, and theophylline (prescribed in Mexico as a bronchial dilator asthma medication) in her system but did not find any evidence of so-called "date rape" substances. *Id.* Based on the incident with AV-1, on June 2, 2020, law enforcement executed a search warrant for Defendant's devices. *Id.* at 15.

This warrant, and others, turned up a hoard of videos depicting Defendant sexually assaulting unconscious women. *Id.* at 18. This recovered media establishes, the Government claims, that Defendant has long enacted a violent sexual fetish to lure unsuspecting women through dating applications (e.g., Tinder) to Defendant's home, drug them, and film himself sexually abusing them. As the initial order mandating Defendant's detention pending trial explained,

> the United States [has] proffered evidence of yet to be charged offenses that involve at least twenty-three victims including a victim who alleges sexual assault in [Mexico City]. . . . The United States began its investigation of Defendant in May of 2020 when a female reported that Defendant sexually assaulted her at a U.S. Embassy[-

2

>  ]rented apartment in Mexico City. . . . Further investigation into Defendant yielded the discovery of numerous videos and photographs in which Defendant appears to be filming unconscious [and nude] females.  The interview of the victim in the charged offense revealed that she had no idea that defendant had filmed her or that he had pulled her bra down[,] exposing her breasts.

Detention Order at 2, ECF No. 14, *United States v. Raymond*, No. 3:20-mj-0442-LL (Oct. 19, 2020).  As the Court explained in more detailed in its memorandum opinion denying Defendant's motion for release on bond pending trial, the multiplicity and the graphic nature of the video and photo evidence is substantial:  multiple women are depicted in various states of undress while Defendant manipulates their bodies (including, but not limited to, their eyelids, mouths, and limbs).  *United States v. Raymond*, Crim. A. No. 21-380 (CKK), 2023 WL 304453, at *6-7 (D.D.C. Apr. 21, 2023).  At times, Defendant's erect penis can be seen.  *Id.* at *6.

In addition to photographic and video evidence, the Government has relied on Defendant's search history and interviews with witnesses and alleged victims to demonstrate that, for many, he drugged his victims before sexually abusing him.  *Id.*  The Government claims that Defendant researched interactions between Ambien and alcohol, and sent an inquiry to an online pharmacy to obtain chloral hydrate, a cousin of Rohypnol (commonly called a "roofie"), and otherwise conducted queries related to so-called "date rape" drugs generally.  *Id.*

To demonstrate that Defendant in fact used this class of drugs on his alleged victims, the Government intends to call Dr. Michael Levine ("Dr. Levine").  Dr. Levine is an associate professor of emergency medicine and co-director of the Division of Medical Toxicology at the University of California, Los Angeles.  Def.'s Hrg. Ex. 4 at 1 ("Expert Report").  Over eighteen years of practicing emergency medicine and fourteen years of practicing medical toxicology, Dr. Levine has diagnosed "thousands" of patients regarding drug toxicity.  Hrg. Trans., ECF No. 285 at 92:2-7 ("Trans').  He is also a member of the American College of Medical Toxicology, through

which he helps develop instruction on medical toxicology in medical schools throughout the country. *See* Expert Report at 1. The Government retained Dr. Levine to offer an opinion as to "whether each [victim's] physical state at the time of the charged conduct is consistent with alcohol intoxication alone [or also with] an incapacitating agent," i.e., a "date rape" drug.[2]

Dr. Levine answered this question in the affirmative as to each alleged victim. Additionally, Dr. Levine offered the following "composite opinions:"

1. There is a clear pattern described that is consistent with intoxication from an incapacitating agent[, as opposed to alcohol alone].

2. [Although] [t]here are several possible drugs that could have been used[,] . . . the most likely scenario is gamma hydroxybutyrate (GHB), or one of its precursors.

3. Urine drug testing is not an absolute indicator of whether a substance was previously present in a patient's system [in part because] . . . GHB is metabolized rapidly. Thus, even if AV-1's urine did not show GHB, it certainly does not mean that GHB was not present.

Expert Report at 35-36. In reaching these opinions, Dr. Levine relied mainly on documentary material and multimedia provided by the Government. *Id.* at 2. That material is voluminous, comprising nearly a thousand files, including videos and photos of the victims at the time of their impairment, victim statements to law enforcement, and Defendant's communications regarding the alleged victims before, during, and after their incapacitation. *See* Expert Report at 2-23.

