**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal No. 21-CR-00380 (CKK)** |
| | : | |
| **v.** | : | |
| | : | |
| **BRIAN JEFFREY RAYMOND,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S MOTION *IN LIMINE* TO ADMIT PRIOR STATEMENTS

The United States of America, through undersigned counsel, respectfully submits this motion to admit at trial certain non-hearsay statements and statements excepted from the hearsay rule. Specifically, the government seeks to admit (A) electronic communications exchanged between the defendant and others, including the victims; (B) certain electronic communications sent by Adult Victim ("AV") 1 to friends on May 31, 2020 reporting events as they occurred; (C) certain outcry statements made by AV-1 to first responders, her mother, and the defendant's neighbors on May 31, 2020; (D) statements made by AV-1 to medical professionals in the course of two sexual assault examinations; and (E) victims' prior consistent statements, including electronic communications with the defendant and statements to investigators. For the reasons set forth below, these statements are admissible pursuant to Federal Rules of Evidence 801 and 803.

## I.   BACKGROUND

On February 23, 2023, a grand jury sitting in this District returned a 25-count second superseding indictment (hereinafter, the "Indictment") charging the defendant with sexual offenses and transportation of obscene materials relating to AV-1 and fourteen other AVs. More specifically, the defendant is charged with the aggravated sexual assault of AV-9, in violation of 18 U.S.C. § 2241(b) (Count Two); the sexual assault of AV-1 and AV-9, in violation of 18 U.S.C. § 2244(2) (Counts One and Three); abusive sexual contact of AV-5, AV-6, AV-7, AV-9, AV-23,

1

and AV-26, in violation of 2241(a)(1) or (2) (Counts Four through Fourteen); enticement of AV-4, AV-15, and AV-17 to travel for to engage in unlawful sexual activity, in violation of 18 U.S.C. § 2422(a) (Counts Fifteen through Seventeen); and transportation of obscene material depicting AV-2, AV-5, AV-6, AV-7, AV-8, AV-9, AV-12, and AV-22, in violation of 18 U.S.C. § 1462 (Counts Eighteen through Twenty-Five). ECF No. 184.

These charges arise from allegations that the defendant drugged and sexually assaulted numerous women over the course of more than a decade, including in U.S. Embassy housing in at least two separate countries, as well as in the United States. During this time, he exchanged thousands of electronic communications with his victims and other women in an attempt to gain their trust and arrange in-person meetings. For more than a decade, he also exchanged thousands messages with his close friend (hereinafter, "Witness 1") about his sexual experiences with women, including some of the AVs. While these women were unconscious and unable to consent, the defendant also took explicit photographs and recordings of the women, which he transported and kept for his own sexual gratification. The explicit images date from 2006 to May 31, 2020, when AV-1 reported that the defendant assaulted her at his apartment in Mexico City.

### A.    The Sexual Assault of AV-1 on May 31, 2020

AV-1 will testify that she met the defendant on the dating application Tinder and exchanged messages via Tinder and WhatsApp prior to meeting in person. On May 31, 2020, AV-1 met the defendant in person for the first time at an outdoor shopping center in Mexico City, Mexico, at approximately 2:00 p.m. The defendant brought a backpack containing travel mugs and wine, which he poured while crouched behind a trashcan. The defendant and AV-1 drank and talked. Approximately two hours later, AV-1 accompanied the defendant back to his apartment. Once in the apartment, the defendant served AV-1 another glass of wine as well as some meat,

cheese, and chocolates. Shortly after consuming some of the wine and snacks, AV-1 suddenly blacked out and has no memory of the hours that followed until she came to in an ambulance outside of the defendant's apartment.

AV-1 will testify that, as a safety precaution, she sent text messages to three friends, including her close friend (hereinafter, "P"), providing contemporaneous updates on her location and wellbeing. At 1:13 p.m., she told P that she was meeting someone at 2:00 p.m. at the park and that "I am going to send you my location in real time." She later sent P a photograph of herself dressed for the date and a Google location. At 2:05 P.m.., she reported to P that the defendant had arrived wearing a backpack and joked about the backpack, stating, "What for? Is he going to keep my organs in it?" P responded: "Hahahahaha I don't think so." AV-1 then reported to P that the defendant had brought wine in his backpack and coffee cups to drink the wine. At 2:53 p.m., AV-1 reported that they were in the park and that the defendant was going to serve more wine, also sending a photograph of the defendant in the corner of what appears to be a shopping center kneeling to serve the wine. At 3:47 p.m., AV-1 reported to P that "we are going to his house."

At 4:00 p.m., AV-1 sent P a Google location, and several minutes later, photographs of the defendant in his kitchen and two plates containing cheese, crackers, and strawberries. After not receiving any further updates, at 7:04 p.m., P sent a series of texts:

P: How are you?!

P: Please let me know when you are at home

P: [AV-1]

P: Girl let me know

Six minutes later, AV-1 responded with two texts: "2" and "*Pero frsbfr*" ("But [unintelligible]"). A brief dropped call occurred at 7:18 p.m., after which P stated that she did not understand

anything. For the next half hour, P sent at least a dozen texts asking AV-1 if she was ok and telling her that she was worried. AV-1 responded once, at 7:43 p.m., stating just "[P]," and then at 9:46p.m. two texts: "Wait [P]" and "*Soy la mm de monk*" ("I am the [unintelligible]"). To P's final text at 7:46 p.m. asking how AV-1 was, AV-1 responded, "No [P]."

