**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>BRIAN JEFFREY RAYMOND,<br><br>Defendant | Criminal Action No. 21-380 (CKK) |

**MEMORANDUM OPINION**
(October 28, 2023)

Before the Court is Defendant Brian Jeffrey Raymond's ("Defendant" or "Mr. Raymond") [190] Motion to Suppress. Defendant moves to suppress essentially all documentary and videographic evidence obtained from his various electronic devices, relying on both the Fourth Amendment's and the Fifth Amendment's exclusionary rules. Defendant's challenge centers on the execution of a warrant issued for Defendant's two iPhones. Defendant argues that law enforcement exceeded the search and seizure authorized by the warrant in compelling Defendant to unlock his devices with his passcodes. Insofar as all subsequent warrants rely on the fruits of this purportedly unlawful conduct, Defendant maintains that these subsequent warrants are so tainted as to require the suppression of all subsequent evidence. In response, the Government insists that law enforcement acted lawfully and, even if law enforcement did not, neither exclusionary rule applies.

To resolve the particularly complex questions of criminal procedure posed by the Motion, the Court commenced a five-day suppression hearing on June 1, 2023. The Court heard testimony from then-Agent Theodore Nelson and Agent Mikel Gajkowski of the Department of State's Diplomatic Security Service ("DSS"), the two main law enforcement officers who executed the warrant for Defendant's phones. The Court also heard testimony from Raymond White, a digital

1

forensic analyst at the Computer Investigation and Forensics ("CIF") office in DSS.  Additionally, the Court admitted sixty exhibits into evidence.

Upon exhaustive review of the record, the pleadings,[1] and the applicable legal authority, the Court concludes that compelling Defendant to unlock his phones using passcodes exceeded the scope of an already-executed warrant, and that law enforcement acted in, at best, reckless disregard of Defendant's Fourth Amendment rights.  Therefore, the Court must exclude the evidence obtained from Defendant's phones.  That said, the unconstitutional taint of law enforcement's unlawful conduct does not so infect subsequent warrants, which rest on independent grounds for probable cause, as to require the suppression of documentary and videographic evidence obtained beyond Defendant's phones.  Lastly, the Court perceives no Fifth Amendment violation.  As such, and in sum, the Court shall **GRANT IN PART AND DENY IN PART** Defendant's [190] Motion to Suppress.

## I.    BACKGROUND

### A.  Factual Background

Before turning to the Court's factual findings, the Court briefly summarizes the factual and legal background of this case, which the Court has addressed at more length in prior

---

[1] The Court's consideration has focused on:
- Defendant's Motion to Suppress, ECF No. 190 ("Motion" or "Mot.");
- The Government's Opposition to Defendant's Motion to Suppress Evidence, ECF No. 198 ("Opp.");
- Defendant's Reply to Government's Opposition to Defendant's Motion to Suppress Evidence, ECF No. 204 ("Repl.");
- The Government's Supplemental Briefing on Defendant's Motion to Suppress Evidence, ECF No. 235 ("Gov.'s Supp. Br."); and
- Defendant's Post-Hearing Brief in Support of Motion to Suppress Evidence, ECF No. 236 ("Def.'s Supp. Br.").

The Court has also relied on the suppression hearing in this matter and the exhibits admitted into the hearing record.

opinions.[2]

An investigation of Mr. Raymond was triggered after police responded, on May 31, 2020, to reports of a naked woman ("AV-1")[3] screaming on the balcony of Defendant's residence – a United States government-leased property in Mexico City, Mexico.  When Mr. Raymond was interviewed in Mexico City by authorities, he indicated that he had met AV-1 online, and the two had gone to his apartment, had drinks, and engaged in consensual intercourse.  *See Raymond I*, 640 F. Supp. 3d at 15.  A June 2, 2020 interview with AV-1 indicated that she had met with Mr. Raymond outdoors, and he brought wine in a backpack.  *Id.*  After going to his apartment, where they drank more wine and ate light snacks, she could not remember anything—including intercourse or standing and screaming on his balcony—until she awoke in an ambulance.  *Id.* When the Federal Bureau of Investigation ("FBI") ran an analysis on AV-1's urine sample in connection with the incident, they found cocaine, methamphetamine, and theophylline (a bronchial dilator asthma medication) in her system but did not find any evidence of so-called date rape substances.  *Id.*  During her follow-up interview, AV-1 denied ever having used any illegal drugs and suggested that Mr. Raymond had put the drugs in her drinks.  *Id.*  Subsequent searches of Defendant's devices (the lawfulness of which is at issue here) revealed a horde of explicit images and videos reflecting Defendant sexually assaulting scores of sleeping, inert women.

For example, in exhibits the Court reviewed for the purposes of bail addressed in *Raymond III*, Defendant filmed himself lifting and dropping a victim's limbs, manipulating her eyelids, and stroking her breasts and genitals with her own hand.  2023 WL 3040453, at *3.  When AV-6 face

---

[2]  *E.g.*, *United States v. Raymond*, 640 F. Supp. 3d 9 (D.D.C. 2022) ("*Raymond I*"); *United States v. Raymond*, --- F. Supp. 3d ---, 2023 WL 2043147 (D.D.C. Feb. 16, 2023) ("*Raymond II*"); *United States v. Raymond*, Crim. A. No. 21-380 (CKK), 2023 WL 3040453 (D.D.C. Apr. 21, 2023) ("*Raymond III*").
[3]  Alleged victims are denominated by number in the indictment.

flinched, Defendant jumped back, revealing his erect penis.  *Id.*   Defendant's actions are the same as or similar to those reflected in additional video and/or photographic evidence provided by the Government for the purposes of resolving other motions filed in this matter. They are also consistent with the Government's proffer as to the seventeen other alleged victims arising from the conduct alleged in the Superseding Indictment.   For example, Defendant again captured his erect penis while kneeling above AV-7's nude body.   *Id.*   Defendant similarly assaulted AV-5, grabbing her breast and playing with her mouth and tongue as she struggled to breathe.  *Id.* at *6. Defendant continued his fetish for manipulating his victim's eyelids with AV-23 and AV-4.  *Id.* Defendant evidently conducted many internet queries reflecting his intent to and motive for sexually assaulting his alleged victims, including "Ambien and alcohol and pass out," "Ambien and alcohol and side effects," and "searches for videos of passed out, sleeping, and drunk women." *Id.*  This brief discussion of evidence obtained through the warrants at issue is not exhaustive of the exhibits provided to the Court, and does not begin to cover the Government's allegations as to all purported victims, charged and uncharged.

