**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal No. 21-CR-00380 (CKK)** |
| | : | |
| **v.** | : | |
| | : | |
| **BRIAN JEFFREY RAYMOND,** | : | |
| | : | |
| **Defendant.** | : | |

<u>**UNITED STATES MEMORANDUM IN AID OF SENTENCING**</u>

The United States of America, by and through undersigned counsel, respectfully files this memorandum to aid the Court in sentencing the defendant, Brian J. Raymond, a serial offender who pleaded guilty to four counts of the Superseding Indictment involving four separate victims[1] and admitted to crimes against an additional 23 victims.[2]

Over the course of 14 years, the defendant engaged in an ongoing criminal scheme to exploit women. The defendant's goal was simple: to sexually and physically assault women when they were at their most vulnerable and to create a lasting collection of photographs and videos memorializing his abhorrent deeds. The defendant used dating applications to drum up conversations. He used the trust associated with his position as a U.S. government employee to convince women to meet in person. He offered drinks and snacks to conceal his true intentions. And he created opportunities to victimize women by drugging them.

The defendant lured victims to his apartment where, unbeknownst to them, another woman had just been drugged hours or days before. Some stood in his hallway where another woman had recently vomited. Some stumbled onto his bed where another woman had laid unconscious just

---

[1] Adult Victim (AV)-1, AV-7, AV-8, and AV-17.

[2] AV-2, AV-3, AV-4, AV-5, AV-6, AV-9, AV-10, AV-11, AV-12, AV-13, AV-14, AV-15, AV-16, AV-18, AV-19, AV-20, AV-21, AV-22, AV-23, AV-24, AV-25, AV-26, and AV-28.

the night before. After rendering the victims unconscious, the defendant spent hours moving, posing, and assaulting them. Emboldened each time he got away with it, the defendant recorded his conduct for his own sexual gratification. When confronted by law enforcement, he deleted evidence.

In the days that followed the druggings, while the victims were left feeling a deep sense of shame for being unable to remember what happened, blaming themselves and feeling extremely ill, the defendant spent that time bragging to a close friend about "successful" sexual conquests and adding the victims' names to a list, noting their age, ethnicity, and, at times, whether their breasts were real. When his victims asked the defendant about the night before, he played dumb. When they questioned his motives, he distracted them by mentioning his busy work schedule, his medical conditions, or the medical condition of a family member.

Before the conduct giving rise to the charges in this case, some of the victims were tricked into feeling a false sense of safety because they knew the defendant personally, sometimes for years. For others, they joined dating applications looking for friendship or companionship and were reassured by the defendant's position with the U.S. government. Regardless of how they met the defendant, however, all these women were violated. The harm caused is immeasurable, and the victims' lives are forever changed.

On November 7, 2023, the defendant admitted to drugging 27 different unsuspecting women between 2006 and 2020. He further admitted that, after rendering these women unconscious, he engaged in nonconsensual sexual acts with four women and nonconsensual sexual contact with six women. He also admitted that, of the 27 victims, he produced obscene material depicting 25 of them without their knowledge or permission.

The conduct in this case establishes that the defendant is a repeat offender, likely to offend

again, and whose behavior will only be curbed by a significant term of imprisonment. As noted

below, the defendant faces an advisory Guidelines range of 235 – 293 months' imprisonment.

Pursuant to the Plea Agreement, however, the parties agree that a sentence of not less than 24 years

(288 months) and not more than 30 years (360 months) is the appropriate sentence. For the reasons

outlined below, the government recommends a sentence of 30 years' imprisonment, to be followed

by a lifetime of supervised release. Such a sentence balances the factors outlined in 18 U.S.C.

§ 3553(a), is "sufficient, but not greater than necessary to comply with the purposes of sentencing,"

and will provide long-term protection to the community from potential future crimes by the

defendant. The United States additionally requests that the Court order the defendant to pay

restitution to the victims in this case, in the amount of $10,000 per victim, as agreed upon by the

parties.

## I.    FACTUAL AND PROCEDURAL BACKGROUND[3]

On November 7, 2023, the defendant pleaded guilty to four counts in the Superseding

Indictment involving four separate victims: Count One, Sexual Abuse of AV-1, in violation of 18

U.S.C. §§ 2242(2) and 7(9); Count Six, Abusive Sexual Contact with AV-7, in violation of 18

U.S.C. §§ 2244(a)(1) and 7(9); Count Seventeen, Coercion and Enticement of AV-17, in violation

of 18 U.S.C. § 2422(a); and Count Nineteen, Transportation of Obscene Material relating to AV-

8, in violation of 18 U.S.C. § 1462(a). *See* ECF No. 184, 357, 359.

As part of the Plea Agreement, the defendant admitted to drugging and sexually assaulting

ten separate women. *See* ECF No. 357 at 2-12.[4] Additionally, he admitted to drugging and then

---

[3] The government incorporates, by reference, the Statement of Offense in this case, filed at ECF
No. 357.

[4] AV-1, AV-4, AV-5, AV-6, AV-7, AV-9, AV-15, AV-17, AV-23, and AV-26.

photographing and/or recording a total of 25 women. ECF No. 357 at 13-14.[5] In the Plea Agreement, the defendant agreed that sixteen of the victims[6] met the definition of "vulnerable victim." *See* ECF No. 359 at 6. Finally, the defendant agreed that, for the purposes of the plea, AV-1 through AV-28 were all victims of the offense and entitled to the same rights as victims so designated under the Crime Victims' Rights Act ("CVRA"), 18 U.S.C. § 3771, to include the right to be reasonably heard at the sentencing hearing and the right to full and timely restitution. *See* ECF No. 359 at 11.

**A. Counts of Conviction: Sexual Abuse, Abusive Sexual Contact, Transportation of Obscene Material, and Coercion and Enticement**

**1. Count One: Sexual Assault of AV-1**

AV-1 met the defendant on the dating application Tinder, and, on May 31, 2020, she agreed to meet him at an outdoor shopping center in Mexico City, Mexico. In messages and during their subsequent date, the defendant spoke to AV-1 in her native language, Spanish. *See* Exhibit A (Tinder messages in Spanish and English, filed under seal).[7] AV-1 understood that the defendant was a U.S. government employee and therefore thought he was trustworthy. Nonetheless, she intentionally chose an outdoor area with which she was familiar and texted friends her location. The defendant brought a backpack containing travel mugs and wine, which he served to AV-1. After drinking a cup of wine, AV-1 began to feel dizzy and confused. The defendant served her a second cup. Shortly thereafter, AV-1 accompanied the defendant back to his embassy-leased apartment. AV-1 was unaware that hours before the defendant brought her to his apartment, he

---

[5] AV-2 through AV-25 and AV-28.

[6] AV-1, AV-3, AV-5 through AV-13, AV-19 through AV-21, AV-24, and AV-26.

[7] The exhibits referenced in this memorandum have been hand delivered to the Court and provided to defense via USAfx. The government will file a motion for leave to file under seal and include an exhibit list. That same exhibit list is attached to this opposition.

had sexually assaulted AV-7 in his bed.[8]

Once in the apartment, the defendant served AV-1 another glass of wine as well as some meat, cheese, and chocolates. Shortly after consuming some of the wine and snacks, AV-1 suddenly blacked out and has no memory of the hours that followed. Throughout their date, AV-1 had been sending her friend updates via text message. AV-1's text messages to her friend then went silent for a period of approximately three hours, during which her friend sent messages asking AV-1 if she was okay. AV-1 eventually sent her friend a message containing incoherent letters. AV-1 has no memory of sending that message.

When AV-1 regained consciousness, she was nude, and the defendant was on top of her sexually assaulting her.[9] As a result of the defendant's actions, AV-1 suffered a vaginal injury consistent with friction, an anal laceration compatible with the introduction of a hard, blunt object, generalized redness throughout her perianal area, bruises on her forearm, elbow, and knees, and a laceration on the inside of her cheek.

AV-1 ran out to the defendant's balcony, which faced a residential street, and screamed for help. The screaming drew attention from the defendant's neighbors and from people on the sidewalk below. Witnesses recalled that AV-1 was curled up in the corner of the defendant's balcony and appeared frightened. Neighbors came to AV-1's aid. When one male neighbor tried to help AV-1, she recoiled in fear. At least one neighbor who went to the defendant's apartment helped cover AV-1 with a blanket. AV-1 was so significantly impaired that when she was interviewed later that day, she did not recall being on the balcony screaming for help.

When questioned at his residence, the defendant denied any wrongdoing and subsequently

---

[8] *See Infra*, pp 6-8.

[9] Though AV-1 initially told one witness that she was raped and another witness that she had been abused, AV-1 now has no memory of sexual intercourse with the defendant.

suggested to others that AV-1 was mentally unstable and could not be believed. That same day, May 31, 2020, the defendant texted a close friend, Witness-1, "it was totally consensual," "we started to have sex but there will be no evidence of forced entry," and "it will be her word against mine and there will be evidence of sex but no bruises or violence." *See* Exhibit B at 3 (Witness-1 WhatsApp Messages, filed under seal). In a subsequent law enforcement interview on June 2, 2020, the defendant told agents that he "hope[s] she's okay mentally." The defendant suggested that there was something wrong with AV-1 because she had "inexplicably …seemed very upset." The defendant questioned AV-1's "motives" before suggesting "maybe she takes medication and the wine triggered a reaction."

In November 2023, the defendant admitted to administering a drug, intoxicant, or similar substance to AV-1, and he admitted that, once AV-1 was impaired, he engaged in sexual acts and sexual contact with AV-1 without her consent. *See* ECF No. 357 at ¶ 6.