In reviewing this material to come to his conclusions, Dr. Levine used the "differential diagnosis" method, sometimes termed "differential etiology." *See* Trans. at 142:9-14. This method is a common process employed by clinical physicians in everyday practice to determine the cause of a patient's particular ailment. *See Patteson v. Maloney*, 958 F. Supp. 2d 169, 175 (D.D.C. 2013). After determining the patient's ailment, a physician engages in a process of

---

[2] The Government posed this question as to the following alleged victims: AV-1, AV-2, AV-4, AV-5, AV-6, AV-7, AV-8, AV-9, AV-12, AV-15, AV-17, AV-22, AV-23, and AV-26.

elimination, selecting from a number of possibilities the disease or diseases which come nearest to explaining the patient's symptoms. *United States v. Chikvashvili*, 459 F.3d 285, 193 (4th Cir. 2017). For instance, consider a patient who complains of shortness of breath and a persistent cough—determining whether the cause is a severe disease such as lung cancer or a minor ailment like bronchitis is differential etiology. Wendy Ertner, *Just What the Doctor Ordered: The Admissibility of Differential Diagnosis in Pharmaceutical Product Litigation*, 56 Vand. L. Rev. 1227, 1240 (2003). A reliable version of this process "typically, although not invariably," involves a physical exam, review of a patient's medical history, and the review of clinical tests, as necessary. *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 262 (4th Cir. 1999). Here, Dr. Levine took a more atypical course, replacing a physical exam with photos and videos of alleged victims, and replacing a review of a patient's medical history with victim statements to law enforcement. *See* Trans. at 77:17-19. Whether this form of differential etiology has produced proper expert testimony is the main question before the Court.

## II. LEGAL STANDARD

Federal Rule of Evidence 702 governs the admission of expert testimony. The rule states that: "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue; (b)the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principals and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." *Id.* The trial judge has "considerable leeway in deciding in a particular case how to go about determining whether particular" testimony is expert testimony and, if so, it is reliable. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

This inquiry is governed by the Supreme Court's opinion in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Under *Daubert*, if the Court concludes that the proposed testimony is that appropriately delivered by an expert, the Court "is required to address two [further] questions, first whether the expert's testimony is based on 'scientific knowledge,' and second, whether the testimony 'will assist the trier of fact to understand or determine a fact in issue.'" *Meister v. Med. Eng. Corp.*, 267 F.3d 1123, 1126 (D.C. Cir. 2001). "[I]n order to qualify as 'scientific knowledge, an inference or assertion must be derived by the scientific method.'" *Id.*

"[T]he proponent of [expert] evidence . . . bear[s] the burden to prove the expert testimony is reliable" and admissible. *See Arias v. DynCorp*, 928 F. Supp. 2d 10, 17 (D.D.C. 2013).

## III. DISCUSSION

Defendant concedes that Dr. Levine is an expert in medical toxicology, mainly instead that the process by which Dr. Levine came to his conclusions is insufficiently reliable. Defendant also argues, evidently in the alternative, that Dr. Levine would offer lay, not expert, opinion. Both arguments fail.

### A. Reliability

#### 1. Dissociative Agents Generally

It is incumbent upon the Court as gatekeeper to determine whether the proffered testimony "is relevant, reliable, and helpful to the jury's evaluation of such evidence." *United States v. Morrow*, 374 F. Supp. 2d 51, 60 (D.D.C. 2005) (CKK). Differential diagnosis generally fits the bill, because it is "a tested methodology, has been submitted to peer review/publication, does not frequently lead to incorrect results, and is generally accepted in the medical community." *Patteson*, 968 F. Supp. 2d at 175 (quoting *Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1208 (8th Cir. 2000)); *see also, e.g.*, *Gislaved*, 178 F.3d at 1262-63 (holding same and collecting cases).

This methodology generally proceeds in two parts: general causation and specific causation. *See Raynor v. Merrell Pharms. Inc.*, 104 F.3d 1371, 1375-76 (D.C. Cir. 1997).

First, a particular drug must be shown to be capable of causing the symptoms at issue *generally*, and then, second, a proper differential diagnosis must be employed to demonstrate that the drug caused the symptoms at issue in the case at bar. *Id.* at 1376. This case does not present any general causation issues, because the parties evidently agree that dissociative drugs (including, but not limited to, GHB) can cause the alleged victims' condition (namely, incapacitation). *Cf. Meister v. Med. Eng. Corp.*, 267 F.3d 1123, 1129 (D.C. Cir. 2001) (rejecting differential diagnosis used to demonstrate that medical device caused form of cancer in plaintiff where expert could not show that medical device caused cancer in general). Instead, Defendant challenges specific causation: that Dr. Levine's form of differential diagnosis is not reliable enough to establish that a dissociative drug, rather than alcohol, caused each alleged victim's incapacitation.