Shortly after 7:00 p.m. in the evening, the defendant's neighbors heard a woman yelling and crying for help. Looking from their balconies at the defendant's apartment building, the defendant's neighbors saw AV-1, naked on the defendant's balcony. She was hysterical and screaming for help. One neighbor tried to comfort her, speaking to her in Spanish across the two balconies, and called 911. Another went to the defendant's apartment and tried to comfort her and provide her with a blanket. Shortly thereafter, Mexican first responders, including police officers and EMTs arrived at the defendant's apartment building. Not long after that, AV-1's mother arrived while first responders were assisting AV-1. U.S. Embassy security personnel also arrived. At the scene, AV-1 was distraught, crying, and disoriented. While she was distraught and within an hour of being sexually assaulted, AV-1 made statements to first responders, defendant's neighbors, and her mother about the sexual assault.

After AV-1 received medical assessment, Mexican officials transported AV-1 and her mother to a police station, where she reported the sexual assault to Mexican authorities. While being transported, AV-1's mother sent her husband a voice note, and AV-1 can be heard in the background, crying. Though AV-1 initially told one witness that she was raped and another witness that she had been abused, AV-1 has no memory of sexual intercourse with the defendant.

Shortly after reporting the sexual assault to Mexican officials, Mexican doctor Nemesis Rodriguez Ortega ("Dr. Rodriguez Ortega") conducted a sexual assault examination, including a physical and competency examination. In her report of the examination, Dr. Rodriguez Ortega

noted that AV-1 was calm and cooperative. As part of the examination and to diagnose any injuries that AV-1 may have suffered, Dr. Rodriguez Ortega asked AV-1 questions about her medical history and what had happened that day. As documented in the report, AV-1 did not identify the defendant by name, but did state the following:

> I had a date with a person in Parquis Polanco, he brought rose wine in coffee cups. I drank one and one-half glasses. And he told me that he was running out of it. And he told me that he had ore wine at this house, and we went. He served me a glass of wine, and I don't remember a thing after that. I just have it in my mind that I sent a friend a message that I wasn't feeling well. When I realized it, he was trying to kiss me. And suddenly my mom was there and I was in an ambulance.

Although Dr. Rodriguez Ortega did not herself prescribe medication to AV-1, as a result of her own observations and AV-1's reported lack of memory and alcohol consumption, Dr. Rodriguez Ortega referred AV-1 to a follow up treatment with a specialist and referred her to a medical clinic to obtain antiretroviral medication and the morning after pill. Based on AV-1's lack of memory of the events and reported alcohol consumption, Dr. Rodriguez Ortega also ordered a urinalysis to check for alcohol and intoxicants.

Two days later, on June 2, 2020, investigators at the U.S. Embassy interviewed AV-1 about what had occurred on May 31, 2020.[1] AV-1 told the investigators that she did not remember anything between when she was drinking wine and having cheese with the defendant until she was in the ambulance with her mother. She stated that she did not recall going to the defendant's bedroom, did not recall having sex, and did not recall giving consent to any sexual acts. Investigators also returned AV-1's belt and glasses, which had been recovered from the

---

[1] On September 3, 2020, a Federal Bureau of Investigation ("FBI") child/adolescent forensic interviewer and agent interviewed AV-1 regarding the events of May 31, 2020. This interview was audio and video recorded. AV-1 made statements consistent with her prior statements to Mexican and U.S. authorities. AV-1 also has met with and debriefed with FBI and Diplomatic Security Service ("DSS") agents on several occasions since September 2020.

defendant's apartment. AV-1 then consented to a sexual assault nurse examination ("SANE") by U.S. Embassy nurses.

On the same day, Nurse Practitioner Deborah Edwards and Registered Nurse Alexandra Pledger di Fabris, both employed by the U.S. Embassy in Mexico City, conducted a sexual assault nurse examination ("SANE exam") of AV-1 at the U.S. Embassy. The SANE included photographs and a gynecological examination. Nurse Edwards documented AV-1's bruises, recommended that AV-1 continue taking medication prescribed by the Mexican medical facility, and prescribed a course of antiretroviral medications.

The government intends to call AV-1, AV-1's mother, one or more of the defendant's neighbors, and the medical professionals who examined AV-1 to testify at trial. This motion seeks to admit electronic communications that AV-1 had with the defendant prior to meeting him on May 31, 2020, text messages AV-1 exchanged with her friends on May 31, 2020, AV-1's mother's voice note, and statements made to the defendant's neighbors, AV-1's mother, and the medical examiners shortly after her sexual assault.

### B.     The Sexual Assault of AV-13 on November 28, 2017

As described in the government's motion to admit evidence of prior sexual assaults and prior bad acts, ECF No. 259 at 16–17, the government intends to introduce evidence that the defendant sexually assaulted AV-13 in his apartment on November 28, 2020. AV-13, a victim of an uncharged sexual assault by the defendant, messaged the defendant via WhatsApp the morning after her date with him, asking the defendant what happened and why she woke up with no clothes on. The defendant assured her that nothing happened other than kissing, though AV-13 indicated that she felt as though something happened. Despite assuring AV-13 that they only kissed, AV-13's name appears on a list that Raymond maintained in his email account of women with

whom he had sex, thereby suggesting that he did indeed have sex with her while she was blacked out.

The government now seeks to admit certain of AV-13's WhatsApp communications, including those that occurred on the day of and days following their date. The following are examples of those statements. On November 26, 2017, the defendant sent AV-13 the following WhatsApp message: "We must drink pisco this week if you have free time." The following day, the defendant and AV-13 arranged via WhatsApp to meet on November 28, 2017 at the defendant's apartment:

> Defendant: Hi [AV-13] happy Monday. Do you have time tomorrow? I'd invite you to my apartment for pisco cocktails. I don't have a blender, but we can experiment. LOL.
>
> AV-13: Hi Brian, At what time would it be tomorrow?
>
> Defendant: If possible, I'd prefer to start early because I have a class the following day. :) At 530-6p.m.? What do you think?
>
> . . .
>
> Defendant: Hi [AV-13] My address is [redacted]

On November 28, 2017, AV-13 and the defendant met at the defendant's apartment. On that day, the defendant told AV-13 by WhatsApp that "[he]'ll wait in the lobby then." That night, the defendant took at least nine photographs of AV-13 apparently unconscious in bed wearing nothing but a watch and underwear.