### B.  Findings of Fact as to June 3, 2023 Search and Subsequent Warrants

The Government applied for, and received, a number of warrants to search Defendant's many devices.  The first warrant, for Defendant's iPhones ("Phone Warrant"), is most important here and precipitated the Government's discovery of the horde of media depicting Defendant abusing incapacitated women.  The probable cause for that warrant was based in part upon AV-1's law enforcement interviews, mainly AV-1's insistence that Defendant had assaulted her, forensic evidence of sexual assault, and her description of her incapacitation.  Gov.'s Hrg. Ex. 4A Aff. ¶¶ 17-21.  The probable cause for the warrant was also predicated upon a June 2, 2020 noncustodial interview with Defendant.  *Id.* ¶¶ 25-26.  The material recovered from the phones formed, in part,

the probable cause for the next warrant for Defendant's iCloud account ("iCloud Warrant") and all subsequent warrants (for, among other things, Defendant's other electronic devices).

      1.   June 2, 2020 Interview

This interview occurred a day after Defendant's return from Mexico to the United States. Hrg. Trans., ECF No. 225 at 101:12 (June 1, 2023) ("6/1/21 Trans."). At the time, Defendant was staying at a hotel in Vienna, Virginia. *See id.* at 151:6-7. During that interview, Defendant told law enforcement that he had met AV-1 on Tinder. *Id.* at 18:15-17. He then permitted Agent Gajkowski to take photos of his Tinder messages, along with messages between AV-1 on WhatsApp, on his personal iPhone XR. Gov.'s Hrg. Ex. 9-E. Additionally, he presented WhatsApp messages he exchanged with AV-1 on his iPhone 6 (which the Government claims was government-issued), Gov.'s Hrg. Exs. 7, 8, and sent screenshots of further messages to law enforcement later that day, Gov.'s Hrg. Ex. 9-F. Although Defendant indicated he used dating apps only rarely, Agent Gajkowski was able to observe that Defendant (1) had corresponded with many women on Tinder and (2) had also downloaded Bumble, another dating application. 6/1/23 Trans. at 115:8-19.

      2.   Phone Warrant

Law enforcement relied in part on this voluntary interview to obtain its first search warrant, the Phone Warrant. The probable cause rested first on reports by a federal protective squad based at the United States Embassy, Mexico City. *See* Gov.'s Hrg. Ex. 4A at 8. Shortly after Mexican law enforcement responded to Defendant's apartment in Mexico City during the incident with AV-1, the federal protective squad observed that "AV-1 was physically unstable and required assistance to walk, appeared heavily intoxicated, and was later crying in the back of an ambulance." *Id.* The warrant application claimed that AV-1 told those around her that Defendant had "tried to rape [her]." *Id.* Law enforcement further alleged that Defendant voluntarily stated to the federal protective squad

that he had met AV-1 on Tinder and corresponded with her on WhatsApp, as his Tinder and WhatsApp accounts confirmed to Agent Gajkowski during the June 2, 2020 interview. *Id.* Defendant also confirmed that AV-1 had indeed claimed that Defendant had tried to sexually assault AV-1, AV-1 having escaped to the apartment balcony to scream, in Spanish, "help me!" *Id.* at 8-9.

In addition to these earlier observations, law enforcement also recounted to the magistrate judge that American medical personnel "observed visible bruises on AV-1's forearms, and AV-1 showed them an additional bruise on her shoulder," after the incident. *Id.* She further claimed that she suddenly lost consciousness at Defendant's apartment, despite drinking relatively little. *Id.* at 10. Based on these allegations, video evidence of AV-1's stupor, and Defendant's June voluntary interview, law enforcement requested, and a magistrate judge issued, the Phone Warrant to seize and search the two phones. *Id.* at 11.

Specifically, the Phone Warrant authorized the search and seizure of those two phones, "for the purpose of identifying electronically stored data" reflecting records related to AV-1, sexual assaults more generally, and records "related to the research, purchase, possession, or use" of date-rape substances. *Id.* Attachs. A, B. Law enforcement was further authorized, during the search, to press Defendant's fingers to the Touch ID sensors of the two phones and to hold both phones to Defendant's face "for the purpose of attempting to unlock the devices via Face ID." *Id.* Attach B. Law enforcement acknowledged in the warrant, however, that these biometrics may not actually open either phone; sometimes, "a passcode or password must be used instead." *Id.* at 4. Agent Gajkowski offered an example in her affidavit: "when the device has been turned off or restarted." *Id.* Nothing in the warrant authorized law enforcement to obtain passcodes, however—only biometrics.

The warrant affidavit indicated further that the agents would seek to "ruse [Defendant] into meeting with [them] under the pretext of a brief follow-up interview, whereupon the devices would be seized in a public setting," but if Mr. Raymond was unwilling to appear for a second interview, the agents would approach him at the hotel where he was staying and request that he retrieve the two phones if he did not have them on his person. *Id.* at 20.  In that event, the agents would escort Defendant "into his hotel room to ensure there is no destruction of evidence [but] [t]he execution of the warrant would not involve any further physical intrusion onto a premises." *Id*.  Before the execution of the warrant, Agent Gajkowski briefed another DSS agent, Ted Nelson, on the warrant and their plan to execute it together with two other DSS agents. *See* Hrg. Trans., ECF No. 266 at 211:11-13 (June 2, 2023) "(6/2/23 Trans.")."

### 3.   Technical Background on iPhones

Before addressing the execution of the warrant, the Court must pause to provide a brief explanation of security settings on iPhones is necessary.  Recall that two phones are at issue here: an iPhone XR and an iPhone 6.   An iPhone XR can be locked by passcode (numeric or alphanumeric) and Face ID (facial recognition).  6/1/23 Trans. at 45:1-6, 64:11-12.  An iPhone 6 can be locked by passcode (numeric or alphanumeric) or fingerprint, but not Face ID.  *Id.* at 45:7-14, 64:7-10.  Both phones require a passcode before changing any settings, including disabling any locking features.  *Id.* at 68:12-70:14.  Additionally, if either iPhone was powered off and then powered on, if a passcode is enabled, then biometrics are insufficient to unlock the phone (sometimes termed the "first unlock" stage).  *Id.* at 45:18-20.  In this instance, Defendant had enabled passcodes on both phones, so the iPhone XR could be accessed by Face ID or passcode after first unlock, but not earlier.  *Id.* at 45:21-23.

The stage at which a phone is locked or unlocked also impacts how quickly a phone can be forensically inventoried. *Id.* at 47:3-8. If a phone is unlocked, as here, the vast majority, if not the entirety, of the phone's contents can be easily inventoried. *See id.* at 77:21-25. If a phone is locked, however, it could take, at the time the phones were seized here, up to twenty-five years to "brute force" entry into the phones, i.e., trying random codes until one works. *Id.* at 47:14-48:18. There is also no guarantee that a locked iPhone 6 and iPhone XR can be accessed through the "brute force" method in the "first unlock" state. *Id.* at 84:1-8.