### 2. Count Six: Sexual Assault and Recording of AV-7

AV-7 met the defendant on the dating application Bumble in May of 2020, and they exchanged messages for a few days before deciding to meet in person at his embassy-leased residence in Mexico City. In messages and in their subsequent in person conversations, the defendant spoke to AV-7 in her native language, Spanish. The defendant and AV-7 met at his embassy-leased apartment on May 30, 2020. In the hours before his date with AV-7, the defendant texted Witness-1, "…Today is just the one tonight – but actually coming direct to my place. So, if she shows there is probably a decent chance for success." *See* Sealed Exhibit B at 5.

AV-7 thought she would be safe going to the defendant's apartment because he represented to her that he worked at the U.S. Embassy and that his apartment was supplied by the U.S. government. When AV-7 arrived, the defendant served her ham, cheese, and strawberries. He also

served alcoholic beverages, tasting at least one of them before giving it to AV-7.

After the second drink, AV-7 and the defendant danced and kissed for a short period of time, pausing once to drink champagne. AV-7 drank some of the champagne, and the two stood to dance again. Upon standing, AV-7 noticed that she was extremely dizzy. AV-7 noted that the defendant seemed completely fine. AV-7 started to feel nauseous, so she ran to the hallway bathroom and vomited into the sink. The defendant came to check on her, and he had to hold her up while she finished vomiting. AV-7's last memory is of the defendant holding her and turning her body to maneuver her out of the small bathroom. AV-7 described her memory loss as sudden.

Without her knowledge, and while AV-7 was unconscious and incapable of consenting, the defendant took 77 photographs and four videos depicting AV-7, all created on May 30 and 31, 2020, over the course of approximately two hours and thirty minutes. The photographs and videos show AV-7 fully nude, unconscious, and lying on the defendant's bed. They depict the defendant's hand opening her eyelid and playing with her mouth. The defendant took several close-up photographs of AV-7's breasts and genitals. Notably, there is a photo in which AV-7 is on her back with her legs tightly closed. While nude and exposing his erect penis, the defendant straddles AV-7's body, placing each knee on either side of AV-7's legs and causing his inner thighs to touch her body. *See* Exhibit C (two photographs and one video, filed under seal).

AV-7's next clear memory was waking up in the defendant's bed, nude, with him asleep next to her. She felt sick and sleepy, and she recalled that she had vomited the night before. Upon waking, the defendant initiated sex with AV-7, who reported feeling obligated to have sex with the defendant because she felt ashamed for having gotten sick the night before. AV-7 recalled that the sexual intercourse and penetration caused her physical pain, as if she was sore from recent, unlubricated sex. AV-7 had a flash of memory from the night before, in which she was face down

7

on a bed with the defendant behind her and grabbing her. AV-7 ran to the bathroom and vomited

again. After AV-7 left the defendant's apartment, he texted Witness-1, "so last night was a success.

She was decent enough looks wise. About what I was expecting and at 26 was still fuckable. But

after 30, who knows. But she was cool and we had a nice time so it worked out. TBD if I will see

her again." *See* Sealed Exhibit B at 6.

On what appears to be a list of sexual conquests maintained by the defendant in his email

account, AV-7's name appears along with the corresponding month and year. *See* Exhibit D at 12

(Mortgage Email List, filed under seal).[10] In November 2023, the defendant admitted to

administering a drug, intoxicant, or similar substance to AV-7, and he admitted that, once AV-7

was impaired, he engaged in sexual acts and sexual contact with AV-7. *See* ECF No. 357 at ¶ 14.

Mere hours after AV-7 left the defendant's apartment on May 31, 2020, he left to meet AV-1 at a

shopping center. Later that same day, the defendant drugged and sexually assaulted AV-1.

---

[10] A forensic analysis of the defendant's Yahoo! email account revealed an email titled, "Mortgage Interest and Expenses." *See* Sealed Exhibit D. Approximately half-way through the document, various women's names are listed next to a number and a location and date. For example, "#91 [Woman Name] [Country] – [Age] – [Month and Year]." The list begins at number 61 and ends with number 143. There are approximately 20 additional women categorized by year (2014, 2015, 2016) for which no number is assigned. The defendant first sent himself a version of the email in June 2020, shortly after he was sent back to the United States and amidst an ongoing investigation into his sexual assault of AV-1. He sent himself an updated email adding women in October 2020. Law enforcement interviewed several potential witnesses in this case. Some of the women interviewed are on this list and some are not. Where the woman interviewed by investigators was on this list, there was some independent corroboration, either from the woman and/or from the defendant, that sexual intercourse (as opposed to sexual contact) occurred. For example, either the woman recalled sexual intercourse when speaking to investigators, and/or the defendant told Witness-1 in messages recovered during the investigation that he slept with the woman or that the night was a "success." Additionally, for at least one victim of uncharged conduct (AV-13), the victim felt like she had sex but had no memory of them having sex. When she asked the defendant whether they had sex, he denied it. This suggests that the defendant knew that AV-13 did not consent to sex.

### 3. Count Seventeen: Sexual Assault, Coercion and Enticement, and Recording of AV-17

AV-17 has known the defendant for over twenty years. When they were younger, AV-17 and the defendant had an on-again, off-again romantic relationship. Over time, they kept in touch, even when the defendant was stationed overseas. AV-17 has met the defendant's parents, and the defendant has met AV-17's family. In the decades she has known the defendant, AV-17 has not seen the defendant intoxicated. Generally speaking, according to AV-17, he would just "taste" drinks.

The defendant visited AV-17 in Chicago twice, in 2013 and 2014. During both visits to Chicago, AV-17 recalled blacking out. During the second visit, she recalled a memory flash where the defendant was in bed with her, hugging her from behind, and she could feel his erect penis. AV-17 asked the defendant if they had sex, and he said no. Though AV-17 was an experienced drinker and only blacked out when she drank with the defendant, she believed the defendant when he called her "silly" for questioning him and assumed she had drunk more than she realized.

In November 2015, AV-17 traveled to the Washington, D.C., area to visit the defendant. The two had a drink at the defendant's apartment, went to dinner, and went to a happy hour. Upon returning to the defendant's apartment, AV-17 suddenly blacked out. Her last memory was being in the defendant's kitchen with him holding her up.

Without her knowledge, and while AV-17 was unconscious and incapable of consenting, the defendant took six photographs of AV-17, all created on November 6, 2015. The photographs depict AV-17 nude, with her breasts exposed, and wearing underwear. She is depicted both on the floor and on the bed in the images. In a photograph, the defendant is holding AV-17's eyelid open. In another, the front of AV-17's underwear is pulled down, exposing her pubic area. *See* Exhibit E (three photographs, filed under seal).

AV-17 regained consciousness in the defendant's bed, wearing only underwear. AV-17 had deep scratches on her back and did not know how she got them. She had no memory of going into the defendant's bedroom or of taking off her clothes. As had happened before, AV-17 thought it was odd that she did not brush her teeth or remove her makeup, but when asked, the defendant assured AV-17 that she simply went straight to bed. AV-17 trusted the defendant and did not believe the defendant would do anything to hurt her.

In November 2023, the defendant admitted to administering a drug, intoxicant, or similar substance to AV-17, and he admitted that, once AV-17 was impaired, he engaged in sexual contact with AV-17. *See* ECF No. 357 at ¶ 34.

### 4. Count Nineteen: Assault and Recording of AV-8

AV-8 met the defendant on the dating application Tinder in March of 2020, and they exchanged messages for a few days before deciding to meet in person at a bar in Mexico City. In messages and during their subsequent dates, the defendant spoke to AV-8 in English and in her native language, Spanish. Before agreeing to a date, AV-8 used her friend network to confirm that the defendant was affiliated with the U.S. Embassy in Mexico and described trusting he was a good person as a result. At the defendant's suggestion, their first date was at a bar in his neighborhood where they talked for a little over an hour before AV-8 went home alone.

Their second date was at the defendant's embassy-leased apartment on March 27, 2020. Before AV-8 arrived at the defendant's apartment, the defendant texted Witness-1, "Bad start to the Colombian date. She pllanned [sic] to come by Uber but said she had a problem with Uber so had to drive her own car. Grrrr. That means she probably will drink very little. Not ideal." *See* Sealed Exhibit B at 8. After AV-8 left the next day, the defendant texted a close friend, "Last night was a lot of fun with [AV-8]. She stayed over-very good physical chemistry and she has a banging

bod-so I am on almost no sleep." *See* Sealed Exhibit B at 9. Unbeknownst to AV-8, and while AV-8 was unconscious and incapable of consenting, the defendant took 13 photographs and one video depicting AV-8, all created on March 27, 2020. The photographs and video show AV-8 fully nude, unconscious, and lying on the defendant's bed. They show close-ups of AV-8's breasts and genitals. In the video, the defendant is manipulating AV-8's arm while AV-8 is unconscious. AV-8 does not react. *See* Sealed Exhibit T-3.

The two met at the defendant's apartment several more times over the next month. AV-8 explained that each date was exactly the same: the defendant always put out a charcuterie board, they would drink wine, the defendant would talk for long stretches of time without showing any physical affection, and then they would have sex. AV-8 knew they had sex, but she did not remember the encounters. She had limited memories of being "in the act," and she'd often wake up in the defendant's bed nude or wearing only her underwear. After drinking with the defendant, AV-8 often felt terrible, sometimes vomited, and felt sick the following day.

On what appears to be a list of sexual conquests maintained by the defendant, AV-8's name appears along with the corresponding month and year. *See* Sealed Exhibit D at 11. In November 2023, the defendant admitted to knowingly rendering AV-8 unconscious, and the defendant admitted that, once AV-8 was unconscious and incapable of consenting, he produced obscene material depicting AV-8. *See* ECF No. 357 at ¶ 36-37, 42-44. Just two days before he produced the obscene material depicting AV-8, the defendant drugged and sexually assaulted AV-9. *See* ECF No. 357 at ¶ 10.