In effect, Defendant argues that Dr. Levine has not actually employed differently diagnosis. By forgoing both individual interviews with any alleged victim and also additional medical tests, Dr. Levin's approach certainly differs from the differential-diagnosis methodology that has generally been accepted in this Circuit. *See, e.g.*, *Raynor*, 104 F.3d at 1375 (holding differential diagnosis that anti-nausea drug caused birth defect satisfied *Daubert* where physician "relied upon family history, parental background, genetic history, physical examination, pregnancy history, and toxicology"). And, as Defendant rightly notes, Dr. Levine's methodology also differs from that following in each case on which the Government relies, in which medical histories and/or toxicology reports were available.[3] *See also Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 156 (3d

---

[3] *See, e.g.*, *Jones v. Halliburton*, Civ. A. No. 4:07-2719, 2011 WL 1841148, at *2 (S.D. Tex. May 13, 2011) (in evaluating cause of post-traumatic stress disorder, considering outpatient interview with plaintiff, medical records, and patient history); *Ashely v. City of Bridgeport*, 473 F. Supp. 3d 41, 48 (D. Conn. 2020) (in determining whether plaintiff had ingested drug

Cir. 1999) (finding differential diagnosis reliable where attending physician "order[ed] standard laboratory tests, physically examin[ed] the plaintiff, t[ook] medical histories, and consider[ed] alternative causes of the plaintiff's illness").

Though a point well taken, the defense nevertheless mistakes a sufficient condition for a necessary one. Although certain diagnostic techniques are sufficient, that does not mean that those techniques, and only those techniques, are necessary. As another Court of Appeals has explained, "a doctor's differential diagnosis is reliable and admissible where the doctor:"

1. Objectively ascertains, to the extent possible, the nature of the patient's injury;

2. Rules in one or more causes of the injury using a valid methodology; and

3. Engages in *standard* diagnostic techniques by which doctors normally rule out alternative causes to reach a conclusion as to which cause is most likely.

*Best v. Lower's Home Ctrs., Inc.*, 563 F.3d 171, 179 (6th Cir. 2009) (cleaned up) (emphasis added). Stated differently, so long as the diagnostic techniques the expert *did* use "provide 'good grounds' for the expert's conclusion, [the] testimony should be admitted." *Heller*, 167 F.3d at 158.

Here, Dr. Levine "[o]bjectively ascertained, to the extent possible, the nature of" each alleged victim's incapacitation by viewing Defendant's contemporaneous video and photo records of their incapacitation. Trans. at 77:17-19. Dr. Levine further used standard diagnostic markers to determine whether alcohol or a dissociative agent caused their incapacitation. For instance, Dr. Levine noted that, when Defendant manipulated an alleged victim's eyelid, she remained unconscious, even though, in his expert opinion, manipulation of an eyelid is "an incredibly noxious stimuli." Trans. at 84:23-85:4. Similarly, Dr. Levine noted, that alleged victims appeared to be in a state of "cataplexy," in which an alleged victim remained in a "posed" state, staying

---

phencyclidine, expert toxicologist's reliance on toxicology report rather than video evidence of incident satisfied *Daubert*).

"perfectly still," which is not indicative of alcohol intoxication. *Id.* at 86:1-9.  Because Defendant opened various alleged victims' eyelids, Dr. Levine also observed an alleged victim's eye movements and pupillary size, which are also indicative of certain sorts of intoxicants. *Id.* at 86:22-87:9.

Lastly, simple evaluation of a patient's physical state is sufficient for Dr. Levine, and any other physician, to return a tentative, reliable diagnosis in these circumstances.  For the purposes of diagnosis in an emergency room, Dr. Levine explained that he almost never orders a toxicology test, based on the fact that "rapid urine drug screens are not helpful" and "a comprehensive drug test routinely takes five to ten days to come back." Trans. at 89:10-22.  Nevertheless, Dr. Levine can, like any other doctor evaluating a patient, reliable return a diagnosis as to drug toxicity without the benefit of toxicology reports. *Id.* at 89:23-90:5.  Although the use of toxicology reports may be more advantageous, or might result in an even more reliable diagnosis, review of video evidence of an alleged victim's state more than adequately approximates the in-person physical exam that is the standard diagnostic technique in this field of medicine.  *Cf. Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) (explaining, in dicta, that key question in *Daubert* analysis is whether expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field").