The next morning, the defendant sent AV-13 the following text message: "Hi [AV-13] how do you feel? I hope you don't have a hangover. I have a small hangover. LOL." The two continued to discuss what happened the previous night:

> Defendant: Don't worry. Seriously, nothing bad happened – I swear to you
>
> AV-13: Define bad
>
> Defendant: Morally bad
>
> AV-13: What did we do? What happened?

7

. . .

Defendant: I remember kisses and nothing else. Then we went to bed.

AV-13: So you don't remember either?

Defendant: That's what I remember. But I think that's the truth.

. . .

Defendant: Of course. I understand. But I'm certain they didn't.

Defendant: Not many things happen.

. . .

AV-13: And why didn't I have any clothing????

AV-13: ♀

. . .

Defendant: Well, I sleep with underwear. Yes, I remember the kisses.

AV-13: Okay so I'm asking why didn't I have clothing?

Defendant: I don't know. I imagine because you're more comfortable that way.

AV-13: More comfortable? . . .

Defendant: I'm sorry you can't remember :(

Defendant: *can't

. . .

Defendant: :( Does it hurt?

AV-13: . . . what could've happened that I even have bruises[?]

The defendant and AV-13 continued to discuss what happened the following day, with AV-13

continuing to ask questions about what happened:

Defendant: Good morning. I"m [sic] sorry but I don't have a clue :( I don't
remember anything like that.

. . .

Defendant: I'm very honest. I'm very sorry but I only remember that you first kissed
and then there were more kisses. I swear to you.

AV-13: I kissed you? It was I who took the initiative?

Defendant: Sorry, I'm in my class. But yes.

8

. . .

AV-13: Do you know if my cell phone fell or got bumped that day? . . .

Defendant: Yes indeed. I think the cell phone fell. I didn't know it had suffered damage. Don't worry (seriously). Everything's fine. I hope you feel a little better.

AV-13 continued to worry about the events of the night because she could not remember anything, including the kissing, and was worried that they had sex. She further stated that it would be easier to discuss in person rather than via WhatsApp. In response, the defendant placed a call to AV-13 that was not answered. He then sent the following message: "Thanks for your text. I understand your concern 100 percent. I swear it will not happen again. It was something strange and unusual for us. It's regrettable that it happened and I'm very sorry about it."

## II.   ANALYSIS

The government seeks to admit (A) electronic communications exchanged between the defendant and others, including Witness 1, AV-13, and other victims, as non-hearsay and admissions of a party opponent pursuant to Federal Rule of Evidence 801(d)(1)(A); (B) certain electronic communications sent by AV-1 to friends on May 31, 2020 as non-hearsay statements or as present sense impressions or excited utterances pursuant to Federal Rules of Evidence 803(1) and (2); (C) certain outcry statements made by AV-1 to first responders, her mother, and the defendant's neighbors as excited utterances pursuant to Federal Rule of Evidence 803(2); (D) statements made by AV-1 to Dr. Rodriguez Ortega on May 31, 2020 and to Nurses Edwards and Pledger di Fabris on June 2, 2020 pursuant to Federal Rule of Evidence 803(4); and (E) victims' prior consistent statements, pursuant to Federal Rule of Evidence 801(d)(1)(B).

***Hearsay Exceptions***. The Federal Rules of Evidence define hearsay as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Hearsay can include both spoken and written assertions, including electronic communications. *See* Fed. R.

Evid. 801(a). Hearsay is inadmissible unless otherwise permitted by a federal statute, the Federal Rules of Evidence, or other rule prescribed by the Supreme Court. Fed. R. Evid. 802. The Federal Rules of Evidence set forth a number of exclusions and exceptions to the definition of hearsay. *See* Fed. R. Evid 801(d), 803, 804, 807.

> ***The Confrontation Clause***. When the declarant testifies at trial and is subject to cross examination, the admission of prior statements does not implicate the Confrontation Clause. *See Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004) (stating that "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements" and "[t]he Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it"). The Confrontation Clause is satisfied even when the witness is unable or unwilling to recall fully events surrounding her victimization. *See Cookson v. Schwartz*, 556 F.3d 647, 650-52 (7th Cir. 2009) (admission of victim's hearsay statements to detective did not violate Confrontation Clause because victim was cross-examined regarding statements, which she did not recall making); *United States v. Spotted War Bonnet*, 933 F.2d 1471, 1473 (8th Cir. 1991) (holding that the Confrontation Clause "is satisfied when the hearsay declarants . . . actually appear in court and testify in person" and stating that "a perfectly satisfactory cross-examination is not required by the Clause, and a witness who cannot remember the details of statements she has made in the past can still be sufficiently available for cross-examination to satisfy the constitutional requirement") (citing *United States v. Owens*, 484 U.S. 554, 549 (1988)). The "Confrontation Clause guarantees only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *United States v. Owens*, 484 U.S. at 549 (1988) (internal citations and quotations omitted).