   4. <u>First Meeting</u>

   The following day, June 3, 2020, DSS Agents Gajkowski and Ted Nelson asked Mr. Raymond to meet with them for a follow-up interview at a Jimmy John's near the hotel where Mr. Raymond was staying. The agents recorded their conversation, and a transcript of the interview was created. *See* Def.'s Hrg. Ex. 6. The execution of the warrant began, as planned, as a follow-up interview. Defendant began the interview by alerting Agents Gajkowski and Nelson that he was "[t]urning [at least one] phone off." *Id.* at 2:10-12. During that interview, the agents asked Defendant if he had his two phones with him and if they could see the phones, and he complied by handing them over. *Id.* at 177:15-178:8. In response to an inquiry by the agents as to how the two phones were secured, Mr. Raymond said, "They're locked with a PIN." Id. at 184:2-12. Agent Nelson indicated then that "DOJ issued a search warrant for both your cell phones, so we're going to take both your phones." *Id*. at 184:13-18. Mr. Raymond responded. "I can't, I can't let you do that without a lawyer present." *Id*. at 184:19-20. Agent Nelson responded by indicating that was what the search warrant was for, "so we are taking your phones," and furthermore, he stated that he was "not asking." *Id*. at 184:21-185:4. Law enforcement also asked Defendant to "turn [both phones] back on." 6/2/23 Trans. at 47:19-20.

Mr. Raymond again responded, "I, I'm, I'm serious. I need . . . I can't authorize that without a lawyer." Def.'s Hrg. Ex. 6 at 185:6-10. Agent Nelson replied that it was a "criminal justice process," and he would show Mr. Raymond his badge and credentials, and "[n]othing good's going to come out of you resisting this." *Id*. at 185:11-19. Mr. Raymond indicated that he was not resisting. *Id*. at 185:20. Agent Nelson told Mr. Raymond he could "notify [his] people that we seized the phones," but Mr. Raymond indicated that he didn't "understand how [he was] supposed to have contact with anybody." *Id*. at 185:21-186:9. After Agent Nelson suggested Mr. Raymond go to a store and get a new cell phone so he could contact people, *id*. at 186:13-20, Mr. Raymond indicated that it was "more than an inconvenience" and he was "dead in the water" as he "d[id]n't have phone numbers." *Id*. at 187:3-12.

At this point in the conversation, Agent Nelson asked Mr. Raymond if there was "something we need to know about . . . [b]esides inconvenience," and Mr. Raymond indicated that there were "naked photos on [the phones] of women." *Id*. at 188:17-22. Agent Nelson then offered to get Mr. Raymond the contacts he needed but stated that "[w]e need PIN numbers for these phones so we can access them," *id*. at 189:19-21, to which Mr. Raymond responded "I, I have to consult a lawyer honestly. I can't - - it's just something I have to do." *Id*. at 189:22-190:1. The dialogue continued as follows:

Ms. Gajkowski: Okay.

Mr. Raymond: You know, I don't know what my rights are in this situation.

Ms. Gajkowski: (Inaudible).

Mr. Nelson: You're right, but we are seizing the phones. What we need to do though, is we need to unlock them and at least put them on airplane mode. Okay?

Mr. Raymond: I can't do that until I talk with my lawyer. I just don't understand what's going on here right now.

Ms. Gajkowski:  So - - so, what we are going to do, because I, I just want to be clear, so you're not willing to voluntarily give us your PIN.  Correct?

Mr. Raymond:  No, not until I consult with a lawyer.

Ms. Gajkowski:  Okay, understood.

Mr. Nelson:  Yeah.  Okay.

*Id*. at 190:2-19.

The agents again told Mr. Raymond they could give him contact numbers from the phones if he decided to give them the passcode but stated they could not "coerce [him] to give [them] any PINs." *Id*. at 190:22-191:9.  They told Mr. Raymond however that "[t]he truth is, one way or another, we're getting into the phones." *Id*. at 191: 10-17.  Mr. Raymond did not provide the PIN codes, and he stated again that he "just [did not] understand what's going on." *Id*. at 191:21-22.  At some point later, Agent Gajkowski asked if Mr. Raymond could tell her how to "turn this [phone] on airplane mode" but Mr. Raymond responded that he would "have to unlock it" and did not know if it went into airplane mode without unlocking it.  *Id*. at 203:3-15.  Thereafter, after some additional conversation and questioning, the agents put Mr. Raymond's phones in evidence bags and handed him property receipts, and Agent Gajkowski announced, "The time is 12:26 Saturday, June 6th, and this concludes our interview and search and seizure warrant execution." *Id*. at 220:8-10.

Despite law enforcement's announcement that they had executed the warrant, they returned twice, this time to the lobby of Defendant's hotel.

     5.  <u>Second Meeting</u>

After their interview, Mr. Raymond returned to his hotel and the agents called Government counsel to let her know that they had the phones but that Mr. Raymond "declined to provide a passcode, which he identified as the means for unlocking both devices." 6/1/23 Trans. at 185:18-19.

Upon receiving that report, the prosecutor directed law enforcement "to go back and compel [Defendant] to open" his phones, 6/4/23 Trans. at 26:13-16, evidently through biometrics, 6/1/23 Trans. at 186:4-7. Agent Nelson testified, however, that he understood the prosecutor to have directed law enforcement to use biometrics and, if that method failed, "detain [Defendant] until he gives [law enforcement] pass[words]." 6/9/23 Trans. at 27:8-12.

It bears noting at this point that if the prosecutor directed law enforcement to reengage to compel biometrics, law enforcement undoubtedly would (or should) have understood that effort to be futile. Through her assistance in the preparation of the warrant, Agent Gajkowski understood that that the devices *could not* have been "unlocked through such means," i.e., biometrics, because they had been powered off during the earlier interaction that day.

Nevertheless, approximately one and one-half hours after Mr. Raymond's phones were seized, the four agents went to Mr. Raymond's hotel along with a uniformed and armed police officer for the Town of Herndon, Virginia. Gov.'s Hrg. Ex. 14. Agent Nelson, Agent Gajkowski, and the Herndon police officer stationed themselves around the lobby, with two more agents outside, and one of the agents asked the front desk to summon Mr. Raymond from his room without providing a reason other than that someone wanted to talk to him. *Id.* When Mr. Raymond came to the lobby, Agent Nelson indicated that Mr. Raymond was "not under arrest" but that "[t]he search warrant compels [him] to open [his] phone" so they had to come back and "get [him] to open his phone." *Id.* Agent Gajkowski indicated that "law enforcement personnel [are] authorized to access fingers, including thumb onto the device, and further to hold the phone up to [his] face." *Id.* When asked if he could open the phone *with a passcode*, Mr. Raymond replied, "Yeah. If I'm compelled to do it, sure." *Id.* Feet away from both Defendant and Agent Gajkowski, Agent Nelson responded "you are," i.e., Defendant was legally obligated to use passcodes to open the devices. Agent Gajkowski

did not correct Agent Nelson to explain, as they both knew, that the warrant *did not* compel Defendant to open his phones with anything other than biometrics.