### B.  The Full Scope of the Defendant's Criminal Conduct

In addition to the counts of conviction, the defendant admitted in the statement of offense to specific facts related to his victimization of eleven additional women. He further admitted to

11

producing obscene material depicting 25 women, including the women named in the counts of conviction. The facts surrounding these additional women make clear the full scope of the defendant's conduct.

### 1.  The Defendant Sexually Assaulted Seven Additional Women

In addition to the underlying conduct supporting the counts of conviction, the defendant admitted to sexually assaulting seven additional women. Specifically, in addition to sexually assaulting AV-1 and AV-7, the defendant admitted to engaging in sexual acts with AV-9 and AV-6 and engaging in sexual contact with AV-4, AV-5, AV-23, AV-15, and AV-26. While the defendant met most of these women via online dating applications, at least one of these victims was also a U.S. government employee whom the defendant met while stationed abroad.

AV-9 met the defendant on the dating application Bumble in March of 2020, and the two exchanged messages before deciding to meet in person at a restaurant in Mexico City on March 25, 2020. In messages and during their subsequent date, the defendant spoke to AV-9 in her native language, Spanish. After the date, the defendant invited AV-9 to his embassy-leased apartment. The defendant had bragged that he worked at the U.S. Embassy and that the U.S. government was paying for his housing. AV-9 felt comforted by this information and accepted the defendant's invitation to go over to his apartment later that same night. Before AV-9 arrived, the defendant messaged Witness-1, "She just asked me to send an Uber to pick her up tonight…but that is a personal no for me unless I am definitely getting sex." *See* Sealed Exhibit B at 12. The defendant then said, "I suppose since it is only 4 bucks and I might have a chance to fuck her I will do it." *See* Sealed Exhibit B at 13. Hours later, AV-9 blacked out. Before blacking out, AV-9 thought the defendant was the perfect gentleman, recalling only that they kissed. Meanwhile, 15 videos and 20 photographs taken during that time period depict AV-9 unconscious and the defendant's hand

opening AV-9's unresponsive eyelid. Some images depict close-ups the defendant took of AV-9's breasts and genitals. In one video, the defendant is nude and lying next to an unconscious AV-9, cuddling with her body and manipulating her limbs while his erect penis is exposed. When AV-9 regained consciousness, she was nude and in the defendant's bed. *See* Exhibit F (three photographs and two videos, filed under seal).

In November 2023, the defendant admitted to administering a drug, intoxicant, or similar substance to AV-9, and he admitted that, once AV-9 was unconscious, he engaged in sexual acts and sexual contact with AV-9. *See* ECF No. 357 at ¶ 10. The next day, the defendant texted Witness-1, "Success last night…at least I salvaged my Wed." *See* Sealed Exhibit B at 14. On what appears to be a list of sexual conquests maintained by the defendant, AV-9's name appears along with the corresponding month and year. *See* Sealed Exhibit D at 11. The defendant drugged AV-8 two days later. *See* ECF No. 357 at ¶ 36-37, 42-44.

AV-6 met the defendant on the dating application Tinder in or around 2018. The two chatted for approximately one year before meeting in person in Mexico City in June of 2019. In messages and during their subsequent dates, the defendant spoke to AV-6 in her native language, Spanish. They went on several dates, including one at a movie theater and additional dates at the defendant's embassy-leased residence. During their first date at his apartment, the defendant offered AV-6 various alcoholic drinks to sample. AV-6 ended up staying at the defendant's apartment that night because she drank too much. She reported having sexual intercourse with the defendant and described it as consensual despite only being able to remember "flashes" of it. Their other dates at the defendant's apartment were similar. The two would drink and engage in sexual intercourse, and AV-6 could not recall the entire encounter.

In November 2023, the defendant admitted that he administered a drug, intoxicant, or

similar substance to AV-6 before engaging in sexual acts and sexual contact with her in both June and December 2019. *See* ECF No. 357 at ¶ 17. There are 29 photographs and six videos from June 23, 2019, and 35 photographs from December 21, 2019. In both sets, the defendant uses his hands to pull back AV-6's eyelids as AV-6 lies unconscious, and in both sets, there are closeup photographs of AV-6's breasts and genitals. In the videos from June 23, 2019, the defendant lifts AV-6's arm and drops it onto the bed several times. In one video, her face flinches, and the defendant jumps back, dropping the camera/phone in the process, causing the video to very briefly record his face, torso, and erect penis. *See* Exhibit G (three photographs and two videos, filed under seal). On what appears to be a list of sexual conquests maintained by the defendant, AV-6's name appears along with the corresponding month and year. *See* Sealed Exhibit D at 11.

AV-5 met the defendant on the dating application Tinder in May of 2019, and they exchanged messages for a few days before deciding to meet in person at a bar in Mexico City. In messages and during their subsequent date, the defendant spoke to AV-5 in her native language, Spanish. The defendant told AV-5 that he worked at the U.S. Embassy. On May 17, 2019, AV-5 went to the defendant's apartment, where he served cheese, ham, chocolates, and alcoholic beverages. AV-5's last memory was sitting in a chair, and her next memory was lying in a bed and sitting up to vomit. She recalled trying to clean it up and the defendant seeming upset. AV-5 felt ashamed, so she left shortly thereafter. Following that date, AV-5 reached out to the defendant, but felt that he did not seem interested.

In November 2023, the defendant admitted that he administered a drug, intoxicant, or similar substance to AV-5 before engaging in sexual contact with her. *See* ECF No. 357 at ¶ 19-20. When the defendant drugged AV-5 on May 17, his 25 photographs and 10 videos depict not only the defendant touching AV-5's inner thigh and grabbing AV-5's breast, but that while

unconscious, AV-5 struggled to breath. *See* Exhibit H (one photograph and one video, filed under seal). On what appears to be a list of sexual conquests maintained by the defendant, AV-5's name appears along with the corresponding month and year. *See* Sealed Exhibit D at 11.

AV-26 met the defendant on Tinder in February of 2019, and their first date was at a café in Mexico City. In messages and during their subsequent dates, the defendant spoke to AV-26 in her native language, Spanish. The defendant invited AV-26 to a second date at his embassy-leased residence. When she arrived, the defendant served her strawberries, cheese, and cookies and poured her a glass of wine. AV-26 began to feel ill, and she vomited in the bathroom. When she returned, she noticed that the defendant had refilled her glass. Shortly thereafter, AV-26 vomited in the bathroom a second time. When she returned to the living room, the two kissed on the couch. At that point, her memory began to lapse. AV-26 next remembered being in the bedroom with the defendant, not knowing how she got there. She was sitting on the bed and felt that she needed to vomit, at which point the defendant led her by the arm to his bathroom. AV-26's legs gave out, and she fell. The defendant held her hair while she vomited again. She recalled sitting on the floor, unable to get up. At some point, AV-26 awoke to feel the defendant's hand on her breast, resting between her inner and outer blouse. She recalls that the defendant was awake, and that he closed his eyes when she looked over at him and quickly pulled his hand away. AV-26 next remembered waking up in the defendant's bed, noticing that her pants were unbuttoned with the zipper pulled all the way down. She left his apartment and vomited again on her drive home.

In November 2023, the defendant admitted that he administered a drug, intoxicant, or similar substance to AV-26 before engaging in sexual contact with her. *See* ECF No. 357 at ¶ 21-22. The defendant admitted that, after he drugged AV-26, she vomited. When she finally stopped, the defendant moved her to his bed and began fondling her. *See* ECF No. 357 at ¶ 21-22.

### 2. The Defendant's Production of Obscene Material Reveals His Deliberate and Abusive Conduct and Blatant Disregard for Victims' Privacy and Welfare

The defendant admitted to administering a drug, intoxicant, or similar substance without the victims' knowledge and then photographing and recording them while they were unconscious and incapable of consenting. *See* ECF No. 357 at ¶ 36. More than 500 explicit images depicting 25 women were recovered from the defendant's devices and accounts. *See* Exhibit T (selection of photographs and videos depicting victims, filed under seal), Sealed Exhibit S (chart of total number of photographs and videos recovered from defendant's devices, filed under seal). The circumstances underlying the creation of this obscene material reveals the defendant was calculating and manipulative. He used his government position to make women feel safe and gain their trust. When useful, he used his medical condition to garner sympathy or his reassuring tone to quell victims' concerns.

For example, regarding the obscene material depicting AV-2, she met the defendant on the dating application Bumble in 2017. The two exchanged messages before deciding to meet in person at AV-2's residence in California in February of 2018. In messages and during their subsequent dates, the defendant spoke to AV-2 in English and in her native language, Spanish. AV-2 blacked out after drinking with the defendant. One of the last things she recalled observing was that the defendant did not seem drunk. AV-2 subsequently woke up naked lying next to the defendant, who had an erection. AV-2 noticed that the bed was wet. AV-2 felt as though she and the defendant had sex, but she did not ask him. AV-2 was sick for the remainder of the day. Later, AV-2 told the defendant that she did not like what happened, and they eventually stopped talking.

The defendant reached out to AV-2 in the fall of 2018 apologizing for the loss of contact and explaining that he had heart surgery. *See* Exhibit I (WhatsApp Messages, filed under seal).[11]

_____

[11] This exhibit contains excerpts from a lengthy conversation between the defendant and AV-2.

Feeling bad for the defendant, AV-2 began speaking with him again. In November 2018, the two met in Mexico City. Before going to dinner, the defendant brought a flask with tequila, which he offered to AV-2. By the time they got to dinner, AV-2 recalled feeling incredibly drowsy. While AV-2 remembered returning to her hotel, she has no memory of what happened thereafter. AV-2 regained consciousness in her hotel bed wearing only her bra and underwear and feeling incredibly sick. Unbeknownst to AV-2, the defendant took 77 photographs and 8 videos of AV-2 in which AV-2 is posed in different positions, her bra is pulled up to expose her breasts, and the defendant pulls down her underwear. *See, e.g.,* Exhibit J (four photographs and one video, filed under seal).[12] On what appears to be a list of sexual conquests maintained by the defendant, AV-2's name appears along with the corresponding month and year. *See* Sealed Exhibit D at 11.