In the context of criminal cases, this result should hardly be surprising.  A victim may not be available for a physical examination, and toxicology reports may have never been conducted in time to detect a particular substance. *See, e.g.*, *Chikvashvili*, 859 F.3d at 293 (rejecting challenge to Government expert who relied on certain medical records rather than physical examination of victim).  Where sufficient sources are available to an expert medical witness to opine on the cause of a particular ailment, whether that expert should or could have used additional sources "go[es]

to weight, not admissibility." *See id.*; *see also, e.g.*, *Roney v. Wendy's Old Fashioned Hamburgers of N.Y., Inc.*, Civ. A. No. 2:05-109-GZS, 2006 WL 696251, at *5 (D. Me. Mar. 17, 2006) (in claim that fast food restaurant caused plaintiff's kidney failure by undercooking hamburger, holding admissible differential diagnosis based broadly on "useful" "inferences" even though expert admitted that opinion would be stronger if it were based on a bacterial culture). Dr. Levine offers ample explanation for why alcohol could not have caused an alleged victim's incapacitation. To the extent Defendant disagrees with the efficacy of that methodology, that argument may be made to the jury, but it does not succeed here.

      2. Particular Dissociative Agents

Although Dr. Levine's composite opinion, that certain alleged victims were under the influence of dissociative agents rather than alcohol is admissible under *Daubert*, his opinion that GHB specifically was the likely culprit is not admissible. An expert opinion is not admissible if it is wholly "speculative." *Campbell. v. Nat'l Railroad Passenger Corp.*, 311 F. Supp. 3d 281, 297 (D.D.C. 2018). In his expert report, Dr. Levine admitted that he could not "definitively conclude which agent was used," opining that GHB was "most likely" among several options. Expert Report at 35-36. When Government counsel asked Dr. Levine whether "the amount of data that [he] w[as] provided [was] sufficient for [him] as a doctor and medical toxicologist to feel comfortable rendering an opinion," he answered, "[c]ertainly on the general category of things, [but] *maybe not on the specific agent*." Trans. at 88:4-9. In other words, Dr. Levine "may not be comfortable" opining that GHB was "most likely" the dissociative agent among several options. Uncomfortable conjecture that a particular drug takes the plurality of a probability distribution is "guesswork," and guesswork is not the province of an expert witness. Although Dr. Levine may explain that GHB is on kind of dissociative agent and indicate how GHB, as a dissociative agent, affects an

10

adult woman, the Court agrees with Defendant that Dr. Levine's opinion that GHB was the "most likely" of possible dissociative agents fails the *Daubert* standard. Accordingly, the Court excludes that testimony from trial.

### B. Lay/Expert Opinion

Lastly, Defendant insists, evidently in the alternative, that a lay jury requires no expert assistance in determining whether an alleged victim was under the influence of a dissociative agent. Binding appellate precedent holds otherwise. "A lay witness may not testify based on scientific or other specialized knowledge[,]" including whether a person had a particular "medical condition" and the nature of that medical condition. *Lane v. District of Columbia*, 887 F.3d 480, 485 (D.C. Cir. 2018). To hold otherwise would mean permitting every alleged victim who testifies to state that they were, in fact, under the influence of a dissociative agent. As such, the Court rejects this last challenge to Dr. Levine's testimony.

### IV. CONCLUSION AND ORDER

For the foregoing reasons, it is hereby

**ORDERED**, that Defendant's [258] Motion to Exclude the Testimony of [Dr.] Michael Levine is **GRANTED IN PART AND DENIED IN PART**. It is further

**ORDERED**, that Dr. Levine is deemed qualified as an expert in medical toxicology. Dr. Levine **may** testify as to the following expert opinions: (1) the incapacitation of the alleged victims listed in Dr. Levine's expert report was consistent with intoxication from an incapacitating agent; (2) urine drug testing is not an absolute indicator of whether a dissociative agent was previously present in a patient's system; and (3) AV-1's urine sample was adulterated. Dr. Levine **may not**

//

//

testify as to his opinion that GHB was most likely the incapacitating agent used.

**SO ORDERED**.

**Dated:** October 5, 2023

/s/
COLLEEN KOLLAR-KOTELLY
United States District Judge