Any electronic communications, such as WhatsApp messages, emails, or messages on Tinder, sent by the victims to the defendant prior to being or being aware of their sexual assault or abusive sexual contact are admissible without the declarant being required to testify because there are no Confrontation Clause concerns when the declarant's statements were made before the declarant "would reasonably expect [them] to be used prosecutorially," *Crawford*, 541 U.S. at 5, and are therefore not testimonial, *see United States v. Bras*, 483 F.3d 103, 109 (D.C. Cir. 2007) (observing that right to confrontation set out in "*Crawford* applies only to 'testimonial' evidence"). Additionally, "the Confrontation Clause 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.'" *United States v. Bostick*, 791 F.3d 127, 147 (D.C. Cir. 2015) (quoting Crawford, 541 U.S. at 60 n.9. Thus, the messages sent by the non-testifying victims to the defendant do not implicate Confrontation Clause concerns.

### A. Electronic Communications Exchanged Between the Defendant and Victims and Witness 1 Are Admissible as Opposing Party's Statements and Non-Hearsay

The defendant exchanged thousands of electronic messages with women in an effort to arrange for them to meet with him in a private location, usually his apartment, to assault them. The defendant also exchanged thousands of electronic communications with Witness-1, with whom he shared reports of his sexual conquests and strategized about how to get women to have sex with him. The government may introduce some of these electronic communications in its case-in-chief at trial.[2]

Any written statements sent by the defendant are admissible for their truth as statements of a party opponent. *See* Fed. R. Evid. 801(d)(2)(A); *see also United States v. Lewisbey*, 843 F.3d

---

[2] The government has disclosed the defendant's prior electronic communications to defense counsel, and the government is in the process, in conjunction with pretrial witness preparation, of narrowing which messages it will seek to introduce and through which witnesses.

653, 658 (7th Cir. 2016) ("The text message [the defendant] *sent* are his own statements and as such are excluded from the definition of hearsay by Rule 801(d)(2)(A).") (emphasis in original); *United States v. Safavian*, 435 F. SupP 2d 36, 43 (D.D.C. 2006) (finding emails "attributed directly to [the defendant] come in as admissions by a party opponent").

Additionally, electronic messages that the defendant received from the victims are admissible to provide context for the defendant's own statements, to make the defendant's statements understandable, and to prove the defendant's knowledge and state of mind. *See Lewisby*, 843 F.3d at 658 ("The messages [the defendant] *received* were admitted not for the truth of the matter asserted but instead to provide context for [the defendant's] own messages."); *see also United States v. Browne*, 834 F.3d 403, 442–43 (3d Cir. 2016) (finding no error in admission of Facebook chats in which defendant was a participant); *United States v. Burt*, 495 F.3d 733, 739 (7th Cir. 2007) (finding no error in admission of chat log where portions representing defendant's writing were admissions of a party opponent and portions representing the other party's contributions were necessary to provide context and were not offered for the truth of the matter asserted); *United States v. Stelten*, 867 F.2d 453, 454 (8th Cir. 1988) (finding third party statements contained in tape recordings of conversations were properly admitted "to ensure the completeness and intelligibility of [defendant's] admissions").

Additionally, a statement is also not hearsay if it is not an assertion. Fed. R. Evid. 801(c)(2). To determine whether a statement constitutes an assertion, courts must look to whether the declarant "intended to make such an assertion." *United States v. Long*, 905 F.2d 1572, 1580 (D.C. Cir. 1990). Thus, whether a question carries an explicit or implicit assertion, it is not one for purposes of Rule 801 unless it is an intentional assertion. *Id.* (finding caller's questions about drugs to not be hearsay because while "[t]he caller may indeed have conveyed messages about [the

defendant] through her questions, . . . any such messages were merely incidental and not intentional"); *see also United States v. Sinclair*, 301 F. App'x 251, 253 (4th Cir. 2008) ("A question or inquiry is not a statement, and therefore is not hearsay unless it can be construed as an intended assertion.") (collecting cases). And, requests for information "cannot be construed as assertions." *Sinclair*, 301 F. App'x at 253.

The defendant's electronic messages are admissible as the opposing party's own admissions. *See* Fed. R. Evid. 801(d)(1)(A); *see also Lewisbey*, 843 F.3d at 658; *Safavian*, 435 F. Supp. 2d at 43. To the extent that the victims' or Witness 1's electronic messages to the defendant constitute non-assertive questions or imperatives, they are admissible because they do not constitute hearsay. *See Long*, 905 F.2d at 1580. Even if their communications constitute intentional assertions, the government does not seek to admit them for their truth, but rather to provide the context to understand the defendant's statements. *See Lewisby*, 843 F.3d at 658. Finally, because these communications took place before any party knew of a pending investigation or litigation, they are not testimonial and therefore raise no Confrontation Clause concerns. *See Bras*, 483 F.3d at 109.

### B.    AV-1's Texts to Her Friends Are Admissible as Present Sense Impressions Pursuant to Rule 803(1)

The government seeks to admit AV-1's texts to her friends as present sense impressions pursuant to Rule 803(1).[3]

A present sense impression is defined as "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it." Fed. R. Evid. 803(1). A

---

[3] Several of these texts—by AV-1 and her friends—are also admissible as non-hearsay because they are non-assertions, whether as incoherent phrases (*e.g.*, "Pero frsbfr"), questions (*e.g.*, "How are you?"), or emotional responses (*e.g.*, "Hahahhahahahahahaha"). *See Long*, 905 F.2d at 1580. To the extent that they also are admissible as excited utterances, pursuant to Rule 803(2) and/or prior consistent statements, pursuant to Rule 801(d)(1)(B), they will be discussed *infra*.

hearsay statement must meet three requirements to be admitted as a present sense impression: (1) the statement describes or explains an event or condition, (2) which the declarant perceived firsthand, and (3) the statement was made contemporaneously—while the declarant perceived the event or condition or immediately thereafter. *See United States v. Ruiz*, 249F.3d 643, 646 (7th Cir. 2001); *United States v. Mitchell*, 145 F.3d572, 576 (2d Cir. 1998). The proponent of the statements bears the burden of proving these elements by a preponderance of the evidence. *United States v. Wills,* No. 18-CR-0117PLF, 2018 WL6716096, at *3 (D.D.C. Dec. 21, 2018).