The agents discussed changing the passcodes, and while Agent Gajkowski looked at the first phone, they handed Mr. Raymond the second phone and asked him to open it, which he did.  Agent Gajkowski then attempted to change the settings/passcodes on one of the phones, but she noted that it required an additional ID or code.  She told Mr. Raymond, "So, it's up to you, if you want to enter the password, you don't have to."  *Id*.  Mr. Raymond responded, "I don't understand.  Aren't I compelled to - - ?"  *Id.*  Agent Gajkowski said, "You are not compelled to give us the code, only the thumbprint, so  I want to be clear on that."  *Id.*  Mr. Raymond replied, "Well, I'd rather - - I mean, just for privacy reasons . . . I'd rather not."  *Id.*  Agent Nelson asked Agent Gajkowski if she had changed the passcode on the first phone, but she said she was unable to do so without Mr. Raymond's password [to his Apple account].  The agents told Mr. Raymond that was all they needed and thanked him, and he left to go back to his hotel room.  This interaction, like the next, took place in a public, hotel lobby, in calm and conversational tones.  *See* Gov.'s Hrg. Exs. 14, 15.

### 6.  Third and Final Meeting

Approximately one hour after their second encounter with Defendant, law enforcement returned again.  The phones had re-locked again, so law enforcement asked Defendant whether he would change his password so as to permit law enforcement to remove the password settings and establish permanent access to the phones.  Gov.'s Hrg. Ex. 15.  Without this last interaction, Agent Nelson said, law enforcement was "dead in the water."  6/2/23 Trans. at 122:3-4.  At this point, Defendant finally relented, entered his passcodes again, and then changed the settings to ensure law enforcement would retain access.  Gov.'s Hrg. Ex. 15.

7.  Phones' Contents and Subsequent Warrants

After the June 2, 2020 interview that precipitated the Phone Warrant, Agent Gajkowski sought assistance from the prosecutor and fellow law enforcement to submit requests to Match (parent company of Tinder and Bumble), Facebook (parent company of WhatsApp), and Apple to preserve all data linked to any accounts Defendant may have then maintained with these companies (termed "preservation requests").  6/2/23 Trans. at 36:3-19   Shortly after the execution of the Phone Warrant, the prosecutor advised law enforcement to submit these preservation requests as soon as possible.  *Id.*  These preservation requests were coterminous with law enforcement's intention to eventually seek a warrant for Defendant's iCloud account.  6/8/23 Trans. at 85:21-25, 86:1-4.[4]

At the same time, law enforcement worked to forensically image the two phones.  During June 2020, law enforcement recovered one explicit photograph depicting a nude, unconscious woman.  6/1/23 Trans. at 55:11-19.  Law enforcement also recovered data reflecting thirty other similar media on the iPhone XR.  *Id.* at 58:3-9.  The iPhone 6 revealed WhatsApp messages with multiple women that the indictment claims Defendant sexually abused.  *Id.* at 18:9.  It also contained an internet search for "deep sleep."  *Id.* at 23:2-4.

---

[4] Defendant insists that Agent Gajkowski offered conflicting testimony as to whether, and when, law enforcement intended to seek a warrant for Defendant's iCloud account.  Defendant's briefing mischaracterizes Agent Gajkowski's testimony.  Defendant argues that Agent Gajkowksi said "she did not know whether she 'plan[ned] to get a warrant for Mr. Raymond's iCloud' prior to July 24, 2020."  Def.'s Supp. Br. at 32 n.8.  That interaction proceeded as follows:

> Q: Prior to July 24, 2020, you didn't have a plan to get a warrant for Mr. Raymond's iCloud; right?
>
> A: I don't know if that's accurate.

6/5/23 Trans. at 59:3-5.  In other words, defense counsel's assertion that there was no plan for the iCloud Warrant prior to July 24, 2020 was inaccurate.

These revelations formed, in part, the probable cause for the next key warrant, the iCloud Warrant.[5]  Gov.'s Hrg. Ex. 4C Aff. ¶¶ 17-22.  The iCloud Warrant's probable-cause also relied on the same information used for the Phone Warrant.  *See id.* ¶¶ 6-15.  That said, the affidavit in support of the warrant, prepared again by Agent Gajkowski added additional, somewhat exculpatory information as to AV-1:  a subsequent forensic analysis of AV-1's urine reflected that her "alcohol concentration was likely 320 ml/dL (0.32%) at the time of the incident."  *Id.* ¶ 15.  Agent Gajkowski also opined that "perpetrators of drug or alcohol-facilitated sexual assault frequently store photos, conversations, and other digital 'keepsakes' of their criminal activities" on, among other things, digital accounts stored in the cloud.  *Id.* ¶ 24.  Based on this affidavit, the iCloud Warrant issued on August 14, 2020.  *Id.* Warrant at 1.   The iCloud Warrant revealed a horde of images and videos depicting Defendant assaulting passed-out women, and this material constitutes the Government's key trial evidence.  It also formed the vast majority of the probable cause for subsequent warrants. *See, e.g.*, Gov.'s Hrg. Ex. 4K Aff. at ¶ 19.

## C.  Procedural Background to Date

Based upon this particularly inculpatory evidence,[6] recovered in large part from Defendant's iCloud account, the Government filed a one-count Complaint charging Defendant with enticing or coercing another "to travel in interstate or foreign commerce . . . to engage in . . . any sexual activity for which any person can be charged with a criminal offense," in violation of 18 U.S.C. § 2422(a).  *See* ECF No. 1 (Oct. 8, 2020).   On December 31, 2020, the Government filed a

---

[5]  Though not relevant for present purposes, to be precise, the iCloud Warrant was the third of seventeen warrants issued over the course of the investigation.  The second covered Defendant's residence in Mexico City.  Gov.'s Hrg. Ex. 4B.

[6]  The Court reiterates that the adjudication of guilt or innocence is exclusively the province of the jury.  At present time, Defendant must be presumed innocent until proven guilty.  To the extent the Court offers any particular editorialization, it is only to provide context for the resolution of the legal issues before it.

superseding complaint, charging Defendant with sexual abuse in violation 18 U.S.C. § 2242(2) and abusive sexual contact in violation of 18 U.S.C. § 2244(a)(2).  In accordance with a plea agreement, the Government then filed a superseding Information, alleging two counts of sexual abuse in violation of 18 U.S.C. § 2242(2) and one count of transportation of obscene material (the photos and videos of unconscious women) in violation of 18 U.S.C. § 1462.  ECF No. 59 at 1-4 (May 28, 2021).  On July 23, 2021, Defendant entered, and the Court accepted, a plea of "guilty" as to the charges in the superseding Information.  *See* Minute Entry (July 23, 2021); Statement of Offense, ECF No. 68; Plea Agreement, ECF No. 69.