As to the obscene material depicting AV-3, the defendant met AV-3 via the dating application Tinder in 2017 while residing in a foreign country. In messages and during their subsequent date, the defendant spoke to AV-3 in her native language, Spanish. In their conversations, the defendant referenced his government employment. In December 2017, after drinking a beverage provided by the defendant, AV-3 blacked out.[13] The next day, AV-3 was concerned that she had unprotected sex with the defendant, but she could not remember. She texted the defendant, "…I have a questions. Yesterday…well today that we were in bed…You took care

---

There are several friendly exchanges between the screenshots provided.

[12] In February 2018 and November 2018, the defendant took a total of 77 photographs and 8 videos of AV-2. The photos and video show her unconscious and in various stages of undress. They depict the defendant's hand moving her bra and pants to expose her breasts and genitals, as well as his hand opening her eyelid and manipulating her arms. The final photos from February 2018 depict AV-2 fully nude. *See* ECF No. 357 at ¶ 45-48.

[13] The defendant took 16 photographs and three videos. In some photographs an unconscious AV-3 is on her stomach; in others, she is on her back. As is a reoccurring theme, the defendant's images captured his penis. *See* ECF No. 357 at ¶ 52; *see also* Exhibit K (two photographs, filed under seal).

of yourself?" The defendant calmly responded, "hello, yes of course. Don't worry." *See* Exhibit L (WhatsApp Messages in Spanish and English, filed under seal). On what appears to be a list of sexual conquests maintained by the defendant, AV-3's name appears along with the corresponding month and year. *See* Sealed Exhibit D at 11.

The obscene material also demonstrates that the defendant often spent hours[14] moving and posing victims after he rendered them unconscious. Photographs of AV-3 depict her both on her stomach and on her back. Similarly, photographs show that AV-2 was clothed at the beginning of the series and unclothed at the end of the series, suggesting that the defendant undressed her. In another series, AV-16 is unconscious, lying face down on a tiled floor with her pants pulled down to expose the top of her underwear. A second photograph shows her lying face up on a carpeted floor with her head rested on a pillow and her bra pulled up to expose her breasts, again suggesting that the defendant moved her and manipulated her clothing. *See* Exhibit M (two photographs, filed under seal). Similar indications of the defendant moving and posing victims' bodies is evident in the obscene material depicting AV-18, AV-22, AV-23, and AV-25. *See* Sealed Exhibit T.

Finally, some of the obscene material revealed the severe condition the victims were in as a result of the defendant drugging them. For example, in the obscene material depicting AV-24, the photographs show that she vomited in the middle of the series and yet the defendant continued to pose her for additional photographs while she lay in her own vomit. *See* Exhibit N (three photographs, filed under seal). Several other women vomited in the defendant's presence, including AV-5, AV-7, AV-26.

---

[14] Photographs and videos of AV-2, AV-7, and AV-13, for example, were taken over the course of roughly two or more hours. Photographs and videos of AV-9 and AV-6 were taken over the course of approximately an hour. *See* Sealed Exhibit Q.

### 3.   Recovered Messages Reveal the Defendant's Deception and Manipulation

When women raised concerns, the defendant often took steps to convince them that nothing happened. For example, in November 2017, the defendant went on a date with AV-13, whom he met on the dating application Tinder while residing in a foreign country. In messages and during their subsequent date, the defendant spoke to AV-13 in her native language, Spanish. For their next date, they met at a shopping center, and the defendant supplied the alcohol. AV-13 became dizzy, and though the defendant invited her to his place, she decided to go home. During a subsequent date, the defendant made AV-13 drinks, and soon after, she blacked out. AV-13 woke up wearing one of the defendant's shirts and feeling as though she had sex the night before. Texts recovered from the defendant's iCloud revealed that AV-13 asked the defendant what happened and told him that she didn't remember anything. The defendant insisted that they only kissed, that AV-13 kissed him first, and that he did not know why AV-13 had no clothes on. He claimed he had a little hangover and that he did not remember anything, at one point stating, "do not worry. Seriously, nothing bad occurred – I swear." *See* Exhibit O (WhatsApp Messages in Spanish and English, filed under seal). Yet nine explicit photographs of AV-13 were recovered wherein her breasts are exposed. In some photographs, the bed sheet covering AV-13 had been pulled down to expose the lower half of AV-13's body. On what appears to be a list of sexual conquests maintained by the defendant, AV-13's name appears along with the corresponding month and year. *See* Sealed Exhibit D at 11.

The defendant similarly manipulated AV-22, who traveled to meet him in a foreign country in 2006. After the defendant served AV-22 alcoholic beverages, she lost consciousness. In recovered messages, AV-22 subsequently reached out to the defendant, stating, "Weird question for u – did I fall or hit my head on Saturday. I can't believe I cant remember anything at all, that

last shot did me in … The last thing I remember was laying down waiting to hear trance lol. But today my head was really sore and the right side of my body feels like I got bruised/pulled something, so I was wondering if I fell or something…?" The defendant replied, "I feel awful about the bruise – yes you did trip over the chair next to the bed. It really is in bad spot – too close to the bed if you ask me (especially in the dark). It did not look too serious when it happened and said it was nothing. I hope you are feeling better." *See* Exhibit P (Email, filed under seal).

In November 2023, the defendant admitted to knowingly rendering AV-22 unconscious, and the defendant admitted that, once AV-22 was unconscious and incapable of consenting, he produced obscene material depicting AV-22. *See* ECF No. 357 at ¶ 36-37, 53-54.

The defendant's façade continued even after he drugged women. For several women, including AV-10[15], recovered messages revealed that in the days that followed the assaults and/or production of obscene material, the defendant asked whether they were feeling better. The defendant's manipulation often resulted in women blaming themselves for losing consciousness, feeling ashamed, and apologizing to the defendant.

### 4.   The Defendant's Internet Searches Expose His Intentional Behavior

Analysis of the defendant's devices revealed pertinent internet searches and internet browsing history spanning from 2010 to 2020. *See* Exhibit Q (Timeline of Internet Searches, filed under seal). This search and browsing history reveal that the defendant searched the titles of certain drugs and substances, such as a 2010 search for "ambien and dissolve," a 2011 search for "ambien and alcohol side effects," and a 2018 search for "tequila and visine latina raped on first date."[16]

Additionally, the defendant routinely searched for pornography relating to drugged, drunk,

---

[15] On what appears to be a list of sexual conquests maintained by the defendant, AV-10's name appears along with the corresponding month and year. *See* Exhibit D at 11.

[16] The first two searches were via internet search engine. The last was a pornography website.

and/or passed out women, often visiting the internet websites depicting such material. At times, these searches happened in the days before or after the defendant went on a date with a woman that he later photographed and/or video recorded without her consent. For example, on May 13, 2017, the defendant viewed, "Sleeping Asian beauty." AV-4, who is Asian, was drugged and sexually abused the next day. Similarly, on September 15, 2018, the defendant searched for "Latina passed out." AV-12, who is Latina, was drugged on that same day. Days afterwards, on September 29, 2018, the defendant viewed, "Passed Out Woman Raped."

On November 17, 2018, the defendant viewed, "ex-gf drunk drugged stripped photo collection"; on November 19, 2018, the defendant viewed, "Video of Kelly passed out on GHB"; on November 27, 2018, the defendant searched "latina sleeping"; and on December 11, 2018, the defendant searched for "vodka & valium." AV-2, who is Latina, was drugged and assaulted on November 24, 2018.

On May 10, 2019, the defendant searched for the terms, "girl totally passed out." Obscene material depicting AV-11 was produced on May 17, 2019. A month later, on June 10, 2019, the defendant viewed, "Taking Advantage of Beautiful Pass-out Friend" and on June 18, 2019, he searched for the term "totally out." On June 23, 2019, AV-6 was drugged and sexually assaulted.

Furthermore, as outlined above, the defendant himself manipulated victims' eyes, arms, and mouths while they were unconscious. On November 18, 2019, the defendant viewed "I Fucked My Drunk, Passed Out Sister And She Won't Remember." On November 24, 2019, he viewed, "Passed out snoring feet and eyecheck" and "Limp Hand And Mouth Play On Sleeping Girl." On December 13, 2019, he viewed, "Abused, Passed Out, Drunk." And finally, on December 15, 2019, he searched the terms "drugged and snoring." AV-6 was again drugged and sexually assaulted on December 22, 2019.

On March 15, 2020, the defendant's internet history revealed searches for terms such as "drunk girl Won't wake up". Between March 26, 2020, and March 27, 2020, metadata indicates the explicit images of AV-8 and AV-9 were taken in Mexico City. Then, on April 1, 2020, the defendant's internet history revealed searches for terms such as "deep sleep Latina" and "passed out girl."

### 5. The Defendant's Conduct After Learning of the Investigation is Probative of His Willingness to Manipulate Others, Obstruct Justice, and Continue Abusing Women

The defendant's conduct was exposed in May 2020 after AV-1's report of sexual assault. He was interviewed by law enforcement agents on June 2 and June 6, 2020. His phones were seized. Around this same time, and after learning about the investigation, the defendant attempted to delete explicit photographs and videos depicting victims from his iCloud account. A search warrant for the defendant's Tinder account revealed that, even *after* his phones were seized and he knew he was under investigation, the defendant opened a new Tinder account. Between July 9, 2020, and August 24, 2020, during which the defendant knew he was under investigation for the sexual assault of AV-1, the defendant communicated with approximately 43 unique Tinder users. Analysis of the defendant's devices revealed that, during roughly the same time period, the defendant also communicated with women on the dating application Hinge. At least three of these women later complained of hangovers or being very tired. All three of the women who complained of a hangover or commented on the amount they drank were on what appears to be a list of sexual conquests maintained by the defendant. *See* Sealed Exhibit D at 12.[17]

---

[17] No explicit photographs or videos were recovered and none of these women reported nonconsensual conduct.