"[C]ontemporaneity or substantial contemporaneity is important because it serves as a proxy for reliability or trustworthiness." *Id.*; *see also Partido Revolucionario Dominicano, Seccional Metropolitana de Wash. v. Partido Revolucionario Dominicano, Sexxional de Md. Y Va.*, 311 F. Supp. 2d 14, 16 (D.D.C. 2014) ("The 'critical element' of the exception therefore is contemporaneity.") (citation omitted). However, strict contemporaneity is not required. "In the D.C. Circuit, it is clear that fifteen minutes is too long to satisfy the contemporaneity requirement, but beyond that, there is very little guidance." *Wills,* 2018 WL6716096, at *5 (comparing *Hilyer v. Howat Concrete Co.*, 578 F.2d 422, 426 n.7 (D.C. Cir. 1978) (explaining that an "out-of-court statement made at least fifteen minutes after the event it describes is not admissible"), *with Flythe v. D.C.*, 4 F. Supp. 3d 222, 234 (D.D.C. 2014) (holding a statement admissible when the statement was made within moments or seconds of the event) and holding a statement admissible when three minutes passed between the event and the time the statement was made).

AV-1 provided her friends, and P in particular, with updates on her location and what was happening on her date with the defendant on May 31, 2020, in real time. She will testify that she did this for safety purposes, because she was meeting a man for the first time that she had met only on Tinder. As described above, AV-1 sent P messages telling her where she was meeting the

defendant and when, what he did when he arrived, and when she proceeded with the defendant to his apartment. Because the updates were contemporaneous with the events, *see Wills*, 2018 WL6716096, at *4, and bear additional indicia of truthfulness due to their purpose of accurately informing her friend of her safety and location, they are admissible as present sense impressions. *See also* Fed. R. Evid. 807. These messages also do not implicate the Confrontation Clause because they are non-testimonial, *Bras*, 483 F.3d at 109, and, in any event, AV-1 will testify at trial and be subject to cross examination, *see Owens*, 484 U.S. at 559. Finally, AV-1's friends' texts are admissible not pursuant to Rule 8013(1) but because they are either non-assertions and therefore not hearsay, *see Long*, 905 F.2d at 1580, or are not offered for the truth of the matter asserted, but to provide context to AV-1's texts, *see Lewisbey*, 843 F.3d at 658.

### C.    AV-1's Outcry Statements on the Evening of May 31, 2020, Are Admissible as Excited Utterances Pursuant to Rule 803(2)

The government seeks to introduce AV-1's outcry statements made on May 31, 2020 pursuant to Rule 803(2). These statements include: (A) AV-1's statements to the defendant's neighbors; (B) AV-1's statements to her mother in the ambulance and in the police cruiser on the way to the police station; (C) texts that AV-1 sent to her friends between 7:00p.m. and 8:00p.m. on May 31, 2020. AV-1 made these statements in the aftermath of being sexually assaulted and while she was still under the stress of the sexual assault.

An excited utterance is defined as "[a] statement relating to a startling event or condition, made while the declarant was under the stress of the excitement that it caused." Fed. R. Evid. 803(2). "For a statement to qualify as an excited utterance, the proponent of the exception must establish: (1) the occurrence of a startling event; (2) that the declarant made the statement while under the stress of excitement caused by the event; and (3) that the declarant's statement relates to the startling event." *United States v. Alexander,* 331 F.3d 116, 122 & n.5 (D.C. Cir. 2003) (noting

that the government bears the burden of proving these elements by a preponderance of the evidence). "[U]nlike the hearsay exception for present sense impressions, an excited utterance need not be contemporaneous with the startling event to be admissible. Rather, the utterance must be contemporaneous with the excitement engendered by the startling event." *Id.* at 122 (internal citations omitted); *see also United States v. Arnold*, 486 F.3d 177, 185 (6th Cir. 2007) ("The exception may be based solely on '[t]estimony that the declarant still appeared nervous or distraught and that there was a reasonable basis for continuing [to be] emotional[ly] upset.'") (citation omitted) (alterations in the original).

In determining whether a declarant "was under the stress of the excitement caused by the event," relevant factors include "the characteristics of the event; the subject matter of the statement; whether the statement was made in response to an inquiry; and the declarant's age, motive to lie and physical and mental condition," and "the declarant's 'tone and tenor of voice.'" *Alexander,* 331 F.3d at 122–23 (citations omitted). The D.C. Circuit has recognized that the "temporal gap between the event and the utterance" is relevant, but not dispositive. *Id.* (collecting cases showing that courts had admitted statements from 15 to 30 minutes after the event up to several hours after the event); *see also Arnold*, 486 F.3d at 185 (affirming admission of statements by the victim on the scene between 15 minutes and 20 minutes after 911 call and collecting cases in which excited utterances were properly admitted hours after the startling event); *Doe v. Exxon Mobil Corp.*, No. 1:01-cv-1357-RCL, 2022 WL 3043219, at *4–5 (D.D.C. Aug. 2, 2022) (admitting statements made by kidnapping victim morning after kidnapping when he had cried the whole night and made statements as soon as he was able to talk).