Despite the plea, this case did not proceed to sentencing.  Rather, Defendant moved to withdraw his plea, based mainly on ineffective assistance of counsel.  *Raymond I*, 640 F. Supp. 3d at 21.  After substantial briefing, the Court granted the motion on those grounds.  *Id.* at 34.  The Government then sought, and a grand jury returned, the first indictment, comprising eleven counts similar to those charged in the prior charging instruments.  *United States v. Raymond*, Crim. A. No. 21-380 (CKK), 2023 WL 3040453, at *3 (D.D.C. Apr. 21, 2023) ("*Raymond III*").  That indictment alleged:  two counts of sexual abuse in violation of 18 U.S.C. §§ 2242(2), 7(9); one count of aggravated sexual abuse in violation of 18 U.S.C. §§ 2241(b), 7(9); seven counts of abusive sexual contact, in violation of 18 U.S.C. §§ 2244(a)(2) and 7(9); and one count of coercion and enticement to travel to engage in unlawful sexual activity, in violation of 18 U.S.C. § 2442(a); two counts of sexual abuse in violation of 18 U.S.C. §§ 2242(2), 7(9); one count of aggravated sexual abuse in violation of 18 U.S.C. §§ 2241(b), 7(9); seven counts of abusive sexual contact, in violation of 18 U.S.C. §§ 2244(a)(2) and 7(9); and one count of coercion and enticement to travel to engage in unlawful sexual activity, in violation of 18 U.S.C. § 2442(a).  *Raymond III*, 2023 WL 3040453, at *3.  Based on the allegations in that indictment and the substantial litigation this case has incurred,

the Court tolled all Speedy Trial time until trial, set for November 8, 2023.  *Raymond II*, 2023 WL

2043147 at *4.

A battery of pretrial motions are pending before the Court, including the instant Motion to

Suppress.  The Court now turns to its resolution.

## II.    DISCUSSION

### A. Fourth Amendment

1.  <u>Lawfulness of Search</u>

"It is a cardinal rule that, in seizing goods and articles, law enforcement must secure and

use search warrants where reasonably practicable."  5 Orfield's Criminal Procedure Under the

Federal Rules § 41:2 (West 2023).  This warrant requirement extends to a person's smartphone.

*See Carpenter v. United States*, 138 S.Ct. 2206, 2214 (2018).  The Government does not

maintain that exceptional circumstances permitted a warrantless search.  Rather, the Government

argues that the Phone Warrant's authority extended to the second and third seizures of

Defendant.

To the contrary.  Because the warrant expired at the conclusion of the first search, the

second and third seizure of Defendant to effect law enforcement's intended search was unlawful.

And because the record does not establish that either iPhone in fact belonged to anyone other

than Defendant, the contents of both phones are therefore presumptively subject to suppression.

These facts, plus the fact that law enforcement would have had to have known that their return

efforts to re-execute an expired warrant would be futile, require the suppression of the phones'

contents.

i.    *Privacy Interest*

Through its briefing, the Government has maintained that Defendant had no privacy interest in the contents of the iPhone 6, because that phone was government-issued and Defendant's employer warned him that the phone may be subject to search.  Gov.'s Supp. Br. at 21.  Were the factual premise accurate, Defendant would have no privacy interest in that phone's contents.  *See United States v. Hill*, 319 F. Supp. 3d 44, 50 (D.D.C. 2018).  Yet the evidentiary record is devoid any of indication that the iPhone 6 was, in fact, government-issued.  Defendant characterized the iPhone 6 as his "Mexican number phone."  Gov.'s Hrg. Ex. 9. Although he appeared at one point to agree that he had a "personal" phone and a "work" phone, Defendant later stated that the phone "belongs to Mexico," as if it is a phone he maintains in Mexico because he works there.  *Id.*   Although it might be reasonable to infer that the phone was issued by Defendant's government employer, the Government adduced neither witness testimony nor documentary evidence supporting this assertion—either during the suppression hearing or in its papers.  Accordingly, the Court cannot find by a preponderance of the evidence that the iPhone 6 was not, as Defendant maintains, a personal phone.

ii.    *Temporal Applicability of Phone Warrant*

A search warrant, like a pumpkin carriage, retains its magical properties only for a certain period of time.  For example, after fourteen days, midnight strikes, and the search warrant loses its validity.  Fed. R. Crim. P. 41(e)(2)(A)(i).  Similarly, a warrant's authority to search a person or premises expires when "the items described in the warrant h[ave] been seized."  *See, e.g.*, *Creamer v. porter*, 754 F.2d 1311, 1319 (5th Cir. 1985).   A warrant permits but one search, and when it is completed, "the prevailing guidance . . . is simple:  get another warrant."  *In re Search*

*of Twenty-Six (26) Digital Devices*, Search Warrant No. 21-233 (BAH/GMH), 2022 WL 998896, at *9 (D.D.C. Mar. 14, 2022) (Howell, C.J.) (collecting cases).

Some jurisdictions, however, have blessed a limited gloss on this rule, permitting law enforcement to "pause" the execution of a search, even after discovering the material to be seized, and to return to the execution of the warrant at some later point.[7]  This gloss, not yet recognized by this Circuit, is termed the "reasonable continuation" doctrine.  *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 547 n.5 (6th Cir. 2003).  Under this "reasonable continuation" doctrine, law enforcement may pause the execution of a warrant and return to it later so long as the suspension of the search is (1) reasonable under the totality of the circumstances and (2) not, in fact, a new search.  *United States v. Keszthelyi*, 308 F.3d 557, 571-72 (6th Cir. 2002).  The basis for this doctrine is understandable.  So long as law enforcement otherwise complies with a warrant's requirements, law enforcement is due some deference in how to execute it.  *See Dalia v. United States*, 441 U.S. 238, 257 (1979).  Sometimes, law enforcement will encounter unforeseen challenges that will prevent them from fully executing the warrant and will want to confer with others on the challenge before them.  *See United States v. Hendley*, Crim. Case No. 14-353-ODE-JSA, 2015 WL 13736219, at *8 (N.D. Ga. Oct. 19, 2015); *cf. also United States v. Whitfield*, 629 F.3d 136, 141 (D.C. Cir. 1980) (in context of exigent search of automobile, holding that exigency does not necessarily "disappear[] when the police decide in good faith to delay their search for a more opportune time or place").

The Government contends that this is such a case.  Agent Gajkowski did not actually force Defendant to apply his biometrics to the phones before concluding the first interaction, and

---

[7]  *See, e.g.*, *United States v. Bowling*, 351 F.2d 236 (6th Cir. 1965) *cert. denied* 383 U.S. 908 (1966); *United States v. Carter*, 854 F.2d 1102, 1107 (8th Cir. 1988); *United States v. Kaplan*, 895 F.2d 618, 623 (9th Cir. 1990).

the prosecutor was evidently surprised to learn that Agent Gajkowski concluded that biometrics would fail given Defendant's use of passcodes on both phones.  So, the argument goes, law enforcement was due another shot at executing the biometrics provision of the warrant.