## II.      SENTENCING ANALYSIS AND RECOMMENDATION

The government joins U.S. Probation in finding that the Guidelines do not sufficiently account for the defendant's conduct but asserts that only a variance to the top of the agreed upon range, 30 years, will properly achieve the goals of sentencing in such an extraordinary case of wanton abuse.

The conduct that brings the defendant before the Court was not a one-time occurrence, nor a mistake. The defendant repeatedly assaulted unconscious women over the course of several years. Going a step further, he recorded those assaults. Moreover, he used his government position to lure his victims, and for years, he concealed his criminal conduct from his employer, friends, and family. The Court can, and should, consider this conduct when weighing the statutory sentencing factors enumerated in 18 U.S.C. § 3553(a), especially here, where the evidence of the defendant's ongoing criminal conduct is overwhelming. *See United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) (sentencing court may consider uncharged conduct, so long as that conduct has been proven by a preponderance of the evidence and the sentence does not exceed the statutory maximum for the crime of conviction).

Post *United States v. Booker*, 543 U.S. 220, 264 (2005), a sentencing court must follow the three-step process set forth by *Gall v. United States*, 552 U.S. 38 (2007). First, the court must properly determine the Guideline range. Second, if applicable, the court must determine whether to apply any of the Guidelines' departure policy statements to adjust the Guideline range. Third, the court must consider all the factors set forth in 18 U.S.C. § 3553(a) as a whole, including whether a variance—a sentence outside the advisory guideline system—is warranted.

A sentencing judge has "legal authority to sentence outside the [Guidelines] range either because he or she 'departs' from the range (as is permitted by certain Guidelines rules) or because

he or she chooses to 'vary' from the Guidelines by not applying them at all." *Chavez-Meza v. United States*, 585 U.S. 109, 112 (2018); *see also United States v. Murray*, 897 F.3d 298, 309 n.8 (D.C. Cir. 2018). Here, the applicable guideline range does not appropriately capture the defendant's conduct and an upward variance is warranted. Only a sentence of 30 years properly addresses the defendant's relentless victimization of women.

### A. The Defendant's Sentencing Guidelines Calculation

#### 1. Applicability of the Advisory Guidelines

Even though the Sentencing Guidelines are advisory, *United States v. Booker* provides that sentencing courts "must consult those Guidelines and take them into account when sentencing." 543 U.S. at 264; *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). The Supreme Court has noted that the Guidelines provide "the starting point and the initial benchmark" for sentencing. *Gall*, 590 U.S. at 49; *see also United States v. Dorcely*, 454 F.3d 366, 375 (D.C. Cir. 2006) ("*Booker* has not changed how the Guidelines range is to be calculated.") Moreover, the Guidelines' recommended sentencing range will ordinarily "reflect a rough approximation of sentences that might achieve [18 U.S.C.] § 3553(a)'s objectives." *Kimbrough v. United States*, 552 U.S. 85, 108-09 (2007) (*quoting Rita v. United States*, 551 U.S. 338, 347-50 (2007)); *Dorcely*, 454 F.3d at 376 (noting that "a sentence within a properly calculated Guidelines range is entitled to a rebuttable presumption of reasonableness"). To calculate a Guidelines sentence, a district court must first select the applicable offense guideline and then select the base offense level within that applicable offense guideline. *United States v. Flores*, 912 F.3d 613, 616 (D.C. Cir. 2019).

#### 2. Criminal History

The government concurs with the United States Probation's assessment of the defendant's criminal history score, as set forth in the Presentence Investigation Report ("PSR"). ECF No. 373

at ¶ 286. The total criminal history score is 0, placing the defendant in criminal history Category I. *Id.*

### 3. Total Offense Level and the Impact of the Plea Agreement

Under the advisory Guidelines, the total offense level is 38 and the Guidelines range for the offenses to which the defendant pleaded guilty is 235 months to 293 months, consistent with United States Probation's assessment as set forth in the PSR. ECF No. 373 at ¶ 283, 397. Here, however, the defendant pleaded guilty pursuant to Fed. R. Crim. Pro. 11(c)(1)(C), and thus agreed that a sentence of not less than 24 years and not more than 30 years of incarceration, followed by a lifetime of supervised release, is the appropriate sentence for the offenses to which the defendant pleaded guilty. *See* ECF No. 359 ¶ 4A (the parties may allocute for any sentence within the agreed sentencing range) and ¶ 5 ("but for the above-described agreed sentence. . .the sentence in this case would be determined by the Court, pursuant to the factors set forth in 18 U.S.C. § 3553(a), including a consideration of the Sentencing Guidelines. . . .").[18]

The Plea Agreement contemplated a total offense level of 40 and a Guidelines range of 292 months to 365 months. The Probation Office's guideline computation differs from the computation included in the Plea Agreement in that the two-level adjustment, pursuant to USSG §3A1.1(b)(2), for "large number of vulnerable victims," though contemplated by the Plea Agreement, is not applicable here because Counts One, Six, and Seventeen are specifically excluded from grouping under USSG §3D1.2(d), and therefore not subject to "expanded relevant conduct," pursuant to USSG §1B1.3.

---

[18]The Plea Agreement further states that, "solely for the purposes of calculating the applicable range under the Sentencing Guidelines, neither a downward nor upward departure from the Estimated Guidelines Range set forth above is warranted. The parties also agree that neither party will seek any offense level calculation different from the Estimated Offense Level Calculated above…" *See* ECF No. 359 ¶ 5C.

**B. The Defendant's Conduct Warrants an Upward Variance**

The government respectfully submits that the 18 U.S.C. § 3553(a) factors warrant an upward variance to 30 years' incarceration. The Supreme Court has noted that while the Guidelines provide "the starting point and the initial benchmark" for sentencing, they "are not the only consideration." *Gall*, 552 U.S. at 49–50.  Instead, the district court should consider all the § 3553(a) factors. *Id.* These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant" (18 U.S.C. § 3553(a)(1)); the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment (18 U.S.C. § 3553(a)(2)); the kinds of sentences available (18 U.S.C. § 3553(a)(3)); the Sentencing Guidelines and related Sentencing Commission policy statements (18 U.S.C. § 3553(a)(4) and (a)(5)); the need to avoid unwarranted sentencing disparities (18 U.S.C. § 3553(a)(6)); and the need to provide restitution to any victims of the offense (18 U.S.C. § 3553(a)(7)).

The district court may impose an upward variance based on the 18 U.S.C. § 3553(a) factors alone and must only "offer a justification compelling enough to support the degree of the variance and complete enough to allow for meaningful appellate review." *United States v. Jimenez*, 2024 U.S. Dist. LEXIS 19493, *6 (11th Cir. Aug. 5, 2024) (no abuse of discretion in trial court's upward variance of 90 months primarily due to the seriousness of the conduct). Additionally, the court may impose an upward variance that is based on the serious nature of the offense and the special circumstances involved. *Id.* Importantly, an upward variance well below the statutory maximum sentence indicates that the sentence is reasonable. *Id.*, citing *United States v. Riley*, 995 F.3d 1272, 1278 (11th Cir. 2021).

When conducting its analysis, "it is not error for a district court to enter sentencing variances based on factors already taken into account by the Advisory Guidelines, in cases in which the Guidelines do not fully account for those factors, or when a district court applies broader § 3553(a) considerations in granting the variance." *United States v. Ransom*, 756 F.3d 770, 775 (D.C. Cir. 2014) (citation and internal quotation marks omitted). In doing so, "the district court can rely on hearsay as evidence for its findings." *United States v. Miller*, 35 F.4th 807, 818 (D.C. Cir. 2022); *see also United States v. Jones*, 744 F.3d 1362, 1368 (D.C. Cir. 2014) ("Clear precedent permits hearsay to be used in sentencing decisions."). And the sentencing court can consider conduct by a defendant that was not charged. *See United States v. Settles*, 530 F.3d at 923.

Moreover, where the applicable Guidelines do not account for the full scope of a defendant's criminality, numerous courts have held that a variance is "expressly encouraged." *See, e.g., United States v. Leach*, 89 F.4th 189 (1st Cir. 2023) (conduct during offense, criminal history, and juvenile history justified an upward variance); *United States v. Bottorff*, 2024 U.S. App. LEXIS 13008 (11th Cir. May 30, 2024) (series of crimes unelected justified an upward variance); *United States v. Brown*, 634 Fed. App'x 477 (6th Cir. 2015) (in statutory rape case, where the Guidelines adequately considered the victim's age and the defendant's pattern of conduct, an upward variance was still warranted based on the brutality of the rapes, the pain the victim endured, the degradation of the victim, and the fact that the rapes stopped only because the defendant was caught in the act); *United States v. Springer*, 2008 U.S. Dist. LEXIS 141503 (D. N.M. Feb. 15, 2008) (upward variance to maximum sentence warranted where the Guidelines did not adequately account for aggravating circumstances relating to the culpability of the defendant, to include circumstances "indicating premeditation and an elaborate degree of preparation rather than an isolated opportunistic crime or a momentary loss of impulse control.").

Here, the Guidelines do not account for the full scope of the defendant's criminality. The defendant pleaded guilty to offenses involving four victims: the Sexual Abuse of AV-1; Abusive Sexual Contact with AV-7; Coercion and Enticement of AV-17; and Transportation of Obscene Material relating to AV-8. *See* ECF No. 184, 357, 359. Although the government has agreed to dismiss the remaining 21 Counts of the Superseding Indictment and not bring charges for the additional conduct relating to victims AV-1 through AV-28, as described in the Statement of Offense, the defendant has "full[y] and complete[ly] acknowledge[d]" that conduct through his plea of guilty. Specifically, in addition to sexually assaulting AV-1 and AV-7, the defendant admitted to engaging in nonconsensual sexual acts with AV-9 and engaging in nonconsensual sexual contact with AV-5, AV-6, AV-23, and AV-26. Counts related to all of those sexual assaults will be dismissed as part of the Plea Agreement.[19]

Also, the defendant admitted to administering a drug, intoxicant, or similar substance without these victims' knowledge and then photographing and recording them while they were unconscious and incapable of consenting. More than 500 explicit images depicting 25 women, including some of the women whom he sexually assaulted, were recovered from the defendant's devices and accounts. Seven counts related to the production and transportation of obscene material will be dismissed as part of the Plea Agreement.