It is uncontroversial that a "sexual assault is a startling event." *United States v. John*, No. 13 CR 2730 MV, 2014 WL 12691032, at *2 (D.N.M. Aug. 13, 2014). Courts have routinely

admitted statements by sexual assault victims in the aftermath of their sexual assaults, even up to several hours later, as excited utterances. *See, e.g.*, *United States v. Smith*, 606 F.3d 1270, 1279 (10th Cir. 2010) (admitting victim's statements to a neighbor less than two hours after being raped after victim realized she had been sexually assaulted while sleeping, confronted her attacker, and fled); *United States v. Hefferon*, 314 F.3d 211 (5th Cir. 2002) (admitting statements made by a minor sexual assault victim one-to-two hours after the event because there was evidence she remained "highly traumatized"); *John*, No. 13 CR 2730 MV, 2014 WL 12691032, at *2 (admitting victim's statements to 911 dispatcher while "she was 'crying frantically' at or immediately following the alleged assault"); *United States v. Pumpkin Seed*, No. CR 07-50062-AWB, 2008 WL 11450455 (D.S.D. Feb. 26, 2008) (admitting statements made to witnesses who approached victim "during or shortly after the alleged assault and to her mother" approximately 15 minutes after assault).

The government anticipates that the outcry witnesses, including AV-1's mother and one or more of the defendant's then neighbors, will testify that AV-1 was distraught and disoriented while she remained in the defendant's apartment and in and around the ambulance at the scene. One of the defendant's neighbors will testify that AV-1 was hysterical and screaming, including yelling "*ayuda!*" ("help!") and "*el!*" ("him!"). Her mother will testify that, in the ambulance shortly thereafter, AV-1 seemed disoriented and was crying, repeatedly asking her what her mother was doing there and what had happened to a necklace she had already given to her mother. In a voice note recorded by AV-1's mother while being driven from the scene to the Mexican police station, AV-1 can be heard in the background crying and mumbling incoherently, demonstrating that she continued to be "under the stress of excitement" even as she left the scene. *See Alexander*, 331 F.3d at 123. Additionally, AV-1 did not have time to fabricate her statement in this short period of

time while in distress. *See Arnold*, 486 F.3d at 185. Indeed, given her disorientation, it is unclear whether she was capable of fabrication or forming a motive to lie. *See Long*, 331 F.3d at 123.

Additionally, the government seeks to admit AV-1's text communications to P between 7:00p.m. and 8:00p.m. on May 31, 2020, as excited utterances. These six texts, several of which are admissible as non-hearsay because they are incoherent gobbledygook that cannot constitute assertions, were made during the time period described above, between when AV-1 was discovered on the balcony hysterical and when she was transported to the police station still crying and under the obvious stress of the sexual assault.

Moreover, because AV-1 will testify, the admission of these statements does not implicate the Confrontation Clause. *See Crawford*, 541 U.S. at 59 n.9.

### D.      AV-1's Statements to Mexican and U.S. Sex Assault Examiners Are Admissible as Statements Made for Medical Diagnosis Pursuant to Rule 803(4)

The government seeks to admit AV-1's statements to Dr. Rodriguez Ortega on May 31, 2020 and to Nurses Edwards and Pledger di Fabris on June 2, 2020 during their respective sexual assault examinations pursuant to Rule 803(4) as statements pertinent to a medical diagnosis or treatment.

Under Rule 803(4), a statement that (A) "is made for—and is reasonably pertinent to— medical diagnosis or treatment" and (B) "describes medical history; past or present symptoms or sensations; their inception; or their general cause" is admissible. Fed. R. Evid. 803(4); *see also United States v. Kootswetewa*, 893 F.3d 1127, 1132 (9th Cir. 2018). The test for admissibility under Rule 803(4) is "whether the subject matter of the statements is reasonably pertinent to diagnosis or treatment." *United States v. Tome*, 61 F.3d 1446, 1451 (10th Cir. 1995). "[I]t is the declarant's understanding it is the declarant's understanding of the purposes for which the statements were made that matters under Rule 803(4)." *Kootswetewa*, 893 F.3d at 1133. However,

the declarant need not testify about her own understanding, "[a]n adequate foundation may be laid under Rule 803(4) by introducing objective evidence of the context in which the statements were made." *Id.*

Courts have found that statements made to SANE examiners can be admissible where they are pertinent to a medical diagnosis, even though SANE exams are by their nature in part conducted for the purpose of collecting evidence. *See, e.g.*, *United States v. Underwood*, 859 F.3d 386 (6th Cir. 2017) (finding statements to nurse examining for sexual assault of minor admissible pursuant to Rule 803(4) where primary purpose was for medical diagnosis); *Kootswetewa*, 893 F.3d at 1132 (noting that "one of the purposes of such an examination is to diagnose any physical, psychological, or emotional injuries the victim may have suffered and to prescribe an appropriate course of treatment"); *United States v. Lukashov*, 694 F.3d 1107, 1115 (9th Cir. 2012) ("Because '[s]exual abuse involves more than physical injury," in cases such as this one statements "made for purpose[s] of physical or non-physical treatment and diagnosis' may be admitted under Rule 803(4).") (citing *Guam v. Ignacio*, 10 F.3d 608, 613 (9th Cir. 1993)) (alterations in original); *United States v. Frost*, 684 F.3d 963, 976 (10th Cir. 2012) (finding certain statements to SANE nurse admissible even though defendant admitted he had sex with the victim but claimed it was consensual); *United States v. Pena*, 2022 WL 1102455, at *6 (D.N.M. Apr. 12, 2022) (finding statements describing the specific abuse, such as exactly "how the abuse occurred," her pain, and that alcohol was involved); *cf. Tome*, 61 F. 3d at 1451 (finding no error in admitting victim's statements to a Child Protective Services caseworker was inadmissible under Rule 803(4) because the caseworker did not diagnose or treat the child but only conducted the interview to determine if a protective order was appropriate); *United States v. Chaco*, 801 F. Supp. 2d 1200, 1203 (D.N.M. 2011) (finding statements made to a doctor during a SANE examination were "reasonably

pertinent to diagnosis or treatment, and therefore admissible," and were relevant to understanding the "nature and scope of the abuse and also pertinent to deciding what treatment and counseling may be necessary"). "True, [the SANE nurse] was collecting evidence, but that forensic function did not obliterate her role as a nurse, in a hospital, performing a medical examination of a victim of a sexual assault. It would have been unprofessional for [the nurse] to have treated [the victim] without eliciting an account of what had happened to her." *United States v. Gonzalez*, 533 F.3d 1057, 1062 (9th Cir. 2008).