To bolster the point, the Government relies mainly on two sets of cases.  The first holds that law enforcement may return when they realize they inadvertently had not seized all items that they were obligated to seize under the terms of the warrant.  *See, e.g.*, *Kaplan*, 895 F.2d at 623.  The second involves logistical challenges.  *See United States v. Gerber*, 994 F.2d 1556, 1557-59 (11th Cir. 1993).  In *Gerber*, a warrant issued directing law enforcement to search the interior of a car.  *Id.* at 1557.  Law enforcement searched some of the car, but stopped when they arrived at the car's engine block.  *Id.*  The hood would not open without a crowbar, so law enforcement returned three days later, thinking the subsequent search of the engine block lawful even though the warrant had expired three days earlier.  *Id.*  This second visit was a continuation of the first, the Eleventh Circuit held, because law enforcement announced that they purposefully intended to pause the search and they believed, evidently in good faith, that the warrant was still active at the time of the second visit.  *Id.* at 1561.

Assuming *arguendo* that the continuation doctrine is good law in this Circuit, neither category of cases applies here.  First and foremost, Agent Gajkowski affirmatively announced that the warrant had been executed at the conclusion of law enforcement's first interaction with Defendant.  June 6, 2020 Interview of Brian Raymond ("Interview Tr."), Ex. E, ECF No. 119-5 at 220:8-10.  Agent Gajkowski was correct in saying so—law enforcement had finished seizing all items described in the warrant.  The plain text of the warrant was also clear that it had been executed.  Law enforcement was "authorized to [use biometrics]" "[d]uring the execution of the

search of" the phones.  Gov.'s Ex. 4B Attach. B at 2.  The "search" to be executed was "the seizure" of the phones, which would later be subject to forensic examination.  *Id.* Attach. A at 2.

Moreover, unlike in *Gerber*, law enforcement was not met by an unexpected, surmountable challenge.  They were faced with passcodes that they anticipated Defendant might have activated, and acknowledged that their form of crowbar, biometrics, *would not work* under that circumstance.  Nevertheless, despite understanding that they had executed the warrant and that a return trip would be futile, Agents Gajkowski and Nelson went one step further to compel *not just* biometrics *but also* Defendant's entry of his passcodes, decidedly beyond the scope of the warrant and contrary to explicit instructions from the prosecutor to Agent Gajkowski before the execution of the warrant.  That is not a reasonable, good faith extension of a half-executed warrant.  That is a futile, illegal attempt to reanimate a warrant whose authority had already lapsed.  Accordingly, the second and third interactions with Defendant were warrantless.

### 2. Exclusionary Rule

As explained further above, the Fourth Amendment's exclusionary rule usually applies to the fruits of an unconstitutional search or seizure.  *Wong Sun v. United States*, 371 U.S. 471, 484 (1963).  This "fruit of a poisonous tree" doctrine encompasses both the primary evidence obtained and evidence later obtained as a derivative of the original illegality.  *Id.* at 488.  Because of the high social costs associated with excluding evidence, however, the Supreme Court has recognized a number of exceptions to the exclusionary rule.  *See Brown v. Illinois*, 422 U.S. 597, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975).  Here, the Government relies on just two:  (1) the "good faith" exception and (2) the "inevitable discovery" doctrine.  First, the Court cannot conclude on this evidentiary record that the law enforcement officers that executed the Phone Warrant behaved in good faith.  Rather, the Court finds that law enforcement acted in reckless disregard of the Fourth

Amendment's warrant requirement.  Second, the Court concludes that the Government confuses the "inevitable discovery" doctrine for the similar "independent source" doctrine, and that the latter requires suppression of only the contents of the phones.  At bottom, the phones' contents seized must be suppressed, but material seized pursuant to the iCloud Warrant and all subsequent warrants is not subject to suppression.

i.      <em>Good Faith</em>

Not all unlawful conduct requires suppression.  The Fourth Amendment's exclusionary rule does not provide "a personal constitutional right of the party aggrieved." *Leon*, 468 U.S. at 906.  Rather, the exclusionary rule is a "prudential doctrine" meant solely to "deter future Fourth Amendment violations." *Davis v. United States*, 564 U.S. 229, 236-37 (2011) (internal quotation marks omitted).  As such, where law enforcement act with a "reasonable good-faith belief that their conduct is lawful," a reviewing court may not exclude unlawfully-seized evidence. *Id.*  In light of this precedent, it is incumbent upon the moving party to demonstrate that law enforcement "violate[d] [a defendant's] Fourth Amendment rights deliberately, recklessly, or with gross negligence." *Id.* at 240.  Otherwise, the reviewing court must excuse law enforcement's unconstitutional conduct.

That said, cases involving good-faith constitutional violations are innocuous indeed.  Most common, police rely on a warrant rendered defective by a magistrate's inadvertent, earlier mistake. *See, e.g.*, *United States v. Thorne*, 548 F. Supp. 3d 70, 130-32 (D.D.C. 2021) (Howell, C.J.) (collecting cases).  In other words, "good faith" cases tend to revolve around a defective warrant, not defective execution of a valid warrant. *See, e.g.*, *United States v. Ginyard*, 628 F. Supp. 3d 31, 49-50 (D.D.C. 2022) (CKK).  To be sure, the "good faith" exception can also apply to minor, "technical violation of the terms of the warrant," but these cases tend to involve how and when a

warrant is executed.  *See, e.g.*, *United States v. Squillacote*, 221 F.3d 542, 557 (4th Cir. 2000) (concluding the law enforcement's continuation of a search into the evening, even though the warrant required a daytime search, was a "technical violation[]" "motivated by considerations of practicality rather than by a desire to engage in indiscriminate 'fishing'" (cleaned up)).

Here, law enforcement's violation of the Phone Warrant was far more than "minor" or "technical."  Most importantly, the record utterly belies the Government's assertion that Agents Gajkowski and Nelson "did not know that the phones could be unlocked using more than one method."  Opp. at 35-36.  Days earlier in her affidavit in support of the Phone Warrant, Agent Gajkowski wrote, under oath, that she *did* know that each phone could be locked with *both* biometrics *and* an alphanumeric passcode.  *See* 6/8/23 Trans. at 69:2-15.  By the conclusion of the first interaction with Defendant both Agents Gajkowski and Nelson had learned that each phone was in fact secured using both measures.  *See id.* at 59:20-22.  And Agent Gajkowski knew, based on her sworn affidavit, that any attempt to use only biometrics to unlock the phones, which were in "first unlock" state, would have been futile.  Because Agent Gajkowski had both been trained in the execution of search warrants and was accompanied with a more experienced Agent Nelson, both Agent Gajkowski and Agent Nelson must have known that a fully-executed warrant cannot be executed a second time, much as they might have liked a second go at Mr. Raymond.  *Supra* at 6.  Nevertheless, they returned not just once, but twice, to execute a dead warrant.