Furthermore, there are numerous aggravating factors that warrant an upward variance, to include: 1) the sheer number of victims; 2) the use of a position of trust to gain access to them;

---

[19] The dismissed counts of the indictment include one count of Aggravated Sexual Abuse, in violation of 18 U.S.C. § 2241(b); one count of Sexual Abuse, in violation of 18 U.S.C. § 2242(2); four counts of Abusive Sexual Contact, in violation of 18 U.S.C. § 2244(a)(1); two counts of Coercion and Enticement to Travel, in violation of 18 U.S.C. § 2422(a); six counts of Transportation of Obscene Material, in violation of 18 U.S.C. § 1462; and one count of Transportation of Obscene Material, in violation of 18 U.S.C. §§ 1462 and 7(9). *See* ECF No. 184.

3) the degree of planning and coercion required to render them unconscious in a place where he could assault them; 4) how close in time the defendant assaulted numerous victims; 5) the defendant's manipulative conduct, which deterred victims from reporting what happened; and 6) the tremendous impact the defendant's conduct has had on the victims' lives. The defendant's criminal conduct was egregious and longstanding, which is why United States Probation recommended a sentence in excess of the defendant's Guidelines range. *See* ECF No. 374. The applicable Guidelines simply do not account for the full scope of the defendant's criminality. An analysis of the § 3553 factors confirms that only a sentence of 30 years' imprisonment followed by a lifetime of supervised release is appropriate.

### 1. Nature and Circumstances of the Offense

The defendant pleaded guilty to raping AV-1, sexually touching AV-7 without her permission, coercing and enticing AV-17 to travel across state lines for the purpose of sexually assaulting her, and producing obscene materials depicting AV-8, all after drugging the victims to deprive them of their ability to consent or protect themselves. Those four offenses, alone, demonstrate the heinous nature of the defendant's conduct. Yet the circumstances surrounding the defendant's offenses, as well as details about the defendant's ongoing criminal scheme to exploit women over more than a decade, adds significant gravity. The defendant admitted to drugging 27 different women between the years of 2006 and 2020. He further admitted that, after rendering these women unconscious, he engaged in sexual acts with four women and sexual contact with six women. He also admitted that, of the 27 victims, he produced obscene material depicting 25 of them.

The defendant lured these women by using the false sense of security created by his position with the U.S. government. He rendered them unconscious, and then took advantage of

them when they were in a vulnerable state. And, incredibly, he documented these atrocities. He photographed their nude bodies, often focusing on their genitals. He grabbed their breasts. He pressed his erect penis against them. He posed the unconscious women such that they touched their own breast and genitalia. He spread their legs. In an apparent attempt to assess the victims' responsiveness, he opened their eyelids and stuck his fingers in their mouths. AV-5 struggled to breath. AV-24 laid in her own vomit. But rather than display concern, the defendant kept recording and photographing the women. In fact, the defendant recorded himself abusing women, sometimes for *multiple hours* at a time— and he recorded his abusive conduct for over a decade, presumably so that he could relive his sexual exploits and thereby revictimize the women time and again, while adding further fuel to his sadistic desire for more criminal sexual conquests. These photographs and videos are conclusive evidence of the scope, breadth, and severity of the defendant's conduct, as well as the defendant's absolute disregard for others.

The defendant did this over and over again, to victim after victim. Over the years, his appetite for sexually assaulting women never subsided. Instead, it increased. He drugged AV-9 and engaged in sexual acts with her on March 25, 2020. Two days later, he drugged AV-8. Mere hours after sexually assaulting AV-7 on May 30, 2020, after AV-7 was vomiting in his government-leased apartment, the defendant brought AV-1 home and drugged and sexually assaulted her on May 31, 2020. The defendant assaulted women he had just met and women he had known for years. He assaulted women once, and, for others like AV-2, he lured them back by tapping into the sympathy they felt for him after a medical procedure. Shockingly, even after the defendant learned that he was under investigation, the defendant continued to pursue women on dating applications. Not only is the defendant's longstanding behavior manipulative and predatory, but the sheer number of victims and acts of victimization is indicative of the brazen and serious

nature of the offenses committed. The defendant acted dangerously and deliberately, and given these facts and circumstances, the Court should vary upwards, and the defendant should receive the maximum penalty under the Plea Agreement.

### 2. History and Characteristics

From August 2018 until June 1, 2020, the defendant, a career U.S. government employee, worked for the U.S. government and lived in U.S. Embassy-leased housing in Mexico. There, he used his government housing to engage in criminal sexual conduct, including sexual abuse, abusive sexual contact, and the creation and transportation of obscene materials. He used his government position to gain victims' trust. He used wine and tequila tastings to disguise his malicious intent. And then, when they were unable to voice their lack of consent or stop him, he undressed, photographed, recorded, and sexual assaulted these unsuspecting women. The defendant showed a blatant disregard for the danger his actions posed to the victims' wellbeing. A video of AV-5 depicts her struggling to breath. Photographs depict AV-24 lying in her own vomit as the defendant continued to photograph her.

The defendant engaged in this dangerous and depraved criminal conduct for *years*. The images of AV-22 were taken in 2006. The most recent images recovered are from 2020. And rather than being ashamed of his ongoing criminal conduct or showing any remorse or empathy for the dozens of women he victimized, the defendant kept and treasured these images, transporting images of vulnerable and abused women from country to country, device to device, all while playing the role of a law-abiding citizen. Neither friends nor family appeared to have had any idea that the defendant was violating women. The defendant proved himself in control and more than capable of concealing his brazen criminal conduct.

The defendant's attempt to blame his alcohol consumption, suggesting that he experienced

the same symptoms that many of the victims reported, is incredible. *See* ECF No. 373 at ¶ 368. Nothing could be further from the truth. The defendant knew what he was doing. This was no accident or misunderstanding. Indeed, several victims, including AV-17, who had known the defendant for over twenty years, as well as AV-2 and AV-7 indicated that the defendant did not appear himself to be intoxicated. And that is because the defendant did not invite women on dates as a pretext for drinking. The date was the pretext. In reality, the defendant invited the victims on dates to sexually assault them and to record them for his own sexual gratification. The alcohol was prominent only insofar as it was a tool to accomplish his goal. This fact is abundantly clear when looking at the defendant's search history. The searches for how drugs interact with alcohol, along with his unmistakable sexual interest in videos depicting the abuse of unconscious women is clear evidence of premeditation. And as to that premeditation, the Court need look no further than the defendant's messages to a close friend regarding AV-8. *See* Sealed Exhibit B at 8 ("Bad start to the Colombian date. She pllanned [sic] to come by Uber but said she had a problem with Uber so had to drive her own car. Grrrr. That means she probably will drink very little. Not ideal."). The victims' drinking was not the culprit. Nor was the defendant's drinking. This was no coincidence. As the defendant himself admitted, he intentionally caused the women to black out, to pass out. And he did so in order to assault and abuse them— and create photographs and videos for himself.

That the defendant suggests he might not remember his conduct tells this Court all it needs to know about this defendant's character. Text messages reveal that the defendant was fully capable of answering women's questions the next morning. He was more than willing to gaslight the women, often suggesting that the women drank too much and that, despite their instincts to the contrary, nothing had happened. He was eager to share his sexual conquests with his close friend, Witness-1, and notably, never complained in recovered messages of a hangover or commented

that he drank too much. He was meticulous in marking down women on his list. The defendant was calculated and measured. By drugging these women, he intentionally took away their ability to defend themselves or to report the sexual assaults. And while these women were drugged, he posed them. He played with them. He assaulted them— sometimes, for several hours. He was not incapacitated. He was not confused. His hand did not shake as he recorded them. He was in control. And his statements to the contrary only reveal his inability to appreciate the harm he caused or his dishonest and manipulative character – or both. Either way, his expressions of remorse ring hollow. Even with no criminal convictions, the facts of this case leave no doubt that the Court should be concerned about the defendant's violent behavior and risk of recidivism.[20]

### 3.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

*Brian drugged and abused me on several occasions, leaving me with memory gaps and a void that is impossible to fill.*

AV-8 Impact Statement, Sealed Exhibit R-5.

A 30-year sentence is proportionate to the severity of the defendant's offenses and the significant and long-lasting harm he has caused. This consideration, encompassed by Section 3553(a)(2)(A), is known as the "just desserts" concept and answers the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense. *See United States v. Irey*, 612 F.3d 1160, 1206 (11th Cir. 2010). The *Irey* court cited the Senate Report regarding this provision:

This purpose--essentially the "just desserts" concept--should be reflected clearly in

---

[20] While the psychological evaluation referenced in the PSR indicates that the defendant has a low risk of reoffending, that evaluation is based solely on the defendant's self-serving statements, the "Mortgage List," a small selection of the defendant's internet searches, and cherry-picked witness statements, including the statements of a woman who later learned via visual evidence that she had been sexually assaulted, all the while the defendant denied (in 2021) the full breadth of his conduct. ECF No. 373 at ¶¶ 353 – 359. Based on a review of the report, the evaluator did not view any photographs or videos.

all sentences; it is another way of saying that the sentence should reflect the gravity of the defendant's conduct. From the public's standpoint, the sentence should be of a type and length that will adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing a recurrence of the offense. (quoting S.Rep. No. 98-225, at 75-76, 1984 U.S.C.C.A.N. 3258-59).