Here, Dr. Rodriguez Ortega conducted a sexual assault exam within only a few hours of when AV-1 reported her sexual assault (the exam was conducted at 9:30 p.m. and the 911 call was placed shortly after 7:00 p.m.). Further, Dr. Rodriguez Ortega conducted the exam with a primary purpose of diagnosing AV-1. That Dr. Rodriguez Ortega is employed by the Mexico City Prosecutor's Office and conducted the exam in clinical space located in the Prosecutor's Office does not defeat Rule 803(4), so long as the statements were made for medical diagnosis. *See United States v. Lukashov*, 694 F.3d 1107 (9th Cir. 2012) (finding fact that the location of the medical clinic where SANE conducted was overseen by District Attorney's Office not dispositive where statements were made for purposes of medical diagnosis). In taking AV-1's statement, her reported memory lapses and alcohol and other consumption was relevant to not only how to proceed with the examination, but also the potential physical effects of ingesting intoxicants. Indeed, Dr. Rodriguez Ortega ordered the urinalysis testing because of the observed odor of alcohol and the reported alcohol consumption. *See Frost*, 684 F.3d 976 (observing that the victim "needed to describe what had happened so that [examining nurse] could make an informed judgment about how best to proceed with the examination and whether to prescribe medications"); *Gonzalez*, 553 F.3d at 1062 (observing that victim's statements about the nature of the abuse are relevant to

20

medical diagnosis in part because "the victim's description of the assault affects the examination [the nurse] conducts").

Dr. Rodriguez also conducted a physical examination that led her to make a referral to a specialist for ongoing care. Dr. Rodriguez Ortega is also expected to testify that in cases such as AV-1's where there is a reported lack of memory of her sexual assault, she refers the victim to a medical clinic to obtain antiretroviral medications to prevent HIV and to take the morning after pill to avoid pregnancy in the event that the victim does not remember whether her assailant wore a condom. That Dr. Rodriguez Ortega made referrals for treatment rather than treating the diagnoses she made does not foreclose admission of the victim's statements pursuant to Rule 803(4). *See United States v. Kappell*, 418 F.3d 550, 557–58 (6th Cir. 2005) (finding that the fact the examining medical professional did not treat the victim is not dispositive if the examining medical professional did so for medical diagnosis). For example, in *Kappel*, the Sixth Circuit considered the admissions of victims' statements to a psychotherapist hired to evaluate the victims' mental health. *Id.* at 552. The psychotherapist diagnosed the victims with post-traumatic stress disorder and told them that they could get help for that. *Id.* at 557. The Sixth Circuit found admission of the victims' statements proper under Rule 803(4), even though the psychotherapist did not herself treat the victims. *Id.*

AV-1's statements to the U.S. Embassy nurses during a second SANE taken two days later are also admissible insofar as they are pertinent to medical diagnosis. *See, e.g.*, *Lukashov*, 694 F.3d at 115 (finding admission of statement made by victim to social worker with police officer and doctor observing from window proper even after doctor had conducted a physical exam); *Goza v. Welch*, No. 1:10CV675, Report & Recommendation, 2011 WL 9686905, at *11 (N.D. Ohio Dec. 1, 2011), *adopted by* 2012 WL 6610781 (N.D. Ohio Dec. 18, 2012), *aff'd by* F. App'x 367 (6th

Cir. 2014) (finding admissible certain statements made during a minor victim's interview with a social worker were admissible, even after the victim had been examined by a nurse at the hospital on a different day, because the caseworker's "duties included determining whether [the victim] needed medical care of psychological help"). AV-1's statements regarding what she consumed, including alcohol provided by the defendant, and the extent of her memory lapses and flashes during the event were pertinent to Nurse Edwards's medical diagnosis and prescription of specific antiretroviral medications. Additionally, they were necessary to determine how to proceed with the SANE.

Thus AV-1's statements regarding when she was assaulted, her alcohol consumption, that the assailant brought and prepared her food and drink, that she recalled not feeling well, and lapses in memory are all relevant to the medical diagnosis and the course of the medical examination and should be admitted.

### E.   Witnesses' Prior Consistent Statements Should be Conditionally Admitted Pursuant to Rule 801(d)(1)(B)

Separately, the government expects that, on cross-examination, the defense will attempt to attack AV-1's memory, to emphasize inconsistencies and omissions in her testimony, and attack the veracity of her testimony. The government seeks a ruling, in advance of trial, that if the defense does so, the Court will admit prior consistent statements that AV-1 made to the defendant and her friends via electronic communications such as WhatsApp, to outcry witnesses, her mother, Mexican and U.S. sexual assault examiners, and Mexican and U.S. investigators as prior consistent statements under Fed. R. Evid. 801(d)(1)(B)(i) and (ii). For the same reasons, the government seeks a ruling, in advance of trial, that if the defense similarly attacks the credibility of other testifying witnesses, including victims and Witness 1, the Court will admit their prior consistent statements, including electronic communications with the defendant and statements to

investigators, as prior consistent statements under Fed. R. Evid. 801(d)(1)(B)(i) and (ii). These statements would be admissible as substantive evidence in the government's case-in-chief.[4]

Pursuant to Rule 801(d)(1)(B), a statement is not hearsay if (1) the declarant testifies and is subject to cross-examination about a prior statement; (2) the prior statement is consistent with the declarant's testimony; and (3) the statement is offered either to "rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying." Fed. R. Evid. 801(d)(1)(B)(i). Subsection (ii) was added, effective December 1, 2014, to include another basis by which a prior consistent statement can be admitted: "to rehabilitate the declarant's credibility as a witness when attacked on another ground." Fed. R. Evid. 801(d)(1)(B)(i)(ii); *see also United States v. Slatten*, 395 F. Supp. 3d 45, 87 (D.D.C. 2019); *Williams v. Devlin*, No. CV 12-1659 (CKK), 2015 WL 13668722, at *6 (D.D.C. Oct. 22, 2015). As the Advisory Committee Notes to Rule 801 explain, "[t]he intent of the amendment is to extend substantive effect to consistent statements that rebut other attacks on a witness—such as the charges of inconsistency or faulty memory."