In doing so, they also ignored the clear terms of the warrant, a warrant that Agent Gajkowski had prepared herself and on which she had briefed Agent Nelson in advance of the warrant's execution.  *Id.*  Both Agents Gajkowski and Nelson must have known, then, that the warrant permitted *only* compelled biometrics, not compelled passcodes.  Agent Gajkowski must have known the warrant's ambits not just  because she prepared it, but because she had also had a

conversation with the prosecutor days prior in which she was reminded that law enforcement may not, under any circumstances, compel passcodes. Def.'s Hrg. Ex. 50. Yet Agent Nelson, standing only few feet away from Defendant and Agent Gajkowski, did just that during the second interaction with Defendant, falsely stating to Defendant that "[t]he [Phone] [W]arrant compels you [Defendant] to open your [Defendant's] phone" *using a passcode*. Agent Gajkowski undoubtedly herad Agent Nelson's reckless misstatement, yet she did nothing.

There is no good-faith explanation for this conduct. To reiterate, Agents Gajkowski and Nelson knew that they had fully executed the Phone Warrant at the end of their first meeting with Defendant. Agent Gajkowski knew that any further interaction to unlock either phone would be futile, unless she somehow convinced or ordered Defendant to take a step not permitted by the warrant—passcodes. She knew that Defendant refused to voluntarily provide or enter them at the first interaction. Yet she returned with Agent Nelson, and permitted, by an act of omission, Agent Nelson to unlawfully compel Defendant to enter a passcode against Defendant's will. Either law enforcement's conduct here was intentional or grossly negligence. In either case, law enforcement did not act in good faith in compelling Defendant's passcodes.

## ii.    *Inevitable Discovery/Independent Source*

Second, as to both the Phone Warrant and the iCloud Warrant, the Government relies on the "inevitable discovery" doctrine. Opp. at 47. This exception to the exclusionary rule applies where the Government demonstrates "that the information [at issue] ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984). As the Supreme Court explained in *Nix*, this doctrine is closely related to the very similar "independent source" doctrine. *Id.* at 441-43. They are, however, distinct. On the one hand, the "inevitable discovery" doctrine asks whether "evidence found because of an earlier [Fourth Amendment]

violation would inevitably have been discovered lawfully," while the "independent source" doctrine, on the other hand, asks "whether [law enforcement] did in fact acquire certain evidence by reliance upon an untainted source."   LaFave *et al.*, 3 Crim. Proc. § 9.3(e) (West 2023) (collecting cases).  In effect, the "inevitable discovery" doctrine applies where law enforcement obtained evidence without a warrant, whereas the "independent source" applies where law enforcement obtained evidence pursuant to a warrant that may or may not be tainted by an earlier Fourth Amendment violation.  *See Murray v. United States*, 487 U.S. 533, 538 (1988).  Here, therefore, the "inevitable discovery" applies to the contents of the iPhones, and the "independent source" doctrine applies to the evidence found on Defendant's iCloud account.

Inevitable Discovery.  The inevitable discovery doctrine applies, when, by a preponderance of the evidence, that even without the unlawful conduct, the evidence sought to be admitted would have been discovered anyway.  *Nix*, 467 U.S. at 444.  However, the doctrine is limited to inevitability that "involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment and does not require a departure from the usual burden of proof at suppression hearings."  *Id.*  The D.C. Circuit has also expressed significant doubt as to whether the inevitable discovery doctrine may ever be applied to "primary evidence," as opposed to mere "derivative evidence."  *See United States v. $639,558.00 in U.S. Currency*, 955 F.2d 712, 718-21 (D.C. Cir. 1992).

Because, under this doctrine, the Government must engage in hypothetical reasoning, it is usually quite difficult to demonstrate that law enforcement truly would have inevitably discovered the contested evidence.  In this regard, *United States v. Holmes*, 505 F.3d 1288, 1293 (D.C. Cir. 2007) is particularly instructive.  In that case, officers conducted a *Terry* stop and frisk of a suspect who was acting suspicious, was in an alleyway late at night, and fled as the officers approached.

*Id.* at 1292.   While there were no issues with the initial *Terry* stop, the officers unlawfully exceeded the scope of the *Terry* search when they removed keys to the suspect's car from the suspect's pocket.   *Id.* at 1293.   Exceeding the bounds of their authority to execute a traffic stop, the officers then used the keys to open the suspect's car and found an illegal gun and ammunition.   *Id.*   Under those circumstances, the Government could not demonstrate that law enforcement would have inevitably discovered the illegal gun and ammunition.   *Id.*   For the keys to be discovered absent the unlawful expansion of the *Terry* patdown, the officers would have had to ask the suspect about the keys, and then, the suspect would have had to answer honestly and lead the officers to his car. *Id.* at 1294.   Whether, as a counterfactual, those circumstances might have come to pass had law enforcement behaved lawfully was too speculative.   *Id.*

In this instance, there were no separate avenues of investigation that were occurring at the same time when the officers illegally searched Defendant's phones.   In the alternative where the officers did not compel Defendant to turnover his passcodes, the agents testified that they would have used the CIF to break into the phone.   6/2/23 Trans. at 22:5-9.   The evidentiary record establishes that it is indeed wholly speculative that CIF would have *ever* gained access to either phone's contents, and even then precisely what would have been forensically imageable.   The "brute force" method CIF would have employed has high variance; using brute force can take moments to open a phone, but it can also take years. 6/1/23 Trans. at 47:16-18.   In some instances, the phone never unlocks.   *Id.* at 48:18.   This step alone injects enough uncertainty into this separate, hypothetical line of investigation to vitiate the Government's invocation of the inevitable discovery doctrine.   With no exception to the exclusionary rule on point, the Court must suppress the contents of both phones.

<u>Independent Source.</u> Having concluded that the exclusionary rule applies to the compelled unlocking of Defendant's phones, the Court turns to whether law enforcement's unconstitutional seizure of Defendant compels the suppression of evidence obtained from the iCloud account.  On the one hand, so long as law enforcement had a separate, independence source for probable cause as to the iCloud warrant, the evidence obtained therefrom is not subject to the exclusionary rule. *See Murray*, 487 U.S. at 2532.  On the other hand, there can be no independent source if  "the officers' decision to seek the warrant was prompted by what they had seen [through an unlawful search or seizure], or if the information obtained during the illegal search or seizure was presented to the judge and affected their decision to issue the warrant." *Id.* at 35-36.

Defendant correctly observes that the affidavit in support of the iCloud relied extensively on the materials and information obtained from the phones.  *Supra* at 13.  Defendant also emphasizes that the government only sought the iCloud warrant until more than two months after the illegal seizures once the phones had been fully analyzed.  Repl. at 20-21.