*Id.*

Here, the defendant has admitted to committing serious offenses, and therefore only a serious sentence is appropriate. When the victims in this case regained consciousness, they blamed themselves for drinking too much. They were ashamed that they vomited in the defendant's apartment. Some lamented ruining their chances with a "perfect gentleman," someone vetted and trusted by the U.S. government. *See, e.g.*, AV-16 Impact Statement, Sealed Exhibit R-7. In her statement to the Court, AV-16 recalled waking up confused as to why she was wearing the defendant's shirt. But after speaking with the defendant, she felt appreciative that, after she vomited, the defendant took care of her and even changed her clothes. She *apologized* to the defendant. She was sad he did not want to go on another date. She blamed herself. *See* Sealed Exhibit R-7 (filed under seal).

Later, after the defendant's conduct had been revealed, AV-16 remembered feeling deceived and manipulated. *See* Sealed Exhibit R-7. AV-17 recalled being in shock, disbelief, and denial and described the defendant as a "man of many faces." *See* Sealed Exhibit R-8. Others described feelings tricked and manipulated. *See, e.g.,* AV-8 Impact Statement, Sealed Exhibit R-6 ("He was someone I trusted in view of his position") and AV-12 Impact Statement, Sealed Exhibit R-8 (stating that the defendant appeared kind and educated and that he worked for an agency that is supposed to protect the world from evil."). AV-18 described feeling overwhelmed with shock and disbelief. She remembers feeling shameful, filthy, and disgusted. *See* Sealed Exhibit R-9. AV-12 was terrified that by drugging her, the defendant put her life at risk. *See* Sealed Exhibit R-6. As AV-8 wrote in her statement to the Court,

> "Seeing myself manipulated by a sexual predator in videos is one of the saddest and most disgusting experiences I have ever had."

*See* Sealed Exhibit R-5 (filed under seal).

In the years that followed, the guilt and shame was immeasurable and felt, at times, insurmountable. *See, e.g.*, AV-2 Impact Statement, Sealed Exhibit R-2 ("I hated myself for having allowed you to come into my life"). AV-17 describes the incredible stress and anxiety, ultimately causing her to see a therapist. *See* Sealed Exhibit R-8. AV-1, AV-2, AV-7, and AV-8 describe seeking medical care to help them manage the ever-present effects of the defendant's conduct. *See* Sealed Exhibits R-1, R-2, R-4, R-5. In her statement to the Court, AV-7 describes breaking down. *See* Sealed Exhibit R-4. AV-1, AV-7, and AV-26 described how the mental anguish negatively affected their work. *See* Sealed Exhibits R-1, R-4, and R-11.

The victims often felt as though no one understood what they were going through. As AV-7 told the Court,

> "Fearing being judged ... I distanced myself from my family, unable to share with them what happened, which exacerbated my isolation."

*See* Sealed Exhibit R-4.

AV-26 similarly explained that sometimes friends and family did not understand. *See* Sealed Exhibit R-11. At other times, AV-1 and AV-8 felt as though they could not tell friends and family for fear of the judgement they would receive. *See* Sealed Exhibits R-1 and R-5.

In their statements, the victims' resulting fear of, or inability to, trust others is palpable. Often, their distrust of others turned inward towards themselves. As AV-3 stated:

> This has caused a drop in my self-esteem and sense of self, leading me to feel damaged, which has affected my self-confidence. I experienced a decrease in my ability to connect emotionally with other people which led me to isolate myself and have difficulty trusting others. It severely damaged my ability to form and maintain healthy relationships because trust in others was affected. It led to a fear of intimacy, difficulty in my sexual relationships, and the inability to set healthy

35

boundaries.

Impact Statement, Sealed Exhibit R-3; *see also* AV-8 Impact Statement, Sealed Exhibit R-5.

Victims blamed themselves for agreeing to meet a man via a dating application. AV-8 described

feeling disappointed in herself, judging herself. *See* Sealed Exhibit R-5. Even now, in her statement

to the Court, AV-24 opines that she should have been more careful. AV-26 described herself as

the "stupidest woman for having allowed this to happen." *See* Sealed Exhibit R-11. AV-2 told the

Court that she "unworthy of every good thing that came into [her] life." AV-1 described reading

the comments to news articles about what happened to her, being called a "whore" and wondering

whether things would be better if she was not alive.

The defendant's actions have long-lasting consequences:

- "…I have nightmares of seeing myself…" *See* AV-17 Impact Statement, Sealed Exhibit R-8.

- "The nights became a torment, with episodes of recurring nightmares." *See* AV-7 Impact Statement, Sealed Exhibit R-4.

- "[O]ne person's action can completely destroy someone else's stability." *See* AV-1 Impact Statement, Sealed Exhibit R-1.

- "I don't see any way of repairing it as I feel I've lost myself. I feel that I'm a completely different person to the one I was and who I worked so hard to build. I sometimes feel that I wish I'd never found out about all this because I don't like the person I now am" *See* AV-26 Impact Statement, Sealed Exhibit R-11.

As these agonized statements make clear, these victims will be struggling with the aftermath of

the defendant's abuse for many years to come. They are forever changed. A sentence of 30 years'

incarceration and a lifetime of supervised release would reflect the seriousness of the offense and

punishment for the long-term damage that the defendant has caused.

### 4.  The Need for the Sentence to Afford Adequate Deterrence and to Protect the Public from Future Crimes of the Defendant

Congress, the Supreme Court, and the Sentencing Commission believe general deterrence is a very important factor when considering an appropriate sentence. *See United States v. Fry*, 851 F.3d 1329, 1332 (D.C. Cir. 2017) (the sentence would deter Fry and "others who may be inclined in doing similar kinds of things."). Here, a sentence of 30 years will deter the defendant from future crimes, as well as others who may be inclined to sexually abuse women, record women without their permission, and then lie to victims and law enforcement – going as far as to delete evidence – to conceal their crimes. This sentence is appropriate given the defendant's long-term abuse in this case. This was not a crime of opportunity or a one-time lapse in judgement. Rather, the defendant engaged in an intentional, years-long course of conduct to sexually abuse women.

The defendant's past actions also establish the future danger he poses to women. He victimized nearly thirty women over fourteen years in multiple countries. By 2020, the frequency of his sexual assaults was almost frenetic. And he ensured the success of his criminal intentions by rendering the women unconscious. When faced with the consequences of his actions, the defendant proceeded to delete evidence. Despite being interviewed several times by law enforcement, the defendant created a new Tinder account, kept going on dates, and kept updating his list of sexual conquests. The defendant is a repeat offender whose conduct was stopped only when he was arrested and detained. A 30-year sentence is necessary to protect the public from the defendant.

### 5.  The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have been Found Guilty of Similar Conduct

Section 3553(a)(6) directs courts to consider avoiding *unwarranted* disparities among defendants "with similar records who have been found guilty of similar conduct." It "does not

require the district court to avoid sentencing disparities between defendants who might not be similarly situated." *United States v. Mattea*, 895 F.3d 762, 768 (D.C. Cir. 2018) (quoting *United States v. Guillermo Balleza*, 613 F.3d 432, 435 (5th Cir. 2010)). When an offense is uniquely serious, courts will consider the need to impose "stiffer sentences" that "justif[y] the risk of potential disparities." *United States v. Jones*, 846 F.3d 366, 372 (D.C. Cir. 2017); *see also United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) (concluding that a within-Guidelines sentence for a child-pornography offense did not produce an unwarranted disparity when the images distributed by the defendant "were much more aggressive and troubling than the images distributed by other offenders" who received lesser sentences). The defendant is a serial offender, and his repeated and multi-year abuse of women sets him apart from others. A 30-year sentence is appropriate and does not subject him to unwarranted disparities.

### 6.   An Upward Variance is Warranted

An analysis of the factors set forth in 18 U.S.C. § 3553(a) confirms that an upward variance is warranted. Courts have varied upwards under similar circumstances. For example, in *United States v. Warren*, 700 F.3d 528 (D.C. Cir. 2012), the D.C. Circuit affirmed the imposition of a 65-month term of incarceration, despite a Guidelines calculation of 27 to 33 months' imprisonment. There, the defendant, a high-level U.S. government official for the U.S. Embassy in Algeria, invited the victim, a Muslim woman and Algerian national (Person A), to his U.S. government housing, where he "served her adulterated alcoholic drinks that caused her to pass in and out of consciousness." *Id.* at 529-30. While she was semi-conscious, defendant Warren sexually assaulted her, engaging in sexual contact, but not intercourse. *Id.* Defendant Warren ultimately pleaded guilty to two counts of abusive sexual contact and unlawful possession of a firearm under 18 U.S.C. § 922(g)(3). The Court found that the above-Guideline variance of approximately twice the

Guideline term of imprisonment was appropriate because, inter alia, "(1) Warren was a high-level United States officer with diplomatic immunity; (2) he took a "calculated risk" in victimizing Person A, a married Muslim woman, who he believed would not complain to authorities (for religious reasons) and could not seek legal recourse because of Warren's diplomatic immunity; (3) Person A's victim impact statement was "overwhelming to read" because of the harm Warren caused to her life; (4) "there has to be a clear message that people should not abuse others in other cultures who may not be in a position to come forward and speak for themselves" and (5) if released, Warren would pose a danger to himself and the community based on his conduct on arrest." *Id*. at 531.