Prior consistent statements admissible pursuant to Rule 801(d)(1)(B) can take the form of prior written statements. *See United States v. Slatten*, 395 F. Supp. 3d 45, 87 (D.D.C. 2019)*; see also United States v. Lepore*, No. 1:15-cr-367-WSD-JKL, 2016 WL 4473125, at *3-4 (N.D. Ga. Aug 25, 2016) ("If, at trial, [defendants] attack [witness's] credibility on grounds other than a claimed recent fabrication or improper influence or motive, Rule 801(d)(1)(B)(ii) permits the Government to introduce [witness's] handwritten notes to rehabilitate his credibility."); *Walker v.*

---

[4] For the reasons stated *infra*, there are no Confrontation Clause concerns presented by the admission of this evidence because the government will only seek to admit prior consistent statements of testifying witnesses, who will be available for cross examination. *See Crawford*, 541 U.S. at 59 n.9.

*Housing Auth.*, 2:13-cv-675-MHT and 2:13-cv-846-MHT, 2015 WL 790893, at *1-2 (M.D. Ala. Feb. 25, 2015) (admitting plaintiff's prior written statements in EEOC intake questionnaire as a prior consistent statement under 801(d)(1)(B)).

Since the 2014 amendment to Rule 801(d)(1)(B), courts have admitted forensic interviews of victims as well as statements previously made by victims to rehabilitate those witnesses after cross-examination. For example, in *United States v. J.A.S., Jr.*, 862 F.3d 543 (6th Cir. 2017), the Sixth Circuit held that playing the video of a child's forensic interview, which was "largely consistent" with her trial testimony, was "plainly admissible" under Rule 801(d)(1)(B)(ii) after the defense attacked the child's testimony by "pointing out that some aspects of her trial testimony were new . . . and by highlighting some collateral points on which her testimony and her prior descriptions supposedly differed." *Id.* at 545; *United States v. Cox*, 871 F.3d 479, 487 (6th Cir. 2017) (upholding admission of child victim's previous statement to an agent under Rule 801(d)(1)(B)(ii) after defendant attacked child's purportedly faulty memory); *United States v. Counts*, No. 3:18-CR-00141, 2020 WL 598526, at *4 (D.N.D. Feb. 7, 2020); *Berry v. Beauvais,* No. 13-cv-2647, 2015 WL 5244892, *2–3 (D. Colo., Sept. 9, 2015); *United States v. Drift*, No. 14-cr-208 (PAM/LIB), 2014 WL 4662505, at *1 (D. Minn. Sept. 19, 2014) (holding that child victim's prior statements to forensic interviewer and child's grandmother are admissible under Rule 801(d)(1)(B)).

Here, should the defendant attack the credibility of testifying victims or Witness 1, the government will seek to admit their prior consistent statements, including their electronic communications with the defendant and their prior statements to investigators. Each of the victim-witnesses made prior statements to law enforcement regarding their interactions with the defendant, some of which were audio and/or video recorded or were summarized in reports of

those interviews. With respect to AV-1, the prior statements include the statements made by AV-1 to Mexican authorities and Dr. Rodriguez Ortega on May 31, 2020, and June 1, 2020, to U.S Embassy investigators and nurses on June 2, 2020, in a recorded FBI forensic interview on September 3, 2020, and subsequent interviews with FBI and DSS agents. Once the defendant has questioned the victim-witnesses' credibility, as the government anticipates, these prior statements fall squarely under Rule 801(d)(1)(B) as prior consistent statements admissible to rebut the defendant's cross-examination and to rehabilitate the witnesses' credibility. *See* Fed. R. Evid. 801(d)(1)(B)(i) and (ii).

## III.   CONCLUSION

For the foregoing reasons, the statements described above are admissible as non-hearsay statements or pursuant to Federal Rules of Evidence 801(d)(1)(A), 801(d)(B), 803(1), (2), and (4), and 807. Accordingly, the government respectfully requests that the Court grant the government's motion.

Respectfully Submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
District of Columbia

NICOLE M. ARGENTIERI
ACTING ASSISTANT ATTORNEY
GENERAL
U.S. Department of Justice
Criminal Division

*/s/ Meredith E. Mayer-Dempsey*
Meredith E. Mayer-Dempsey
NY Bar No. 5213202
Assistant United States Attorney
United States Attorney's Office
for the District of Columbia
601 D Street, Northwest
Washington, D.C. 20530
(202) 252-7259
Meredith.Mayer-Dempsey@usdoj.gov

*/s/ Angela N. Buckner*
Angela N. Buckner
DC Bar No. 1022880
Katharine A. Wagner
NY Bar No. 4798245
Trial Attorneys
U.S. Dept. of Justice, Criminal Division
Human Rights and Special Prosecutions
1301 New York Avenue, Northwest
Washington, D.C. 20530
(202) 616-0238
Angela.Buckner.2@usdoj.gov