The Court is not so troubled.  As a threshold matter, an affidavit merely incorporating information obtained lawfully does not defeat the "independent source" doctrine so long as the affidavit also incorporates information legally obtained.  *United States v. Redrick*, 48 F. Supp. 3d 91, 107 (D.D.C. 2014) (RJL).  To illustrate this point, consider *United States v. Halliman*, 923 F.2d 873 (D.C. Cir. 1991) (Thomas, J.).  There, exigent circumstances permitted law enforcement to search a portion of a suspect's hotel room. *Id.* at 880.  Law enforcement went further, however, in searching other areas for which there existed neither exigent circumstances nor a warrant.  *Id.* Although the evidence recovered served as *a* basis for a later warrant, police did not seek that later warrant *but for* the unlawfully-seized evidence, nor did the unlawfully-seized evidence play a dispositive role in the magistrate's decision to issue the later warrant.  *Id.* at 881-82.  Accordingly,

the evidence obtained from the later warrant was not subject to suppression where the warrant therefore relied on evidentiary bases independent from the tainted evidence.  *Id.* at 882.  *Halliman* therefore envisions two questions under such circumstances:  (1) would law enforcement have sought the later warrant regardless of the tainted evidence, and (2) was there probable cause for the later warrant absent the tainted evidence.  *See id.*

As to the first question, the officers' actions and testimony here support the counterfactual that they would have sought the subsequent warrant for the iCloud account irrespective of the information found on the iPhones.  When asked the question directly, Special Agent Gajkowski explicitly answered that she would have applied for the iCloud Warrant absent the information obtained in the iPhones. 6/8/23 Trans. at 85:25-86:1-4.  Her actions also signaled that there was already a plan in place to get a warrant to search the iCloud account before the officers discovered what was on the phone.  On the same day that investigators seized the two iPhones from the defendant, which had clearly not yet been searched, law enforcement also submitted a preservation request to Apple for the defendant's iCloud account before the iPhones had been analyzed.  *Supra at* 13.   As such, it is eminently clear from the factual record that it is the mere existence of the phones, and not their contents, that prompted law enforcement to seek the preservation request and, ultimately, the warrant for Defendant's iCloud account.

When asked why she waited as long as she did to actually seek the search warrant after submitting the preservation request, Agent Gajkowski indicated that there were more pressing matters ongoing in the investigation. 6/8/23 Trans. at 86:7-15.  Once the preservation request was filed, the information sought to be preserved must be retained for 90 days before a new renewed request to retain the specific records. 18 U.S.C. § 2703(f). Given that Agent Gajkowski sought the

iCloud Warrant well within the bounds of those 90 days, the two-month delay in applying for the iCloud Warrant is not particularly suspect, and her explanation fairly reasonable.

As to whether the magistrate would have found probable cause to search the iCloud account absent the phones' contents, it is evident that the probable cause for the Phone Warrant, which Defendant does not contest, carried over to the iCloud Warrant. Indeed, the affidavit in support of the iCloud Warrant copies those portions of the Phone Warrant verbatim. *Compare* Gov.'s Hrg. Ex. 4A *with* Gov.'s Hrg. Ex. 4C. As explained further above, each affidavit recounts AV-1's report of sexual assault, AV-1's demeanor on the day she reported, and Defendant's statements from voluntary interviews that indicated that he had iPhones that had relevant messages and information that would have been backed up to the iCloud. *Supra at* 12-13. Additionally, each warrant notes that Defendant admitted that he corresponded with AV-1 on his iPhones, and that iPhones are necessarily linked to iCloud storage. It further explained that iCloud storage often contains data associated with the use of iCloud-connected services, including email, images and videos, and other files. *Id.* iCloud could also be used to store iOS device backups, which could contain a user's photos and videos, messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, and other data. *Id.* at 25. So, there was a substantial basis to conclude that there was evidence of unlawful interactions between Defendant and AV-1 on Defendant's iCloud account. *Cf. United States v. Griffith*, 867 F.3d 1265, 1274 (D.C. Cir. 2017) (concluding that there is probable cause for a warrant as to a suspect's phone where the Government establishes that the suspect likely owns a phone and there is reason to believe that there is evidence on the phone).

To be sure, the iCloud Warrant also relies on the phones' contents. For example, the affidavit in support of the iCloud Warrant references video fragments and photos of several

different victims and Defendant's internet search history. *Supra at* 12-13. The contents influenced how the affidavit is structured—they are presented after the information that is also included in the Phone Warrant affidavit. *Id.* at 13. Yet, even omitting these additions, the earlier sections of the affidavit provide probable cause to search Defendant's iCloud account. As such, the contents of Defendant's phones could not have had a dispositive impact on the magistrate's decision to issue the warrant. Without that dispositive impact, the iCloud Warrant, and all subsequent warrants, remain valid. As such, the evidence seized pursuant to those warrants is not subject to suppression.

*     *     *

In sum, the Court concludes that the Phone Warrant was finally executed at the end of law enforcement's first interaction with Defendant. Each time law enforcement reengaged Defendant, they acted beyond the scope of the warrant, either in grossly negligent or intentional violation of law. Because the Government cannot show on this record that it would have inevitably discovered either phone's contents, the contents of both phones must be suppressed. Each subsequent warrant remains untainted by this earlier Fourth Amendment violation, however, so their fruits are not subject to suppression.

## B. Fifth Amendment

Defendant also argues that on the Due Process Clause and Self-Incrimination Clause require suppression of the fruits of each of the Government's searches. These arguments merit far less consideration.

As to the former, Defendant cannot establish a violation of the Due Process Clause, because he cannot come close to demonstrating that the police engaged in the sort of "egregious" behavior necessary to render a statement involuntary. *See United States v. Mohammed*, 693 F.3d 192, 198

(D.C. Cir. 2012) (suggesting that, at a minimum, a defendant must show the law enforcement threatened or injured the defendant during questioning); *Mincey v. Arizona*, 437 U.S. 385, 398-400 (1978) (confession involuntary where defendant had been wounded a few hours before question, was in hospital bed in an intensive care unit encumbered by tubes and needles, was complaining of intense pain, and gave confused and incoherent responses).  Here, each interaction took place in a public, hotel lobby, in calm and conversational tones.  *Supra* at 12.  As to the latter, it suffices to note that *Miranda*'s prophylactic rule applies only to testimonial statements, not tangible evidence.  *United States v. Patane*, 542 U.S. 630, 637 (2004).

As such, Defendant's Fifth Amendment challenge fails.

### III.   CONCLUSION

Having emerged from the thicket of these complex questions of criminal procedure, the Court's conclusion is nevertheless straightforward.  The phones' contents must be suppressed, but the remainder of the Government's evidence survives.  As such, the Court **GRANTS IN PART AND DENIES IN PART** Defendant's [190] Motion to Suppress.  An appropriate order accompanies this Memorandum Opinion.

**Dated:** October 28, 2023

    /s/
COLLEEN KOLLAR-KOTELLY
United States District Judge