Many of the same reasons considered by the court in *Warren* are present here. Like Warren, the defendant was a high-level U.S. government employee who used that position to prey on foreign nationals less likely to report his conduct or question his motives. Like Warren, the defendant drugged his victims, rendering them unable to consent to sexual acts and contact. But, unlike Warren, the defendant is before the Court having admitted to abusing 27 different women, representing at least five distinct countries, over the course of approximately 14 years. The defendant's history of victimizing women is lengthy and shocking. Furthermore, his conduct was escalating. He assaulted AV-8 and AV-9 within days of one another. He raped AV-1 within hours of AV-7 leaving his apartment. And finally, the defendant's absolute disregard for the law, no matter where he was and no matter whether he was on the verge of getting caught, should greatly concern this Court that he will reoffend. Here, the justification for an upward variance is significant. *See United States v. Brevard*, 18 F.4th 722, 726 (D.C. Cir. 2021) ("The [judge] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.") (citing *Gall*, 552 U.S. at 50).

### C.  The Need to Provide Restitution

The victims are entitled to restitution for the full amount of the losses suffered at the hands of the defendant. The Victim and Witness Protection Act (VPWA), 18 U.S.C. § 3663, instructs that the court "may order, in addition to … any other penalty authorized by law, that the defendant make restitution to any victim of such offense…" In other words, the VWPA "provides federal courts with discretionary authority to order restitution to victims of most federal crimes," *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).[21] "[T]he district court may also 'order restitution in any criminal case to the extent agreed to by the parties in a plea agreement.'" 18 U.S.C. § 3663(a)(3); *see also United States v. Anderson*, 545 F.3d 1072, 1077–78 (D.C. Cir. 2008). Where the offense results in "bodily injury" to a victim, including an offense under chapter 109A or 110, a court may require that the defendant "pay an amount equal to the cost of necessary medical and related professional services and devices relating to physical, psychiatric, and psychological care, including nonmedical care and treatment rendered in accordance with a method of healing recognized by the law of the place of treatment." 18 U.S.C. § 3663(b)(2)(A). Although Section 3663 does not define "bodily injury," the term is defined in Chapter 110A of Title 18 covering crimes of domestic violence and stalking. Under Chapter 110A, "bodily injury means any act, except one done in self-defense, that results in physical injury or sexual abuse." *Id.* at § 2266. Under such a definition, the victims in this case have suffered "bodily injury" and their necessary therapeutic treatment should be compensated by the defendant.

Pursuant to 18 U.S.C. § 2248, restitution is mandatory for the offenses of sex abuse in violation of 18 U.S.C. § 2242(2) and abusive sexual contact in violation of 18 U.S.C. § 2244(a)(1)

---

[21] In contrast, the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A instructs that restitution is mandatory for a subset of crimes, including a "crime of violence," as defined by section 16 of Title 18, "in which an identifiable victim or victims have suffered a physical injury or pecuniary loss. 18 U.S.C. § 3663A(c)(1); *see also Papagno*, 639 F.3d at 1096.

as long as the offense proximately caused the victims' losses. *See* 18 U.S.C. §§ 2248(a), (b)(4), and (b)(3)(F); *see also Paroline v. United States*, 572 U.S. 434, 445-448 (2014). The order of restitution "shall be issued and enforced in accordance with [Section] 3664 in the same manner as an order under" [Section] 3663A." *See* 18 U.S.C. § 2248(b)(2). Furthermore, the order of restitution "shall direct the defendant to pay ... the full amount of the victim's losses," as determined in accordance with Section 3664. 18 U.S.C. § 2248(b)(1), (2). Finally, district court "may not decline to issue an order [of restitution] under this section because of ... the economic circumstances of the defendant." 18 U.S.C. § 2248(b)(4)(B).

Similarly, Section 2429 mandates restitution for the offense of coercion and enticement, in violation of 18 U.S.C. § 2422(a). *See* 18 U.S.C. §§ 2429(a) and (b)(1).[22] The order of restitution "shall be issued and enforced in accordance with [Section] 3664 in the same manner as an order under [Section] 3663A." *See* 18 U.S.C. § 2429(b)(2). Under the statute, the restitution order "shall" direct the defendant to pay the "full amount of the victim's losses." § 2429(b)(1). Pursuant to § 3664(f)(1)(a), the Court should order full restitution, without regard to the economic circumstances of the defendant.

For both Sections 2248 and 2429, the "full amount of the victim's losses" is defined as any costs incurred by the victim for:

(A) Medical services relating to physical, psychiatric, or psychological care;

(B) Physical and occupational therapy or rehabilitation;

(C) Necessary transportation, temporary housing, and child care expenses;

(D) Lost income;

(E) Attorneys' fees, as well as other costs incurred; and

---

[22] Section 3664(e) provides that the government has the burden to demonstrate by a preponderance of the evidence "the amount of the loss sustained by a victim as a result of the offense."

(F) Any other losses suffered by the victim as a proximate result of the offense.

18 U.S.C. 2248(b)(3)(F); 18 U.S.C. § 2259(b)(3); *see also United States v. Hite*, 113 F. Supp. 3d 91, 94 (D.D.C. 2015).

Here, the defendant has agreed that the victims are entitled to restitution. Specifically, the defendant agreed to:

> [P]ay restitution to all victims associated with [the defendant's] conduct charged in all counts of the Superseding Indictment, to include any counts that will be dismissed at sentencing, all victims identified in the Statement of Offense, and all victims of your client's criminal conduct between 2006 and 2020. This includes any victims who were photographed while fully or partially nude and unconscious, depicted in any of the obscene images and videos transported and possessed by [the defendant] on any digital devices and un any online accounts.

In addition to the terms of the Plea Agreement, the government respectfully requests that the Court to consider the Victim Impact Statements that were submitted to the Court regarding the victims' ongoing need for psychological support as well as other expenses borne by the victims because of the defendant's criminal conduct, including loss of income and/or employment. Additionally, future psychological treatment may be needed throughout the victims' lives. In addition to the costs associated with each treatment session and any necessary medications, the victims will incur costs for the associated necessary transportation and loss of income associated with the disruption in their work schedules to attend therapy. In consideration of the victims' projected immediate and future therapeutic needs, as well as the actual costs incurred as a result of the defendant's criminal conduct, the government respectfully requests restitution for each victim.

The government must establish a restitution amount by a preponderance of the evidence. 18 U.S.C. § 3664(e). The calculation need not be perfect. "Rather, the government must establish the amount of the victim's loss with 'reasonable certainty.'" *United States v. Johnson*, 680 F.

App'x 194, 200 (4th Cir. 2017) (quoting *United States v. Laney*, 189 F.3d 954, 967 n.14 (9th Cir. 1999)); *United States v. Anderson*, 741 F.3d 938, 954 (9th Cir. 2013) (reasonable estimate will suffice); *United States v. Williams*, 319 F. Supp. 3d 812, 816 (E.D. Va. 2018) (quoting *In re Sealed Case*, 702 F.3d 59, 66 (D.C. Cir. 2012)). "[S]ome degree of approximation' is acceptable," and courts should "resolve uncertainties with a view towards achieving fairness to the victim." *United States v. Kearney*, 672 F.3d 81, 100 (1st Cir. 2012) (quoting *United States v. Monzel*, 641 F.3d 528, 540 (D.C. Cir. 2011)) (quotation marks omitted).

"Moreover, when determining the appropriate amount of restitution, courts have determined that they 'may consider hearsay evidence that bears minimal indicia of reliability so long as the defendant is given an opportunity to refute that evidence.'" *Johnson*, 680 F. App'x at 200 (quoting *United States v. Bourne*, 130 F.3d 1444, 1447 (11th Cir. 1997)) (accepting a letter from the victim's guardian relaying the consensus opinion among the victim's counselors about her likely future counseling needs).

Here, the cost of ongoing therapy informs the estimated future cost of treatment for the victims. State and federal crime victim funds have paid an estimated $2,500 to $5,000 a year per victim to provide therapeutic service.[23] These figures do not take into account those victims who sought care from private providers, nor does it contemplate the loss of income experienced by some of the victims. Even setting aside those estimates, however, the defendant agreed to pay restitution in the amount of $10,000 per victim, provided they are identified at or before the time of sentencing.[24] The government submits, and the defendant has agreed, that this amount is a

---

[23] Depending on a variety of factors, including location of therapist, number of sessions, and hourly rate.

[24] There are 28 victims. Of those 28, the government has located, identified, and made contact with 26 of them. The government is prepared to provide contact information for purposes of restitution.

reasonable estimate of the wage and medical and associated costs that the victims have and will incur as a result of their physical injuries and sexual abuse.

## III.    CONCLUSION

The government submits that a sentence of 30 years' incarceration and lifetime supervised release is reasonable in this case and is "sufficient, but not greater than necessary to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). The Government further requests that the Court order the defendant to pay restitution in the amount of $10,000 to the victims identified in the Statement of Facts and Plea Agreement. Finally, the government requests the conditions of supervision recommended by U.S. Probation, to include computer search and monitoring of the defendant's online activities; no contact with the victims named in this case; and an international travel restriction. *See* ECF No. 373 at ¶¶ 353 – 359; ECF No. 374 at 5.


Respectfully Submitted,

MATTHEW M. GRAVES                    NICOLE M. ARGENTIERI
UNITED STATES ATTORNEY               PRINCIPAL DEPUTY ASSISTANT
District of Columbia                 ATTORNEY GENERAL
                                     Head of the Criminal Division
                                     U.S. Department of Justice
                                     Criminal Division


/s/_____           /s/_____
Meredith E. Mayer-Dempsey            Angela N. Buckner
NY Bar No. 5213202                   DC Bar No. 1022880
Assistant United States Attorney     Katharine A. Wagner
United States Attorney's Office      NY Bar No. 479825
for the District of Columbia         Trial Attorneys
601 D Street, Northwest              U.S. Dept. of Justice, Criminal Division
Washington, D.C. 20530               Human Rights and Special Prosecutions
(202) 252-7259                       1301 New York Avenue, Northwest
Meredith.Mayer-Dempsey@usdoj.gov     Washington, D.C. 20530
                                     (202) 616-0238
                                     202-514-4584
                                     Angela.Buckner.2@usdoj.gov
                                     Katharine.Wagner@usdoj.gov